# EXHIBIT A

**Table of Contents**


I. Introduction 1

II. Overview of Medicaid 2

A. The Differences Between Medicaid and Medicare 2

B. Applicable Federal Standards 3

C. CMS Approval of State Plans 5

III. Overview of the Medicaid Pharmacy Benefit 6

A. Medicaid's Drug Distribution Network 6

B. Medicaid's Access Requirements 6

C. General Reimbursement Parameters 8

IV. Generic Drugs: Role and Reimbursement 10

A. The Generic Drug Market 10

B. Reimbursement of Generic Drugs by Commercial Insurers and Other Third-Party Payers 11

V. Medicaid and the Role of the State 15

A. The Information Available to State Medicaid Programs 15

B. The Tools Available to a State Medicaid Program 17

C. Requirements for State Action 26

D. The Differing Outcomes 27

VI. The Medicaid Rebate Program 28

A. OBRA '90 28

B. The Medicaid Rebate Agreement 29

C. Calculating Rebates 30

D. The Mechanics of the Medicaid Rebate Program 31

VII. Current Developments and Conclusion 33

A. The Deficit Reduction Act of 2005 33

B. Conclusions 34

## I. Introduction[1]



Good day, your honor. I'm Fiona Scott-Morton, Professor of Economics at the School of Management of Yale University. This tutorial is submitted on behalf of the defendants in the case of Commonwealth of Massachusetts vs. Mylan Laboratories, Inc. (et al.)

The purpose of this tutorial is to give you an overview of how Medicaid manages the reimbursement of drugs provided to Medicaid recipients. This tutorial is divided into five main sections, each of which covers an important topic relating to Medicaid and its pharmacy benefit.




In the first section, I provide an overview of the Medicaid program, including some important events in its history.

In the second part, I lay out some of the basic concepts and procedures that guide state Medicaid programs in setting reimbursement levels for prescription drugs in general.

In the third part, I discuss the role that generic drugs have played and continue to play in the Medicaid program. In particular, this section covers the key concepts and mechanisms involved in Medicaid's reimbursement of pharmacies for generic drugs.

In the fourth part, I talk about the various resources and tools states use to balance cost and access when setting reimbursement rates for drugs.

Finally, the fifth part of this tutorial covers the Medicaid rebate program. It discusses the origin of manufacturer rebates, explains how they work, and situates the rebate program in the overall context of Medicaid.

---

[1] Consistent with this Court's Order for Tutorial Regarding Pharmaceutical Reimbursement under Medicaid, this Tutorial when presented without the accompanying graphics is twenty-eight pages.

## II. Overview of Medicaid




Medicaid is a joint federal-state program that was established by the Social Security Act of 1965 to help provide medical care to needy Americans.[2]

Medicaid is currently our largest and most expensive health care program, providing assistance to over 50 million Americans.[3]

### A. The Differences Between Medicaid and Medicare

Medicaid is different from the similarly-named Medicare program in a number of important ways.




The eligible population served by these programs is different. Medicare serves people age 65 or older, people under age 65 with certain disabilities, and people of all ages with end stage renal disease. In contrast, Medicaid is a social welfare program intended to provide medical assistance to financially needy individuals and families.

Second, unlike Medicare, which is funded and administered by the federal government, Medicaid programs are jointly funded and administered by the federal government and the various state Medicaid agencies.[4] Under Medicaid, each state devises its own independently run program subject to certain federal statutory requirements and approval by the federal government.[5] To receive federal matching funds (which can range from 50% to 83%), the state's program must meet the minimum statutory requirements imposed by the federal government.[6]

---

[2] Social Security Act, 42 U.S.C. § 1396.
[3] The Henry J. Kaiser Family Foundation, *Medicaid: Fiscal Challenges to Coverage* (Aug. 2003), available at http://www.kff.org/medicaid/loader.cfm?url=/commonspot/security/getfile.cfm&PageID=31732. (last visited Feb 25, 2004).
[4] 42 U.S.C. § 1396(a).
[5] 42 U.S.C. § 1396r-8(d).
[6] 42 U.S.C. § 1396(b).

Third, the prescription drugs covered under Medicare and Medicaid are very different. Prior to 2006 and the passage of the Medicare Part D benefit, Medicare coverage was limited for the most part to physician-administered drugs. The Medicaid program that we are discussing today, in contrast, largely covers pharmacy-dispensed, self-administered drugs, such as pills and tablets, and has done so for a long time.

Another significant difference is that Medicare beneficiaries are required to make a 20% co-payment for all prescription drugs received. Most Medicaid beneficiaries pay nothing, or the co-payments applicable in some states are small, flat amounts, not more than a few dollars. For example, for most of the relevant time period, the co-payment in Massachusetts was 50 cents.

### B. Applicable Federal Standards

The federal government places some limits on state Medicaid expenditures (since it is footing half or more of the bill).[7] However, states have considerable flexibility in the way they implement their Medicaid programs.




To be eligible to receive federal funding, the federal government requires that a state's program meet certain minimum standards. The states individually administer and control their own programs within the broad parameters set by the federal government.[8]

Every participating state must submit a State Plan, and any amendment to it, for approval by the Centers for Medicare and Medicaid Services (known as "CMS").[9] (During this tutorial, I will sometimes speak of "the Federal government," "the Federal Medicaid program," "HCFA", and "CMS," but for practical purposes, in the context of Medicaid, they are synonymous.)

---

[7] 42 U.S.C. § 1396(b).
[8] 42 U.S.C. § 1396r-8(d).
[9] 42 C.F.R. § 430.10.




Each state's reimbursement methodology is set forth in its State Plan, which is created by the state and approved by the federal government.[10] Once the State Plan is approved, in order to receive federal funding, the state must follow the Plan.[11] States also have to certify compliance with their plan periodically. As to the reimbursement levels for certain drugs, states must certify compliance annually.

At the very highest level, the federal government says that there are services that a state must provide, and services that a state may provide if it chooses.[12] As a result, there is a wide variation in Medicaid plans state by state.[13] However, while it is optional to provide a prescription drug benefit, in practice every state finds it necessary to cover prescription drugs.[14] In fact, Medicaid has long provided drug benefits to patients.




Although Medicaid has been providing this prescription drug benefit for a long time, things changed dramatically in 1990 with the passage of a new law, called OBRA '90.[15] OBRA '90 created the Medicaid Rebate Program.

I will return to the details of the Medicaid Rebate Program and OBRA '90 in Section 5, but for now it is important to keep in mind that OBRA '90 significantly increased the scope of prescription drug coverage.

At the same time, it reduced the cost to the Medicaid program of reimbursing for covered drugs on a per prescription basis by the amount of the rebate paid by the manufacturers to the Medicaid program.

---

[10] 42 C.F.R. § 430.14; 42 C.F.R. § 430.32.
[11] 42 U.S.C. § 1396(a).
[12] 42 U.S.C. § 1396r-8(d).
[13] *See, e.g.*, Pharmaceutical Benefits 2001, National Pharmaceutical Council, available at http://www.npcnow.org/resources/PharmBenefitsMedicaid.asp (last visited April 16, 2008).
[14] *Id.*
[15] Omnibus Budget Reconciliation Act of 1990 ("OBRA 90"), Pub. L. 101-508, 104 Stat. 1388 (1990).

OBRA '90 was significant for another reason as well. The Rebate Agreement that manufacturers were required to sign to participate in the program requires manufacturers to submit to CMS on a quarterly basis NDC-level information about the average selling price to wholesalers of all drugs being reimbursed by Medicaid. As I will cover in more detail later, the standard Medicaid Rebate Agreement and a federal statute define how manufacturers are to calculate these average prices to wholesalers, commonly known as Average Manufacturers Price or AMPs.[16] For now, it suffices to say that, since 1991, CMS has had – on an NDC-level basis – quarterly information about a discounted, average selling price to wholesalers of every drug reimbursed by Medicaid.

### C. CMS Approval of State Plans




As I mentioned a moment ago, one of CMS' responsibilities in administering the Medicaid program at the federal level is to approve state Medicaid plans.

In approving state Medicaid plans, CMS has available to it information from a number of sources. First, states submit information to justify the reimbursement rate set forth in their plans.




Second, as I was describing a moment ago, under the Rebate Agreements, CMS would have received NDC-level information about average selling prices to wholesalers of all drugs being reimbursed by Medicaid, or AMPs.

Third, CMS also had available to it reports from the Office of the Inspector General and other agencies— many of which compared discounts in the marketplace with published prices— and other information that was generally available in the marketplace about the selling prices for manufacturers' drugs.

---

[16] 42 U.S.C. 1396r-8.

## III. Overview of the Medicaid Pharmacy Benefit

### A. Medicaid's Drug Distribution Network




Before I explain what objectives Medicaid is trying to achieve and how it determines a reimbursement rate to achieve those objectives, I think it is important to pause to note how the Medicaid program has chosen to deliver its prescription drug benefit. It has not chosen, like the Veterans Benefits Administration, for example, to create its own distribution network. Rather, Medicaid has sought to take advantage of the existing distribution network—the same network used by insurance companies and other payers—to distribute drugs, namely retail pharmacies.

Let me now explain the significance of that choice.

Pharmacies are not required to participate in the Medicaid program. This means that the state has to pay them enough so that they're willing to participate. In other words, they have to earn enough in reimbursement from serving Medicaid patients so that they're willing to enroll in the program, which then gives access to Medicaid beneficiaries.

Because participation in the program is voluntary for retail pharmacies, states must constantly balance the need to control the cost of reimbursement for prescription drugs with the need to keep pharmacies in the Medicaid program.

### B. Medicaid's Access Requirements




The single, most important requirement that the federal government imposes on state Medicaid programs is an access requirement. Medicaid, by statute, requires that states provide equal access to medical services for Medicaid recipients.[17] According to federal regulations, Medicaid recipients must have

[17] 42 U.S.C. § 1396a(a)(30)(A).

the same access to medical services and pharmaceuticals as the general population.[18]




So, in practice, this means that a state has to have all or almost all of the pharmacies in the state participating in the Medicaid program.

A state can't have just a few pharmacies in a few locations participating in the Medicaid program because that wouldn't allow equal access to all its Medicaid patients across the state.

Deciding how much Medicaid should reimburse a pharmacy is, thus, further affected by the realities of the marketplace. Different providers have different operating costs.




For example, a single independent pharmacy will typically pay more for a drug than a large chain pharmacy like Rite Aid, which buys drugs in greater volumes and, thus, can negotiate lower prices with wholesalers and manufacturers.

These differences need to be taken into account when setting the reimbursement rate if the state wants to keep the high-cost, independent pharmacy in the Medicaid program. Accordingly, the state must balance its desire to control costs with the need to reimburse these higher-cost providers at a rate sufficient to ensure broader access to care for Medicaid recipients.




To balance cost and access, the federal government and the states have developed a number of concepts, tools, and procedures to ensure that they are paying appropriate reimbursements for prescription drugs – not too high (which would be a waste of taxpayer dollars), and not too low (which would reduce the incentive for pharmacists to remain in the Medicaid program).

---

[18] *Id.*

### C. General Reimbursement Parameters

The Federal government has established a general framework based on the concept of Estimated Acquisition Cost or EAC within which reimbursement takes place, although that framework is most applicable as a practical matter to branded, not generic, drugs.[19] This case is exclusively about generic drugs, and I will explain in a few minutes that Medicaid's approach to generic drug reimbursement has additional, different components, which encourage more experimentation and variability at the state level.

In order to control costs, the federal government generally requires that drugs be reimbursed in the aggregate at the lower of the Estimated Acquisition Cost ("EAC") plus a reasonable dispensing fee or a pharmacy's Usual and Customary (U&C) charge.[20] U&C is an amount submitted by the pharmacy.




Unless a state defines it differently, as Louisiana, Rhode Island, Massachusetts, and Colorado have done, it typically reflects what the pharmacist would charge a cash-paying customer without private insurance or Medicaid benefits. U&C, by definition, includes both the pharmacy's ingredient cost and its dispensing cost.[21]




The federal regulations do not require reimbursement at any particular level. Rather they describe EAC as the "agency's best estimate of the price generally and currently paid by providers for the drug."[22]

This means that states are free to estimate on their own, a reasonable reimbursement rate in the aggregate. It is important to note that the federal government intends EAC not to represent the individual acquisition cost of any particular drug,

---

[19] 42 C.F.R. § 447.301.
[20] 42 C.F.R. § 447.331(b).
[21] 40 Fed. Reg. 32284-32303 (July 31, 1975).
[22] 42 C.F.R. § 447.301.

but rather to approximate acquisition costs across drugs "in the aggregate."[23] In other words, states are not bound to estimate – or reimburse based upon – acquisition costs on a drug-by-drug basis. Rather, they must achieve a reasonable reimbursement rate in the aggregate.

[23] 42 C.F.R. §§ 447.331 and 447.332.

## IV. Generic Drugs: Role and Reimbursement

Medicaid has long focused on generic drugs, developing specific regulations for their reimbursements and seeking to encourage their use because they reduce overall Medicaid drug expenditures.

In determining how to run this portion of Medicaid effectively and efficiently, both the federal government and the states have developed important tools and resources, which I will now describe. First, however, let me begin by highlighting some significant features of the generic market overall.







### A. The Generic Drug Market

Generic drugs began emerging in the pharmaceutical marketplace in the 1970s.[24]

In 1984, the "Hatch-Waxman Act"[25] was passed, which drastically reduced the fixed costs of entry for generic drugs.

As a result of Hatch-Waxman, a dramatic increase took place in the number of much cheaper generic equivalents to branded drugs in the marketplace.[26]

The markets for branded and generic drugs are, of course, very different. As the court knows, brand drugs enjoy a certain amount of protection from price competition, and the price of brand drugs tends to increase over time.

In sharp contrast, the most important aspect of the market for generic drugs – unlike that for branded drugs – is intense price competition. Because all versions of a particular generic are

---

[24] 40 Fed. Reg. 32297-98 (July 31, 1975).

[25] Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Act"), Pub. L. No. 98-417, 98 Stat. 1585 (1984).

[26] IMS Update for 2006 and 2007 (FY 2006 and YTD April 2007), available at http://www.pfizer.com/about/public_policy/generics.jsp (last visited April 16, 2008).

essentially equivalent, manufacturers compete vigorously on price for the business of pharmacies. In this regard, generic drugs are like commodities and the real distinguishing factor is price. As a result, generic prices tend to decline significantly with the entry of additional generic competitors and generics are very inexpensive compared to brands.




As the graphic illustrates, generic prices typically fall quickly and steeply as the number of generic manufacturers of a particular medication increases.[27]

Similarly, prices can suddenly increase if competitors exit the market or supply issues arise.

### B. Reimbursement of Generic Drugs by Commercial Insurers and Other Third-Party Payers

Accordingly, to take advantage of the price competition in the generic market place, commercial insurers and other third-party payers developed a different approach to reimbursing for generic drugs.




Rather than simply using published prices to reimburse providers, commercial insurers and other payers have developed Maximum Allowable Costs ("MACs"). As the court knows, a Maximum Allowable Cost is simply a dollar figure for each drug, representing the most the insurer will reimburse the pharmacy for that drug regardless of which manufacturer's version of the drug is dispensed.

Payers and PBMs gather information in the marketplace about prices and use that information to set a MAC that they then send to the pharmacies. Commercial MAC lists are, of course,

---

27 Richard G. Frank, Ph.D., New England Journal of Medicine, November 2007, available at http://content.nejm.org/cgi/content/full/357/20/1993/F2 (last visited April 17, 2008).

confidential because they represent the insurer's best efforts at determining market prices.[28]




The private market dominates prescription drug reimbursement.[29] 64% of all reimbursements are paid by private insurers and other third-party payers, and most of those transactions relating to generics are subject to a MAC. MACs have dominated reimbursement in the private market since at least the mid-1990s. Similarly, as we will see, the Medicaid system, which involves another 26% of reimbursements, has also made wide use of MACs in reimbursing for generic drugs.

The large increase of generic drugs in the marketplace in the 1980s led Medicaid to reevaluate its policies regarding generics. Prior to the passage of the Hatch-Waxman Act in 1984, Medicaid had its own MAC program, but there was broad consensus that the federal MAC program was cumbersome and was too slow in reacting to the fast-changing generic marketplace.




In response, Medicaid, both at the federal and state levels, developed a number of tools. On the federal level, the most important change was the development of the Federal Upper Limit (FUL).




In 1987, recognizing the need to capture available savings from generics and encourage their use, HCFA adopted the use of FULs.[30]

Federal Upper Limits apply to "multi-source" drugs, that is, therapeutically equivalent drugs available from at least three suppliers, and are defined as 150% of the lowest published price

[28] Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris ("Berndt Report"), paragraph 58.
[29] Kaiser Family Foundation, Prescription Drug Trends, May 2007, http://www.kff.org/rxdrugs/upload/3057_06.pdf (accessed April 16, 2008).
[30] 52 Fed. Reg. 28,648 (July 31, 1987).

for the drug.[31] Thus, federal regulations provide that multi-source drugs are to be reimbursed by the states at the lowest of EAC, U&C or the FUL established by CMS. States are further encouraged to establish even lower MACs.[32]




As the regulatory history points out, basing FULs on published prices offers some distinct advantages.[33]

First, it makes the program easy to administer and makes it possible to react more quickly to changes in generic pricing.




Second, in setting federal upper limits based on published prices, HCFA recognizes that, while there will be a cost savings for the program, the limits set will also be high enough to maintain adequate access for Medicaid beneficiaries and flexibility for states in administering their programs.




In addition, the FUL was designed to act as an "aggregate" cap, rather than a cap on the reimbursement of each individual drug.[34] A state can reimburse more than the FUL for a particular drug so long as it pays less for another. Again, the idea was to give states maximum flexibility to manage cost and access.




Moreover, although the FUL regulation is rigid by its terms, in practice CMS exercises considerable discretion in implementing its FUL regulation. It did so to strike the appropriate balance between cost savings and access that I have been discussing. Specifically, it appears that CMS didn't always use the lowest published price available as the regulation says.

Sometimes using the lowest published price resulted in a FUL that CMS decided was lower than the price at which pharmacies could actually acquire the drug. In that case, to strike an

---

[31] 42 C.F.R. § 447.332(b).
[32] 52 Fed. Reg. at 28,653.
[33] 52 Fed. Reg. at 28,648.
[34] *Id.*













appropriate balance from an access perspective, CMS ignored the lowest published price.[35]

At the same time CMS was establishing FULs to reduce Medicaid's cost of reimbursing for generic drugs, it recognized that, because of rampant price competition in the generic marketplace, drugs would be available to providers for less than the aggregate upper limits that CMS set.[36]

Therefore, CMS encouraged "State agencies [to] be innovative in these programs and find ways to assure the availability at reasonable prices of multiple-source drugs."[37]

Indeed, CMS went on to say "one way they could do this would be to encourage retail pharmacy participation in the Medicaid program by permitting them to retain profits from the sale of the listed drugs to Medicaid recipients."[38]

---

[35] Deposition of Sue Gaston, March 19, 2008, pp. 451-52.
[36] 52 Fed. Reg. at 28,648.
[37] 52 Fed. Reg. at 28,653.
[38] *Id.*

## V. Medicaid and the Role of the State

We have been discussing to this point the "top down" contribution by the federal government to the overall structure of the prescription drug program, including its encouragement of state efforts to control costs.

I now would like to turn to a discussion of how states responded from the "bottom up" within those parameters, with a particular focus on generics. As we will see, states use a variety of different information sources, tools, and approaches to balance cost and access, producing a variety of different outcomes in different states.




### A. The Information Available to State Medicaid Programs

States have a variety of sources of information to consult in balancing cost and access. In striking the appropriate balance for reimbursement rates, states have access to a variety of informational resources provided by the federal government, other state governments, and independent third-parties.




From the federal government, information concerning drug pricing is available in reports issued by various agencies, including the Office of the Inspector General of the Department of Health and Human Services (or HHS-OIG), the Government Accountability Office (GAO), and the Congressional Budget Office.

Information on the cost of prescription drugs is also available through the Medicaid Rebate Program, in the form of Unit Rebate Amounts, or URAs. I will discuss URAs and the Rebate Program in more detail later, but essentially URAs for generics are roughly 10% of AMP, so by looking at the URA you have a pretty good idea of what AMP is.
















States also communicate with one another about the cost of prescription drugs in a variety of ways. For example, there are regular meetings and publications of the National Association of State Medicaid Directors and other groups of Medicaid Agency personnel.

There are also Internet "listservs" which enable Medicaid programs to share information, and publications by the Council of State Governments, among other means.

Some states, like Kentucky, conduct surveys of pharmacy acquisition costs and then share them with other state Medicaid agencies.

Other states, like Minnesota, Texas, and Wisconsin develop MAC prices (based on a study of actual prices) and then publish their MAC list, making it available to other state Medicaid programs.

Many states also purchase drugs directly for other state programs, such as departments of public health, mental health, prisons, and AIDS drug-assistance programs. Some states also purchase drugs for state-run facilities.

In addition, all states reimburse for drugs under health insurance programs for state employees.

In doing so, many states use the services of a PBM or enroll in a group purchasing organization to control their costs. This often results in states being able to purchase or reimburse for drugs at amounts well below published prices. This information, too, would be available to state Medicaid programs in setting appropriate reimbursement rates.

State Medicaid programs also receive information about pharmacy costs for drugs through their own claims data.







For example, if a Medicaid beneficiary walks into a pharmacy that participates in the federal 340B program (serving a specialized, low-income population), the pharmacy must submit to Medicaid a reimbursement claim for only its actual acquisition cost. Pharmacists' U&C submissions also tell a Medicaid program something about the prices of drugs available in the market place.

Finally, many states use independent fiscal agents that are well-informed about the current ranges of reimbursement rates for prescription drugs. For example, the largest of these fiscal agents, EDS, currently serves as fiscal agent or principal information technology provider for 21 state Medicaid systems, and processes approximately 1 billion Medicaid claims every year.[39] EDS holds periodic conferences and seminars for its state customers to discuss hot topics and best practices in pharmaceutical reimbursement.

### B. The Tools Available to a State Medicaid Program

So, we have seen the many sources of information that states have at their disposal in setting reimbursement rates. Now I will discuss the wide variety of tools available to them in controlling costs.

As we have discussed, the Medicaid program allows the individual states significant latitude in balancing cost and access. Accordingly, states have adopted a number of different approaches to controlling costs. The rates and approaches that emerge in the various states differ in large part because of the economic needs, and political positioning of the pharmacists in the different states.

[39] Government Healthcare BPO Services, EDS, available at http://www.eds.com/services/governmenthealthcare/ (last visited April 16, 2008).

As I mentioned earlier, for brand drugs, federal regulations require that states reimburse, in the aggregate, at the lower of EAC or the usual and customary charge submitted by the pharmacist.[40] I will return to how U&C can be used as a tool to control costs in a moment, but it is worth noting at the outset that – whether for brand or generic drugs – federal regulations provide that reimbursement on the basis of EAC or the FUL will occur only if the amount reimbursed is less than what the pharmacist reports as his U&C.[41] So, let's begin with EAC, though as we will learn, it is less relevant for generics than for brands.




As I mentioned earlier, federal regulations define EAC as the state Medicaid "agency's best estimate of the price generally and currently paid by providers for the drug."[42] While CMS sets some parameters, it does not tell the states precisely how they should determine EAC.




Therefore, one tool that states have at their disposal when attempting to control costs is the ability to adjust their estimate of acquisition cost through their EAC formula. Not surprisingly, different states have developed different formulas for calculating EAC at different times. Most states calculate it as a function of the Average Wholesale Price, or "AWP," but some – currently 10 – use Wholesale Acquisition Cost, or "WAC."




This chart shows the diversity in state-level reimbursement formulas and shows that states tinkered with (and increased) discount levels throughout the 1990s and to the present, often at the urging of the federal government.

In the early years of Medicaid, some states were simply using AWP itself, that is, 100% of AWP as an estimate acquisition cost.

---

[40] 42 C.F.R. § 447.332.
[41] *Id.*
[42] 42 C.F.R. § 447.301.

But, as early as 1974, HCFA warned the states that AWP was too high a number.[43]




In the 1980's, as more and more studies comparing published and actual drug prices emerged, HCFA disallowed federal funding to states that used undiscounted AWPs as their EAC (even prevailing in a lawsuit brought by one such state) and eventually told all states in 1989, that they could not use undiscounted AWP as an estimate of acquisition cost.[44]




As a result, many states subsequently adopted an "AWP minus" formula for EAC or several states abandoned AWP altogether and decided to use WAC as a basis for approximating EAC.

For example, Massachusetts had been using AWP prior to 1989, but in 1989, it decided to adopt WAC plus 10% as its definition of EAC.[45]

One must keep in mind, however, in using this tool to control costs that setting a lower estimate of acquisition cost must be balanced against the need to provide for adequate reimbursement, and, thus, adequate access for Medicaid beneficiaries.

At this point, let me say a word about WACs and how they are used for generic drugs because it is very different than for brand drugs. WAC, as this Court knows, is generally an undiscounted list price that often appears in pricing compendia.[46]

Brand manufacturers typically set a WAC or list price, and wholesalers and retail pharmacies generally pay prices that are close to WAC for branded, self-administered drugs. (AWPs for

---

[43] Proposed Regulations Limiting Drug Costs, 39 Fed. Reg. 40,302 (Nov. 15, 1974).
[44] HCFA Administrative Decision, Docket No. 88-11, June 9, 1989.
[45] Deposition of Arnold H. Shapiro, October 3, 2007, pp. 121-24, 153.
[46] *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F.Supp.2d 20, 51 n.32 (D.Mass. 2007) ("WAC is sometimes referred to as the list price or catalogue price.").

brand drugs, as the Court knows, typically represent a 20 to 25% markup above the drug's WAC).[47]




WACs for generic drugs (to the extent that they even exist or are published) are set somewhat differently and their relationship to what a pharmacy pays is also different. When a generic drug enters the market, it is necessary for the manufacturer to report to the pricing compendia either an AWP or a WAC for the drug that is more than 10% less than the equivalent brand drug's AWP or WAC to be listed in the pricing compendia as a generic drug.[48]

Unlike most branded manufacturers, however, not all generic manufacturers publish a WAC. Indeed, this is a result of the fact that, as I have said, the brand and generic markets function very differently.

Whereas brand drugs enjoy a certain amount of protection from competition and pharmacies acquire branded, self-administered drugs at a price close to WAC, price competition is the hallmark of the generic marketplace, and manufacturers may find it economically advantageous to keep their list prices and discounts confidential after launch, once the drug has been listed in the pricing compendia as a generic drug.




Thus, some generic manufacturers keep WAC prices confidential, sharing them only with customers and interested agencies. In fact, it has been reported that 30% of the drugs in this case had no published WACs from 1997 to 2003.[49]

EAC (and in particular WAC) is often much less relevant for Medicaid reimbursement for generic drugs.

---

[47] *Id.* at 33.
[48] Deposition of Patricia Kay Morgan, January 11, 2005, p. 202.
[49] *Declaration of Eric M. Gaier, Ph.D. in Support of Defendants Opposition to the Commonwealth of Massachusetts' Claims of Liability and Calculation of Damages*, March 28, 2008, paragraph 56.




States have available to them additional tools for controlling costs when the same drug is available from multiple sources – i.e., with generic drugs. Because generic drugs are freely substitutable, and price competition tends to drive market prices down naturally, states can set MACs or a single reimbursement rate applicable to all manufacturers' versions of the particular drug.[50]

At the same time the federal government established FULs, it recognized that there would be opportunities for additional cost savings and it began encouraging state Medicaid programs to adopt MAC programs like those in the private market in order to take advantage of the big discounts and low prices available for generics.[51] Because generic drugs are entering the market all the time, and price competition is fierce, and the prices of individual drugs are very fluid, MACs were seen as a way of allowing states to be responsive to these changes.




To take advantage of this generic price competition, CMS encouraged the states, depending on their assessment of local conditions, to set MACs below the FUL, but to still "assure the availability at reasonable prices of multiple-source drugs."[52] Thus, MACs have been seen by CMS as a way of allowing the states to be responsive to changes in the market prices for generic drugs, while at the same time continuing to assure access.

Many states have established MAC programs and those programs vary both in the rates and how those rates are set.[53]

---

50 52 Fed. Reg. at 28,653.
51 *Id.*
52 *Id.*
53 Pharmaceutical Benefits 2001, National Pharmaceutical Council, available at http://www.npcnow.org/resources/PharmBenefitsMedicaid.asp (last visited April 16, 2008).







In Wisconsin, for example, MACs have been set on a monthly basis for years by a single consultant, who has access to one of the national wholesalers' price lists, and otherwise gets submissions from pharmacies.[54] The process is not onerous and it responds quickly to prices in the generic market.

In contrast, Alabama relies on a system like the Medicare "median" and sets a MAC based on a median of published prices. In yet another variation, Massachusetts' MACs are defined in much the same way as FULs.[55]

As I have mentioned, under the overall federal reimbursement structure, another possible basis for reimbursement is U&C. U&C is another tool available to states in trying to control costs. It is generally understood as the cash price that a pharmacy charges for a drug for anyone that doesn't have insurance. The federal regulations define it as "the provider's usual and customary charge to the general public for a drug,"[56] although they permit a state to alter the definition and require its pharmacists to submit a charge that is defined differently.

When U&C is defined consistent with its generally understood meaning, the price the pharmacist submits tends to be higher than the EAC, FUL, or MAC, and it is not often used as a basis for reimbursement. However, a number of states -- including Louisiana, Rhode Island, Massachusetts, and Colorado -- have created unique U&C definitions, which -- by their terms -- import into Medicaid the rates available through private, third-party payment programs.




Massachusetts, for example, in 1995, changed the definition of U&C. It remains essentially the same today as "the lowest price that a pharmacy charges or accepts from <u>any</u> health insurer or

[54] DHCF Current Policy Brand Medically Necessary and Medicaid Maximum Allowable Cost List.
[55] 130 CMR 406.402; 1015 Mass. Reg. 57 (Dec. 17, 2004).
[56] 42 C.F.R. § 447.331(b).

pharmacy benefit manager for the same quantity of a drug dispensed to a Massachusetts resident on the same date of service."[57]

Most states have adopted MAC programs directly, and have undertaken their own effort to review the prices available in the marketplace to set their MACs. In adopting these unique definitions of U&C, what these states have done is managed to import into the Medicaid system the MAC-based rates used by private payers (and PBMs) for multi-source drugs.

Because PBMs aggressively search for market prices and set low MACs, one would expect that, in these states, U&C would generally be lower than the EAC or the FUL set by CMS. And one would also expect that the states would have reimbursed for most generics on the basis of these private MACs.

Of course, reimbursement for ingredient costs does not address the entire economic equation.







You will recall that the Federal regulations also mandate that the states include, as part of their reimbursements to pharmacies, a "reasonable dispensing fee."[58] I would now like to explain how the states approach the dispensing fee issue in their efforts to balance cost and access, because dispensing fees are another tool available to a Medicaid program in seeking to strike an appropriate balance.

Although some might suggest that the federal regulations tend to compartmentalize "ingredient cost" and "dispensing fee," such a distinction is really irrelevant to pharmacists. What matters to them is the aggregate, or total reimbursement, that they get from the state for the Medicaid prescriptions they dispense, and whether that total reimbursement, at a minimum, covers their

[57] 960 Mass. Reg. 53 (Nov. 18, 2002); 759 Mass. Reg. 44 (Feb. 24, 1995).
[58] 42 C.F.R. § 447.331(b).




costs and provides some additional incentive to participate in the Medicaid program.

During the dispute period in this lawsuit, the operating costs of pharmacies – things like utilities, property taxes, insurance, personnel costs – have risen dramatically.[59]




Although the amounts vary by state, the dispensing fees Medicaid pays pharmacies have stayed relatively flat in most states, including Massachusetts.[60]

To address this issue, as Professor Berndt noted in his report to this Court in 2005, Medicaid programs purposefully compensated for low dispensing fees by providing an ingredient cost reimbursement amount that "generally exceeds actual acquisition costs."[61] The question that arises is why this "cross-subsidy" makes sense from the state's perspective, especially with respect to generic drugs.




It is important to keep in mind that, because the ingredient costs for generic drugs are so much lower than for branded drugs, the margin pharmacies earn on the ingredient (e.g., 6% over WAC) is correspondingly much lower, and thus may not be sufficient to cover any dispensing fee shortfall that might exist.




Assuming a fixed 10% margin on all drugs, let's suppose a branded drug costs $100 and a generic drug costs $2. A 10% margin on the $2 generic drug represents 20 cents above the pharmacy's cost, while a 10% margin on a $100 name brand drug represents $10 above cost. In other words, imposing a 10% margin on the two will result in the pharmacy earning $9.80 more from dispensing the brand.

---

59 *Declaration of Eric M. Gaier, Ph.D. in Support of Defendants Opposition to the Commonwealth of Massachusetts' Claims of Liability and Calculation of Damages*, March 28, 2008, paragraph 72.
60 *Id.* at paragraph 37.
61 *Berndt Report*, paragraph 51.













But, quite apart from the need to make up for any dispensing fee shortfall that might exist to entice the pharmacists to remaining in the Medicaid system, it is important to incent pharmacists to dispense generic drugs because they are cheaper and result in an overall cost savings for the program.[62] Indeed, this has been a conscious strategy for Medicaid for a long time.

Professor Berndt agreed with this analysis. He said that the "widely understood reason" that payers have allowed pharmacies to "enjoy a considerable spread on their generic drugs" is that generics are so much cheaper overall.[63] In fact, according to MassHealth, each time a generic drug is dispensed instead of a single-source, brand drug, Medicaid saves approximately $80.[64] [65]

It is clear that States recognize that cost savings will result from a higher utilization of generic drugs, but pharmacists must receive some incentive to push the substitution of generics (beyond statutorily required auto-substitution). To this end, some states have adopted higher dispensing fees for generic drugs than brand drugs. Regardless of precisely how the result is achieved, what is also clear is that pharmacists are an essential part of a Medicaid program's cost control effort.

Many states have explicitly recognized this fact. For example, in Idaho, Medicaid reimbursement rates are set "following negotiations" with pharmacists.[66]

Similarly, the consent decree under which New York's Medicaid program was operated for years required ongoing consultation

---

[62] Affidavit of Robert B. Helms, paragraph 3.
[63] *Berndt Report*, paragraph 52.
[64] *Declaration of Fiona Scott Morton*, April 7, 2007, paragraph 33; Report to the General Court, Reimbursement for Prescribed Drugs (Oct. 3, 2002), p. 18.
[65] The corresponding DVD video contains an inadvertent misstatement of this point.
[66] Idaho Admin. Code § 16.03.09.665.02(d) (West 2007).

with the state pharmacy association over both the dispensing fee and the ingredient cost.[67]

Although states' approaches differ, the impact on pharmacies undeniably plays a role in striking the balance between cost and access in every state.




In addition to the reimbursement mechanisms that we have been discussing, it is important to mention that there are a variety of other tools states use in their discretion to control costs. These may include setting particular flat co-payments that beneficiaries must contribute, requiring generic substitution, requiring prior authorization of certain drugs, limiting the number of prescriptions for certain drugs, and drug utilization review.

### C. Requirements for State Action

We have now discussed the many different tools available to states to achieve an appropriate balance between cost and access, and the many different solutions adopted by the states. Before we move on, it is worth pausing here to discuss the process by which states use the tools and achieve the reasonable reimbursement rates that we've been discussing.

Most state Medicaid programs are authorized to change their reimbursement levels and approaches through simple agency action. That is, if the Medicaid agency determines that a change in reimbursement is needed, it can make it happen without the need for legislative intervention. As a result, as CMS envisioned, most states have changed, or at least "tinkered" with, their reimbursement structure and rates on multiple occasions since 1994, when a moratorium imposed by OBRA '90 expired.

67 *Pharmaceutical Soc'y of the State of N.Y., Inc. v. Carey*, No. 76 Civ. 5080, Consent Decree (July 7, 1978).







For example, Massachusetts has changed its definitions of EAC, MAC, and U&C through a series of regulatory, not legislative, actions.[68]

## D. The Differing Outcomes

So we have seen that state Medicaid programs have a wide variety of information and utilize many different tools. In turn, this has produced wide variations in the overall expenditures for drugs.[69]

But as we have seen, State Medicaid agencies are consistently trying to balance competing objectives. On the one hand, they are under regulatory and political pressure to keep the costs of their Medicaid programs as low as possible. On the other hand, they cannot allow the total reimbursements to pharmacists – ingredient cost plus dispensing fee – to fall too low, because that will result in pharmacies leaving the Medicaid program and, consequently, reduced access for Medicaid beneficiaries. In fact, a number of states, including Massachusetts, have reached a point in which pharmacists have come at least to the brink of widespread withdrawals from the program.[70]

As we'll see in the next section, the Rebate Program has furthered these objectives: it has allowed Medicaid to pay more for the ingredient cost (using dollars subsidized by manufacturers' rebates), while keeping dispensing fees (paid from tax dollars) essentially flat.

---

[68] MAC – 674 Mass. Reg. 153 (Nov. 22, 1991), 759 Mass. Reg. 44 (Feb. 24, 1995), 977 Mass. Reg. 51 (July 4, 2003), 1019 Mass. Reg. 31 (Feb. 11, 2005); U&C – 674 Mass. Reg. 153 (Nov. 22, 1991), 759 Mass. Reg. 44 (Feb. 24, 1995), 1019 Mass. Reg. 31 (Feb. 11, 2005), 1019 Mass. Reg. 31 (Feb. 11, 2005); WAC – 970 Mass. Reg. 57 (Mar. 28, 2003).

[69] Pharmaceutical Benefits 2001, National Pharmaceutical Council, available at http://www.npcnow.org/resources/PharmBenefitsMedicaid.asp (last visited April 16, 2008).

[70] Report to the General Court, Reimbursement for Prescribed Drugs (Oct. 3, 2002), p. 10.

## VI. The Medicaid Rebate Program

### A. OBRA '90




As I mentioned, in 1990, the Medicaid Rebate Program came into being with the passage of the Omnibus Budget Reconciliation Act (OBRA '90)[71], which was an important moment in the history of the Medicaid system. The rebate regulations emerged out of a concern at the federal level that the Medicaid program had become too expensive, and various proposals were contemplated for reducing costs.




As previously discussed, during the 1980s, HCFA had pushed states to stop using undiscounted AWPs to set reimbursement levels, and the states had adopted various levels of reductions off AWP.[72] These changes, of course, reduced the amount pharmacies were being reimbursed for dispensing prescription drugs to Medicaid beneficiaries. One proposal was simply to reduce further the level of reimbursement to participating pharmacies. However, as I have been discussing, pharmacy participation in state Medicaid programs is voluntary, and this proposal raised a concern that pharmacies would simply stop participating in Medicaid programs.

Prior to 1990, in a further effort to control costs, many states had been offering prescription drug coverage, but only for a limited set of drugs. Another solution considered was for Medicaid to further restrict formularies and reimburse only certain lower cost drugs. This approach, of course, would have limited Medicaid beneficiaries' access to care.

---

[71] Pub. L. No. 101-508, 104 Stat. 1388 (1990).

[72] *See, e.g.*, HCFA Medicaid Action Transmittal, No. 84-12 (Sept. 1984), *reprinted in* Medicare & Medicaid Guide (CCH) (Sept. 1984), ¶ 34,157, at 10,193.




Rebates from manufacturers emerged as the most practical solution, representing a way to reduce costs for Medicaid without further reducing reimbursement to pharmacies or limiting access to care. Rather than further reducing reimbursement payments or restricting access to care, the government would "claw back" a portion of its outlays from the manufacturers.[73]




Thus, the result of this policy debate was a grand bargain struck between the manufacturers, on the one hand, and Medicaid, on the other. The deal was that Medicaid would reimburse for <u>all</u> of a manufacturer's drugs (i.e., have an "open formulary"), but in exchange the manufacturer had to agree to pay rebates to the states which are taken into account when federal matching funds are calculated. As I mentioned earlier, the net effect of the bargain was to expand the scope of coverage, while simultaneously reducing, on a per prescription basis, the state's cost of reimbursing for the drug by the amount of the rebate paid by the manufacturer. The bargain, in effect, allowed Medicaid to maintain adequate payments to pharmacies to ensure access, while simultaneously controlling costs to the program.

## B. The Medicaid Rebate Agreement

The bargain struck was formally memorialized in a contract – the standard-form Medicaid Rebate Agreement that a manufacturer must sign to be allowed to participate in any state Medicaid program.




So, as a practical matter, starting in 1991, drug manufacturers entered into contracts – federal rebate agreements – with Medicaid, requiring them to pay rebates to the states in order for their drugs to be covered by Medicaid.[74] These contracts are the exclusive channel through which a drug manufacturer may participate in Medicaid.

[73] H.R. Rep. No. 101-881 (1990).
[74] 42 U.S.C. § 1396r-8(a)(1) (the "Rebate Statute"); 56 Fed. Reg. 7049 (Feb. 21, 1991).




During the relevant time period, as part of these contracts with Medicaid, and by federal law, every quarter, manufacturers were required to calculate an Average Manufacturer Price (or AMP) and a Best Price (non-multi-source), and report this information to CMS. The AMP is defined as the average price paid by wholesalers for drugs distributed to retail pharmacies – in other words, the average price paid to the manufacturers for drugs eligible for distribution to Medicaid beneficiaries and, thus, reimbursement by a state Medicaid program.[75]




During the relevant period, the Statute, applicable federal regulations, and the Rebate Agreement required the manufacturer to take into account price concessions made by the manufacturer to wholesalers - for example, prompt-pay discounts - when calculating and reporting AMP.[76] In effect, the AMP for a given drug is roughly equal to the manufacturer's net revenue from sales to the retail pharmacy class of trade for that drug divided by the number of units sold. AMP is a fully discounted measure of the average selling price to wholesalers for drugs sold in the retail class of trade.




The Rebate Agreement and federal regulations also define Best Price for brand drugs. With certain exceptions (primarily concerning purchases by government agencies and programs), Best Price is defined as the lowest price for the drug available to any wholesaler, retailer, provider, HMO, nonprofit entity, or government entity in any pricing structure, including all price concessions.[77] It is a minimum price at which a drug is sold.




## C. Calculating Rebates

The rebate formula is different for brand and generic drugs. For brand and innovator multiple-source drugs, the rebate amount is

---

[75] 42 U.S.C. § 1396r-8(k)(1).
[76] *Id.*
[77] 42 U.S.C.. § 1396r-8(c)(1)(C).

the greater of 15.1% of the AMP or the difference between AMP and Best Price.[78]




Under this formula, the federal government and states get the benefit (in the form of a larger rebate) from the lowest price that a manufacturer offers to the largest and most powerful private payers, such as the large insurance companies. For brand drugs, the objective of the rebate formula is to secure for Medicaid the benefit of the largest discount being offered by a manufacturer to any customer, without Medicaid having to do the work to negotiate that discount directly.




The formula for calculating rebates for generic drugs is much simpler. It does not involve a Best Price component. Since 1994, for generics the rebate formula is simply AMP times 11%.[79]

## D. The Mechanics of the Medicaid Rebate Program




Now, let's look at the mechanics of how the rebate program works. The process begins with the manufacturer reporting AMPs (and Best Prices for some drugs) to CMS.




The standard Rebate Agreement requires that AMPs be kept confidential.[80] They are competitively sensitive information and releasing them in a way that permits competitors to learn what a manufacturer's average selling price is could impose costs on everyone, including Medicaid because it could force manufacturers to provide fewer and smaller discounts. This is a concept with which the Court is familiar – that "the best discount is a secret discount."

---

[78] 42 U.S.C.. § 1396r-8(c)(3)(b)(5).
[79] 42 U.S.C.. § 1396r-8(c)(3)(b)(2).
[80] 42 U.S.C. § 1396r-8(b)(3)(D); 56 Fed. Reg. 7049 (Feb. 21, 1991); Rebate Agreement at § VII, available at http://www.cms.hhs.gov/MedicaidDrugRebateProgram/downloads/rebateagreement.pdf (last visited April 16, 2008).










Leaving aside what the Rebate Agreement says about the use of AMP, until recently, CMS did not provide AMPs to the states directly, but rather provided AMP-information in the form of Unit Rebate Amounts or URAs.[81] CMS derives URAs from AMPs and Best Prices by the formulas I described a moment ago, and transmits the URAs to the states.

The states then use this URA information to bill the manufacturers and collect rebates from them.

Mechanically, a state multiplies the URA (or per unit rebate amount) times the number of units of a particular drug reimbursed by that state Medicaid program during that quarter, and bills the manufacturer for the resulting amount. Of course, if a state knows the URA for a particular generic drug, simple multiplication would provide it with the AMP.[82]

---

[81] 60 Fed. Reg. 48442, 48475 (Sept. 19, 1995).
[82] Deposition of Anthony Megathlin, July 11, 2007, p. 141

## VII. Current Developments and Conclusion




### A. The Deficit Reduction Act of 2005

The policy debate about how Medicaid should provide reimbursement and how to balance cost and access continues even today.




On February 8, 2006, the President signed into law the Deficit Reduction Act of 2005.[83] The purpose of the DRA was to achieve reductions in total expenditures on entitlement programs (like Medicare and Medicaid).

One way the DRA sought to save money on Medicaid services was by revising the way Medicaid pays for prescription drugs. As we discussed, prior to the DRA, Federal Upper Limits (FULs) for generic drugs were based on published prices.




Under the DRA, instead of 150% of the lowest published price, the FUL was supposed to be calculated as 250% of the lowest reported AMP for a given drug.[84]




The shift to using AMP was and is controversial inside and outside the government. Both the Department of Health and Human Services' OIG and the GAO issued reports concluding that the new AMP-based reimbursement policy would mean that many pharmacies would receive Medicaid reimbursements totaling less than what they paid to acquire the drugs, even with the increase in the multiple from 150% to 250%.[85]

---

[83] Deficit Reduction Act of 2005 ("DRA"), Pub. L. 109-171 (Feb. 8, 2006).

[84] 42 U.S.C. § 1396r-8; 72 Fed. Reg. 39142, 39154-39157 (July 17, 2007).

[85] GAO, *Medicaid: States' Payments for Outpatient Prescription Drugs* (Oct. 2005); GAO, *Medicaid Outpatient Prescription Drugs: Estimated 2007 Federal Upper Limits for Reimbursement Compared with Retail Pharmacy Acquisition Costs* (Dec. 2006); HHS-OIG, *Deficit Reduction Act of 2005: Impact on the Medicaid Federal Upper Limit Program* (June 2007).




Consistent with OIG and GAO's findings, the National Association of Chain Drugstores sued the Federal Medicaid program and won a preliminary injunction in December, 2007 against the implementation of this regulation, arguing that it would reduce reimbursements to pharmacies below reasonable levels and in many cases cause significant losses.[86]

The Department of Justice has indicated that it will not seek to overturn the injunction, so many people believe that this proposal is more or less a "dead letter."

This development is important because it illustrates pretty starkly the policy balancing act that I have been talking about: keeping costs low while keeping pharmacies and drugs accessible.

### B. Conclusions




To conclude, let me just summarize the main points of this presentation.

First, as we have seen, the Medicaid program – both at the federal level and the state level – is continually challenged to balance considerations of <u>cost</u> to the program and <u>access</u> to prescription drugs by Medicaid recipients.

Second, in attempting to achieve this balance and manage their Medicaid programs in a prudent way, states utilize a variety of information sources and employ a number of different tools, and the history of their reimbursement practices reflects this.

Third, generic drugs have played an important role in the Medicaid program for a long time. They have helped states achieve the cost-access balance by accommodating an expanding population of Medicaid recipients while also saving

---

[86] *National Association of Chain Drug Stores et al., v. Leavitt, Secretary of Health and Human Services et al.*, Civ. No. 1:07cv02017 (RCL) (D.D.C. Dec. 19, 2007).

significant amounts of money. There are unique features of the generic market, such as rapid price changes, large price reductions, and intense competition, which make tracking exact transaction prices over time very difficult. Medicaid programs have developed tools and implemented regulations designed specifically to address these unique features of the generic market (e.g. FUL, MAC, U&C) and have encouraged the use of generics in a number of important ways.

And finally, we have seen that the Medicaid Rebate program provides several important benefits. For example, it provides Medicaid with information about an average of actual selling prices for drugs that it reimburses. And for some drugs, it helps Medicaid achieve the greatest discounts available in the marketplace without having to negotiate individually with manufacturers.

Thank you for your attention and I look forward to participating in the tutorial hearing before Your Honor.