UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br>　　　　　　PLAINTIFF<br><br>　　　　vs.<br><br>MYLAN INC. *et al.*,<br>　　　　　　DEFENDANTS | )<br>)<br>)<br>)　　C.A. No. 03-11865-PBS<br>)<br>)<br>)<br>)<br>) |

**THE COMMONWEALTH'S MEMORANDUM IN SUPPORT
OF ITS MOTION TO EXCLUDE PORTIONS OF THE
<u>TESTIMONY OF SUMANTH ADDANKI, Ph.D.</u>**

Pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm. Inc.,* 509 U.S. 579, 113 S.Ct 2786 (1993), the Commonwealth of Massachusetts has moved to exclude portions of the testimony of Sumanth Addanki, Ph.D. from the trial of this action.

Dr. Addanki is an economist who was retained by Schering Corporation, Schering-Plough Corporation and Warrick Pharmaceuticals Corporation (hereinafter "Defendants") to provide "economic analysis." However, Dr. Addanki's opinions go well beyond economic analysis. Dr. Addanki strays far afield of his area of expertise by attempting to interpret Medicaid regulations, speculating about the intent of state and federal Medicaid personnel, and arguing that MassHealth should have used a different framework for calculating Medicaid reimbursements. Defendants also will attempt to use Dr. Addanki's testimony to revive their government knowledge defense, despite the fact that the Court has already ruled that Warrick has no legally viable government knowledge defense prior to 2002. While the Commonwealth is not challenging Dr. Addanki's qualifications to testify as an economic expert, the Commonwealth is

challenging Dr. Addanki's attempts to go beyond economic analysis into other fields and issues. Dr. Addanki's theories are inadmissible speculation that are irrelevant and will create a substantial danger of confusing and misleading the jury. Accordingly, Dr. Addanki's opinions must be excluded under the Federal Rules of Evidence and the relevant case law.

## FACTUAL BACKROUND

Defendants have designated Sumanth Addanki, Ph.D. as an expert in this case. Dr. Addanki is an economist who has been retained by Defendants to provide "economic analysis."[1] Defendants produced Dr. Addanki's Original Report in this case on March 28, 2008 ("Addanki Original Report"), attached hereto as Exhibit 1 and 1A. Defendants also produced an affidavit from Dr. Addanki dated March 31, 2008 ("Addanki Affidavit"), attached hereto as Exhibit 2, in support of their Motion for Summary Judgment. The Commonwealth deposed Dr. Addanki in this case on April 16, 2008.

On December 23, 2009, Defendants produced Dr. Addanki's Supplemental Report ("Supplemental Addanki Report"), attached hereto as Exhibit 3. In his supplemental report, Dr. Addanki produced new charts demonstrating new calculations Dr. Adanki performed based upon (1) rates used by the Group Insurance Commission, a "quasi-governmental agency" in Massachusetts, and (2) data obtained from IMS America, Ltd., a commercial data source. To date, Defendants have not produced the IMS data to the Commonwealth in this litigation.

---

[1] The Court is familiar with Dr. Addanki as he was also Defendants' expert in the AWP multidistrict litigation trial and provided testimony related to the FUL in the New York Counties cases. Additionally, Dr. Addanki has been designated as an expert witness by these Defendants and many other pharmaceutical companies in pricing litigation throughout the country.

**ARGUMENT**

I. **Legal standards**

Federal Rule of Evidence 702 allows an expert witness to testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Before admitting expert testimony, the trial court must first perform a gatekeeping function to determine whether the expert is qualified and whether the expert's testimony is sufficiently reliable and "relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The trial judge must make this requisite gatekeeping determination for all proffered expert testimony that reflects "specialized knowledge," whether "scientific" or not. See *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (citing Fed.R.Evid. 702); *see also Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 175 F.3d 18, 34 n. 12 (1st Cir. 1999)(extending the court's gatekeeping function to expert testimony based upon economic analyses).

If the court finds the expert to be qualified, it must then turn to the proffered expert testimony to determine its relevance, i.e., "whether those principles and methods have been properly applied to the facts of the case." *United States v. Monteiro,* 407 F.Supp.2d 351, 357-58 (D.Mass.2006) (quoting Fed.R.Evid. 702 advisory committee's note). The critical inquiry is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.,* 526 U.S. at 152, 119 S.Ct. 1167. Beyond the normal requirement of relevance for all evidence, "expert testimony must be relevant ... in the incremental sense

that ... if admitted, [it] likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.,* 161 F.3d 77, 81 (1st Cir.1998); see also Fed.R.Evid. 702.

An expert's methodology is the "central focus of the *Daubert* inquiry," but a court "may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Natchitoches Parish Hosp. Service Dist. V. Tyco Intern., Ltd.,* slip copy, 2009 WL 3053855 (D.Mass. Sept. 21, 2009) at *1 (quoting *Ruiz-Troche v. Pepsi-Cola of P.R. Bottling Co.,* 161 F.3d 77, 81 (1st Cir. 1998); *see also Elcock v. Kmart Corp.,* 233 F.3d 734, 756 (3d Cir. 2000)(holding that district court should have excluded expert testimony of economist where testimony was based on assumptions without foundation in the trial record).

Vigilant exercise of this gatekeeper role is critical because expert witnesses are allowed to express opinions on matters about which they have no firsthand knowledge, and because an expert's testimony may be given substantial weight by the jury due to the expert's background. *Id.* at *2; *see also Daubert,* 509 U.S. at 595; *Kumho Tire Co. v. Carmichael,* 526 U.S. at 148 (noting that experts enjoy "testimonial latitude unavailable to other witnesses"); *United States v. Hines,* 55 F.Supp.2d 62, 64 (D.Mass. 1999)("[A] certain patina attaches to an expert's testimony unlike any other witness; this is a 'science', a professional's judgment, the jury may think, and give more credence to the testimony than it may deserve.")  According to the Supreme Court in *Daubert,* the relaxation of the usual requirement of firsthand knowledge is presumably "premised on

an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." See *Daubert,* 509 U.S. at 592 [Emphasis added.]

Additionally, irrelevant evidence is inadmissible. Fed. R. Evid. 402. Even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403; *Williams v. Drake,* 146 F.3d 44, 48 (1st Cir. 1998)(holding that relevant evidence may be excluded when it comes with "unwanted baggage" such as potential juror confusion or unfair prejudice). Rule 403 is *"*a tool a trial judge can use to keep a jury's attention riveted on the dispositive issues." *Williams,* 146 F.3d at 48. Rule 403 may be applied to prevent "muddling the issues" or creating "an unwanted sideshow, drawing attention from the main event." *Id.*

## II.   The Court should preclude Dr. Addanki from testifying regarding cross-subsidization and access.

Dr. Addanki opines that Massachusetts deliberately chose to overpay pharmacies for acquisition costs to compensate for allegedly inadequate dispensing fees in order to incentivize pharmacies to participate in the Medicaid program and thereby ensure adequate access. Exhibit 1 and 1A ("Original Addanki Report") at Section IV, ¶¶ 42-57, and Exhibits 14-20.

Dr. Addanki is an economist and the scope of his retention by Warrick in this case is to provide "economic analysis." *See* Exhibit 4, excerpts of the April 16, 2008 Deposition of Sumanth Addanki, Ph.D. ("Addanki Dep.") at 10:12-22. However, Dr. Addanki attempts to go well beyond economic analysis and profess upon the "larger context" in which governmental reimbursement rates are set. He speculates that

"apparent 'spreads' may be permitted to persist in the interest of better serving [Medicaid] programs' broader goals"—specifically, the "goal of ensuring access." Exhibit 1 and 1A (Original Addanki Report) at ¶ 43. Dr. Addanki's analysis of the "reimbursement decisions actually made by MassHealth personnel" and "their informed judgment about how best to achieve their objectives" should be excluded from the evidence at trial for several reasons:

1. Dr. Addanki's opinions are beyond the scope of his expertise as an economist;

2. Federal regulations and policy expressly prohibit states from overpaying on acquisition costs to compensate for inadequate dispensing fees (i.e. cross-subsidization) and the law presumes that this law and policy were followed absent clear admissible evidence to the contrary;

3. Dr. Addanki has no basis upon which to conclude that that Massachusetts intentionally overpaid pharmacies for acquisition costs to ensure adequate access. There is no admissible evidence that prior to 2002, MassHealth officials intentionally overpaid for acquisition costs because they believed dispensing fees were too low. Dr. Addanki's opinions are based purely on his own speculation. Thus, his speculative opinions on this matter are inadmissible under Fed. R. Evid. 702.

Dr. Addanki is not a psychologist or a political scientist. He is an economist who was retained to provide "economic analysis." Exhibit 4 (Addanki Dep.) at 10:12-22. While he concedes that one cannot "conclude anything about intent from data" (Exhibit 4 (Addanki Dep.) at 234:12-18), he goes on to do just that--speculate about the intent of MassHealth personnel based upon claim data.

> "If I observe pretty systematic willingness to reimburse above the lowest basis mandated by the regulation, then it could be error, but it also could be a decision taken by someone at some point to go beyond the regulation, which would typically be because of access concerns."

Exhibit 4 (Addanki Dep.) 229:13-19.

> "Given that it occurs for one specific product, one specific NDC, which is the unit dose NDC, which would be more readily usable by the patients,

> and the incidence with which it happens suggests that it probably wasn't an error, but you know, I don't know for sure, which is why I have stated it exactly the way I stated it, which is that maybe this is what's going on really here.  It certainly wouldn't be surprising; I've seen it happen in other contexts."

Exhibit 4 (Addanki Dep.) at 230:3-12.

Contrary to Dr. Addanki's opinion, federal Medicaid regulations do not permit states to inflate estimated acquisition costs to compensate for inadequate dispensing fees. Under federal regulations, a state Medicaid program's payments for a drug may not exceed the "estimated acquisition cost" of the drug plus a reasonable dispensing fee, where the "estimated acquisition cost" (EAC) is defined as "the agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers." 42 C.F.R. § 447.502 (2008).  Given this regulation, there is no room for states to deliberately inflate the EAC to increase profits to pharmacies or "cross-subsidize" for inadequate dispensing fees.

Moreover, if there was ever any doubt about whether cross-subsidization was permitted under the regulations, the issue was clarified in 1994 by the Department of Health and Human Services Medicaid Bureau Director in a memorandum to all Division of Medicaid Associate Regional Administrators:

> "We would also like to clarify our policy that a dispensing fee determination must be separate and distinct from the EAC determination and unrelated to the cost of the drug product."

*See* Exhibit 5, August 12, 1994 Memorandum from Department of Health and Human Services, Director, Medicaid Bureau, to All Associate regional Administrators, Division

of Medicaid. *See also* Exhibit 6, September 6, 1994 State Medicaid Agency Regional Bulletin No. 94-25.

"In the game of statutory interpretation, statutory language is the ultimate trump card." *U.S. v. Czubinski,* 106 F.3d 1069, 1078 (1st Cir. 1997). In the absence of evidence to the contrary, it must be presumed that the law was followed. *See TRW, Inc., TRW Michigan Division v. N.L.R.B.,* 393 F.2d 771, 774 (6th Cir. 1968)(holding that suspicion of a company's intent to discriminate is not a sufficient basis for finding a violation of the law); *see also N.L.R.B. v. Shawnee Indus., Inc.,* 333 F.2d 221, 225 (10th Cir. 1964).

In an attempt to rebut this presumption, Defendants, through Dr. Addanki, cobble together a collection of deposition excerpts from various state and federal employees regarding the importance of access in an attempt to support an inference that MassHealth consciously overpaid for acquisition costs to compensate for inadequate dispensing fees. Not only is Dr. Addanki, an economist, completely unqualified to interpret federal regulations and speculate on the intentions of federal and state agencies, the testimony upon which he bases these conclusions does not come close to supporting this bold conclusion. Dr. Addanki makes a huge leap from the testimony of state and federal Medicaid personnel regarding the importance of ensuring access to his speculative opinion that MassHealth intentionally overpaid pharmacies to keep them in the program. This opinion is based on nothing more than Dr. Addanki's sheer speculation. Dr. Addanki admits that he did not review any materials related to the Commonwealth's process of redefining the Massachusetts Maximum Allowable Cost in 1988 or the Commonwealth's process of setting the Estimated Acquisition Cost in 1989. Exhibit 4 (Addanki Dep.) at 81:12-82:16.

This is not the first time Dr. Addanki has proffered opinions based purely on speculation. In *Computer Sciences Corp. v. Computer Assocs. Intern., Inc.,* 1999 WL 675446 at *25-26 (C.D.Cal. 1999), the Court dismissed a counterclaim based upon an assessment of damages performed by Dr. Addanki on the grounds that the claimed damages were "unreasonably speculative."

In sum, there is absolutely no basis to allow Dr. Addanki to speculate about access and cross-subsidization. Therefore, the Court should preclude Dr. Addanki from offering the opinions contained in Section IV of his Original Report, ¶¶ 42-57, Exhibits 14-20 of his Original Report, and any other testimony relating to cross-subsidization, access or the intentions of state or federal Medicaid personnel.

**III.     Pursuant to the law of the case doctrine, the Court should preclude Dr. Addanki from testifying that WAC is a "list price" or anything other than "the amount goods actually cost"**

This Court has held in connection with summary judgment motions that "wholesale acquisition cost" (WAC) "does not mean a list price; it means the amount the goods actually cost." *Massachusetts v. Mylan Labs., Inc. et al.,* 608 F.Supp.2d 127, 143 (D.Mass. 2008). This is now the law of the case. *See Naser Jewelers, Inc. c. City of Concord, N.H.,* 538 F.3d 17, 20 (1st Cir. 2008). Under the "law of the case doctrine," a court's decision upon a rule of law continues to govern the same issues in subsequent stages of the same case. *Id.* Narrow exceptions to the doctrine exist if the initial ruling was made on an inadequate record or was designed to be preliminary; if there has been a material change in controlling law; if there is newly discovered evidence bearing on the question; and if it is appropriate to avoid manifest injustice. *Id.* None of these exceptions apply here. Accordingly, Dr. Addanki should not be permitted to testify that WAC is a

"list price" or offer any other testimony regarding the meaning of WAC that contradicts the law of this case: that WAC is the "the amount that goods actually cost."

Specifically, the Court should preclude Dr. Addanki from offering the opinions contained in his Original Report at ¶ 24 and ¶ 34, in which he refers to WACs as "list prices." The Court should also preclude Dr. Addanki from expressing the opinions contained in his Original Report at ¶ 9, wherein he opines that Massachusetts Medicaid could not have believed that WACs represented net prices obtained by Defendants or "prices paid by pharmacies for those products."

These opinions are contrary to this Court's ruling, which is now the law of this case, that WAC does not mean a "list price" and does mean "the amount that goods actually cost." Dr. Addanki should not be permitted to encourage the jury to come to a conclusion contrary to the Court's ruling by asserting these opinions.

## IV. The Court should preclude Dr. Addanki's testimony regarding "government knowledge"

This Court has already ruled in connection with summary judgment motions that "with respect to the period before 2002, a government knowledge defense does not fly as a matter of law." *Massachusetts v. Mylan Labs., Inc. et al.,* 608 F.Supp.2d 127, 152 (D.Mass. 2008). Therefore, under the law of the case doctrine, any evidence, arguments or testimony intended to demonstrate government knowledge prior to 2002 should be excluded at trial. *See Naser Jewelers,* 538 F.3d at 20 (upholding the "law of the case doctrine" whereby a court's decision upon a rule of law continues to govern the same issues in subsequent stages of the same case). Evidence and testimony offered to establish government knowledge prior to 2002 is irrelevant and would only confuse and mislead the jury to believe that Defendants have a legally viable government knowledge defense.

Specifically, the Court should preclude Dr. Addanki from testifying about various sources of information he claims were "available" to MassHealth prior to 2002. The fact that information may have been "available" does not mean that MassHealth was aware of it. While evidence of actual knowledge may be relevant, evidence that was merely "available" is completely irrelevant. In Section III of his Original Report, Dr. Addanki sets out information he claims was "available" to MassHealth:

- GAO and OIG reports (Exhibit 1 and 1A, Original Addanki Report at ¶¶ 24-26);

- A textbook on pharmaceutical economics and policy (Original Addanki Report ¶ 27);

- Wholesaler catalogs (Original Addanki Report ¶ 28);

- Rates paid by the Group Insurance Commission (Original Addanki Report ¶32);

- AMPs  (Original Addanki Report Section III.C.)

Additionally, in his Supplemental Report, Dr. Addanki claims that data from IMS America, Ltd. was available to MassHealth. Exhibit 3 (Supplemental Addanki Report) at ¶ 7).

Much of this evidence was proffered by Defendants in their summary judgment motion and rejected by the Court as insufficient "government knowledge" evidence.  The Court has previously held that the knowledge of the Group Insurance Commission and other similar state agencies cannot be imputed to MassHealth. *Massachusetts v. Mylan Labs., Inc. et al.,* 2008 WL 5650859 (D.Mass. Dec. 23, 2008) at *20.  The Court has also held that since MassHealth did not "reverse engineer" data to calculate AMP, it is not evidence of government knowledge. *See id.* at *23.  Accordingly, Dr. Addanki should not be permitted to testify regarding  AMPs or rates paid by the Group Insurance

Commission and should not be permitted to introduce charts or calculations based on these numbers. Defendants should not be permitted to circumvent the Court's ruling and resurrect this defense by introducing it under the guise of expert testimony.

Likewise, the remaining categories of "government knowledge" evidence cited by Dr. Addanki should be excluded for the reasons set out in the Commonwealth's Motion in Limine regarding "government knowledge" evidence. There is no evidence that the Commonwealth saw or utilized textbooks or wholesaler catalogs or any of the other information Defendants and Dr. Addanki claim was "available."

***Data from IMS America, Ltd***: In his Supplemental Report, Dr. Addanki claims that "IMS pharmacy cost data were available throughout the relevant period." Exhibit 3 (Supplemental Addanki Report) at ¶ 7. To date, Defendants have not produced the IMS data to the Commonwealth. IMS data is irrelevant and should be excluded from the trial of this action as there is no evidence that MassHealth ever purchased or utilized the data from IMS. Therefore, it would be impermissible to impute knowledge of prices contained in the IMS data to the Commonwealth. Additionally, Defendants (and their experts) should be precluded from implying or arguing that MassHealth had access to IMS data and from introducing charts or other evidence that refer to IMS data.

Moreover, even if government knowledge was still a viable defense, which it is not, it is inappropriate for an expert in economics to offer opinions about what MassHealth knew or did not know. Clearly, Dr. Addanki does not have the firsthand knowledge or observation that would be required of an ordinary witness under Fed.R.Evid. 602, and given that this testimony is well beyond the scope of Dr. Addanki's

discipline—economics, it is not reliable expert testimony admissible under Fed.R.Evid. 702.

The Court should preclude Dr. Addanki from offering the opinions contained in his Original Report at Section III, ¶¶ 24-41, Exhibits 3-14 to his Original Report, the opinions contained in his Supplemental Report and Exhibits 3-18 to his Supplemental Report.

## V. **The Court should preclude all charts and analysis set forth in Dr. Addanki's supplemental report.**

On December 23, 2009, Defendants produced the Supplemental Report of Dr. Addanki. Despite the fact that the Court previously ruled that the Commonwealth cannot be charged with the knowledge of AMPs or rates used by the Group Insurance Committee, Defendants asked Dr. Addanki to calculate what MassHealth would have paid in reimbursements if it had used the following alternative bases for calculating reimbursements:

a. Average pharmacy acquisition cost obtained from AMPs/IMS data (Exhibit 3, Supplemental Addanki Report at Exhibits 6-11)

b. Rates used by the Group Insurance Commission (Supplemental Addanki Report at Exhibits 12-14)

The court should exclude Dr. Addanki's new analysis on the following grounds:

1. The Commonwealth has not been given an opportunity to depose Dr. Addanki regarding his new calculations.

2. Dr. Addanki's calculations based upon IMS data must be excluded as the data has not been produced to the Commonwealth in this litigation.

3. In calculating what reimbursements would have been if MassHealth had used other data, Dr. Addanki's analysis makes an assumption of government knowledge that has been rejected by this Court and is not based on any factual evidence.

4. The analysis is irrelevant.

The Commonwealth did not learn of Dr. Addanki's new calculations until Defendants produced his Supplemental Report on December 23, 2009. The Commonwealth has not had an opportunity to depose Dr. Addanki regarding his new calculations. Therefore, it would be unfairly prejudicial for Dr. Addanki to be permitted to testify regarding these new calculations at trial. Additionally, many of Dr. Addanki's new calculations are based upon IMS data, which Defendants have never produced to the Commonwealth in this litigation. Accordingly, it would be unfair for Defendants to rely on this evidence at trial or for Dr. Addanki to testify regarding calculations based upon this data.

Additionally, Dr. Addanki's new calculations are based upon Group Insurance Commission rates, IMS data and AMPs--data that, as set forth above, MassHealth did not know about or use. Dr. Addanki's new calculations of what MassHealth would have paid had it used this different data presume that MassHealth was aware of this data. This presumption has not been supported by any evidence. It would be highly confusing and misleading to a jury, and thus extremely prejudicial, for these charts and analysis to be admitted at trial.

Additionally, Dr. Addanki's new calculations and charts have no conceivable relevance to this action. It is unclear what element of the Commonwealth's claims Defendants intend to attack or what affirmative defense Defendants intend to support with this evidence.

Defendants cannot argue that MassHealth should have used one of Dr. Addanki's calculations instead of relying on Defendants' WAC. It appears Defendants may be

attempting to argue that the Commonwealth had a duty to avoid the fraud perpetrated by Defendants. There is absolutely no authority to support this argument. Defendants may attempt to argue that these calculations are being offered to support an affirmative defense that the State failed to mitigate its damages. *See* Defendants' Answer, Dkt. No. 616 at p. 16, Seventh Affirmative Defense. Such an affirmative defense must fail. The Massachusetts False Claims Act does not require the state to mitigate its damages. Moreover, the Government has no duty to mitigate its damages in fraud cases, including those under the False Claims Act. *U.S. v. Robert Wood Johnson Univ. Hosp.,* 2009 WL 4576097 at *8 (D.N.J. December 1, 2009)("Defendant is not entitled to shield itself from potential liability from the Government's allegations by arguing that the Government should have done more to stop Defendant from perpetuating an alleged fraud."); *Toepleman v. U.S.,* 263 F.2d 697, 700 (4th Cir. 1959)(holding that failure to mitigate damages is not a defense to a fraud under the False Claims Act because the defendant "cannot be exonerated by the failure to cast it off at the most propitious time.") Finally, no party (including the State) has a duty to mitigate damages caused by fraud where the plaintiff and defendant had an equal opportunity to reduce the damages and the defendant failed to do so.

> "Where both the plaintiff and defendant have had equal opportunity to reduce damages by the same act and it is equally reasonable to expect the defendant to minimize damages, the defendant is in no position to contend that the plaintiff failed to mitigate."

*Shea-S&M Ball v. Massman-Kiewit-Early,* 606 F.2d 1245, 1249 (D.C. Cir. 1979)(*quoting S.J. Groves & Sons, Co. v. Warner Co.,* 576 F.2d 524, 530 (3d Cir. 1978).

These new calculations have no relevance to this case and would be highly confusing, misleading and prejudicial. Accordingly, Dr. Addanki should be precluded from offering any of the opinions contained in his Supplemental Report and Exhibits 3-18 to his Supplemental Report.

**VI.** **Dr. Addanki should be precluded from attempting to interpret Medicaid regulations and arguing that MassHealth should have used a different framework for calculating reimbursements.**

Dr. Addanki goes well beyond economic analysis and attempts to interpret Medicaid regulations and argue that MassHealth should have used a different framework for calculating Medicaid reimbursements. For example, in his Original Report, Dr. Addanki indicates that he intends to offer the opinion that "CMS Allows State Medicaid Agencies Wide Latitude in Choosing Their Reimbursement Frameworks." Exhibit 1 and 1A (Original Addanki Report) at Section IV.C., ¶¶ 53-57. Dr. Addanki, an economist, is not qualified to offer opinions regarding the meaning of Medicaid legislation. These are purely questions of law upon which that Dr. Addanki has no business opining. It is well-established that an expert cannot offer opinions on the meaning of the law. *See U.S. Mikutowicz,* 365 F.3d 65, 73 (1st Cir. 2004). The Court should not allow Dr. Addanki to give his own personal interpretation of the Medicaid regulations or make the legal argument that Massachusetts should have used a different frame work for calculating Medicaid reimbursements.

**VII.** **The Court should preclude the analysis set forth in Dr. Addanki's March 31, 2008 affidavit as it is no longer relevant**

Dr. Addanki incorporated his March 31, 2008 Affidavit (produced in support of Defendants' Motion for Summary Judgment) into his Supplemental Report. See Exhibit

2 (Addanki Affidavit) and Exhibit 3 (Addanki Supplmental Report) at ¶ 1. Dr. Addanki's Affidavit pertains to a period of time in which it appears that MassHealth reimbursed pharmacies at a rate higher than the Federal Upper Limit (FUL).

The Commonwealth has recently revised its damages calculation to exclude those claims. Accordingly, the testimony reflected in Dr. Addanki's affidavit and the charts attached to the affidavit are no longer relevant and should be excluded.

## CONCLUSION

For the foregoing reasons, the Court should grant the Commonwealth's Motion to Exclude Portions of the Testimony of Sumanth Addanki, Ph.D. and limit Dr. Addanki's testimony as set forth herein.

                                                Respectfully submitted,

                                                Martha Coakley
                                                Attorney General

By:    /s/ Peter A. Mullin
         Peter A. Mullin (BBO # 360620)
         K. Nathaniel Yeager (BBO # 630992)
         Colleen A. McCarthy (BBO # 660581)
         John Pina, III (BBO # 652247)
         Gregory W Matthews (BBO # 653316)
         Robyn Pozza Dollar (BBO# 674480)
         Steven T. Sharobem (BBO# 664583)
         Assistant Attorneys General
         One Ashburton Place
         Boston, MA 02114
Dated: January 15, 2010         (617) 963-2622

**Certificate of Service**

    I hereby certify that I caused a copy of the foregoing Commonwealth's Memorandum in Support of its Motion To Exclude Portions of the Testimony of Sumanth Addanki, Ph.D. to be served on counsel for each other party in this case, by filing it electronically in the Court's CM/ECF system this 15th day of January 2010.

                                              /s/ Peter A. Mullin
                                              Peter A. Mullin
                                              Assistant Attorney General