**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| COMMONWEALTH OF MASSACHUSETTS, PLAINTIFF | ) | |
| vs. | ) | C.A. No. 03-11865-PBS |
| MYLAN INC. *et al.*, DEFENDANTS | ) | |

**THE COMMONWEALTH'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE PORTIONS OF THE TESTIMONY OF FIONA SCOTT MORTON**

Pursuant to the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 113 S.Ct 2786 (1993), the Commonwealth of Massachusetts has moved to exclude portions of the testimony of Fiona Scott Morton from the trial of this action.

Schering Corporation, Schering-Plough Corporation and Warrick Pharmaceuticals Corporation (hereinafter "Defendants") have designated Fiona Scott Morton as an expert witness in this case. Dr. Scott Morton is an economist who purports to be an expert in "pharmaceutical economics." Dr. Scott Morton's opinions go well beyond economic analysis. Dr. Scott Morton strays far afield of her area of expertise by attempting to interpret Medicaid regulations and speculate about the intent of state and federal Medicaid personnel. Defendants also attempt to use Dr. Scott Morton's testimony to revive their government knowledge defense, despite the fact that the Court has already ruled that Defendants have no legally viable government knowledge defense prior to 2002. While the Commonwealth is not challenging Dr. Scott Morton's qualifications to

testify as an economic expert, the Commonwealth is challenging Dr. Scott Morton's attempts to go beyond economic analysis into other fields and issues. Dr. Scott Morton's theories are inadmissible speculation that are irrelevant and will create a substantial danger of confusing and misleading the jury. Accordingly, Dr. Scott Morton's opinions must be excluded under the Federal Rules of Evidence and the relevant case law.

**FACTUAL BACKROUND**

Defendants have designated Fiona Scott Morton as an expert witness in this case. Dr. Scott Morton is an economist who regularly consults and serves as an expert witness for pharmaceutical companies involved in litigation. See excerpts of the April 8, 2008 Deposition of Fiona Scott Morton ("Scott Morton Dep."), attached hereto as Exhibit 1 at 54:15-21. Although she is an economist, Dr. Scott Morton "had nothing to do with the data portion of this lawsuit and the damages portion." Exhibit 1 (Scott Morton Dep.) at 129:14-20. Rather, Dr. Scott Morton considers herself to be an expert in "pharmaceutical economics," which she defines as encompassing "the economics of drug discovery, of pricing, of distribution, of regulation, competition." Exhibit 1 (Scott Morton Dep.) at 86:17-88:3.

On March 28, 2008, Defendants produced Dr. Scott Morton's Declaration ("Scott Morton Decl."), attached hereto as Exhibit 2. The Commonwealth deposed Dr. Scott Morton on April 8, 2008. On April 22, 2008, pursuant to the Court's Order for Tutorial Regarding Pharmaceutical Reimbursement Under Medicaid, Defendants produced a tutorial presentation by Dr. Scott Morton ("Scott Morton Tutorial"), attached hereto as Exhibit 3. By letter dated December 23, 2009 the Defendants advised the

Commonwealth that they were adopting Dr. Scott Morton's April 22, 2008 tutorial report as a supplemental expert disclosure for Dr. Scott Morton.

## ARGUMENT

### I. Legal standards

Federal Rule of Evidence 702 allows an expert witness to testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Before admitting expert testimony, the trial court must first perform a gatekeeping function to determine whether the expert is qualified and whether the expert's testimony is sufficiently reliable and "relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The trial judge must make this requisite gatekeeping determination for all proffered expert testimony that reflects "specialized knowledge," whether "scientific" or not. See *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (citing Fed.R.Evid. 702); *see also Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 175 F.3d 18, 34 n. 12 (1st Cir. 1999)(extending the court's gatekeeping function to expert testimony based upon economic analyses).

If the court finds the expert to be qualified, it must then turn to the proffered expert testimony to determine its relevance, i.e., "whether those principles and methods have been properly applied to the facts of the case." *United States v. Monteiro*, 407 F.Supp.2d 351, 357-58 (D.Mass.2006) (quoting Fed.R.Evid. 702 advisory committee's note). The critical inquiry is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

*Kumho Tire Co.*, 526 U.S. at 152, 119 S.Ct. 1167. Beyond the normal requirement of relevance for all evidence, "expert testimony must be relevant ... in the incremental sense that ... if admitted, [it] likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir.1998); see also Fed.R.Evid. 702.

An expert's methodology is the "central focus of the *Daubert* inquiry," but a court "may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Natchitoches Parish Hosp. Service Dist. V. Tyco Intern., Ltd.*, slip copy, 2009 WL 3053855 (D.Mass. Sept. 21, 2009) at *1 (quoting *Ruiz-Troche v. Pepsi-Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3d Cir. 2000)(holding that district court should have excluded expert testimony of economist where testimony was based on assumptions without foundation in the trial record).

Vigilant exercise of this gatekeeper role is critical because expert witnesses are allowed to express opinions on matters about which they have no firsthand knowledge, and because an expert's testimony may be given substantial weight by the jury due to the expert's background. *Id.* at *2; *see also Daubert,* 509 U.S. at 595; *Kumho Tire Co. v. Carmichael,* 526 U.S. at 148 (noting that experts enjoy "testimonial latitude unavailable to other witnesses"); *United States v. Hines*, 55 F.Supp.2d 62, 64 (D.Mass. 1999)("[A] certain patina attaches to an expert's testimony unlike any other witness; this is a 'science', a professional's judgment, the jury may think, and give more credence to the testimony than it may deserve.") According to the Supreme Court in *Daubert,* the

relaxation of the usual requirement of firsthand knowledge is presumably "premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." See *Daubert,* 509 U.S. at 592 [Emphasis added.]

Additionally, irrelevant evidence is inadmissible. Fed. R. Evid. 402. Even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403; *Williams v. Drake*, 146 F.3d 44, 48 (1st Cir. 1998)(holding that relevant evidence may be excluded when it comes with "unwanted baggage" such as potential juror confusion or unfair prejudice). Rule 403 is "a tool a trial judge can use to keep a jury's attention riveted on the dispositive issues." *Williams,* 146 F.3d at 48. Rule 403 may applied to prevent "muddling the issues" or creating "an unwanted sideshow, drawing attention from the main event." *Id.*

## II. Pursuant to the law of the case doctrine, the Court should preclude Dr. Scott Morton from testifying that WAC is a "list price" or anything other than "the amount the goods actually cost"

This Court has held in connection with summary judgment motions that "wholesale acquisition cost" (WAC) "does not mean a list price; it means the amount the goods actually cost." *Massachusetts v. Mylan Labs., Inc. et al.,* 608 F.Supp.2d 127, 143 (D.Mass. 2008). This is now the law of the case. *See Naser Jewelers, Inc. c. City of Concord, N.H.*, 538 F.3d 17, 20 (1st Cir. 2008). Under the "law of the case doctrine," a court's decision upon a rule of law continues to govern the same issues in subsequent stages of the same case. *Id.* Narrow exceptions to the doctrine exist if the initial ruling was made on an inadequate record or was designed to be preliminary; if there has been a

material change in controlling law; if there is newly discovered evidence bearing on the question; and if it is appropriate to avoid manifest injustice. *Id.* None of these exceptions apply here. Accordingly, Dr. Scott Morton should not be permitted to testify that WAC is a "list price" or offer any other testimony regarding the meaning of WAC that contradicts the law of the case: that WAC is "the amount the goods actually cost."

Specifically, the Court should preclude Dr. Scott Morton from offering the opinions contained in her Declaration at ¶ 52, wherein Dr. Scott Morton opines that "the Commonwealth understood that WACs were not necessarily net prices" and in ¶ 88, wherein Dr. Scott Morton opines that "[t]he Commonwealth knew that the WAC is an undiscounted list price and not an average of net prices." Additionally, the Court should preclude Dr. Scott Morton from offering the opinions contained in her Tutorial, wherein she opined:

> At this point, let me say a word about WACs and how they are used for generic drugs because it is very different than for brand drugs. WAC, as this Court knows, is generally an undiscounted list price that often appears in pricing compendia.
>
> Brand manufacturers typically set a WAC or list price, and wholesalers and retail pharmacies generally pay prices that are close to WAC for branded, self-administered drugs. (AWPs for brand drugs as the Court knows, typically represent a 20 to 25% markup above the drug's WAC).

Exhibit 3 (Scott Morton Tutorial) at pp. 19-20.

Contrary to Dr. Scott Morton's assertion that this Court "knows" that WAC is an undiscounted list price, this Court has actually ruled exactly the opposite in this case. This Court's ruling, which is now the law of case, is that WAC "does <u>not</u> mean a list price; it means the amount the goods actually cost." Dr. Scott Morton should not be

permitted to encourage the jury to come to a conclusion contrary to the Court's ruling by asserting these opinions.

**III. The Court should preclude Dr. Scott Morton's testimony regarding "government knowledge"**

This Court has already ruled in connection with summary judgment motions that "with respect to the period before 2002, a government knowledge defense does not fly as a matter of law." *Massachusetts v. Mylan Labs., Inc. et al.*, 608 F.Supp.2d 127, 152 (D.Mass. 2008). Therefore, under the law of the case doctrine, any evidence, arguments or testimony intended to demonstrate government knowledge prior to 2002 should be excluded at trial. *See Naser Jewelers*, 538 F.3d at 20 (upholding the "law of the case doctrine" whereby a court's decision upon a rule of law continues to govern the same issues in subsequent stages of the same case). Evidence and testimony offered to establish government knowledge prior to 2002 is irrelevant and would only confuse and mislead the jury to believe that Defendants have a legally viable government knowledge defense.

The Court should preclude Dr. Scott Morton from arguing that the evidence shows the Commonwealth knew WACs were higher than net prices. Examples of Dr. Scott Morton's attempts to argue a "government knowledge" defense based upon selective evidence include the following excerpts from her Declaration:

> ¶ 8: The evidence reflects the Commonwealth's understanding that generic drugs are often sold at very low prices due to market competition and that the published Wholesale Acquisition Costs ("WACs") for generic drugs are often higher than net prices.
>
> ¶ 9: Evidence further reveals that the Commonwealth was well-informed about generic drug manufacturers' published prices and the fact that they were higher than net prices and Medicaid's statutorily-defined "average manufacturer prices" (AMPs), particularly in light of the fact that since

> 1991, the Commonwealth has received quarterly information on unit rebate amounts , which are 11 percent of AMP for generic drugs approved under an Abbreviated New Drug Application.
>
> ¶ 52: Not only does the evidence reflect that the Commonwealth understood that WACs were not necessarily net prices, but it also reflects the Commonwealth's awareness that pharmacies purchased drugs at prices substantially below published prices due to discounts arising from competition.
>
> ¶ 88: Based on the evidence, it does not appear that The Commonwealth was not misled by published prices; by the accounts of Commonwealth officials and the actions of the state, it is clear that the Commonwealth must have understood that published WACs (and AWPs) differed from net prices. The Commonwealth knew that the WAC is an undiscounted list price and not an average of net prices.

Additionally, throughout Section VII of her Declaration (which she has entitled "The Commonwealth was Well-Informed About Drug Pricing and Acted on its Knowledge"), Dr. Scott Morton offers selected evidence and testimony and argues that it demonstrates government knowledge. Dr. Scott Morton does not apply any economic expertise to this evidence. She is merely acting as an advocate for the Defendants—in effect, making a closing argument.

Dr. Scott Morton's arguments are contrary to this Court's prior ruling that Defendants have no viable government knowledge defense prior to 2002. Moreover, even if government knowledge was still a viable defense, which it is not, it is inappropriate for an expert in economics to offer opinions about what MassHealth knew or did not know. Clearly, Dr. Scott Morton does not have the firsthand knowledge or observation that would be required of an ordinary witness under Fed.R.Evid. 602, and given that this testimony is well beyond the scope of Dr. Scott Morton's discipline—economics, it is not reliable expert testimony admissible under Fed.R.Evid. 702.

In addition to precluding Dr. Scott Morton from arguing that the evidence demonstrates government knowledge, the Court should preclude Dr. Scott Morton from testifying that various sources of information were "available" to MassHealth prior to 2002. The fact that information may have been "available" does not mean that MassHealth was aware of it. While evidence of actual knowledge may be relevant, evidence that was merely "available" is completely irrelevant. Throughout Section VII of her Declaration (¶¶52-89) and in her Tutorial (pp. 15-17), Dr. Scott Morton sets out information she claims was "available" to MassHealth including:

- AMPs (Exhibit 2, Scott Morton Decl. at ¶ 56)
- Prices paid by other state agencies including the Group Insurance Commission (GIC), the State Office of Pharmacy Services (SOPS), the Prescription Advantage Program and the 340B program (Exhibit 2, Scott Morton Decl. at ¶ 57-62; Exhibit 3, Scott Morton Tutorial at pp. 15-17)
- Information from "Independent Fiscal Agents" such as EDS (Exhibit 3, Scott Morton Tutorial at p. 17)

Much of this evidence was proffered by Defendants in their summary judgment motion and rejected by the Court as providing insufficient evidence of government knowledge. The Court has previously held that the knowledge of the Group Insurance Commission and other similar state agencies cannot be imputed to MassHealth. *Massachusetts v. Mylan Labs., Inc. et al.*, 2008 WL 5650859 (D.Mass. Dec. 23, 2008) at *20. The Court has also held that since MassHealth did not "reverse engineer" data to calculate AMPS, it is not evidence of government knowledge. *See id.* at *23. Such "reverse engineering" of AMPs from URAs is not possible for the Warrick drugs at issue in this case because they are innovator generics and the URA is the greater of 15.1% of AMP or the difference between the AMP and the Best Price. 42 U.S.C. § 1396r-

8(c)(3)(b)(5); *see* Exhibit 3 (Scott Morton Tutorial) at pp. 30-26 and n. 78. Accordingly, Dr. Scott Morton should not be permitted to testify regarding AMPs or rates paid by GIC, SOPS, or the Prescription Advantage or 340B program. Defendants should not be permitted to circumvent the Court's ruling and resurrect this defense by introducing it under the guise of expert testimony.

Additionally, the Court should preclude Dr. Scott Morton from testifying about "independent fiscal agents" such as EDS. Exhibit 3 (Scott Morton Tutorial) at p. 17. EDS did not process claims for Massachusetts. Accordingly, this evidence is irrelevant and would only confuse and mislead the jury to believe that Massachusetts had or should have had information from EDS.

In sum, the Court should preclude Dr. Scott Motion from offering the opinions contained in her Declaration at ¶¶ 8-9 and Section VII and the opinions on pages 15-17 of her Tutorial.

**IV. <u>The Court should preclude Dr. Scott Morton from testifying regarding cross-subsidization, access and the intent of federal and state Medicaid personnel.</u>**

Dr. Scott Morton goes beyond claiming government knowledge and further opines that the Commonwealth "acted on its knowledge" by deliberately overpaying pharmacies. Some examples of her testimony include:

> ¶ 63: It is clear from the evidence in this case that the Commonwealth officials in charge of running the Massachusetts Medicaid agency were very knowledgeable about drug pricing and that they acted on this knowledge in changing their policies regarding payments to pharmacies.
>
> ¶ 88: The evidence shows that the Commonwealth had extensive knowledge of net prices as well as published prices and must be assumed to have deliberately chosen a formula for paying pharmacies in light of this information. The evidence further shows that the Commonwealth did not attempt to make payments to pharmacies for drugs exactly equal to the pharmacies' costs of purchasing drugs, rather, it attempted to ensure that

total payments to pharmacies were sufficient to balance the Medicaid program objectives of cost control with the imperative to pay pharmacies enough to ensure that they would participate in the Medicaid program.

Indeed, throughout Section VII of her Declaration ("The Commonwealth was Well-Informed About Drug Pricing and Acted on its Knowledge") and pages 24-26 of her Tutorial, Dr. Scott Morton offers selected evidence and testimony and argues that it demonstrates not only government knowledge, but intentional actions by Medicaid personnel based on that knowledge. Specifically, Dr. Scott Morton adopts the argument that Medicaid programs "purposefully compensated for low dispensing fees by providing an ingredient cost reimbursement amount that 'generally exceeds actual acquisition costs.'" Exhibit 3 (Scott Morton Tutotrial) at p. 24. Dr. Scott Morton goes on to opine that this "cross-subsidy" "makes sense" from the state's perspective. *Id.* The Court should preclude Dr. Scott Morton's opinions regarding the intent of Medicaid personnel because:

1. Dr. Scott Morton's opinions are beyond the scope of her expertise as an economist;

2. Federal regulations and policy expressly prohibit states from overpaying on acquisition costs to compensate for inadequate dispensing fees (i.e. cross-subsidization) and the law presumes that this law and policy were followed absent clear admissible evidence to the contrary;

3. Dr. Scott Morton has no basis upon which to conclude that that Massachusetts intentionally overpaid pharmacies for acquisition costs to ensure adequate access. There is no admissible evidence that prior to 2002, MassHealth officials intentionally overpaid for acquisition costs because they believed dispensing fees were too low. Dr. Scott Morton's opinions are based on sheer speculation. Thus, her speculative opinions on this matter are inadmissible under Fed. R. Evid. 702.

Dr. Scott Morton is an economist, not a psychologist or a political scientist. She does not base any of her theories about the intent of Medicaid personnel on economics.

She merely recites selective evidence and draws inferences from the evidence without applying any economic analysis. Dr. Scott Morton's opinions regarding the intentions of Medicaid personnel must be excluded because they lack any reliable basis in the knowledge and experience of her discipline. See *Daubert*, 509 U.S. at 592. Therefore, her opinions are not proper expert testimony under Fed. R. Evid. 702 and must be excluded.

Contrary to Dr. Scott Morton's opinion, federal Medicaid regulations do not permit states to inflate estimated acquisition costs to compensate for inadequate dispensing fees. Under federal regulations, a state Medicaid program's payments for a drug may not exceed the "estimated acquisition cost" of the drug plus a reasonable dispensing fee, where the "estimated acquisition cost" (EAC) is defined as "the agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers." 42 C.F.R. § 447.502 (2008). Given this regulation, there is no room for states to deliberately inflate the EAC to increase profits to pharmacies or "cross-subsidize" for inadequate dispensing fees.

Moreover, if there was ever any doubt about whether cross-subsidization was permitted under the regulations, the issue was clarified in 1994 by the Department of Health and Human Services Medicaid Bureau Director in a memorandum to all Division of Medicaid Associate Regional Administrators:

> "We would also like to clarify our policy that a dispensing fee determination must be separate and distinct from the EAC determination and unrelated to the cost of the drug product."

*See* Exhibit 4, August 12, 1994 Memorandum from Department of Health and Human Services, Director, Medicaid Bureau, to All Associate regional Administrators, Division of Medicaid. *See also* Exhibit 5, September 6, 1994 State Medicaid Agency Regional Bulletin No. 94-25.

"In the game of statutory interpretation, statutory language is the ultimate trump card." *U.S. v. Czubinski,* 106 F.3d 1069, 1078 (1st Cir. 1997). In the absence of evidence to the contrary, it must be presumed that the law was followed. *See TRW, Inc., TRW Michigan Division v. N.L.R.B.*, 393 F.2d 771, 774 (6th Cir. 1968)(holding that suspicion of a company's intent to discriminate is not a sufficient basis for finding a violation of the law); *see also N.L.R.B. v. Shawnee Indus., Inc.,* 333 F.2d 221, 225 (10th Cir. 1964).

When asked what evidence she had to support her opinion that MassHealth deliberately overpaid pharmacies and thereby rebut this presumption, Dr. Scott Morton could only point to two things: the October 2002 report to the General Court and portions of Paul Jeffrey's deposition testimony. Exhibit 1 (Scott Morton Dep.) at 268:20-275:5.[1] Not only is Dr. Scott Morton, an economist, completely unqualified to interpret federal regulations and speculate on the intentions of federal and state agencies, the testimony upon which she bases these conclusions does not come close to supporting this bold conclusion. Neither the 2002 report nor Dr. Jeffrey's testimony suggest that the Commonwealth deliberately overpaid pharmacies throughout the time period at issue in this case.

In sum, there is absolutely no basis to allow Dr. Scott Morton to speculate about the intent of federal or state Medicaid personnel. Accordingly, the Court should preclude

[1] Dr. Scott Morton also indicated that portions of Arnold Shapiro's deposition testimony supported her opinion, but she was unable to point to any specific testimony by Shapiro that supported her claims.

Dr. Scott Morton from opining regarding cross-subsidization, access or the intentions of state or federal Medicaid personnel, and should specifically preclude her from expressing the opinions contained in ¶¶ 8-9 and Section VII of her Declaration and in pages 24-26 of her Tutorial.

## V. <u>The Court should preclude Dr. Scott Morton's testimony regarding Defendants' incentive to defraud the Commonwealth</u>

In Section VIII of her Declaration, Dr. Scott Morton opines that Defendants had no incentive to defraud the Commonwealth. Although Dr. Scott Morton entitled this section of her report "Generic Manufacturers Had No Economic Incentive to Defraud or Attempt to Defraud the Commonwealth as Alleged," her opinions regarding Defendants' incentives are not based upon economics. Her opinions are based on her interpretation of Medicaid regulations and her speculation regarding how generic drug manufacturers would interpret and respond to regulations:

> ¶ 93: If a manufacturer had stopped to consider the regulations regarding pharmacy payments by Massachusetts Medicaid—and the likelihood that the usual and customary charge, which would reflect private-sector MAC prices, would have been less than prices based on published prices—there is no reason to believe generic drug manufacturers would have expected their published prices—such as WACs—to have been relevant to Massachusetts Medicaid payments to pharmacies for those drugs that had multiple generic alternatives available.

Exhibit 2 (Scott Morton Decl.)

To the extent Dr. Scott Morton intends to opine on the "economic incentives" of manufacturers, her opinions should be limited to her expertise—economics. She should not be permitted to make legal arguments, interpret legislation or speculate regarding what manufacturers would have done if they had "stopped to consider the regulations."

Accordingly, the Court should exclude Dr. Scott Morton's opinions contained in Section VIII of her Declaration.

## VI. The Court should preclude Dr. Scott Morton from testifying regarding the Deficit Reduction Act

On pages 33-34 of her Tutorial, Dr. Scott Morton offers testimony regarding the Deficit Reduction Act (DRA) of 2005 and legislative changes in the calculation of the FUL from using published prices to using AMP-based calculations. Among other things, Dr. Scott Morton purports to testify about a suit in the United States District Court in Washington, D.C. brought by the National Association of Chain Drug to enjoin implementation of the DRA of 2005 on Administrative Procedure Act grounds. All of this testimony relates to events that occurred long after the 2003 end of the damages period in this case. Testimony regarding the Deficit Reduction Act is completely irrelevant to this case and would only waste time and lead to juror confusion. Therefore, this testimony should be excluded pursuant to Fed. R. Evid. 402 and 403.

## CONCLUSION

For the foregoing reasons, the Court should grant the Commonwealth's Motion to Exclude Portions of the Testimony of Fiona Scott Morton and limit Dr. Scott Morton's testimony as set forth herein.

Respectfully submitted,

Martha Coakley
Attorney General

By: /s/ Peter A. Mullin
Peter A. Mullin (BBO # 360620)
K. Nathaniel Yeager (BBO # 630992)
Colleen A. McCarthy (BBO # 660581)
John Pina, III (BBO # 652247)
Gregory W Matthews (BBO # 653316)
Robyn Pozza Dollar (BBO# 674480)
Steven T. Sharobem (BBO# 664583)
Assistant Attorneys General
One Ashburton Place
Boston, MA 02114
(617) 963-2622

Dated: January 15, 2010

## Certificate of Service

I hereby certify that I caused a copy of the foregoing Commonwealth's Memorandum in Support of its Motion To Exclude Portions of the Testimony of Fiona Scott Morton to be served on counsel for each other party in this case, by filing it electronically in the Court's CM/ECF system this 15th day of January 2010.

/s/ Peter A. Mullin
Peter A. Mullin
Assistant Attorney General