**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS,<br>Plaintiff,<br>v.<br><br>MYLAN LABORATORIES, INC., IVAX CORPORATION, WARRICK PHARMACEUTICAL CORPORATION, WATSON PHARMACEUTICALS, INC., SCHEIN PHARMACEUTICAL, INC., TEVA PHARMACEUTICALS USA, INC., PAR PHARMACEUTICAL, INC., PUREPAC PHARMACEUTICAL CO., and ROXANE LABORATORIES, INC.,<br>Defendants | ) | **CIVIL ACTION**<br>**No. 03-11865-PBS** |

# CORRECTED DECLARATION OF FIONA SCOTT MORTON

AWP Exhibits Henderson *Expedite*

EXHIBIT
Scott-Morton 001
4-8-08 JMW

CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

## I. INTRODUCTION

1. My name is Fiona Scott Morton. I am a Professor of Economics and Strategy at the Yale School of Management and also serve as the Senior Associate Dean for Faculty Development at the School of Management. After receiving a B.A. from Yale College and a Ph.D. from the Massachusetts Institute of Technology, both in Economics, I taught at the Stanford University Graduate School of Business and the University of Chicago Graduate School of Business.

2. My primary expertise is in the study of firms, markets, and competition. I have undertaken research in a variety of industries, including pharmaceuticals, merchant shipping, wineries, funeral homes, e-commerce, automobile retailing, and magazines. With respect to the pharmaceutical industry, I have been, or am, conducting research into competition, generic entry, and effects of procurement policies for pharmaceuticals for Medicaid and Medicare, and my doctoral thesis explored the Medicaid Rebate Program and the impact that program had on pharmaceutical prices in the United States. My research has been widely disseminated through top peer-reviewed journals and research seminars and conferences to which I have been frequently invited.

3. I serve in an editing role for journals in the field of Industrial Organization, and have won several prestigious research grants from the National Science Foundation. My professional experience is described in my curriculum vitae, which is attached as Exhibit A. I prepared an expert tutorial for the Court in *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456 with Dr. Gregory Bell entitled, "An Orientation to the Acquisition of and Reimbursement for Prescription Drugs," submitted on December 3, 2004, and I testified as an expert on behalf of *AstraZeneca in Alabama v. Abbott Labs, et al.*, in February 2008.

4. In connection with this case, I have been asked to provide an overview of the generic drug industry, including how generic prescription drugs were distributed and priced; to examine how third-party payers, such as Blue Cross Blue Shield of Massachusetts, paid pharmacies for prescription drugs; to examine the information

that was available to the Commonwealth that informed decisions by the Massachusetts Medicaid program regarding its payments to pharmacies for prescription drugs; to evaluate the allegations in the Commonwealth's complaint;[1] and to evaluate the opinions offered by and testimony of the plaintiff's experts.

5. In preparing my report, I have relied upon the materials cited in the report and listed in Exhibit B, and I will update my analysis if additional information becomes available through discovery. Further, I reserve the right to supplement or modify my opinions, if warranted, and to prepare additional supporting materials, such as summaries, graphical exhibits, or charts, and as I review additional depositions previously taken in this case. In this matter, I am being compensated for my time at a rate of $650 per hour.

6. My report is organized as follows. The next section presents a summary of my opinions in this matter. In the third section, I discuss the economics of the generic drug industry and describe how the generic drug industry differs from the brand-name (innovator) drug industry in general. Section four presents a discussion of the differences in the use of published prices, such as wholesale acquisition cost ("WAC"), by the manufacturers and purchasers of brand-name and generic drugs. In section five, I describe how non-governmental third-party payers ("TPPs") set payments to pharmacies, and I describe how the Massachusetts Medicaid agency sets payments to pharmacies in section six. In section seven, I discuss the information available to and used by the Commonwealth of Massachusetts and the Medicaid agency in setting its reimbursement policies. I discuss the allegations in the complaint in section eight and section nine concludes. In addition, I will address certain errors in the reports and deposition testimony of plaintiff's experts, Dr. Meredith Rosenthal[2] and Dr. Raymond Hartman[3], throughout my report.

---

1 First Amended Complaint, The Commonwealth of Massachusetts v. Mylan Laboratories, Inc., et al., Civil Action No. 03-CV-11865-PBS, United States District Court, District of Massachusetts, May 19, 2005 ("Complaint").

2 Declaration of Meredith Rosenthal: Report on the Prescription Drug Market, February 28, 2008 ("Rosenthal Report") and Deposition of Meredith Rosenthal, March 13, 2008 ("Rosenthal Deposition").

## II. Summary of Opinions

7. My opinions in this matter include, but are not limited to, the following:

8. The evidence reflects the Commonwealth's understanding that generic drugs are often sold at very low prices due to market competition and that the published Wholesale Acquisition Costs ("WACs") for generic drugs are often higher than net prices. The Commonwealth acted on this awareness by implementing programs to reduce expenditures on prescription drugs. For example, at several times during the relevant period, the Commonwealth changed its definition of the usual and customary charge to avail itself of lower prices in the market—such as the Maximum Available Cost ("MAC") prices negotiated by Pharmacy Benefit Managers ("PBMs") and commercial insurance companies for multi-source generic drugs—that were generally below manufacturers' published prices, including WAC. It is important to note that the Commonwealth saved an average of $80 for each generic drug dispensed to a Massachusetts Medicaid patient in lieu of a single-source brand name equivalent, according to the Division of Health Care Finance and Policy.

9. Evidence further reveals that the Commonwealth was well-informed about generic drug manufacturers' published prices and the fact that they were higher than net prices and Medicaid's statutorily-defined "average manufacturer prices" ("AMPs"), particularly in light of the fact that since 1991, the Commonwealth has received quarterly information on unit rebate amounts, which are 11 percent of AMP for generic drugs approved under an Abbreviated New Drug Application. The Commonwealth's witnesses testified that they gathered extensive pricing information by reading Federal government reports from the OIG, holding hearings, conducting their own analyses, and by purchasing drugs for state-owned facilities. The Commonwealth acted on this knowledge by revising its formulae for paying pharmacies, which involved the lesser of the Federal Upper Limit ("FUL") plus a

---

[3] Declaration of Raymond S. Hartman in Support of the Commonwealth of Massachusetts' Claims of Liability and Calcuation [sic] of Damages, February 28, 2008 ("Hartman Report") and Deposition of Raymond S. Hartman, March 18 and 19, 2008 ("Hartman Deposition").

dispensing fee, the State MAC plus a dispensing fee, the Estimated Acquisition Cost plus a dispensing fee, and the usual and customary charge.

10. The available evidence indicates that in determining its formulae for paying pharmacies, the Commonwealth recognized that the total payments must be sufficient to allow pharmacies to earn profits at levels that would ensure their participation in the Medicaid program. This imperative was reaffirmed when the Commonwealth proposed reducing payments to pharmacies below WAC and many chain and independent pharmacies testified that this would cause them to lose money on every prescription, which was also of concern to the Commonwealth's Pharmacy Director.

11. The reporting of prices to the compendia varied across generic drug manufacturers; some did not have or report WACs, others negotiated sales based on unpublished prices, and others had no standard price at all. There is no single standard practice for setting or adjusting prices that are reported (if they are adjusted at all), as these practices varied according to the generic drug manufacturer's business model and the market conditions faced by their products. There was also variation among generic drug manufacturers in the types and levels of discounts and rebates offered to purchasers.

12. I conclude that the defendant generic drug manufacturers had no economic incentive to defraud or attempt to defraud the Commonwealth, as alleged. If a manufacturer had stopped to consider the regulations regarding pharmacy payments by Massachusetts Medicaid—and the likelihood that the usual and customary charge, which would reflect private-sector MAC prices, would have been less than prices based on published prices—there is no reason to believe generic drug manufacturers would have expected their published prices—such as WACs—to have been relevant to Massachusetts Medicaid payments to pharmacies for those drugs that had multiple generic alternatives available.

## III. Guide to the Generic Drug Industry

13. Since 1962, prescription and over-the-counter (OTC) pharmaceuticals must be approved by the FDA as safe and effective treatments for specified therapeutic indications before they can be marketed in the United States.[4] In general, innovator (or brand-name) drugs are approved under a New Drug Application (NDA), and NDA applicants must demonstrate the safety and effectiveness of their products through extensive clinical trials.[5] Prior to the enactment of the "Drug Price Competition and Patent Term Restoration Act of 1984," commonly referred to as the "Hatch-Waxman Act," generic drug manufacturers "were obliged to conduct the same safety and efficacy tests that had been required of the original brand-name manufacturers to receive Food and Drug Administration (FDA) approval for marketing."[6]

14. The Hatch-Waxman Act has been successful at increasing the number of generic drugs approved in the United States. According to a study performed by the Congressional Budget Office ("CBO"), "In 1983, only 35 percent of the top-selling drugs with expired patents (excluding antibiotics and drugs approved before 1962) had generic versions available[,]" whereas in 1998, "nearly all do."[7] According to Prof. Berndt, "The generic share of prescription units dispensed has risen from 19 percent in 1984 to 33 percent in 1990, 42 percent in 1995 and stayed at 42–43 percent since then."[8]

### A. Economics of the Entry Decision

15. There are a number of economic considerations that may influence a generic drug manufacturer's decision to enter a market. Performing the research required to

---

4 21 U.S.C. § 355 (2000). The efficacy requirement was enacted in the Kefauver-Harris Amendments to the Food, Drug, and Cosmetic Act. (See http://www.fda.gov/cder/about/history/Histext.htm.)

5 See 21 C.F.R. §§ 314.50(c)(2)(viii), (d)(5)–(d)(6), 314.125(b)(2)–(b)(5), and 314.126.

6 Frank, Richard G., The Ongoing Regulation of Generic Drugs, *New England Journal of Medicine*, 357(20), November 15, 2007, pp. 1993–1996 ("Frank 2007"), at p. 1993.

7 CBO, How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry, July 1998 ("CBO 1998"), p. xii.

8 Berndt, Ernst R., Pharmaceuticals in U.S. Health Care: Determinants of Quantity and Price, *Journal of Economic Perspectives*, Vol. 16, No. 4, Fall 2002, pp. 45–66 ("Berndt 2002"), at p. 62.

manufacture a drug and the required bioequivalence tests can take anywhere from months to years and can cost anywhere from $250,000 to $20 million, depending on the characteristics of the drug, the firm's experience with similarly-formulated drugs, and the availability of the active ingredient.[9] During the period from 1984 to 1994, the average time between the filing of an ANDA by a generic manufacturer and FDA approval was roughly 18 months, with a minimum time of just under two months and a maximum time of seven years.[10] Another study found that "the median annual FDA approval time for ANDAs during the period 1992 to 1997 varied between 1.5 years to over 3 years."[11]

16. A generic manufacturer that is considering whether to develop a generic alternative for a particular brand-name drug will consider the expected profits it could earn on that drug, which will depend on the revenue earned by the brand-name drug (e.g., whether it is a "blockbuster" or a niche drug), the expected number of generic entrants, and the company's manufacturing costs, and compare this with its anticipated cost of entry.

17. Looking at a sample of 98 drugs that lost patent protection between 1986 and 1992, I found "[t]he revenue of the brand in the year before patent expiration is the most important factor determining the amount of generic entry; higher revenues attract a greater number of entrants. The extent to which a branded drug is purchased by hospitals positively affects the number of entrants. Drugs which treat chronic conditions also attract more generic firms; the patients buying these drugs may have a higher elasticity of demand."[12] A more recent paper by Saha et al. reported that drugs with pre-generic annual sales of over $500 million (a common definition of a

---

9 Scott Morton, Fiona M., "Entry decisions in the generic pharmaceutical industry," *RAND Journal of Economics*, Vol. 30, No. 3, Autumn 1999, pp. 421–440 ("Scott Morton 1999"), at pp. 422–423.

10 Scott Morton 1999, Table 1, p. 427.

11 Saha, Atanu, Henry Grabowski, Howard Birnbaum, Paul Greenberg, and Oded Bizan, "Generic Compeition in the US Pharmaceutical Industry, *International Journal of the Economics of Business*, Vol. 13., No. 1, February 2006, pp. 15–38 ("Saha et al. 2006"), at p. 26.

12 Scott Morton, Fiona M., "Barriers to entry, brand advertising, and generic entry in the US pharmaceutical industry," *International Journal of Industrial Organization*, 18 (2000), pp. 1085–1104, at p. 1102.

"blockbuster" drug) "average two more generic entrants annually compared with non-blockbusters" and encounter more increased generic penetration and price erosion than do drugs with pre-generic sales of less than $500 million.[13]

### B. Requirements for Entry

18. Under the Hatch-Waxman Act, generic drug manufacturers are required to establish bioequivalence[14] to the innovator drug product (also known as the reference listed drug) and file what are known as "abbreviated new drug applications" ("ANDAs").[15] The Hatch-Waxman Act allows generic drug manufacturers to perform testing and submit ANDAs prior to the expiration of the innovator drugs' patents, although final marketing approval will generally not be granted until after the patents have expired or been found to be either invalid or not infringed by the generic drug in question.[16]

19. The FDA classifies products as "AB rated" to a brand-name drug if they are both pharmaceutically equivalent, in that they contain the same amount of the identical

---

13 Saha et al. 2006, pp. 18–19.

14 According to the FDA, "The Bioequivalence Review process establishes that the proposed generic drug is bioequivalent to the reference listed drug, based upon a demonstration that both the rate and extent of absorption of the active ingredient of the generic drug fall within established parameters when compared to that of the reference listed drug." (See http://www.fda.gov/cder/handbook/bioequiv.htm, accessed March 26, 2008.)

15 Public Law 98-417—September 24, 1984, Title I § 101.

16 The applicant is required to certify with respect to all patents claiming the drug product or the intended use of the drug product that (i) patent information has not been submitted to the FDA, (ii) the patent has expired (iii) the date on which the patent will expire, or (iv) "the patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the drug product for which the abbreviated application is submitted." (See 21 C.F.R. § 314.94(a)(12)(i)(A).) The applicant is also required to notify the patent holder if it has submitted a "Paragraph IV Certification" and, should the patent holder file an infringement suit within 45 days of receiving notification, the FDA will postpone final approval of the ANDA for 30 months, unless the patent expires or is found to be invalid or non-infringed before then. According to FDA, "The statute provides that the first applicant to file a substantially complete ANDA containing a paragraph IV certification to a listed patent will be eligible for a 180-day period of exclusivity beginning either from the date it begins commercial marketing of the generic drug product, or from the date of a court decision finding the patent invalid, unenforceable or not infringed, whichever is first." (See http://www.fda.gov/cder/about/smallbiz/generic_exclusivity.htm, accessed March 26, 2008.)

active ingredient in precisely the same dosage form, and bioequivalent, in that they are absorbed in the body at the same rate and to the same extent.[17]

20. As a practical matter, once the FDA has approved a generic manufacturer's ANDA for a particular drug, the manufacturer must report information, such as the "NDC [National Drug Code] number [assigned by the FDA], product description, the manufacturer of the product, the AWP [the acronym for Average Wholesale Price], the first date on the market, and also the form of the product"[18] to the price compendia, such as First DataBank ("FDB"), Medi-Span, and Red Book, in order for pharmacies to be reimbursed for the drug by any third-party payer,[19] including state Medicaid programs. Because it was a commonly-held belief among manufacturers that the AWP reported to FDB for a generic drug had to be slightly more than 10 percent lower than the AWP of the corresponding branded drug in order for FDB to code that the generic drug is a "generic" in its system,[20] most generic companies set their AWPs at a 10 to 11 percent discount to the AWP of the branded alternative at launch when they were the first generic entrant.[21]

---

17 See 21 C.F.R. §§ 314.94(a)(7), 314.127(a), and 320.24. The FDA emphasized in 1997 and 1998 that brands and their AB-rated generic versions are essentially identical, even for so-called narrow therapeutic index drugs. (See Letter from Stuart L. Nightingale, M.D., Associate Commissioner for Health Affairs, Center for Drug Evaluation and Research, U.S. Food and Drug Administration (Jan. 28, 1998), available at http://www.fda.gov/cder/news/nightgenlett.htm, accessed March 26, 2008.)

18 Deposition of Karen A. Andrus, former Director of Contract Management at Par, October 15, 2007 ("Andrus Deposition"), p. 46. Ms. Andrus of also testified: "If Par was not listed in the databases, pharmacies would not be able to get their claims to go through, so they would not be able to get payment. Because what would happen at the pharmacy level is when the prescription and the member information is being entered, they'll get an error message saying we can't process this claim." (See *ibid.*, p. 47.)

19 Andrus Deposition, p. 47.

20 Notwithstanding the manufacturers' belief, FDB testified that there was no 10 percent rule, and that the generic designation was derived from a more complicated algorithm. (See Deposition of Patricia Kay Morgan, former Manager of Editorial Services at FDB, November 30, 2007, pp. 20–21.)

21 Deposition of Corinne Hogan, former VP of Sales and Marketing at IVAX, February 6, 2008, p. 57.

### C. Differences in Focus of Competition Between Brand-Name and Generic Manufacturers

21. The brand-name manufacturer strives for its product to be the preferred therapy for the prescribing physician vis-à-vis other molecules and focuses much of its marketing efforts on physicians. In addition, it strives to have good formulary position at pharmacy benefit managers ("PBMs") and other TPPs by offering lower net prices through rebates. While the prescribing physician can control whether a particular prescription is filled with a brand-name drug or a generic alternative,[22] (in Massachusetts the physician is required to write "no substitution" in the space under his signature on the face of the prescription), with pharmacy-dispensed, self-administered drug such as those at issue in this case, the physician has no economic stake in the decision, because the physician will not be reimbursed for his or her services based on which drug is prescribed. Likewise, the physician does not usually have a preference regarding or control over which manufacturer's generic alternative is dispensed to the patient at the pharmacy. In general, except through their purchases for mail-order operations, PBMs and TPPs also lack control over which manufacturer's generic alternative is dispensed to a member. As a result, with a few exceptions, physicians and PBMs are not the focus of marketing by generic manufacturers, which instead focus on having their product stocked by the pharmacy.[23] According to the CBO, "The chain pharmacy can choose which of several generic drugs to stock, and it purchases large volumes of those drugs.

---

22 Massachusetts General Law, Chapter 112, Section 12D, states:

> The standards [set by the Department of Public Health] shall permit the practitioner to instruct the pharmacist to dispense a brand name drug product by indicating "no substitution". The standards shall require that the indication of "no substitution" shall not be the default indication and further that the prescription indicate the "Interchange is mandated unless the practitioner indicates 'no substitution' in accordance with the law". Where the practitioner has so indicated "no substitution", the pharmacist shall dispense the exact drug product as indicated by the practitioner.
>
> Except in cases where the practitioner has indicated "no substitution", the pharmacist shall dispense a less expensive, reasonably available, interchangeable drug product as allowed by the most current formulary or supplement thereof.

23 There are a few drugs, including Ivax's clozapine, which is at issue in this case, for which the manufacturer of the first generic entrant has had to essentially "market" the generic alternative to physicians, because they would otherwise block generic substitution by means of the "no substitution" mechanism.

Therefore, the chain pharmacy can negotiate lower prices from manufacturers for generic drugs."[24]

22. Brand-name drug manufacturers and generic drug manufacturers also differ in terms of the channels of distribution they use. Some brand-name drug manufacturers have sold their products directly to chain pharmacies that own warehouses (known as "warehousing chains").[25] However, the vast majority of sales of brand-name drugs are made through wholesalers and distributors, and contracts between brand-name drug manufacturers and pharmacy outlets are uncommon.

23. In contrast, the generic drug manufacturers enter into agreements, whether explicitly through written contracts or by means of "offer letters," with both warehousing chains and other pharmacies that purchase prescription drugs through wholesalers. Generic drug manufacturer sales to wholesalers include significant indirect sales – those sold under the manufacturer's contract with pharmacies[26] that are delivered and invoiced by wholesalers – or sales for the wholesaler's auto-substitution program – those sold by the wholesaler to member pharmacies that lack economies of scale in buying generics themselves and can benefit from the wholesaler's ability to negotiate prices on their behalf.[27]

---

24 CBO, *Prescription Drug Pricing in the Private Sector*, January 2007, p. 1.

25 Throughout this report, I will use the term pharmacy to refer to all retail pharmaceutical outlets, even though sales of prescription drugs are not the primary line of business for some of these outlets, such as grocery stores and mass merchandisers. In 2005, Wal-Mart was the third largest drug chain ranked by total prescription drug sales. (See *2006–2007 HDMA Factbook: The Facts, Figures & Trends in Healthcare, Industry Overview*, Table 71.)

26 For example, Mr. DiMaio, formerly Executive Vice President, Sales and Marketing at Par Pharmaceuticals, Inc., ("Par") testified that 10 percent of Par's sales to wholesalers are made to pharmacies with which Par does not have a contract. (See Deposition of Nick DiMaio, August 16, 2007 ("DiMaio Deposition"), p. 179.)

27 Andrew S. Boyer, Vice President, Sales and Marketing/Generic Pharmaceutical Products at Watson, described auto-substitution, or source, programs: "… the wholesalers have contracted with X number of independent pharmacies or other pharmacies that do not have enough purchasing power on their own or a central location to buy product from, and they act as basically their warehouse, and they the make the decision of which product that's going to be used across that entire book of business, all the independents. So their source program is that contract that they buy under." (See Deposition of Andrew S. Boyer, Watson, June 27, 2007 ("Boyer Deposition"), p. 51.) According to McKesson, its source program, OneStop Generics[SM], allows members to obtain "competitive pricing and industry-leading rebates on high-margin generic drugs from one time-saving source." (See

### D. Impact of Additional Generic Entry on Prices

24. Because FDA testing assures that all AB-rated generic drugs are equally safe and efficacious, the primary means by which generic drug manufacturers compete to be the generic alternative stocked by the pharmacy is on price.[28] Academic and governmental research has demonstrated the impact of the entry of additional manufacturers on prices paid by pharmacies (and by retail customers). For example, in a paper published in 1991, Caves et al. found that the ratio of the price of the generic version to the price of the brand-name drug fell from 0.599, when there was one generic entrant, to 0.335, when there were 10 generic entrants, and to 0.201, when there were 20 generic entrants.[29] In 1992, Grabowski and Vernon published a paper reporting that prices for generic versions of 18 high-value drugs "fell to 78 percent of their initial value at the end of the first year [post-generic entry] and 65 percent at the end of their second year.[30] In a 1997 paper, Frank and Salkever performed an econometric analysis of the impact of the number of generic entrants on prices and found that "with each additional entrant[,] there is a fall in the average price of a generic product of between 5.6% and 7.2%. Thus on moving from the sample mean of about 3 competitors to 6 competitors[,] there is a reduction in prices of between 17% and 22%."[31] In a study published in 1998, the

---

http://www.mckesson.com/en_us/McKesson.com/For+Pharmacies/Retail+National+Chains/Purchasing+Solutions/McKesson+OneStop+Generics.html, accessed March 26, 2008.)

28 I disagree with Ms. Rosenthal's characterization of competition between generic manufacturers being solely on price (See Rosenthal Report, ¶16), because, while price is certainly a very important factor in a pharmacy's decision to purchase from manufacturer A rather than manufacturer B, customer service (e.g., prompt delivery, carrying a full line of generic drugs) is also relevant.

29 Caves, Richard E., Michael D. Whinston, and Mark A Hurwitz, Patent Expiration, Entry and Competition in the U.S. Pharmaceutical Industry, *Brookings Papers on Economic Activity, Microeconomics*, 1991, pp. 1–48, at p. 36. The authors looked at a sample of 30 drugs that went off-patent during the period 1976–1987 and used invoice prices obtained from IMS America. (See *ibid.*, pp. 14–15.)

30 Grabowski, Henry G., and John M. Vernon, Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act, Journal of Law and Economics, Vol. 35, No. 2 (Oct. 1992), pp. 334–350, at p. 336. The authors focused on drugs with over $50 million in sales at the time of patent expiration that became subject to generic competition between 1983 and 1987. (See *ibid.*, pp. 334–335)

31 Frank, Richard G., and David S. Salkever, Generic Entry and the Pricing of Pharmaceuticals, *Journal of Economics & Management Strategy*, Vol. 6, No. 1, Spring 1997, pp. 75–90, at p. 88. The authors used information on sales volumes (unit and dollar) from IMS America Inc. United States Drugstore and Hospital data based for 1980 to 1991. (See *ibid.*, p. 80.)

CBO reported "When one to 10 generic manufacturers are in the market, the generic retail prescription price averages 61 percent of the brand-name price. When 11 to 24 generic manufacturers are in the market, the generic retail price averages less than half of the brand-name price."[32]

25. Contrary to the opinion expressed by Dr. Rosenthal that "pharmacies are the focus for competition ... between generics and the innovator once generics have entered)[,]" the evidence, as cited by Prof. Berndt, shows that "following loss of patent protection, brand products typically do not engage in price competition with generics, but instead raise average brand prices, targeting their product to that (ever smaller) market niche that remains brand loyal."[33]

### E. Economics of Search and Why Prices Fall

26. Given the significant and rapid price declines upon entry of additional manufacturers, pharmacies and PBMs (and other TPPs) have incentives to search for information on the costs of generic drugs and to use this information to lower their costs for generic drugs.

27. Pharmacies, particularly the buyers for large chain pharmacies, are well aware of the competition between generic manufacturers and use this knowledge to search for the lowest price they can obtain. As the pharmacy often receives a fixed dollar amount (e.g., $5.24) for a particular drug according to the maximum allowable cost ("MAC"), or price ceiling for each generic drug, to the extent that the store can purchase the generic drug for less than this amount, it will earn additional profits. Pharmacies recognize that prices may vary across generic drug manufacturers, as well as over time, so they search for the lowest price. Prices vary across manufacturers, because each manufacturer has capacity constraints or excess capacity that changes every month, contracts it must fulfill, competitors who may be changing prices, and uncertain demand for any one product in its product line.

32 CBO 1998, p. 32. Table 5 shows that the average generic retail prescription price was approximately 40 percent of the brand-name price when there were between 21 and 24 generic manufacturers. (See *ibid.*, p. 33.) These results are inconsistent with Dr. Rosenthal's implication that the costs to consumers of generic drugs do not fall as the result of competition among generic drug suppliers. (See Rosenthal Report, ¶16.)

33 Berndt 2002, p. 63 (reference omitted).

28. PBMs and TPPs strive to lower payments to pharmacies while maintaining pharmacy participation in their networks. PBMs and TPPs are also well aware of the impact of competition among generic manufacturers on the prices paid by pharmacies. TPPs use the information they discover on the current costs of a generic drug to set the drug's MAC regardless of the version purchased by the pharmacy.[34] These prices reflect the competitive intelligence of the PBM or TPP, and, therefore, the MAC lists are considered proprietary.[35]

### F. Incentives to Switch to Generic Versions of Prescription Drugs

29. Consumers, PBMs, and pharmacies all benefit from the availability of generic drugs and all have incentives to switch to generic alternatives.

30. Consumers benefit from switching to generic drugs, even if they have prescription drug coverage, because PBMs require lower co-payments for generic drugs than for branded drugs.[36]

31. PBMs and other TPPs benefit from having members switch to generic drugs, because generic drugs cost substantially less than their branded alternatives, particularly after the PBMs have instituted MAC pricing.[37] They provide incentives

---

34 PBMs vary in their methods of determining MACs. According to Mr. Boyer of Watson, "There are PBMs that own mail-order organizations and know what the price in the mail-order facilities are buying the product for, and they set their max -- or their pricing, their reimbursement price based upon that." (Boyer Deposition, p. 110) Many, if not most, of the major PBMs operate mail-order facilities. For example, Express Scripts, the PBM used by Blue Cross Blue Shield of Massachusetts ("BCBS-MA") has a mail-order operation (See "Frequently Asked Questions" and "Mail Service Pharmacy," both available through http://www.bluecrossma.com/pharmacy/en_US/pharmacyIndex.jsp); CVS/Caremark, the PBM used by Tufts Health Plan, owns retail pharmacies as well as a mail-order operation (See www.advancerx.com/advpcsrx_pmwroot/pmwroot/Formulary/00654/IndexForm.jsp?com=tufts&reset=yes); and PharmaCare, the PBM used by Fallon Community Health Plan, has had a mail-order operation, PharmaCare Direct, since 1983. (See http://www.fchp.org/Extranet/Members/OnlineDrugFormulary.htm and "Prescription Mail Order Form, p. 2, available through that link.)

35 As I discuss in more detail below, the Massachusetts Medicaid agency has benefited directly from the setting of MACs by PBMs, due to the 1995 change in the definition of "usual and customary" charge in Medicaid payment regulations.

36 In some cases, the price negotiated by the consumer's PBM is less than the co-payment amount, in which case the consumer need only pay the negotiated price.

37 In 1999, MACs were used by 86 percent of the employers who reported pharmacy reimbursement data, according to The Pharmacy Benefit Management Institute, Inc. ("PBMI"). (See *Wyeth-Ayerst Prescription Drug Benefit Cost and Plan Design Survey Report, 2000 Edition* ("PBMI 2000"), Table 31.)

to patients to switch to generic alternatives by reducing copayment levels and provide incentives to pharmacies by paying higher dispensing fees for generic drugs.[38]

32. Pharmacies benefit from dispensing generic drugs, rather than the innovator drug, in two ways: first, as I mentioned above, they often receive higher dispensing fees for generic drugs; second, their profit levels on generic drugs are generally higher than on branded drugs.[39]

33. TPPs and PBMs allow these large markups to encourage use of the generic drug over the brand. While they could purposefully reduce the markups on generic drugs, they may save far more by creating a financial incentive for pharmacists to switch patients from brand-name drugs to their generic counterparts.[40] In fact, according to the Massachusetts Medicaid agency, each time a generic drug was dispensed instead of its single-source brand name equivalent, the Medicaid program in Massachusetts would save approximately $80.[41]

## IV. Use of Published Prices by Brand-Name and Generic Drug Manufacturers

34. There are two published prices that are commonly used in the pharmaceutical industry, namely AWP and WAC. As I mentioned previously, all drug manufacturers in the United States have to provide one of these prices to price

---

38 According to the PBMI, the average brand-drug dispensing fee was $2.30 in 1999, while the average generic-drug dispensing fee was $2.41. (See PBMI 2000, Table 26.)

39 CBO 1998, p. 8.

40 This point was also made by Prof. Berndt, whose report states: "In the context of generic drugs, one widely understood reason third party payors have long been willing to allow pharmacies to enjoy a considerable "spread" on their generic drugs is that whenever a generic version of a drug is dispensed instead of its brand version, the third party payor typically saves a substantial mount of money (recall the earlier discussion on average brand prescription prices being considerably less than average generic prescription prices). Given that it enjoys these large savings, the third party payor is less likely to quibble over whether the pharmacy is pocketing a larger margin for generics than for brands." (See Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris, MDL No. 1456, Civil Action No. 01-12257-PBS, United States District Court of Massachusetts, February 9, 2005 ("Berndt Report"), ¶ 52.)

41 Report to the General Court, Reimbursement for Prescription Drugs, Commonwealth of Massachusetts, Executive Office of Health and Human Services, Division of Healthcare Finance and Policy, October 3, 2002 ("Report to the Massachusetts General Court"), p. 18.

reporting services, such as First DataBank ("FDB"), Medi-Span, and Red Book, in order for pharmacies to be paid for their drugs.

35. Generally, brand-name drug manufacturers report WACs to the pricing reporting services, and the pricing services compute AWPs from these WACs. Wholesalers typically purchase brand-name drugs at WAC and generally receive "prompt-payment discounts" that are based on WAC (generally 2 percent of WAC). Because brand-name drug manufacturers do not enter into price negotiations with pharmacies, as I mentioned above, pharmacy acquisition costs for branded drugs are closely tied to WAC.[42]

36. Published prices play a very different role for most generic companies. As I discussed briefly above, generic manufacturers typically sell their drugs by negotiating prices directly with pharmacy chains, and both the pharmacies and the manufacturers focus on these contract prices. Because prices are subject to negotiation, one manufacturer is likely to have negotiated contracts with two chains at two different prices and may, actually, offer two prices to a single warehousing chain customer: one for its direct purchases and one for its indirect purchases through wholesalers. In addition, generic manufacturers often offer purchasers rebates that depend on total purchases from that manufacturer, which may be a flat percentage of all purchases or may be tiered, with higher dollar purchases commanding higher rebate percentages.[43] As a result, there is a time lag between the purchase and the determination of the net price as well as uncertainty about what price will ultimately be paid for a particular bottle of tablets.

37. While the existence of deep discounting and the effect of entry on prices in the generic drug industry are well known, the exact contract prices and rebate

42 According to Charles J. Reed, III, a vice-president of business management in the Retail Sales and Marketing Group of AmerisourceBergen, in the late 1990s, one-third of pharmacies purchased branded drugs from AmerisourceBergen on a WAC-plus basis, while between 2000 and 2005, "[m]any retail pharmacies by then were either a WAC with very small markups, or even markdowns." (See Deposition of Charles J. Reed, III, August 28, 2007, pp. 48–50.)

43 For example, Ms. Sarfas testified that IVAX offered both sales rebates (constant percentage) and volume rebates (percentage paid increases with increasing total purchases). (See Deposition of Trisha Sarfas, former Manager of Contracts at IVAX, August 22, 2007 ("Sarfas Deposition"), pp. 234–238.)

provisions negotiated between pharmacies and generic drug manufacturers are necessarily confidential business information. Were these terms made public, the likely outcome is that pharmacies would end up paying higher prices as price concessions by manufacturers would decrease or disappear entirely, as has been articulated by the Federal Trade Commission ("FTC"), the CBO, and representatives of major TPPs.[44]

38. Because it is a commonly-held belief among generic manufacturers that AWPs reported to FDB had to be slightly more than 10 percent lower than the AWP of the corresponding branded drug in order for FDB to code that generic drug as being "generic" in its system,[45] most generic companies would set their launch AWPs at a 10 to 11 percent discount to the AWP of the branded alternative if they were the

---

44 The Federal Trade Commission has said this on many occasions. For example, a letter responding to a request by a member of the California Assembly, said "Inclusion in a PBM formulary offers pharmaceutical manufacturers the prospect of substantially increased sales opportunities. Whenever PBMs have a credible threat to exclude pharmaceutical manufacturers from their formulary, manufacturers have a powerful incentive to bid aggressively. Willingness to bid aggressively, however, is affected by the degree of transparency with respect to the terms that pharmaceutical companies offer PBMs. Whenever competitors know the actual prices charged by other firms, tacit collusion – and thus higher prices – may be more likely." (See Letter from the Office of Policy Planning, Bureau of Competition, and Bureau of Economics of the FTC Letter to Assembly Member Greg Aghazarian, September 7, 2004, p. 9.)

In March 2007, the CBO wrote to Congressmen Barton and McCrery regarding a bill to require public disclosure of rebates given to insurers offering Medicare Part D plans. Their report states: "The disclosure of drug rebates could affect Medicare spending through two principal mechanisms. First, disclosure would probably make rebates less varied among purchasers, with large rebates and small rebates tending to converge toward some average rebate. Such compression, for reasons discussed below, would tend to reduce the rebates that PDPs [Prescription Drug Plans] received and thus would raise Medicare costs. Second, for a range of medical conditions, drugs appropriate for treatment are available from only a few manufacturers; disclosure of drug-by-drug rebate data in those cases would facilitate tacit collusion among those manufacturers, which would tend to raise drug prices." (See CBO, Letter to Congressmen Barton & McCrery, March 12, 2007 p. 2.)

In addition, the general counsel for Kaiser Foundation Health Plan, a very large HMO that began in California, testified before hearings held by the FTC and the US DOJ on Competition in Health Care, and stated "We believe that price competition can best be achieved when negotiated prices and rebates are kept confidential. ... More expansive disclosure would ultimately result in fewer discounts and rebates...." (See Testimony of Anthony Barrueta, Senior Counsel for the Kaiser Foundation Health Plan, FTC/DOJ Joint Hearings, Health Care and Competition Law and Policy, Pharmacy Benefit Management Companies, June 26, 2003.)

45 See, for example, Hogan Deposition, p. 57 (Asked why IVAX had to set its AWP slightly more than 10 percent below the brand AWP, Ms. Hogan testified: "You had to be." Asked why, she stated: "To be coded as a generic in First DataBank.")

first generic entrant.[46] If they were launching into an already "genericised" market, they would set their launch AWPs "in the pack of competitors' AWPs."[47]

39. In setting WACs (or, alternatively, invoice prices), generic manufacturers often consider the impact WACs may have on their profitability. First, because many generic drug manufacturers invoice wholesalers at WAC, the prompt-payment discounts they provide to wholesalers are also based on WAC, and, if contract prices are much below WAC, two percent of WAC could account for a substantial portion of the contract price.[48] In addition, to the extent that a generic manufacturers sells to wholesalers at WAC (or, alternatively, invoice prices), it will actually receive WAC for those sales made by wholesalers to pharmacies with which neither the manufacturer nor the wholesaler has a contract.[49] Generic manufacturers are not consistent in how they set WACs.

39.1. According to Mr. Boyer, Watson's WAC was generally set to be around 20 percent less than the generic SWP.[50]

---

46 See, for example DiMaio Deposition, p. 41. (Par would set its launch AWP "in the neighborhood of 10 percent discount to the brand" when it was the first generic.) See, also, Deposition of Andrew S. Boyer, June 27, 2007 ("Boyer Deposition"), p. 78. (Watson would "look at the branded product and take 10 to 11 percent off of the branded SWP and we will set our SWP.")

47 See, for example, Boyer Deposition, p. 91. (In the event that Watson is not the first generic on the market, its AWP is "[u]sually consistent with what's in the marketplace.") See, also, Deposition of Harvey J. Weintraub, Consultant for Warrick, September 18–22, 2007 ("Weintraub Deposition"), p. 527. (If other generic competitors had already entered the market, Warrick set its AWP "somewhere in the pack, so to speak, [to]...save...a lot of time and trouble.")

48 For example, Nick Dimaio of Par testified that if competition causes contract prices to decline dramatically, "it's not uncommon for generic manufacturers to lower their WAC... [b]ecause in many cases the cash [prompt-pay] discount on the WAC price can erode all your profits on the contract side." (See DiMaio Deposition, p. 152.) Mr. Roman of Mylan also testified that "Our business is served by having a low WAC where the size of the charge-backs and the accounting and the reserves we have to hold. I mean, when that WAC is -- The higher that WAC is, the larger that charge-back could be, so that causes issues." (See Deposition of Brian Roman, August 2, 2007 ("Roman Deposition"), p. 182.)

49 Mr. DiMaio of Par testified that approximately 10 percent of Par's sales to wholesalers are not subject to contractual pricing, so that Par actually sells this amount of product at WAC. (See DiMaio Depostion, p. 179.) Asked why it was not fair to say that Roxane never sells drugs at WAC, Ms. Waterer testified: "WAC is the price that we sell the drug to the wholesaler. ... If the wholesaler does not sell that through a contract where we would honor a lower price, it will sell at WAC." (See Deposition of Judith Waterer, Associate Director of Marketing at Roxane Laboratories, May 9, 2007 ("Waterer Deposition I"), pp. 72–73.)

50 Boyer Deposition, p. 91.

39.2. According to Mr. DiMaio, Par sets a WAC that "represents a reasonable discount to the brand product…."[51]

39.3. According to Mr. Roman, at Mylan, "The practice is that the pricing in contracts in conjunction with the sales leadership would determine a price based on the existing competitive conditions and the forecast of how the market would shape up to come up with a price that they felt would be a price that would be attractive to customers and would enable us to get business."[52]

39.4. According to Mr. Weintraub, Warrick did not have a uniform price for direct customers and had no WAC or other published list price.[53]

40. Generic drug manufacturers also differ from one another in their reporting, or not reporting, of WAC to the price compendia.

40.1. Some manufacturers reported WAC throughout the time period, including Teva,[54] IVAX, [55] and Mylan.[56]

40.2. Some manufacturers consistently did not report WACs to FDB, including Par[57] and Warrick.[58]

40.3. Some manufacturers reported WACs to FDB for part of the time period, including Watson[59] and Roxane.[60]

---

51 DiMaio Deposition, p. 148. This discount is "typically in the range of 20 to 25 percent." (See *ibid*, p. 174.)

52 Roman Deposition, p. 175.

53 Weintraub Deposition, pp. 155–59.

54 Deposition of Paul Krauthauser, Director of Product Marketing at TEVA, January 29, 2008 ("Krauthauser Deposition"), p. 57.

55 Sarfas Deposition, p. 253.

56 See Affidavit of David L. Workman, II, In Support of Defendant Mylan Inc.'s Motion for Summary Judgment, February 28, 2008, ¶ 21

57 Andrus Deposition, p. 52.

58 As I mentioned previously, Warrick does not even set a WAC.

59 According to the Commonwealth, Watson reported only AWPs prior to 2000, but sometime in 2000, Watson reported a WAC for hydrocodone with acetaminophen, Necon, and latebetalol hydrochloride, and it reported a WAC for lorazepam in 2002. (See Commonwealth Of Massachusetts' Local Rule 56.1 Statement Of Undisputed Material Facts Applicable To Defendants Watson And Schein, pp. 4–5.)

## V. How Third-Party Payers Set Payments to Pharmacies

41. Unless PBMs and TPPs operate their own pharmacies, as do some staff- and group-model health maintenance organizations, they, as does the Massachusetts Medicaid agency, depend on pharmacies to dispense drugs to their members. PBMs also recognize that pharmacies have to make a profit on dispensing drugs in order to stay in business. Payments to pharmacies generally have two components: one for the drugs themselves and additional fees that cover the costs (including profits) the pharmacies incur for dispensing the drugs, but both PBMs and pharmacies recognize that it is the sum of the two that is relevant and that, historically, generous reimbursement for the drug ingredient has cross-subsidized inadequate dispensing fees.[61] In fact, according to a report issued by the General Accounting Office in March 1993, HCFA and state Medicaid officials agreed that pharmacies must often use excess Medicaid reimbursements [for ingredient cost] to cover their dispensing costs.[62] This point was also noted by Prof. Berndt: "A commonly held view is that dispensing fees received by pharmacies have tended to be lower than their actual dispensing costs, but that ingredient cost reimbursement has generally exceeded actual pharmacy acquisition costs, thereby offsetting the underrecovery of actual dispensing costs."[63]

42. In setting prescription drug reimbursement rates, TPPs (and Medicaid agencies) must balance access and cost, because, if pharmacy payments by a TPP are too low, pharmacies may withdraw as providers and stop serving that TPP's members, which happened in November 2007, when Walgreens withdrew as a provider for four prescription benefit plans administered by CVS/Caremark.[64] TPPs also have to

---

60 According to Ms. Paoletti, Roxane stopped reporting WACs to FDB in late 1997 or early 1998. (See Deposition of Lesli Paoletti, Associate Director of Marketing at Roxane, July 26, 2007, p.180.)

61 Jeffrey Deposition of June 2007, pp. 144–46.

62 U.S. General Accounting Office, Outpatient Drug Costs and Reimbursements for Selected Pharmacies in Illinois and Maryland, GAO/HRD-93-55FS, March 1993 ("GAO Mar 1993"), p. 6.

63 Berndt Report, ¶ 50.

64 See http://news.walgreens.com/article_print.cfm?article_id=4885, accessed March 24, 2008.

consider how much plan sponsors are willing to pay for prescription drug coverage and try to negotiate appropriate rates.[65]

43. As I mentioned above, one way TPPs manage prescription drug costs is to encourage members to use generic versions of branded drugs.

## VI. How Massachusetts Medicaid Sets Payments to Pharmacies

### A. The Federal Framework

44. Medicaid is a joint Federal/State program, with the Federal government providing a regulatory framework under which the State Medicaid agencies operate and providing a minimum of 50 percent of the funding for the State programs. The Federal government, through both statutory and regulatory provisions, determines the minimum eligibility standards for qualification for Medicaid assistance and the basic services that must be provided to Medicaid beneficiaries.[66] One requirement by the Federal government is that each state must submit a document called its State Plan that details such things as the State's specific eligibility requirements, the services offered to Medicaid beneficiaries, and the State's reimbursement policies.

45. I believe it is important to note that every State Medicaid program has provided prescription drug coverage since 1990,[67] and payments for prescription drugs under the Medicaid system were already $5.5 billion in fiscal year 1991.[68] Dr. Hartman's recitation of Prof. Berndt's phrase "the importance of being unimportant,"[69] which was made in the context of physician-administered drugs under Medicare,[70] is particularly inapposite in these circumstances. The Commonwealth of Massachusetts has had a practicing pharmacist involved in running the pharmacy

65 TPPs differ from State Medicaid agencies in that they can choose to pay some "have-to-have" pharmacies at a higher rate than pharmacies that are located in areas in which there are many competing pharmacies, where State Medicaid agencies generally pay all pharmacies in the state based on the same formula.

66 One way CMS exercises its control over the State agencies is through denial, or threatened denial, of the Federal matching funds.

67 Department of Health and Human Services, Office of Inspector General, *Medicaid Rebates for Physician-Administered Drugs*, OEI-03-02-00660, April 2004 ("OIG Apr 2004"), p. ii.

68 GAO Mar 1993, p. 2.

69 Hartman Report, ¶ 25a and footnote 31.

70 Berndt Report, ¶ 187.

program at least since Arnold Shapiro, a registered pharmacist, was hired in 1988 and has acted to study and control pharmaceutical expenditures throughout the relevant period (as I explain below). Clearly payments for prescription drugs were not "unimportant" to the Commonwealth.

46. There are three regulatory and statutory provisions governing State Medicaid reimbursement in general, and prescription drug reimbursement specifically, that are particularly relevant to this case, which I will discuss in turn.

47. In 1978, the Health Care Financing Administration ("HCFA, the predecessor to Centers for Medicare and Medicaid Services ("CMS")) mandated that payment to providers "must be sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population."[71] This provision is commonly termed the "equal access" requirement.

47.1. How seriously the Federal Government took this provision can be seen in a Departmental Appeals Board ruling from 1991.[72] The Appeals Board agreed with HCFA's determination that undiscounted AWP was not a valid measure of acquisition costs, but disagreed with HCFA's estimate of the disallowance, which was based on the $4.01 dispensing fee in effect during this period, stating: "The State's testimony shows that, if the State had not increased the dispensing fee at the same time as discounting from the AWP, the State would have had to discount by a lesser percentage than 10.5 in order to assure access to services, particularly for recipients in rural areas. As the State pointed out, it must not only consider efficiency and economy in setting reimbursement rates in accordance with section 1902(a)(30)(A) of the Act, but must also consider quality of care."

48. In 1987, HCFA revised its regulations regarding Medicaid reimbursement for prescription drugs implemented in 1976, scrapping the MAC program for multi-

71 42 CFR 447.204 (1980).

72 This ruling stemmed from HCFA's denial of matching fund for a 6-month period in 1989. (See DHHS, Departmental Appeals Board Decision No. 1273, Arkansas Department of Human Services, August 22, 1991.)

source drugs, which it recognized was a cumbersome process,[73] in favor of a new mechanism for setting reimbursements on generic pharmaceuticals termed the "Federal Upper Limit" ("FUL") program and abandoning any requirement that State Medicaid Agencies had to adhere to a particular formulaic method of determining pharmacy reimbursement rates.[74]

48.1. According to the regulations, for multi-source drugs for which FULs had been established: "The agency's payments for multiple source drugs identified and listed in accordance with paragraph (a) of this section must not exceed, in the aggregate, payment levels determined by applying for each drug entity a reasonable dispensing fee" established by the agency plus an amount established by HCFA that is equal to "150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists in quantities of 100 tablets or capsules (or, if the drug is not commonly available in quantities of 100, the package size commonly listed) or, in the case of liquids, the commonly listed size."[75]

---

73 In fact, in the preamble to the final regulations published in 1987, CMS wrote: "We agree that the process of approving a MAC for a specific drug is lengthy. This has been of concern particularly since the passage of the Drug Price Competition and Patent Term Extension Act of 1984 (Pub. L. 98-417). This law streamlines the FDA approval process for certain drugs. The result of this law is that therapeutically equivalent (generic) drugs will be coming into the marketplace more quickly than in the past. As evidenced by the current MAC program, we are interested in encouraging the use of therapeutically equivalent drugs. We would like to adopt a Medicaid drug policy that would allow us promptly to adjust payment upper limits to reflect the availability of new drug equivalents as they enter the marketplace." (See 52 Fed. Reg. 28648 (July 31, 1987).)

74 Contrary to Dr. Hartman's claim that legislation and regulation have "encouraged states to base their payments on Estimated Acquisition Cost," (Hartman Declaration, p. 17) CMS specifically stated in the preamble to the 1987 regulations: "Under these rules, the Federal requirement for States to use the EAC method of payment will be eliminated. However, because the rule merely establishes an upper limit concept and does not describe the specific methodology for payment, State agencies may continue their practice of establishing EACs for the ingredient costs and adding to it a dispensing fee. Such practices will be acceptable, as will a system of establishing charge/payment screens based on Statewide or regional customary and usual prices." (See 52 Fed. Reg. 28648 (July 31, 1987), at 28654.)

75 52 Fed. Reg. 28648 (July 31, 1987), at 28652–53. According to Sue Gaston, a CMS Health Insurance Specialist and Analyst, CMS did not always pick the lowest published price in setting its FULs, because sometimes the lowest published price (such as a WAC) was too low to be a realistic price—it would not reflect a price at which pharmacies actually could acquire multi-source drugs. (See Deposition of Sue Gaston, March 19, 2008, pp. 409–13 (lowest published price may not be available in the market), 427–32 (Teva clonazepam example), 438–39 (lowest published price too low), 444–45 (judgment in determining most common package

48.2. With respect to multi-source drugs for which FULs had not been set and single-source drugs: The agency payments for "brand name drugs certified in accordance with paragraph (c) of this section" and "drugs other than multiple source drugs for which a specific limit has been established under § 447.332 must not exceed in the aggregate, payment levels that the agency has determined by applying the lower of the (1) Estimated acquisition costs plus reasonable dispensing fees established by the agency; or (2) Providers' usual and customary charges to the general public."[76]

49. The Medicaid drug rebate provisions of the Omnibus Reconciliation Act of 1990 ("OBRA 90") required manufacturers to enter into rebate agreements with the Secretary of HHS in order to have their pharmaceuticals eligible for Medicaid reimbursement.[77] As part of the rebate system, generic drug manufacturers are required to submit their Average Manufacturer Prices ("AMPs") to the HHS Secretary on a quarterly basis.[78] Rebates paid on generic drugs (approved under and ANDA) were to be 10 percent of AMP for 1991 to 1993 and 11 percent of AMP thereafter.[79] Some drugs commonly referred to as "generic" drugs are classified under the Medicaid drug rebate law as branded multi-source drugs, because they received marketing approval under a NDA, rather than an ANDA. These drugs, some of which are at issue in this case, are subject to the same rebates as other innovator drugs, namely greater of 15.1 percent of AMP or the difference between AMP and "Best Price" (the lowest price the manufacturer charged anyone) plus an additional rebate that depends on rate of change of AMP relative to consumer price index (CPI-U).[80]

---

size), 458–59 (FULs verified against state MAC lists), and 484–87 (FULs verified against wholesaler's prices).).

76 52 Fed. Reg. 28648 (July 31, 1987), at 28657.

77 OBRA 90, § 4401(a)(1).

78 OBRA 90, § 4401(a)(3) §1927(b)(3). AMPs are defined in OBRA 90, § 4401(a)(3) § 1927(k)(1).

79 OBRA 90, § 4401(a)(3) §1927(c)(3).

80 Compilation of the Social Security Laws, §1927(c)(1) and §1927(c)(2).

### B. The Formulas Used by the Commonwealth

50. The Commonwealth currently reimburses multi-source drugs according to 114.3 C.M.R. 31.04, which provides that:

> Pharmacy Payment for Multiple Source Drugs. Payment to providers for such drugs dispensed shall not exceed the lowest of:
>
> (a) The federal upper limit of the drug, if any, plus the appropriate dispensing fee as listed in 114.3 CMR 31.06; or
>
> (b) The Massachusetts upper limit ["MUL"] of the drug, if any, plus the appropriate dispensing fee as listed in 114.3 CMR 31.06; or
>
> (c) The estimated acquisition cost of the drug, plus the appropriate dispensing fee as listed in 114.3 CMR 31.06; or
>
> (d) The usual and customary charge (without a dispensing fee).[81]

51. The Massachusetts upper limit of the drug is currently defined to be "an amount equal to one hundred thirty percent of the price of the least costly therapeutic equivalent as listed in any United States published or other United States public source for the most frequently purchased package size,"[82] and the estimated acquisition cost of the drug is currently defined to be the "drug wholesaler's acquisition cost (WAC) plus 5 percent."[83] The regulations also define the usual and customary charge: "The lowest price that a pharmacy charged or accepted from any health insurer or pharmacy benefit manager for the same quantity of a drug dispensed to a Massachusetts resident on the same date of service. When an insurer and the provider have a contract that specifies that the insurer will pay an average or similarly computed fixed amount for multiple categories of drugs with different acquisition costs, the fixed amount will not be the provider's usual and customary charge."[84]

---

81 Available at http://www.mass.gov/Eeohhs2/docs/dhcfp/g/regs/114_3_31.pdf. Notably, this formula has remained unchanged since 2003, when this lawsuit was filed.

82 114.3 C.M.R. 31.02 (2005). As I discuss below, from 1989 until 2002, the MUL was 150 percent of the price of the least costly therapeutic equivalent.

83 114.3 C.M.R. 31.02 (2005). As I discuss below, from 1989 until 2002, the EAC was defined to be WAC plus 10 percent, which was reduced to WAC plus 6 percent in 2002.

84 114.3 C.M.R. 31.02 (2005).

## VII. The Commonwealth was Well-Informed About Drug Pricing and Acted on its Knowledge

### A. The Commonwealth Knew Reported Prices Were Not Necessarily Net Prices in the late 1980s

52. Not only does the evidence reflect that the Commonwealth understood that WACs were not necessarily net prices, but it also reflects the Commonwealth's awareness that pharmacies purchased drugs at prices substantially below published prices due to discounts arising from competition. At least as early as 1988, Massachusetts Medicaid program employees were aware that pharmacies obtained substantial discounts in purchasing generic drugs. In 1988, Paul O'Connor, Pharmacy Provider Manager, recommended that the Commonwealth redefine its EAC to be based on WAC, rather than AWP, in light of the awareness that pharmacies could purchase multi-source drugs at prices significantly below AWP.[85]

53. Arnold Shapiro, a registered pharmacist who initially worked as the program's Assistant Pharmacy Manager under Paul O'Connor and later as the Pharmacy Manager (until 1999), testified that the pharmacy at which he worked in the 1980s had purchased generic drugs directly from generic drug manufacturers and was aware of "dramatic differences between the stated AWP by the generic house and the price that they would charge."[86] In February 1988, when Mr. Shapiro began working with the Massachusetts Department of Public Welfare, he discussed his knowledge that "the quoted AWP did not include substantial discounts commonly given to retail pharmacies"[87] with an official in HCFA's pharmacy reimbursement area and learned that HCFA "viewed AWP as much higher than pharmacy acquisition costs."[88] Diane Jacobs (then a Policy Analyst for the Rate Setting Commission) recounted a meeting in February of 1988, at which Paul O'Connor and Arnold Shapiro explained that Blue Book AWPs "average about 30 percent more than the prices paid by retailers and wholesalers to manufacturers," and that

---

85 MA011752–57 (Memorandum from Paul O'Connor to Velvet Miller, October 24, 1998) ("Velvet Miller memo") at MA011753.

86 Shapiro Deposition, pp. 21, 38–39, 41–42.

87 Shapiro Exhibit 2 (p. 1).

88 Shapiro Exhibit 2 (pp. 2–3).

"Blue Book listings do not represent actual acquisition costs."[89] In an affidavit filed in 1989, Mr. Shapiro recounted his conversations with a number of Commonwealth officials regarding substantial differences between AWP and the prices pharmacies paid for multi-source drugs.[90]

### 1. The Commonwealth Learned About Pricing from Federal Government Publications

54. The Commonwealth had access to numerous reports on pharmaceutical industry prepared by federal agencies such as the Department of Health and Human Services Office of the Inspector General ("OIG").[91] Beginning in the early 1980s, the OIG and other governmental agencies, such as the General Accounting (now Accountability) Office ("GAO") have published numerous reports documenting the differences between pharmacies' actual acquisition costs and published prices. For example, in 1984, the OIG reported that pharmacies in the Commonwealth of Massachusetts were purchasing drugs at prices that were anywhere from 6.94 percent to 40.70 percent below AWP, and HCFA sent this report to "State Agencies Administering Medicaid Assistance Programs" in September 1984.[92] In two reports that specifically addressed reimbursement for generic pharmaceuticals, a 1997 OIG report noted there was a 42.5 percent difference between acquisition costs and AWP,[93] and a 2002 OIG report noted that there was a 30.55 percent difference between acquisition costs and WAC.[94] Mr. Shapiro testified that he regularly received and read these reports.[95] Paul Jeffrey, the Commonwealth's Pharmacy

---

89 Jacobs Exhibit 1 at MA011591–92; see, also, Jacobs Exhibit 4 at MA011596.

90 Shapiro Deposition, pp. 106–10, and Shapiro Exhibit 2 (pp. 3–4)..

91 Dr. Rosenthal ignores the numerous government reports on pharmaceutical pricing that were released before, during, and after the relevant period; see Rosenthal Report, ¶35.

92 HCFA, Medicaid Transmittal No. 84-12, attaching OIG, *Changes to the Medicaid Prescription Drug Program Could Save Millions*, A-06-40216), 1984, p, 9.

93 OIG, *Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products* A-06-97-00011, August 1997, p. 4.

94 OIG, *Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products*, A-06-01-00053, March 2002, p. 7. This report also noted that acquisition costs were, on average, 65.93 percent below AWP. (*ibid.*) A companion report for brand name drugs found discounts of 10.3 percent off AWP. (See OIG, *Medicaid Pharmacy: Actual Acquisition Cost of Brand Name Prescription Drug Products*, August 2001.)

95 Shapiro Deposition, pp. 69–70 and 209.

Director, similarly testified that he received and read these reports on a regular basis.[96] Dr. Jeffrey further testified that, given his understanding of the difference between AWP and WAC, he understood these reports to mean that pharmacies were able to purchase drugs at prices below WAC.[97]

### 2. The Commonwealth Conducted Surveys of Drug Prices

55. In November of 1988, the Division of Health Care Finance and Policy (then called the Rate Setting Commission) conducted a survey of wholesalers to determine what pharmacies were actually paying for prescription drugs; the five largest wholesalers in the state participated in the survey.[98] Even prior to conducting this survey, the Commonwealth "was aware that there were a number of different discounts out there" for direct purchasers (rather than wholesalers).[99] The survey found that independent pharmacies on average acquired drugs at AWP minus 13 percent, which was equivalent to WAC plus 6.4 percent.[100]

### 3. The Commonwealth Could Easily Calculate AMPs from Medicaid Rebate Information

56. The Commonwealth received information sufficient to calculate AMPs under the Medicaid Rebate program for those drugs approved under ANDAs. As Timothy Catlett, Senior Vice-President of Sales and Marketing at Barr Laboratories, Inc. (a major generic drug manufacturer) testified, "For generic products, the manufacturer … pays a unit rebate amount of 11% of the AMP to the state Medicaid programs based on utilization of the product by each state Medicaid program. States can readily calculate AMP for a generic product from the unit rebate data they receive from CMS."[101] In fact, Dr. Jeffrey recalled that the Commonwealth did so on at

---

96 Jeffery Deposition of October 2007, pp. 163–68.

97 Jeffrey Deposition of October 2007, pp. 167–70.

98 Shapiro Deposition, pp. 224–31, Shapiro Exhibit 2 (pp. 6–7), and Shapiro Exhibit 8 (Miriam Shark Affidavit). The survey focused on brand name drugs; Shapiro Deposition, p. 229.

99 Shapiro Deposition, p. 228.

100 Shapiro Deposition, p. 231.

101 Catlett, Timothy P., "Medicaid Prescription Drug Reimbursement," Testimony before the Subcommittee on Oversight and Investigations of the House Committee on Energy and Commerce, December 7, 2004, p. 7.

least one occasion in 2002.[102] The Commonwealth could have determined AMPs from URAs at any time during the relevant period.[103] The Attorney General's Office Medicaid Fraud Control Unit also calculated AMPs from URAs in a matter of seconds.[104] The Medicaid formula that relates URAs to AMPs has long been known to the states, including the Commonwealth, as it is enshrined the Medicaid Rebate Provisions of OBRA 90.

#### 4. The Commonwealth Purchased Drugs Directly

57. The Commonwealth has directly observed the net prices at which pharmaceuticals can be purchased, as well as the differences between these prices and prices reported to the price compendia, through several different programs.

58. Since 1993, the State Office of Pharmacy Services ("SOPS")—which coordinates purchasing of pharmaceuticals for the Commonwealth's Departments of Mental Health, Mental Retardation, Public Health, and Corrections—has used AmerisourceBergen as a PBM.[105] The Commonwealth has also been a member of the group purchasing organization Managed Healthcare Associates since 1993.[106] SOPS was able to purchase generic drugs (including certain defendants in this lawsuit) at prices approaching 50 percent off WAC in some cases.[107]

59. Around 1998, the Commonwealth formed the Massachusetts Alliance for State Pharmaceutical Buying to negotiate prices for prescription drugs and other products for use by all state run facilities.[108] This program has allowed the Commonwealth to gain knowledge about manufacturers' net prices.

---

102 Jeffrey Deposition of June 2007, pp. 114–15

103 Brown Deposition, pp. 101–102; Dr. Rosenthal ignores the ability of the Commonwealth to calculate AMPs from URAs in concluding that AMPs are "based on actual transaction prices which cannot be observed using public data;" see Rosenthal Report, ¶46 and fn. 28.

104 Megathlin Deposition, p. 141.

105 Dell'Olio Deposition, pp. 35–37.

106 Dell'Olio Deposition, p. 38.

107 Dell'Olio Deposition, 86–87.

108 National Conference of State Legislatures, Pharmaceutical Bulk Purchasing: Multi-state and Inter-agency Plans, 2008.

60. In 1999, the Commonwealth entered into a contract for the purchase of clozapine; the contract reflected more than a 30 percent discount to WAC, which would increase to over 60 percent by 2001 for some sizes.[109]

61. Since 2001, the Commonwealth's Prescription Advantage Program ("RxA") has contracted with AdvancePCS, a PBM, to provide pharmaceutical benefits to its elderly and disabled beneficiaries; their contract includes a MAC equal to AWP minus 52 percent for generic drugs.[110]

62. In 2003, Dr. Jeffrey gave a presentation on how states could use federal discounts through the Public Health Service 340B Program.[111] He explained that at least 135,000 Medicaid recipients received services from a 340B entity and provided an example showing how the state net Medicaid price compared with a number of other prices, including AWP, WAC, AMP, the Medicaid Best Price, Medicaid reimbursement (AWP – 10%), the Medicaid rebate (AMP – Best Price).

### B. The Commonwealth Changed Medicaid Policies Based on Their Knowledge of Drug Pricing

63. It is clear from the evidence in this case that the Commonwealth officials in charge of running the Massachusetts Medicaid agency were very knowledgeable about drug pricing and that they acted on this knowledge in changing their policies regarding payments to pharmacies.

#### 1. The 1988 Survey and the 1989 Revision to the EAC Formula

64. As I mentioned above, in November 1988, Medicaid officials conducted a survey of wholesalers. In light of the results of this survey, Mr. Shapiro and his colleagues

---

109 Dell'Olio Deposition, pp. 114–121 and Dell'Olio Exhibit 13. Based on a comparison of these 1999 contract prices (IVAX-MA-00354249–254) and the WACs in effect as of June 1988 (IVAX-MA-00109595–602), the contract price was at a 32 percent discount to WAC. While there were no changes in the WACs between 1999 and 2000, IVAX offered reduced contract prices in 2001 (Dell'Olio Exhibit 16), and the discounts under this new offer averaged 58 percent, and the discount was 66 percent for the 100 mg tablets in a 100 tablets per bottle package size.

110 Garten Deposition, pp. 14, 29–32, 60–61.

111 Paul Jeffrey, "The PHS 340B Program: Massachusetts Medicaid Perspective, Prescription Drugs: How states can use federal discounts," October 15, 2003, http://ncsl.org/programs/health/340bpresentation-2/Paul's%20340B%20Presentation.PPT, accessed March 25, 2008.

drafted recommendations that the Massachusetts Medicaid EAC be changed to WAC plus 10 percent.[112] They recommended an EAC that was higher than the *average* actual acquisition cost because WAC plus 6.4 percent would be less than *individual* actual acquisition costs for a significant number of pharmacies.[113]

65. According to Mr. Shapiro, in 1988 and 1989 the Commonwealth gathered additional information on published and net prices, and as a result proposed revisions that would reduce the program's MAC by 47 percent.[114]

66. In 1989, Massachusetts Medicaid revised its EAC formula to be WAC plus 10 percent and removed AWP as a factor in estimating the EAC for generic drugs subject to a MAC.[115] It is important to note that the Commonwealth's witnesses have said that they did not expect to use a WAC-based formula for most generic drug payments, because these payments would be subject to MAC and FUL limits.[116]

### 2. The Medicaid Rebate Provisions and the Commonwealth's 1995 Change in its Usual & Customary Definition

67. In his May 1990 remarks introducing the "Pharmaceutical Access and Prudent Purchasing Act of 1990," a predecessor to the Medicaid Rebate Provisions enacted in OBRA 90, Senator Pryor noted that "the Department of Veterans Affairs, hospitals, and HMO's were obtaining 30 to 40 percent discounts under what the State Medicaid programs are paying."[117]

68. In September 1990, Senator Pryor introduced the "Medicaid Anti-Discriminatory Drug Price And Patient Benefit Restoration Act," which, according to Senator Pryor, "mandates that, in order to be placed on a State list of covered drugs, a prescription drug manufacturer must provide the Medicaid Program the same

112 Shapiro Deposition, pp. 231–34 and Shapiro Exhibit 2 (p. 8).

113 Shapiro Deposition, pp. 233–34.

114 Shapiro Deposition, pp. 100–3.

115 Shapiro Deposition, pp. 153–56.

116 Shapiro Deposition, pp. 278–79.

117 "Statements on Introduced Bills and Joint Resolutions (May 10, 1990)," Congressional Record, 101st Congress, s5987.

substantial discounts it is now giving to other purchasers of that medication."[118] Congress cited examples of discounts up to 60 percent on some drugs in support of the Medicaid Rebate program.[119]

69. After 1990, in conjunction with the implementation and operation of the Medicaid rebate program, Mr. Shapiro learned that at least some manufacturers sold drugs to wholesalers at discounts.[120]

70. In November 1994, Diane Jacobs (then a Policy Analyst for the Rate Setting Commission) described how the Commonwealth needed to be ready to act by changing its EAC definition and dispensing fees once the OBRA90 moratorium on changes to the pharmacy payment formula would expire in January 1, 1995.[121]

71. In 1995, after the OBRA 90 moratorium expired,[122] the Commonwealth recommended changing and did change the Medicaid program's definition of usual and customary to take advantage of dramatic changes in the market, including discounts offered to HMOs and other third-party payers, manufacturers' rebates, and other factors.[123] Dr. Jeffrey testified that because PBMs were often the parties that negotiated the substantial discounts on drugs[124] and they created MAC lists that reference specific dollar amounts, rather than list prices, he believed that the usual and customary charges that pharmacies report "are not based in any way on the prices manufacturers report,"[125] which may include WACs.

118 "Statements on Introduced Bills and Joint Resolutions (September 12, 1990),) Congressional Record, 101st Congress, s12954.

119 Freudenheim, Milt, "Drug Makers Face Pressure to Restrain Price Increases," *The New York Times*, May 11, 1991.

120 Shapiro Deposition, pp. 158–60.

121 Jacobs Exhibit 16 at MA012218–19.

122 Shapiro Deposition, pp. 163–64.

123 Shapiro Exhibit 11 at MA007172–74; see, also, 759 Mass. Reg. 44 (Feb. 24, 1995). Dr. Rosenthal ignores the Commonwealth's change in the definition of usual and customary charge in 1995; see Rosenthal Report, ¶49.

124 Jeffrey Deposition of October 1997, pp. 89–90.

125 Jeffrey Deposition of October 1997, pp. 94–96.

### 3. The 2001 and 2002 OIG Reports and the Commonwealth's 2002 Policy Changes

72. As I mentioned above, two OIG reports that came out in 2001 and 2002 showed that pharmacies were able to acquire prescription drugs at prices substantially below WAC. This information was clearly considered by Medicaid officials, and they sought additional information regarding payment formulas used by other third-party payers in response.

73. In 2001, Gary Gilmore wrote to Paul Jeffrey about the OIG study showing the EAC for generics to be WAC minus 30 percent; as a result, he recommended changing the Massachusetts Medicaid EAC from WAC plus 10 percent to WAC plus 5 percent, and noted that other agencies were already on board in supporting the change.[126]

74. Also in 2001, Dr. Jeffrey was informed that United Healthcare was paying pharmacies AWP minus 57 percent for generic drugs and that other commercial insurance companies' payment rates were in the same vicinity.[127] Dr. Jeffrey obtained additional information on commercial insurance company payment rates from the Commonwealth's Group Insurance Commission ("GIC").[128] The GIC contracted with a PBM in 1995;[129] the payment formula included a "lesser of" provision where the MAC was determined to be AWP minus 46 percent.[130] He also obtained information from the Commonwealth's Prescription Advantage program regarding payments for prescription drugs.[131]

75. A section of Chapter 184 of the 2002 Session Laws, approved in part by the Acting Governor on July 22, 2002, directed the Division of Health Care Finance and Policy ("the Division") to reduce payments for all prescription drugs, both single-source and multi-source, to WAC less two percent plus a dispensing fee, to conduct

---

126 Jeffrey Deposition of June 2007, pp. 91–93, 95, and Jeffrey Exhibit 7 at MA001435.

127 Jeffrey Deposition of June 2007, pp. 127–29.

128 Jeffrey Deposition of June 2007, pp. 129–31. The Commonwealth has stipulated that similar discounts were in effect from 1995 through June 30, 2000.

129 Stipulation Relating to The Commonwealth's Group Insurance Commission, January 14, 2008.

130 Johnson Deposition, pp. 35–41.

131 Jeffrey Deposition of June 2007, pp. 134–136.

hearings on this change, and to consider whether this change would compromise Medicaid beneficiaries' access to pharmacy services.[132]

76. Dr. Jeffrey also felt that a payment rate of WAC minus 2 percent would be inadequate, and he communicated his concern to "anybody who would listen," including the Governor's top aides, the Commissioner, the secretary of Administration and Finance, the Division of Health Care Finance and Policy, and others.[133]

77. The Division held hearings on September 5 and 6, 2002 and summarized the information received at those hearings in a Report to the General Court: "Through information provided by testimony at the public hearing, documents submitted to the record of the public hearing, review of other studies, and data analysis referenced in this report, the Division learned that: a) pharmacies acquire drugs at or around WAC. b) as reported by the OIG and other states' analyses, pharmacies acquire generic drugs at much deeper discounts from manufacturers… c) as reported in other states' analyses, pharmacies incur costs in addition to the acquisition cost."[134] Three major pharmacies—CVS, Brooks, and Walgreens—that fill 61 percent of MassHealth prescriptions threatened to end their participation in the program if the new rates went into effect.[135] Many pharmacists testified that payments of WAC minus 2 percent plus a $3 dispensing fee "would be inadequate and force them to lose money on every Medicaid prescription filled."[136]

78. The Report also stated that, although pharmacies "acknowledged that they receive bigger discounts for generic drugs, they pointed out that MassHealth has already

---

132 Available at http://www.mass.gov/legis/laws/seslaw02/sl020184.htm.

133 Jeffrey Deposition of June 2007, pp. 172–73.

134 Report to the Massachusetts General Court, p. 15. See, also, Deposition of Paul Jeffrey (Director of Pharmacy, Commonwealth of Massachusetts), June 14, 2007 ("Jeffrey Deposition of June 2007"), pp. 70–71 (Dr. Jeffrey contributed content and editorial revisions to the report) and Jeffrey Exhibit 3.

135 Report to the Massachusetts General Court, p. 10; see, also, Jeffrey Deposition of October 2007, pp. 197–98.

136 Report to the Massachusetts General Court, p. 11.

captured some of these savings when it pays at the lower of the usual and customary charge, MUL, or FUL."[137]

79. In addition, "[t]he Division has concluded that at the present time, Massachusetts could not change to a tiered payment system. Although it is clear that pharmacies receive larger discounts on generic drugs, one way to encourage the use of generic drugs is to maintain one payment rate for both brand name and generic drugs. Although this may result in a greater percentage profit margin for dispensing a generic drug, the dollar amount will be smaller."[138]

80. In 2002, the Division recommended that the dispensing fee for generic drugs be increased from $3 to $5 to encourage the dispensing of generic drugs.[139] "The Division has concluded that to achieve Medicaid savings in the long run, the payment system must encourage the dispensing of a generic drug rather than a brand name drug whenever possible. To meet this goal, the Division recommends that the dispensing fee for generics be increased to $5.00, and for brands to $3.50, effective November 1, 2002."[140] According to the Division's Report, each time a generic drug was dispensed instead of its single-source brand name equivalent, the Medicaid program would save approximately $80.[141]

81. In 2002, Gary Gilmore recommended changing the MAC program "to get immediate savings;" the proposal called for reducing the MAC from 150 percent to 130 percent of the lowest published price.[142] Changes to the Massachusetts upper limit could be accomplished by agency action; they do not require legislative action.[143] The Commonwealth again changed the definition of the usual and customary charge in 2002.[144]

---

137 Report to the Massachusetts General Court, p. 13.

138 Report to the Massachusetts General Court, p. 18.

139 Lapp Deposition, pp. 141–42

140 Report to the Massachusetts General Court, p. 16.

141 Report to the Massachusetts General Court, p. 18.

142 Jeffrey Deposition of June 2007, p. 95.

143 Jeffrey Deposition of October 2007, pp. 104–5

144 See 960 Mass. Reg. 53 (Nov. 18, 2002). Dr. Rosenthal ignores the Commonwealth's change in the definition of usual and customary charge in 2002; see Rosenthal Report, ¶ 49.

### C. The Commonwealth Operated the Medicaid Program in a Manner That Demonstrated its Knowledge of Drug Pricing

82. The Commonwealth implemented programs that were modeled after some of the most advanced cost control techniques used by commercial insurance companies and the federal government, including MACs to limit expenditures on generic drugs and generic substitution programs to encourage the use of generic drugs. Like private third-party payors, Massachusetts Medicaid kept confidential its exact payment rates to pharmacies.

83. As early as 1975, the Federal government acknowledged that prices may differ between brand name and generic drugs in implementing its Maximum Allowable Cost ("MAC") program that placed limits on payments to pharmacies for generic drugs.[145]

84. In 1987, the federal government allowed state Medicaid programs to have the flexibility in setting reimbursement rates and to benefit from lower prices for generic drugs through its Federal Upper Limit ("FUL") program.[146] Massachusetts Medicaid had earlier implemented a MAC program and used FULs in determining payments to pharmacies.[147] The Federal government encouraged states to adopt lower MAC prices.[148]

85. In 1988, when considering changes to the EAC definition, Paul O'Connor provided an overview of competition and pricing in the pharmaceutical industry, noting significant differences between published prices and pharmacy acquisition costs; he also explained that Massachusetts Medicaid's dispensing "fee is supposed to cover all of the fixed costs of dispensing a prescription plus an appropriate amount for profit" and the need to consider the effect of total payments to pharmacies, not just dispensing fees or payments for drug acquisition costs alone.[149]

---

145 See 40 Fed. Reg. 32287–88 (July 31, 1975).

146 See 42 C.F.R. §§ 447.331, 447.332; see, also, 447.304 and 447.331–334 (flexibility).

147 Shapiro Deposition, pp. 91–92.

148 52 Fed. Reg. 28653.

149 Velvet Miller memo at MA011752, MA011756.

86. In the 1990s, the Commonwealth made adjustments to the EAC formula and dispensing fees, most notably in 1995 when it revised the usual and customary charge language to take advantage of discounts available in the market.[150]

87. When Paul Jeffrey became the Pharmacy Director for the Commonwealth in 2001, he determined that the Commonwealth had "a fairly rigorous process for managing the [pharmacy] reimbursement."[151]

### D. The Commonwealth Chose its Payment Formula in Light of This Knowledge

88. The evidence shows that the Commonwealth had extensive knowledge of net prices as well as published prices and must be assumed to have deliberately chosen a formula for paying pharmacies in light of this information. The evidence further shows that the Commonwealth did not attempt to make payments to pharmacies for drugs exactly equal to the pharmacies' costs of purchasing drugs, rather, it attempted to ensure that total payments to pharmacies were sufficient to balance the Medicaid program objectives of cost control with the imperative to pay pharmacies enough to ensure that they would participate in the Medicaid program. Based on the evidence, it does not appear that The Commonwealth was misled by published prices; by the accounts of Commonwealth officials and the actions of the state, it is clear that the Commonwealth must have understood that published WACs (and AWPs) differed from net prices. The Commonwealth knew that the WAC is an undiscounted list price and not an average of net prices.

89. The Commonwealth—and the Medicaid program in particular—was not unable to act in response to information regarding drug pricing and changes in priorities of the program. In fact, the Commonwealth—and the Medicaid program—on a number of occasions used its power to investigate, hold hearings, request information, and ultimately to change Medicaid policies relating to payments to pharmacies for prescription medications, including generic drugs. Most of these

---

150 Shapiro Exhibit 11 at MA007172–74; see, also, 759 Mass. Reg. 44 (Feb. 24, 1995). Dr. Rosenthal ignores the Commonwealth's change in the definition of usual and customary charge in 1995; see Rosenthal Report, ¶49.

151 Jeffrey Deposition of June 2007, p. 48.

changes were accomplished through the regulatory powers of the agency.[152] As a result of these actions, Massachusetts Medicaid had some of the lowest payment rates among Medicaid programs nationwide.[153]

## VIII. Generic Manufacturers Had No Economic Incentive to Defraud or Attempt to Defraud the Commonwealth as Alleged

90. As I explained above, private-sector MAC lists created by PBMs and TPPs generally use competitive intelligence and reference specific dollar amounts; thus, the usual and customary charges reported by pharmacies are not generally based on generic drug manufacturers' reported prices.[154]

91. If Massachusetts Medicaid's statutory usual and customary charge was based on the lowest price charged or accepted by pharmacies from private-sector insurance companies (or their PBMs), it is unlikely that the usual and customary charge would be based on a generic drug manufacturer's WAC. Furthermore, the Commonwealth implemented its own MAC program in 1987 modeled after the Federal FUL program, which was based on published prices.

92. If a manufacturer had stopped to consider the regulations regarding pharmacy payments by Massachusetts Medicaid—and the likelihood that the usual and customary charge, which would reflect private-sector MAC prices, would have been less than prices based on published prices—there is no reason to believe generic drug manufacturers would have expected their published prices—such as WACs—to have been relevant to Massachusetts Medicaid payments to pharmacies for those drugs that had multiple generic alternatives available.[155]

---

152 The Commonwealth at times also pursued and successfully legislated policy changes pertaining to the Medicaid program's expenditures on drugs. For example, the Commonwealth legislated a surcharge on non-Medicaid, non-Medicare pharmacy prescriptions to provide additional funding for Medicaid drug costs. (IssueSource.org, Issue: Prescription Drug Coverage for Seniors, http://www.issuesource.org/issue.cfm?ID=54&Mode=Background, accessed March 15, 2008.) The surcharge was later repealed.

153 Jeffrey Deposition of June 2007 Exhibit 2 at MA001286.

154 Jeffrey Deposition of October 1997, pp. 94–96.

155 Also, it is my opinion that manufacturers who reported WACs generally portrayed them as list prices, not net prices, and that this fact was well understood by the Commonwealth.

93. Massachusetts pharmacies were required to certify as true that the usual and customary charges they reported to the Commonwealth were equal to the lowest price they charged or accepted. The extent to which they complied is an issue for the pharmacies, not the defendant generic drug manufacturers.

I declare under the penalty of perjury that the foregoing is true and correct.
Executed on April 7, 2008.

Fiona Scott Morton

# Exhibit A

# Fiona M. Scott Morton

**School of Management**
**Yale University**
**P.O. Box 208200**
**New Haven, CT 06520-8200**

**++1.203.432.5569 voice**
**++1.203.432.6974 fax**
**fiona.scottmorton@yale.edu**

**Employment:**

| | |
|---|---|
| 2006 - present | Senior Associate Dean for Faculty Development, Yale School of Management |
| 2002 - present | Professor of Economics, Yale School of Management |
| 2005 - 2006 | Adam Smith Visiting Fellow in Economics, University of Edinburgh, Scotland |
| 2000 - 2002 | James L. Frank '32 Associate Professor of Private Enterprise and Management, Yale School of Management |
| 1999 - 2000 | Associate Professor of Economics and Strategy, Yale School of Management |
| 1997 - 1999 | Assistant Professor of Economics and Strategy<br>Graduate School of Business, University of Chicago |
| 1994 - 1997 | Assistant Professor of Strategic Management<br>Graduate School of Business, Stanford University |
| 1991 - 1992 | Instructor for Economics 10, Prof. Martin Feldstein, Harvard University |

**Education:**

| | |
|---|---|
| 1994 | Massachusetts Institute of Technology, PhD. Economics |
| 1989 | Yale University, B.A. Economics, *magna cum laude* |

**Peer-reviewed Articles:**

"Entry and Predation: British Shipping Cartels 1879-1929"
*Journal of Economics & Management Strategy*:6:4:679-724, 1997
"The Strategic Response by Pharmaceutical Firms to the Medicaid Most-Favored-Customer Rules"
*The RAND Journal of Economics*:28:2:269-290, 1997
"The Interaction Between a Most-Favored-Customer Clause and Price Dispersion: An Empirical Examination of the Medicaid Rebate Rules of 1990"
*Journal of Economics & Management Strategy*:6:1:151-174, 1997
"Misclassification of the Dependent Variable in a Discrete-Response Setting"
Joint with Jerry Hausman, MIT, and Jason Abrevaya, University of Chicago
*Journal of Econometrics*:87:2:239-269, 1998
"Social Status, Entry, and Predation: The Case of British Shipping Cartels 1879-1929"
Joint with Joel Podolny, Yale SOM
*The Journal of Industrial Economics*:47:1:41-67, 1999
"Barriers to Entry, Brand Advertising, and Generic Entry in the US Pharmaceutical Industry"
*International Journal of Industrial Organization*:18:7:1085-1104, 2000
"Entry Decisions in the Generic Pharmaceutical Industry"
*The RAND Journal of Economics*:30:3:421-440, 1999
"Love or Money? The Effects of Owner Motivation in the California Wine Industry"

Joint with Joel Podolny, Yale SOM
*The Journal of Industrial Economics*:50:4:431-456, 2002
"Horizontal Integration between Brand and Generic Firms in the Pharmaceutical Industry"
*Journal of Economics & Management Strategy*:11:1:135-168, 2002
"Internet Car Retailing"
Joint with Florian Zettelmeyer, UC Berkeley and Jorge Silva-Risso, UC Riverside
*The Journal of Industrial Economics*:49:4, 2001
"The Strategic Positioning of Store Brands in Retailer-Manufacturer Negotiations"
Joint with Florian Zettelmeyer, UC Berkeley
*Review of Industrial Organization*:24:2:161-194, 2004
"Consumer Information and Discrimination: Does the Internet Affect the Pricing of New Cars to Women and Minorities?"
Joint with Florian Zettelmeyer, UC Berkeley and Jorge Silva-Risso, UCLA
*Quantitative Marketing and Economics*:1:1:65-92, 2003
"Behavioral Biases Meet the Market: the Case of Magazine Subscription Prices"
Joint with Sharon Oster, Yale SOM
*Berkeley Electronic Journals in Economic Analysis & Policy Advances*:5:1, 2005
"The Distortionary Effects of Government Procurement: Evidence from Medicaid Prescription Drug Purchasing"
Joint with Mark Duggan, University of Maryland
*Quarterly Journal of Economics*:121:1, 2006
"The Role of the Internet in Lowering Prices: Evidence from Matched Survey and Auto Transaction Data"
Joint with Florian Zettelmeyer, UC Berkeley and Jorge Silva-Risso, UC Riverside
*Journal of Marketing Research*, May 2006
"State Casket Sales Restrictions: a Pointless Undertaking?"
Joint with Judy Chevalier, Yale SOM
Forthcoming in *The Journal of Law and Economics*, February 2008

**Working Papers:**

"Cowboys or Cowards: Why are Internet Car Prices Lower?"
Joint with Florian Zettelmeyer, UC Berkeley and Jorge Silva-Risso, UC Riverside
"A Test of Bargaining Theory in the Auto Retailing Industry"
Joint with Florian Zettelmeyer, UC Berkeley and Jorge Silva-Risso, UC Riverside
"Scarcity Rents in Car Retailing"
Joint with Florian Zettelmeyer, UC Berkeley and Jorge Silva-Risso, UC Riverside

**Research in Progress:**

"Medicare Part D: A summary for economists"
Joint with Mark Duggan, University of Maryland and Patrick Healey, Brookings Institution
"Technology Adoption and Organizational Change in the Retail Auto Industry"
Joint with Florian Zettelmeyer, UC Berkeley and Jorge Silva-Risso, UC Riverside
"The Effect of the Medicare Drug Benefit on Pharmaceutical Prices"
Joint with Mark Duggan, University of Maryland
"The Impact of Loss Aversion in Auto Transactions"
Joint with Sharon Oster, Yale SOM

"The Reasons for Asset Reallocation: Efficiency or Agency?
Joint with Gavin Kretzschmar, Univ of Edinburgh
"Dying for a Discount"
Joint with Judy Chevalier, Yale SOM, and David Harrington, Kenyon College

**Other Publications:**

"Why Economics has been Fruitful for Strategy"
*Financial Times*, Mastering Strategy Series, 4 Oct 1999
"Strategic Complements and Substitutes"
*Financial Times*, Mastering Strategy Series, 8 Nov 1999
"The Problems of Price Controls"
*Regulation*:24:1, Spring 2001
"Consumer Benefit from Use of the Internet"
*NBER Innovation Policy and the Economy*:6, 2005

**Awards:**

| | |
|---|---|
| 2007 | Yale School of Management Alumni Association Teaching Award: the only teaching prize awarded at Yale SOM for the academic year 2006-7. |
| 2007 | Green Award, *Journal of Marketing Research*, for the paper "How the Internet Lowers Prices: Evidence from Matched Survey and Automobile Transaction Data" |
| 2005 - 2008 | National Science Foundation Research Grant 0518858<br>"The Effect of Government Procurement of Pharmaceuticals"<br>Joint with Mark Duggan, University of Maryland |
| 2001 - 2003 | National Science Foundation Research Grant 0111885<br>"The Effect of Internet Car Shopping on Prices and Discrimination"<br>Joint with Florian Zettelmeyer, UC Berkeley |
| 1998 - 2002 | National Science Foundation Research Grant 9810178<br>"Studies of Competition" |
| 1995 | Distinguished Teaching Commendation: One of three "second prizes" given by Stanford MBA students for excellence in teaching during the academic year 1994-1995 |
| 1993 - 1994 | Program on the Pharmaceutical Industry, MIT, grant for full tuition and stipend |

**Teaching:**

*Competitive Strategy*: Elective MBA course covering topics in I.O. such as price and quantity competition, entry, and antitrust, as well as strategy concepts such as industry analysis, competitive advantage, and sustainability
*E-commerce Strategy:* Elective MBA course applying microeconomic principles to understand the sources of profit in information technology-based businesses

**PhD Students Supervised** (PhD institution, year; first placement):

Andrea Coscelli (Stanford GSB, 1998; University College London)
Brian Viard (University of Chicago GSB, 2000; Stanford GSB)
Paris Cleanthous (Yale, 2003; NYU Stern)

Juan Esteban Carranza (Yale, 2004; Wisconsin Madison)
Henry Schneider (Yale, 2006; Cornell Johnson School)

**Memberships and Professional Service:**

American Economics Association
NBER Research Associate, Industrial Organization
First Western Bancorp Inc. (now Sky Bank, Bowling Green, Ohio) Board of Directors (1998-1999)
StreamSage.com Advisory Board (2000-2004)
*Economic Policy* Panel (2002-2004)
*Review of Industrial Organization* Editorial Board (2002-2004)
*The Journal of Industrial Economics* Associate Editor (2003-2006)
*International Journal of Industrial Organization* Co-Editor (2005-present)
*BE Journal of Economics Analysis and Policy,* Editor (2006-present)
*Journal of Economic Perspectives*, Associate Editor (2007-)

**Invited Research Presentations Given at:**

Dartmouth Econ, MIT Econ, Harvard Econ. Harvard Business School, Yale Econ, Yale Law, Columbia Econ, Columbia Business School, NYU Stern, U. Penn Wharton School, Univ. of Maryland Econ, Federal Trade Commission, Univ. of Delaware Econ, Duke Econ, Univ. of Virginia Econ, Carnegie Mellon Heinz School, Northwestern Econ, Northwestern Kellogg GSM, Chicago Econ, Chicago GSB, Purdue Econ, Univ. of Michigan Business School, Washington Univ. St. Louis Olin School, Iowa State Econ, Univ. of Rochester Business School, Cornell Econ, Univ. of Texas at Austin, Univ. of Arizona, Stanford GSB, UC Berkeley Econ, UC Berkeley Haas School, UCLA Econ, Univ. of Toronto Econ (Canada), Univ. of British Columbia (Canada), Queens University (Canada), Univ. of Munich (Germany), Univ. of Linz (Austria), London School of Economics (England), Office of Fair Trading (England), Oxford University (England), Cambridge University (England), Edinburgh University (Scotland), Stirling University (Scotland), European University Institute (Italy), IDEI Toulouse (France)

**Conferences (Presenter or Discussant):**

Boston University healthcare I.O. conference: 1995, 1999, 2004
Stanford Strategy Conference: 1996, 1997 (organizer), 1999, 2000
Harvard Business School Strategy Conference: 1999, 2004
Economic Policy Conference: 2002 spring and fall, 2003 fall, 2004 fall
American Economics Assn. Meetings: 2001, 2002, 2004, 2005, 2007
IO NBER Summer Institute: 1998, 2001 (organizer and presenter), 2003, 2007 (organizer)
IO NBER Winter Meetings: 1995, 1996, 2000, 2004
NBER e-commerce group conferences: 2000, 2001
NBER conference on non-profits: 2002
NBER conference on IO of healthcare: 1998
NBER conference on innovation policy: 2005
IDEI (Toulouse) e-commerce conference: 2001, 2003 (co-author presented), 2005
Univ. of British Columbia IO conference: 2004
WZB Institute Behavioral IO conference, Berlin, Germany: 2005
CEPR Applied IO conference: 2006
UCL Behavioral IO conference, England: 2006

NBER conference on intellectual property: 2006

**Referee for:**

*Review of Economic Studies, Quarterly Journal of Economics, The RAND Journal of Economics, The Journal of Industrial Economics, Journal of Economics & Management Strategy, Journal of Health Economics, Review of Industrial Organization, International Journal of Industrial Organization, American Economic Review,* National Science Foundation, *Journal of Law and Economics, Journal of Political Economy, Journal of Law, Economics, and Organization, Marketing Science, Management Science, Strategic Management Journal, Review of Economics and Statistics, Journal of Econometrics, European Economic Review, Berkeley Electronic Journals, The American Journal of Managed Care, Contemporary Economic Policy*

**Government Testimony:**

Senate Finance Committee Hearings, "Prescription Drug Pricing and Negotiation: An Overview and Economic Perspectives for the Medicare Prescription Drug Benefit" January 2007

FTC hearings, "Possible Anticompetitive Efforts to Restrict Competition on the Internet," Auto Panel, October 2002

**Media (major only):**

*New York Times*, April 24, 2003: G:8: col. 3
*Business Week*, May 13, 2002: 3782: p. 32
CNN TV News, January 2002
*New York Times*, December 6, 2001: C:2: col 1
*Wall Street Journal*, January 6, 1999: B1

**Selected Consulting Engagements:**

Prepared and delivered educational materials for the Court in *In Re Pharmaceutical Industry Average Wholesale Price Litigation, US District Court of Massachusetts, MDL No. 1456, 01-CV-012257-PBS* (2004).

Submitted expert report on behalf of Teva USA in IP damages litigation *Abbott Laboratories vs Andrx Pharmaceuticals Inc, and Teva Pharmaceuticals USA, Inc and Roxane Laboratories Inc., US District Court for the Northern District of Illinois Eastern Division, No. 05 C 1490* (2005). Currently retained as consultant for Teva in other antitrust cases (2007).

Submitted expert report and currently retained as expert on behalf of fast-track defendants in *In Re Pharmaceutical Industry Average Wholesale Price Litigation, US District Court of Massachusetts, MDL No. 1456, 01-CV-012257-PBS* (2006).

Retained on behalf of Pfizer, submitted expert report, and deposed in *In Re Neurontin Marketing Sales Practices, and Products Liability Litigation, US District Court of Massachusetts, MDL No MDL 1629* (2007).

Retained on behalf of Schering-Plough, submitted expert report, and deposed in *In Re Schering-Plough Corporation Securities Litigation, US District Court of the District of New Jersey, 01-CV-0829* (2007).

Retained on behalf of MedStar Health and submitted expert report in *In re Hypodermic Products Antitrust Litigation MDL No. 1730, US District Court of the District of New Jersey, 05-CV-1602* (2007).

Retained on behalf of AstraZeneca, deposed, and testified at trial in *State of Alabama vs Abbott Laboratories, Inc., et al, Circuit Court of Montgomery County, Alabama, CV-2005-219* (2008).

I have been retained as an expert in antitrust cases that ended before opinions were submitted, and am currently retained in other ongoing matters. The types of subjects I have worked on, or am now working on, include alleged anticompetitive use of patents and contracts, alleged conspiracy to deter entry, competition between branded and generic pharmaceuticals, and alleged abuse of a dominant position (EU).

**Personal:**

Date of Birth: 20 Feb 1967 Sex: Female Citizenship: USA
Marital status: Married to Stephen R. Latham; three children

Updated: 28-Mar-2008

## Exhibit B

### Materials Relied Upon

### Legal Memoranda, Declarations, Reports, and Case Documents

First Amended Complaint, The Commonwealth of Massachusetts v. Mylan Laboratories, Inc., et al., Civil Action No. 03-CV-11865-PBS, United States District Court, District of Massachusetts, May 19, 2005.

Declaration of Raymond S. Hartman in Support of the Commonwealth of Massachusetts' Claims of Liability and Calcuation [sic] of Damages, February 28, 2008.

Declaration of Meredith Rosenthal: Report on the Prescription Drug Market, February 28, 2008.

Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris, MDL No. 1456, Civil Action No. 01-12257-PBS, United States District Court of Massachusetts, February 9, 2005.

Affidavit of David L. Workman, II, In Support of Defendant Mylan Inc.'s Motion for Summary Judgment, February 28, 2008.

Commonwealth Of Massachusetts' Local Rule 56.1 Statement Of Undisputed Material Facts Applicable To Defendants Watson And Schein, February 28, 2008.

Stipulation Relating to the Commonwealth's Group Insurance Commission, January 14, 2008.

Memorandum from Paul O'Connor to Velvet Miller, October 24, 1998, MA011752–57.

Med-Plus Generic Program Primary Products, IVAX-MA-00354249–254.

Zenith Goldline Pharmaceuticals, WAC Decreases Effective June 1 and June 15, 1998, IVAX-MA-00109595–602.

### Depositions

Deposition of Alvin B. Brown, July 27, 2007.

Deposition of Andrew S. Boyer, June 27, 2007.

Deposition of Anthony W. Megathlin, October 17, 2007.

Deposition of Arnold H. Shapiro, October 3, 2007.

Deposition of Brian Roman, August 2, 2007.

Deposition of Charles J. Reed, III, August 28, 2007.

Deposition of Corinne Hogan, February 6, 2008.

Deposition of Diane Jacobs, August 13, 2007.

Deposition of Douglas A. Lapp, June 8, 2007.

Deposition of Gary Gilmore, July 26, 2007.

Deposition of Harry Korman, November 26, 2007.

Deposition of Harvey J. Weintraub, September 18–22, 2006.
Deposition of Judith Waterer, May 9, 2007.
Deposition of Karen A. Andrus, October 16, 2007.
Deposition of Lesli Paoletti, July 26, 2007.
Deposition of Louis Dell'Olio, October 17, 2007.
Deposition of Lucinda Brandt, June 12 and October 10, 2007.
Deposition of Meredith Rosenthal, March 13, 2008.
Deposition of Nick DiMaio, August 16, 2007.
Deposition of Patricia Kay Morgan, November 30, 2007.
Deposition of Patricia O'Malley, September 19, 2007.
Deposition of Paul Krauthauser, January 29, 2008.
Deposition of Paul L. Jeffrey, June 14, 2007.
Deposition of Paul L. Jeffrey, October 19, 2007.
Deposition of Randy Garten, October 22, 2007.
Deposition of Raymond S. Hartman, March 18–19, 2008.
Deposition of Robert G. Cunard, October 26, 2007.
Deposition of Robert S. Johnson, October 24, 2007.
Deposition of Robert Shanks, February 22, 2008.
Deposition of Sue Gaston, March 19, 2008.
Deposition of Trisha Sarfas, August 22, 2007.

**Publicly-Available Documents**

"ANAPROX®/ANAPROX® DS," and "NAPROSYN," http://www.fda.gov/cder/foi/label/2004/17581s99,100,18164s50,51,18965s9,10,20067s4,6lbl.pdf.

"Azathioprine Tablets [Roxane Laboratories]," http://bidocs.boehringer-ingelheim.com/BIWebAccess/ViewServlet.ser?docBase=renetnt&folderPath=/Prescribing+Information/PIs/Roxane/Azathioprine/Azathioprine+Tablets+USP+50mg.pdf.

"Carisoprodol," http://pi.watson.com/data_stream.asp?product_group=1213&p=pi&language=E.

"Clonazepam (Clonazepam) Tablet [Actavis Elizabeth LLC]," Daily Med (U.S. National Library of Medicine), http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=6235.

"Clozapine (Clozapine) Tablet [Mylan Pharmaceuticals Inc.]," Daily Med (U.S. National Library of Medicine), http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=2545.

"Cordarone," http://www.fda.gov/cder/foi/label/2004/18972s030lbl.pdf.

"EC-NAPROSYN" Product Label.

"Hydrocodone bitartrate and acetaminophen," http://pi.watson.com/data_stream.asp?product_group=1246&p=pi&language=E.

"Ibuprofen Tables [Par Pharmaceutical],"
http://www.parpharm.com/products/index.jsp#I.

"Ibuprofen,"
http://pi.watson.com/data_stream.asp?product_group=1615&p=pi&language=E.

"Ipatropium Bromide (Inhalation Solution 0.2%) [Nephron Pharmaceuticals]",
http://www.nephronpharm.com/pdf/IPB02_Pkg_Insert.pdf.

"Ipratropium," Drug Information Online, http://www.drugs.com/pro/ipratropium.html.

"Isosorbide Mononitrate (Isosorbide Mononitrate) Tablet [Actavis Elizabeth LLC]," Daily Med (U.S. National Library of Medicine),
http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=6372.

"IVAX Announces New Organization and Management Structure," *PR Newswire*, January 9, 1995.

"Keflex," http://www.fda.gov/cder/foi/label/2004/50405slr094_keflex_lbl.pdf.

"Lithium Carbonate Tablet, Capsules, and Oral Solution [Roxane Laboratories],"
http://bidocs.boehringer-ingelheim.com/BIWebAccess/ViewServlet.ser?docBase=renetnt&folderPath=/Prescribing+Information/PIs/Roxane/Lithium/Lithium+Carbonate+Tablets+Capsules+Oral+Solution.pdf.

"Lorazepam (Lorazepam) Tablet [Mylan Pharmaceuticals Inc.]," Daily Med (U.S. National Library of Medicine),
http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=4145.

"Lorazepam,"
http://pi.watson.com/data_stream.asp?product_group=1257&p=pi&language=E.

"Low Payments by CVS Caremark Force Walgreens to Withdraw as a Provider from Four Insurance Plans," November 29, 2007,
http://news.walgreens.com/article_print.cfm?article_id=4885.

"Methylphenidate hydrochloride,"
http://pi.watson.com/data_stream.asp?product_group=1266&p=pi&language=E.

"NAPROSYN" Product Label.

"Phenytoin sodium (Phenytoin Sodium) Capsule [Mylan Pharmaceuticals Inc.]," Daily Med (U.S. National Library of Medicine),
http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=6585.

"Ranitidine Tablets, Capsules, and Syrup [Par Pharmaceutical],"
http://www.parpharm.com/products/index.jsp#I.

"Roxicet Tablets and Oral Solution [Roxane Laboratories]," http://bidocs.boehringer-ingelheim.com/BIWebAccess/ViewServlet.ser?docBase=renetnt&folderPath=/Prescribing+Information/PIs/Roxane/Roxicet/Roxicet+Tablets.pdf.

"Roxicodone Tablets [Xanodyne Pharmaceuticals],"
http://www.xanodyne.com/products/pdf/Roxicodone%20Tablet%20Final%204-25-06%2010004436-01.pdf.

"Roxicodone Tablets, Oral Solution, and Liquid Concentate [Xanodyne Pharmaceuticals],"
http://www.xanodyne.com/products/pdf/Roxicodone%205mg20mg%20orals%20and%20

tablet%20final%2010004437-01.pdf.

"Statements on Introduced Bills and Joint Resolutions," Congressional Record, 101st Congress, s5987, May 10, 1990.

"Statements on Introduced Bills and Joint Resolutions," Congressional Record, 101st Congress, s12954, September 12, 1990.

"Tegretol," http://www.fda.gov/cder/foi/label/2001/20234S17LBL.PDF.

"Trazodone hydrochloride," http://pi.watson.com/data_stream.asp?product_group=1312&p=pi&language=E.

"Tylenol with Codeine," http://www.ortho-mcneil.com/ortho-mcneil/shared/pi/tylenol_codeine.pdf#zoom=100.

"Zenith Goldline Now Known As IVAX Pharmaceuticals," *Chain Drug Review*, March 26, 2001.

*2006-2007 HDMA Factbook: The Facts, Figures & Trends in Healthcare, Industry Overview.*

Berndt, Ernst R., "Pharmaceuticals in U.S. Health Care: Determinants of Quantity and Price," *Journal of Economic Perspectives*, Vol. 16, No. 4, Fall 2002, pp. 45-66.

Catlett, Timothy P., "Medicaid Prescription Drug Reimbursement," Testimony before the Subcommittee on Oversight and Investigations of the House Committee on Energy and Commerce, December 7, 2004.

Caves, Richard E., Whinston, Michael D., and Hurwitz, Mark A, "Patent Expiration, Entry and Competition in the U.S. Pharmaceutical Industry," *Brookings Papers on Economic Activity, Microeconomics*, 1991, pp. 1-48.

CBO, How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry, July 1998.

CBO, Letter to Congressmen Barton & McCrery, March 12, 2007.

CBO, Prescription Drug Pricing in the Private Sector, January 2007.

Department of Health and Human Services, Departmental Appeals Board Decision No. 1273, Arkansas Department of Human Services, August 22, 1991, http://www.hhs.gov/dab/decisions/dab1273.html.

Department of Health and Human Services, Office of Inspector General, *Medicaid Rebates for Physician-Administered Drugs*, OEI-03-02-00660, April 2004.

Frank, Richard G., "The Ongoing Regulation of Generic Drugs," *New England Journal of Medicine*, 357(20), November 15, 2007, pp. 1993-1996.

Frank, Richard G., and Salkever, David S., "Generic Entry and the Pricing of Pharmaceuticals," *Journal of Economics & Management Strategy*, Vol. 6, No. 1, Spring 1997, pp. 75-90.

Freudenheim, Milt, "Drug Makers Face Pressure to Restrain Price Increases," *The New York Times*, May 11, 1991.

Grabowski, Henry G., and Vernon, John M., "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics*, Vol. 35, Oct. 1992, pp. 334-350.

HCFA, Medicaid Action Transmittal No. 84-12, September 1984.

IssueSource, "Issue: Prescription Drug Coverage for Seniors," http://www.issuesource.org/issue.cfm?ID=54&Mode=Background.

Jeffrey, Paul, "The PHS 340B Program: Massachusetts Medicaid Perspective, Prescription Drugs: How states can use federal discounts," October 15, 2003, http://ncsl.org/programs/health/340bpresentation-2/Paul's%20340B%20Presentation.PPT.

Letter from Nightingale, Stuart L., M.D., Associate Commissioner for Health Affairs, Center for Drug Evaluation and Research, U.S. Food and Drug Administration (Jan. 28, 1998), available at http://www.fda.gov/cder/news/nightgenlett.htm.

National Conference of State Legislatures, Pharmaceutical Bulk Purchasing: Multi-state and Inter-agency Plans, 2008.

Office of Policy Planning, Bureau of Competition, and Bureau of Economics of the FTC, Letter to Assembly Member Greg Aghazarian, September 7, 2004.

OIG, Changes to the Medicaid Prescription Drug Program Could Save Millions, A-06-40216, 1984.

OIG, Medicaid Pharmacy – Actual Acquisition Cost of Brand Name Prescription Drug Products, A-06-00-00023, August 2001.

OIG, Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products, A-06-97-00011, August 1997.

OIG, Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products, A-06-01-00053, March 2002.

Report to the General Court, Reimbursement for Prescription Drugs, Commonwealth of Massachusetts, Executive Office of Health and Human Services, Division of Healthcare Finance and Policy, October 3, 2002.

Saha, Atanu, Grabowski, Henry, Birnbaum, Howard, Greenberg, Paul, and Bizan, Oded, "Generic Competition in the US Pharmaceutical Industry, *International Journal of the Economics of Business*, Vol. 13., No. 1, February 2006, pp. 15-38.

Scott Morton, Fiona M., "Barriers to entry, brand advertising, and generic entry in the US pharmaceutical industry," *International Journal of Industrial Organization*, 18 (2000), pp. 1085-1104.

Scott Morton, Fiona M., "Entry decisions in the generic pharmaceutical industry," *RAND Journal of Economics*, Vol. 30, No. 3, Autumn 1999, pp. 421-440.

Testimony of Barrueta, Anthony, Senior Counsel for the Kaiser Foundation Health Plan, FTC/DOJ Joint Hearings, Health Care and Competition Law and Policy, Pharmacy Benefit Management Companies, June 26, 2003.

U.S. General Accounting Office, Outpatient Drug Costs and Reimbursements for Selected Pharmacies in Illinois and Maryland, GAO/HRD-93-55FS, March 1993.

*Wyeth-Ayerst Prescription Drug Benefit Cost and Plan Design Survey Report, 2000 Edition.*

**Websites**

Drug.com, BETA-ADRENERGIC BLOCKING AGENTS, http://www.drugs.com/cons/normodyne.html#GXX06

Frequently Asked Questions and Mail Service Pharmacy, http://www.bluecrossma.com/pharmacy/en_US/pharmacyIndex.jsp

http://www.advancerx.com/advpcsrx_pmwroot/pmwroot/Formulary/00654/IndexForm.jsp?com=tufts&reset=yes

http://www.fda.gov/cder/about/history/Histext.htm

http://www.fda.gov/cder/about/smallbiz/generic_exclusivity.htm

http://www.fda.gov/cder/foi/appletter/2000/21011ltr.pdf

http://www.fda.gov/cder/handbook/bioequiv.htm

http://www.mckesson.com/en_us/McKesson.com/For+Pharmacies/Retail+National+Chains/Purchasing+Solutions/McKesson+OneStop+Generics.html

http://www.referenceforbusiness.com/history2/99/IVAX-Corporation.html

http://www.rxlist.com/cgi/generic/baclofen-tabs_ids.htm

Prescription Mail Order Form, http://www.fchp.org/Extranet/Members/OnlineDrugFormulary.htm

RxList, Batrim Indications & Dosage, http://www.rxlist.com/cgi/generic/bactrimiv_ids.htm

Teva Pharmaceuticals, Company History, http://www.tevausa.com/default.aspx?pageid=36

US Food and Drug Administration, A Brief History of the Center for Drug Evaluation and Research, http://www.fda.gov/cder/about/history/Histext.htm

**Regulations**

114.3 C.M.R. 31.02

114.3 C.M.R. 31.04

21 C.F.R. §§ 314.125-127

21 C.F.R. §§ 314.50

21 C.F.R. §§ 314.94

21 C.F.R. §§ 320.24

21 U.S.C. § 355 (2000)

40 Fed. Reg. 32287-88 (July 31, 1975)

42 C.F.R. §§ 447.201, Section 4.19 (May 22, 1980)

42 C.F.R. §§ 447.204, Section 4.19 (May 22, 1980)

42 C.F.R. §§ 447.304

42 C.F.R. §§ 447.331-334

52 Fed. Reg. 28648-58 (July 31, 1987)

759 Mass. Reg. 44 (Feb. 24, 1995)
960 Mass. Reg. 53 (Nov. 18, 2002)
Chapter 184 of the 2002 Session Laws (July 22, 2002)
Massachusetts General Law, Chapter 112, Section 12D
Public Law 98-417, Title I § 101 (September 24, 1984)
Social Security Act, §1927