IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| -VS- | | CA No. 03-11865-PBS<br>Pages 1 - 75 |
| MYLAN LABORATORIES, INC., et al, | ) | |
| | ) | |
| Defendants | ) | |

PRETRIAL CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
January 29, 2010, 2:05 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA 02210
(617)345-6787

A P P E A R A N C E S:

PETER A. MULLIN, ESQ., NATHANIEL YEAGER, ESQ., and ROBYN DOLLAR, ESQ., Office of the Attorney General, Medicaid Fraud Control Unit, One Ashburton Place, Room 1813, Boston, Massachusetts, 02108-1598, for the Commonwealth of Massachusetts.

JOHN T. MONTGOMERY, ESQ., JOHN P. BUEKER, ESQ., and ERIC P. CHRISTOFFERON, ESQ., Ropes & Gray, LLP, One International Place, Boston, Massachusetts, 02110, for Schering-Plough Corporation and Warrick Pharmaceuticals Corporation.

JAMES W. MATTHEWS, ESQ., Sherin and Lodgen, LLP, 101 Federal Street, Boston, Massachusetts, 02110, for Watson Pharmaceuticals.

DOUGLAS B. FARQUHAR, ESQ., Hyman, Phelps & McNamara, Inc., 700 Thirteenth Street, N.W., Suite 1200, Washington, D.C., 20005, for Activas US.

NEIL MERKL, ESQ. and CHRISTOPHER C. PALERMO, ESQ., Kelley Drye & Warren, LLP, 101 Park Avenue, New York, New York, 10178, for Mylan, Inc. and Mylan Pharmaceuticals, Inc.

PAUL K. DUEFFERT, ESQ., Williams & Connolly, LLP, 725 Twelfth Street, N.W., Washington, D.C., 20005, for Par Pharmaceutical.

P R O C E E D I N G S

THE CLERK: The case of the Commonwealth of Massachusetts V. Mylan Laboratories, Incorporated, et al, Civil Action 03-11865, will now be heard before this Court. Will counsel please identify themselves for the record.

MR. MULLIN: Good afternoon, your Honor. Peter Mullin on behalf of the Commonwealth.

MS. DOLLAR: Robyn Dollar, also for the Commonwealth.

MR. YEAGER: Nate Yeager for the Commonwealth of Massachusetts.

MR. CHRISTOFFERSON: Good afternoon, your Honor. Eric Christofferson on behalf of Warrick.

MR. BUEKER: Good afternoon, your Honor. John Bueker, also on behalf of Warrick.

MR. MONTGOMERY: John Montgomery for Warrick, your Honor.

MR. MERKL: Neil Merkl on behalf of Mylan.

MR. PALERMO: Chris Palermo on behalf of Mylan.

MR. DUEFFERT: Paul Dueffert for Par.

MR. FARQUAR: Doug Farquar for Actavis.

MR. MATTHEWS: Good afternoon, your Honor. James Matthews for the Watson family of defendants.

THE COURT: Okay, already I'm surprised, so maybe I shouldn't be. So this is a pretrial for which case?

MR. MULLIN: Your Honor, this is a pretrial for the

Commonwealth versus the Schering Warrick defendants. We designated two defendants for trial to start February 22, Schering-Warrick and Watson. We've reached a settlement with Watson. We now have a signed agreement. Watson has a little more time to send us the money, and then we'll be filing the stipulation of dismissal. So I don't think you need to be concerned that Watson will go to trial.

THE COURT: And I know about Schering-Warrick, so why are the rest of you here? Is this just simply on the scheduling issue?

MR. DUEFFERT: Yes, your Honor.

MR. MERKL: Yes, your Honor.

THE COURT: So the best thing would be to take that first so then you can leave?

MR. DUEFFERT: We're curious, so we'll be here no matter what.

THE COURT: Okay, all right. All right, so we have this scheduled coming up. I also have another trial scheduled on that date. Both trials have scheduled so many motions in limine, the serious question in my mind is which one is going to go first. Part of it has to do on the length of the trial, and I'm sort of thinking that we should start off with that issue, and you've proposed that as well.

MR. MULLIN: Your Honor, we do address that in the Joint Pretrial Memorandum. The Commonwealth is requesting or

estimating that it would take us ten to eleven trial days 9:00 to 1:00 to present our case.

THE COURT: Just your half of the case?

MR. MULLIN: Well, what we estimate that would be would be jury selection, openings, the Commonwealth's case in chief, including the cross-examination of the witnesses the Commonwealth calls, closing arguments, and jury instructions.

THE COURT: Well, let's do this in a methodical way and just go through who the live witnesses are first, and then we'll go with possible depositions.

Let me say, I just had a phenomenal trial. Actually, I'd never had a full-blown antitrust trial in front of me. There aren't that many in this district, and it was very interesting; but unfortunately for you in a way, over half of it was deposition testimony, which put both me and the jury to sleep. So I've seen it actually in practice. And this was live testimony. It was actually much better than reading it in. It was actually video, and still it's incredibly dry.

So my instinct is, when I saw someone point out there was nine and a half hours with one witness, to try and, like, let's just figure out what's really needed in this case. I was hoping for a two- to three-week trial all together on a 9:00-to-1:00 basis, was sort of -- two weeks may be pressing it a little bit too much, but I was thinking along the lines of two -- assuming a three-and-a-half-hour trial day, giving you,

excluding openings and jury instructions, et cetera, but for pure testimony, giving you five days and them five days. And then if you added a couple of days on at either end, basically you're at a three-week trial. That's sort of where I am thinking. Now, am I wedded to that as opposed to six days, whatever? But I'm not going to give each side two full trial weeks. That means it's probably going to be a five-week trial, and I'm not willing to do that.

MR. MULLIN: Your Honor, I don't think the Commonwealth is requesting a five-week trial certainly.

THE COURT: Well, you would be if you're ten days and they're ten days, and then I've got to add on stuff -- we're going to pare it back is what we're going to do. So let's talk about who your live -- who's your first live witness likely to be?

MR. MULLIN: Your Honor, I expect that we would call four witnesses live.

THE COURT: Four live witnesses, and who are they?

MR. MULLIN: One would be Meredith Rosenthal to kind of provide background information about the various topics that are going to come up.

THE COURT: Like a background tutorial on the statutory scheme.

MR. MULLIN: Yes.

THE COURT: And how long would she be?

MR. MULLIN: I mean, it's very hard to put a number on that. She's not a long witness. I think it's --

THE COURT: Two?

MR. MULLIN: -- an hour, maybe a half and a half, something like that.

THE COURT: All right, so let's say an hour and a half just on the statutory scheme. Now, who's the next one?

MR. MULLIN: I think that we would call Arnold Shapiro, who was the pharmacy director from '89 to '99. He's a major witness.

THE COURT: Yes, he is.

MR. MULLIN: You know, it's very hard for me to estimate because I don't know what the objections are going to be, I don't know how much foundation --

THE COURT: No, no, no. Yes, you can estimate. So let's assume for a minute you're doing a crisp presentation. I'll deal with their objections before trial and through these motions in limine, but let's assume, would you assume three and a half hours anyway?

MR. MULLIN: I think I would have to assume four, your Honor.

THE COURT: All right, four, fine. And I understand, he's an important witness. And for all these, I'm just going to double it for their side. Who's the next one?

MR. MULLIN: In terms of a live witness, your Honor, I

think Paul Jeffrey, the pharmacy director from 2001 on.

THE COURT: To present, or is it --

MR. MULLIN: He is till present, although I think relevant will only be through 2003.

THE COURT: 2003, right. And how long will he be, another four?

MR. MULLIN: I think he probably is another four, yes.

THE COURT: Okay.

MR. BREEN: And the only other live witness I expect to present would be Dr. Hartman, our damages expert.

THE COURT: And he should be relatively quick as a damages expert.

MR. MULLIN: Just estimating our direct?

THE COURT: Yes.

MR. MULLIN: I would think two and a half hours.

THE COURT: All right. So just on live witnesses, three, four, eight, twelve. I mean, we're basically at four to five days for you. I mean, that basically takes the five days. So what is it you think is going to fill in the rest of the time? Help me with that.

MR. MULLIN: Your Honor, it would be video deposition testimony.

THE COURT: Of whom?

MR. MULLIN: Of witnesses from Schering and Warrick, of --

THE COURT: Now, this is what almost killed me during the antitrust trial. They went on for hours and hours, and I had no control because it was a fait accompli, and I swore I would never do that again. So how much time -- have you timed out your video depositions?

MR. MULLIN: We have not, your Honor. We've made designations. I believe that we were overinclusive in the designations that we made.

THE COURT: So let's go through who the video -- is it video, or is it reading?

MR. MULLIN: Almost all of it is video. A couple of the people are not videotaped, so there are brief portions that we'll have to have someone read. We have Janice Brennan who's a Schering employee. It's like five minutes. It's very brief.

THE COURT: All right.

MR. MULLIN: We have designated three Warrick salespeople: Walter Goff, Jerome Sherman, and -- I guess we only designated the two? We've only designated two. I think we'll probably choose and just take one, but we haven't made a final decision yet.

THE COURT: About how long would it be, roughly?

MR. BUEKER: Your Honor, if you want to know how long the Commonwealth's designations are, it appears on Footnote 5 on Page 26 of the pretrial memo. We have timed them.

THE COURT: So how long do you think you're going to

need? That's why I'm doing this exercise.

MR. MULLIN: I mean, I -- well, let's see what --

THE COURT: Is this the one you claimed is nine hours long?

MR. BUEKER: No. If we're talking about Walter Goff, it was two hours and twenty minutes, your Honor, and it --

THE COURT: Well, that may be because they've got to put in a case as to your state of mind, or they don't get past directed verdict. I mean, they do have to do that, I mean, so --

MR. BUEKER: Directed verdict would be fine.

MR. MULLIN: Your Honor, I would say that Goff would be probably two hours.

THE COURT: Okay. And that's just yours, or does it include the cross?

MR. MULLIN: Well, this is based on what we designated. I think they'll get to do counterdesignations. I don't know if that will substantially change things.

THE COURT: Is he coming to trial at all, Goff? Will Goff be a live witness?

MR. BUEKER: We're working, your Honor, on -- because of the extensive length of the designations, we have been -- all these are former employees. We have been trying to contact and convince as many of these people to come to trial live as possible. As to Mr. Goff, I can't make a representation one

way or another.

THE COURT: All right, so two hours for Goff. Then who?

MR. MULLIN: Your Honor, it's possible then, instead of calling Goff, that we'd use Jerome Sherman. According to the timings from Warrick, his designations are only 41 minutes long, so that I think we'll need two hours for Goff and Sherman together.

THE COURT: Something in there.

MR. MULLIN: Okay. Mr. Kapur, who's the former president of Warrick Pharmaceuticals.

THE COURT: Why do you need him? Does he know anything?

MR. MULLIN: Yes. He's the president of the company and deeply involved with regard to how the company got set up and also how it operated. He definitely is a very important --

THE COURT: Does he know anything about drug pricing?

MR. MULLIN: Yes. Warrick Pharmaceuticals had at its peak fifteen employees. It's a very small operation. They're really just a subunit of Schering, and that will be an issue, I think, that will be contested.

THE COURT: And I want to explore it. That was one of the issues I don't think I understand, a lot of the pricing issues I don't understand, because the defendant here is who?

MR. MULLIN: We've sued all three defendants, your

Honor.

THE COURT: But it got so confusing in the pretrial. Can't we just sue one of them and have the rest of them be liable? I mean, are we really having this issue about whether Schering is separate from Warrick or not?

MR. MONTGOMERY: It is not an issue for us. Warrick is a wholly owned subsidiary of Schering. Schering stands behind Warrick. There's absolutely no issue with respect to responsibility for any judgment. There is no reason for any defendant other than Warrick to be in this case.

THE COURT: We'll get to that later, but I was completely confused by that portion of the brief about why it mattered and who was an enemy of whom. It made no sense to me.

MR. MULLIN: I understand that it's confusing, and it was hard to respond because of the way the motion in limine that was filed. With regard to why we need to have the three defendants, your Honor --

THE COURT: No, but let me just assume for a minute, if they agree that they're liable for whatever Warrick is liable for -- in other words, there's not going to be a deep pocket problem? They'll have enough resources to cover it? I don't know if they are agreeing. If they're willing to stand behind it, I don't know why I need -- it seems more confusing than it is necessary.

MR. MULLIN: I think what Mr. Montgomery is saying is

that Schering will agree to pay the judgment.

THE COURT: Yes.

MR. MULLIN: But I don't think that they're agreeing that they're liable for the conduct. Here's the issue or the problem that we have: The actions that Warrick takes, sometimes it's people -- most of the employees are not employed by Warrick. They're Schering people that are providing services to Warrick. One of the key issues in the case is whether they know, they're aware that First DataBank is publishing a WAC price.

THE COURT: When you say "they," I'm losing you in the pronouns.

MR. MULLIN: Whether or not Warrick is aware that First DataBank is publishing a WAC price for Warrick. That's a function that the Warrick employees didn't deal with. They didn't do much in terms of communicating with First DataBank. There were people at Schering that handled that for both the Schering drugs and for the Warrick drugs.

With regard to who decides on what the policy is going to be, it's being decided by people at Schering. Schering creates Warrick in 1993 --

THE COURT: But can I just say, is that disputed by you?

MR. MONTGOMERY: It's not disputed. Now, it is true that Schering, as many parent corporations do, provides certain

services. We have no dispute as to whether Schering's knowledge is Warrick's knowledge. That's not an issue. But there is an issue here of jury confusion. There is an issue with respect to at least what appears to us to be the introduction of non-issues into the evidentiary array in the case.

THE COURT: Do you agree that all of your knowledge is imputed to Warrick and the reverse?

MR. MONTGOMERY: Yes. If we knew something about Warrick --

THE COURT: So your understanding of drug pricing will be imputed to Warrick?

MR. MONTGOMERY: It's never been a contest in the case.

THE COURT: Okay. I was completely confused about that, and it may cut back on the number of witnesses if they're willing to concede these points.

MR. MULLIN: I don't think it does, your Honor, because --

THE COURT: Well, let me just say, I'm going to cut back on the hours. So at some point, if they're not disputing it, you're going to have to exercise some surgical judgment.

MR. MULLIN: Your Honor, I absolutely agree with you that we're going to reduce the designations that we've made of the video testimony. The numbers that are contained may be the

numbers relating to what we designated, but it's been our plan all along to cut those down and reduce them.

THE COURT: That's fine, but right now I've got to set a time for how long the trial is going to be, and they're conceding an issue, and it was very confusing to me, which is basically they're conceding for purposes of drug pricing a single entity. So it strikes me that we don't need testimony on that, unless there's some issue that I don't understand.

MR. MULLIN: Your Honor, their answer does the exact opposite. We alleged a single business unit in the complaint, and they deny that in their answer.

THE COURT: Well, maybe there's some legality to that, but they're now conceding it. I mean, maybe you didn't know that, but they now, under the doctrine of judicial estoppel, will not argue, as I understand it, that knowledge imputed to one is not knowledge of the other.

MR. MONTGOMERY: Maybe we could --

THE COURT: Maybe you could talk?

MR. MONTGOMERY: -- talk and see if we can agree on a stipulation. There are certainly reasons why in an answer we wouldn't concede that it was -- you know, there's control issues. I mean, there are questions there. Clearly it was an independent, a separate independent, adequately capitalized subsidiary. That raises issues that are not in contest here. But all of this evidence about who controlled who is a

sideshow.

THE COURT: Okay. So my guess is, we're going to eliminate that issue from the case, and maybe the two of you can talk. As you're talking about the witnesses that you'd need on that point, maybe that would be a way of winnowing down. We have so many issues to deal with, that just strikes me as a sideshow.

MR. MULLIN: Well, I agree that I should talk with Mr. Montgomery. I think it will depend upon what their view is with regard to certain exhibits that we want to put in that relate to the formation of Warrick.

THE COURT: Sure, talk about it, but what took me by surprise in this case was that that was even an issue, okay --

MR. MULLIN: Okay.

THE COURT: -- because I have never heard that from them before, and I hadn't heard it before in this case. And I understand why you're responding off the answer to the complaint, fair enough, but they're not pressing that point for purposes of knowledge, and I think that's what's key here.

Okay, so do you need Kapur if they're conceding that point?

MR. MULLIN: I think we'll be able to reduce our designations, but we'll still want to use some of his time.

THE COURT: So assume he's only like what, fifteen minutes or something?

MR. MULLIN: Your Honor, I'd have to say forty-five minutes.

THE COURT: Fine. I just want to get some -- okay.

MR. MULLIN: Mr. Manfredi, who's a Warrick employee, and I'd say an hour for him.

THE COURT: Now, that's one of the contested ones, right?

MR. BUEKER: No, your Honor.

MR. MULLIN: They're objecting to our use of him, yes.

MR. BUEKER: Actually, if you read the opposition to the motion to admit that testimony, we're not contesting the admission in total of Mr. Manfredi's deposition. To be clear, there are portions of the testimony that are objectionable, and we'll make those specific objections; but as to the use of the deposition, actually playing the videotape, we are not objecting.

THE COURT: Okay, so let's say an hour there then.

MR. MULLIN: John Van Schaften who's a finance person.

THE COURT: Why do you need him?

MR. MULLIN: Essentially with regard to the interchange between Warrick and Schering relating to the Medicaid rebates, the knowledge that they have relating to how the Medicaid rebate program works, the people that calculate that. I think there's also a couple of other exhibits that we have from him. His group supervises the people that have two

different pricing systems, and the prices that they report --

THE COURT: All right, so how long will he be?

MR. MULLIN: We think that he's probably only thirty minutes.

THE COURT: Okay.

MR. MULLIN: Harvey Weintraub. Mr. Weintraub, he was Warrick Pharmaceuticals. He was the person who sets the company up, establishes all the policies. He's a forty-year Schering employee when he takes over at Warrick. I would say that once we've edited down the designations that we have, that his video clips would probably be in the order of six hours.

THE COURT: It's going to be too long.

MR. MULLIN: I understand that that's long.

THE COURT: It's just going to be too long, so we're not going to do two days on a video. Is he coming?

MR. BUEKER: Your Honor, he's recently had back surgery. We would like him to be here. We have been in contact with him. We're trying to bring him, but he had back surgery two weeks ago.

THE COURT: You want six. It's not going to happen, but I'm going with your aspirational list right now. We're just not doing it.

MR. MULLIN: With regard to Mr. Weintraub, your Honor, he was 77 in 2006 when he was deposed, and he had Parkinson's disease, so he's in his 80s now. He has Parkinson's. I don't

believe that --

THE COURT: It may be he's impossible to bring here. I'm simply saying, six hours of videos is probably going to be too much. But, in any event, he's a lengthy witness. So are you done yet? How many more are we talking about?

MR. MULLIN: We have one other Warrick witness, Richard Zahn. He was a senior official at Schering. He's involved in the formation of Warrick. I think we can cut him down. I would say two hours.

MR. BUEKER: I'd note for the record that he did testify that he had no day-to-day understanding or responsibilities for Warrick.

MR. MULLIN: He's deeply involved in the creation, the setup of Warrick.

THE COURT: Who cares?

MR. MULLIN: We care --

THE COURT: As long as he does the pricing. If he knows pricing, that's critical. But if it's just, you know, whether it's a wholly owned subsidiary or not -- you know, I'm going to be cutting you back, so at some point you're going to make these judgments. You're not going to be able -- I'm not going to make this a six-week trial, so this is the issue here. I haven't even dealt yet with cross or their case, so --

MR. MULLIN: I believe that, you know, we can cut this whole case, defense, Commonwealth's, openings, closings, I

believe we can cut everything down to three weeks, your Honor.

THE COURT: And that would be fine with me. You can get a jury for three weeks; you can't for six weeks. I mean, that's basically the problem here. You can get a decent jury for three weeks.

MR. MULLIN: Your Honor, we're going to have to -- I believe we're going to have to present deposition testimony from Kathy Chadwick from First DataBank with regard to how First DataBank works.

THE COURT: That makes sense. How long? Is she a live witness?

MR. MULLIN: She's in San Francisco. We can't get her to come. I don't have an estimate as to her time. I don't think it's extensive, though.

MR. BUEKER: The designations are an hour and thirty minutes, your Honor, an hour and thirty-three, to be exact.

MR. MULLIN: Frank Milnes is a --

THE COURT: You keep them going. I thought you said just one more.

MR. MULLIN: I'm sorry. Frank Milnes is a Unisys employee. They were our claims processor. We have designations from him, and, I don't know, John, do you know what the length of the designations are?

MR. BUEKER: I do. Three hours and five minutes, your Honor.

MR. MULLIN: I would say we can cut that down to two, your Honor.

THE COURT: Let me just say this: You just represented three weeks to me, which seems great because then I divide it -- for both sides, not just yours.

MR. MULLIN: Yes, I think fifteen to sixteen days total, yes.

THE COURT: So this is what we're going to do. So it's fifteen -- and I think this is consistent with some serious editing -- so fifteen trial days. If I take two trial days off, one for openings and preliminary jury instructions and impanelment and the second for closings and instructions, that puts us down to thirteen trial days, okay? Is everyone doing the math with me? And then if I divide that in two, that's six and a half trial days apiece. It's usually three and a half hours. Now, the problem -- so three and a half times -- 22.75, bingo, all right, is what each side will get for everything, direct and cross.

MR. MULLIN: Your Honor, I would ask you not to do that. On every one of the trials that I'm familiar with, the plaintiff has taken more time than the defendant. I don't believe that it's fifty/fifty. The plaintiff is doing a lot to educate the jury about issues so that they know terms, that they know background information. We have the burden of proof. The defendant benefits from uncertainty or unclarity. And I

understand you want a three-week trial --

THE COURT: Well, what do you think the split should be? You just told me three weeks.

MR. MULLIN: I told you that I think the whole case can be done in three weeks.

THE COURT: All right, so what do you think you need? I've got to give them time, right? You'd agree with that principle.

MR. MULLIN: You do, your Honor, and if --

THE COURT: So what do you want? I can't -- in other words, if I added up everything you just gave me, the whole three weeks would be yours.

MR. MULLIN: I'd ask for eight days, your Honor.

THE COURT: So you want eight days.

And how many do you think you need?

MR. MONTGOMERY: Your Honor, let me just make a preliminary statement. The presumption ought to be that we get equal time, but I think the way the time ought to be counted is on a clock: They're charged with their directs in their case; we could be chargeable with the crosses. The reason I think that in the AWP cases that have taken place around the country that the plaintiff has taken longer is because it turns out that a portion of the defendant's case is presented fully enough during the plaintiff's case. That may happen here. If they're calling some of our witnesses, they're presented, they

put them on in direct, we put them on in cross, we don't need them in our case any longer. Presumably your Honor is going to have us only examine these witnesses once. So I think the way the split ought to work is just the way you've done it, but not twenty-two and three-quarters hours to the Commonwealth followed by the same amount of time for us, but, rather, we get charged with the time seriatim as to each witness back and forth.

THE COURT: Well, no, it's a complete thing. So you can use it in direct or cross or redirect or recross, however you want to use it.

MR. MONTGOMERY: Sure, that's right, if we go over our time during their case, it will be chargeable against us in our case.

THE COURT: Well, no. If they do three hours of direct and you do three hours of cross, it's three hours of direct off of their clock and three hours of cross off of yours. And similarly on any depositions, to the extent you designate, it's off of your clock in a cross-designation. But I don't want to hear from people twice is the thing. So if you're bringing in people live, we could substitute that for the depositions, which is more interesting anyway.

So I'm going to sort of start off with the presumption of about six and a half, seven hours a side. And I understand there's Murphy's law, and we can have a snowstorm or someone

can get the flu or the plane can be stopped or something like that, but we're going to start off with that. And I think you can pare down, you know, Shapiro to a day, 3.5. I think you can pare down Jeffrey, whatever his name is, to a day, 3.5. Rosenthal and Hartman seemed reasonable. I don't even know if you need that much with Hartman because he's just a damages expert primarily, right?

MR. MULLIN: He also has opinions as to liability.

THE COURT: Okay, so --

MR. BUEKER: No, he doesn't.

MR. MONTGOMERY: Not expressed in his expert report.

THE COURT: If it's not in his expert report, it's not happening, okay? If it's in there, it's in there. I mean, I don't know, I haven't read it. In any event, you do have to put in a fair amount. Weintraub, six hours is just too long with someone on a video, so you'll just have to pare that down. And, you know, if you come up with a compelling case why this is impossible, maybe I'd give you an extra day in there, but you've got to be focused on six and a half and six and a half, about three and a half hours a day. I know sometimes the jury is late getting in here. I know sometimes, you know, something happens, and we'll go to 1:15. I mean, this is not an exact science, but it means I can legitimately tell a jury three to four weeks, bringing in Murphy's law and deliberations which could take a couple of days, and I can be pretty safe in being

sure that that's going to happen, because otherwise we lose them.

MR. MONTGOMERY: We think this can be done in two weeks. We understand --

THE COURT: That's why I did this.

MR. MONTGOMERY: But we think the outside limit ought to be three weeks in fairness --

THE COURT: So I am shooting hard -- and I've had Mr. Mullin many times in a criminal case where I don't usually use a clock -- but we're going to shoot hard for three weeks. It's in everyone's interest not to have a boring case but to have a crisp case. And the reason I went through this exercise is because, in fairness, they do have to put in a case about Warrick as well as about their own understanding, so they have a lot to put in. And I think we can do it in six and a half, seven days, but it's going to mean severe editing on Weintraub. That's really the key.

MR. MULLIN: I agree, your Honor, that he has to be edited down substantially.

THE COURT: And I don't know about these other things. They're willing to admit imputation of knowledge, which allows you to knock it way down. You know, you don't have to deal with the single/double entity thing. I think that's a nonissue, and I'd rather not confuse the jury anyway with it.

MR. MULLIN: With which issue, your Honor?

THE COURT: Whether or not Schering and Warrick were different and whether one's knowledge can be imputed to another, I think that's going to be conceded, so I think it will help you edit things done.

MR. MULLIN: Just so the record is clear, one witness that I neglected to mention is David Sibor from ACS, which is the claims processing company that took over in 2001. We're going to have to call him as a live witness. But I understand what you're telling me. You're telling me six and a half days, maybe a little bit more than that.

THE COURT: Yes, but, I mean, that's the target in there. I understand that things aren't an exact science, but what we can't do is be there six weeks from then and still plodding through this because I lose the jury and they get upset. So, I mean, I just went through this with an antitrust trial, and afterwards that was one of their big comments was at times it was just so dry. I think you have to take that into account. It's not just building for an appellate record; it's so they understand it.

So good. So we've gotten through one key thing. I'm just assuming that, have you similarly given them a list of your live witnesses?

MR. MULLIN: No.

THE COURT: Who are your live --

MR. MONTGOMERY: We have disclosed a witness list,

your Honor.

THE COURT: I know, that's sometimes just to sort of protect yourself, but the ones you're likely to call live?

MR. MONTGOMERY: The witnesses we are likely to call are Debbie Kane, K-a-n-e, and her direct is likely to be in the vicinity of an hour.

THE COURT: Who is she now?

MR. MONTGOMERY: She is a Schering employee and was, and she is the individual responsible for AMP reporting. She testified actually, your Honor, in the MDL trial.

THE COURT: Don't tell her I didn't remember her.

MR. MONTGOMERY: I won't. Al Graf --

THE COURT: Wasn't Weintraub there too?

MR. MONTGOMERY: Weintraub did testify briefly, briefly. Al Graf, who was a member of the Warrick sales force, ten years it was; Dr. Sumanth Addanki, who your Honor is familiar with.

THE COURT: Yes.

MR. MONTGOMERY: Al Graf would be approximately an hour; Dr. Addanki, two hours; Fiona Scott Morton, and she would be two hours; Todd Brown, a pharmacist and a person in the leadership of the Mass. Pharmacy Association, I would think an hour.

THE COURT: Is he the one with the so-called U and C deal?

MR. MONTGOMERY: Yes, he will testify about U and C. He's a witness --

THE COURT: There were certain allegations which were vague before but --

MR. MONTGOMERY: That's right.

THE COURT: -- and not proved up, and then you alluded to the fact in these motions that you had more. So the general gist of this would be that at some point the state told him that U and C wouldn't be enforced?

MR. MONTGOMERY: Correct. And that will be Mr. Brown, and then the same for Mr. Leary, Jay Leary, also approximately an hour. And then we might present some other company witnesses but have made no final decisions and certainly understand we have time constraints. And in addition to that, there are Commonwealth witnesses, and there are Commonwealth witnesses that we will definitely call, either live or by video, present by video.

THE COURT: In addition to the ones that he's mentioned that wouldn't come up on cross?

MR. MONTGOMERY: That's right, that's right.

THE COURT: And who would they be?

MR. BUEKER: They would include potentially Vic Vangel, Chris Burke, other Commonwealth witnesses who had some testimony and understanding as to the meaning of WAC.

MR. MONTGOMERY: The testimony by these witnesses

would not be long, and we can certainly provide an estimate as to each of them. And if we could consult, we could probably do it right now.

THE COURT: Well, anyway, you're agreeing to the six-and-a-half- to seven-hour range anyway, so --

MR. MONTGOMERY: Yes. We don't think we'll have any trouble doing it.

THE COURT: So with depositions, inevitably you'll designate -- you'll do a final designation, and you may want to be cross-designating, and there may be objections. So have you worked out a protocol for doing that in a way to get any -- you know, to confer beforehand, iron out what you don't object about, and then get it to me in enough time that I can actually rule and then have you edit the video in time. That's been a consistent problem I've had in these huge cases.

MR. MULLIN: Under the system you've set up in the pretrial order, your Honor, the parties have made their designations. Counterdesignations are due on Monday. Objections to counterdesignations are due a week after that. We are expecting that we're going to confer, we're going to see what we can work out.

THE COURT: But here's what -- I just came out of one of these massive trials, so I'm right on top of this. What they were trying to do was hand it to me the night before they wanted to play it and expect me to spend all night ruling on

the objections. And I did it the first time, and then at 11:00 o'clock said "Never again." So you've got to give me a 48-hour window. And one of the ways that they presented as it evolved that was the most helpful is, 48 hours in advance of when you were planning on putting it on, so someone can keep this going, you would have your designations, your cross-designations; if there was an objection, either something in the beginning saying a few words about the objection, or maybe even in the margin handwritten, "Objection, hearsay, foundation," just something to sort of give me some sense of it. And then a lot of times, if the objections really were coming in through a document that was being discussed, just having the document attached so that I can essentially just rule "Allowed, denied, allowed, denied," hand it to you, have somebody edit it. And then if I don't understand, we can have brief argument the next morning and still have time to have it be edited. So the key is sort of the 48 hours in advance getting this little notebook to me, I think.

I urge you not to have a thousand objections, or I just won't be able to rule on them. I mean, you know, some of your key issues would be important, not just whether something was leading or the like. And every morning -- I used to do it with you in the criminal cases and I think on the AWP -- if we met at quarter of and then just worried about any exhibits that there might be a problem coming in that day, you'd share that

morning. Or would you prefer, both of you, the night before any exhibits that you were going to introduce through the witness the following day? How do you prefer it?

MR. MULLIN: We haven't conferred about that, but I expect we'll be able to agree on something to give each other advanced notice of what witnesses we expect to call and exhibits.

THE COURT: Yes, every day at the end, as you know, if you remember, at the end of the testimony, we'll stand up here, and I'll say, "Who do you plan on calling tomorrow?" Then I'll probably say something along the lines, "Give the other side the exhibits you're planning on using by 5:00." And then the next morning you'd ideally present anything you were planning on using on cross. I'm not talking about impeachment, something you'd want to introduce. And then I would rule on any objections, if I could, or at least know what the issue is and rule as we go.

You don't have to sort of say "Can I approach the witness every time." It's not like a criminal case. Just have a pile up there, because everyone will know what things are, premarked 2, 3, 4, right up on the bench, and then the witness can do it. We'll use the doc cameras. It will go as smoothly as humanly possible.

MR. MULLIN: Yes, hopefully.

(Laughter.)

THE COURT: Okay, okay. So I think what we need to do now is -- it's ten of 3:00. There were so many of these motions, and I really just got a chance to eyeball them to get a sense of what was being talked about. So we're not going to finish, but I thought we could at least start, each side. You've given me a proposed agenda on the ones that you all cared about. Is that agreed upon?

MR. MULLIN: Yes.

MR. MONTGOMERY: Actually, we collaborated on the agenda.

THE COURT: Yes, that's great. I thought that was incredibly useful. That's why I started with length of trial, so --

(Laughter.)

THE COURT: Are there witness scheduling problems because I'm -- I've got you and Neurontin back to back, my two huge trials. I plan on whoever goes first -- I don't know who's going to settle; would I be so lucky, both. I don't know whether the problem is going to pop up, but whoever goes first, the second one will probably come right on the heels. So I didn't know if there were any particular reasons why one would go first rather than second. Daughters getting graduated, weddings, surgeries, anything that I should know about?

MR. MULLIN: Not that I'm aware of with regard to the Commonwealth's live witnesses, your Honor. I haven't actually

checked with them about conflicts, say, twenty or thirty days after --

THE COURT: I'll work around people's schedules. It's a long enough period of time, they can probably adjust.

MR. MONTGOMERY: We're in the same position. We have not checked with our witnesses. I'm a little worried -- I shouldn't say worried, but I do not know about our experts. So we have them locked in for a period after February 22. We could certainly check, but we haven't done that.

THE COURT: Okay, thank you. All right, so let's just start going.

MR. MULLIN: Your Honor, I think the first one on the list is the Commonwealth's motion in limine to exclude evidence relating to the state agencies and the federal programs. Essentially it's the 340B program, the Group Insurance Commission, and the Prescription Advantage Program, and the reverse engineering of AMP.

THE COURT: Do you know what tab? That's way late in it, isn't it?

MR. BUEKER: Tab 16, your Honor.

THE COURT: It was one of the later ones. Can I ask you about this. I did read this, and while initially I was sympathetic, they claim that it's relevant to statute of limitations, as well as they can actually lock it into actual knowledge, as opposed to what I ruled before, which is, you

can't just assume because the GIC knows something, it's imputed to the Medicaid officials. They haven't quite conceded the point, but they say, nonetheless, they can lock it into actual knowledge on the part of Medicaid officials. So if that's true and they can actually lay that foundation, why wouldn't I allow it in?

MR. MULLIN: Well, your Honor, I think you need to distinguish between two types of information relating to these various programs. One is testimony or exhibits relating to how the program operates or --

THE COURT: How which program? These other programs?

MR. MULLIN: The Group Insurance Commission, the 340B program, those various kinds of things. With regard to evidence that MassHealth employees spoke with the GIC and got some information from them, or spoke with somebody at the Prescription Advantage, we're not objecting to them being able to testify to that.

With regard to their claimed relevance to the statute of limitations defense, it's not the knowledge of MassHealth that's relevant; it's the knowledge of the Attorney General's office, specifically the Medicaid Fraud Control Unit.

THE COURT: I don't think that's true.

MR. MULLIN: In the Massachusetts False Claims Act, the discovery rule says that it's "more than three years after the date when the facts material to the right of action are

known or reasonably should have been known by the official within the Office of the Attorney General charged with responsibility to act in the circumstances," and I would say that that's the Medicaid Fraud Division.

MR. BUEKER: That's a tolling provision, your Honor. There's a statute of limitations provision that precedes that that is six years. It is true that the Commonwealth would have an additional three years if no one in the Attorney General's office knew about it. However, on this record, there is a letter from the Attorney General's office to --

THE COURT: Can I say, I feel very unprepared. Was this briefed in a footnote somewhere that I missed?

MR. BUEKER: No. This is a subject matter on which we were focused significantly because so much of this evidence is relevant to the statute of limitations, and we do intend to prove a statute of limitations defense here.

THE COURT: No, I'm asking actually a much easier point. Has this been briefed?

MR. MULLIN: It has not, your Honor.

MR. MONTGOMERY: Well, except, your Honor, it was briefed, at least in part, in connection with summary judgment. And you ruled that what the Commonwealth knew and when they knew it will be relevant to a determination on the statute of limitations, so we operated from that premise, but we didn't brief it again.

THE COURT: In fairness to all of you, I'm not sure I focused on who in the Commonwealth. I don't know if that was a litigated issue. At least I don't remember it.

Let me say this. There's a fraud claim as well, right?

MR. MULLIN: There's a fraud claim, yes.

THE COURT: So that, in any event, is a standard discovery rule. Let me just say this: I'm likely to, unless there's some agreement on your part that you're not going back before the six-year statute of limitations -- which I doubt you're going to agree to, right? You want to go back a while?

MR. MULLIN: We want to go more than six years back, yes.

THE COURT: Yes, yes, so I think I'm going to allow it in, and I'm going to have to send this issue to the jury. And at this point, if you want to brief for me why your position is correct. I just can't have a position on the legal rule. I just -- to the extent they can lay a foundation that the MassHealth people knew the actual acquisition cost, they can put it in. To the extent that it's not actual knowledge but sort of a "should have known/should have found," like I did in the big case, you would have to -- I'm denying the motion to exclude it without prejudice to your persuading me of your legal position on the statute of limitations issue.

MR. MULLIN: Your Honor, I understand, and just so

that I'm clear, you're saying that what people at MassHealth actually know, that that comes in; but that evidence relating to these programs in general, how they operate, you know, what Group Insurance Commission, what its contract with its PBM provides, if MassHealth didn't know that, then that doesn't come in?

THE COURT: Based on what I know right now. But they claim -- you have the predicate, you claim you have the predicate to bring it in.

MR. MONTGOMERY: Well, also, but what MassHealth knew or could have known in the exercise of reasonable diligence is the standard.

THE COURT: Right. Well, that's the statute of limitations issue.

MR. MONTGOMERY: I understand, but then we do have the reasonableness of their reliance.

THE COURT: I'm holding off on what I'm allowing for the statute of limitations issue, okay. But on the actual -- what I think I have ruled as a matter of law is, just simply because there's an AMP or just simply because some other agency somewhere has this information, and it does not get imputed either to the Attorney General or to, what do you call it, MassHealth --

MR. MONTGOMERY: And we're not arguing --

THE COURT: You weren't, you weren't arguing it. So

for actual knowledge, it's got to be brought into MassHealth somehow.

On statute of limitations, that's different. That's what you should have or could have or reasonably should have known or could have found out. And it sounds as if, if you're seeking damages going way back, they're entitled to put some of that in, at the very least. And this is without prejudice to your briefing it and proving to me that that's not the right standard. I know it's the right standard for fraud, unless you're willing to drop the fraud claim.

MR. MULLIN: With regard to the 340B program, which is a special federal program that provides drugs at very low prices to certain community health centers, the defendants want to put in evidence about that program saying those programs buy at actual acquisition cost. We don't dispute that they buy at an actual acquisition cost, but it's a special actual acquisition cost set up by the federal government because they're serving such a poor, disadvantaged population. It has no relevance whatsoever as to what a CVS or a Walgreens that's serving the general public can buy at.

THE COURT: That sounds right to me, but it may -- I don't know. There were five different programs mentioned. I don't know. At some point, I don't know why it's that big a deal, but if it was brought into MassHealth, that's relevant. I'm going to allow in whatever data was brought into

MassHealth. Is it relevant on the statute of limitations issue? It may not be because it may not be enough of a trigger.

MR. MONTGOMERY: Well, in the case of 340B --

THE COURT: That's like what, Boston Medical Center?

MR. MONTGOMERY: Yes, Boston would be an example.

THE COURT: Like some of these community -- like Dimock or something like that?

MR. MONTGOMERY: Yes, the community pharmacies. And the relevance is that MassHealth had, on every single day from 1995 forward, essentially the AMPs, the actual acquisition costs for pharmacies in the Commonwealth for our albuterol products. It is highly relevant.

THE COURT: But these are for these poor pharmacies.

MR. MONTGOMERY: I understand that. Well, they don't buy at any different acquisition costs. They're buying on the market, but that's --

MR. MULLIN: They're definitely buying at a different price than a CVS.

THE COURT: I can't resolve that right now.

MR. MULLIN: Okay. Your Honor, can I raise one other issue in connection with that motion? Essentially the defendants are arguing that this evidence that they want to put in goes to Warrick's scienter, that the evidence is relevant as to what Warrick's state of mind is. It seems to me that that's

totally wrong and that that's not a basis for the relevance of any of this evidence.

THE COURT: I don't have to decide that now, though, right?

MR. MULLIN: I guess that's right if you're going to essentially rule --

THE COURT: Well, we've got a problem with statute of limitations. I forgot that that was even an issue, so unless you -- and I've got fraud, so I've got just a plain garden variety discovery rule for fraud. There may be some special rule for False Claims Act. I don't know. That's the first I heard of that, so I'm not prepared to rule on that. But, in any event, there are about five different ways that it might come in, and I just can't rule on it right now. When I instruct the jury, I sure will tell them, but I just don't know enough right now.

MR. MULLIN: The other issue that the defendants raise in their response to this motion goes to whether or not they get to put in evidence with regard to what the term "wholesale acquisition cost," WAC, means.

THE COURT: Can we talk -- that's a really good point. I wrote an opinion that was issued either yesterday or the day before. I think it was not an issue that was focused on, if I'm remembering correctly, in Mylan, which is, what does WAC mean? So one way of thinking about WAC -- it's clear to me

it's not a phony price, okay. Let's start there. But then the question is, how do you define a true price? One way to do it would be an average of actual acquisition costs. But another way, which has essentially been embraced in the New York counties case and GSK, and really since the trial on the big case, is the Federal Trade Commission Act, which is, if you're actually selling a majority of your products at a price, even if some are discounted, that isn't a phony price.

So I know both sides think I've sort of put my stake in the ground on that, and I really haven't. The only thing I've put a stake in the ground is that it can't be a fictitious price, it can't be a phony price, an invoice price that has no relationship to the market. So I think I didn't actually get data to deal with the FTC standard, right?

MR. MULLIN: That's correct. Is the recent opinion you're referring to in the New York cases relating to FUL?

THE COURT: Yes.

MR. MULLIN: I mean, I'm aware that you issued that. I've read it a couple of times, but I haven't really focused on what implications it has here.

THE COURT: And it might be worth -- it wasn't a disputed point there, in fairness to you, and I'm not sure you're both bound by it. You weren't in that case, were you?

MR. BUEKER: We were, your Honor.

THE COURT: You were? So maybe you are bound by it,

but basically no one there disputed that the WAC list price test was a fair one, and that's been true for --

MR. BUEKER: Well, I don't know. I would not accept that. What I will say is, in this case, in the Commonwealth v. Mylan case, you did look at the Massachusetts statute; and in the context of the statute, you did statutory -- I'm sorry, the regulation --

THE COURT: That it has to be true price.

MR. BUEKER: You constructed a meaning of WAC based on your reading of the regulation. I would say, frankly, that there is evidence from Commonwealth witnesses, from others, that is inconsistent with the construction that the Court has given to the definition of WAC.

THE COURT: I don't even remember, it was so many years ago. Was it a statutory definition or a --

MR. BUEKER: You took at a look at the regulation --

THE COURT: The regulatory, right?

MR. BUEKER: Regulatory -- you pulled out your dictionary, you looked up some words, and you came up with a definition.

THE COURT: The actual acquisition cost.

MR. BUEKER: That's the definition I'm thinking of, yes.

THE COURT: Or true acquisition cost, or some such words. But then the issue is, well, what does that mean?

That's the weeds I didn't get into. What I said it wasn't was a faux, phony, untrue list price; but what's truthful I didn't actually say.

MR. BUEKER: Right, on the record here -- and there will be a dispute in the New York counties case, but let's leave that for another day, we have enough today here. There's no evidence in the record here as to a sales-at-list test. The Commonwealth's expert hasn't done that. There will be no evidence at trial. That is not an issue that's in this case.

THE COURT: Well, I've been thinking about your case since I wrote the other one. So your state of mind was that it can be a list price, even if no one, even if zero people paid at it, and I won't accept that.

MR. BUEKER: Our state of mind is that Warrick didn't have a single WAC. What Warrick did was report at launch a direct price. Call it a WAC if you want, but we reported a list price at launch that was the price Warrick believed people in the market would pay at the launch of the product. But generics are different than brands because the price goes down very quickly. We knew --

THE COURT: As I understand it, though, you kept reporting it. It wasn't just a --

MR. BUEKER: No, no, we didn't. That's --

THE COURT: Excuse me, I said that wrong. Every year you would be sent what was -- at least somebody represented

that.

MR. BUEKER: We contest that. There's a footnote in your Honor's summary judgment opinion that says that on one occasion in 1999 a document turned up in Warrick's files that has no fax cover sheet on it, it's got no directions, nothing. It's just --

THE COURT: You'd say that's a fact dispute?

MR. BUEKER: I would say that's a fact dispute.

THE COURT: Okay, okay.

MR. BUEKER: Our intent is that we did not have a single list price or a WAC.

THE COURT: Fair enough, but at least for point of view of this, what I wouldn't accept is, "We believed we were doing an okay thing as long as it was just, as we called it, a list price, even if no one in America ever paid it."

MR. BUEKER: That's not our position, your Honor.

THE COURT: All right, that's not your position.

MR. MULLIN: Your Honor, I think the evidence will be that they reported what they called the "direct price" and which First DataBank put in the WAC category prices in 1993 with regard to two of the products at issue, and in 1995 with the third product when it was launched, and that those numbers are never changed; and that over the history of the product, those numbers, the actual transaction prices plunges. So that during the time period that's at issue in the case, nobody is

buying at that price or anything close to that price.

THE COURT: Is their position correct, though? They reported it once, and then they just --

MR. MULLIN: As far as we know, yes, that's correct. But there will be testimony that on an annual basis, First Databank sent a so-called "turnaround document" to all the manufacturers whose prices they were reporting. This is during the time period when First DataBank put out a hardcopy Blue Book, and they would ask the manufacturer to verify that all the prices that they had in their computer database were in fact accurate. That '99 document that we have from the files of Warrick is one of them. That's the only one we have. We believe that that actually comes from the files of the people at Schering who handled this function for Warrick. But we would argue to the jury, and we believe the evidence supports the argument, that every year the Schering-Warrick group got this request to verify; they never told First DataBank that the price was no longer applicable. With regard to one of the products, the inhaler, when they launched the product, they sent a letter to the MassHealth agency to Arnie Shapiro that said, "Here's our price, and we're sending this to you in case it's relevant to reimbursement for you." And they never correct it, they never change it, they never say, "This is no longer even close to what the product is selling for."

THE COURT: All right, so there's a dispute of fact on

it.

MR. MONTGOMERY: There is, but just to balance the fighting about the facts, there will be no dispute that after 1995, every time First DataBank reported our direct price, they reported it as zero. Now, it was not zero, but they effectively in the computer, it's zeroed out because they're not reporting a direct price for Warrick because we instructed them not to for the reasons Mr. Bueker said, because we didn't have a single direct price, and we had no instruction about reporting anything else. So there's going to be a lot of argument back and forth about what we reported and the inferences to be drawn therefrom.

THE COURT: So you're viewing it essentially from a pure legal question. From your point of view, First DataBank became an intervening cause because without your authority, in your view, they kept publishing a price?

MR. MONTGOMERY: They kept publishing a price, but they also published the direct price, which is the only thing we ever disclosed to them back at launch. And as to that price, because they had multiple fields, they reported zero. That was the correct thing to do. It was zero.

THE COURT: Well, then --

MR. MONTGOMERY: And so --

THE COURT: So where does the WAC --

MR. MONTGOMERY: So what happens is that First

DataBank has a field in its report called "WHL net," wholesale net, I guess. At the outset, they took our direct price and they reported it.

MR. MULLIN: In that field.

MR. MONTGOMERY: In the "direct price" field, and then had a separate field in which they in effect transferred; they made the decision themselves to treat our direct price as this thing called "wholesale net."

THE COURT: And you're saying you didn't know about it?

MR. MONTGOMERY: We didn't know about it. That's the decision that the Commonwealth makes to use this field called "wholesale net."

THE COURT: So you're saying you didn't know they were reporting it that way. You say, yes, they did, and that will be the jury call.

MR. MONTGOMERY: That's right, exactly.

MR. MULLIN: The turnaround document that they get, it has the "AWP" field. I believe the terminology by '99 is "WHN," wholesale net. That's where the price that they reported in 1993 is reported. I believe there is a field there called "DP," direct price, and there's no number, there's no anything. I don't believe it's a zero. I think it's just vacant. And I think that that's true throughout the time period.

MR. BUEKER: Excuse me. The zero shows up in your document, in your screen shots.

MR. MULLIN: In our screen shots, it may show up as zero, but in terms of what --

THE COURT: All right, I don't need to spend much more time on it. It's a fact dispute, okay. So you want me to do what?

MR. MULLIN: Well, the question, your Honor, is whether or not the defense is going to be able to elicit testimony from MassHealth employees about what they understood WAC to mean.

THE COURT: Sure.

MR. MULLIN: Well, you've ruled as to what WAC means.

THE COURT: I may rule again, but it may go to scienter.

MR. MULLIN: Well, I don't think it goes to the defendant's scienter.

THE COURT: You know what, I'm not excluding it. They can ask the question. I'll make legal rulings at the end in how I instruct the jury, but I'm not doing -- you want me to micromanage every witness's testimony. I'm not doing that.

MR. MULLIN: I understand, your Honor, and I think this is a major disputed issue between us.

THE COURT: I will construe it as a matter of law, but they can testify as to how they understood it, as to how they

did their procedures, how they were operating, what their thought process was, what their thought process might have been, and I'm not going to stop that.

Now, I will rule as a matter of law as to what it does mean, okay? So let's just keep going.

To exclude evidence characterizing -- I didn't even understand this -- characterizing provider-submitted claims, that's a legal issue.

MR. BUEKER: Well, it is a legal issue. That's part of the problem, but --

THE COURT: You want me to say it was only the once so that you get billed -- if you're wrong, you only get $5,000?

MR. BUEKER: No, no, no, I don't want -- I mean, I don't want --

THE COURT: Sure, that would be terrific.

MR. BUEKER: That would be, yeah, exactly, I mean, just like I'd like a directed verdict. But, no, this is -- Dr. Hartman is prepared to testify, as the Commonwealth's summary of the evidence in the pretrial memo states, that the number of provider-submitted claims, about a million claims, constitute violations of the Massachusetts False Claims Act.

THE COURT: Like with him, I'll tell them what it is, but is this just a nomenclature?

MR. BUEKER: No. This is much more than nomenclature because --

THE COURT: He's allowed to calculate on that basis.

MR. BUEKER: No. I think that would be clear legal error for him to calculate -- the Supreme Court in Bornstein, United States V. Bornstein --

THE COURT: No, that was the old, old case. That's why I said this is a legal question you want me to rule on. This is not about how he calls it. You're trying to cut his damages down because you want me to say that each provider claim is not a separate false claim under the False Claims Act.

MR. BUEKER: Right, I think it's prejudicial and misleading and --

THE COURT: Excuse me. You're asking me for a legal ruling. You essentially want me to rule -- like he wants me to rule WAC only means X so I don't allow any testimony in, you want me to tell Hartman, right, that the only false claim, if any, that exists was the first -- was when you submit something to First DataBank or you confirm something from First DataBank, not each time a pharmacy submits a claim, right?

MR. BUEKER: That is correct, we are asking --

THE COURT: This is a legal ruling you're asking for.

MR. BUEKER: We are asking for a legal ruling, but we're asking for a legal ruling that instructs Dr. Hartman not to give that testimony so that the jury --

THE COURT: Right, you want me to cut off his damages.

MR. BUEKER: -- so that the jury is not misled and

confused and comes back with a verdict that would be in error.

THE COURT: Excuse me. This is essentially a request for a legal ruling that "cause to submit a claim" does not include every time a pharmacy submits a claim for a false price for the generics. You're asking for a legal ruling, not what Hartman happens to call it or not call it, right?

MR. BUEKER: It is a request for a legal ruling, that's absolutely right.

THE COURT: All right, I will do that, and I'm not prepared to do that today. And I'm unlikely to rule your way, I mean, just --

MR. BUEKER: Well, I would ask you to take a serious, serious look at the paper --

THE COURT: I will take a serious look at that old Supreme Court case, will do that, okay, will do that.

The other cases, we're not going to go into all these other cases. Temodar? I happen to be Temodar. It was a particularly nefarious moment in Schering-Plough's career, or Schering Corporation, or whichever affiliate it was. I seem to get a disproportionate number of these. And I think I had the Claritin case too. I've had a bunch of these. I've taken the pleas. And unless they come up with -- I'm going to do this without prejudice -- "We're the greatest corporation that ever existed under the face of the sun," in which case you can zap them, I don't know why it's not more prejudicial than

probative.

MR. YEAGER: Can I just respond to that, Judge?

THE COURT: Yes.

MR. YEAGER: I think we're very close to where you are on this. First of all, we definitely overdesignated on this issue. We have stipulated that we do not intend in our answer to introduce the evidence in our direct case. We would like you to not rule on the matter. And the only real issue that it comes up on these convictions is, one, should they have a witness testify at trial who is testifying on behalf of the corporation, is speaking on behalf of the corporation, that your Honor consider letting us cross-examine them on impeachment of the corporate criminal convictions. And then, secondly, as your Honor says, unless they start going off about some corporate good acts and they open the door, and that's obviously going to be a sliding scale --

THE COURT: All right, so this is allowed without prejudice. You bring it up again if in fact there's an appropriate time for it.

MR. YEAGER: Thank you.

MR. MONTGOMERY: Just to mention, there is a threshold basis for denying this and never revisiting it, and that is because the corporation that entered the plea before your Honor and the plea in Philadelphia is not a party to this case. It is Schering Sales. And there is no case anywhere, or even any

commentary, that would permit the admission of a plea by one corporation --

THE COURT: Maybe. It's allowed without prejudice.

MR. MONTGOMERY: -- in a case against another.

THE COURT: It's allowed without prejudice, but I'll probably be inclined not to allow it.

Warrick's motion to exclude evidence regarding nominal pricing and bundling, I didn't even understand this. I mean, just like I'm going to let you put in some stuff, I mean, if they want to show -- if we're talking about these drugs, these drugs.

MR. CHRISTOFFERSON: Thank you, your Honor. This actually brings up some of the issues that we were talking about earlier with respect to Warrick and Schering as a single entity versus whether they're not a single entity, and there's a reason why we're focused on these two issues. It seems now that we've kind of moved beyond the relevance issues that the Commonwealth has put forward in terms of showing that Schering and Warrick are together as one, and our point is, again, that's not disputed. But to the extent that they're interested in this evidence for that reason, it's totally unnecessary. The problem with this evidence, your Honor, is that it goes to subjects that would cause mini-trials or a sideshow, or whatever you want to call it, because they impact other issues that are embedded in the Medicaid statute, for example, or

suggest other types of criminal maybe misconduct or potential conduct issues that we need to make sure don't affect the trial. Specifically, nominal pricing --

THE COURT: Just start from the very beginning.

MR. CHRISTOFFERSON: Okay. So nominal pricing, your Honor, as you may know, is a concept embedded in the Medicaid statute that is a perfectly legal thing to do, so long as you follow the law, and it relates to how you calculate best price.

Bundling is a concept that's been thrown around colloquially to mean when you take a high-priced drug, say a brand drug, and put it together with a low-priced drug, say a generic, and sell it to the marketplace. There have been allegations in the industry that one alleged, you know, one effect of that is to hide discounts from the high-priced drug into the low-priced drug, and there have been cases that have been brought on that front.

What happens is, all of these --

THE COURT: What's at issue in this case? Is best prices still an issue in this case?

MR. CHRISTOFFERSON: No, it's not an issue in this case, neither is the reporting of AMP. So these issues are just not essential. And because, as we've discussed earlier, they don't need these documents to prove the things that they say they're interested in --

THE COURT: Do you still need them now that --

MR. YEAGER: We absolutely need them. This is a crucial part of our case, your Honor, and it does --

THE COURT: Is best prices still part of the case?

MR. YEAGER: It does not that I know of, but let me say this, okay? When you were talking with Mr. Mullin and Mr. Montgomery earlier about their willingness to stipulate to imputing knowledge, okay --

THE COURT: Yes, they are.

MR. YEAGER: -- that's only part of it, all right? The other part of the consideration that we urge the Court to think about is that we still have to prove their knowledge, and I think your Honor can agree that that's going to be a huge issue in this case.

THE COURT: The knowledge that --

MR. YEAGER: The knowledge that FDB was publishing those prices. Your Honor addressed that issue in the memorandum on summary judgment; it came up just with Mr. Mullin and Mr. Montgomery arguing. When their witnesses testified, particularly their executives, Mr. Weintraub and Mr. Zahn, and they're talking about Schering-Plough and they're talking about Schering Sales versus Warrick Pharmaceuticals, they run from Schering as hard as they can. And they come out looking ridiculous on it, they really do. It is incredibly impeachable testimony.

THE COURT: I don't know what you're talking about.

Get me back into the weeds. Why are these prices relevant to them knowing what FDB was doing?

MR. YEAGER: First, the knowledge that they're running from is the turnaround document. The turnaround document was sent to a Schering employee, a Janice Brennan, and they don't want any knowledge with that. When these witnesses are --

THE COURT: But how do bundling and nominal sales, why does it relate to that? You're right, that's a key issue.

MR. YEAGER: Okay, and here's why. They separate themselves from Janice Brennan. So Janice Brennan is Schering. Warrick says, "We didn't have anything to do with that. That's not us." They run from it. Now, we're trying to prove that's not true. We're trying to prove that when they say, "We didn't know anything about that, that was somebody else," they're lying or they're not being truthful about what happened.

The whole Warrick Pharmaceuticals company was a shill. Your Honor asked the question earlier: Why does it matter whether or not Warrick Pharmaceuticals and Schering Sales are different? It's all the same company, and we believe that you're correct about that, and the jury is going to ask that same question.

THE COURT: They're conceding it's correct.

MR. YEAGER: They are conceding that the knowledge can be imputed. But when the witnesses testify about what knowledge they had, we either knew about the document or where

they didn't know about the document, they deny. And when you take these issues away from us, you take away from us the ability to demonstrate --

THE COURT: I don't know what "these issues" are. I had no idea what your brief was talking about.

MR. YEAGER: All right, what we're talking about is this. Warrick Pharmaceuticals was created for one reason and one reason only: to protect Schering brand, specifically Proventil. There's no reason that Warrick Pharmaceuticals had to exist at all.

THE COURT: Proventil is what? Is that the brand of albuterol?

MR. YEAGER: Yes, it's the brand of albuterol, okay? So Schering could have just produced at their factory their brand label and their generic label, and they could have sold them separately, but they didn't do that. They created Warrick Pharmaceuticals so that they have a separate NDC, and they created it so that they can do this nominal pricing thing and this bundling thing. We don't want to go ad nauseam into this. I mean, it's crystal clear to us. It was clear before today; it is now crystal clear to us that we need to limit the evidence that we're going to produce in this case. But when they say that we didn't have anything to do with Schering --

THE COURT: But they're not saying that.

MR. YEAGER: No, no, their witnesses say that.

THE COURT: I tell you what, this is what I'm going to do: I'm not ruling on this. You're not going to mention it in openings. I'm skeptical. But if they start running away from each other, then maybe we'll bring this in.

MR. YEAGER: The problem with that, Judge, is, our ability to put designations in front of the jury of the witnesses lying about their connection with Schering demonstrates that they cannot be believed about the turnaround document.

THE COURT: Let me just say, I've got concerns under 403. If best prices are no longer an issue and if the unity of the entities is no longer an issue, I'm not sure it is worth a dime getting into what's nominal and what's bundling. I don't get it. So at this point I'm just going to put this on hold, and we're not going to bring that in because it is not directly relevant to WAC.

All right, now, Commonwealth's motion to admit deposition at trial. Yes, why shouldn't they be able to? I mean, it's subject to the time limitations.

MR. BUEKER: There's one witness, your Honor, Janice --

THE COURT: Brennan.

MR. BUEKER: Brennan, whose deposition was taken fifteen months after the close --

THE COURT: Your objection is overruled. I'm going to

allow it in. Now, I haven't got it in front of me. I mean, there may be certain portions that aren't appropriate. I don't know.

MR. BUEKER: I would say all of it is not appropriate.

THE COURT: No, I'm going to allow that in. So that's allowed, subject to my time limitations.

Warrick's motion in limine to exclude irrelevant, prejudicial -- all right, all irrelevant, prejudicial, and inadmissible evidence is excluded.

(Laughter.)

MR. BUEKER: Perfect. Thank you.

THE COURT: Now, what are we talking about?

MR. BUEKER: We're talking about -- essentially forget the witnesses because you've ruled on those. We're talking about two categories of documents, your Honor. The first category of documents, broadly speaking, are documents that have to do with drugs that are not at issue in this case.

THE COURT: Excuse me. This has to go with knowledge about WACs. Isn't this where there's WACs in Arkansas and WACs in Maryland and WACs in Texas? I actually can't really rule on this until I see the documents, so maybe what you can do is -- because if they're referring to --

MR. BUEKER: The documents are attached to the motion in the opposition.

THE COURT: Maybe it's just from this very nice

compendium where I don't have them, so I should go back into the weeds, I'll have them?

MR. YEAGER: And I think this is one that's very easy to rule on the papers, your Honor. It's laid out, what our position is and why it's relevant. I think you'll find --

THE COURT: Okay. I mean, in general, the fact that you know that WACs are being relied on is fine, but what the specific numbers are depends on what the statutory definition is. So, I mean, in other words, Texas seems to have actually a regulatory definition, so what's a WAC in Texas may not be a WAC here, right?

MR. YEAGER: I think it's more a matter of their testimony in their direct examinations of their executives saying, "We didn't have any WAC at all," and then backing off of that when they're confronted with those documents.

MR. BUEKER: It's the prejudice to us that comes from being asked specifically by another state Medicaid program with a different regulatory scheme to submit something that is different than the Commonwealth. The Commonwealth never made a direct request for any kind of information from us. The Commonwealth has a different regulatory scheme.

THE COURT: I'll probably -- I haven't looked at the documents -- be inclined to admit them because it shows that Medicaid agencies rely on WACs and you know what a WAC is.

MR. BUEKER: There is another group of documents in

there, your Honor, that have absolutely nothing to do with albuterol, the only drug at issue in this case. And as to those, the argument is really a goose/gander issue. Throughout discovery in this case, the Commonwealth took the position that drugs not at issue in the complaint were not relevant.

THE COURT: Do you want WACs on drugs that aren't albuterol? I mean, that's why I say, I haven't looked at the documents.

MR. YEAGER: It demonstrates their knowledge, your Honor.

THE COURT: Yes, but you're going to get those in the other ones, so, I mean, I'm inclined to --

MR. YEAGER: I would ask the Court just -- there are some distinctions between them, and we lay those out in our memorandum.

THE COURT: So I'm likely to allow in the documents that have WAC on albuterol. I don't know why, unless they're to Massachusetts, why it matters if it's WAC on a completely different drug.

MR. YEAGER: Well, for instance, there's a document in which they refer to DP as WAC. As your Honor knows from the memorandum --

THE COURT: All right, well, then they come in for that reason.

MR. YEAGER: That's what I'm saying. If you read what

we say, I think it's clear why we're putting them in, for limited state of mind information, your Honor.

THE COURT: All right. So Warrick's motion to limit testimony of Hartman, I mean, that's like Addanki and Scott Morton. Everyone's allowed to have an expert that puts in some background, how does it work; but no one can impute state of mind or deceit or motive to the other side. I mean, I think that's going to be true for all three of them. They can all -- let me put it this way: It's taken me -- this is my tenth year on this case. I still don't think I understand it. So you've got to put this in, both sides need to put this in, for a jury to even hope to understand what we're talking about here. So you can't just impute --

MR. BUEKER: I agree with that with one -- there's one unique issue about Dr. Hartman, and that issue, your Honor, has to do with the ruling you made back in December with regard to the federal share. Dr. Hartman, despite this Court's ruling, wants to talk about the --

THE COURT: I agree, we're not putting in about the federal share. Just have them delete that out. I forgot that issue.

MS. DOLLAR: The problem with that, your Honor, is, the way that damages are calculated, you can't really -- I mean, there aren't state claims and federal claims, so it's all calculated together. The only way to take it out is to divide

the number in half at the end.

THE COURT: Sounds terrific.

MS. DOLLAR: But that would have to be explained to the jury somehow.

THE COURT: Just say you're only suing for the state share, and they shouldn't speculate about what happened with the federal share. I'm not sending a number to the jury that's double what it really is. You're just going to send the state share because that's all you're allowed to get.

MS. DOLLAR: But to get to that number --

THE COURT: Divide by two, right?

MS. DOLLAR: At the end. But he would have to explain that to the jury why you're taking half of that at the end. Otherwise they're going to wonder why the number being submitted is half of what he came up with.

MR. BUEKER: No, the jury shouldn't hear that we caused $9.1 million in damage. To the Commonwealth of Massachusetts, we caused on their theory -- now, I'm not conceding this, but on their theory, we caused $4.5 million worth of damages.

THE COURT: I'm sure he can testify and figure out how to do it so that the -- I actually don't feel that strongly on this issue, but you cannot be seeking the federal's damages.

MS. DOLLAR: No, we agree, we're not seeking that portion in this case, but --

THE COURT: Why can't you say there are yabadah number of claims, the state share on each of them is blah, multiply it out, and that's the damages? Why isn't that honest?

MR. MULLIN: Your Honor, the problem is that when he was calculating his damages, he takes the amount that the Commonwealth actually paid, and he looks at what the amount would have been if there had been a true WAC, and he takes the difference between those two numbers as being the damage. He totals that all up, and it comes to $9 million. If you want us to say, and he then will divide that by two to get half of it, and explain to the jury that he did that because the federal government pays half of it, we're willing to do that.

THE COURT: Or just say, the amount that the state ends up paying out of its own pocket is X, and multiplying it out and getting 4.5. Any juror who can do basic math can then multiply by 2 and get 9, but I don't -- I don't feel strongly about that, but the key here is, at the end of the day, they're only going to be asked for the 4.5.

MR. MULLIN: That's what we're proposing to do, your Honor, yes.

THE COURT: So I don't need to walk through that. I mean, the jury can handle that, I think.

I think any -- when does damages being sought go up to?

MR. MULLIN: The first quarter of '03, your Honor.

THE COURT: So I'm not sure anything having to do with after that time period is admissible, either the OIG 2003 -- you could give them the draft notice from 2002 as to what the federal government was thinking about.

And similarly with you, any statutes that were enacted after that point shouldn't come in either, unless --

MR. BUEKER: Your Honor, Dr. Hartman has testified about a theory, an economic theory of revealed preferences. In other words, what you know at a point in time reveals a preference about what you knew or intended in a prior time. The fact that the Commonwealth is continuing even today to reimburse at a WAC plus --

THE COURT: Excuse me. What's sauce for the goose is sauce for the gander. They issued a notice in 2002 for the OIG about what expectations were. They received comments by you as a group of manufacturers, and eventually they issued a final OIG. If you all want to keep in through the end of 2003 as relevant time framework, that makes some sense to me. If you don't want to, that's fine. I don't know yet -- it's a legal issue -- whether there's any mitigation issue, but I imagine it could go to state of mind. I don't know if -- you know, no one --

MR. BUEKER: The post-2003 stuff certainly goes to state of mind.

THE COURT: I can't include 2003 for you and not for

them and vice versa. If you both want to go through to the end of 2003 --

MR. MULLIN: Yes, your Honor, the Commonwealth is glad not to put in the regulations that are issued in May of 2003. If that issue comes up and we want to raise that issue, we'd use what was put out in 2002.

THE COURT: I'm not inclined to put in what's happening now. So unless somebody comes up to me separately, nothing past the end of the damage period should come in. Now, that isn't to say, sometimes people say things about the past that's relevant. I'm not going to make that an across-the-board rule, but not what they're compensating at today.

MR. MONTGOMERY: We would like to think about it, your Honor, whether we want to press this.

THE COURT: Okay, thank you.

Ah, we finally reached the back row. When can we try the case for you all?

MR. MERKL: Your Honor, Mr. Mullin has requested that all three be tried together in July.

THE COURT: Where are you from? I forget.

MR. MERKL: Mylan.

THE COURT: No, but what part of the world?

MR. MERKL: Oh, Kelley Drye in New York.

THE COURT: It's so nice here in July. There aren't

many nice months in Boston, but July is one of them.

MR. MERKL: Well, your Honor, between now and July, we have multiple trials scheduled. We have, I think, five Mylan trials, and we also are going to enjoy trying the Dey case for you in April, if that goes ahead. As things stand, we have a trial for Mylan tentatively scheduled in Texas for March 22.

THE COURT: Okay.

MR. MERKL: Alabama on April 5, June in Hawaii.

THE COURT: Why aren't you settling some of these?

MR. MERKL: Your Honor, we are negotiating. I can fill you in on that at side bar if you really want to hear the ins and outs of where we are. It's possible these dates could move, but all of these dates are court-ordered. Every judge wants to keep everyone's feet to the fire --

THE COURT: I've been here for ten years. I've already burned to a crisp.

MR. MERKL: Your Honor, all we're really asking is that, as it stands today, if these things really all go and we have to try, and even not all of them, just two or three of them, July just isn't timely because even after the ones I just told you, we have a trial in September, we have --

THE COURT: I'm not waiting that long.

MR. MERKL: Your Honor, I'm not asking you to do that. All I'm asking is that as of today, could you not set us down for July? Could we come back at the end of April --

THE COURT: No, because then you're all busy. I want a date. I mean, I'm not so wedded to what that date has to be. I am wedded to having a date, and it's not going to be -- because when I come back in April, then every other judge is going to get ahead of me in line. So we need a date. You all need a vacation. I tend to vacation at the end of August, send my kid off to college. So I'm thinking, assume that it's a similar -- I don't know because we're talking about whether it's two or three defendants. What did we decide, that it was two or three? I don't remember.

MR. MULLIN: There are three remaining defendants, your Honor. I'd ask you to set all three of them for a trial date.

MR. FARQUHAR: Your Honor, Doug Farquhar representing Actavis. You asked us for a date when we could try these cases. I think all three of us agree that October would work for us.

THE COURT: You know, but my law clerk who knows everything there is to know about this is gone, so I'm trying to do -- on the other hand, I think we should get one of you in here over the summer. He's busy as can be. What does your trial schedule look like?

MR. FARQUHAR: We have Alabama June 14, and then we have Hawaii August 23, so it's pretty hard to squeeze a three-week trial in between those two three-week trials and get

it so that it will work.

THE COURT: What does your schedule look like?

MR. DUEFFERT: Ours is in the same position, your Honor, effectively. We may have an Alabama trial in April. I think we're going to be moved to June.

THE COURT: What does, like, say July 15, July 20 look like for you all? Assume a three-week trial similar to this.

MR. FARQUHAR: If we just finished Alabama on July 7 or 10 or something, it's going to be pretty hard to get ready for July 15 here, and then Hawaii coming right after that. I'm sensitive to the law clerk issue. Perhaps many of the pretrial rulings could be --

THE COURT: I am not waiting till October. It's January. How about doing it earlier? How about June?

MR. FARQUHAR: We're in Alabama in June. That's the problem.

THE COURT: What's the third week in July? That gives you a break in between a little bit there.

MR. FARQUHAR: It won't give us a break on the other end, though. That's the problem. With Hawaii August 23, if you do the end of July three weeks, then we've got --

THE COURT: You know, I'm not waiting ten months. This case has been pending ten years. So, like, you want --

MR. DUEFFERT: Your Honor, I can do one of these per quarter, and without getting divorced, with our experts and our

witnesses and us and our Daubert motions and all the other ramp-up. We have Alabama in June --

THE COURT: Wait, let me get this down because we're going to squeeze this in somewhere. Alabama is June what?

MR. FARQUHAR: 14 for Actavis.

MR. MERKL: We have Hawaii June 7.

THE COURT: June 7 is Mylan?

MR. MERKL: Yes.

THE COURT: Okay, and --

MR. DUEFFERT: Par I believe has the same schedule as Actavis, although currently we're set for April.

THE COURT: To June 14?

MR. DUEFFERT: June 14, that's my understanding.

THE COURT: And then what were the August dates?

MR. FARQUHAR: Hawaii is August 23 for Actavis.

MR. DUEFFERT: And for Par, we are set for the same date.

THE COURT: August 23?

MR. DUEFFERT: Yes, your Honor.

THE COURT: And when is Mylan?

MR. MERKL: Your Honor, we don't have an August trial date, but we have one September 8 in Kentucky, followed by a September trial in Mississippi, in addition to the three I told you about previously.

THE COURT: So why don't I -- so you're only September

and December?

MR. MERKL: Well, April and June.

THE COURT: Or April. So why don't you just pick. July or August? You're the one who makes sense the end of July.

Robert, pick the third week in July for Mylan.

THE CLERK: July 19.

THE COURT: All right, July 19 for Mylan. And I'm going to put down Actavis and Par, but I'm going to give you mercy. If your June 14 trial actually goes and is sort of right up back against it, then I'll put you into the fall.

MR. DUEFFERT: Thank you, your Honor.

MR. FARQUHAR: Thank you, your Honor.

THE COURT: So it's Mylan, Actavis, Par. All these things have a certain level of uncertainty to it.

MR. FARQUHAR: And, your Honor, I'm sure that you're saying without prejudice to the decision on the motion to sever that's still pending before you for us three?

THE COURT: I'm going to think a lot more about it after I've been through one trial.

MR. FARQUHAR: I understand.

THE COURT: See how complicated it is.

MR. MERKL: Your Honor, is that the three of us are all on for July 19?

THE COURT: Yes. You're the only one who's certain to

go, though.

MR. MERKL: Well, thank you.

(Laughter.)

THE COURT: Because it depends on what happens on their other trials. That's midway between a June 7 trial and a September 8 trial. So I'm assuming it's going to be no longer than two or three weeks, right? I don't see any reason why it should be any longer than this one. And once I get Mr. Mullin's case down to a T, I'm going to keep shaving it further, but it's a little hard for me to do that without knowing it, so --

MR. MULLIN: Your Honor, with regard to the July 19 trial date, I'd ask you to allow us to confer after the Warrick trial is over with the defendants who are set for July 19 and come up with a proposed pretrial disclosure order, you know, order for the events leading up to the trial. I think there will be enough time. This trial will --

THE COURT: I think so. But let's go off the record right now because I don't want to see any of you, so --

(Discussion off the record.)

THE COURT: Okay, anything else?

MR. MONTGOMERY: We did leave hanging the question of post-2003 evidence.

THE COURT: Yes, you're going to --

MR. MONTGOMERY: I was going to think about that. If

we can agree, we can take those two issues --

THE COURT: Okay, so actually there were a couple of hanging issues, hanging chads. One is the 2003 issues. One is the legal question of the claims, the provider claims, the 1986 Supreme Court case; and one is the statute of limitations, which really hasn't been, at least I don't remember it being well briefed for me as to what you were talking about, so it's a new issue for me. You're saying it's only the Attorney General's office and not MassHealth.

MR. MULLIN: Certainly the statute says that it's relevant as to whether the information --

THE COURT: Just a brief, okay?

MR. MULLIN: Okay.

THE COURT: I'm tired, you're tired. Have a wonderful weekend. And you were going to let me know Monday what's happening or Tuesday on what's happening on the settlements?

MR. MULLIN: Yes, your Honor.

MR. MONTGOMERY: Yes, your Honor. But what I was going to say about -- we would agree, and we could take these two motions off the list, if the arrangement is that we're not going to have evidence with respect to MassHealth and its reimbursement policies after the damage period, which runs into 2003.

THE COURT: Why don't you both just talk about it because whatever I'm going to do I'm going to do for both

because both of you have sort of in various ways tried to bring it in, so you'll have to see what you agree on.

MR. MULLIN: Your Honor, one other issue that's in the joint pretrial memo, wasn't filed as a separate motion, is whether or not deposition testimony can be used when the witness is here live and available in the Commonwealth.

THE COURT: Well, can it? Yes, if it's an admission of a party opponent, persons speaking within the scope -- you know, the classic if the person was an agent at the time when the deposition was taken and the like, yes, it can be. That having been said, I went through three and a half of the most excruciatingly dull deposition readings that you've ever heard. So sometimes it's a great little pithy admission you'd want to put in, fine, but not hours.

MR. MULLIN: Well, we don't want to do any of that, your Honor, but six of the people that Warrick has designated are employees of the Commonwealth, were employees at the time they testified in a deposition, but they're available to testify live.

THE COURT: They're allowed to do it either way. It's just one way is forceful advocacy, and one way puts people to sleep. That's the --

(Laughter.)

MR. MULLIN: Your Honor, I would say that Rule 32 requires three things in order to make --

THE COURT: You know, I'm not -- I'm gone, okay? See you later.

THE CLERK: Court is in recess.

(Adjourned, 3:48 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 75 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 03-11865, Commonwealth of Massachusetts V. Mylan Laboratories, Inc., et al, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

In witness whereof I have hereunto set my hand this 10th day of January, 2010.

/s/ Lee A. Marzilli

LEE A. MARZILLI, CRR
OFFICIAL COURT REPORTER