IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

THE COMMONWEALTH OF MASSACHUSETTS, )
)
Plaintiff )
)
-VS- CA No. 03-11865-PBS
Pages 1 - 32
MYLAN LABORATORIES, INC., et al )
)
Defendants )

STATUS CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
March 24, 2010, 10:15 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA 02210
(617)345-6787

A P P E A R A N C E S:

PETER A. MULLIN, ESQ. and NATHANIEL YEAGER, ESQ., Office of the Attorney General, Medicaid Fraud Control Unit, One Ashburton Place, Room 1813, Boston, Massachusetts, 02108-1598, for the Commonwealth of Massachusetts.

JOHN T. MONTGOMERY, ESQ., JOHN P. BUEKER, ESQ., and ERIC P. CHRISTOFFERSON, ESQ., Ropes & Gray, LLP, One International Place, Boston, Massachusetts, 02110, for Warrick Pharmaceuticals Corporation.

ALSO PRESENT:

BETH TRENT, ESQ., for Merck & Co.

P R O C E E D I N G S

THE CLERK: The case of the Commonwealth of Massachusetts V. Mylan Laboratories, Incorporated, et al, Civil Action 03-11865, will now be heard before this Court. Will counsel please identify themselves for the record.

MR. MULLIN: Good morning, your Honor. Peter Mullin on behalf of the Commonwealth.

MR. YEAGER: Good morning. Nathaniel Yeager for the Commonwealth.

MR. CHRISTOFFERSON: Good morning, your Honor. Eric Christofferson.

MR. BUEKER: John Bueker for Warrick.

MR. MONTGOMERY: Good morning. John Montgomery for Warrick.

MS. TRENT: Beth Trent with Merck.

THE COURT: With?

MS. TRENT: Merck, parent company Merck.

THE COURT: Well, welcome. Do you want to move on up?

MS. TRENT: No.

THE COURT: All right. Anybody else want to come on up, join the jury? If I'm seeing a little bit out of it, I'm coming on the down-slope -- we got the jury out yesterday at 4:30 on the Neurontin case, which you knew you were scheduled simultaneously with; and there were various skirmishes this morning, so I don't pretend to have truly scrutinized your

materials. Maybe I'll start with you. You requested this emergency status hearing?

MR. MONTGOMERY: We did, your Honor, and we did it on the heals of a delivery last Tuesday evening by Mr. Mullin to me of a set of documents. The documents reveal to us that the Commonwealth has been hiding the ball on a core issue in this case. Even worse than that, the best evidence of the hidden ball has existed at all times throughout this case in the files of the Attorney General, an investigative file involving an investigation of CVS run by an investigator, who is the lead investigator in this very case, and involving an Assistant Attorney General who has an appearance in this very case and who has argued motions in front of the Court on this very case.

The most critical document that the Court needs to look at is Exhibit A to the submission we made to you yesterday. We haven't even purported to give you the complete chapter and verse or our complete delineation of all of these documents, but Exhibit A is critical. The issue involves the usual and customary charge.

And to bring your Honor back to the tutorial and to the summary judgment argument, you, your Honor, have asked a number of questions about this issue. You began to do so during the tutorial, when in response to questions on cross-examination, Dr. Scott Morton said, you know, from some documents she's seen, it looked like there was a secret deal or

a secret understanding which permitted pharmacists to submit as their usual and customary charge an amount far higher than the lowest amount that's required under the regulations.

What Exhibit A is is a document, a letter from CVS to Arnold Shapiro, who you may or may not recall --

THE COURT: I remember him.

MR. MONTGOMERY: -- was the head of the program.

THE COURT: He's the guy who knows all. He spanned a long period of time and --

MR. MONTGOMERY: That's right. He runs from 1988 to 1999 or so.

THE COURT: Is he sick?

MR. MONTGOMERY: He is ill.

MR. MULLIN: He is sick, your Honor, yes.

MR. MONTGOMERY: The letter from CVS, if I can just give you the bottom line, says, "We're not going to comply with the usual and customary rate as written. Specifically, we are not going to include in our review of the lowest rate that we accept so-called MAC rates," which, as you know, are the lowest rates obtained by PBMs. They're going to exclude MAC rates. There's no question that that's what the document means. Indeed, Mr. Mullin in his response to our request for a hearing last week conceded that that's what the document means.

There ensues from 1995 a series of steps which emerge partially -- we still don't have the complete picture -- but

emerge from that point all the way through 2004. So CVS, and it would appear other providers, are not using their MAC rates to calculate the usual and customary rate. The Attorney General's office in 1998, after an audit, notices that that's the fact and accuses CVS of breaking the law. CVS reacts with outrage saying, "We have an understanding with Mr. Shapiro. We sent him a letter. Not only did we send him a letter, we actually spoke to him. He told us he had received our letter."

In the documents is an internal file memorandum from -- I believe it's June of 1995 -- from somebody at CVS showing that they actually had this conversation with Mr. Shapiro. So the Attorney General says, "That's illegal." CVS says, "Not only do we have an understanding, but there are problems with this regulation. It is vague and ambiguous." At least CVS claims that the Commonwealth conceded that it was vague and ambiguous, and they continue to assert that they weren't going to comply with it because, they said, for lots of complicated reasons, it's actually impossible to comply with.

CVS continued on in communications with both MassHealth, with the Attorney General's office. The issue kind of frittered along for a couple of years. It appeared that there were questions, at least the way we read the documents, about Mr. Shapiro's credibility, whether he actually permitted them to engage in this conduct. There were ultimately very formal interviews conducted in 2000 by, it would appear, the

Attorney General's office of Mr. Shapiro.

THE COURT: Can I just --

MR. MONTGOMERY: Just one more point. Ultimately nothing changes. And then in 2004 the Attorney General's office again says to CVS, "By the way, you're still breaking the law." And CVS, through Mintz, Levin, writes back in a very long memorandum: "We had an understanding. You agreed to it. By the way, you've known about this for a long, long time. You are too late." So all of that is in these documents.

And what's important is that the U&C issue, your Honor, goes to the very core of this case.

THE COURT: So let me get to Mr. Mullin in a minute. At the end of it, though, I'm going to say to you, what do you want? Because I don't want to --

MR. MONTGOMERY: I will tell you exactly.

THE COURT: -- go through a whirlwind of discovery of these attorneys and sanction hearings. Do you need more discovery on these documents?

MR. MONTGOMERY: Your Honor, here's what we want: We want more information from the Attorney General's office because so far they have declined to give us --

THE COURT: All right, so you want more of the same if they exist?

MR. MONTGOMERY: More of the same, number one. Number two, we want a schedule that's convenient for your Honor for a

motion because we want you to enter an order deeming certain facts to be established, facts that are evident on the basis of these documents, and reasonable inferences from these documents, because we can't go back and unscramble or rescramble this egg. You can't really -- we don't want all the discovery.

THE COURT: Well, I'm not sure about that. You don't want more discovery is your bottom line?

MR. MONTGOMERY: Well, your Honor, you can't do it. The individuals, some individuals are unavailable. Entities don't exist any longer.

THE COURT: Well, no, no.

MR. MONTGOMERY: Putting this back together, what I think we really could use --

THE COURT: So can I just back up?

MR. MONTGOMERY: Yes.

THE COURT: I'm not sure -- I want to hear both sides on it. I don't want to get into a maelstrom of your deposing Mr. Mullin. I'm not going to do that. So at the end of the day, if you were asking me, you want additional discovery of the record keepers, do you want additional discovery of CVS, you want to take an extra deposition because of the late-filed documents, I might do that.

MR. MONTGOMERY: Your Honor, I want to know the truth. The Attorney General knows the truth.

THE COURT: I am not letting you depose trial counsel.

MR. MONTGOMERY: I think trial counsel -- actually, I'm not suggesting anything about Mr. Mullin or Mr. Yeager. There are individuals in the Attorney General's office who know the truth. They should tell us. I shouldn't need to depose them.

THE COURT: Well, let me put it this way: There are two different issues here, and I'll get to him in a minute. One is whether there is a discovery of the trial attorneys in the Attorney General's office about why they found it so late. We're not doing those depositions.

The second issue, though, is, are there other documents out there which are relevant -- those I might allow -- or, secondly, somebody at CVS, for example, or somebody who's sick. I don't know what Mr. Shapiro's health is like.

MR. MONTGOMERY: He's very sick. It's highly unlikely we're going to be able to talk to Mr. Shapiro, and he's key to this.

THE COURT: Well, maybe there's an underling who has worked directly with him who might know about it.

But let me get to you for a minute.

MR. MULLIN: Your Honor, the Commonwealth has not been hiding the ball in this case. There's a dispute between the parties as to what was going to be produced back in 2007. In

late 2006, the defendants served a document request on the Commonwealth. One of the paragraphs asked for documents relating to efforts to enforce the U&C reg. There was objections to that paragraph, there were meets and confers. And then there was a letter from the Commonwealth to defense counsel, and that letter said, "The Commonwealth will produce such nonprivileged documents as are not part of ongoing investigations in the possession of the Attorney General's office." And that's what we did.

THE COURT: Excuse me. Apart from -- I haven't read your thing yet. I'm really sorry. It came in, was it today? I just haven't read your response, and I will do that. I started reading it, and I figured, would you rather be sitting here waiting or having me read it? So I haven't gone through it all. But let me just say, apart from slinging allegations one way or another on good faith or bad faith, it just does strike me that it's relevant.

MR. MULLIN: I think the documents are relevant, yes.

THE COURT: So are there more of them?

MR. MULLIN: We're continuing to look. This whole issue arose because of some filings that the defense made in January of this year. In those filings, they alleged for the first time that in 1995 there was some kind of an agreement or understanding between the pharmacies and MassHealth that the U&C reg did not apply to generics. This is different than the

issue that had arose in connection with the summary judgment argument. In connection with summary judgment, they were saying that there was an agreement, and Dr. Scott Morton did call it a "secret agreement," but it was an agreement not to audit them. It wasn't that there had been an agreement in '95 with regard to compliance with the reg.

THE COURT: You may be exactly right on the nuances of it, but it has been an issue all along about what the government knew and when it knew it, and it does strike me as these documents are relevant. Put aside whether there was a good-faith disagreement about what you agreed to produce or not produce, they strike me as relevant.

MR. MULLIN: We don't dispute that, your Honor. That's why we produced them. We don't think we were obligated to produce them, but we felt they were relevant, and once we became aware of them, we could not fail to produce.

THE COURT: So are there more where that came from with other pharmacies? Where are the files that would let us know this because it is relevant?

MR. MULLIN: There are two places that conceivably there are relevant documents. One is in the files of the Attorney General's office and any investigations that the Attorney General's office has conducted relating to U&C compliance.

THE COURT: Well, have you looked there personally,

you or Mr. Yeager?

MR. MULLIN: Since early February, we've been looking at various things there. Some of them relate to, there's a sealed quit tam that's filed in the Northern District of Illinois, and we've been talking to the staff handling that matter and some of the files and documents that they're aware of.

THE COURT: Excuse me. A sealed qui tam involving Massachusetts and Illinois?

MR. MULLIN: Essentially it has a Massachusetts count in it. It's a federal False Claims Act quit tam with counts based on, I don't know, fifteen or twenty state qui tam statutes.

THE COURT: Thank God another judge has that. I've had it with --

MR. BUEKER: For now, your Honor.

(Laughter.)

THE COURT: All right. So, in any event, here's the thing. If they're Massachusetts documents, they need to be produced. And it's just by luck of the draw that I needed to do the Neurontin trial first. Otherwise, we would have been in the middle of a trial, and these things wouldn't have been available. And also it is true, I remember, that Mr. Shapiro is so sick. How are we going to -- is there someone else that there could be a 30(b)(6) deposition about all these documents

on them?

MR. MULLIN: Your Honor, conceivably, although the investigation that we've done to date, I don't believe there's anyone that's going to be able to testify with regard to the CVS letter from MassHealth.

THE COURT: Well, how about, was there somebody from the Attorney General's office who was functioning more as a, what would you say, not as trial counsel here but, I don't know, a negotiator of a deal with CVS, for want of a better word?

MR. MULLIN: There hasn't been a deal with CVS. We have produced --

THE COURT: Is there someone at the Attorney General's office who knows about this stuff, what pharmaceutical companies they were on notice of, what agreements were reached, what agreements weren't reached, just has knowledge?

MR. MULLIN: We've produced to the defense an interview of Mr. Shapiro in 2000 in connection with the documents we've recently produced. There's a March, 2000 interview of Mr. Shapiro in which he relates his views with regard to that letter.

THE COURT: I understand, is he dying? Is that --

MR. MULLIN: He told me that he has cancer. It's very serious cancer. He was undergoing chemotherapy. I have not literally had the courage to call him back and ask him how he's

doing. It's very serious.

THE COURT: Well, you know, obviously, if the man is in his final days, we aren't going to bother him. On the other hand, if it went into remission after the chemotherapy and he has knowledge, I think someone needs to sort of gently ask him how he's doing.

MR. MULLIN: You know, if there was someone else that I could talk to that I knew out there or knew him well enough, I would. I'd be glad to tell the Court more at side bar, but I don't think, as a matter of personal privacy, I don't think we should make it part of the public record.

THE COURT: I would agree with that, but let me just say this. Here's the issue: These are directly relevant. I need a game plan for you to be going through the files of the Attorney General's office with respect to any pharmaceutical company where there was a dispute about usual and customary. And I need at least you, because I know how thorough you've been, to come up with the names of somebody whom they can depose to find out what happened. And if there isn't anyone and it's because it's been so late in being produced, then I'll think about what flows from that. Otherwise, I'm not inclined to get into a pissing battle -- that's a legal term -- you know, about whether this is in good faith or bad faith and whether or not sanctions. But if in fact, you know, it could have been produced before Mr. Shapiro got sick, there may be

certain inferences that can be drawn from the documents themselves, or things at least that you can't rebut in terms of knowledge. But I need to know what the document base is, and if there's anybody in the AG's office -- is there anyone in the AG's office handling this investigation who would actually know?

MR. MULLIN: They won't know anything with regard to CVS or the CVS letter.

THE COURT: Well, how about -- I mean, we have all these other places, Wal-Mart, Walgreens. I don't know, what other places do we have? There are other pharmacies out there. Isn't this terrible, I can't even think of one? Walgreens, Rite-Aid.

MR. MULLIN: There are basically three pharmacies left in the Commonwealth: CVS, Walgreens, and Rite-Aid. Some of the stores --

THE COURT: Pretty good, I got them, right?

MR. MULLIN: That's right.

Your Honor, the letter that came in from CVS is the only letter that we're aware of where any pharmacy is claiming that it does not need to include MAC prices. We're continuing to look both at the agency, at MassHealth, and in the Attorney General's office to see if there's any other evidence suggesting that.

THE COURT: But, you know, sometimes -- I've worked in

government -- you know, there's such high staff turnover that the right hand doesn't know what the left hand is doing, or they're stuck in a file somewhere in an archive. I'm just trying to -- is there somebody who was there? Do you have a suggestion of a name?

MR. MONTGOMERY: I have a couple of suggestions, but let me just say, Mr. Mullin may just not know what's available, but in the course of trying to peel back the lid on this issue, we've discovered some things. It's why I told you in the pretrial hearing we had two witnesses. Their testimony is imperfect, but it does go to the possibility, strong possibility, that there was an understanding. We have since discovered a letter to the Medicaid agency from a pharmacy talking in 2004, after the period when they stopped producing documents to us, about a long-standing agreement, understanding.

THE COURT: Which pharmacy is this now?

MR. MONTGOMERY: It's called Inman Pharmacy. But the point is that this document and similar documents have been in the possession of the Medicaid agency for a long time. We infer from everything that we've seen in this file that the Attorney General's office, somebody -- maybe it's Mr. Brown, the investigator, maybe it's Mr. Patten -- that they know about the whole arc of the long history of this issue from 1995 to the present. So when I said earlier we want to know the truth, we want to know who knows the truth, and we don't think it's

Mr. Shapiro.

THE COURT: It may not be. So you think it's Brown and who else?

MR. MONTGOMERY: Well, Brown is the lead investigator on the investigative file that they withheld from us that had the letter to Arnold Shapiro. Robert Patten is the Assistant Attorney General, who has an appearance in in this case but has not been on the pleadings for quite a while, but he has appeared here. He argued the motion to dismiss. He participated --

THE COURT: Are they here? Are they here right now?

MR. MULLIN: No. Mr. Brown left the employ of the Commonwealth in February of 2007. Mr. Patten was present for one interview, the interview of Arnold Shapiro in the documents that we've produced. And that's a full report. It's a three- or four-page report of the interview with Mr. Brown in which he goes through the letter from CVS paragraph by paragraph and relates his history of conversations.

MR. MONTGOMERY: But, your Honor, I think I know things that may be true that Mr. Mullin doesn't know, and we have just discovered that Mr. Patten may have been involved, actually probably was involved, in discussions with another pharmacy.

THE COURT: Is this Inman?

MR. MONTGOMERY: No, not Inman, but a large pharmacy.

And Mr. Patten actually examined a witness in this case, Mr. Patten serving as the Commonwealth's counsel at a deposition, with respect to issues related to U&C. We've now learned, the reason that he was asking some very obscure questions is because he had negotiated with that pharmacy.

THE COURT: So just so we don't play -- what's the pharmacy?

MR. MONTGOMERY: Stop & Shop.

THE COURT: Okay, so --

MR. MONTGOMERY: So we just think there's a lot more here than we're being told.

MR. MULLIN: Well, I'd be glad to get any information that --

THE COURT: Well, no, no, excuse me. Mr. Mullin, here's the problem. You're as thorough and as honest as they come -- I know that from the U.S. Attorney's office -- but you're recently -- this has been a decade-long dispute. We've got to figure out a way to make sure that you've got the information that's relevant here. So why don't we start with this: Why don't we start with you discussing -- have you talked with Brown?

MR. MULLIN: Not with regard to the file that we've recently produced to the defense, no.

THE COURT: About any of the other -- why don't you start with this. It can be you, Mr. Yeager. I'm not saying it

has to be -- but just go back and talk with Brown and Patten today or tomorrow.

MR. MULLIN: I have talked with Mr. Patten. I have not talked with Mr. Brown.

THE COURT: Well, is there anything regarding Stop & Shop?

MR. MULLIN: I'm familiar with the Stop & Shop investigation that our office conducted. It was a voluntary disclosure. There was a settlement with them. Essentially they paid back some money. It doesn't relate to this issue, I don't believe. I think it involves certain third-party payor claims, but I'm well familiar with the Stop & Shop investigation.

THE COURT: Does it involve at all U&C, usual and customary?

MR. MULLIN: It was a usual and customary investigation, but it related to claims where the Medicaid beneficiary had both coverage under some private insurance and coverage under Medicaid. In those instances where that happens, the other insurance pays first and Medicaid pays second, and sometimes they're able to identify instances where a different price was submitted to the other third-party coverage rather than the price that was submitted to Medicaid.

I'm familiar with the Stop & Shop investigation. I don't think it's going to have any relevance to the issue we

have.

THE COURT: But here's the issue: Relevance I'm defining now as anything having to do with usual and customary. So unless there's some reason like, I don't know, confidential informant or something -- you know, something that shouldn't be disclosed and you let me know that -- anything having to do with usual and customary should be turned over to the defendants. And I think you need to call Patten and Brown and find out if any other pharmacies had a dispute. It could help you -- it could be you've rejected their claims -- it could hurt you, but it's relevant to government knowledge because that's been one of their heartland issues from the get-go. And then when do you think you can accomplish that?

MR. MULLIN: I don't know Mr. Brown's schedule. He now works for Tufts Health Plan. I would think we'd need at least a week.

THE COURT: Fine. And if you need to depose Mr. Brown, he's not part of the trial team, I think you could start there.

MR. MONTGOMERY: How about Mr. Patten?

THE COURT: Mr. Patten, is he still on the trial team?

MR. MULLIN: He's not on the trial team. He's an attorney in the AG's office.

THE COURT: Why don't we do this: No, we're not going to depose him, but since he used to be on the trial team, you

can ask him some interrogatories under oath about the existence of other documents. I think that's the best way to handle that from the beginning. Do you want to take depositions of CVS or of any of the --

MR. MONTGOMERY: Well, we have not considered that, but --

THE COURT: Stop & Shop?

MR. MONTGOMERY: I think we'd like to have -- well, the problem is that, your Honor, we have already deposed all these people. The defendants collectively have just spent a fortune doing that. But if you're offering us that opportunity, we will think about it. I have spoken to the attorney --

THE COURT: And you didn't ask these questions about U&C?

MR. MONTGOMERY: We sought documents that concerned U&C. Some questions were asked about U&C, but we didn't have the information that would lead one to ask questions directed precisely to this issue.

THE COURT: Well, why don't you just file a subpoena to bring in documents to trial, and then you can call them in, if your private investigator isn't talking to them. Let me put it this way: There are new documents produced. They are relevant. I'm asking the Attorney General's office to do a thorough investigation. And, Mr. Mullin, why don't you file at

some point a certification as to what you've done. Mr. Yeager, you could do that. If this means you need a new deposition or two --

MR. MONTGOMERY: Maybe a 30(b)(6) deposition or a deposition of Dr. Jeffrey, who must know they haven't -- just to take CVS --

THE COURT: Who's Jeffrey again?

MR. MONTGOMERY: Jeffrey succeeds Shapiro, and he's been there since 2001 through to today.

THE COURT: Maybe that's relevant. At this point I decline a request to get into a hearing on sanctions. However, if in fact there's -- I think spoliation can actually be negligence as well as bad faith. There may be certain inferences I can find if I think that there are documents but they're not findable; but right now all I have is a typical, which happens unfortunately in many criminal and civil cases, which is someone finds a mother lode of documents late in the day. And so the way it's usually fixed is depositions. I don't believe they were holding out on you.

MR. MONTGOMERY: Well, we draw a different inference because they specifically, after a motion to compel, identified. They said: We'll produce all the documents, including documents from the office of the Attorney General, except an investigative file. The people who were making that representation to us were Mr. Heidlage and Mr. Patten. We

think there's a fair inference -- it's not established -- but a fair inference that they knew.

The other thing that they knew at the time, speaking of spoliation, is they knew that Mr. Shapiro, upon leaving or as he was leaving the state Medicaid agency, destroyed all of his documents, so that the only place that Exhibit A could be found -- we couldn't find it in Mr. Shapiro's file -- it was in the Attorney General's file. They had to have known that. That is worth investigating. We think, though we don't want to divert the trial -- that is not our point -- we think these issues have to be examined.

MR. MULLIN: Can I just briefly respond? I think Mr. Montgomery misspoke. The letter where we said we were going to search closed files but not open files in the AG's office precedes any motion to compel. That was the result of a meet and confer. Mr. Patten was not involved with document production. His role in the case was primarily defense of depositions.

And with regard to Mr. Shapiro shredding his documents, on the prior pleading asking for the emergency status conference, we submitted to you his testimony. What happens is, the man is retiring after eleven years in state government. And with regard to his personal files, his copies of letters, his copies of various documents, the routine practice at the agency was to shred the stuff. And that's the

documents that we're --

THE COURT: But am I right in saying that sometimes spoliation can be negligence?

MR. MULLIN: I haven't looked at the law on spoliation. I'm not sure. But those things that got shredded were part -- it's three years before any lawsuit was filed.

THE COURT: Excuse me. At this point I'm not doing anything on this other than, you are going to do a diligent search and file some certification within the week to make sure -- and this is a broad cut here -- that if there are any disputes between any pharmacy and the Commonwealth with respect to U&C, the documents should be produced unless there's a reason not to, in which case let me know; like, if there's a whistleblower, you know what I mean, a confidential informant or something that there would be reason not to produce it. If it's under another judge's seal, I suppose I'll have to figure that out, that kind of thing.

And you'll be checking with Brown and Patten. If you want -- I'm not going to allow a deposition of Patten because I think he's still on the trial team, but what you can do is send interrogatories to him about any documents that he's seen or any of the disputes that he may have seen.

And then with respect to Mr. Brown, if you want a deposition of him, that's fine. If you want either depositions of the pharmacy, CVS, or another pharmacy that you subsequently

get documents about, you can. Or otherwise we can just do a subpoena duces tecum and just put them on the stand. I mean, we don't have to have seventeen depositions on everyone. I mean, sometimes actually it can be the old-fashioned way: You sort of see them and ask them. But I think we've got to get to when this trial is going to be.

MR. MONTGOMERY: We agree with that, your Honor. Just one more thing on this subject?

THE COURT: Yes.

MR. MONTGOMERY: And that is, the search that should be made here and the documents that should be produced should be without regard to time limits. That is, we know documents exist in 2004, but they have refused to give them to us. We now know they're there. So they conducted audits in 2004 about U&C of pharmacies. It showed and it surfaced --

THE COURT: Well, let me put it this way: You should look through anything in 2004 to the present, if there are U&C debates and if it shows that it goes backwards in time.

MR. MULLIN: Your Honor, I think I'm familiar with what Mr. Montgomery is referring to, and there is a project in 2004, and I don't have a problem with producing documents relating to that. I'm aware of at least four quit tam cases that were filed in 2009. I don't know off the top of my head in which case.

THE COURT: On this issue?

MR. MULLIN: They have various allegations relating to U&C. Sometimes it's the failure to give promotional prices to the Medicaid agency. I believe at least three of them are national quit tams covering all states.

THE COURT: Well, to the extent it's under a judge's seal, I'm not asking that, but if there are documents relevant to it, then those should be produced.

MR. MULLIN: Well, you know, I haven't looked at the statement of material facts that was submitted by the relator, but I don't believe there's going to be any documents relating to the Commonwealth in any of these cases. I mean, these are national quit tams against various pharmacies making allegations sometimes about U&C and other issues.

THE COURT: Well, if it involves the Commonwealth of Massachusetts and it's not subject to a seal, you should disclose it. Otherwise, if it's subject to a judge's seal, that's a different situation.

This whistleblower litigation has really started exploding, hasn't it?

MR. MULLIN: Well, if you hit it big, it's worth it.

THE COURT: I guess so.

So how long a trial is this? I forget. Who's left?

MR. MULLIN: It's a three-week trial. It's only the Warrick defendants that are on trial. After that, we have Mylan and Par. We've settled with Purepac since the last time

we were before you.

THE COURT: And it's jury, right?

MR. MULLIN: Yes.

THE COURT: So I need to -- I will not just pop it on you. You're on my rolling list. There's a criminal case that's going, but you're my first civil case after it.

Are there expert issues?

MR. MONTGOMERY: Well, if we just assume that the trial might get going in May, given your criminal trial, we have just been informed while we were sitting here by one of our witnesses that there could be a modest problem in May, but we would like to think --

THE COURT: How about June? Is that a problem?

MR. MONTGOMERY: No, June could be worse. This is Dr. Scott Morton who has a problem in May. She would need to testify, I think, before the 20th of May. But that may well be doable, but that's the specific problem.

THE COURT: Well, since I'm required to be at the National Federal Judges Association event, that may not be such a problem. I would probably -- I just don't know. I'll work around it. I understand that puts you at huge inconvenience, and I have to apologize. I am just for the first time -- well, not for the first time -- I'm just really backed up in trials right now. I just gave Judge Young the Shearer trial in Neurontin so that I could leave this as my next civil case out,

since I figured I'd given a lot of time to the Neurontin folks; but I also have this criminal case where somebody's in custody, and that takes priority, so -- it would have been maybe right up Mr. Mullin's old haunts in the olden days, but it's a document-intensive case and --

MR. MONTGOMERY: But are you thinking, your Honor, that when that case is over --

THE COURT: You're my first civil case, and so -- but we're not going to pop it on you. I mean, I've got plenty -- if for some reason the criminal case goes and you can't do it, I'll get to you. But let me ask you this with Dr. Morton. I've been pretty impressed at video depositions. It's not like just boring reading it in. It's primarily an expert report. Do you want to do that, I mean, just take a trial deposition of her?

MR. MONTGOMERY: We would be very reluctant to do that.

THE COURT: Is she very key to your case?

MR. MONTGOMERY: She's very important, and her testimony will relate very significantly to the very issue that we're talking about today.

THE COURT: You know, I don't know if you've heard about this. In the last two major trials I've had -- one was a major antitrust trial that went for three and a half weeks and one this product liability case that went five weeks -- I tried

something new that I've loved, just essentially allowing juries to ask questions. I won't do it in the criminal, but just like ask -- it keeps them engaged. When they're confused, they ask. You get a read on what they're thinking, and I would think about doing this. And that's why in a sense you're right to want someone live because what I saw happen is a lot less engagement with the depositions. So I'm not disagreeing with that judgment. It's a sort of backstop if you got into big trouble. But I'd be interested in trying it in this case as well because it's a technical case, let's face it.

Is it definitely not going to settle?

MR. MONTGOMERY: There does not appear to be any prospect.

MR. MULLIN: It was late January, I believe, we had a session with Eric Green, and since then --

THE COURT: We should probably go off the record, Lee, just for a second.

(Discussion off the record.)

MR. MULLIN: Your Honor, if the criminal case were to plead, would you expect to plug us in April 5 or right around then?

THE COURT: Yes, but I'm not going to tell you the day before. Just I don't do it that way here. So you would be the next case. If you could do it on April 5, I'd be thrilled and jumping up. If I gave you a week's notice -- I'll be honest, I

don't think it's going to plead. It was going to plead for a while, and now they're all telling me it's going. So I'm not hearing the drumbeat, you know, that you sometimes hear, "Oh, maybe." I'm not hearing the drumbeat, so I think it's a month-long trial.

And I'm skipping, and I would for you as well, because of my own schedule as well as jurors' schedules, that spring break. So to those of you who want to go off with your kids who are on public school vacation break rather than private school vacation break that week in April, you know, the Marathon week, I won't be sitting.

Anyway, I will get to you. We've got a game plan. The only question that I have is, when can we do all this discovery? When will you decide so I'm not right up against a trial date? Can we do this all within two weeks, you can make judgments about what you want and you don't want?

MR. MONTGOMERY: Oh, absolutely. I think we want to go at lightning speed. I think we obviously need a response from the Commonwealth. We certainly are going to be making a motion to your Honor for some relief once we have this record together.

THE COURT: Well, let me ask you this: Do you agree that Shapiro's statements, which probably aren't under oath, about these documents would be admissible?

MR. MULLIN: We'd certainly be willing to put them in,

yes. I don't think the defense is going to want to do that.

MR. MONTGOMERY: There is a complication there, which is, what Mr. Mullin has done is, he has given us a document containing purported statements by Mr. Shapiro, which is privileged; but he's also given us a privilege log excluding, you know, any production of a whole bunch of other documents. So I think there's a sword/shield problem here. So it's going to be a discrete --

THE COURT: Privileged in the sense of attorney-client privilege?

MR. MONTGOMERY: Attorney-client privilege. So we need to know more about that document. We need to know more about the allegedly privileged documents, and then there is going to be a question whether it's actually appropriate for that document to come in.

THE COURT: Well, it may not be. I thought you wanted it. I'm sorry, I thought --

MR. MONTGOMERY: No, no, no.

THE COURT: I don't know what it says, so I don't know if it's --

MR. MONTGOMERY: We probably don't want it in.

THE COURT: All right, all right. I'm sorry. I thought --

MR. MONTGOMERY: There are other documents that we want in.

THE COURT: And can I just see you for one minute at side bar, sealed, about Mr. Shapiro. He does turn out to be a key player in all of this, and I agree with you it shouldn't be on a public record.

(Sealed side-bar discussion.)

THE COURT: I think that's it pretty much, right.

MR. MULLIN: Yes.

THE COURT: We'll let you know as we know.

(Adjourned, 10:58 a.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 32 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 03-11865, Commonwealth of Massachusetts V. Mylan Laboratories, Inc., et al, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

In witness whereof I have hereunto set my hand this 28th day of March, 2010.

/s/ Lee A. Marzilli

LEE A. MARZILLI, CRR
OFFICIAL COURT REPORTER