## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 03-CV-11865-PBS |
| v. | ) ) | |
| MYLAN LABORATORIES, INC., *et al.* | ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM SUPPORTING WARRICK'S MOTION TO COMPEL PRODUCTION OF ALL DOCUMENTS RELATING TO U&C WITHHELD ON THE BASIS OF THE ATTORNEY-CLIENT PRIVILEGE OR THE WORK PRODUCT DOCTRINE

Warrick seeks a determination that the Commonwealth has waived the protections of the attorney-client privilege and the work product doctrine with respect to all documents concerning the usual and customary charge. The Commonwealth has (i) selectively disclosed witness interview memoranda, internal correspondence and memoranda among government lawyers, and other documents that are plainly protected from discovery, (ii) used the documents to advance its pre-trial presentation to the Court, (iii) declared that it reserves the right to offer these documents in evidence at trial, and (iv) justified its conduct by *ipse dixit* declarations that the documents are not privileged at all. The law does not tolerate selective waiver of the attorney-client privilege or the work product doctrine. If, as here, a party deliberately produces privileged or work-product protected materials – and there can be no doubt that the Commonwealth's production is not inadvertent – then the party waives the applicable privilege and/or work-product protection as to all such materials. The waiver, moreover, extends to the entire subject matter at issue in the documents.

The documents that the Commonwealth has produced in the last several weeks, after being ordered to do so (the "Late-Produced Documents"), reveal that MassHealth intended its most favored nation U&C provision to provide the lowest reimbursement rate for generic drugs, knew that MassHealth was not receiving the lowest reimbursement rate from pharmacies, and yet did not insist on compliance with the regulation.  The documents (and deposition testimony) also reveal that the Office of the Attorney General was aware of these facts by 1995, but did not take any formal action. There is, moreover, every reason to think that the documents that the Commonwealth is continuing to withhold will even more fully illuminate the reasons why MassHealth and the Attorney General's Office chose not to act.

It is incumbent upon the Court to decide whether, by production of certain attorney-client privileged and work-product protected materials, the Commonwealth has waived such privileges and protections, and to determine the scope of the waiver.  This is an issue of law as to which the Court has no discretion.  *See United States* v. *Massachusetts Inst. of Tech.*, 129 F.3d 681, 683 (1st Cir. 1997) ("[T]he principal issue before us – forfeiture by disclosure – . . . pos[es] an abstract issue of law and review is plenary.").  Because these documents likely will have a profound impact on the trial of this case, Warrick requests that the Court decide this motion promptly or, alternatively, refer it to a Magistrate Judge for immediate decision, so that, if the Commonwealth is compelled to produce the materials that it is claiming remain privileged (as it should be), Warrick will receive those materials sufficiently in advance of trial to incorporate them into its trial presentation

## BACKGROUND

Beginning on March 16, 2010, long after the close of fact discovery and on the eve of trial, the Commonwealth began producing from files in the Attorney General's Office a number

of documents relating to the Commonwealth's interpretation and enforcement of its usual and

customary ("U&C") regulation.  Since then, the Commonwealth has produced more than twenty

thousand (20,000) pages of documents in thirteen separate productions along with five separate

privilege logs, listing 757 documents that are being withheld on the basis of a claimed attorney-

client privilege or work-product protection.

The Commonwealth invokes these claims of privilege and work-product protection,

notwithstanding that it has produced the following documents concerning an investigation

commenced in 1998 of CVS's compliance with the U&C regulation:

- MA060408-09 - August 28, 1998, Memorandum to the Investigative File 13-365 by Alvin Brown, Coordinator of Pharmacy Investigations for the Medicaid Fraud Control Unit of the Massachusetts Attorney General's Office ("MFCU") (the "8/28/98 U&C Investigative Memo") (attached hereto as Ex. A).  The memorandum, which bears the subject line "Usual and Customary," was prepared at the request and under the supervision of counsel in the Office of the Attorney General, and summarizes a meeting between the Department of Medical Assistance ("DMA"), including its Deputy General Counsel Barbara Wexler, MFCU, and representatives from CVS at a time when the Commonwealth was threatening to bring suit against CVS.

- MA060296-97, MA060176-77, and MA060265-66, – A draft and two final versions of a November 18, 1998 letter from Barbara Wexler, DMA's Deputy General Counsel to Nicholas Messuri, Chief of the MFCU (the "11/18/98 Wexler Letter") (attached as Ex. B).  The draft letter references a conversation between Assistant Attorney General ("AAG") James Caruso, another attorney in the MFCU, and Ms. Wexler, and states that Ms. Wexler "understand[s] that MFCU is prepared to file suit against CVS to recover overpayments its pharmacies received as a result of CVS's failure to comply with our 'usual and customary' regulations for drug charges."  The draft states, "Please be assured that the Division supports your office's efforts to ensure that CVS complies with our regulations and that it returns all overpayments it has received."  In the draft letter, Ms. Wexler continues by reporting to the AG's Office the recollections of Arnold Shapiro, DMA's Pharmacy Director, regarding his interactions with CVS about the U&C regulation and disputing the position taken by CVS regarding those interactions.  The draft letter also contains a footnote that has been redacted on work-product grounds.  Attached to the draft letter are two e-mails with the subject "RE:  draft letter – CVS."  However, all of the substance has been redacted from these e-mails on the basis of a claimed attorney-client privilege.  The final version of the letter contains an additional paragraph in which Ms. Wexler provides the AG's Office with a legal analysis and opinion regarding CVS's position and its defenses, concluding that CVS's position "has no basis in law or in fact."  The final version of the letter also notes the complexities in

pharmacy pricing and expresses an interest in "working with [the AG's] Office in calculating the amount of overpayments."

- MA060191-94 and MA081951-54 – A draft and final March 23, 2000 Interview Report to Investigative File 13-365 (the "3/23/00 Shapiro Interview Report") (attached as Ex. C). The draft and final report, prepared by Eileen Casey, Senior Auditor in the DMA, summarizes an interview with Arnold Shapiro, former Director of DMA's Pharmacy Program, conducted by AAG Robert Patten, Joan Senatore, Manager of Fraud and Abuse at DMA, and Casey.  The interview report summarizes Mr. Shapiro's responses to questions about his role in implementing the U&C regulation and his interactions with CVS and Pharmacare regarding compliance with that U&C regulation.  The draft (produced yesterday and long-after this privilege controversy erupted) shows handwritten notes, apparently from Ms. Casey to AAG Patten, asking him, *inter alia*, how he wanted the interview memorialized and whether she was "saying this right?".

These documents are by no means the only privileged documents that the Commonwealth has

produced.  However, they are representative, and their disclosure alone is sufficient to establish

that the Commonwealth has waived any applicable attorney-client privilege or work-product

protection.

On April 9, 2010, counsel for Warrick wrote to counsel for the Commonwealth noting

that the Commonwealth's voluntary production of the above-referenced documents, among

others, constituted a subject-matter broad waiver of the attorney-client privilege and the work-

product protection.  (*See* 4/9/2010 Letter from John P. Bueker to Peter A. Mullin (attached as Ex.

D).)  The letter went on to request that the Commonwealth inform Warrick immediately

"whether it intends to rely on any of the above-referenced documents at trial."  On April 12,

2010, counsel for the Commonwealth responded, maintaining that no waiver had occurred

because the above-referenced documents were not covered by the attorney-client privilege.  (*See*

4/12/2010 Letter from Peter A. Mullin to John P. Bueker (the "4/12/10 Mullin Letter") (attached

as Ex. E).)  Although Warrick's letter addressed the waiver of both the attorney-client privilege

and the work product doctrine, the Commonwealth's response did not address the work-product

issue, except to note that work product protection had been claimed for a redacted portion of the

Wexler Letter.  (*Id.*)  The letter also advised Warrick that the Commonwealth "reserve[s] the right" to "rely on any of these documents at trial" and that Warrick should "assume [the Commonwealth] might want to offer one or more of these documents at trial."  (*Id.*)

## ARGUMENT

**I.**      **The Commonwealth Has Knowingly Produced Materials Protected by the Attorney-Client Privilege and/or the Work Product Doctrine.**

**A.**      **The Applicable Legal Standards**

In normal circumstances, it would be the role of the Commonwealth to assert and defend its privileges.  *In re Keeper of the Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2003) (hereinafter, "*XYZ Corp.*") ("[T]he party who invokes the privilege bears the burden of establishing that it applies to the communications at issue and it has not been waived.").  Here, because the Commonwealth seeks to avoid the consequences of its selective production of privileged materials by denying that any privilege ever attached, it falls to Warrick to establish the privileged nature of the documents – an easy task because the law governing the issues is long-settled and the documents themselves do not present "close calls."  We note for the Court, however, that, under the principle of judicial estoppel, the Commonwealth's position to the contrary, if accepted, would have similar consequences for the Attorney General's Office far beyond this case.  *See, e.g., Griffiths* v. *Certain Underwriters at Lloyds, London*, No. 08-cv-507-JL, 2010 WL 1463405, *8 n.12 (D.N.H. April 13, 2010) (Under the doctrine of judicial estoppel, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, it may not thereafter, simply because its interests have changed, assume a contrary position . . . .  The purpose of this doctrine is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.") (internal citations omitted).  Put differently, if the Attorney General's Office were to

prevail in its argument that interview memoranda, investigative materials, and correspondence between it and an agency's counsel are not protected by the attorney-client privilege and/or the work product doctrine, it would be estopped from asserting differently in any ongoing or subsequent proceeding.

### 1.    The attorney-client privilege

The attorney-client privilege protects communications between a lawyer and a client "that are confidential and are made for the purpose of seeking or receiving legal advice." *XYZ Corp.*, 348 F. 3d at 22; *see also Massachusetts Inst. of Tech.*, 129 F.3d at 684 (citing 9 J Wigmore, *Evidence* § 2292, at 554 (McNaughton rev. 1961) for the elements of the attorney client privilege). "[T]he privilege protects 'not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.'" *Texaco Puerto Rico, Inc.* v. *Department of Consumer Affairs*, 60 F.3d 867, 883 (1st Cir. 1995) (citing *Upjohn Co.* v. *United States*, 449 U.S. 383, 390 (1981)). Thus, "factual investigations performed by attorneys *as attorneys* fall comfortably within the attorney client privilege." *Sandra T.E.* v. *South Berwyn School Dist. 100*, __ F.3d __, 2010 WL 1191170, at *5 (7th Cir. March 30, 2010).

In *Upjohn*, the Supreme Court, addressing privilege in the context of a corporation, found that communications made by corporate employees to counsel for the corporation to enable counsel to advise the corporation "must be protected against compelled disclosure." *Upjohn*, 449 U.S. at 394-95 (protecting from disclosures factual questionnaires filled out by current and former corporate employees and attorneys notes and memoranda summarizing interviews of such employees). Such communications must be protected because "[t]he first step in resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye

to the legally relevant." *Id*. at 390-91.  While the *Upjohn* majority opinion was limited to current employees, the concurring opinion included former employees within the privilege when they are interviewed regarding facts within the scope of their employment.  *See id*. at 402-03 (Burger, C.J., concurring) ("[A]s a general rule, a communication is privileged at least when, as here, an employee *or former* employee speaks at the direction of the management with an attorney regarding conduct or proposed conduct within the scope of employment.") (emphasis added). Thus, where – as here – the lawyer needs to communicate with a former employee about matters within the scope of his employment to provide legal advice, the attorney-client privilege attaches to that communication as well.[1]  In addition, the privilege analysis in the context of a governmental entity mirrors that for a corporation under *Upjohn*.  *See*, *e.g.*, *Sandra T.E.*, 2010 WL 1191170, at *7 ("The fact that the privilege is invoked to protect communications made by employees of a governmental entity rather than a private party does not change the analysis.")

### 2.    The work product doctrine

The work product doctrine, first established in *Hickman* v. *Taylor*, 329 U.S. 495 (1947), "protects work done by an attorney in anticipation of, or during, litigation from disclosure to the opposing party."  *State of Maine* v. *U.S. Dept. of the Interior*, 298 F.3d 60, 66 (1st Cir. 2002).  In *Hickman*, the Supreme Court rejected an attempt "to secure written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties" and noted that "[n]ot even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney."  *Hickman*,

---

[1]  *See also In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 658 F.2d 1355, 1361 n.7 (9th Cir.1981), *cert. denied*, 455 U.S. 990 (1982) ("Although *Upjohn* was specifically limited to current employees . . . the same rationale applies to the ex-employees (and current employees) involved in this case.  Former employees, as well as current employees, may possess the relevant information needed by corporate counsel to advise the client with respect to actual or potential difficulties."); *Amarin Plastics, Inc.* v. *Maryland Cup Corp.*, 116 F.R.D. 36, 41-42 (D. Mass. 1987) (Saris, M.J.) ("In some circumstances, the communications between a former employee and a corporate party's counsel may be privileged.").

329 U.S. at 510.  Accordingly, the Court refused to compel the production to opposing counsel

of an attorney's notes and memoranda summarizing interviews with fact witnesses conducted in

anticipation of litigation.  *Id.* at 512-13 ("[A]s to oral statements made by witnesses to [defense

counsel], whether presently in the form of his mental impressions or memoranda, we do not

believe that any necessity can be made . . . so as to justify production.")

The holding of *Hickman* and its progeny has since been codified in Federal Rule of Civil

Procedure 26(b)(3):

> (A) Ordinarily, a party may not discover documents and tangible
> things that are prepared in anticipation of litigation or for trial by
> or for another party or its representative (including the other
> party's attorney, consultant, surety, indemnitor, insurer, or agent)
> . . .
>
> (B) If the court orders discovery of those materials, it must protect
> against disclosure of the mental impressions, conclusions,
> opinions, or legal theories of a party's attorney or other
> representative concerning the litigation.

Fed. R. Civ. P. 26(b)(3).  The First Circuit has ruled that that "[d]ocuments should be deemed

prepared for litigation and within the scope of the Rule if, 'in light of the nature of the document

and the factual situation in the particular case, the document can be fairly said to have been

prepared or obtained *because of* the prospect of litigation.'"  *State of Maine*, 298 F.3d at 68

(quoting and adopting the reasoning of *United States* v. *Aldman*, 134 F.3d 1194, 1202 (2d Cir.

1998)).[2]

Since *Hickman*, courts have routinely afforded special protection to notes and

memoranda of witness interviews prepared by or for an attorney in anticipation of litigation.  In

---

[2] *See also In re Lernout & Hauspie Sec. Litig.*, 222 F.R.D. 29, 35 (D. Mass. 2004) (Collings, M.J.) ("[T]he most
sensible test . . . as to whether something is done or prepared 'in anticipation of litigation' is the one found in Wright
and Miller, [which states that] 'the test should be whether, in light of the nature of the document and the factual
situation in the particular case, the document can be fairly said to have been prepared or obtained because of the
prospect of litigation.'") (internal citation omitted).

*Upjohn*, the Court noted, "[f]orcing an attorney to disclose notes and memoranda of witnesses'

oral statements is particularly disfavored because it tends to reveal the attorney's mental

processes."  *Upjohn*, 449 U.S. at 399-400 (citing *Hickman*, 329 U.S. at 513, 516-17).  The

*Upjohn* Court concluded:

> The notes and memoranda sought by the Government here,
> however, are work product based on oral statements.  If they reveal
> communications, they are, in this case, protected by the attorney-
> client privilege.  To the extent they do not reveal communications,
> they reveal the attorney's mental processes in evaluating the
> communications.  As Rule 26 and *Hickman* make clear, such work
> product cannot be disclosed simply on a showing of substantial
> need and inability to obtain the equivalent without undue hardship.

*Id.* at 401.  Based on these principles, each of the documents described below is protected by the

attorney-client privilege, the work product doctrine, or both.

### B.       The Attorney-Client Privileged and/or Work-Product Protected Documents

### 1.       Alvin Brown's Investigative Memo

First, the 8/28/98 U&C Investigative Memo falls comfortably within the work product

doctrine.  The memorandum was prepared by Alvin Brown, an investigator in the MFCU, at the

request and direction of counsel, and summarizes a meeting between MFCU, DMA, including its

Deputy General Counsel Barbara Wexler, and officials and counsel for CVS as a part of an

ongoing investigation into CVS's reporting of U&C at a time when litigation was clearly

threatened.[3]  While the meeting with opposing counsel was not itself confidential and, therefore

not protected by the attorney-client privilege, the memorandum to the investigative file

summarizing that meeting is protected by the work product doctrine.  *See Upjohn*, 449 U.S. at

399-400; *Hickman*, 329 U.S. at 513.  This memorandum was prepared specifically because of an

---

[3] The 11/18/98 Wexler Letter removes any doubt that this memorandum was prepared in anticipation of litigation, as it notes at the outset Ms. Wexler's understanding that the AG's Office is about to bring suit against CVS.

ongoing investigation and was, thus, prepared in anticipation of litigation. *See State of Maine*, 298 F.3d at 68 (adopting the "because of" test for the First Circuit); *see also Kent Corp.* v. *NLRB* 530 F.2d 612, 615 (5th Cir 1976) (finding investigatory reports were prepared in anticipation of litigation). AAG James Caruso and AAG Nicholas Messuri, head of the MFCU, asked Mr. Brown to attend the meeting and memorialize the substance of the discussion, and his notes were made part of the investigatory file. (*See* 4/13/10 Brown Dep. Tr. at 241:5-242:10 & Ex. 17 (attached hereto as Ex. F).) That Mr. Brown is not a lawyer does not mean that Mr. Brown's memorandum is not covered by the work product protection. *See United States* v. *Nobles*, 422 U.S. 225, 238-39 (1975) (The work product "doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself."). As Mr. Brown himself testified:

> Q.     . . . did you typically conduct an investigation at the direction of an Assistant Attorney General?
>
> A.     What?
>
> Q.     The direction of an Assistant Attorney General?
>
> A.     Every case I was working with, an Assistant Attorney General, yes.
>
> Q.     And was the Assistant Attorney General responsible for directing your work on the investigation?
>
> A.     Absolutely.

(4/13/10 Brown Dep. Tr. at 70:5-16.) Thus, were it not voluntarily produced by the Commonwealth in this action, the 8/28/98 U&C Investigative Memo would be protected by the work product doctrine.

The Commonwealth's argument that this memorandum is not privileged because "[n]othing which was said at this meeting was covered by the attorney-client privilege" simply misses the point.  (*See* 4/12/10 Mullin Letter at 2.)  The memorandum is clearly of the type protected by *Hickman*.  But, if there were any doubt, the Commonwealth has withheld from production AAG Robert Patten's notes of a different conversation that he had with CVS's counsel on the same subject.  (*See* Ex. G attached hereto.)  Again, it makes no legal difference that one set of notes was created by Alvin Brown, working at the direction of an attorney, and the other set of notes was made by Attorney Patten himself.  *See Nobles*, 422 U.S. at 238-39.

Likewise, the Commonwealth's reliance on *XYZ Corp.* for its assertion is misplaced.  In *XYZ Corp.*, the court did not address the issue of work product protection.  Instead, the Court addressed the question of whether an implied waiver of the attorney-client privilege could arise from the disclosure of a tape recording of a non-privileged meeting.  348 F.3d at 23-24. Moreover, in reaching its conclusion that no implied waiver had occurred as a result of an attorney's participation in an "extra-judicial meeting or negotiation," the court clearly distinguished such circumstances from those present here:

> There is a qualitative difference between offering testimony at trial or asserting an advice of counsel defense in litigation, on the one hand, and [an attorney's] engaging in negotiations with business associates on the other hand.  In the former setting, the likelihood of prejudice looms:  once a litigant chooses to put privileged communications at issue, only the revelation of all related exchanges will allow the truth-seeking process to function unimpeded.

*Id.* at 24.

### 2.   Barbara Wexler's November 1998 Letter

The 11/18/98 Wexler Letter is covered by both the attorney-client privilege and the work product doctrine.  With regard to the attorney-client privilege, the letter recounts conversations between Mr. Shapiro, Director of DMA's Pharmacy Program, and Ms. Wexler, DMA's Deputy

General Counsel.  Moreover, the context of the letter makes clear that Ms. Wexler had those conversations with Mr. Shapiro to obtain information necessary to assess CVS's anticipated defenses to a claim that the Commonwealth was considering bringing against CVS.  The substance of those communications and the legal conclusions reached based on them are then passed on to another lawyer representing the Commonwealth, AAG Nicholas Messuri, Chief of the MFCU.  The portion of the letter detailing Mr. Shapiro's discussions with Ms. Wexler is therefore privileged, as a communication between an employee of the Commonwealth and its attorney for the purpose of enabling the attorney to assess legal action against CVS.  *See Upjohn*, 449 U.S. at 394-95; *see also Sandra T.E.*, 2010 WL 1191170, at *6 ("[W]hen an attorney conducts a factual investigation in connection with the provision of legal services, any notes or memoranda documenting client interviews or other client communications in the course of the investigation are fully protected by the attorney-client privilege.")  The letter is also privileged with respect to Ms. Wexler's legal analysis of CVS's anticipated defense and her recommendation that a claim should be pursued.  *Id.* at *5.

The 11/18/98 Wexler Letter is also covered by the work product doctrine.  As noted above, the first paragraph of the letter makes clear that the letter was written by an attorney for the Commonwealth because of her "understand[ing] that MFCU is prepared to file suit against CVS."  *See State of Maine*, 298 F.3d at 68.  Moreover, the letter is replete with the types of mental impressions and legal conclusions that the *Hickman* Court was concerned with protecting from disclosure.  (*See* 11/18/98 Wexler Letter at 2 ("As to any assertion that CVS has made that it is impossible to comply with our regulations, such assertion has no basis in law or in fact . . . ."))  Thus, were it not voluntarily produced by the Commonwealth in this action, the 11/18/98

Wexler letter would be protected by both the attorney-client privilege and the work product doctrine.

The Commonwealth's April 12 letter completely ignores the attorney-client privilege. With respect to the work product doctrine, the letter notes that the Commonwealth redacted a footnote in the draft on the basis of the work product doctrine.  However, the assertion of the work product doctrine with respect to a portion of the draft is, in fact, a tacit admission that the entire document could properly be claimed as work product.  Likewise, while the Commonwealth does not address this issue in its letter, the draft version of the Wexler letter redacts the substance of two attached e-mails on the basis of the attorney-client privilege, again implicitly recognizing the applicability of the privilege to this particular communication.

### 3.        The 3/23/00 Shapiro Interview Report

Lastly, the 3/23/00 Shapiro Interview Report is also covered by both the attorney-client privilege and the work product doctrine.  That memorandum summarizes an interview of Arnold Shapiro, former DMA Director of Pharmacy, by AAG Robert Patten for the purpose of seeking facts about what Mr. Shapiro did, while Director of Pharmacy, with respect to implementing the U&C regulation and what interactions he had with CVS, Harvard Pilgrim, and Pharmacare, the subject of the investigation, on those topics.  It is clear from the memorandum that the purpose of the meeting was to gather facts as part of a broader investigation by the AG's Office necessary to determine whether or not to bring claims against CVS, Harvard Pilgrim, and Pharmacare.  Again, where, as here, "an attorney conducts a factual investigation in connection with the provision of legal services, any notes or memoranda documenting client interviews or other client communications in the course of the investigation are fully protected by the attorney-client privilege."  *Sandra T.E.*, 2010 WL 1191170, at *6 (citing *Upjohn*).  That Mr. Shapiro was, at that

point, a former employee of the Commonwealth, does not defeat the application of the attorney-client privilege where counsel needed information from Mr. Shapiro about matters within the scope of his duties while at DMA in order to provide legal services to the Commonwealth.  *See*, *e.g.*, *Command Transp., Inc.* v. *Y.S. Line (USA) Corp.*, 116 F.R.D. 94, 96-97 (D. Mass. 1987).

The 3/23/00 Shapiro Interview Report is also core work product as it memorializes a witness interview conducted by counsel for the Commonwealth relating to an ongoing investigation by the AG's Office.  Like the interview memoranda addressed by the Supreme Court in *Upjohn*, the 3/23/00 Shapiro Interview Report is "work product based on oral statements."  449 U.S. at 401.  Thus, here, as in *Upjohn,* to the extent it "reveal[s] communications, [it is] protected by the attorney-client privilege." *Id*.  "To the extent [it] do[es] not reveal communications, [it] reveal[s] the attorneys' mental processes in evaluating the communications" and thus falls within the work product doctrine.  *Id.*  Once again, it does not make any legal difference whether AAG Patten or Eileen Casey, the Senior DMA Investigator assigned to memorialize the interview, prepared the memorandum.[4]  *See Nobles*, 422 U.S. at 239.

The Commonwealth's April 12 letter argues that "Mr. Shapiro was not seeking any legal advice from AAG Patten and AAG Patten was not providing any legal advice to anyone in connection with this communications."  The Commonwealth's first assertion misses the point. Warrick does not contend that Mr. Shapiro was seeking legal advice from Mr. Patten.  The Commonwealth's second contention is flatly wrong.  The documents make plain that Mr. Patten interviewed Mr. Shapiro to gather facts in connection with an on-going investigation of CVS.  In fact, although the substance of the communication has been redacted, the Commonwealth has

---

[4] The notes on the draft of the memorandum make clear that Ms. Casey was acting at Attorney Patten's direction. (*See* Ex. C hereto.)

produced Mr. Patten's notes of a conversation with CVS's counsel that he had the very same day

he interviewed Arnold Shapiro. (*See* Ex. G.) As *Upjohn* and *Hickman* make clear, under

circumstances where, as here, the Commonwealth was actively contemplating both bringing and

defending claims, that alone is sufficient for the attorney-client privilege and work product

protection to attach.

      **C.**    **The Commonwealth's Production Was Knowing.**

     Notably, in its April 12 letter, the Commonwealth makes no argument that it

"inadvertently" produced any of the documents identified above, although it did make such

assertions with regard to other documents that had been called to its attention. That alone should

be sufficient to put to rest any argument that the Commonwealth might now try to make that it

did not knowingly and intentionally produce attorney-client privileged and/or work-product

protected documents. As if this were not enough, the knowing and intentional nature of the

production here is underscored by the Commonwealth's reliance on certain of these very

documents at the time that they were first produced. In its March 16, 2010 cover letter, which

accompanied the initial late production of documents, the Commonwealth expressly identified

and relied upon portions of both the Wexler Letter and the Arnold Shapiro Interview Report.

(*See* Ex. H attached hereto.) The Commonwealth again relied on these privileged materials in

responding to Warrick's Motion for an Emergency Status Conference, describing for the Court

portions of the 8/28/98 U&C Investigative Memo and the 3/23/00 Shapiro Interview Report that

the Commonwealth says support its view of the facts in this case:

> A report of an August 28, 1998 meeting between MassHealth and
> this pharmacy chain indicates that Mr. Shapiro told the chain it
> should make its best efforts to determine its lowest price. In a
> March 23, 2000 interview, Mr. Shapiro said he told the pharmacy
> chain it was "playing games" with regard to the U&C regulation,
> he did not believe the chain did not know what it was being paid,

and that it would not receive any dispensation from the U&C
regulation.

(Commonwealth's Resp. to Warrick's Mot. for Emergency Status Conf. at 4 (Dkt. 724).)  Then,

when the parties appeared before this Court on March 24, 2010, counsel for the Commonwealth

again relied on the Shapiro Interview Report in advancing the Commonwealth's argument.  (*See*

3/24/10 Hr.'g Tr. at 13:17-21.)  Finally, and most notably, even after being put on notice by

Warrick of the privileged nature of the documents and the resulting waiver, the Commonwealth

told Warrick to assume that the Commonwealth "might want to offer one or more of these

documents at trial."  (*See* 4/12/10 Mullin Letter at 3.)  Nothing could be more knowing than that.

## II.     By Producing and Relying on Privileged Materials Relating to U&C, the Commonwealth Has Waived the Right to Withhold Other Documents Regarding U&C on the Basis of the Attorney-Client Privilege or the Work Product Doctrine.

The voluntary production of these documents covered by the attorney-client privilege and

the work product doctrine, waives both privileges.  *Massachusetts Inst. of Tech.*, 129 F.3d at 685

("[T]he general principle that disclosure normally negates the [attorney-client] privilege is worth

maintaining."); *id.* at 687 (adhering to the "prevailing rule that disclosure to an adversary, real or

potential, forfeits work product"); *In re Lernout & Hauspie Sec. Litig.*, 222 F.R.D. at 34-35

(knowing production of material protected by the attorney-client privilege and work product

doctrine to an adversary constitutes a waiver of both the privilege and work product protection).

Moreover, the Commonwealth is not permitted to voluntarily produce some materials

covered by the attorney-client privilege and work product doctrine and continue to withhold

other documents on the same subject.  In other words, the waiver effectuated by the

Commonwealth's voluntary production of these materials extends to all documents related to the

same subject matter – the interpretation and enforcement of the Commonwealth's U&C

regulations.  *See XYZ Corp.*, 348 F.3d at 24 (Subject matter waiver "ensures fairness because it

disables litigants from using the attorney-client privilege as both a sword and shield.  Were the

law otherwise, the client could selectively disclose fragments helpful to its cause, entomb other

(unhelpful) fragments, and in that way kidnap the truth-seeking process.").  In *Texaco Puerto*

*Rico, Inc*., the First Circuit held, prior to congressional adoption of Federal Rule of Evidence

502, that even "a waiver premised on ***inadvertent disclosure*** will be deemed to encompass all

other such communications on the same subject." *Texaco Puerto Rico, Inc.,* 60 F.3d at 883-84

(emphasis added).  Not surprisingly, then, courts in this District have consistently held that

production of privileged materials that is not inadvertent, *i.e.*, voluntary or negligent disclosures,

likewise leads to a waiver of privilege that is subject matter broad.  *See In re Lernout & Hauspie*

*Sec. Litig.*, 222 F.R.D. at 34-35 ("[I]f [subject matter broad waiver] is the law with respect to

inadvertent disclosures, it is surely the rule for knowing disclosures.").  This Court has

previously held, in *VLT, Inc.* v. *Lucent Tech., Inc.*, No. Civ.A 00-11049-PBS, 2003 WL 15399,

at *4 (D. Mass. Jan. 21, 2003) (Saris, J.), that, since waiver premised on inadvertent disclosure

will be deemed to encompass all other materials on the same subject, the same "result should

apply to disclosures deemed grossly negligent or reckless."  The Court should now apply this

same reasoning to the Commonwealth's knowing production of these materials in this case.

> The recently adopted Federal Rule of Evidence 502 confirms that subject matter waiver is

appropriate here.  Rule 502 (a) provides:

> When [a] disclosure is made in a Federal proceeding . . . and
> waives the attorney-client privilege or work product protection, the
> waiver extends to an undisclosed communication or information. . .
> only if:
>
> (1) the waiver is intentional;
>
> (2) the disclosed and undisclosed communications or
> information concern the same subject matter; and
>
> (3) they ought in fairness to be considered together.

Fed. R. Evid. 502(a).  Consistent with Rule 502, Warrick seeks, as a result of the

Commonwealth's intentional waiver, the production of materials concerning the same subject

matter that, as described below, "ought in fairness be considered together" with the privileged

materials the Commonwealth has produced and relied on.

The Commonwealth cannot be permitted to "kidnap the truth-seeking process" by

withholding from production certain materials relating to U&C on the basis of the attorney-client

privilege and work product protection while relying on other materials that, if they had not been

produced, would likewise be privileged and/or work product protected.  *XYZ Corp.*, 348 F.3d at

24.  First Circuit precedent and basic tenets of fairness require production of all remaining

privileged materials relating to the U&C regulation.  A review of the privilege logs produced to

date – all of which were provided in the context of the U&C production – indicates that this

waiver reaches all of the documents that have been withheld on the basis of attorney-client

privilege or the work product doctrine.[5]

**III.    The Possible Significance of the Materials that the Commonwealth Is Continuing to Withhold from Production.**

As a partial remedy for the Commonwealth's late production of documents, Warrick

intends to move this Court for a ruling that certain facts evidenced by the Late-Produced

Documents have been conclusively established.  The significance of the facts established by the

Late Produced Documents cannot be understated – they are flatly inconsistent with the

Commonwealth's theory of liability, its damages calculations, and many affirmative

representations to the Court.  In particular, Warrick will ask the Court to find that the following

facts have been established:  (i) pharmacists have systematically failed to comply with the U&C

---

[5] Although the Commonwealth's privilege logs are not sufficient to sustain a claim of privilege – *e.g.*, no authors or recipients identified – the Court need not address that issue at this time because the Commonwealth has affirmatively waived any privilege or work-product protection that might otherwise attach.

regulation for generic drugs from 1995 to the present; (ii) the non-compliance with the U&C

regulation typically has involved the failure to fully account for MAC pricing in determining the

applicable U&C rate; (iii) the Commonwealth has been aware of the non-compliance by

pharmacists with the U&C regulation at all relevant times; (iv) the economic difference between

the reported U&C rates and the lowest rates required by the U&C regulation has been

substantial; and yet (v) the Commonwealth has not followed-through on efforts to recover

significant overpayments from providers for non-compliance with the regulation.  In Warrick's

view, the Late-Produced Documents, together with the limited discovery that Warrick has been

permitted to take, are sufficient to prove these facts.

　　　　As discussed above, the case law unambiguously holds that fairness requires that the

Commonwealth produce all material related to U&C that it has withheld on the basis of a

claimed privilege or work-product protection.  Warrick need not show more.  However, to

underscore the importance of the issue and the prejudice to Warrick if the Commonwealth is

permitted to engage in selective disclosure, Warrick received a heavily redacted memorandum as

it *was in the process of finalizing this brief*, dated July 8, 2008,[6] from the files of Christopher

Walsh, the current Chief of the MFCU.  (*See* Exhibit I attached hereto.)  The subject matter of

the memorandum is "Request to Issue MFCA CID:  CVS Usual and Customary Investigation."

Virtually all of the substance of this memorandum has been redacted, but the topics identified in

the memorandum alone make Warrick's point.  They include:  "Section II.  Elements of Usual

and Customary Price Violations"; "A.  The Drug Pricing System Results in Multiple Prices for

Identical Drugs on a Given Day and in a Given Pharmacy"; "C.  Massachusetts Usual and

---

[6] Obviously this document was being prepared at the very same time that the Office of the Attorney General was
arguing to this Court at summary judgment that there was no reason to believe that pharmacists were not complying
with the U&C regulation.  *See generally* 5/6/08, 5/13/08 & 6/17/08 Summary Judgment Hr.'g Trs.

Customary Price in Operation"; and "D.  Why Medicaid Has Been Unable to Enforce This

Regulation."

The unfairness to Warrick and to the truth seeking process is palpable and cannot be

permitted.  As the First Circuit observed in *XYZ Corp.*:

> Many years ago, Justice Holmes warned that those who deal with the government
> must turn square corners.  That advice cuts both ways:  those who deal with the
> government have a right to expect fair treatment in return.  The principle that the
> government must turn square corners in dealing with its constituents is dispositive
> here.

*XYZ Corp*, 348 F.3d at 26 (internal citations omitted).

## CONCLUSION

For all of the foregoing reasons, Warrick respectfully requests that this Court grant its

Motion to Compel Production of All Documents Relating to U&C Withheld on the Basis of the

Attorney-Client Privilege or Work Product Doctrine.

Respectfully submitted,

/s/ John P. Bueker
John T. Montgomery (BBO#352220)
John P. Bueker (BBO # 636435)
Eric P. Christofferson (BBO# 654087)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

*Attorneys for Warrick*

Dated: April 23, 2010

## CERTIFICATE OF SERVICE

I, John P. Bueker, hereby certify that a true and correct copy of the foregoing document
was served upon all counsel of record via ECF electronic filing on April 23, 2010.

/s/ John P. Bueker
John P. Bueker