**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS ) ) ) ) Plaintiff, ) ) v. ) ) MYLAN LABORATORIES, INC., *et al.* ) ) Defendants. ) ) | Civil Action No. 03-CV-11865-PBS |

**WARRICK'S POST-TRIAL BRIEF AND MEMORANDUM OF LAW IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR IN THE <u>ALTERNATIVE FOR A NEW TRIAL</u>**

# TABLE OF CONTENTS

## ARGUMENT

I.    FOCUSING ON WARRICK'S CONDUCT, THE COURT SHOULD FIND THAT,  AT
      MOST, WARRICK COMMITTED 28 VIOLATIONS OF THE MFCA...........................1

      A.    The Supreme Court Has Made Clear that Any Penalty Imposed Under the FCA
            Must Be Based on the Defendant's Own Affirmative Acts..................................... 2

      B.    The Court Must Observe Constitutional Limits in Imposing Civil Penalties......... 9

            1.    The MFCA is Punitive in Nature............................................................. 10

            2.    Because the Imposition of Penalties on a Per-Claim, Rather than a Per-
                  Violation Basis, Would Result in a Penalties Award that Would Violate
                  the Excess Fines and Penalties and Due Process Clauses of the United
                  States and Massachusetts Constitutions, the Court Should Follow
                  *Bornstein* as a Matter of Constitutional Avoidance.................................. 12

            3.    In Applying These Constitutional Limits, the Court Must Consider Only
                  Warrick's Conduct and that Portion of the Compensatory Damages that
                  Post-Date the MFCA's Enactment in July 2000........................................ 14

II.   THE COURT SHOULD FIND AS A MATTER OF LAW THAT WARRICK'S
      CONDUCT DOES NOT CONSTITUTE A BREACH OF THE IMPLIED  COVENANT
      OF GOOD FAITH AND FAIR DEALING.....................................................................16

III.  THE COURT SHOULD ENTER JUDGMENT IN WARRICK'S FAVOR AS TO
      COUNTS I, II, AND III AS A MATTER OF LAW NOTWITHSTANDING THE
      JURY'S VERDICT......................................................................................................17

      A.    The Commonwealth's Claim Under Prong 1 of the MFCA Is Precluded as a
            Matter of Law ................................................................................................... 17

      B.    The Commonwealth Has Failed to Prove that Warrick "Caused to Be Presented" a
            False Claim   .................................................................................................... 18

      C.    Warrick's Statements of Price – Issued at Launch – Were Not False When Made,
            and Warrick Had No Duty to Update Them ........................................................ 20

      D.    Warrick Did Not Have the Necessary Scienter to Be Liable Under the MFCA... 24

            1.    The Commonwealth Has Failed to Prove Warrick Knew of the Alleged
                  Falsity.................................................................................................... 24

Table of Contents (continued)

Page

        2.    For All the Same Reasons and More, the Evidence Is Insufficient to Show that Warrick Acted with the Improper Purpose Required Under Prong 2 of the MFCA .............................................................................................. 28

   E.    Warrick's Direct Prices Were Not Material to MassHealth's Decision to Reimburse Above Actual Acquisition Costs .......................................................... 29

   F.    The Commonwealth Has Failed to Establish that Warrick Violated the MMFCA  ..................................................................................................... 32

   G.    The Commonwealth Has Also Failed to Introduce Evidence Sufficient to Sustain a Jury Verdict as to Its Common Law Fraud Claim ............................................. 33

IV.    THE COMMONWEALTH HAS FAILED TO PROVE DAMAGES ............................. 34

   A.    Warrick Was Not the Proximate Cause of MassHealth's Alleged Damages ....... 34

   B.    Dr. Hartman's Damages Calculation Is Unreliable ............................................... 38

# TABLE OF AUTHORITIES

Page(s)

CASES

*Accusoft Corp.* v. *Palo*,
  237 F.3d 31 (1st Cir. 2001) ................................................................16

*Allison Engine Co., Inc.* v. *United States ex rel. Sanders*,
  553 U.S. 662 (2008) ................................................................ passim

*Archer* v. *Warner*,
  538 U.S. 314 (2003) ................................................................35

*Astro-Med, Inc.* v. *Nihon Kohden Am., Inc.*,
  591 F.3d 1 (1st Cir. 2009) ................................................................38

*Backman* v. *Polaroid Corp.*,
  910 F.2d 10 (1st Cir. 1990) (en banc) ................................................................21

*BMW of N. Am., Inc.* v. *Gore*,
  517 U.S. 559 (1996) ................................................................14

*Cardullo* v. *Landau*,
  105 N.E.2d 843 (Mass. 1952) ................................................................33

*Collins* v. *Huculak*,
  783 N.E.2d 834 (Mass. App. Ct. 2003) ................................................................34

*Commonwealth* v. *Alfonso*,
  449 Mass. 738 (Mass. 2007) ................................................................10

*Commonwealth* v. *Cory*,
  454 Mass. 559 (2009) ................................................................11, 15

*Cook County* v. *United States ex rel. Chandler*,
  538 U.S. 119 (2003) ................................................................11

*Cooper Indus., Inc.* v. *Leatherman Tool Group, Inc.*,
  532 U.S. 424 (2001) ................................................................13

*Cumis Ins. Society, Inc.* v. *BJ's Wholesale Club, Inc.*,
  918 N.E.2d 36 (Mass. 2009) ................................................................32

*Damon* v. *Sun Co.*,
  87 F.3d 1467 (1st Cir. 1996) ................................................................38

*Espada* v. *Lugo*,
    312 F.3d 1 (1st Cir. 2002) ....................................................................................17

*Exxon Shipping Co.* v. *Baker*,
    128 S. Ct. 2605 (2008) .......................................................................................14

*Falby* v. *New England Forestry Foundation*,
    823 N.E.2d 823, 2005 WL 600332 (Mass. App. Ct. 2005) ............................20, 33

*Gill* v. *Office of Pers. Mgmt.*,
    699 F. Supp. 2d 374(D. Mass. 2010) ...................................................................10

*Gross* v. *Summa Four, Inc.*,
    1995 WL 806823 (D.N.H. Nov. 8, 1995) ..............................................................21

*Hagood* v. *Sonoma County Water Agency,*
    81 F.3d 1465 (9th Cir.1996) ................................................................................26

*Hanlester Network* v. *Shalala*,
    51 F.3d 1390 (9th Cir. 1995) ..............................................................................33

*Hays* v. *Hoffman*,
    325 F.3d 982 (8th Cir. 2003) ...............................................................4, 6, 10, 12

*IMS Health Inc.* v. *Mills*,
    616 F.3d. 7 (1st Cir. 2010) ..................................................................................10

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    498 F. Supp. 2d 389 (D. Mass. 2007) ....................................................................8

*In re Phillips Petroleum Sec. Litig.*,
    881 F.2d 1236 (3rd Cir. 1989) ............................................................................22

*Kansas* v. *Hendricks*,
    521 U.S. 346 (1997)............................................................................................15

*Kennedy* v. *Mendoza-Martinez*,
    372 U.S. 144 (1963)............................................................................................11

*Kuwaiti Danish Computer Co.* v. *Digital Equip. Corp.*,
    781 N.E.2d 787 (Mass. 2003) ..................................................................33, 34, 35

*Maher* v. *Retirement Bd. of Quincy*,
    452 Mass. 517 (2008) .........................................................................................13

*Massachusetts* v. *Mylan Labs.*,
    608 F. Supp. 2d 127 (D. Mass. 2008) ....................................................2, 24, 28, 33

*McEvoy Travel Bureau, Inc.* v. *Norton Co.*,
    563 N.E.2d 188 (Mass. 1990) ........................................................................20, 33

*Mikes* v. *Straus*,
    274 F.3d 687 (2d Cir. 2001) ....................................................................................29

*Murray* v. *Ross-Dove, Co.*,
    5 F.3d 573 (1st Cir. 1993) ........................................................................................17

*Nadoff* v. *Duane Reade, Inc.*,
    107 Fed. Appx. 250 (2nd Cir. 2004) ........................................................................22

*Peckham* v. *Continental Cas. Ins. Co.*,
    895 F.2d 830 (1st Cir. 1990) ....................................................................................35

*Proulx* v. *DeWolfe Co., Inc.*,
    819 N.E.2d 633, 2004 WL 2937818 (Mass. App. Ct. Dec. 20, 2004) ....................33

*Ralston Dry-Wall Co.* v. *U.S. Gypsum Co.*,
    926 F.2d 99 (1st Cir. 1991) ................................................................................35, 36

*Reeves* v. *Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000) ..................................................................................................17

*Ross* v. *A.H. Robins Co., Inc.*,
    465 F. Supp. 904 (S.D.N.Y. 1979) ..........................................................................22

*Rubinstein* v. *Collins*,
    20 F.3d 160 (5th Cir. 1994) ......................................................................................22

*Safeco Ins. Co.* v. *Burr*,
    551 U.S. 47 (2007) ..............................................................................................26, 27

*Smith* v. *Doe*,
    538 U.S. 84 (2003) ....................................................................................................11

*Sony BMG Music Ent.* v. *Tenenbaum*,
    __ F. Supp. 2d __, 2010 WL 2705499 (D. Mass. July 9, 2010) ............................14

*St. Paul Fire and Marine Ins. Co.* v. *Ellis & Ellis*,
    262 F.3d 53 (1st Cir. 2001) ......................................................................................33

*State Farm Mutual Auto. Ins. Co.* v. *Campbell*,
    538 U.S. 408 (2003) ..................................................................................................13

*Stransky* v. *Cummins Engine Co., Inc.*,
    51 F.3d 1329 (7th Cir. 1995) ....................................................................................23

*Trustees of Boston Univ.* v. *Beacon Labs., Inc.*,
  270 F. Supp. 2d 88 (D. Mass. 2003) ....................................................35

*U.S. ex rel. Baker* v. *Community Health Systems Inc.*,
  __ F. Supp. 2d __, 2010 WL 1740624 (D.N.M. Mar. 19, 2010) .............................11

*U.S. ex rel. Farmer* v. *City of Houston*,
  523 F.3d 333 (5th Cir. 2008) ....................................................25, 26

*United States ex rel. Berge* v. *Bd. of Trustees of the Univ. of Alabama*,
  104 F.3d 1453 (4th Cir. 1997) ....................................................23, 29, 32

*United States ex rel. DRC, Inc.* v. *Custer Battles, LLC*,
  2009 WL 3756343 (E.D. Va. Oct. 14, 2009)....................................................4

*United States ex rel. Fago* v. *M&T Mortgage Corp.*,
  518 F. Supp. 2d 108 (D.D.C. 2007) ....................................................12

*United States ex rel. Grynberg* v. *Ernst & Young LLP*,
  323 F. Supp. 2d 1152 (D. Wyo. 2004) ....................................................24

*United States ex rel. Harrison* v. *Westinghouse Savannah River Co.*,
  352 F.3d 908 (4th Cir. 2003) ....................................................30

*United States ex rel. Hendow* v. *Univ. of Phoenix*,
  461 F.3d 1166 (9th Cir. 2006) ....................................................20

*United States ex rel. Hixson* v. *Health Mgmt. Sys., Inc.*,
  657 F. Supp. 2d 1039 (S.D. Iowa 2009) ....................................................26

*United States ex rel. Hopper* v. *Anton*,
  91 F.3d 1261 (9th Cir. 1996) ....................................................20

*United States ex rel. Loughren* v. *Unum Group*,
  613 F.3d 300 (1st Cir. 2010)....................................................26

*United States ex rel. Marcus* v. *Hess*,
  317 U.S. 537 (1943)....................................................19

*United States ex rel. McElderry* v. *Praxair Healthcare Serv., Inc.*,
  2006 WL 3421839 (D. Utah Nov. 22, 2006) ....................................................26

*United States ex rel. Milam* v. *Regents of Univ. of California*,
  912 F. Supp. 868 (D. Md. 1995)....................................................23

*United States ex rel. Piacentile* v. *Wolk*,
  1995 WL 20833 (E.D. Pa. Jan.18, 1995)....................................................24

*United States ex rel. Sanders* v. *Allison Engine Co.*,
   667 F. Supp. 2d 747 (S.D. Ohio 2009) ..........................................................11, 15

*United States ex rel. Schwedt* v. *Planning Research Corp.*,
   59 F.3d 196 (D.C. Cir. 1995) ........................................................................35, 36

*United States ex rel. Sikkenga* v. *Regence BlueCross BlueShield of Utah*,
   472 F.3d 702 (10th Cir. 2006) ..............................................................................24

*United States ex rel. Smith* v. *Gilbert Realty Co.*,
   840 F. Supp. 71 (E.D. Mich. 1993)......................................................................13

*United States ex rel. Tyson* v. *Amerigroup Illinois, Inc.*,
   488 F. Supp. 2d 719 (N.D. Ill. 2007) ...................................................................12

*United States* v. *Bajakajian*,
   524 U.S. 321 (1998)...............................................................................................13

*United States* v. *Bickel*,
   2006 WL 1120439 (C.D. Ill. Feb. 22, 2006)...................................................12, 13

*United States* v. *Bornstein*,
   423 U.S. 303 (1976) ....................................................................................... passim

*United States* v. *Cabrera-Diaz*,
   106 F. Supp. 2d 234 (D.P.R. 2000)........................................................................12

*United States* v. *Data Translation, Inc.*,
   984 F.2d 1256 (1st Cir. 1992)..........................................................................29, 36

*United States* v. *Dwinells*,
   508 F.3d 63 (1st Cir. 2007).....................................................................................10

*United States* v. *Ehrlich*,
   643 F.2d 634 (9th Cir. 1981) ..........................................................................6, 7, 8

*United States* v. *Inc. Vill. of Island Park*,
   888 F. Supp. 419 (E.D.N.Y. 1995) ..........................................................................8

*United States* v. *Krizek*,
   111 F.3d 934 (D.C. Cir. 1997)........................................................................4, 6, 10

*United States* v. *Mackby*,
   261 F.3d 821 (9th Cir. 2001) .................................................................................12

*United States* v. *Miller*,
   645 F.2d 473 (5th Cir. 1981) .................................................................................34

*United States* v. *Murphy*,
   937 F.2d 1032 (6th Cir. 1991) .................................................................4, 6

*United States* v. *Parke-Davis*,
   2003 WL 22048255 (D. Mass. Aug. 22, 2003) ..........................................35

*United States* v. *President and Fellows of Harvard College*,
   323 F. Supp. 2d 151 (D. Mass. 2004) ........................................................18

*United States* v. *Shields*,
   522 F. Supp. 2d 317 (D. Mass. 2007) ........................................................10

*Vermont Agency of Nat. Res.* v. *United States ex rel. Stevens*,
   529 U.S. 765 (2000)....................................................................................11

## CONSTITUTIONS AND STATUTES

Mass. Const. Pt. 1, art. 24 ...............................................................................15

Mass. Const. Pt. 1, art. 26 ...............................................................................13

U.S. Const. art. 1, § 10, cl. 1 ...........................................................................15

U.S. Const. amend. VIII..............................................................................12, 13

U.S. Const. amend. XIV .............................................................................13, 14

31 U.S.C. § 3729(a)(1).......................................................................................6

G. L. c. 12, § 5A............................................................................................. 24

G. L. c. 12, § 5B.....................................................................................5, 12, 15

G. L. c. 12, § 5K..............................................................................................15

G.L. c. 118E, § 40.......................................................................................15, 33

G. L. c. 231, § 6B............................................................................................12

G. L. c. 231, § 6H............................................................................................12

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-5 .........22

## OTHER AUTHORITIES

Federal Rules of Civil Procedure 50..................................................................1

Federal Rules of Civil Procedure 59..................................................................1

John T. Boese, Civil False Claims and *Qui Tam* Actions, § 3.06[C] (2010)................................14

Claire M. Sylvia, The False Claims Act: Fraud Against the Government § 10:47 (2010)............15

S. Rep. No. 99-345 (1986) .........................................................................................................6, 25

Warrick submits this memorandum in support of its Renewed Motion for Judgment as a

Matter of Law or, in the Alternative, for a New Trial pursuant to Federal Rules of Civil

Procedure 50(b) and 59.  In Sections I and II, Warrick addresses those purely legal questions that

the Court reserved for decision after verdict, specifically (1) the number of  "violations" of the

Massachusetts False Claim Act (MFCA) that Warrick committed for purposes of imposing

penalties, and (2) whether Warrick's conduct constitutes a breach of the covenant of good faith

and fair dealing implied in the federal Medicaid rebate agreement.  Section III renews the

arguments that Warrick advanced in support of its request for judgment as a matter of law at the

conclusion of the Commonwealth's case and sets forth grounds warranting a new trial.  Many of

the issues are intimately intertwined and, in an effort to avoid duplication, Warrick simply cross-

references those arguments as appropriate.

## ARGUMENT

**I.      FOCUSING ON WARRICK'S CONDUCT, THE COURT SHOULD FIND THAT, AT MOST, WARRICK COMMITTED 28 VIOLATIONS OF THE MFCA**

Warrick contends that the MFCA count should not have been submitted to the jury on a

Prong 1 theory, and that the jury's verdict in that regard, including its finding as to the number of

false claims, should be set aside entirely.  *See infra* Section III.A.  Leaving that overarching

contention aside, if penalties were imposed on the basis of the jury's finding of 989,103 false

claims – claims that were submitted by pharmacists, not Warrick, and that allegedly became

"false" only after the Commonwealth adjudicated them in an irregular manner that was hidden

from Warrick – the calculation would result in penalties of a massive, disproportionate, and

blatantly unconstitutional amount.  At the same time, the jury found that Warrick made a total of

28 false statements – presumably based on the number of times that Warrick failed to correct as a

part of First DataBank's (FDB) allegedly annual update process the erroneous WNUs that FDB

continued to publish for Warrick's products.  Assuming that penalties are imposed at all, they should focus on Warrick's conduct, and thus 28 is the maximum number of violations on which penalties may be based.[1]  This conclusion fits naturally with the underlying facts, follows the overwhelming weight of precedent, including Supreme Court precedent, and would avoid the stark constitutional implications of imposing penalties in an amount so disproportionate to Warrick's conduct.

### A.    The Supreme Court Has Made Clear that Any Penalty Imposed Under the FCA Must Be Based on the Defendant's Own Affirmative Acts

Imposing civil penalties, to the extent penalties are awarded at all, based on the number of provider-submitted Medicaid claims is flatly contradicted by the United States Supreme Court's decision in *United States* v. *Bornstein*, 423 U.S. 303, 312-13 (1976).[2]  In *Bornstein*, the Supreme Court drew a distinction between those cases in which a defendant submits false claims directly to the government, and those, such as the present suit, in which the defendant does not submit any claims at all, but rather is alleged to have "caused" a third-party to submit false claims to the government.  In the former circumstance, the Court noted, "the number of imposable forfeitures has generally been set at the number of individual false payment demands."  *Id.* at 309 n.4.  However, "[t]he difficulty with" calculating the number of violations in that manner in the latter circumstance "is that it fails to distinguish between the acts committed by [the defendant] and the acts committed by [the third-party]."  *Id.* at 312.  "The distinction is a critical one," the Court explained, "because the statute imposes liability only for

---

[1] Elsewhere, Warrick argues that it had no legal duty to correct the WNUs that FDB continued to report for Warrick's products, *see infra* III.C.  If the Court were to accept this argument, the maximum number of violations it could find Warrick committed would be three.

[2] Although *Bornstein* is a case interpreting the federal FCA, "Massachusetts Courts will look for guidance in interpreting the MFCA to cases and treatises interpreting the FCA."  *Massachusetts* v. *Mylan Labs.*, 608 F. Supp. 2d 127, 140 (D. Mass. 2008).

the commission of acts which cause false claims to be presented." *Id.* Because the "Act, in short, penalizes a person for his own acts, not for the acts of someone else," the Court held that the defendant-subcontractor could be liable for only three civil penalties, corresponding to *its own* fraudulent acts of shipping falsely labeled tubes on three occasions, and not for 35 penalties based on the 35 claims submitted by the prime contractor, as the government had urged. *Id.* at 312-13.

The majority opinion in *Bornstein* expressly rejected the position—advanced by the Commonwealth at various points in this case—that civil penalties can be imposed against a defendant merely because it could foresee that third-parties might submit some later-determined quantity of claims to the government for reimbursement. In his dissenting opinion, Justice Rehnquist urged, as the Commonwealth has here, that it was sufficient that the defendant "knew or had reason to believe" that the prime contractor would deliver finished products to the government "at routine and regular intervals" and that it was foreseeable that the prime contractor "would regularly invoice the Government for the customary progress payments." *Id.* at 323 (Rehnquist, J., dissenting in part). The majority decision rejected the dissent's view that the imposition of civil penalties should turn on the "foreseeability" of a third-party's submission of claims. *See id.* at 318 (Rehnquist, J., dissenting in part). To the contrary, the Court held that the statute "penalizes a person for his own acts, not for the acts of someone else." *Id.* at 312. Although the defendant-subcontractor shipped falsely marked tubes "knowing that [the prime contractor] would incorporate the tubes into the radio kits it later shipped to the Government, and that it would ask for payment from the Government on account of those tubes," *id.* at 313, the subcontractor "did not cause [the prime contractor] to submit *any particular number* of false claims. The fact that [the prime contractor] chose to submit 35 false claims instead of some

other number was, so far as [the defendant] was concerned, wholly irrelevant, completely

fortuitous, and beyond [its] knowledge or control." *Id.* at 312 (emphasis added).

*Bornstein* remains good law and has been applied by several courts of appeals and other

courts consistently since 1976. *See, e.g.*, *Hays* v. *Hoffman*, 325 F.3d 982, 993-94 (8th Cir. 2003)

(holding, on the basis of *Bornstein*, that the defendant could be found liable only for eight

violations based on the defendant's own actions, rather than 336); *United States* v. *Krizek*, 111

F.3d 934, 939-40 (D.C. Cir. 1997) (relying on *Bornstein* for the proposition that the court must

focus on "the specific conduct of the defendant," rejecting "the government's definition of claim

[that] permitted it to seek an astronomical $81 million worth of damages," and remanding for a

recalculation of the civil penalty); *United States* v. *Murphy*, 937 F.2d 1032, 1038-39 (6th Cir.

1991) (holding that, even assuming the 1986 FCA amendments applied to pre-1986 conduct, the

amendments did not eliminate *Bornstein*'s focus on the defendant's own conduct); *see also, e.g.*,

*United States ex rel. DRC, Inc.* v. *Custer Battles, LLC*, 2009 WL 3756343 at *1 (E.D. Va. Oct.

14, 2009) (counting the number of "violations" subject to a penalty and noting that, under

*Bornstein*, the focus must be "upon the specific conduct of the person from whom the

Government seeks to collect the statutory forfeitures").

In its opposition to Warrick's previous filing on this issue[3] and at other times, the

Commonwealth has advanced several arguments in an attempt to convince this Court to ignore

*Bornstein*'s holding.  These arguments are simply wrong.

**1.**  The Commonwealth's reliance on the MFCA's "plain language," Pl's Opp. 2, cannot

provide a plausible basis for distinguishing *Bornstein* because the relevant MFCA language—

that "each false claim that a person 'causes to be presented' to the Commonwealth is a

---

[3] *See* Commonwealth's Opp. to Warrick's Revised Mot. in Limine to Exclude Evidence Characterizing Provider-Submitted Medicaid Claims as Violations of the Massachusetts False Claims Act or the Massachusetts Medicaid False Claims Act (Aug. 9, 2010) [Dkt. No. 858] (hereinafter, "Pl's Opp.").

violation"—is identical to the FCA language construed by the Supreme Court.  *Id.*[4]  As the

Supreme Court recognized, this language "penalizes a person for his own acts, not for the acts of

someone else."  *Bornstein*, 423 U.S. at 312.  Indeed, to use the Supreme Court's words, it "would

ignore the plain language of the statute" to measure the number of a defendant's violations by

anything other than the defendant's own violative acts.  *Id.* at 311.  The Commonwealth does not

allege that Warrick presented any claim directly to Massachusetts.  Rather, it claims that Warrick

"caused" false claims to be presented (pursuant to Prong 1 of the MFCA).  Using a hypothetical

quite similar to the facts as alleged here, the Court rejected precisely the reading of the statutory

text now offered by the Commonwealth:

> If United [the defendant subcontractor] had committed one act which caused Model [the prime contractor] to file a false claim, it would clearly be liable for a single forfeiture.  If, as a result of the same act by United, Model had filed three false claims, United would still have committed only one act that caused the filing of false claims, and thus, under the language of the statute, would again be liable for only one forfeiture.

*Id.* at 312.  Here, similarly, if Warrick committed one act that caused pharmacists to file multiple

false claims, Warrick can be held liable for only one violation.

**2.**  Perhaps recognizing that the plain language of the statute (and Supreme Court

precedent) is against it, the Commonwealth has also resorted to legislative history.  The

Commonwealth has contendedhat the 1986 changes to the FCA and the corresponding legislative

history prove that *Bornstein*, decided before the 1986 amendments, is no longer good law.  This

is just inaccurate.  Contrary to the Commonwealth's arguments, Congress did not legislatively

overrule *Bornstein* in 1986.  Indeed, the 1986 Senate Report cites the *Bornstein* decision with

---

[4] *Compare* G.L. c.12, § 5B *with Bornstein*, 423 U.S. at 306 n.1 (quoting Rev. Stat. § 5438).

approval in not one but two places.  *See* S. Rep. No. 99-345, at 9 (1986).[5]  As explained above,

*Bornstein* made clear that the statutory text imposed liability only on the basis on the sub-

contractor's own conduct in "caus[ing] [the prime contractor] to submit false claims to the

Government."  423 U.S. at 313.  Far from overruling *Bornstein* legislatively, Congress retained

in the amended Section 3729(a) the precise language the Supreme Court had relied on for its

holding, providing liability for one who "causes to be presented" a false claim.  *Compare* 31

U.S.C. 3729(a)(1) with *Bornstein*, 423 U.S. at 306 n.1 (quoting Rev. Stat. § 5438).  Moreover, as

noted above, the Commonwealth's contention that the 1986 amendments to the FCA overruled

*Bornstein* is in direct conflict with the decisions of numerous federal circuits.  *See, e.g.*, *Hays*,

325 F.3d at 993-94; *Krizek*, 111 F.3d at 939; *Murphy*, 937 F.2d at 1038-39.  Courts of appeals

and other courts have continued to rely on *Bornstein*, after those amendments, specifically for the

proposition that the number of violations must be based on the defendant's own conduct.

**3.**  Finally, the Commonwealth has sought to distinguish *Bornstein* on its facts.  Pl's Opp.

4-9.  Indeed, the Commonwealth has gone so far as to urge that this Court has already ruled that

*Bornstein* is inapplicable to the facts of this case.  *Id.* at 7.  These arguments are also wrong.

The Commonwealth's attempt to distinguish *Bornstein* on its facts relied almost

exclusively on the Ninth Circuit's decision in *United States* v. *Ehrlich*, 643 F.2d 634 (9th Cir.

1981).  There, a divided panel of the Ninth Circuit held that the general partner of a mortgagor

whose interest on a fraudulently inflated loan was subsidized by HUD could be held liable for

each monthly claim that the mortgagee filed with HUD.  *Id.* at 637-38.  In that case, each month

the mortgagor would make a payment at a rate of 1%, and the mortgagee would send a claim to

HUD for the remainder of the interest due.  *Id.* at 635.  The panel majority reasoned that where,

---

[5] Whereas the Report does single out certain judicial interpretations with which it takes issue—such as certain specified cases that adopted a mens rea element and burden of proof that were inappropriately high for civil cases, *see* S. Rep. No. 99-345, at 7 (1986)—*Bornstein* comes under no similar criticism.

as in that case, the mortgagor "knowingly causes a *specific number* of false claims to be filed, he is liable for an equal number of forfeitures." *Id.* at 638 (emphasis added). Judge Canby dissented. He criticized the majority opinion for "deviat[ing] from the teaching of *Bornstein* by subjecting the [mortgagor] to forfeitures based not upon his own causative acts, but upon the 76 submissions by the mortgagees." *Id.* at 639-49 (Canby, J., dissenting). Judge Canby would have held that the defendant could only be held liable for his own false statements in two documents that inflated the amount of the mortgage. *Id.* at 640.

Assuming, *arguendo*, that *Ehrlich* can be squared with *Bornstein*, the facts of *Ehrlich* are readily distinguishable from those here. In *Ehrlich*, the defendant "knowingly" caused a "specific number" of false claims to be filed, one a month, and had control over the inaccurate dollar amount that he knew was being submitted each month. *See id*. at 638. Despite the Commonwealth's assertions, Warrick's participation in the Medicaid rebate program gave it no similar knowledge or control over the submission of pharmacist claims to Medicaid. Warrick did not know in advance the particular number of claims that would be submitted to MassHealth on its drugs in a given time period. Even if there were evidence that Warrick knew how many units of albuterol were sold to Medicaid patients, which there is not, that knowledge would not translate into knowledge of the number of claims made for those units of albuterol (pharmacists submit multiple claims in many different amounts). Nor did Warrick have any knowledge or control over what U&C information pharmacists submitted with their requests for reimbursement. Had the Commonwealth enforced the U&C requirement, many—if not all—of the submitted claims would have been reimbursed on the basis of U&C, and any WAC published by FDB for Warrick's albuterol would have been irrelevant. Warrick had *no control* over the number of claims submitted by pharmacists or over the basis of reimbursement for those claims.

Thus, *Ehrlich* is wholly inapplicable here.  Even under the holding of its majority, Warrick cannot be penalized for "causing" the submission of an unpredictable number of pharmacy claims that later became "false" only when the Commonwealth applied its payment algorithm to them, sometimes even knowingly choosing to overpay on them.[6]

It is for this same reason that the Commonwealth's previous attempts to rely upon this Court's earlier treatment of *Bornstein* is misleading, see Pl's Opp. 7.  In its prior decision, this Court *focused on Dey's conduct* in rejecting Dey's argument that the statute of limitations began to accrue upon its first report of an allegedly false AWP.  Instead, the Court noted that, for purposes of its motion to dismiss decision, "[a]ccording to the MDL record, a drug manufacturer typically reports drug pricing on a quarterly basis to the compendia.  Any fact dispute about the frequency . . . can be addressed during discovery."  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 498 F. Supp. 2d 389, 400 & n.9 (D. Mass. 2007).  On that basis, the Court distinguished Dey's alleged conduct – "the regular quarterly republication of false AWP figures" – from the conduct the Supreme Court said in *Bornstein* could *not* form the basis for a FCA violation – "where the submission of multiple claims 'was, so far as [defendant] was concerned, wholly irrelevant, completely fortuitous, and beyond [defendant's] knowledge and control."  *Id.* at 400 (quoting *Bornstein*, 432 U.S. at 312) (alterations in original).  A focus on Warrick's conduct (not the pharmacists' conduct, which was "beyond [Warrick's] knowledge and control") is precisely what Warrick urges here.  At most, the jury found that *Warrick* made 28 false statements when it failed to correct WNUs as a part of FDB's allegedly annual update process.[7]

---

[6] To the extent *United States* v. *Inc. Vill. of Island Park*, 888 F. Supp. 419 (E.D.N.Y. 1995), moves further away from *Bornstein*'s focus on the defendant's own acts to determine the number of forfeitures, it is incorrect.  It is, in any event, distinguishable.  There, as in *Ehrlich*, the defendant caused "a readily ascertainable number of claims." *Id.* at 441.

[7] Put differently, while Warrick contests the sufficiency of the evidence on which the jury's finding rests, discovery and the evidence at trial shows that, at most, Warrick annually failed to update prices that FDB erroneously

Again, this Court's prior holding, stressing Dey's own conduct, is consistent with *Bornstein* and inconsistent with the imposition of penalties on a per-claim basis here.[8]

The Commonwealth's prior attempts to distinguish *Bornstein* on the ground that it was construing a criminal statute, *see* Pl's Opp. 8, are similarly unavailing. *Bornstein* was a *civil* case interpreting the civil liability section of the FCA. *Bornstein*, 423 U.S. at 305 n.1. As discussed above, the relevant language that the Supreme Court was construing in *Bornstein* has been retained in the current version of the FCA, which is exclusively civil in nature, and is also identical to the language in the correlative provision of the MFCA. Indeed, no court has questioned the validity or precedential effect of *Bornstein's* holding on that basis.

Under the plain language of the statute at issue and under controlling Supreme Court precedent, Warrick must be held liable—if at all—for its own acts, not for the acts of someone else. Warrick did not "cause" pharmacists to submit any particular number of claims to the Commonwealth, and the number of claims that pharmacists submitted should have no bearing on the calculation of any potential civil penalties. "A correct application of the statutory language requires, rather, that the focus in each case be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." *Bornstein*, 423 U.S. at 313. Computing civil penalties by equating the number of provider-submitted Medicaid claims with violations of the MFCA is based on a faulty interpretation of the law.

**B.     The Court Must Observe Constitutional Limits in Imposing Civil Penalties**

---

continued to publish for its products. This is precisely the kind of analysis that the Court applied in determining the triggering date for the statute of limitations as applied to Dey.

[8] The Commonwealth seizes upon the Court's further statement that "a claim accrued each time a false claim was presented." Pl's Opp. 7 (quoting *In re Pharm. Indus. Average Wholesale Price Litig*, 498 F. Supp. 2d at 400). That comment was unnecessary to the Court's holding, is inconsistent with the facts as proven in this case, is contrary to controlling precedent, does not at all address the question of the number of statutory violations that is presented here, and would, in any event, have to be revisited in light of the Supreme Court's decision in *Allison Engine Co., Inc.* v. *United States ex rel. Sanders*, 553 U.S. 662, 671-72 (2008).

This Court should observe *Bornstein*'s holding for another compelling reason:  doing so will allow it to avoid having to grapple with the constitutional implications of imposing massive penalties based on the conduct of others.[9]  The case law makes plain that false claims act penalties are subject to limitations under both the Excess Fines and Penalties Clauses of the United States and Massachusetts Constitutions, and the Due Process Clause of the United States Constitution.  Moreover, the doctrine of retroactivity mandates that these limits be applied with reference specifically to Warrick's conduct and the compensatory damages awarded for the period after the enactment of the MFCA on July 28, 2000.  Nonetheless, while it would clearly be unconstitutional to impose massive penalties relative to the compensatory damages that the jury found Warrick to have caused – indeed Warrick is not aware of any court having ever done so – this Court should never reach the constitutional questions.  All of these issues are avoided if this Court does as others have done and faithfully applies the Supreme Court's holding in *Bornstein*.  *See, e.g., Hays*, 325 F.3d at 993 (avoiding similar questions by "focus[ing] on 'the specific conduct of the person from whom the Government seeks to collect the statutory forfeiture" – as the Supreme Court mandates in *Bornstein*, 423 U.S. at 313); *Krizek*, 111 F.3d at 939-40 (rejecting the government's number-of-claims theory that produced "an astronomical $81 million" recovery for conduct that caused "actual damages of $245,392").

## 1.    The MFCA is Punitive in Nature

---

[9] *See, e.g., IMS Health Inc.* v. *Mills*, 616 F.3d. 7, 13 (1st Cir. 2010) (A court "must avoid an unconstitutional construction of a statute if a reasonable interpretation of the statute would satisfy constitutional requirements.") (internal quotation marks omitted); *United States* v. *Dwinells*, 508 F.3d 63, 70 (1st Cir. 2007) (The "canon of constitutional avoidance . . . . teaches that Congress is presumed to legislate in accordance with the Constitution and that, therefore, as between two plausible constructions of a statute, an inquiring court should avoid a constitutionally suspect one in favor of a constitutionally uncontroversial alternative."); *Gill* v. *Office of Pers. Mgmt.*, 699 F. Supp. 2d 374, 386 n.81 (D. Mass. 2010); *United States* v. *Shields*, 522 F. Supp. 2d 317, 336 (D. Mass. 2007) ("A court should interpret a statute to avoid a serious constitutional flaw unless such a saving construction plainly contradicts the clear intent of Congress."); *accord Commonwealth* v. *Alfonso*, 449 Mass. 738, 745 (Mass. 2007) ("[W]here a statute may be construed as either constitutional or unconstitutional, a construction will be adopted which avoids an unconstitutional interpretation." (internal quotation marks omitted)).

The treble damages and civil penalties provisions of the MFCA are sufficiently punitive so as to be subject to constitutional limits. These provisions of the FCA (and, by extension, the MFCA) have been determined by the United States Supreme Court to be "essentially punitive in nature."[10] *Vermont Agency of Nat. Res.* v. *United States ex rel. Stevens*, 529 U.S. 765, 784, 786 (2000) ("'The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers.'" (quoting *Texas Indus., Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981))); *United States ex rel. Sanders* v. *Allison Engine Co.*, 667 F. Supp. 2d 747, 755 (S.D. Ohio 2009) (noting that courts have "consistently recognized that the FCA punishes those who violate it, with particular attention being paid to the FCA's treble damages clause"). Indeed, the Supreme Court has expressly rejected a purely "remedial" characterization of these provisions. *Vermont Agency of Nat. Res.* at 784-85 ("Although this Court suggested that damages under an earlier version of the FCA were remedial rather than punitive, that version of the statute imposed only double damages and a civil penalty of $2,000 per claim." (internal citation omitted)).[11]

If anything, the MFCA can readily be characterized as *more* punitive than the federal FCA. In the federal context, the treble damages are considered, at least in part, compensatory, because the federal FCA does not provide for prejudgment interest or attorneys fees and investigatory costs. *See, e.g.*, *Cook County, Ill.*, 538 U.S. at 130-31 (explaining that, because

---

[10] While there are remedial aspects of the FCA, "the FCA's treble damages remedy is still 'punitive' in that recovery will exceed full compensation in a good many cases." *Cook County* v. *United States ex rel. Chandler*, 538 U.S. 119, 130-31 (2003).

[11] Both the United States Supreme Court and Massachusetts Supreme Judicial Court apply a seven factor test to "determin[e] whether a sanction is punitive in effect." *Commonwealth* v. *Cory*, 454 Mass. 559, 568 (2009) (citing *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)); *see also Smith* v. *Doe*, 538 U.S. 84, 97 (2003). Multiple courts applying this test have concluded that the "*Kennedy* factors weigh in favor of finding that the civil FCA sanctions are punitive in nature and effect." *Allison Engine*, 667 F. Supp. 2d at 758; *accord U.S. ex rel. Baker* v. *Community Health Systems Inc.*, __ F. Supp. 2d __, 2010 WL 1740624 at *18 (D.N.M. Mar. 19, 2010) (agreeing with and adopting the *Allison Engine* analysis).

"[t]he FCA has no separate provision for prejudgment interest," courts have concluded that the FCA's "damages multiplier has compensatory traits along with the punitive.").  In contrast, the applicable Massachusetts statutes provide for substantial prejudgment interest, reasonable attorneys fees, and reasonable investigatory costs, in addition to the compensatory damages, treble damages, and civil penalties provided for by the MFCA.  G. L. c. 12 § 5B(9); *id.* c. 231 § 6B (providing for prejudgment interest at the statutory rate of 12% per year); *id.* at § 6H (same) . Thus, the treble damages and civil penalties provisions of the MFCA are entirely punitive in nature.

> **2.**  **Because the Imposition of Penalties on a Per-Claim, Rather than a Per-Violation Basis, Would Result in a Penalties Award that Would Violate the Excess Fines and Penalties and Due Process Clauses of the United States and Massachusetts Constitutions, the Court Should Follow *Bornstein* as a Matter of Constitutional Avoidance**

Given the punitive nature of treble damages and civil monetary penalties, courts have consistently held that such awards are subject to the Eighth Amendment's Excessive Fines Clause.[12]  *See United States* v. *Mackby*, 261 F.3d 821, 830-31 (9th Cir. 2001) ("We conclude the civil sanctions provided by the False Claims Act are subject to analysis under the Excessive Fines Clause because the sanctions represent a payment to the government, at least in part, as punishment."); *Hays*, 325 F.3d at 992 ("[W]e agree with the Ninth Circuit that FCA penalties are punitive in nature and therefore fall within the reach of the Excessive Fines Clause.").[13]  The

---

[12] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[13] *See also United States ex rel. Fago* v. *M&T Mortgage Corp.*, 518 F. Supp. 2d 108, 124 (D.D.C. 2007) (noting that several circuits have applied an analysis under the Excessive Fines Clause to FCA damages awards, but finding it premature to apply that analysis before any fines were imposed); *United States ex rel. Tyson* v. *Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 740 (N.D. Ill. 2007) (noting that a court should not simply "rubber-stamp the number of false claims as determined by the jury, as these are facts with constitutional import"); *United States* v. *Bickel*, No. 02-3144, 2006 WL 1120439, at *3 (C.D. Ill. Feb. 22, 2006) ("The Excessive Fines Clause applies in civil matters such as this when the awards have a punitive character."); *United States* v. *Cabrera-Diaz*, 106 F. Supp. 2d 234, 242 (D.P.R. 2000) (holding that the court has "discretion" to "limit the number of penalties" assessed under the FCA

Excessive Fines Clause of the Eighth Amendment has been incorporated to apply to the States by the Fourteenth Amendment.  *See Cooper Indus., Inc.* v. *Leatherman Tool Group, Inc.*, 532 U.S. 424, 433-34 (2001); *Maher* v. *Retirement Bd. of Quincy*, 452 Mass. 517, 522 (2008).  In addition, the Massachusetts Constitution itself contains a prohibition on excessive fines:  "No magistrate or court of law, shall demand excessive bail or sureties, impose excessive fines, or inflict cruel or unusual punishments."  Mass. Const. Pt. 1, Art. 26.

If the punitive aspect of the statutory damages and penalties award is disproportionate to the harm caused by the defendant, then the Constitution requires that the penalties be reduced, as has happened in several FCA cases.  *See, e.g., Gilbert Realty*, 840 F. Supp. at 74-75 (finding that civil penalties of $290,000 compared to an actual damages amount of $1,630 (a ratio of 1:178) was excessive and reducing the award); *Bickel*, 2006 WL 1120439, at *3-4 (a case in which the United States declined to seek the full amount of the mandatory statutory penalties because doing so would violate the Excessive Fines Clause).  The standard that applied in each of these cases, and the Supreme Court's controlling pronouncement on this point, is that penalties "violate the Excessive Fines Clause if [they are] grossly disproportional to the gravity of defendant's offense."  *United States* v. *Bajakajian*, 524 U.S. 321, 334 (1998).  Here, a failure to follow *Bornstein*, even applying the lowest per-violation penalty of $5,000, would result in penalties that certainly surpass any constitutional limit.[14]

Punitive damages awards are also subject to the limits imposed by the Due Process Clause of the United States Constitution.  *See State Farm Mutual Auto. Ins. Co.* v. *Campbell*, 538

---

"when the penalties are deemed 'excessive'" and awarding no penalties because doing so on top of the treble damages would be excessive); *United States ex rel. Smith* v. *Gilbert Realty Co.*, 840 F. Supp. 71, 74 (E.D. Mich. 1993) (determining that "it was appropriate for the Court to consider whether this [FCA] punishment is excessive" under the Eighth Amendment constitutional challenge).

[14] The jury awarded compensatory damages of $4,563,328.  Penalties of $4,945,515,000 (989,103 x $5,000) result in a penalties to damages ratio of *1,084 to 1* – far in excess of anything that Warrick is aware of any court having ever approved.

U.S. 408, 425 (2003) (rejecting a punitive damages award of 145 times the compensatory

damages because it violated the Due Process Clause of the Fourteenth Amendment); *see also*

*BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 574 (1996); John T. Boese, Civil False Claims and

*Qui Tam* Actions, § 3.06[C] (2010) (Due Process Clause provides a separate, additional ground

to challenge an FCA award under "circumstances [that] might otherwise survive an Excessive

Fines Clause challenge under existing FCA precedent").[15]  In fact, another court in this District

recently found that the Due Process Clause's "fair notice" requirement can apply in the context

of a civil statutory damages scheme and applied the limits of the Due Process Clause to reduce

the penalties awarded by the jury.  *Sony BMG Music Ent.* v. *Tenenbaum*, __ F. Supp. 2d __, 2010

WL 2705499, at *26 (D. Mass. July 9, 2010) (Gertner, J.) (finding that the jury's award of

$675,000 in statutory damages was "grossly excessive" in violation of the Due Process Clause

and reducing the award).  Although the test is not one strictly of ratios, the Supreme Court has

noted that "few awards exceeding a single digit ratio between punitive and compensatory

damages . . . will satisfy due process."  *State Farm Mutual Auto. Ins. Co.*, 538 U.S. at 425.

Indeed, the Court has said, even a ratio as low as 4:1 "might be close to the line of constitutional

impropriety."  *Id.*

>    **3.**    **In Applying These Constitutional Limits, the Court Must Consider Only Warrick's Conduct and that Portion of the Compensatory Damages that Post-Date the MFCA's Enactment in July 2000**

The MFCA punishes acts that were not culpable prior to its enactment on July 28, 2000,

and imposes per violation penalties that the Massachusetts Medicaid False Claims Act

(MMFCA) does not.  In particular, in the MFCA, the Massachusetts legislature adopted a lower

---

[15] *Exxon Shipping Co.* v. *Baker*, 128 S. Ct. 2605, 2634 (2008) (determining "anything greater than [compensatory damages determined] would be excessive" and that "the constitutional upper limit confirms that the 1:1 ratio" is appropriate).

scienter requirement than that described in the MMFCA and substantially increased the penalties that could be imposed for the prohibited conduct. *Compare* G. L. c. 118E, § 40 (penalizing "knowing[] and willful[]" acts) *with* G. L. c. 12, § 5B (which does not require a showing of willfulness) *and id.* (adding a "penalty of not less than $5,000 and not more than $10,000 per violation").

Although the MFCA purports to apply to "acts or omissions that occurred prior to [its] effective date,"  G. L. c.12, § 5K, retroactively penalizing conduct in this manner violates both the United States Constitution's and Massachusetts Constitution's bans on Ex Post Facto lawmaking.  U.S. Const. art. 1, § 10, cl. 1; Mass. Const. part 1, art. 24 ("Laws made to punish for actions done before the existence of such laws, and which have not been declared crimes by preceding laws, are unjust, oppressive, and inconsistent with the fundamental principles of a free government."); *Cory*, 454 Mass. at 564 n.9 (treating "the meaning and scope of the ex post facto provisions in the Federal and State Constitutions as identical").[16]

Although it is unlikely to ever reach this issue, to avoid creating a retroactivity problem in applying the limits of the 8th and 14th Amendments, the Court must consider only that conduct occurring after July 28, 2000, and only the compensatory damages produced by that conduct.   Put differently, the constitutionality of the penalties must be measured with reference to the approximately $1.3 million in compensatory damages that Dr. Hartman says Warrick

---

[16] The operation of the Ex Post Facto Clause is not limited solely to facially criminal statutes.  It applies to statutory civil penalties where the statutory scheme is "'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'" *Kansas* v. *Hendricks*, 521 U.S. 346, 361 (1997) (alteration in original).  As discussed above, the treble damages and penalties provisions of the MFCA are sufficiently punitive to fall within the ambit of the Ex Post Facto clauses.  *See Allison Engine*, 667 F. Supp. 2d at 758 (""Retroactive application [of FCA amendments] violates the Ex Post Facto Clause because Congress intended for the FCA to be punitive ***and*** because FCA sanctions are punitive in purpose in effect."); *see also* Claire M. Sylvia, The False Claims Act: Fraud Against the Government § 10:47 (2010) ("[E]ven if Congress intended [FCA liability] to apply retroactively" – as the Massachusetts legislature expressly did – "doing so would violate the Ex Post Facto Clause of the Constitution" because "Congress intended for the FCA to be punitive and because FCA sanctions are punitive in purpose and effect.").

caused post-July 2000, *see* Trial Ex. 5.  However, Warrick would (again) urge the Court to first focus on applying *Bornstein* and holding Warrick liable, if at all, for penalties based only on Warrick's conduct and not on the basis of pharmacist-submitted claims.

## II.     THE COURT SHOULD FIND AS A MATTER OF LAW THAT WARRICK'S CONDUCT DOES NOT CONSTITUTE A BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

In order to prevail on a claim that Warrick breached the implied covenant of good faith and fair dealing, the Commonwealth must prove that Warrick's conduct had "the effect of destroying or injuring the right of the other party to receive the fruits" of the rebate agreement. *Accusoft Corp.* v. *Palo*, 237 F.3d 31, 45 (1st Cir. 2001) (internal quotations omitted).  Because the covenant is only as broad as the underlying contract, it cannot be used to impose new duties or expectations of performance not found in the express terms of the agreement.  *Id.* ("Equally clear from this definition [of the covenant of good faith and fair dealing] is that the requirement of good-faith performance ultimately is circumscribed by the obligations—the contractual 'fruits'—actually contained in the agreement.").  The Commonwealth asserts that Warrick's actions frustrated the purpose of the federal Medicaid rebate agreement in that the Commonwealth did not receive the "best price" available in the marketplace.  *See* Commonwealth's Supplemental Proposed Jury Instruction on Breach of Covenant of Good Faith and Fair Dealing, at 3 (Sept. 23, 2010) [Dkt. 908].  However, in making this claim, the Commonwealth is not using "best price" in the sense that the term is defined in the rebate agreement, nor can it point to any provision or combination of provisions in the Medicaid rebate agreement that entitles it to receive the "best price" in an ordinary economic sense.  In exchange for allowing drug manufacturers to have their drugs reimbursed by the Medicaid program, the Medicaid rebate agreement entitles States to receive rebate payments from the drug manufacturers in specified amounts calculated with reference to certain measures – AMP and

-16-

Best Price – defined in the rebate agreement.  While those rebates necessarily reduce the Medicaid program's net cost of reimbursing for certain prescription drugs, they do not entitle the Medicaid program to the "best price" available in the marketplace except in the very limited and specific sense of that term as defined in the Medicaid rebate agreement.  Accordingly, Warrick is entitled to judgment as a matter of law on Count IV.

## III.   THE COURT SHOULD ENTER JUDGMENT IN WARRICK'S FAVOR AS TO COUNTS I, II, AND III AS A MATTER OF LAW NOTWITHSTANDING THE JURY'S VERDICT

Judgment as a matter of law is appropriate when the evidence "would not permit a reasonable jury to find in favor [of the nonmoving party] on any permissible claim or theory." *Espada* v. *Lugo*, 312 F.3d 1, 2 (1st Cir. 2002) (internal quotation marks omitted).  Necessarily, the plaintiff must have introduced sufficient evidence to support a finding in its favor on each element of each of its claims.  *Murray* v. *Ross-Dove, Co.*, 5 F.3d 573, 576 (1st Cir. 1993). Where there are multiple causes of action, judgment as a matter of law can be granted on a subset of the causes of action if appropriate.  *Reeves* v. *Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149 (2000).  The Commonwealth has not met its burden of proof as to any of the three remaining causes of action and thus judgment as a matter of law should be entered in Warrick's favor.

### A.   The Commonwealth's Claim Under Prong 1 of the MFCA Is Precluded as a Matter of Law

As this Court knows, certain Defendants moved for a ruling that the Supreme Court's decision in *Allison Engine Co., Inc.* v. *United States ex rel. Sanders*, 553 U.S. 662 (2008), confirms that this case may proceed only under Prong 2 of the statutes.  *See* Memo. in Support of Certain Defs' Mot. for Reconsideration or Clarification In Light of the Supreme Ct.'s Op. in *Allison Engine Co.* v. *United States ex rel. Sanders*, at 36 (Jan. 16, 2009) [Dkt. No. 574-2].  As

outlined in that motion, the Commonwealth cannot make out a cause of action under Prong 1 of the MFCA because Warrick did not submit any claim to the Commonwealth or directly cause any false claim to be submitted because the claims that were submitted by pharmacists do not themselves contain WACs or AWPs (or any other allegedly false price information from manufacturers).  In *Allison Engine*, the Supreme Court clarified a critical distinction between the first and second prongs of the FCA.  The Court held that, if the relevant claim that is submitted does not contain any false statement from the defendant, then a "false presentment" claim made under Prong 1 of the FCA cannot proceed as a matter of law.  *See Allison Engine*, 553 U.S. at 670-71.  The Commonwealth has never contended that Warrick presented a false claim itself or directly caused a pharmacist to present a false claim.  Accordingly, this case should not have been submitted to the jury under Prong 1 of the MFCA and the jury's verdict on this count should be set aside.

**B.      The Commonwealth Has Failed to Prove that Warrick "Caused to Be Presented" a False Claim**

The Commonwealth has introduced no evidence whatsoever that Warrick caused pharmacists to present to the Commonwealth claims for payment that were false.  The very cases on which the Commonwealth relies with respect to Prong 1 in fact demonstrate that "[t]o 'cause' the presentation of false claims under the FCA, some degree of participation in the claims process is required."  *United States* v. *President and Fellows of Harvard College*, 323 F. Supp. 2d 151, 186-87 (D. Mass. 2004).  While the defendant need not have been directly involved in the presentation of the claim, there must be, at least, a direct causal path by which the alleged falsity can be traced from the defendant *through* a third party who presents the false claim to the government.  *See, e.g.*, *id.* at 187-88 (defendant "signed [false] invoices for payment" submitted to Harvard with knowledge that "Harvard would bill USAID for the funds"); *see also United*

*States ex rel. Marcus* v. *Hess*, 317 U.S. 537 (1943).  As the Supreme Court recently made clear, the "express presentment requirement" is critical to a Prong 1 violation and distinguishes it from a Prong 2 violation, which does not require presentment.  *See Allison Engine*, 553 U.S. at 669-71.

The Commonwealth has presented no evidence of a similar chain of causation from Warrick through the pharmacists who allegedly "presented" false claims to the government.  In contrast to the cases upon which the Commonwealth relies, the alleged falsity in this case consists of the use by the Commonwealth's fiscal agent of pricing information received from a third-party, FDB, in making a reimbursement calculation, which information did *not* pass through pharmacists to be "presented" to the government, in the way Prong 1 envisions.  The claims for payment that the pharmacists presented to MassHealth did not contain WACs or AWPs (or any other allegedly false price information provided by Warrick).  Trial Tr. 22:4-15, 91:6-7, 95:24-96:3, Sept. 16, 2010.  And, that it takes only "3 seconds" to adjudicate the claim does not alter the analysis.  Trial Tr. 87:16-88:1, Sept. 23, 2010.  Rather, the allegedly false statements concerning WACs traveled from Warrick through FDB to MassHealth's fiscal agent ACS or Unisys – bypassing the pharmacists altogether.  Trial Tr. 28:22-29:4, Sept. 16, 2010 (Sibor testified that "with the exception of the SMAC price, First DataBank provides [all of] pricing information" used in claim reimbursement).  MassHealth allegedly used the "statement" of wholesale net price – which was itself never "presented" to MassHealth in a claim – to "pay[]" or "approv[e]" the pharmacists' claims.  Such a fact pattern is only actionable, if at all, under Prong 2 of the MFCA.

The Court's jury instruction concerning the submission of a false claim (Instruction No. 16) was erroneous and directed the jury to find liability for claims that were not false when

submitted but that – on the Commonwealth's theory – only later became "false" as a result of the fiscal agent's application of a reimbursement algorithm using data supplied by FDB.  In so instructing the jury, the Court not only erred, but also permitted the Commonwealth to evade the heightened scienter requirement of Prong 2.  Accordingly, judgment as a matter of law should be entered in Warrick's favor on the Commonwealth's Prong 1 MFCA claim or, alternatively, Warrick should be granted a new trial free from these errors.

### C.      Warrick's Statements of Price – Issued at Launch – Were Not False When Made, and Warrick Had No Duty to Update Them

The Commonwealth has also failed to prove its claims under both prongs of the MFCA for the additional reason that no reasonable jury could find that Warrick's statements concerning price were false when Warrick made them.  Because of "the central importance of the scienter element to liability under the False Claims Act,  . . . false claims must in fact be 'false *when made*.'"  *United States ex rel. Hendow* v. *Univ. of Phoenix*, 461 F.3d 1166, 1171-72 (9th Cir. 2006) (emphasis added).  And when liability is premised on a particular statement, the "statement in question [must be] knowingly false when made." *Id.* at 1172.  Thus, in *United States ex rel. Hopper* v. *Anton*, 91 F.3d 1261 (9th Cir. 1996), the court of appeals rejected an FCA claim based on alleged "promissory fraud" because the plaintiff failed to show that the promise was "false when made." *Id.* at 1267.  Massachusetts law is to the same effect. *Falby* v. *New England Forestry Foundation*, 823 N.E.2d 823, 2005 WL 600332, at *1 (Mass. App. Ct. 2005) ("statements cannot serve as a basis for fraud unless it shown that the disputed statements were false when made"); *see also McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 563 N.E.2d 188, 192 (Mass. 1990).

Here, Warrick made a statement regarding the "direct price" for its albuterol product at the time of launch.  Trial Exs. 9, 26.  That statement was true when made.  At launch, the

reported "direct price" was, and could only reasonably be understood as, an opening list price (as it was set before any sales were made) – the price at which Warrick hoped to sell its product. That is, indeed, what the evidence shows Warrick's direct price was – an accurate statement about the price at which it hoped to sell its product – and Warrick did in fact sell some product at that price.   *See*, *e.g*, Gough Dep. Tr. 151:15-18, Feb. 6, 2003; Trial Tr. 103:24-104:1, 137:22-138:3, 141:6-10, Sept. 24, 2010 (testifying that there were sales at Warrick's launch price).

      Contrary to the Commonwealth's contentions, Warrick then had no duty to update its price statements after launch.  The Commonwealth has now acknowledged that "the First Circuit in *Backman* generally rejected a broad duty . . . to update accurate statements of historical fact." Commonwealth's Legal Mem. Regarding Backman v. Polaroid Corp. at 1 (Sept. 15, 2010) [Dkt. 903] (hereinafter "Commonwealth's Duty to Update Mem.") (citing *Backman* v. *Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (en banc)); *see also Gross* v. *Summa Four, Inc.*, 1995 WL 806823, at *12 n.7 (D.N.H. Nov. 8, 1995) ("The First Circuit has definitively held that no duty to correct exists if the statements were true and not misleading when made.").  The Commonwealth maintains that Warrick's statements of direct price at launch come within one of two exceptions to *Backman*'s general no-duty-to-update rule:  (1) they were misleading, even if literally true, when made, or (2) they had a "forward intent and connotation upon which parties [could] be expected to rely."  Commonwealth's Duty to Update Mem. at 1-2.  The Commonwealth first contends that a jury could find "Warrick's reported list price at launch" to be "misleading" because "Warrick knew at the time it reported its list price that the price of albuterol would drop precipitously after launch and that it would not be the price actually paid by wholesalers."  *Id.* at 3.  But such knowledge does not render "Warrick's reported list price at launch" false or "misleading."  All of the witnesses agree that it was commonly understood that prices in the

generic market would drop, maybe even "precipitously," after launch.  *See, e.g.*, Trial Tr. 27:15-

18, Sept. 13, 2010 (testimony of plaintiff's expert, Meredith Rosenthal); *id.* 87:8-13, Sept. 21,

2010 (testimony of plaintiff's expert, Raymond Hartman).   In light of this widely-held

knowledge, Warrick's statements about its launch price could not reasonably have been

interepreted as a statement of fact regarding the price at which future sales would take place after

launch and thus could not be misleading as a matter of law.

    Nor, for similar reasons, did Warrick's publication of a "list price at launch" convey a

"forward-looking connotation" about actual future sales prices such that Warrick "should have

known that state Medicaid agencies would continue to rely on it [for the next ten years] in future

reimbursement calculations."  Commonwealth's Duty to Update Mem. at 3-4.  The cases cited

by the Commonwealth regarding "forward-looking" statements that may require updating in

light of changed circumstances are entirely inapposite.[17]  Warrick's statement regarding a price

at a specific time (at launch) did not have a forward-looking connotation, and thus no duty to

update is imposed.  *See, e.g.*, *Nadoff* v. *Duane Reade, Inc.*, 107 Fed. Appx. 250, 252 (2d Cir.

2004) (upholding dismissal of a complaint alleging a duty to update, because "[a]ccurate

---

[17] None of the Commonwealth's cases suggest that once Warrick issued a list price at launch and then withdrew that list price, the law imposed on Warrick an ongoing duty to give a constantly updated average of actual sale prices.  *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1245 (3rd Cir. 1989), concerned a corporation's specific statement of its intent to take a certain action in the future, which the Third Circuit held created a duty to update the public when the corporation changed its plan.  *Id.*  By contrast, Warrick's statement concerning a list price at launch could not have been understood as a statement of intent to maintain that price for the indefinite future.  *Rubinstein* v. *Collins*, 20 F.3d 160 (5th Cir. 1994), is similarly inapposite.  There, the Fifth Circuit held that there was a duty to "disclose material, firm-specific adverse facts that affect the validity or plausibility of [a] *prediction*" the firm had made.  *Id.* at 170 and n. 41 (emphasis added.).  Warrick's statement of a list price at launch was not a prediction of how that price would change in light of market forces, nor has the Commonwealth identified any "material, firm-specific adverse facts" related to Warrick's list price that it failed to disclose.

    The Commonwealth also cites *Ross* v. *A.H. Robins Co., Inc.*, 465 F. Supp. 904, 908 (S.D.N.Y. 1979), *rev'd on other grounds,* 607 F.2d 545 (2d Cir. 1979), *cert. denied,* 446 U.S. 946 (1980).  The district court's discussion of a duty to update was dicta (the court ultimately dismissed the complaint) and cited no legal authority.  Moreover, the court of appeals expressly declined to "reach the question whether the defendants' alleged failure to update and correct prior statements which were accurate when made constitutes conduct actionable under § 10(b) and Rule 10b-5."  607 F.2d at 559 n.21. Notably, Congress has since created an express safe harbor that prevents such forward-looking statements from serving as the basis for securities fraud claims.  *See* Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-5.

statements about past performance are self evidently not actionable"); *Stransky* v. *Cummins Engine Co., Inc.*, 51 F.3d 1329, 1332 n.3 (7th Cir. 1995) ("No duty to update an historical statement can logically exist.  By definition an historical statement is addressing only matters at the time of the statement.").  And even assuming Warrick had a duty to *withdraw* (again) the outdated FDB WNU price, it had no duty to go beyond withdrawal and provide MassHealth an accurate WAC.

Courts have consistently recognized that the FCA "includes no duty to disclose certain information."  *United States ex rel. Milam* v. *Regents of Univ. of California*, 912 F. Supp. 868, 883 (D. Md. 1995).  Thus, "unless the defendant has an obligation to disclose the omitted information" that exists independently, "[t]he [FCA] does not impose liability for omissions." *Id.; see United States ex rel. Berge* v. *Bd. of Trustees of the Univ. of Alabama*, 104 F.3d 1453, 1461 (4th Cir. 1997) (reversing judgment for plaintiff based on omission because "[t]here can only be liability under the [FCA] where the defendant has an obligation to disclose").  In this case, the relevant regulations did not require manufacturers to publish a WAC or to provide any pricing information to MassHealth.  As such, Warrick cannot be held liable for not reporting a true price.

Moreover, contrary to the Commonwealth's contention that Warrick is liable because it allegedly knew or recklessly disregarded that the Commonwealth was "adjudicat[ing claims] using Warrick's outdated, reported price," which FDB continued to publish as a "Wholesale Net" price, Commonwealth's Duty to Update Mem. 5, the FCA does not impose liability based upon a defendant's failure to correct a third-party's alleged misstatement.  As the Tenth Circuit has recognized, "[g]enerally, mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish liability under the FCA."  *United States ex rel.*

*Sikkenga* v. *Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 714 (10th Cir. 2006).  Thus, "allegations that a defendant had direct and concrete knowledge of a fraud on the government but did nothing to stop it are not enough to state a claim under the FCA."  *United States ex rel. Grynberg* v. *Ernst & Young LLP*, 323 F. Supp. 2d 1152, 1155 (D. Wyo. 2004).  *See United States ex rel. Piacentile* v. *Wolk,* 1995 WL 20833, at *4 (E.D. Pa. Jan.18, 1995) ("Mere inaction is not enough to constitute a violation of the False Claims Act.").

### D.      Warrick Did Not Have the Necessary Scienter to Be Liable Under the MFCA

#### 1.      The Commonwealth Has Failed to Prove Warrick Knew of the Alleged Falsity

To establish liability under Prong 1 of the MFCA, the Commonwealth must prove that Warrick "knew that the claim was false or fraudulent."  *Mylan Labs.*, 608 F. Supp. 2d at 140. The Commonwealth must therefore demonstrate that Warrick (1) "possess[ed] actual knowledge of relevant information," (2) acted "with deliberate ignorance of the truth or falsity of the information," or (3) acted with "reckless disregard of the truth or falsity of the information."  G. L. c.12, § 5A.  The Commonwealth's evidence is inadequate to support a jury finding of such knowledge on the part of Warrick.

Assuming *arguendo* that the MFCA did impose liability on the basis of a defendant's failure to prevent the government from relying on a known false statement, the Commonwealth has failed to offer evidence sufficient to establish that Warrick had such knowledge.  It is undisputed that, shortly after the launch of its solutions prices, Warrick withdrew and asked FDB to stop publishing a "direct price" for its product.  Trial Ex. 16; Weintraub Dep. Tr. 153:9-154:14, Sept. 18, 2006.  Moreover, it is undisputed that FDB did, in fact, stop publishing a "direct price" for Warrick's products, Trial Ex. 526, and Warrick confirmed that FDB complied with its withdrawal and did not thereafter publish a direct price for any of the three products.

Weintraub Dep. Tr. 154:5-12, Sept. 18, 2006.  The Commonwealth's assertion that Warrick nonetheless knew that MassHealth continued "adjudicat[ing claims] using Warrick's outdated, reported price," Commonwealth's Duty to Update Mem. at 5, relies on pure conjecture.  For the Commonwealth's theory to be valid, Warrick would have to have known that: (1) FDB had used Warrick's direct price at launch to populate a separate field referred to as "Wholesale Net" price; (2) FDB nonetheless did *not* delete "Wholesale Net" price when it was asked to and did delete Warrick's "direct price"; (3) the Commonwealth used FDB's "Wholesale Net" price as a proxy for WAC; and (4) FDB, Unisys/ACS, and MassHealth failed to notice and correct the discrepancy between direct price and wholesale net price.  The Commonwealth has failed to establish any of these four logical leaps necessary to establish Warrick's knowledge.  *See, e.g.*, Weintraub Dep. Tr. 154:20-25, Sept. 18, 2006 (Warrick did not subscribe to the electronic database); *id* at 154:5-12 (the hard copy version properly zeroed out Warrick's direct prices); Trial Exs. 147, 150 (evidencing ACS's confusion about whether WACs were the same as WNUs); Trial Ex. 402 (evidencing confusion on the part of a seasoned MassHealth official as to the relationship between Direct Price and WAC as late as 2001); Trial Ex. 735, Trial Tr. 81:21-23, Sept. 16, 2010 (ACS noticing and correcting mistakes with regard to other manufacturers' reported prices, and communicating issue to MassHealth).[18]

Because the Commonwealth has failed to establish that Warrick knew of any false statements, it has fallen back on the MFCA's alternative standards for proving scienter under

---

[18] At most, the Commonwealth has demonstrated that Warrick was negligent in not realizing FDB's mistake.  For example, for Trial Exhibit 19 (and similar exhibits) to be relevant at all, someone at Warrick would have had to have seen the document – which there is no evidence ever happened – and also understood the meaning of the undefined term WNU.  But negligence cannot support a finding of liability under the MFCA.  *U.S. ex rel. Farmer* v. *City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008) (explaining that the "*mens rea* requirement [of the FCA] is not met by mere negligence or even gross negligence"); S. Rep. No. 99-345, at 7 (1986) (stating that the intention of the FCA, and by extension, the MFCA, is "not [to] punish honest mistakes or incorrect claims submitted through mere negligence").

Prong 1 – deliberate ignorance or reckless disregard.  *Cf.* Trial Tr. 5:20-21, Sept. 17, 2010 (the

Court observing that this "may turn into a recklessness case").  But the evidence at trial

demonstrating ambiguity in the regulatory terms precludes liability under either standard.

      As numerous courts have held, a plaintiff cannot establish scienter under Prong 1 of the

FCA, and judgment as a matter of law is appropriate, where the relevant regulations are unclear.

For example, in *United States ex rel. Farmer* v. *City of Houston*, 523 F.3d 333 (5th Cir. 2008),

the Fifth Circuit explained that "if the regulations were thoroughly unclear, as a matter of law,

the FCA's knowledge and falsity requirements have not been met." *Id.* at 340 n.12.  The court

noted that "HUD officials admitted that there is nothing in HUD's . . . regulations that

objectively defines what is a reasonable cost." *Id.* at 341.[19]  The First Circuit has similarly

highlighted the importance of a "clear understanding of the difference" between terms defined by

the government to satisfying the FCA's "reckless disregard" standard.  *United States ex rel.*

*Loughren* v. *Unum Group*, 613 F.3d 300, 314 (1st Cir. 2010).  Under a different statute, the

Supreme Court has similarly held that a plaintiff cannot establish "the 'unjustifiably high risk' of

violating the statute necessary for reckless liability" where "the statutory text and relevant court

and agency guidance allow for more than one reasonable interpretation." *Safeco Ins. Co.* v.

*Burr*, 551 U.S. 47, 69-70 & n.20 (2007).

      The Commonwealth has failed to establish that there was a clear meaning of the

regulatory term "WAC" or that it would even have been clear to Warrick that FDB's "Wholesale

Net Unit" price was being used as a proxy for WAC.  The Commonwealth's own expert, the

---

[19] *See also Hagood* v. *Sonoma County Water Agency,* 81 F.3d 1465, 1478-79 (9th Cir.1996) (signing a contract with an arguably false cost-allocation figure, based upon a "disputed legal issue" as to the requisite precision of this figure, does not amount to deliberate ignorance or reckless disregard); *United States ex rel. Hixson* v. *Health Mgmt. Sys., Inc.*, 657 F. Supp. 2d 1039, 1056 (S.D. Iowa 2009) (where there is a "lack of clarity regarding the proper interpretation" of a term, "no basis exists for imposing FCA liability") (internal citations and quotations omitted); *United States ex rel. McElderry* v. *Praxair Healthcare Serv., Inc.*, 2006 WL 3421839, at *3 (D. Utah Nov. 22, 2006) (where a term is "uncertain," there can be no liability).

Director of the Pharmacy Program for MassHealth, every witness from FirstData Bank, and a representative from the Commonwealth's own claims processor each testified that, contrary to the position asserted by the Commonwealth in this litigation, WAC is an undiscounted price. Trial Tr. 71:11-17, Sept. 21, 2010 (plaintiff's expert testifying that WAC is a list price "that doesn't include rebates and discounts"); Trial Tr. 79:20-80:22, Sept. 20, 2010; *id.* 47:18-25, Sept. 22, 2010 (Dr. Jeffrey testifying that WACs are undiscounted list prices); Morgan Dep. Tr. 37:13-16, Nov. 30, 2007 (FDB understood that "WAC was not necessarily a transaction price"); Chadwick Dep. Tr. 92:5-93:7, Oct. 24, 2007 (30(b)(6) designee of First Data Bank states that "WAC . . . represents the manufacturer's published catalog or list price" and "does not represent actual transaction prices and does not include prompt pay or other discount rebates"); Trial Tr. 92:16-20, 94:5-7, Sept. 16, 2010 (Mr. Sibor of ACS confirming that "WAC or wholesale acquisition cost is an undiscounted price").  Moreover, even if WAC were a clearly defined term, it was not clear that "Wholesale Net Unit" price was treated as equivalent to WAC.  Indeed, as late as 2002 and 2003, MassHealth and its own representatives were still uncertain as to the meaning of "WNU" and whether it was equivalent to WAC.  Trial. Exs. 147, 150, 435.  In the absence of a clearly defined regulatory framework, Warrick cannot as a matter of law be held liable under the MFCA.

The Court, however, significantly confused the jury in this regard by defining the term WAC as a matter of law in Instruction No. 17.  The relevant inquiry under the MFCA is not the meaning of the term or regulation as a matter of law, but rather the reasonableness of the defendant's understanding of the term or regulation.  A reasonable, but incorrect interpretation of the regulation precludes a finding of the requisite scienter.  *See Safeco Ins. Co.*, 551 U.S. at 69-70 & n.20.  Even with the qualifying instruction that WAC was not defined by Massachusetts

law during the time period in question, the Court's instruction improperly focused the jury's

inquiry and suggested to the jury that the term enjoyed a settled meaning that the evidence

showed clearly it did not.  Accordingly, Warrick is not liable under Prong 1 of the MFCA or, at

the very least, is entitled to a new trial free from a misleading instruction as to the definition of

the term WAC.

>        **2.        For All the Same Reasons and More, the Evidence Is Insufficient to Show that Warrick Acted with the Improper Purpose Required Under Prong 2 of the MFCA**

Under Prong 2 of the MFCA, the Commonwealth must show that "[t]he defendants

*intended* that the false statement be material to the Commonwealth's decision to pay or approve

the false or fraudulent claim."  *Mylan Labs.*, 608 F. Supp. 2d at 140 (citing *Allison Engine*)

(emphasis added).  The defendant must have "made a false record or statement for the purpose of

getting 'a false or fraudulent claim paid or approved by the Government.'" *Allison Engine*, 553

U.S. at 671.  The Commonwealth's evidence would not permit a reasonable jury to find that

Warrick acted with the requisite scienter.  To the contrary, as noted above, the testimony

regarding the pricing terms at issue – WAC and WNU to name just two – showcases the

confusion and ambiguity prevalent throughout the industry.  Moreover, reading the regulations

on their face, no reasonable market participant would have expected that WAC would have been

the lowest of the four reimbursement figures and, indeed, it was the lowest only 25% of the time

– in instances when the Commonwealth failed to enforce its own regulation.  Trial Tr. 107:4-6,

Sept. 22, 2010; *id.* at 68:15-69:10, Sept. 23, 2010.  Thus, the Commonwealth has failed to

demonstrate that Warrick could have anticipated, much less intended, that FDB's WNU figure

would have provided the reimbursement rate for Warrick's albuterol.

A finding that Warrick had the requisite intent would ascribe to it an impossible

clairvoyance.  The jury would have to have found that Warrick published a "direct price" at

launch and soon thereafter withdrew it with the intent that (1) FDB would use the "direct price"

to populate a different price field – WNU, but (2) FDB would fail to delete WNU when Warrick

asked FDB to delete the "direct price," and (3) that the Commonwealth would use WNU (the

meaning of which was unclear even to MassHealth) to populate its field for WAC, and (4) the

Commonwealth would fail to notice that Warrick's WAC did not change for *ten years*, and (5)

that the Commonwealth would fail to follow its own regulations, leading it to reimburse based on

WAC rather than the pharmacists' U&C or FUL or MULP, which were expected to be lower.

As demonstrated above, the Commonwealth's evidence fails even to establish the Warrick *knew*

of all of the steps in this improbable chain, much less that Warrick set out with the intent to

defraud MassHealth in that manner.  Judgment as a matter of law should therefore be entered in

Warrick's favor on Prong 2 of the Commonwealth's MFCA claim or, at the very least, Warrick

should be granted a new trial free from a misleading instruction as to the definition of the term

WAC.

### E.   Warrick's Direct Prices Were Not Material to MassHealth's Decision to Reimburse Above Actual Acquisition Costs

In order to be liable under the MFCA, the allegedly false statement contained within the

submitted claim must have been material to MassHealth's decision to pay the claim. *United

States* v. *Data Translation, Inc.*, 984 F.2d 1256, 1267 (1st Cir. 1992) (Breyer, C.J.) (affirming

judgment for defendant in FCA action because the "alleged nondisclosure could not have been

material"); *Mikes* v. *Straus*, 274 F.3d 687, 697 (2d Cir. 2001) (noting that the FCA "does not

encompass those instances of regulatory noncompliance that are irrelevant to the government's

disbursement decisions").  Courts have found statements immaterial where the government has

continued to pay even after learning that the statement was untrue.  *Berge*, 104 F.3d at 1460,

1462 n.3 (granting judgment as a matter of law to defendants after applying the "natural

tendency" test and finding that the defendants' statements were immaterial; in determining that

the statements were immaterial, the court noted that the plaintiff "totally ignore[d] the fact that,

at the time of trial, well after all of [plaintiff's] allegations had been repeatedly probed," the

government continued to fund defendants), *cert. denied*, 522 U.S. 916 (1997).[20]

      As an initial matter, no published price attributable to Warrick could have been material

to the vast majority of the claims at issue.  As Dr. Hartman, the Commonwealth's expert,

concedes, WACs or WNUs were not used as the basis for reimbursement as to 75% of the claims

for which the Commonwealth seeks damages.  Trial Tr. 28:12-18, 30:13-24, Sept. 21, 2010.

      As to the remaining 25% of claims, the Commonwealth has failed to establish that the

omission of data reflecting lower historical sales prices for Warrick's generic albuterol products

would have resulted in MassHealth's having paid less.  The evidence establishes that –

regardless of what Warrick did – MassHealth often chose to pay more than it could have paid.

Under the regulations as written, the Commonwealth expected U&C to be the lowest basis of

reimbursement for generic drugs, such as the albuterol products at issue in this case, 100% of the

time.  Trial Tr. 34:23-35:3, Sept. 22, 2010.  Nevertheless, MassHealth allowed pharmacists

throughout the relevant time period to ignore MAC rates, which are the lowest commercial

market rates, in reporting U&C.  Trial Tr. 112:23-113:3, 118:19-119:3, Sept. 20, 2010; *id.* 15:10-

25, Sept. 22, 2010.  Moreover, pursuant to the regulations as written, where the U&C rate was

not the lowest alternative, MassHealth expected that MULP or FUL rates would provide the

---

[20] The Commonwealth contends that *Berge*'s reliance on the fact that the university continued funding after learning of the true facts was overruled in *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 914 (4th Cir. 2003).  *See* Commonwealth's Trial Br., at 17 (Aug. 31, 2010) [Dkt. 891] at 14.  To the contrary, *Harrison* relied on the fact, not present in *Berge* or this case, that a no-conflict certification was "a prerequisite to GPC's being awarded the contract."  352 F.3d at 916.  Likewise, the court observed that there were reasons, such as sunk costs, why the government might continue a contract even after learning of the fraud.  *Id.* at 917.  Here, there are no such countervailing considerations.  The Commonwealth's actions after learning the true nature of reported WAC prices is consistent with its conduct before learning that fact and merely confirms that the premise of the Commonwealth's suit – that MassHealth would have relied on lower WACs if they had been reported – is inaccurate.

basis for reimbursement.  Shapiro Tr. 278:16-279:7, Oct. 3, 2007 (confirming that it was

Shapiro's "expectation that [his] fiscal intermediary would, for the most part, be reimbursing

[generic] drugs at . . . the federal upper limit rate or a lower usual and customary rate" and that

MassHealth "didn't expect that it would be the WAC plus 10 rate").  However, MassHealth

failed to establish a MULP during most of the relevant period.  Trial Tr. 103:20-22, Sept. 20,

2010 (testimony of Paul Jeffrey).  Accordingly, even under a "natural tendency" standard,

Warrick's WNUs cannot be said to have been "material" to the Commonwealth's reimbursement

decision or the harm that it allegedly suffered.

     MassHealth's actions after learning the "true" facts regarding WAC further undermine

the Commonwealth's proof as to materiality.  In 2002, MassHealth learned from the OIG that

generics could be acquired by pharmacists at WAC minus 30.55% and that one of the albuterol

products at issue in this case could be purchased, on average, at a rate of WAC minus 81.3%.

Trial Tr. 115:8-13, Sept. 21, 2010; Trial Exs. 50, 468.  Nevertheless, even to this day the

reimbursement regulation remains largely unchanged with the Commonwealth continuing to

reimburse both brand and generic drugs at a rate of WAC plus 5%.  Trial Tr. 73:18-21, Sept. 20,

2010; Trial Ex. 173.  Moreover, while MassHealth undertook a MULP initiative, the MULP rates

set for the products at issue have remained consistently more than *double* the AMP reported for

the Warrick products at issue.  Trial Tr. 165:18-24, Sept. 27, 2010.  Nevertheless, it is these fully

discounted AMPs that the Commonwealth contends Warrick had a duty to report and that,

contrary to the evidence, it says MassHealth would have used, without change to its

reimbursement structure, in reimbursing pharmacists for the drugs at issue.  Furthermore,

MassHealth still does not require generic manufacturers to report a WAC price at all, Trial Tr.

79:6-10, Sept. 20, 2010, and even defines WAC with reference to the pricing compendia

knowing full well that compendia prices are undiscounted list or invoice prices.  Trial Tr. 73:18-21, 79:20-80:22, Sept. 20, 2010; *id.* 47:18-25, Sept. 22, 2010; Trial Ex. 507.  In light of this evidence, the Commonwealth cannot meet its burden of proving materiality even under a "natural tendency" test.  *See Cumis Ins. Society, Inc.* v. *BJ's Wholesale Club, Inc.*, 918 N.E.2d 36, 48-49 (Mass. 2009) (because plaintiff "presented no evidence that . . . they have withdrawn from or altered their participation in the system after becoming aware of the defendants' [alleged misrepresentation]," defendant's conduct was per se immaterial, and no liability for fraud could attach).

Moreover, the Court's instruction to the jury on materiality (Instruction No. 22) was partly contrary to law, *see Berge*, 104 F.3d at 1462, partly inconsistent on the point (suggesting that the Commonwealth's continuing to approve claims based on published wholesale acquisition costs even though it knew they were not actual transaction costs could, at the same time, support a finding of both materiality and immateriality), and wholly unwarranted in light of the fact that there is no evidence that there was anything that prevented the Commonwealth from changing its reimbursement methodology during the now more than *seven* years that have transpired since this law suit was filed.  Thus, the jury's verdict on the MFCA count should be set aside for these reasons as well or, alternatively, Warrick should be given a new trial free from these errors.

### F.    The Commonwealth Has Failed to Establish that Warrick Violated the MMFCA

For the same reasons the Commonwealth's evidence fails to establish a violation of the MMFCA, *see supra* Part III.A-E, the evidence is also insufficient to prove the overlapping elements of the Commonwealth's MMFCA claim.  Indeed, the standard for demonstrating scienter under the MMFCA is even more stringent than under the MFCA.  To prove an MMFCA

violation, the plaintiff must show that the defendant "knowingly and *willfully* ma[de] or cause[d] to be made [a] false statement or representation of a material fact for use in determining rights to [a Medicaid] benefit or payment."  G.L. c. 118E, § 40.  To demonstrate "willfulness," the Commonwealth must prove that Warrick voluntarily and intentionally violated a known legal duty.  *Mylan Labs.*, 608 F. Supp. 2d at 155; *see also Hanlester Network* v. *Shalala*, 51 F.3d 1390, 1400 (9th Cir. 1995) (applying Medicaid Anti-Kickback Act).  For the same reasons the Commonwealth's evidence fails to demonstrate knowledge or recklessness under Prong 1 of the MFCA or a purpose to defraud MassHealth as required under Prong 2 of the MFCA, the Commonwealth's claim under Prong 2 of the MMFCA also necessarily fails.

### G.  The Commonwealth Has Also Failed to Introduce Evidence Sufficient to Sustain a Jury Verdict as to Its Common Law Fraud Claim

As explained more fully elsewhere in this memorandum, the Commonwealth has failed to prove that (1) Warrick ever made a false statement of material fact, *see supra* Part III.C; (2) the statement was material, *see supra* Part III.E; (3) Warrick made the misrepresentation intentionally or recklessly, *see supra* Part III.D; (4) Warrick made the misrepresentation for the purpose of inducing MassHealth to rely on it, *see supra* Part III.D.2; or (5) MassHealth sustained damages as a result of any misrepresentation *by Warrick*, *see infra* Part IV.  Each of those is an essential element of the Commonwealth's claim for common law fraud,[21] and the Commonwealth's failure to establish them requires entry of judgment as a matter of law in

---

[21] In order to prevail on its claim of fraud, the Commonwealth must prove that: (1) Warrick made a false statement, which was "false when made," *Falby*, 2005 WL 600332, at *1 ("statements cannot serve as a basis for fraud unless it shown that the disputed statements were false when made"); *see also McEvoy Travel Bureau, Inc.*, 563 N.E.2d at 192; (2) the statement was a material influence in inducing MassHealth to take action, *St. Paul Fire and Marine Ins. Co.* v. *Ellis & Ellis*, 262 F.3d 53, 62 & n.9 (1st Cir. 2001) (quoting *Zimmerman* v. *Kent*, 575 N.E.2d 70, 75 (Mass. App. Ct. 1991)); (3) the misrepresentation was made intentionally or recklessly, *Proulx* v. *DeWolfe Co., Inc.*, 819 N.E.2d 633, 2004 WL 2937818, at *1 (Mass. App. Ct. Dec. 20, 2004) ("To recover on their claim for fraud, the plaintiffs must establish that [defendant] made the false statement intentionally or recklessly, rather than negligently"); (4) the statement was made for the purpose of inducing MassHealth to rely on it, *Kuwaiti Danish Computer Co.*, 781 N.E.2d at 795-96; (5) MassHealth reasonably relied on the false representation as true and acted on it, *id.*; and (6) MassHealth suffered damages as a result, *Cardullo* v. *Landau*, 105 N.E.2d 843, 845 (Mass. 1952).

Warrick's favor on this count as well.  The fraud claim also fails for another, independent reason.

Under a claim of fraud, the Commonwealth must also prove that MassHealth's reliance on

Warrick's statements was "reasonable and justifiable under the circumstances."  *Collins* v.

*Huculak*, 783 N.E.2d 834, 839 (Mass. App. Ct. 2003).  "The recipient of a fraudulent

misrepresentation of fact is not justified in relying upon its truth if he knows that it is false or if

its falsity is obvious to him."  *Kuwaiti Danish Computer Co.* v. *Digital Equip. Corp.*, 781 N.E.2d

787, 795-96 (Mass. 2003).  MassHealth was "required to use [its] senses, and cannot recover if

[it] blindly relies upon a misrepresentation, the falsity of which would be patent" if it had made

"a cursory examination or investigation."  *Collins*, 783 N.E.2d at 839 (quoting Restatement

(Second) of Torts § 541 comment a (1977)).

The evidence is insufficient to show that any reliance on Warrick's outdated Direct Prices

was reasonable.  A "cursory investigation" into the reimbursement rates of albuterol would have

revealed that MassHealth was relying on the same price for a generic drug for *almost a decade*;

transactions prices, by their very nature, fluctuate.  *See* Trial Ex. 526; Trial Tr. 71:21-24, 72:14-

17, Sept. 16, 2010 (ACS could have written a program to answer questions MassHealth had

about the reimbursement data).  Moreover, it is widely understood that prices for generic drugs

fall significantly after launch, as market forces take hold.  Trial Tr. 27:15-18, Sept. 13, 2010

(testimony of plaintiff's expert, Meredith Rosenthal).

## IV.    THE COMMONWEALTH HAS FAILED TO PROVE DAMAGES

### A.    Warrick Was Not the Proximate Cause of MassHealth's Alleged Damages

An award of damages under any of the Commonwealth's claims requires it to prove that

Warrick's conduct was the cause of the Commonwealth's alleged loss.[22]  The Commonwealth

---

[22]  *See United States* v. *Miller*, 645 F.2d 473, 475-76 (5th Cir. 1981) (explaining that "before the [government] may
recover [] damages [under the False Claims Act], it must demonstrate the element of causation between the false

has failed to make this showing.  "Causation" encompasses two distinct concepts: "causation in

fact and proximate (or 'legal') causation."  *Peckham* v. *Continental Cas. Ins. Co.*, 895 F.2d 830,

836 (1st Cir. 1990).  Under the proximate cause part of the analysis, an independent cause that

was not reasonably foreseeable to the defendant constitutes an intervening or superseding cause

that will "cut off" the defendant's liability.  *Archer* v. *Warner*, 538 U.S. 314, 326 (2003).  *See*

*also Ralston Dry-Wall Co.* v. *U.S. Gypsum Co.*, 926 F.2d 99, 102 (1st Cir. 1991) (Breyer, C.J.).

If, under a proper application of the governing payment regime, the alleged misrepresentation

"would simply be irrelevant" to the government's payment decision, then the government's

failure to abide by its regulation is not foreseeable and then the defendant cannot be held liable

for damages, even if the defendant's misstatement was a "but for" cause of the government's

loss. *United States ex rel. Schwedt* v. *Planning Research Corp.*, 59 F.3d 196, 200 (D.C. Cir.

1995). [23]

 As numerous courts have recognized, the *plaintiff's own conduct* can constitute a

superseding cause that prevents the defendant's conduct from being regarded as the proximate

cause of the plaintiff's injuries.  In *United States* v. *Data Translation, Inc.*, for example, the First

Circuit held that the defendant was entitled to a directed verdict in a contract claim brought by

the federal government because the government contracting officer's "negligence in relying upon

statements and the loss"); *Kuwaiti Danish Computer Co.*, 781 N.E.2d at 796 (finding plaintiff's evidence of misrepresentation "deficient on a[] necessary element" because plaintiff "offered no evidence that any losses it incurred were caused by its reliance on a misrepresentation attributable to [defendant]"); *Trustees of Boston Univ.* v. *Beacon Labs., Inc.*, 270 F. Supp. 2d 88, 90-91 (D. Mass. 2003) (explaining that "a party alleging breach of contract [must] prove both causation and foreseeability in order to recover damages").

[23] Although the concept of proximate causation is perhaps most familiar in the context of common-law torts, it has broader application as well to the breach of contract and statutory fraud claims that the Commonwealth asserts here. This Court has previously observed that "common-law tort causation concepts" like proximate cause apply in the False Claims Act setting.  *United States* v. *Parke-Davis*, 2003 WL 22048255, at *4 (D. Mass. Aug. 22, 2003). Likewise, in *Exxon Co.* v. *Sofec, Inc.*, the Supreme Court applied the proximate causation doctrine to a contract claim. 517 U.S. 830 (1996).  The Court explained that "proximate causation principles are generally thought to be a necessary limitation on liability" and that, "[a]lthough the principles of legal causation sometimes receive labels in contract analysis different from the 'proximate causation' label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well."  *Id.* at 838-40.

[defendant's] statement, not the statement itself, would have been the predominant cause of any resulting higher price." 984 F.2d at 1266 (Breyer, C.J.). Similarly, in *Exxon* v. *Sofec*, the Supreme Court relieved the defendant of all liability after concluding that the plaintiff's superseding conduct was the "sole proximate cause of [its own] injury." 517 U.S. at 839-40; *see also Ralston Dry-Wall Co.*, 926 F.2d at 102.

The Commonwealth has failed to prove that Warrick was the proximate cause of MassHealth's alleged damages. Rather, the evidence at trial demonstrates that numerous unforeseeable superseding causes broke any causal chain between Warrick's conduct and MassHealth's reimbursement above actual acquisition cost. MassHealth's *own decisions* with regard to the non-enforcement of the U&C regulation caused the damages it now seeks to recover from Warrick. MassHealth permitted pharmacies to exclude private MAC rates from their calculation of U&C charges, despite regulations requiring such rates to be included. Trial Tr. 112:23-113:3, 118:19-119:3, Sept. 20, 2010; *id.* 15:10-25, Sept. 22, 2010 (testimony of Dr. Jeffrey). The Commonwealth's decision not to enforce the U&C regulation was a superseding cause that cut off liability. *Schwedt*, 59 F.3d at 200.

In addition, the actions of MassHealth's own agents – namely FDB and MassHealth's fiscal agents Unisys/ACS – were superseding causes that cut off Warrick's liability for damages. There is no evidence that Warrick knew FDB would use its direct price at launch to populate a field referred to as "Wholesale Net Unit Price;" that FDB would delete its Direct Price from the hard copy publication but keep an obsolete price in the electronic database; that MassHealth would use the WNU price as a WAC for reimbursement purposes; or that neither the Commonwealth or Unisys/ACS would notice the discrepancy between DP and WNU and fix the mistake in its data, despite a contractual duty on ACS's part to "insure that the data in the POPS

system were accurate" and to "identify and correct any errors in the data."  Trial Tr. 75:10-76:14,

Sept. 16, 2010 (testimony of Mr. Sibor of ACS).  Each of these unforeseeable steps is an

intervening cause:  had any of these steps not occurred, MassHealth never would have relied on

Warrick's DP at launch for reimbursement purposes.

Moreover, Warrick's allegedly inflated WAC could not, as a matter of law, have caused

the Commonwealth any damages.  As an initial matter, MassHealth did not use WACs or WNU

prices as a basis for reimbursing 75% of the claims at issue. Trial Tr. 28:12-18, 30:13-24, Sept.

21, 2010.  In the absence of the allegedly inflated WAC, MassHealth would have had *no*

information from Warrick in its system to use in its reimbursement formula for Warrick's

products.  Because Warrick had no obligation to report a WAC, Trial Tr. 14:2-25, Sept. 13,

2010; Trial Tr. 79:6-10, Sept. 20, 2010, if FDB had properly withdrawn Warrick's launch price,

there would have been no price in the WAC field at all.  Thus, FDB's continued reporting of an

inflated WAC, rather than no WAC, could not possibly have damaged MassHealth in the 75% of

cases in which MassHealth reimbursed on a basis other than WAC.  As to the remaining 25% of

claims, because WAC was the lowest price of the four, the Commonwealth was not injured by

FDB's failure to withdraw the launch price.  For those claims, if the launch price had been

properly withdrawn, and there was no WAC, MassHealth would instead have reimbursed at the

next *higher* rate among the four values under MassHealth's formula.  Trial Tr. 162:21-163:10,

Sept. 27, 2010.

Separate and apart from this, as to each claim, the Commonwealth's theory of damages

depends on its contention that, had Warrick reported as its WAC a number as low as the AMP

that Warrick reported quarterly to CMS, MassHealth would have reimbursed on that basis.

There is, however, absolutely no evidence in the record from which any reasonable jury could

have concluded that MassHealth would have paid at this much lower level.  Indeed, the only

evidence in the record on this point is that, even to the present, the lowest reimbursement rate

that MassHealth has set for any of the drugs at issue in this case is more than *double* the AMPs

for these drugs.  Trial Tr. 165:18-24, Sept. 27, 2010.

>    **B.      Dr. Hartman's Damages Calculation Is Unreliable**

The Commonwealth has, in any event, failed to prove by reliable evidence the amount of

damages attributable to FDB's erroneous wholesale net prices.  Damages "must be proven 'with

a fair degree of certainty.'"  *Damon* v. *Sun Co.*, 87 F.3d 1467, 1472 (1st Cir. 1996) (citing *Pearl*

v. *William Filene's Sons Co.*, 58 N.E.2d 825, 827 (Mass. 1945)); *Astro-Med, Inc.* v. *Nihon*

*Kohden Am., Inc.*, 591 F.3d 1, 19 (1st Cir. 2009) (reiterating the "enduring rule that damages

must be established by a reasonable certainty and may not be recovered if purely speculative")

(citing *Nestle Food Co.* v. *Miller*, 836 F. Supp. 69, 78 (D.R.I. 1993)).  The damages calculation

of the Commonwealth's expert, Dr. Hartman, fails to meet the reliableness standard.  Dr.

Hartman inappropriately attributes damages to Warrick where MassHealth's basis of

reimbursement was FUL or U&C.  That is based on the unfounded assumption that, but for the

inflated WNU number, MassHealth would have had available to it, and would have reimbursed

based on, a "true" WAC.  His calculation also fails to account for the instances in which a

pharmacists' actual U&C would have been the lowest reimbursement rate.

Damages cannot be attributed to Warrick for the 75% of claims adjudicated using FUL or

U&C.  Trial Tr. 28:12-18, 30:13-24, Sept. 21, 2010.  There is no evidence that Warrick's

"mistaken" WAC was used as the basis for any federal upper limit.  And it is undisputed that

U&C's were submitted solely by pharmacists and had nothing to do with WAC.  Trial Tr. 24:11-

20, 68:5-8, Sept. 16, 2010.  Thus FDB's inaccurate WNU price was irrelevant to the

reimbursement decision for 75% of the claims, and no damages can be attributed to it or assessed

against Warrick with respect to those claims.  Nor can damaged be attributed as to the other 25%

of the claims.  There is no foundation in the evidence from which to conclude that MassHealth

would have had available to it a "true" WAC upon which to base reimbursement as there was no

duty to report a WAC at all.  *See* Trial Ex. 1; Trial Tr. 14:2-25, Sept. 13, 2010 (testimony of

plaintiff's expert, Meredith Rosenthal); Trial Tr. 79:6-10, Sept. 20, 2010 (testimony of Director

of Pharmacy for MassHealth, Dr. Paul Jeffrey).  Nor is there any evidence that MassHealth

would have reimbursed based on a proxy for WAC, such as AMP.  *See, e.g.*, Trial Tr. 83:24-

84:11, Sept. 21, 2010.  Therefore any calculation of damages for that 25% of claims is purely

speculative.  Moreover, since Dr. Hartman provided the jury with no reliable information to

allow it to parse out the 25% of claims reimbursed on the basis of EAC, the jury could not

possibly have calculated the alleged damages on the only claims for which Warrick could even

theoretically be held liable.

In addition, the damages testimony of Dr. Hartman, is inconsistent, speculative, and

unreliable because that it fails to account for those claims for which the pharmacists' U&C

would have been the lowest reimbursement rate had they been truthful.  According to Dr.

Hartman's testimony, in those instances in which the pharmacists' billed amount (*i.e.*, the

reported U&C) was less than what Dr. Hartman calculates the Commonwealth should have paid

if it had known an accurate WAC figure for Warrick (the "but for" reimbursement rate), Dr.

Hartman has calculated no damage attributable to Warrick and, in fact, does not even count the

claim for purposes of his penalties calculation. Trial Tr. 33:23-34:23, Sept. 21, 2010.

Consistency would require Dr. Hartman similarly to exclude from his damages and penalty

calculations every instance in which a pharmacist's "true" U&C (had it been submitted) would

have been lower than Dr. Hartman's "but for" rate.[24]   However, Dr. Hartman has – by his own admissions – made no effort to identify those claims for which, had the pharmacy submitted a so-called "true" U&C, it would have been lower than the "but for" rate.  Trial Tr. 90:6-17, Sept. 21, 2010; Hr'g. Tr. 31:22-23; 57:23-58:1, July, 28, 2010.  According to Dr. Jeffrey, if the U&C regulation had been enforced, generics would have been reimbursed on the basis of the U&C 100% of the time.  Trial Tr. 34:23-35:3, Sept. 22, 2010.  Dr. Hartman's failure to make adjustments for such claims renders his entire damages calculation inconsistent, speculative, and unreliable.  Accordingly, the Commonwealth cannot meet its burden of proving damages to any reasonable degree of certainty.

## CONCLUSION

For all the foregoing reasons, Warrick is entitled to judgment as a matter of law on all counts or, in the alternative, a new trial.  At the very least, the Court should find that Warrick committed no more than 28 violations for purposes of imposing penalties under the MFCA.

Respectfully submitted,

/s/ John P. Bueker
John T. Montgomery (BBO #352220)
Douglas H. Hallward-Driemeier (BBO #627643)
John P. Bueker (BBO #636435)
Amanda L. Lydon (BBO #669235)
Ropes & Gray LLP
800 Boylston Street
Boston, MA 02199-3600
(617) 951-7000

*Attorneys for Warrick*

Dated:  October 13, 2010

---

[24] The Court observed during a pre-trial hearing regarding Dr. Hartman's calculations that his failure to do so may constitute an "inconsisten[cy]" in Dr. Hartman's damages methodology.  Hr'g. Tr. 50:12-13, July 28, 2010.

## <u>CERTIFICATE OF SERVICE</u>

     I, John P. Bueker, hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via ECF electronic filing on October 13, 2010.

<u>/s/ John P. Bueker</u>
John P. Bueker