# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| COMMONWEALTH OF MASSACHUSETTS, | ) | |
| PLAINTIFF | ) | |
| | ) | C.A. No. 03-11865-PBS |
| vs. | ) | |
| | ) | |
| MYLAN INC. et al., | ) | |
| DEFENDANTS | ) | |

## COMMONWEALTH'S OPPOSITION TO DEFENDANTS' RENEWED
## MOTION FOR JUDGMENT AS A MATTER OF LAW
## OR IN THE ALTERNATIVE FOR A NEW TRIAL

## TABLE OF CONTENTS

I.   LEGAL STANDARDS.................................................................................1

    A.    Judgment as a Matter of Law.................................................................1

    B.    Motion for New Trial............................................................................2

II.   THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW FOR
    THE COMMONWEALTH ON ITS CLAIM FOR BREACH OF THE IMPLIED
    COVENANT OF GOOD FAITH AND FAIR DEALING...........................................3

III.   THE COURT SHOULD ASSESS PENALTIES UNDER SECTION 1 OF THE
    MFCA BASED UPON THE NUMBER OF FALSE CLAIMS THE JURY
    DETERMINED DEFENDANTS CAUSED TO BE PRESENTED…...........................6

    A.    Defendants' Position is Contrary to the Plain Language of the Massachusetts
        False Claims Act.....................................................................7

    B.    Defendants' Position is Contrary to the Legislative History of the 1986
        Amendments to the Federal False Claims Act..............................7

    C.    Defendants' Position is Exclusively Based Upon Bornstein, a Single, Pre-1986
        Supreme Court Case that is Distinguishable from the Facts of this Case..............9

    D.    Defendants' Constitutional Avoidance Argument Fails on Multiple Grounds.....12

        1.    The Canon of Constitutional Avoidance Does Not Apply.......................12

        2.    Defendants' Arguments Regarding the Constitutionality of
            Penalties are Premature and Irrelevant......................................13

        3.    Defendants Waived Their Ex Post Facto Argument, But In Any Event,
            There is No Ex Post Facto Problem............................................14

IV.   THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR JUDGMENT
    AS A MATTER OF LAW ON THE COMMMONWEALTH'S MFCA
    CLAIMS.................................................................................18

    A.    *Allison Engine* is Irrelevant to the Commonwealth's MFCA Section 1 Claim.....18

    B.    There Was Sufficient Evidence for the Jury to Find That Defendants Caused
        False Claims to Be Present.....................................................19

C.      There Was Sufficient Evidence that Defendants' Reported Prices Were False, Inaccurate, Incomplete or Misleading When Made, or Had a Forward-Looking Connotation, Requiring That They Be Updated....................................................23

D.      There Was Sufficient Evidence That Defendants Had the Necessary Scienter To Be Liable Under the MFCA..................................................................................28

     1.      Defendants Knew Their Reported WAC Prices Were False and Fraudulent....................................................................................................28

     2.      Defendants' Argument that They Did Not Have the Necessary Scienter Under the MFCA Misconstrues or Disregards the Record Evidence.......30

     3.      Defendants Understood the Relevant Regulations, Which Were Clear and Unambiguous.................................................................................32

     4.      Jury Instruction No. 17 Was Clear, Appropriate and Legally Correct......33

     5.      Defendants Intended Their False Statements To Be Material to the Commonwealth's Decision To Pay Or Approve Claims Under Section 2 Of The MFCA.........................................................................34

E.      There Was Sufficient Evidence of Materiality....................................................36

V.      **THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR JUDGMENT AS A MATTER OF LAW ON THE COMMONWEALTH'S MMFCA CLAIM**..........40

VI.     **THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR JUDGMENT AS A MATTER OF LAW ON THE COMMONWEALTH'S COMMON LAW FRAUD CLAIM**................................................................................................................40

VII.    **THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO FIND PROXIMATE CAUSE**................................................................................................................42

VIII.   **DR. HARTMAN'S DAMAGES CALCULATIONS WERE RELIABLE**…..........44

IX.     **CONCLUSION**…………………………………………………………………...47

## TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Accusoft Corp. v. Palo,*
   237 F.3d 31 (1st Cir. 2001) ..................................................................3

*Allison Engine Co., Inc. v. United States ex rel. Sanders,*
   128 S.Ct. 2123 (2008) ...............................................................18, 19

*Arbaugh v. Y&H Corp.,*
   564 U.S. 500 (2006) ...............................................................................14

*Backman v. Polaroid Corp.,*
   910 F.2d 10 (1st Cir. 1990) ...........................................................23, 26

*Bergeron v. Ridgewood Securities Corp.,*
   610 F.Supp.2d 113 (D.Mass. 2009) .....................................................4

*BMY—Combat Sys. Div. of Harsco Corp. v. United States,*
   44 Fed.Cl. 141 (Fed.Cl. 1999) .............................................................12

*Bobbitt v. U.S.*
   2006 WL 335231 (D.Mass. Feb. 10, 2006) ........................................45

*Cambridge Plating Co. v. Napco, Inc.,*
   85 F.3d 752 (1st Cir. 1996) ....................................................................2

*Capitol Records, Inc. v. Alaujan,*
   626 F.Supp.2d 152 (D.Mass. 2009) ....................................................13

*Capri Optics Profit Sharing v. Digital Equipment Corp.,*
   950 F.2d 5 (1st Cir. 1991) .....................................................................26

*Carleton v. Framingham,*
   418 Mass. 623 (1994) ............................................................................17

*Centex Corp. v. U.S.,*
   395 F.3d 1283 (Fed. Cir. 2005) .............................................................4

*Chase Manhattan Bank, N.A. v. Keystone Distributors, Inc.,*
   873 F.Supp. 808 (S.D.N.Y. 1994) .........................................................4

*Child Support Enforcement Div. of Alaska v. Brenckle,*
   424 Mass. 214 (1997) .....................................................................15, 17

*Correa v. Hospital San Francisco,*
  69 F.3d 1184 (1st Cir. 1995) .......................................................................3, 14


*Craig-Buff Ltd. Partnership v. U.S.,*
  69 Fed.Cl. 382 (Fed. Cl. 2006) ...........................................................................4

*Crowe v. Bolduc,*
  334 F.3d 124 (1st Cir. 2003) ...............................................................................1

*Cummings v. Standard Register Co.,*
  265 F.3d 56 (1st Cir. 2001) ................................................................................44

*Damon v. Sun Co., Inc.,*
  87 F.3d 1467 (1st Cir. 1996) ........................................................................40, 44

*Daubert v. Merrill Dow Pharms., Inc.,*
  509 U.S. 579 (1993) ................................................................................44, 45, 48

*Declude, Inc. v. Perry,*
  593 F.Supp.2d 290 (D.Mass. 2008) .....................................................................4

*Delaney v. Reynolds,*
  63 Mass.App.Ct. 239, 242, 823 N.E.2d 554 (2005) ......................................42, 43

*Department of Housing and Urban Development v. Rucker,*
  535 U.S. 125 (2002) ...........................................................................................14

*Doe v. Sex Offender Registry Bd.,*
  450 Mass. 780 (2008) .........................................................................................15

*F.C.C. v. Fox Television Stations, Inc.,*
  129 S.Ct. 1800 (2009) ........................................................................................12

*Falby v. New England Forestry Found.,*
  823 N.E.2d 823, 2005 WL 600332 (Mass.App.Ct. 2005) ...................................28

*First Act, Inc. v. Brook Mays Music Co.,*
  429 F.Supp.2d  429 (D. Mass. 2006) ...................................................................2

*Hanscom v. Malden & Melrose Gaslight Co.,*
  220 Mass. 1 (1914) .............................................................................................15

*Hays v. Hoffman,*
  325 F.3d 982 (8th Cir. 2003) ...............................................................................8

*Heckler v. Community Health Servs.*,
467 U.S. 51 (1984) ....................................................................................25

*In re Biogen Securities Litig.*,
179 F.R.D. 25 (D.Mass. 1997) ...................................................................23

*In re Credit Suisse-AOL Securities Litig.*,
465 F.Supp.2d 34 (D.Mass. 2006) .............................................................23

*In re Liquidation of Amer. Mut. Liability Ins. Co.*,
434 Mass. 272 (2001) ................................................................................17

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*,
498 F.Supp.2d 389 (D.Mass. 2007) ...........................................................11

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*,
582 F.3d 156 (1st Cir. 2009) .......................................................................7

*In re Phillips Petroleum Securities Litig.*,
881 F.2d 1236 (3d Cir. 1989) ....................................................................26

*In re Schimmels*,
85 F.3d 416 (9th Cir. 1996) .......................................................................11

*Jorgensen v. Massachusetts Port Authority*,
905 F.2d 515 (1st Cir. 1990) .....................................................................42

*Kannavos v. Annino*,
356 Mass. 42, 247 N.E.2d 708 (1969) .......................................................24

*Kontrick v. Ryan*,
540 U.S. 443 (2004) ..................................................................................14

*Kumho Tire Co. Ltd. v. Carmichael*,
526 U.S. 137 (1999) ..................................................................................44

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*,
438 Mass. 459, 781 N.E.2d 787 (2003) .....................................................41

*Lawrence v. Kamco, Inc.*,
8 Mass.App.Ct. 854, 856-58, 397 N.E.2d 1157 (1979) ...............................43

*Leibovich v. Antonellis*,
410 Mass. 568 (1991) ................................................................................15

*Lucia v. Prospect Street High Income Portfolio,*
     36 F.3d 170 (1st Cir. 1994) ...............................................................................23

*M/A-COM Sec. Corp. v. Galesi,*
     904 F.2d 134 (2nd Cir. 1990) ..............................................................................4

*Massachusetts v. Mylan Labs.,*
     608 F.Supp.2d 127 (D.Mass. 2008) ...........................................................passim

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,*
     552 F.3d 44 (1st Cir. 2009) ..................................................................................3

*McEvoy Travel Bureau, Inc. v. Norton Co.,*
     563 N.E.2d 188 (Mass. 1990) .............................................................................28

*Murray & Sorenson, Inc. v. United States,*
     207 F.2d 119 (1st Cir. 1953) ................................................................................8

*Neder v. United States,*
     527 U.S. 1, 16, 119 S.Ct. 1827 (1999) ..............................................................36

*Nei v. Burley,*
     388 Mass. 307, 446 N.E.2d 674 (1983) .............................................................24

*O'Neil v. Electrolux Home Products, Inc.*
     2010 WL 3504191 (D. Mass. Sept. 7, 2010) .......................................................2

*Parker v. Gerrish,*
     574 F.3d 1 (1st Cir. 2008) ..................................................................................14

*Parker v. Town of Swansea,*
     310 F.Supp.2d 356 (D. Mass. 2004) ....................................................................2

*Porter v. Cabral,*
     2007 WL 602605 (D. Mass. Feb. 21, 2007) ........................................................2

*Rae v. Air-Speed, Inc.,*
     386 Mass. 187 (1982) .........................................................................................42

*Rios v. Empresas Lineas Maritimas Argentinas,*
     575 F.2d 986 (1st Cir. 1978) ................................................................................3

*Roeder v. Alpha Industries, Inc.,*
     814 F.2d 22 (1st Cir. 1987) ................................................................................23

*Ross v. A.H. Robins Co.*,
   465 F.Supp. 904 (S.D.N.Y. 1979) ...................................................................26

*Rubinstein v. Collins*,
   20 F.3d 160, 170 (5th Cir. 1994) ...............................................................28

*Santos v. Goldman*,
   76 Mass.App.Ct. 1136, 927 N.E.2d 530 (2010) .............................................43

*Scannell v. Attorney General*,
   70 Mass.App.Ct. 46 (2007) ..........................................................................9

*Scarfo v. Cabletron Sys., Inc.*,
   54 F.3d 931 (1st Cir. 1995) ........................................................................2

*Speakman v. AllAmerica Financial Life Ins. Co.*,
   367 F.Supp.2d 122 (D.Mass. 2005) ...............................................................5

*Steinhilber v. McCarthy*,
   26 F.Supp.2d 265 (D. Mass. 1998) .................................................................2

*Textron, Inc. v. Comm'r*,
   336 F.3d 26 (1st Cir. 2003) ...........................................................................7

*United States v. Bornstein*,
   423 U.S. 303 (1976) ................................................................................6-12

*United States v. Collyer Insulated Wire Co.*,
   94 F. Supp. 493 (D.R.I. 1950) ......................................................................8

*United States v. Ehrlich*,
   643 F.2d 634 (9th Cir. 1981) ................................................................10, 11

*United States v. Fliegler*,
   756 F.Supp. 688 (E.D.N.Y. 1990) ................................................................11

*United States v. Incorporated Village of Island Park*,
   888 F.Supp. 419 (E.D.N.Y. 1995) ................................................................11

*United States v. Killough*,
   848 F.2d 1523 (11th Cir. 1988) ..................................................................11

*United States v. Krizek*,
   111 F.3d 934 (D.C. Cir. 1997) ......................................................................8

*United States v. McLeod,*
   721 F.2d 282 (9th Cir. 1983) ................................................................11

*United States v. Murphy,*
   937 F.2d 1032 (6th Cir. 1992) ...............................................................8

*United States v. Parke-Davis,*
   2003 WL 22048255 (D.Mass. Aug. 22, 2003) ................................................42

*United States v. President and Fellows of Harvard College,*
   323 F.Supp.2d 151 (D.Mass. 2004) .............................................................19

*United States v. Rivera,*
   55 F.3d 703 (1st Cir.1995) ......................................................................11

*United States v. Rogan,*
   459 F.Supp.2d 692, 720 (N.D.Ill. 2006), aff'd, 517 F.3d 449 (7th Cir. 2008) ......................11

*United States ex rel. Berge v. Board of Trustees of the Univ. of Ala.,*
   104 F.3d 1453 (4th Cir. 1997) .................................................................38

*United States ex rel. Carpenter v. Abbott Labs., Inc.,*
   F.Supp.2d--, 2010 WL 2802686 (D.Mass. July 16, 2010) ..................................19

*United States ex rel. DRC, Inc. v. Custer Battles, LLC,*
   2009 WL 3756343 (E.D. Va. Oct. 14, 2009) ................................................8

*United States ex rel. Duxbury v. Ortho Biotech Products, LP,*
   579 F.3d 13 (1st Cir. 2009) ...................................................................19

*United States ex rel. Fago v. M&T Mortgage Corp.,*
   518 F.Supp.2d 108 (D.D.C. 2007) ............................................................13

*United States ex rel. Harrison v. Westinghouse Savannah River Co.,*
   352 F.3d 908 (4th Cir. 2003) ..................................................................38

*United States ex rel. Hendow v. Univ. of Phoenix,*
   461 F.3d 1166 (9th Cir. 2006) .................................................................28

*United States ex rel. Hopper v. Anton,*
   91 F.3d 1261 (9th Cir. 1996) ..................................................................28

*United States ex rel. Marcus v. Hess,*
   317 U.S. 537 (1943) ..........................................................................8, 20

*Unitherm Food Sys. v. Swift-Eckrick, Inc.,*
   546 U.S. 394 (2006) ..................................................................................1

*Wilson v. Mar. Overseas Corp.,*
   150 F.3d 1 (1st Cir. 1998) ........................................................................2

*Yorke v. Taylor,*
   332 Mass. 368, 124 N.E.2d 912 (1955) ...................................................40

*Zimmerman v. Direct Federal Credit Union,*
   262 F.3d 70 (1st Cir. 2001) ......................................................................1

*Zinck v. Gateway Country Store,*
   72 Mass.App.Ct. 571, 893 N.E.2d 364 (2008) .......................................43

## Constitutions and Statutes

Mass. Const. Pt .1, art. 1 ..............................................................................17

Mass. Const. Pt. 1, art. 10 ............................................................................17

Mass. Const. Pt. 1, art. 12 ............................................................................17

MGL c. 118E § 40 ........................................................................................40

MGL c. 12 § 5B ..............................................................................7, 16, 17

MGL c. 12, § 5K .....................................................................................15, 16

MGL c. 12, §§ 5B-5M ..................................................................................17

MGL c. 93, § 9 ..............................................................................................16

MGL c. 93, §9B .............................................................................................16

St. 1980, c. 531, §1 .......................................................................................16

St. 2000, c. 159, §18 .....................................................................................16

St. 2000, c. 159, §202 ...................................................................................16

U.S. Const. amend XIV .................................................................................17

31  U.S.C. § 3729(a) ...............................................................................8, 18

**Other Authorities**

C. Wright & Miller, 9B Fed. Prac. & Proc. Civ. (3d ed. 2010) ...................................................15

Fed. R. Civ. P. 59 ....................................................................................................................1

Fed. R. Civ. P. 7(b)(1)(B) .......................................................................................................2

Fed. R. Civ. P. 12(b)(6) .........................................................................................................14

Fed. R. Civ. P. 12(h)(2) .........................................................................................................14

Fed. R. Civ. P. 50(a) .........................................................................................................1, 15

Fed. R. Civ. P. 50(b) .........................................................................................................1, 15

Fed. R. Civ. P. 61...................................................................................................................2

Fed. R. Evid. 702 .................................................................................................................44

James W. Moore, 5A *Moore's Federal Practice* (2d ed. 1994) ................................................15

Restatement (Second) of Torts § 435 (2010) .........................................................................42

Restatement (Second) of Torts §442B (2010) ........................................................................43

Senate Report No. 99-345, 99th Cong., 2d Sess.1986, 1986 U.S.C.C.A.N. 5266 ................8, 12

The Court should deny Defendants' Renewed Motion for Judgment as a Matter of Law or in the Alternative for a New Trial and enter judgment on the jury verdict.[1]  Defendants have not shown that the evidence at trial was "so overwhelmingly inconsistent with the verdict that no reasonable jury could have returned it."  *See Crowe v. Bolduc,* 334 F.3d 124, 134 (1st Cir. 2003).  Nor have Defendants shown any basis for a new trial under Fed. R. Civ. P 59.  The Commonwealth requests that the Court deny Defendants' renewed motion in its entirety, rule that the Commonwealth has established as a matter of law that Defendants breached the implied covenant of good faith and fair dealing, and enter judgment for the Commonwealth consistent with the jury's verdict.

## I.   **LEGAL STANDARDS**

### A.   **Judgment as a Matter of Law**

A motion for judgment as a matter of law may only be granted when, after examining the evidence of record, and drawing all reasonable inferences in favor of the nonmoving party, the record reveals no sufficient evidentiary basis for the verdict.  *Zimmerman v. Direct Federal Credit Union,* 262 F.3d 70, 75 (1st Cir. 2001).  In the course of this review, the court may not weigh the evidence, undertake credibility determinations, or engage in differential factfinding.  *Id.*  "This review is weighted toward preservation of the jury verdict, which stands unless the evidence was so strongly and overwhelmingly inconsistent with the verdict that no reasonable jury could have returned it."  *Crowe,* 334 F.3d at 134.  "In the end, the jury's verdict must stand unless the evidence, taken in the light most favorable to the prevailing party, points unerringly to an opposite conclusion." *Zimmerman,* 262 F.3d at 75.

---

[1] The Court granted the Commonwealth's request to allow this opposition to also serve as the Commonwealth's Opposition to Defendants' Rule 50(a) Motion for Judgment as a Matter of Law [Dkt. No. 910].  Any arguments contained in Defendants' Rule 50(a) motion which were not reiterated in its Rule 50(b) renewed motion have been waived.  *See Unitherm Food Sys. v. Swift-Eckrich, Inc,* 546 U.S. 394, 400-401 (2006).

### B.   Motion for New Trial

A Court should only grant a new trial motion in those limited circumstances in which allowing a verdict to stand would result in a "miscarriage of justice." *O'Neil v. Electrolux Home Products, Inc.*, 2010 WL 3504191 at *2 (D.Mass. Sept. 7, 2010)(quoting *O'Rourke v. City of Providence,* 235 F.3d 713, 726 (1st Cir. 2001)).  The remedy is to be "sparingly used." *Porter v. Cabral*, 2007 WL 602605 at *1 (D.Mass. Feb. 21, 2007); s*ee also Parker v. Town of Swansea*, 310 F.Supp.2d 356, 370 (D.Mass. 2004) ("Motion for new trial not to taken lightly . . .").  The legal standard applied on a motion for new trial depends on the grounds for relief asserted in the new trial motion.  The movant must state the grounds for a new trial with specificity.  *See* Fed. R. Civ. P. 7(b)(1)(B); *Cambridge Plating Co. v. Napco, Inc.,* 85 F.3d 752, 760 (1st Cir. 1996).

Defendants assert that they are requesting a new trial based upon three allegedly erroneous jury instructions. When a new trial motion is premised on an allegedly erroneous jury instruction (presuming the objection was timely preserved), the objecting party bears the burden of proving that the instruction was "misleading or gave an inadequate understanding of the law." *First Act, Inc. v. Brook Mays Music Co.,* 429 F.Supp.2d 429, 432 (D.Mass. 2006), *quoting Steinhilber v. McCarthy,* 26 F.Supp.2d 265, 278 (D. Mass. 1998).  If the Court concludes that the instruction was erroneous, the Court must then evaluate whether the error was harmless under Fed. R. Civ. P. 61, which provides that, "[a]t every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."  Unless the Court concludes that the instruction was plainly erroneous "and caused a miscarriage of justice or [] undermined the integrity of the judicial process," the grant of a new trial is unwarranted. *Wilson v. Mar. Overseas Corp.,* 150 F.3d 1, 6 (1st. Cir. 1998), *quoting Scarfo v. Cabletron Sys., Inc.,* 54 F.3d 931, 939 (1st Cir. 1995); *see also First Act, Inc.*, 429 F.Supp.2d at 432 ("Even if the objecting party shows the Court

misstated the law, a new trial can be granted only if the Court's error affected the outcome of the trial"). Reversal is warranted "only if the error is determined to have been prejudicial based on a review of the record as a whole," *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 44, 72 (1st Cir. 2009), and the jury charge as a whole. *O'Neill*, 2010 WL 3504191 at *2.

To the extent Defendants are implicitly arguing that they are entitled to a new trial because the verdict is against the weight of the evidence, the motion should be denied, as Defendants have failed to state the grounds with specificity. The Court should deny a new trial motion if the jury's verdict was "within the spectrum of acceptable outcomes." *Correa v. Hospital San Francisco,* 69 F.3d 1184, 1194 (1st Cir. 1995). As set forth below, the jury's verdict was clearly within the spectrum of acceptable outcomes, and Defendants have not shown that the evidence was "grotesquely lopsided" in Defendants' favor. *See Id.* "A trial court, in assessing whether to grant a new trial for lack of legally sufficient evidence, does not properly do so merely because it might have come to a result different from that reached by the jury. The district court should order a new trial only when convinced that a miscarriage of justice would otherwise obtain." *Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986, 990 (1st Cir. 1978).

## II.  THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW FOR THE COMMONWEALTH ON ITS CLAIM FOR BREACH OF THE IMPLIED COVENANT  OF GOOD FAITH AND FAIR DEALING

The covenant of good faith and fair dealing means that when parties enter into a contract, neither party shall do anything to destroy or injure the other party's rights to receive the benefit of the contract. *Massachusetts v. Mylan Labs.,* 608 F.Supp.2d 127, 158-59 (D.Mass. 2008). Although the requirement of good-faith performance is "circumscribed by the obligations-the 'fruits'-actually contained in the agreement," *Accusoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001), that does not mean that a party can avoid liability simply by honoring the letter of the agreement. A party may

3

breach the covenant of good faith and fair dealing even if it does not violate a specific clause in the contract. *Mylan Labs.,* 608 F.Supp.2d at 158-59 ("A party may breach the covenant of good faith and fair dealing implicit in every contract without breaching any express term of that contract. Otherwise, the implied covenant would be a mere redundancy."); *see also Bergeron v. Ridgewood Securities Corp.,* 610 F.Supp.2d 113, 141 (D.Mass. 2009)("The implied covenant of good faith and fair dealing is a judicial convention designed to protect the spirit of an agreement when, *without violating an express term of the agreement*, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain.")(emphasis added); *Declude, Inc. v. Perry,* 593 F.Supp.2d 290, 295 (D.Mass. 2008)(covenant can be breached even in the absence of a breach of the express terms of the contract); *Craig-Buff Ltd. Partnership v. U.S.,* 69 Fed.Cl. 382, 388 (Fed. Cl. 2006)("claim for a breach of implied covenant of good faith and fair dealing is not limited to specific contract terms."); *Chase Manhattan Bank, N.A. v. Keystone Distributors, Inc.,* 873 F.Supp. 808, 815 (S.D.N.Y. 1994)("a party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations.")

The Commonwealth's claim does not hinge on expanding Defendants' contractual duties beyond the terms of the contract, or imposing a duty inconsistent with the contract. Rather, the Commonwealth contends Defendants should not be allowed to engage in an extra-contractual course of action that has the effect of destroying the value of the agreement or interfering with the reasonable expectations of the parties to the agreement. *See Centex Corp. v. U.S.,* 395 F.3d 1283, 1306 (Fed. Cir. 2005)(prohibition on interfering with benefits contemplated by contract is "among the core functions served by the implied covenant of good faith and fair dealing"); *M/A-COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2nd Cir. 1990)("Where a party's acts subsequent to performance on the contract so directly destroy the value of the contract for another party that the acts may be

presumed to be contrary to the intention of the parties, the implied covenant of good faith may be implicated.")

The Court has already concluded that the intended "fruits" of the rebate agreement included: "[giving] state Medicaid programs the benefit of the best price at which the manufacturer sells the drug to any public or private purchaser." *Mylan Labs.,* 608 F. Supp.2d at 159. The rebate agreement provides value to the Commonwealth only when reimbursement is grounded in reality. Although Defendants may have truthfully reported AMPs for purposes of the rebate agreement, they "sabotaged" the intended benefit of the agreement by simultaneously reporting and failing to correct their falsely inflated published prices, thereby inflating reimbursement and diminishing the value of the rebates.

Other courts have applied the implied covenant of good faith and fair dealing where one party engages in extra-contractual conduct that negates an intended benefit of an agreement. For example, in *Speakman v. AllAmerica Financial Life Ins. Co.,* 367 F.Supp.2d 122, 125 (D.Mass. 2005), insurance agents agreed to repay an insurance company past commissions on annuities in exchange for a stream of future commissions on those annuities. Shortly thereafter, the insurance company curtailed its annuities business, destroying the value of the future commissions. *Id.* The court held that the contract necessarily included a duty to remain in the annuities business – the insurance company could not engage in deliberate actions that "hindered plaintiffs from reaping substantial benefits of the contract." *See Id.* at 135 ("plaintiffs did not bargain for deliberate actions on the part of [the insurer] that made it impossible … for them to earn the commissions contemplated by the contract"). In *Centex*, 395 F.3d at 1288, a corporation acquired distressed savings and loan institutions from the Federal Savings and Loan Insurance Corporation. One of the chief benefits of the acquisition was that the corporation could take tax deductions from the losses

they incurred liquidating the assets of the institutions.  *Id.*  Congress later passed a law disallowing the deductions.  *Id.* at 1289.  The trial court concluded, and the Federal Circuit affirmed, that the tax benefits were an important "fruit" of the contract, and that the government breached the implied covenant by passing legislation unilaterally destroying that benefit.  *Id.* at 1305-06; s*ee also Chase*, 873 F. Supp. at 816 (allegations that party violated implied covenant of good faith and fair dealing by acting to "dry up" the revenue stream contemplated by a contract survived motion to dismiss).

Defendants' extra-contractual conduct (violating the Massachusetts False Claims Act (MFCA) and Massachusetts Medicaid False Claims Act (MMFCA) and committing common law fraud) interfered with the reasonable expectations of the parties and destroyed the value of the agreement to the Commonwealth.  Accordingly, the Court should rule as a matter of law that Defendants breached the implied covenant of good faith and fair dealing implicit in the Medicaid Rebate Agreement.

### III.   THE COURT SHOULD ASSESS PENALTIES UNDER SECTION 1 OF THE MFCA BASED UPON THE NUMBER OF FALSE CLAIMS THE JURY DETERMINED DEFENDANTS CAUSED TO BE PRESENTED

The jury found Defendants liable under both Section 1 and Section 2 of the MFCA.  Under Section 1, the jury found Defendants caused 989,103 false claims to be presented.  Under Section 2, the jury found Defendants made 28 false statements.  Defendants request that the Court set aside the jury's finding under Section 1 and only impose 28 penalties under Section 2.  *See* Warrick's Memorandum of Law in Support of Its Renewed Motion for Judgment as a Matter of Law or in the Alternative for a New Trial [Dkt. No. 937] ("Defts' Memo") at 1-16.  Defendants rely exclusively on *United States v. Bornstein,* 423 U.S. 303 (1976).  Their theory is contrary to the plain language of the MFCA, the legislative history of the federal False Claims Act (FCA) and its 1986 amendments, and the relevant case law.

### A.   Defendants' Position is Contrary to the Plain Language of the Massachusetts False Claims Act

The MFCA provides:

Any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval…shall be liable to the commonwealth or political subdivision for a civil penalty of not less than $5,000 and not more than $10,000 per violation, plus three times the amount of damages, including consequential damages, that the commonwealth or political subdivision sustains because of the act of that person.

M.G.L. c. 12 § 5B.

By the plain terms of the statute, a person commits a violation (and is subject to a civil penalty) each time he causes a false claim to be presented.  "The Supreme Court has repeatedly emphasized the importance of the plain meaning rule, stating that if the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written."  *In re Pharmaceutical Indus. Average Wholesale Price Litig.,* 582 F.3d 156 (1st Cir. 2009)(quoting *Textron, Inc. v. Comm'r,* 336 F.3d 26, 31 (1st Cir.2003)).

The plain language of the statute indicates that (1) each false claim that a person "causes to be presented" to the Commonwealth is a violation and (2) a civil penalty is to be assessed "per violation."  Defendants attempt to reconcile their position with the plain language of the statute by arguing that the FCA in effect in 1976 (when *Bornstein* was decided) was "identical" to the MFCA language.  Contrary to Defendants' representation, the statutory language in *Bornstein* was not "identical," as it did not specifically provide for a civil penalty to be assessed "per violation."  *See Bornstein,* 423 U.S. at 307, n. 1.

### B.   Defendants' Position is Contrary to the Legislative History of the 1986 Amendments to the Federal False Claims Act

Consistent with the plain meaning of the MFCA, the legislative history of the 1986 amendments to the FCA makes clear that the imposition of a civil penalty is "automatic and

mandatory for each claim which is found to be false."  Senate Report No. 99-345, 99th Cong., 2d

Sess.1986, 1986 U.S.C.C.A.N. 5266, 5273.[2]  In its report regarding the 1986 amendments, the

Committee made it clear that each claim was a violation, warranting a separate civil penalty:

> **Each separate bill, voucher or other 'false payment demand' constitutes a separate claim for which a forfeiture shall be imposed**, see, for example, *United States v. Bornstein,* 423 U.S. 303 (1976), *United States v. Collyer Insulated Wire Co.*, 94 F. Supp. 493 (D.R.I. 1950), and this is true although many such claims may be submitted to the Government at one time....For example, all claims submitted under a contract obtained through collusive bidding are false and actionable under the act—*Murray & Sorenson, Inc. v. United States*, 207 F.2d 119 (1st Cir. 1953); *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943)—as are all Medicare claims submitted by or on behalf of a physician who is ineligible to participate in the program. *Peterson v. Weinberger*, supra.

*Id.* at 5274-75 [emphasis added].[3]

The 1986 Amendments to the FCA were passed in response to increasing concerns that the

FCA was not doing enough to control rampant fraud against the government.  *Id.* at 5267-68.  The

new constructive knowledge definition added to the FCA was an attempt by Congress to reach "the

'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make

---

[2] Defendants agree that provisions of the MFCA are modeled after the similarly worded §§ 3729(a)(1) and (2) of the FCA, so cases and treatises interpreting the FCA are instructive. Defts' Memo at n. 2; *see also Mylan Labs.,* 608 F.Supp.2d at 140.

[3] Defendants' only response to this clear directive by the Legislature is that the Legislature and a handful of federal courts have cited *Bornstein* favorably, hence it has not been "overruled." *See* Defts' Memo at  4.  The Commonwealth has never argued that *Bornstein* has been "overruled." There is legal analysis in *Bornstein* that remains relevant today. However, the mere fact that a court cites *Bornstein* does not necessarily mean that it agrees with every legal proposition in the case or that *Bornstein* cannot be distinguished on its facts.  The four cases Defendants cite do not support applying *Bornstein* in the manner in which Defendants suggest. In *United States ex rel. DRC, Inc. v. Custer Battles, LLC,* 2009 WL 3756343 (E.D.Va. Oct. 14, 2009), the court did cite *Bornstein,* but it was emphasizing that when deciding whether to assess a $5,500 or $10,000 penalty per violation, the focus should be on the egregiousness of the defendant's own conduct. Notably, and directly contrary to Defendants'  position, the court in *Custer Battles* accepted the number of claims found by the jury as the number of "violations" and assessed one penalty per claim. In *Hays v. Hoffman,* 325 F.3d 982 (8th Cir. 2003), the court's reduction of the number of claims was not "on the basis of *Bornstein*" as Defendants contend, but rather was based upon a determination that the plaintiff's expert had guessed at the number of claims and that many of the claims were beyond the court's jurisdiction. The court in *United States v. Krizek,* 111 F.3d 934 (D.C.Cir. 1997) remanded because it held that the claim should have been defined as each demand for payment rather than each CPT code contained within the demands.  *United States v. Murphy,* 937 F.2d 1032 (6th Cir. 1992) had nothing to do with the number of claims, the number of violations or the number of penalties. It pertained to the scienter required to establish a civil conspiracy under the FCA.

simple inquiries which would alert him that false claims are being submitted." *Id.* at 5286.  In their

motion, Defendants request that the Court take a position contrary to the clear intent of the

legislature in amending the False Claims Act.  The Court should decline to do so.  The Court should

not permit Defendants to get away with the exact "ostrich type" behavior the legislature sought to

prevent.

**C.     Defendants' Position is Exclusively Based Upon *Bornstein*, a Single, Pre-1986 Supreme Court Case that is Distinguishable from the Facts of this Case**

In support of their motion, Defendants rely exclusively on *Bornstein*, a 1976 case decided

solely as a matter of statutory construction, prior to the 1986 amendments to the FCA, which

changed the structure of the statute.[4]  In *Bornstein*, the defendant subcontractor sent falsely labeled

components to a prime contractor in three separately invoiced shipments.  The prime contractor

shipped the final product to the government in 35 separately invoiced shipments.  The Supreme

Court held that the subcontractor was responsible for three - not 35 - forfeitures because the number

of shipments by the prime contractor was unrelated to the subcontractor's conduct.  Specifically, the

Court noted that the fact that the prime contractor "chose to submit 35 false claims instead of some

other number was, so far as [the subcontractor] was concerned, wholly irrelevant, completely

fortuitous and beyond [the subcontractor's] knowledge and control."  *Bornstein*, 423 U.S. at 312.

Unlike the subcontractor in *Bornstein*, Defendants cannot credibly argue that the number of

claims pharmacies submitted to the Commonwealth was, as far as Defendants were concerned,

"wholly irrelevant, completely fortuitous and beyond [Defendants'] knowledge and control."  *See*

*Id.*  Defendants knew pharmacies submitted claims for reimbursement to MassHealth whenever

---

[4] It is not clear that *Bornstein* has any precedential value in interpreting the MFCA or that Massachusetts courts would look to *Bornstein* for guidance.  The FCA at issue in *Bornstein* was not similarly worded to the MFCA. While it is clear Massachusetts courts will look to federal cases involving the FCA, post 1986 amendments, it is not clear the courts will look to cases interpreting earlier versions of the FCA. *See Scannell v. Attorney General,* 70 Mass.App.Ct. 46, 49 n.4, 872 N.E.2d 1136, 1138 (2007).

9

Defendants' drugs were dispensed to Medicaid patients.  They could have prevented the filing of

additional false claims by reporting accurate prices, but did nothing.  The number of claims being

submitted was within Defendants' knowledge and control.  The evidence demonstrates Defendants

were regularly informed of the number of claims pharmacies were submitting, and MassHealth was

paying, for Defendants' drugs.  Defendants signed a Medicaid Rebate Agreement in 1993.  Exh. 7.[5]

By signing that agreement, Defendants made their drugs eligible for reimbursement by MassHealth.

9/27/10 Tr. 40:13-25.[6]  Each quarter during the relevant time period, the Commonwealth sent an

invoice to Defendants advising them of the total dollar amount and the total number of prescriptions

it had reimbursed, by NDC, for each of the Warrick subject drugs.  *See* 1996 HCFA training guide

for the Medicaid Drug Rebate Program at pp. F-15 et seq. [Dkt. No. 858-1]; sample Medicaid Drug

Rebate Program invoice [Dkt. No. 858-2]; 9/27/10 Tr. 82:15-27; 9/27/10 Tr. 107:17-108:8.  Thus,

unlike the subcontractor in *Bornstein,* Defendants knew, on a quarterly basis, exactly how many

claims were being presented to the Commonwealth for payment relating to each of the Warrick

subject drugs.

     In *U.S. v. Ehrlich,* 643 F.2d 634 (9th Cir. 1981), the defendant, relying on *Bornstein,* argued

he "did but one act" - overstated construction costs - so he should only be liable for one penalty, not

the 76 penalties the district court assessed based on 76 false monthly vouchers that were generated

based on the falsely overstated construction costs.  *Id.* at 637.  The court distinguished *Bornstein*

and rejected Ehrlich's argument, holding that when a person knowingly causes a specific number of

false claims to be filed, he is liable for an equal number of forfeitures, stating:

> Ehrlich knew a false claim would be submitted each month. He could have prevented the
> filing of additional false claims. Instead, he did nothing and gained a continuing benefit

---

[5]  All references to "Exh. __" refer to Trial Exhibit numbers.

[6]  All transcripts referenced herein as "Tr." refer to trial transcripts unless otherwise noted.

from the inflated interest subsidies. Had he submitted the claims himself, he would be liable for 76 forfeitures. As in the case of conspirators, it would defeat the purposes of the Act, given Ehrlich's knowledge and control of the situation, to limit his liability to one forfeiture.

*Id.* at 638.

This Court has recognized that *Bornstein* is distinguishable from the situation involved in this case, in which a pharmaceutical manufacturer submits false prices with knowledge that they will be used in the adjudication of multiple subsequent claims.  In assessing the triggering date for the statute of limitations in the AWP litigation, this Court noted, "an FCA claim accrues each time a false claim is submitted."  *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 498 F.Supp.2d 389, 400 (D.Mass. 2007)(citing *United States v. Rivera,* 55 F.3d 703, 707 (1st Cir.1995)); *see also U.S. v. Incorporated Village of Island Park*, 888 F.Supp. 419, 441 (E.D.N.Y. 1995)(holding that a separate claim for liability existed for each monthly mortgage subsidy submitted by the non-party where the defendant's initial fraudulent conduct and false statements caused the third party to submit a "readily ascertainable number of claims" for reimbursement); *U.S. v. Rogan,* 459 F.Supp.2d 692, 720 (N.D.Ill. 2006), aff'd, 517 F.3d 449 (7th Cir. 2008)(holding that the number of violations of the False Claims Act depends on the number of false or fraudulent claims or other requests for payments that defendant caused to be submitted, and that a separate penalty is assessed per false claim); *U.S. v. Killough*, 848 F.2d 1523, 1533 (11th Cir. 1988)(holding that imposition of forfeitures under the Act is not discretionary, but is mandatory for each claim found to be false); *U.S. v. Fliegler,* 756 F.Supp. 688, 694 (E.D.N.Y. 1990)(holding that the amount of the penalty to be assessed per claim is left to the court's discretion); *United States v. McLeod,* 721 F.2d 282, 285 (9th Cir. 1983)("A person who commits any of the acts prohibited by the False Claims Act is liable for a…civil penalty for each false claim presented…"); *In re Schimmels,* 85 F.3d 416, 419 n. 1 (9th Cir. 1996)("[T]he FCA requires a court to award [penalties] for each false

claim or statement submitted to the government, even if no damages were caused by the false submissions."); *BMY—Combat Sys. Div. of Harsco Corp. v. United States,* 44 Fed.Cl. 141, 150 (Fed.Cl. 1999)("Each false claim results in one penalty.")

When Congress amended the FCA in 1986, it specifically indicated it was targeting prior cases such as *Bornstein* that took a restrictive interpretive approach and thereby limited the effectiveness of the Act:

> Since the act was last amended in 1943, several restrictive court interpretations of the act have emerged which tend to thwart the effectiveness of the statute. The Committee's amendments contained in S. 1562 are aimed at correcting restrictive interpretations of the act's liability standard, burden of proof, *qui tam* jurisdiction and other provisions in order to make the False Claims Act a more effective weapon against Government fraud.

Senate Report No. 99-345, 99th Cong., 2d Sess.1986, 1986 U.S.C.C.A.N. 5266, 5269.

### D.    Defendants' Constitutional Avoidance Argument Fails on Multiple Grounds

### 1.    The Canon of Constitutional Avoidance Does Not Apply.

Under the guise of the canon of constitutional avoidance, Defendants advocate that the Court's decision on the number of civil penalties should be driven by convenience rather than reason. Defendants argue that the Court should grant their motion for judgment as a matter of law, and set aside the jury's finding of the number of false claims, purely to avoid having to "grapple with" issues related to the Excessive Fines and Due Process Clauses of the United States and Massachusetts Constitutions. Defts' Memo at 10-14.

Defendants misunderstand the canon of constitutional avoidance. "The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts." *F.C.C. v. Fox Television Stations, Inc.,* 129 S.Ct. 1800, 1811 (2009). Where a statute is not ambiguous, the canon does not apply. *Department of Housing and Urban Development v. Rucker*, 535 U.S. 125, 134-35 (2002). The canon does not, as

Defendants suggest, authorize the Court to depart from the clear mandate of the MFCA because applying the statute correctly may later raise a constitutional concern. *See Capitol Records, Inc. v. Alaujan*, 626 F.Supp.2d 152, 155 (D.Mass. 2009)(despite fact that Copyright Act's penalty provisions might result in constitutionally excessive award against non-commercial defendant, provisions clearly applied to all infringers, and doctrine of constitutional avoidance did not allow Court to interpret Act to apply only to commercial infringers).

The canon of constitutional avoidance is implicated when one interpretation of a statute makes the statute unconstitutional, not when a clearly constitutional statute, applied in one specific case, results in a penalties award that the losing party claims is constitutionally excessive. Defendants are essentially advocating that rather than deciding a disputed legal issue deliberately and correctly, the Court should base its decision on the outcome that will most limit litigation down the road. The Court should reject Defendants' suggestion that in resolving this legal issue the Court should be guided by a desire to avoid addressing the issue of the constitutionality of civil penalties.

## 2. Defendants' Arguments Regarding the Constitutionality of Penalties are Premature and Irrelevant.

Defendants' arguments regarding the constitutional implications of civil penalties in this case are premature and completely irrelevant to the Court's resolution of this Motion for Judgment as a Matter of Law. It is premature to apply an Excessive Fines Clause analysis before any penalties are requested or imposed. *See United States ex rel. Fago v. M&T Mortgage Corp.,* 518 F.Supp.2d 108, 124 (D.D.C. 2007). Defendants' argument assumes that the Commonwealth will seek to obtain $4.9 billion in penalties, or some other grossly disproportional amount. Defts' Memo at 13 and n. 14. As Defendants themselves recognize, if the Court is concerned that a specific penalty amount would be unconstitutional, the Court can simply reduce the amount of the penalties.

*See* Defts' Memo at 13-14.  It is unnecessary for the Court to address this issue in connection with Defendants' Motion for Judgment as a Matter of Law.

### 3.      Defendants Waived Their Ex Post Facto Argument, But, In Any Event There is No Ex Post Facto Problem.

Defendants contend that this Court must apply civil penalties only to conduct occurring after July 28, 2000---the enactment date of the MFCA.  Defts' Memo at 14-16.  This argument fails both procedurally, for being untimely, as well as substantively, because it ignores well-established Massachusetts law relating to the retroactivity of civil statutes.

Procedurally, Defendants' failure to raise this argument prior to the conclusion of trial has resulted in a waiver of such a defense.  In practical effect, the contention that the Commonwealth is not entitled to civil penalties under the MFCA prior to the statute's effective date of July 1, 2000[7] is an argument that the Commonwealth has failed "to state a claim upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6).  Both the Federal Rules and case law require, however, that any argument that a party has not stated a claim upon which relief can be granted must be made no later than the conclusion of trial.  *See* Fed. R. Civ. P. 12(h)(2), *Arbaugh v. Y&H Corp.,* 564 U.S. 500, 507 (2006) ("Under Rule 12(h)(2), [a 12(b)(6)] objection endures up to, but not beyond, trial on the merits"); *Kontrick v. Ryan*, 540 U.S. 443, 459 (2004).  The Supreme Court has expressly held that a failure to present such an argument prior to this temporal threshold results in the defense being lost. *Kontrick,* 540 U.S. at 459.  Given that Defendants have not raised this argument prior to this post-verdict motion, the argument must be deemed waived.[8]

---

[7] Although the statute was enacted on July 28, 2000, the statute's date of actual effect was set by the Legislature to be July 1, 2000.  *See* St. 2000, c. 159, 18.

[8] Additionally, Defendants' failure to raise this argument as a ground for judgment as a matter of law in their Fed. R. Civ. P. 50(a) motion [Dkt. Nos. 910, 911] also results in a waiver.  *Parker v. Gerrish,* 547 F.3d 1, 12 (1st Cir. 2008).  "As the name implies, a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) is bounded by the movant's earlier Rule 50(a) motion. The movant cannot use such a motion as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for directed verdict." *Correa v. Hospital San*

In addition to being waived, Defendants' Ex Post Facto argument should be rejected on the merits.  As set forth in M. G. L. c. 12, § 5K, the Massachusetts legislature has expressed an intention that the MFCA should apply to "acts or omissions that occurred prior to the effective date" of the statute.  As the Supreme Judicial Court has made consistently clear:

> The retroactive application of a statute is a subject we have addressed on many occasions.  We have applied the rule described in *Hanscom v. Malden & Melrose Gaslight Co*., 220 Mass. 1, 3 (1914): 'The general rule of interpretation is that all statutes are prospective in their operation, **unless an intention that they shall be retrospective appears by necessary implication from their words, context or objects** when considered in the light of the subject matter, the pre-existing state of the law and the effect upon existing rights, remedies and obligations. . . .  It is only statutes regulating practice, procedure and evidence, in short, those relating to remedies and not affecting substantive rights, that commonly are treated as operating retroactively, and as applying to pending actions or causes of action.'

*Child Support Enforcement Div. of Alaska v. Brenckle*, 424 Mass. 214, 219 (1997) (emphasis added).   Given the express language of M. G. L. c. 12, §5K, there can be no doubt as to the Massachusetts Legislature's intention to have the statute apply retrospectively.

Moreover, Defendants cannot contend that the passage of the MFCA in July of 2000 represented an alteration in the state of the law of the Commonwealth or in their substantive rights generally.  As the Supreme Judicial Court has said, "in the context of civil statutes . . . generally, persons challenging a retroactive statute must show that they acted in reasonable reliance upon the previous state of the law."  *Doe v. Sex Offender Registry Bd.*, 450 Mass. 780, 791 n. 17 (2008), *quoting Leibovich v. Antonellis*, 410 Mass. 568, 578 (1991).  Prior to July of 2000, Massachusetts had a statute that prohibited the very same conduct and required proof of the very same elements— including scienter—that Defendants were found to have violated in Sections 1 and 2 of the MFCA

---

*Francisco,* 69 F.3d 1184, (1st Cir. 1995); *see also* James W. Moore, 5A *Moore's Federal Practice* § 50.08 (2d ed. 1994)(explaining that a motion for judgment after the verdict under Rule 50(b) "may only be premised upon particular grounds raised in the earlier motion made at the close of all the evidence," and that, accordingly, "any argument omitted from the motion made at the close of the evidence is waived as a ground for judgment under Rule 50(b)"); C. Wright & A. Miller, 9B Fed. Prac. & Proc. Civ. § 2537, (3d ed. 2010)("Since the post-submission motion is nothing more than a renewal of the earlier motion made at the close of the presentation of the evidence the case law makes it quite clear that the movant cannot assert a ground that was not included in the earlier motion.")

at trial.  The statute, enacted in 1980, *see* St. 1980, c. 531, §1, and previously found at M. G. L. c.

93, §9B, provided that:

> **Any person who shall make or cause to be made, or present or cause to be presented, for payment or approval**, to or by any employee, department, agency, or public instrumentality of the commonwealth, or any political subdivision thereof, any claim upon or against any department, agency, public instrumentality of the commonwealth, or any political subdivision thereof, **knowing such claim to be false, fictitious or fraudulent**, **or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry,** shall forfeit and pay to the commonwealth, or any political subdivision thereof, the sum of two thousand dollars and, in addition, double the amount of damages which the commonwealth or political subdivision thereof may have sustained by reason of the doing or committing of such act, together with the costs of the action.

M. G. L. c. 93, §9B (emphasis added).  Providing further evidence of the intertwined relationship

between the old statute and the MFCA, M. G. L. c. 93, §9B was  repealed on July 28, 2000 and

replaced by the MFCA on the very same day.[9]  *Compare* St. 2000, c. 159, §202 (repealing M. G. L.

c. 93, §93B) and St. 2000, c. 159, §18 (enacting M. G. L. c. 12, §5K).

The only material difference between the prior statute at M. G. L. c. 93, §9B and the MFCA,

relevant for present purposes, is in the remedy available to the Commonwealth.  *Compare* M. G. L.

c. 93, §9B ($2000 civil penalty; double damages and costs of the action) and M. G. L. c. 12, §5B

(civil penalty of not less than $5000 and not more than $10,000; trebling of damages; consequential

damages; and attorneys' fees).  The distinction in remedy alone, and the presence of a similar

statute (with similar elements) dating back to 1980 providing notice to Defendants that their

conduct would subject them to liability under Massachusetts law even prior to the enactment of the

---

[9]  Notably, M. G. L. c. 93, §9B was found in a portion of a chapter related to "Civil actions by attorney general." *See* M. G. L. c. 93, §9.  The MFCA was subsequently inserted into Chapter 12 of the Massachusetts General Laws which outlines the authority of the "Department of the Attorney General and the District Attorneys."

MFCA[10], supports the legislative intention that the MFCA should be retroactively applied to encompass Defendants' illegal conduct dating back to 1995 when determining civil penalties. *See Child Support Enforcement Div. of Alaska*, 424 Mass. at 219.

Massachusetts law also makes clear that the retroactive application of the MFCA does not violate the Defendants' Due Process rights.  "The rule that guides judges in deciding whether a retroactive statute violates due process rights under the Fourteenth Amendment to the U.S. Constitution or arts. 1, 10 and 12 of the Massachusetts Declaration of Rights is that only statutes, 'which, on a balancing of opposing considerations, are deemed to be unreasonable, are held to be unconstitutional.'" *In re Liquidation of Amer. Mut. Liability Ins. Co.,* 434 Mass. 272, 282 (2001). An evaluation of reasonableness includes three considerations: "the nature of the public interest which motivated the Legislature to enact the retroactive statute; the nature of the rights affected retroactively; and the extent or scope of the statutory effect or impact." *Id. quoting Leibovich*, 410 Mass. at 577.  When evaluating reasonableness, "the objectors face a heavy burden, for [the Court] gives credit to every rational presumption in favor of the legislation.  *Id. citing Carleton v. Framingham*, 418 Mass. 623, 631 (1994).

As set forth above, the existence of a prior statute that prohibited the very same conduct of Defendants that violated the MFCA, demonstrates that Defendants' rights were unaffected in any material way by a retroactive application of the MFCA for purposes of determining civil penalties. Moreover, the motivation of the Legislature to continue the prohibition against such false and fraudulent conduct, while increasing the possible remedies available to the Commonwealth, supports the valid public interest of deterring persons from engaging in such conduct.  In light of

---

[10] The MFCA, which tracked the amended 1986 version of the FCA, also added several other instances of conduct which could result in liability to the Commonwealth and was designed to encourage more "whistle-blowers" to come forward to report false and fraudulent acts to the Commonwealth.  *See* M. G. L. c. 12, §5B-5M.  These additional provisions, for purposes of Defendants' Motion, are of no relevance.

the presumption in favor of the legislation, and the state of the law at the time of Defendants'

conduct, Defendants' contention that their Due Process rights would be violated is simply without

constitutional force.

## IV.   THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR JUDGMENT AS A MATTER OF LAW ON THE COMMMONWEALTH'S MFCA CLAIMS

### A.   *Allison Engine* is Irrelevant to the Commonwealth's MFCA Section 1 Claim

Defendants argue that *Allison Engine Co., Inc. v. United States ex rel. Sanders,* 128 S.Ct.

2123 (2008), eliminates liability for "causing false claims to be presented," except in the situation

in which a defendant's false statement is specifically included in the claim.  Defts' Memo at 17-18.

Specifically, Defendants claim that unless a drug company's false wholesale acquisition cost

("WAC") is explicitly listed in the claim submitted to the government, or the drug company directly

submits the claim to the government, the drug company cannot be held liable under section 1 of the

MFCA for its false WAC.  There is absolutely no authority to support Defendants' contention that

the Supreme Court in *Allison Engine* intended to eliminate a crucial part of the statute in dicta.[11]

*Allison Engine* only pertained to claims brought under sections 2 and 3 of the FCA.  The

Court in *Allison Engine* briefly mentioned claims brought under section 1, but only to distinguish

section 1 claims (which require a showing of presentment) from claims brought under section 2

(which do not).  Defendants contend that the Court in *Allison Engine* held that under section 1, the

---

[11]  Defendants rely on the following dicta in *Allison Engine:*

> Under [31 U.S.C.] § 3729(c)'s definition of "claim," a request or demand may constitute a "claim" even if the request is not made directly to the Government, but under § 3729(a)(2) it is still necessary for the defendant to intend that a claim be "paid ... by the Government" and not by another entity. This does not mean, however, as petitioners suggest, see Reply Brief 1, that § 3729(a)(2) requires proof that a defendant's false record or statement was submitted to the Government. While § 3729(a)(1) requires a plaintiff to prove that the defendant "present[ed]" a false or fraudulent claim to the Government, the concept of presentment is not mentioned in § 3729(a)(2). The inclusion of an express presentment requirement in subsection (a)(1), combined with the absence of anything similar in subsection (a)(2), suggests that Congress did not intend to include a presentment requirement in subsection (a)(2).

*Id.* at 2129 (footnote omitted).

presented claim has to contain the false statement made by the defendant (in this case, the WAC).

That is simply untrue.  That proposition does not appear anywhere in the *Allison Engine* decision.

Similarly, nowhere in the *Allison Engine* decision did the Supreme Court indicate that its intent was

to disregard the statutory language; "or causes to be presented," so as to preclude all claims brought

under section 1 where there is no direct presentment by the defendant.

Tellingly, in the two years since *Allison Engine* was decided, no court has adopted

Defendants' suspect interpretation of *Allison Engine*.  To the contrary, since *Allison Engine,* the

First Circuit has concluded that a party who induces a third party to present false claims can be held

liable under section 1 of the FCA. *See United States ex rel. Duxbury v. Ortho Biotech Products, LP,*

579 F.3d 13, 29-30 (1st Cir. 2009); *see also United States ex rel. Carpenter v. Abbott Labs., Inc.,* --

F.Supp.2d--, 2010 WL 2802686 (D.Mass. July 16, 2010).  This is consistent with all the other prior

authority in this district indicating that defendants may be liable if they operated under a policy that

caused others to present false claims to the government. *See Mylan Labs.,* 608 F.Supp.2d at 144-

145*; United States v. President and Fellows of Harvard College,* 323 F. Supp. 2d 151, 187

(D.Mass. 2004); *In re Pharm. Indus. Average Wholesale Price Litig.,* 491 F.Supp.2d 12, 16

(D.Mass. 2007).  There is no indication that the Court in *Allison Engine* intended to overturn this

entire line of authority and eliminate a key phrase from the statute.

**B.  There Was Sufficient Evidence for the Jury to Find
That Defendants Caused False Claims to Be Presented**

Defendants assert there was "no evidence whatsoever" that Defendants caused pharmacies

to present claims to the Commonwealth that were false.  Defts' Memo at 18.  They argue,

incorrectly, that there must be evidence that the alleged falsity can be traced "from the defendant

*through* a third party who presents the false claims to the government." *Id.*  They also argue, again

incorrectly, that the Court's jury instruction (No. 16), on causing false claims to be presented, was erroneous. *Id*. at 19-20.

The MFCA reaches any party who knowingly assisted in causing the government to pay claims which were grounded in fraud, regardless of whether the party had direct contractual relations with the government. *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45 (1943). Although the Defendants did not themselves submit claims to the Commonwealth, and the pharmacy submissions did not themselves contain the false WACs, the claims here were "predicated on an underlying fraudulent pricing scheme," and thus Defendants are chargeable with causing false claims to be submitted to the Commonwealth. *Mylan Labs*., 608 F.Supp.2d at 145(quoting *In re Pharm. Indus. Average Wholesale Price Litig*. 491 F.Supp.2d at 16.

There was sufficient evidence for the jury to find that Defendants were a substantial factor in causing the pharmacies to submit false claims. Defendants' drugs were eligible for Medicaid reimbursement only because Warrick signed a Medicaid Rebate Agreement, reported its AMPs to the Center for Medicare and Medicaid Services ("CMS") each quarter and made its rebate payments. Exh. 7; 9/8/10 Tr. 107:18 -109:24; 9/27/10 Tr. 40:17-25. When a pharmacy submitted a claim to MassHealth using the Pharmacy On-line Processing System ("POPS") system: the claim traveled electronically, through a network switch, to the claim processor's server (Unisys or ACS), where it caused, among other things, a pricing file to be brought up; the billed amount (U&C) in the pharmacy's submission was compared with the pricing file (FUL, MULP and EAC): the lowest price was selected: and a communication went back to the pharmacy, through the network switch, which had remained open, telling the pharmacy whether the claim was approved and what amount would be paid. 10/26/07 Milnes Video 107:8-121:22, 143:22-144:16, and 155:12-19; 9/16/10 Tr. 20:5-24:20, 27:7-16, 35:1-3:22, 70:7-25. This process took approximately three seconds, on

average.  9/16/10 Tr. 20:21-22:1.  The claims submitted by the pharmacy contained an National

Drug Code ("NDC"), assigned by Warrick, which determined what pricing file was activated for

comparison purposes.  *Id.* at 22:4-12; 24:4-10; Exh. 145 at 014446.

     The facts proven at trial regarding the Defendants' involvement in the claims submitted to

the Commonwealth are consistent with the facts in *Marcus v. Hess*.  There, electrical contractors

engaged in a collusive bid rigging scheme, in which, by agreement, one contractor submitted an

agreed upon price and the other contractors submitted higher prices.  *Hess,* 317 U.S. at 539, n.1.

The bids were submitted to "local municipalities and school districts."  *Id*. at 542. While

competitive bidding was a federal requirement, not all bidders certified that their bids "were

genuine and not sham or collusive."  *Id*. at 543. The local governments submitted claims to the

federal government for money, not the electrical contractors. *Id.* There is no indication in the

Court's opinion that false certifications of competitive bidding were ever submitted to the federal

authorities.  *Id*. at 542-43.  Yet the Supreme Court found that the FCA reached these defendants

because they "knowingly assisted in causing the government to pay claims which were grounded in

fraud."  *Id*. at 544.  Similarly here, the Defendants' false WAC prices were used to populate the

claim processor's pricing file, meaning that adjudication of the claim was "grounded in fraud."

     Defendants argue "there must be, at least, a direct causal path by which the alleged falsity

can be traced from the defendant *through* a third party who presents the false claim to the

government," citing *Marcus v. Hess* and *President & Fellows of Harvard Coll.,* 323 F.Supp.2d at

187-188.  Defts' Memo at 18-19 (emphasis in original). These cases, however, do not support this

assertion. In *Marcus v. Hess* not all defendants certified their bids were not collusive, and there is

no indication that false certifications of competitive bidding were submitted by the municipalities to

the federal government. *Hess,* 317 U.S. at 543-44. In the *Harvard College* case, the court found that

to "cause" the presentation of false claims under the FCA "some degree of participation in the claims process is required." 323 F. Supp. 2d at 186-87. The court went on to find that defendant Hay had sufficient participation in the claims process to be liable in any month in which he both (1) violated the RGEs (Regulations Governing Employees), and (2) approved some invoice or expense that would eventually be charged to the USAID. *Id.* at 188. The court repeatedly noted that the invoices Hay approved need not be false. *Id.* at 188, n.30 and n.31. Invoice approval was significant, the Court said, because it provided a "nexus" between Harvard's submission of false claims and Hay's role in causing claims to be presented. *Id.* at 188, n.31. By contrast, the court found that defendant Shleifer did not have a sufficient participation in the claims process because there was no evidence he approved any invoices or took "any action to have claims submitted to the government." *Id.* at 188.  Nowhere in the *Harvard College* case does it say that a false statement must pass through a third party (Harvard) to the government.

Contrary to the Defendants' assertions, there was nothing erroneous with the Court's Jury Instruction No. 16 relating to causing the submission of a false claim. The Court told the jurors they may find that a false claim was submitted if they found "Warrick knowingly caused false wholesale net unit prices to be listed in [FDB]" and "knew that those false … wholesale net unit prices [] were used in MassHealth's algorithm when a reimbursement claim for one of Warrick's  albuterol products was submitted." 9/28/10 Tr 121:17-23. The Court went on to instruct that Warrick "can be liable if its conduct was a substantial factor in causing pharmacies to submit false claims," that the MFCA reaches any person who "knowingly assisted in causing the government to pay false claims," and that to cause the presentation of a false claim "some degree of participation in the claims process is required." *Id.* at 122:3-13. All of these instructions were good law and entirely consistent with the cases cited above.

**C.    There Was Sufficient Evidence that Defendants' Reported Prices Were False, Inaccurate, Incomplete or Misleading When Made, or Had a Forward-Looking Connotation, Requiring That They Be Updated**

At Defendants' request, the Court instructed the jury pursuant to *Backman v. Polaroid Corp.,* 910 F.2d 10 (1st Cir. 1990), that there is no duty to correct a statement if it was true and not misleading when made. 9/28/10 Tr. 123:17-124:21; Defendants' Trial Brief [Dkt. No. 890] at pp. 6-7.  The Commonwealth requested that the Court also instruct the jury regarding the two caveats set forth in *Backman:* (1) If a disclosure is inaccurate, incomplete or misleading when made, and the speaker thereafter learns of this, there is a duty to correct it; and (2) If a statement is correct when made, but has a forward intent and connotation upon which parties may be expected to rely, correction or further disclosure may be called for if there is a change. Commonwealth's *Backman* Memorandum [Dkt. No. 903].  Defendants did not object, and the Court gave the instruction.

Defendants do not dispute that the First Circuit in *Backman* held that if a disclosure is inaccurate, incomplete or misleading when made, and the speaker thereafter learns of this, there <u>is</u> a duty to correct it. *Id.* at 16-17 (discussing *Roeder v. Alpha Industries, Inc.,* 814 F.2d 22, 26-27 (1st Cir. 1987)("When a corporation does make a disclosure-whether it be voluntary or required- there is a duty to make it complete and accurate.")).  In continuing to examine the duty to correct, the First Circuit has acknowledged that some statements "although literally accurate, can become, through their context and manner of presentation, devices which mislead." *Lucia v. Prospect Street High Income Portfolio,* 36 F.3d 170, 175 (1st Cir. 1994).  For that reason, the disclosure required is not measured by literal truth, but by the ability of the material to accurately inform rather than mislead. *Id.*  A corporation has a duty to avoid incomplete and half-true misleading statements.  *In re Biogen Securities Litig.,* 179 F.R.D. 25, 34-25 (D.Mass. 1997); *see also In re Credit Suisse-AOL Securities Litig.,* 465 F.Supp.2d 34, 58 (D.Mass. 2006)(holding that because defendants were in the business

of speaking to the public about stock values, every time they issued a projection for AOL's earnings or stock prices and omitted information material to those projections, their reports were "so incomplete as to mislead."). Massachusetts law also provides that a party can be held responsible for giving misleading partial information or for telling half-truths. As this Court has acknowledged:

> [I]n Massachusetts…a party who discloses partial information that may be misleading has a duty to reveal all the material facts he [or she] knows to avoid deceiving the other party.

*Mylan Labs.,* 608 F.Supp.2d at 156 (quoting *Nei v. Burley,* 388 Mass. 307, 446 N.E.2d 674, 676 (1983)); *see also Kannavos v. Annino,* 356 Mass. 42, 247 N.E.2d 708, 711-12 (1969)("Fragmentary information may be as misleading…as active misrepresentation, and half-truths may be as actionable as whole lies.").

Defendants do not dispute this legal authority, but argue that the jury could not reasonably have concluded that Defendants' direct prices at launch, such as $16.06 for the 17g albuterol inhaler, were inaccurate, incomplete or misleading. Defts' Memo at 20-24. The Commonwealth strongly disagrees.

Defendants knew at the time they reported their direct price that the price would drop precipitously after launch and it would not be the price actually paid by wholesalers. In fact, Defendants were so sure the price of the albuterol inhaler would fall that they price protected their customers so that they would never have to pay the announced price. *See* 9/19/06 Weintraub Video 379:10-381:7; Exh. 219 (Warrick Albuterol Inhaler Pre-launch Memo – anticipating a launch price of $14-$15, guaranteeing price protection and expecting 30 day post-launch erosion as much as 50%); 9/27/10 Tr. 66:19-68:20. To that end, as to at least some customers, the announced price was never even entered in the pricing files related to those customers. *See* 2/6/03 Gough Video 141:12-151:14. Warrick's pricing file (Exh. 109) listed every invoice price that was ever sent to each of Warrick's customers. 9/27/10 Tr. 54:12-63:17; 68:21-70:14. The pricing file shows that the large

wholesalers were not paying $16.06.  *Id.* at 54:12-63:17; 2/6/03 Gough 149:7-151:14.  While at first glance it may appear that some pharmacies were paying $16.06, once rebates are accounted for, it is clear they never paid $16.06 either.  9/27/10 Tr. 65:5-66:18. Exhibit 3, page 3, Dr. Hartman's chart, illustrates the point that even at launch, the albuterol inhaler's WAC was considerably higher than the AMP, providing further evidence that Defendants' reported price was untrue from the beginning.[12]

Defendants' knew their reported prices were completely disconnected from real prices charged to wholesalers.  Exh. 4 (Warrick's subject drugs spreads by quarter, showing spreads as high as 690%); Exhs. 222 and 223. Although Defendants knew MassHealth's reimbursement system and that their reported prices were not what the wholesalers actually paid, Defendants still did not update their reported prices to reflect true prices. 1/23/09 Brennan Video at 90:6-19; Exh. 19.

As this Court has acknowledged, by entering into Medicaid rebate agreements, Defendants were required, as a matter of law, to familiarize themselves with the legal requirements, standards and procedures of the Medicaid program, including the procedures and legal requirements applicable to reimbursement.  *Mylan Labs.,* 608 F.Supp.2d at 154 (citing *Heckler v. Community Health Servs.,* 467 U.S. 51, 63-65 (1984)).  Defendants were required to know that the Commonwealth's EAC was "the agency's best estimate of the price generally and currently paid by providers." *See Id.*  Knowing that WAC was used to calculate EAC, and that EAC was meant to estimate what pharmacies actually pay for drugs, the jury could certainly find that Defendants' reported list price at launch was misleading.[13]

---

[12] Similar comparisons can be made for the two other drugs at issue using the POPS screens, Exh. 57, to show launch WACs, and Exh. 59, the Defendants' AMP data, showing the corresponding AMPs.

[13] Defendants claim that their launch price could not have been misleading because it is "widely-held knowledge" that prices drop precipitously after launch.  Defts'Memo at 22. Defendants  rely upon testimony by the

Defendants' argument that they had no duty under the MFCA to disclose pricing information or publish a WAC is completely immaterial. As the First Circuit explained in *Capri Optics Profit Sharing v. Digital Equipment Corp.,* 950 F.2d 5 (1st Cir. 1991), even if a party generally has no duty to disclose certain information, it may assume a duty to disclose that information if omitting the information makes what it did say misleading:

> In *Backman v. Polaroid Corp.*, we held that there was no duty to disclose to market buyers information simply because it was material, or to amplify what was said, unless the omitted matter caused what was said to be misleading.

*Id.* at 7-8 (internal citation omitted).  Likewise, Defendants' argument that there is no duty to correct a misstatement by a third party is inconsequential—Defendants were more than mere bystanders looking on as fraud was committed.  It was Defendants' own report of direct price that set the course of fraud in motion.  Exh. 26 (Stipulation that Warrick suggested a direct price to FDB at the time of launch of its drugs).

There was also ample evidence from which the jury could conclude that Defendants' conduct also fell within the second caveat in *Backman:* There is a duty to correct forward-looking or predictive statements, even if they are true when made, if they become misleading due to subsequent events.  *Backman,* 910 F.2d at 17; *see also In re Phillips Petroleum Securities Litig.,* 881 F.2d 1236, 1245 (3d Cir. 1989)("There can be no doubt that a duty exists to correct prior statements, if the prior statements were true when made but misleading if left unrevised."); *Ross v. A.H. Robins Co.,* 465 F.Supp. 904, 908 (S.D.N.Y. 1979)("It is now clear that there is a duty to correct or revise a prior statement which was accurate when made but which has become misleading due to subsequent events. This duty exists so long as prior statements remain 'alive'."),

---

Commonwealth's experts, which Defendants have taken completely out of context. Dr. Hartman only testified that it is *currently* well known by the *pharmaceutical industry* that prices often drop after launch, but he would not agree that it was generally known among state Medicaid agencies or by the Commonwealth. Dr. Rosenthal merely testified that generic prices tend to decrease over time—she said nothing about such knowledge being "widely-held."

*rev'd on other grounds,* 607 F.2d 545 (2d Cir. 1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64

L.Ed.2d 802 (1980); *Rubinstein v. Collins,* 20 F.3d 160, 170 and n. 41 (5th Cir. 1994)(holding that

"a duty to speak the full truth arises when a defendant undertakes a duty to say anything.")[14]

        The jury had sufficient evidence to find that Defendants' reported price had a forward-

looking connotation, and Defendants knew or should have known that state Medicaid agencies

would continue to rely on them in future reimbursement calculations.  First, at launch, Defendants

reported direct prices to FDB for each of the NDC's at issue in this case "for reimbursement

purposes."  Exh. 26 at ¶2; Exh. 8 (10/30/95 form letter from Warrick to MassHealth listing  Direct

Wholesale price of 17 gram inhaler as $16.06 and stating, "This information is being provided in

the event it is required for reimbursement purposes.");  Manfredi Video 128:18-129:12 (Warrick

reported pricing to First Databank because it knew its products had to be listed to be eligible for

reimbursement by state Mediaid agencies).  Second, Defendants knew that state Medicaid agencies

relied upon FDB's reported prices as a basis for their reimbursement methodologies.  Exh. 92 and

Exh. 539 (4/8/02 letters from Warrick to Indiana and MassHealth stating "First Data Bank is the

source used by the majority of … State Medicaid agencies");  Exh. 146 (form letter from FDB

stating, "wholesale prices… are the basis for reimbursement for several state Medicaid programs.")

Third, FDB routinely sent Defendants update reports listing Warrick's reported prices and

requesting verification of those reported prices.  Exh. 146 ("[i]t is extremely important that you

[drug manufacturer] update all relevant pricing categories, including wholesale prices.");  Exh. 19

and Exh. 20 (1999 & 2005 NDDF Product Update Reports respectively);  10/24/07 Chadwick Video

162:15-21, 163:9-12, 164:2-12, 165:8 (FDB sent updates to drug manufacturers to verify prices that

---

[14] Defendants' attempt to distinguish these cases on their facts is fundamentally flawed because their argument is
premised upon the incorrect assumption that their reported prices had no forward-looking connotation.

the manufacturers reported to FDB).  Fourth, Warrick's prices remained unchanged.  Exh. 20 (2005

NDDF Product Update Report).[15]

### D.   There Was Sufficient Evidence That Defendants Had the Necessary Scienter To Be Liable Under the MFCA

#### 1.   Defendants Knew Their Reported WAC Prices Were False and Fraudulent

Defendants argue that the Commonwealth has failed to prove that Warrick knew its WAC

prices were false. Defts' Memo at 24-28. The evidence, however, is to the contrary.  First, the

evidence established that Defendants knew MassHealth's formula for drug reimbursement. During

the time period in question, CMS and the National Pharmaceutical Council (of which Schering-

Plough Corp. was a member) published a list advising of each state's basis for reimbursement. Exh.

133, at RGXA 0051483; 9/21/10 Tr. 16:7-17:23; Exh. 2 (Stipulation relegating the knowledge of

Schering-Plough to Warrick).  The list specifically advised that Massachusetts was reimbursing

based on WAC + 10%. Exh. 33; *see also* 3/7/02 Kapur Video 94:22-98:21; 126:12-127:8

(Weintraub was very familiar with Medicaid reimbursement and Medicaid regulations and

requirements).

Second, Defendants knew or should have known that MassHealth acquired the WAC prices

used in its reimbursement formula from FDB.  *See Mylan Labs.*, 608 F.Supp.2d at 154 (citing

*Heckler.*, 467 U.S. at 63-65) (Defendants were required, as a matter of law, to familiarize itself with

the legal requirements, standards and procedures of the Medicaid program, including the procedures

---

[15] None of the cases cited by Defendants undercut the legal principles established in *Backman*.  Defendants rely upon two 9th Circuit cases discussing the conditions necessary for a plaintiff to succeed on a false certification theory or a promissory fraud theory under the False Claims Act. *See United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171-72 (9th Cir. 2006) and *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996).  Neither of those theories was at issue in this case. Defendants' reliance upon *McEvoy Travel Bureau, Inc. v. Norton Co.*, 563 N.E.2d 188 (Mass. 1990) and *Falby v. New England Forestry Found.*, 823 N.E.2d 823, 2005 WL 600332 (Mass.App.Ct. 2005) suffers from the same flaw-both cases are distinguishable because they involved promises regarding future conduct  rather than statements of fact that remained 'alive' into the future and upon which the party has reason to know others would continue to rely.

and legal requirements applicable to reimbursement); 2/6/03 Gough Video 75:1-16 (Weintraub, who as set forth above, was familiar with Medicaid reimbursement and regulations, was responsible for reporting Warrick's pricing information to FDB); Manfredi Video 182:10-184:6 and Exh. 106 (Weintraub was involved with all pricing communications and was consulted regarding any communication of pricing, including pricing provided to FDB).

Third, Defendants were well aware that FDB was publishing Warrick's WAC prices for the subject drugs throughout the relevant time period.  Exh. 146 (1994 form letter with Blue Book Update Report); 10/24/07 Chadwick Video 162:15-21, 163:9-12, 164:2-12, 165:8; Exh. 19 (Warrick produced 1999 FDB NDDF Product Update Report listing Warrick's subject drugs' wholesale net prices); 1/22/09 Valerio Video 115:6-7; 115:9; 115:16-18; 115:20 (Valerio recognized Exh. 19 as a type of communication he received from FDB from 1995 moving forward); Exh. 20 (Warrick produced 2005 FDB NDDF Product Update Report listing Warrick's subject drugs' WAC prices).

Fourth, in addition to FDB regularly informing Defendants of what it reported as Warrick's WAC prices, *see Id*., Defendants also independently monitored FDB's reported prices.  *See* Exh. 156 (Warrick produced 8/5/1997 PriceProbe Printout listing Warrick's subject drugs' reported prices, including wholesale net prices, in FDB's database);  11/30/07 Morgan Video 158:15-19; 162:1-3 (PriceProbe was a product sold by FDB); Exh. 153 (2002 PriceProbe Manual that explains that the data in PriceProbe is derived from FDB's electronic database ("NDDF")).

Fifth, Defendants knew that the price FDB reported as 'wholesale net price" was synonymous with WAC.  Exh. 146, p. 3 ("Wholesale Net Price **or** Wholesale Acquisition Cost (WAC) – Price to Wholesaler or Distributor") (emphasis added); Exh. 153 at FDB-AWP 10966

(2002 PriceProbe Manual Glossary defining WHN – Wholesale Net Price as the wholesale price that is paid by the wholesaler to the manufacturer).

Sixth, as stated above in Section IV.C., Defendants knew that their reported launch prices would not be the prices actually paid by wholesalers and would drop precipitously after launch.

Seventh, as stated above in Section IV.C., Defendants knew their reported prices used by MassHealth for reimbursement purposes were false or fraudulent and completely disconnected from real prices charged to wholesalers.

Eighth, as stated above in Section IV.C., although Defendants knew MassHealth's reimbursement system and that its reported prices were not what the wholesalers actually paid, Defendants still did not update their reported prices to reflect true prices.

Taking all the above mentioned facts in the light most favorable to the Commonwealth, there was sufficient evidence for the jury to conclude that Defendants knew that claims were being adjudicated based upon false pricing information.

### 2. Defendants' Argument that They Did Not Have the Necessary Scienter Under the MFCA Misconstrues or Disregards the Record Evidence

Defendants contend that the Commonwealth relied "on pure conjecture" to prove that Defendants had the necessary scienter. Defts' Memo at 25. In support of this contention, Defendants argue that shortly after launch, they: (1) asked FDB to stop publishing a "direct price" for their products; (2) FDB, in fact, stopped publishing Defendants' direct prices; (3) Defendants confirmed that FDB complied with their request; and (4) as a result, Defendants could not have known FDB reported a WAC price for Warrick's subject drug. *Id.* at p. 24-25 (citation omitted).

In addition to the facts listed above in section IV.D.1., upon which the jury could rely, Defendants admitted and the evidence showed that Defendants knew "Direct Price" and "WAC" were synonymous and the terms were used interchangeably. *See* 9/20/06 Weintraub Video 568:18-

21 (wholesale acquisition cost price is the same as direct price; 2/6/03 Gough Video 72:21-73:24;

Exh. 85 (Maryland Medicaid Document listing both direct price and WAC price as $15.45 for

Warrick's Albuterol Inhaler); Exh. 8 (Letter from Warrick to MassHealth listing an Albuterol

Inhaler "Direct Wholesale" price of $16.06 same as Warrick's "direct price"); 9/16/2010 Tr. 111:1-

9; Exh. 120 (a Warrick price change letter listing direct price and Warrick's corresponding account

information form ("AIF") listing the same price as WAC) .  Defendants also reported direct prices

and WACs for some products after requesting FDB to stop publishing the direct price on the

albuterol solution product.  Exhs. 10, 16, 17 and 18.

Defendants' assertion that they confirmed that FDB complied with their request, that

Warrick did not subscribe to FDB's electronic database, and that hard copy versions of FDB

publications properly zeroed out Warrick's direct price, is misleading and misconstrues the record

evidence.  The evidence showed that Defendants knew that pricing compendia had electronic

databases.  *See* Exh. 93 (Memo from Brennan to Weintraub mentioning Red Book listed certain

Warrick's prices solely on its website/e-version).  In fact, FDB expressly told manufacturers (i.e.

Defendants) when requesting annual pricing updates that the wholesale prices needed for State

Medicaid reimbursement were for its database (National Drug Data File "NDDF") and would not

be published in hardcopy.  *See* Exh. 146.

Moreover, Defendants' alleged confirmation that FDB compiled with its request is based

solely on Weintraub's review of FDB's PriceAlert publication.  *See* 9/18/06 Weintraub Video

154:5-12.  However, Defendants' actual request to FDB related to only two NDCs and stated

"[p]lease delete direct price listings from your publication **or** database."  Exh. 16 (emphasis added).

Accordingly, it was not inconsistent for FDB to remove Defendants' direct prices from PriceAlert

but continue to report a price electronically.  The evidence showed that it was FDB's practice to

31

only report wholesale prices in its electronic database.  *See* 10/24/07 Chadwick Video 172:7-11; *see also* Exh. 146 ("This price [wholesale price] is not published in BLUE BOOK or PRICEALERT magazine.").

### 3. Defendants Understood the Relevant Regulations, Which Were Clear and Unambiguous

Defendants assert that the Commonwealth has "fallen back" to proving scienter under Section 1 using "deliberate ignorance or reckless disregard."  Defts' Memo at 25-26.  They argue that the meaning of WAC is ambiguous and ambiguity precludes liability under the applicable standards of scienter.  *Id.* at 26-27.  Yet they cite to nothing in which the Commonwealth indicated it was relying on deliberate ignorance or reckless disregard to prove scienter.  Instead, they cite a passing comment by the Court that the case "**may** turn into a recklessness case." 9/17/10 Tr. 5:20-21 (emphasis added).  They cite to nothing, however, because there is nothing, to indicate the case did turn into a reckless disregard case.

The jury had sufficient evidence to reject Defendants' assertion that the regulations were unclear and instead concluded that Defendants understood the regulations.  Specifically, in the Massachusetts Medicaid regulatory scheme, WAC is used to determine EAC.  *Mylan Labs.,* 608 F.Supp.2d at 143 (citation omitted); Exh. 1 (Stipulation Regarding Massachusetts Regulations Governing Prescribed Drugs and Pharmacy Services).  EAC is defined in the regulation as "an estimate of the price generally and currently paid by … eligible pharmacy providers for the most frequently purchased package size of a drug."  *Id.*  Examining WAC within the context of regulation, wherein EAC is meant to estimate what pharmacies actually pay for drugs, and WAC is used to determine EAC, it logically follows that "WAC must be the type of thing that is amenable to being used to estimate what pharmacies actually pay for drugs."  *Id.*

Nevertheless, Defendants continue to misconstrue the evidence, arguing that there was no established meaning of WAC. Defts' Memo at 26. For example, Defendants cite FDB's 30(b)(6) witness Kathy Chadwick's testimony that WAC was a published catalog price, *see Id.* at p. 27, citing 10/24/07 Chadwick Video 92:5-93:7, however, Chadwick's cited testimony was referring to a FDB drug policy that was published on its website in 2005, well after the relevant time period in this case. *Cf.* 10/24/07 Chadwick Video 90:14-19; 91:3-7. Contrary to Defendants' assertions, the record evidence supported the conclusion that WAC was unambiguously, the price the manufacturer charged the wholesaler for its drugs. *See Id.* at 167:1-9; 186:21-187:3; 187:12-16; 187:21-188:8; 189:1; *see also* 11/30/07 Morgan Video at 101:19-21; 102:10; Exhs. 145, 146, 148, 151, 152, 153. Moreover, the record evidence established that Defendants themselves often used the term "WAC" and reported WACs to customers, state Medicaid agencies, and pricing compendia, including FDB. 3/6/02 Sherman Video 45:12-23; Manfredi Video 182:10-184:6 and Exh. 106; Exhs. 10, 11, 72, 74, 85, 86, 88, 115-117, 120-126. Warrick's pricing files included WAC pricing. 2/6/03 Gough Video 141:12-145:18. Defendants were specifically aware that the price FDB listed as "Wholesale Net Price" was equivalent to WAC and defined as the price from the manufacturer to the wholesaler. Exh. 146, p. 3 (pricing definitions). Therefore, there was sufficient evidence for the jury to conclude that Defendants had the requisite scienter.

### 4.    Jury Instruction No. 17 Was Clear, Appropriate and Legally Correct

Defendants assert that the Court's Jury Instruction No. 17, regarding the meaning of WAC, "significantly confused" the jury, was misleading, and entitles them to a finding of no liability under Section 1 of the MFCA or to a new trial. Defts' Memo at 27-28. They cite no juror question or other evidence in support of this contention. The Court carefully instructed the jury that it was instructing them on the meaning of WAC only as it was "used in the regulation." 9/28/10 Tr. 123:9-

17.  Contrary to Defendants' contention, the Court did not "suggest[] to the jury that the term enjoyed a settled meaning that the evidence showed clearly it did not."  Defts' Memo at 28.  The Court specifically advised the jury, "By instructing you as to the legal meaning of WAC though, I am not instructing you as to how the parties or the industry understood or came to utilize WAC during the time period in question."  *See* 9/28/10 Tr. 123:14-17.  Defendants have not established that Jury Instruction No. 17 was erroneous or that it entitles Defendants to a new trial.

> **5.  Defendants Intended Their False Statements To Be Material To The Commonwealth's Decision To Pay Or Approve Claims Under Section 2 Of The MFCA**

The Court properly instructed the jury that "because there's no way of directly scrutinizing the workings of the human mind," intent "is usually proven by circumstantial evidence," and "you may infer… that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted."  9/28/10 Tr.131:15-132:5.  As set forth above, the evidence was sufficient for the jury to find that Defendants knew that claims were being adjudicated based upon false pricing information, knew what pricing terms meant, knew what pricing terms were being used by compendia and MassHealth for reimbursement purposes, knew about FDB's electronic database, knew what WAC meant and knew that FDB's WNU was WAC.  *See supra* Sections IV.C, D.1-4.  Moreover, the record evidence demonstrated that Defendants' knowledge of these facts persisted throughout the relevant time period in this case.  *See* Discussion, *supra* Section IV.C.

Additionally, there was a wealth of evidence that showed that Defendants were motivated to publish false prices and were interested in the "spread" between acquisition cost and the reimbursement amount, because they knew it mattered to customers. *Compare* Exh. 81, p. RGXA 0098620 and Weintraub Video 460:2-15 (Harvey Weintrraub's handwritten notes calculating the difference between the "reimbursed price" and the "after Rebate price" of albuterol) *with*  9/23/10

Tr. 74:4-76:17 (Fiona Scott Morton conceding that "the spread" is the "reimbursed price minus the "after Rebate price"); Exh. 83; Exh. 104; 3/21/03 Manfredi Video 201:19-202:5; 1/15/03 Zahn Video 145:5-147:17; 215:5-216:3 (Defendants were concerned with pharmacy profits because they knew they could affect sales.)[16]  This is sufficient evidence for the jury to conclude that Defendants intended their false statement to be material to the Commonwealth's decision to pay or approve the claims.

Defendants assert that they lacked the necessary scienter because "no reasonable market participant would have expected that WAC would have been the lowest of the four reimbursement figures and, indeed, it was the lowest only 25% of the time."  Defts' Memo at 28.  This assertion is completely misleading and irrelevant.  The 25% of the time when MassHealth reimbursed based on Warrick's WAC represents MassHealth reimbursing at Warrick's inflated, false WAC price.  Had Defendants reported a true WAC price, the percentage of claims paid at WAC would have increased. 9/21/10 Tr. 44:19-45:3; 46:13-47:8; Exh. 3. The assertion is irrelevant, because materiality is not determined on the basis of whether WAC would be the basis of payment, but rather whether it was "capable of influencing" the agency's payment decision. 9/28/10 Tr. 128:18-129:2.  Had true WACs been reported, 989,103 claims would have been paid at a lower price. 9/21/10 Tr. 30:13-39:25; 57:7-58:5; Exh. 6, p. 2.

Defendants cite Dr. Fiona Scott Morton for the proposition that no reasonable market participant would expect WAC to be the lowest if MassHealth was enforcing its U&C regulation. However, Dr. Scott Morton admitted that when most favored nation ("MFN") clauses are enacted

---

[16] Dr. Rosenthal testified that in the generic pharmaceutical market a manufacturer's reported prices to the pricing compendia are used for virtually all reimbursement for pharmacies in the retail class of trade; higher reported prices mean higher pharmacy reimbursement; the difference between the reimbursement and the acquisition cost is the "spread;" manufacturers compete on the basis of spread; manufacturers have no incentive to decrease their reported prices, and if they do decrease their reported prices and do not decrease the actual acquisition cost, they will lose market share. 9/8/10 Tr. 67:7-69:12.

(as in the case of MassHealth's U&C regulation) it may actually cause the lowest prices to increase. 9/23/10 Tr. 115:21-116:12; 120:21-121:7.  In 1995, when MassHealth was implementing its MFN U&C regulation, Steve Grossman, Legislative Director for the Massachusetts Pharmacists Association, requested a 90-day delay in implementing the MFN provision so pharmacists could review their current drug pricing contracts and determine whether or not to maintain them.  *See* Exh. 217 at 82:16-83:23; *see also* 9/23/10 Tr. 118:25-119:8; Exh. 218 at 33:19-34:9 (MFN clauses reduce discounting).

     **E.**     <u>**There Was Sufficient Evidence of Materiality**</u>

Defendants argue that Warrick's Direct Prices were not material to MassHealth's payment decisions.  Defts' Memo at 29-32.  They are wrong.  There was sufficient evidence for the jury to conclude that Defendants' false prices were material.  A false statement is material if it has a "natural tendency to influence" or is "capable of influencing" agency action.  *Mylan Labs.,* 608 F.Supp.2d at 153 (citing *Neder v. United States,* 527 U.S. 1, 16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)).

Defendants claim that their published prices were immaterial because: (1) WACs were not used as a basis for reimbursement for 75% of claims; and (2) MassHealth "often chose to pay more than it could have paid."  Defts' Memo at 30.  As set forth above, Defendants' first contention is misleading and irrelevant because a true WAC would have resulted in more claims being reimbursed on the basis of EAC.  Additionally, regardless of the basis upon which a claim was ultimately paid, the EAC (and hence, in Massachusetts, the WAC) was contained in the algorithm by which every claim was adjudicated. Therefore, the WAC was "capable of influencing" every claim, not just those that were paid on the basis of EAC.  9/21/10 Tr. 26:6-30:24.

In alleged support of their materiality argument, Defendants assert that MassHealth allowed pharmacies to ignore MAC prices when setting their U&C rates and this reflected a decision "to pay more than it could have paid." Defts' Memo at 30. The jury was certainly free to reject some or all of the defendants U&C evidence. 9/28/10 Tr. 111:19-22. The Commonwealth presented sufficient evidence for the jury to reject Defendants' argument that the Commonwealth chose not to enforce its U&C regulation. Arnold Shapiro, the Director of Masshealth at the time the U&C regulation was adopted, testified that the purpose of the U&C regulation was to get the best price for MassHealth. 10/3/07 Shapiro Video 195:7-196:6. MassHealth reviewed computer reports of how many claims were paid at U&C and made adjustments as result of those comparisons. *Id.* at 150:3-7. All pharmacies were expected to comply with the U&C regulation, and they were audited to make sure they were in compliance. *Id.* at 149:2-19; *see also* 9/24/10 Tr. 79:6-18. When the audits "showed the pharmacies not in compliance, and there were a small number that were not in compliance, … they were fined." 10/3/07 Shapiro Video at 208:18-208:21. Likewise, Paul Jeffrey, the current MassHealth Director, testified that at no time did he ever decide not to enforce the U&C regulation. 9/20/10 Tr. 64:7-16. He indicated that he was informed that pharmacies were generally compliant with the U&C regulation; nevertheless, MassHealth conducted audits of provider compliance. *Id.* at 17:19-21; Exh. 178 (slide 3). The record reflects that several of those audits produced settlements. *See* Exh. 179; Exh. 180; 9/20/10 Tr. 22: 15-120; 58: 1-5 (regarding Pharmerica audit and settlement); Exh. 184; Exh.185; 9/20/10 Tr. 35:9-12; 41:15-21 (Sunscript); Exh. 186; Exh. 187; 9/20/10 Tr.42:1-6; 44:19-22 (Walgreens). The jury was also presented evidence, that as a result of the audits, MassHealth eliminated the 1% exception to the U&C regulation. *Id.* at 16:2-9-17:10; *see also id.* at 18:19-19:14 and Exh. 171; *see also* 9/24/10 Tr. 83:24-84:11 (Al Brown testified that in his tenure as pharmacy investigator at the Attorney General's

Office, he never once heard anyone indicate that the Attorney General's Office or MassHealth was not interested in enforcing the U&C regulation).

The evidence was also sufficient for the jury to reject Defendants' argument that the Commonwealth's alleged failure to update the MULP reflected an intention to pay more.  Defts' Memo at 31.  As Dr. Hartman testified, it is not unusual for states to rely on the FUL rather than setting their own state MULP.  9/21/10 Tr. 98:11-99:2.  If the MULP tracks the FUL, there is no need for a state to update its MULP list.  *Id.*  Paul Jeffrey testified that he took efforts to modify the MULP shortly after he joined MassHealth.  9/17/10 Tr. 40:5-8-41:8; 45: 2-22.   Specifically, the MULP regulation was changed so that a MULP could be imposed when there was no FUL.  *Id.* at 45:11-13.  MassHealth lowered the number of manufacturers needed in the market before a MULP could be set from 3 to 2, in order to expand the number of drugs covered.  *Id.* at 45:14-20.

Relying exclusively on *United States ex rel. Berge v. Board of Trustees of the Univ. of Ala.,* 104 F.3d 1453 (4th Cir. 1997), Defendants continue to request that the Court rule as a matter of law that Defendants' falsely inflated prices were immaterial because the Commonwealth continued to calculate reimbursements using WAC after learning WAC prices reported by drug companies did not accurately reflect actual transaction costs.  Defts' Memo at 29-30 and 32.  The Fourth Circuit, however, has since held that continued payment of claims after learning of the false nature of the claim **does not** negate materiality.  *See United States ex rel. Harrison v. Westinghouse Savannah River Co.,* 352 F.3d 908, 915-16 (4th Cir. 2003).  The Fourth Circuit explained that if it did negate materiality, it would change the well-established "natural tendency to influence" standard for materiality, because it would focus on the effect of a falsehood when it was discovered, rather than focusing on whether a false statement had a "natural tendency" or was "capable of influencing"  a government payment decision. *Id.* at 916-17.  The Court in *Harrison* emphasized that the focus

must be on "*the potential effect of the false statement when it is made,* not on the actual effect of the false statement when it is discovered." *Id.*

Defendants claim that the Court's materiality instruction was "partly contrary to law" and "partly inconsistent." Defts' Memo at 32. Jury Instruction No. 22 was clear, consistent and accurately reflected the law. It accurately advised the jury that it could consider the Commonwealth's continued use of WAC as a basis for reimbursement when evaluating materiality, but the mere fact that the Commonwealth continued to use WAC as a basis for reimbursement was not dispositve and did not necessarily negate materiality. *See* 9/28/10 Tr. 128:20-129:18. This instruction was entirely consistent with *Berge* and *Harrison.* Defendants have not explained why the instruction was erroneous or why they are entitled to a new trial based upon the instruction.

The jury heard evidence regarding why the Commonwealth continued to use WAC in calculating reimbursements after learning WAC did not accurately reflect actual acquisition costs. Dr. Rosenthal, a Commonwealth expert, testified that there are no other sources of information about all drugs that can be efficiently used for electronic claims processing other than prices published in the compendia. 9/8/10 Tr. 95:3-18. Dr. Jeffrey concurred that MassHealth depended on data from the pricing compendia to manage the millions of claims it processed each year. 9/22/10 Tr. 80:20-81:10; *see also* 10/26/07 Milnes Video 209:5-21 (Unisys processed 80,000-90,000 claims a day for MassHealth); 9/16/10 Tr. 18:4-14 (ACS processed 75,000-80,000 claims per day for MassHealth); *Id.* at 18:25-24 (MassHealth processed claims for approximately 10,000 NDCs). Dr. Hartman testified that it takes time for government agencies to change their regulations and policies and apply them consistently for all drugs. 9/21/10 Tr. 82:25-83:11. This evidence was sufficient for the jury to reject Defendants' argument that the Commonwealth's continued use of WAC proved that its false prices were immaterial.

**V.      THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR JUDGMENT AS
A MATTER OF LAW ON THE COMMONWEALTH'S MMFCA CLAIM**

In section III, F of their Memorandum, Defendants merely reiterate as to the MMFCA count

their arguments regarding the evidentiary basis upon which the jury found them liable under the

MFCA.  Accordingly, the Commonwealth incorporates herein the evidence and arguments set forth

above in response to Defendants' MFCA arguments.  There was sufficient evidence presented at

trial for the jury to find Defendants "knowingly and willfully ma[de] or caus[ed] to be made [a]

false statement or representation of a material fact for use in determining rights to [a Medicaid]

benefit or payment."  M. G. L. c. 118E § 40.

**VI.     THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR
JUDGMENT AS A MATTER OF LAW ON THE COMMONWEALTH'S
COMMON LAW FRAUD CLAIM**

In section III, G of their Memorandum, Defendants again reiterate as to the Common Law

Fraud count their arguments regarding the evidentiary basis upon which the jury found them liable

under the MFCA.  Accordingly, the Commonwealth incorporates herein the evidence and

arguments set forth above in response to Defendants' MFCA arguments.  There was sufficient

evidence presented at trial for the jury to find Defendants knowingly made a misrepresentation of

material fact with the intention to induce the Commonwealth to act, and the Commonwealth was

injured as a result of its reliance.

Defendants argue that there was insufficient evidence for the jury to conclude that the

Commonwealth's reliance was reasonable.  Defts' Memo at 34.  The Commonwealth did not have a

duty to investigate the truth of Warrick's statements.  *See Damon v. Sun Co., Inc.,* 87 F.3d 1467,

1480 (1st Cir. 1996).  The recipient of a fraudulent misrepresentation of fact is usually justified in

relying on its truth, even if he could have ascertained the falsity of the representation through

investigation or inquiry.  *Yorke v. Taylor,* 332 Mass. 368, 124 N.E.2d 912, 915-16 (1955).  Reliance

is reasonable unless the falsity of the representation was readily apparent or obvious.  If a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious.  *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.,* 438 Mass. 459, 781 N.E.2d 787, 795 (2003).

There was sufficient evidence at trial for the jury to conclude that the Commonwealth's reliance upon Defendants' published prices was reasonable.  Other states rely on published prices, including WAC, in calculating Medicaid reimbursements.  Exh. 133.  Arnold Shapiro testified that from the time that WAC was adopted until he retired in 1999, MassHealth believed that WAC accurately reflected the cost of the drug from the manufacturer to the wholesaler and that pharmaceutical manufacturers were truthfully reporting WAC prices to FDB.  10/3/07 Shapiro 154:6-158:6; 260:9-261:6; 263:2-17.  The jury heard evidence that as of August 10, 2001, the OIG was reporting that pharmacy acquisition costs were only 1.81 percent below WAC.  Exh. 48; 9/17/10 Tr. 48:16-8-49:3.  Paul Jeffrey testified that between May of 2001 and March of 2003 he was unaware that spreads between the reported prices and the actual transaction prices for the three Warrick drugs at issue in this case ranged between 100 percent and almost 700 percent.  9/20/10 Tr. 64: 24-9-65.  Dr. Hartman testified that it was not until 2002 that it began to become apparent that WACs for generic drugs were inflated.  9/21/10 Tr. 17:24-19:2; 24:24-25:18.  In March of 2002, the OIG published a study (overwhelmingly focused on AWP), which estimated that invoice prices for generic drugs were, on average, 30.55 percent below WAC.  Exh. 50 and 9/17/10 Tr. 50:10-51:10.  Dr. Jeffrey testified that he was not aware of any other report from OIG, prior to the March 2002 report, that indicated that WACs were inflated.  *Id.* at 51:22-52:1.

Defendants claim that MassHealth's reliance on their false and inflated WAC prices was unreasonable because MassHealth could have asked ACS to write a computer program that would

analyze Masshealth's reimbursement rates over time, and from that MassHealth would have seen that its reimbursement rates for Warrick's albuterol products had not changed over the course of the damages period.  Defts' Memo at 34.  Defendants do not specify when they believe MassHealth should have initiated the inquiry or at what point the inquiry would have revealed the falsity of Defendants' published prices.  In any event, it is clear that what Defendants describe is an investigation that is simply not required for a party to establish that its reliance was reasonable.  It is far beyond a "mere cursory glance that would have disclosed the falsity" of Defendants' prices. Defendants' description, on its face, refutes its suggestion that the falsity of its published prices was "obvious."  It certainly does not establish that the Commonwealth's reliance was unreasonable as a matter of law.

## VII.   THE EVIDENCE WAS SUFFICIENT FOR THE JURY TO FIND PROXIMATE CAUSE

Defendants assert that Warrick was not the proximate cause of MassHealth's damages. Defts' Memo at 34-38.  The Commonwealth presented sufficient evidence to support the jury's conclusion that Defendants' conduct was a proximate cause of the MassHealth's damages.  An act or omission is a proximate cause if it was a substantial factor in bringing about the injury - that is if the injury or damages were a reasonably foreseeable consequence of Defendants' acts or omissions. *See* Restatement (Second) of Torts § 435 cmt. a & b (2010); *Jorgensen v. Massachusetts Port Authority,* 905 F.2d 515, 523 (1st Cir. 1990); *United States v. Parke-Davis,* 2003 WL 22048255 at *4-5 (D.Mass. Aug. 22, 2003).  A result is foreseeable unless it appears highly extraordinary that the defendant's conduct would have brought about that harm.  *See Rae v. Air-Speed, Inc.,* 386 Mass. 187, 193 (1982); *Delaney v. Reynolds,* 63 Mass.App.Ct. 239, 242 (2005).  The Commonwealth was not required to prove that Defendants' conduct was the sole or exclusive cause of the Commonwealth's damages.  *Damon v. Sun Co.,* 87 F.3d 1467, 1472 (1st Cir. 1996).

As set forth above, the Commonwealth presented sufficient evidence that Defendants' conduct was a substantial factor in bringing about the Commonwealth's damages and that the damages incurred by MassHealth were a foreseeable result of Defendants' conduct. *See* section IV, B., *supra*. Defendants contention that the Commonwealth failed to prove proximate cause because "[t]he Commonwealth's decision not to enforce the U&C regulation" is rebutted in section IV, E., *supra*.

If Defendants' conduct was followed by the independent act of a third party, or of the Commonwealth, that directly resulted in injury to the Commonwealth, the jury could still find that Defendants' conduct was a proximate cause of the Commonwealth's damages, if according to human experience, the jury concluded that Defendants ought to have seen that the intervening act was likely to happen in the natural and ordinary course of events. 9/28/10 Tr. 139:16-23. In order for a third party's (or the Commonwealth's) actions to constitute a superseding cause that breaks the chain of causation, the jury would have had to have concluded that the third party's or the Commonwealth's actions were intentionally caused and were not within the risk created by Defendants' conduct. Restatement (Second) of Torts §442B (2010). *Lawrence v. Kamco, Inc.*, 8 Mass.App.Ct. 854, 856-58, 397 N.E.2d 1157, 1160 (1979). The jury would also have had to have concluded that the intervening event was so extraordinary that it could not reasonably have been foreseen - in other words, a reasonable person would consider the pharmacies' act of falsely reporting U&C prices, or the government's act of failing to enforce its regulation, as highly unusual or extraordinary. *Delaney,* 63 Mass.App.Ct. at 242; *Santos v. Goldman,* 76 Mass.App.Ct. 1136, 927 N.E.2d 530 (2010) at *2; *Zinck v. Gateway Country Store,* 72 Mass.App.Ct. 571, 578, 893 N.E.2d 364 (2008); *Bobbitt v. U.S.* 2006 WL 335231 at *1-2 (D.Mass. Feb. 10, 2006).

As set forth above, there was sufficient evidence to refute Defendants' argument that the Commonwealth made an affirmative decision not to enforce the U&C regulation. *See* section IV, E., *supra*. To the extent some pharmacies did not comply with the U&C regulation, there was still sufficient evidence for the jury to conclude that (1) it was foreseeable that there would be some noncompliance by pharmacies; and (2) that any noncompliance did not break the chain of causation. As Dr. Hartman testified, even if pharmacies failed to report "true" U&C prices, Defendants and the pharmacies jointly caused the Commonwealth's damages. 9/21/10 Tr. 61:7-63:14.

## VIII.  DR. HARTMAN'S DAMAGES CALCULATION WAS RELIABLE

Defendants filed a pretrial *Daubert* motion challenging the reliability of Dr. Hartman's damages calculations. [Dkt. No. 838]. The Court denied the *Daubert* motion, after an evidentiary hearing. 9/21/10 Tr. 5:15-19.[17] Defendants do not cite *Daubert* or Fed. R. Evid. 702 in their Memorandum, nor do they make any reference to the Court's denial of their pretrial *Daubert* motion.[18] Defendants merely make sweeping and conclusory statements about Dr. Hartman's testimony and ask the Court to reverse the jury's finding on damages. Defts' Memo at 38-40. There is no basis for the Court to do so. In denying Defendants' pretrial *Daubert* motion, the Court

---

[17] Defendants' suggestion that the Court indicated that Dr. Hartman's damages methodology is "inconsistent" is egregiously misleading. [Defendants' Memo at n. 24]. The Court merely asked Dr. Hartman whether he believed there was anything inconsistent in the manner in which he calculated damages. 7/8/10 Hearing Tr. 50:12-51:13. Dr. Hartman responded as to why there was no such inconsistency. The Court has never opined that Dr. Hartman's methodology is inconsistent. To the contrary, the Court indicated that it heard nothing at the 7/28/10 hearing that indicated Dr. Hartman's methodology was unreasonable. 8/11/10 Hearing Tr. 38:12-19. More importantly, the Court **denied** Defendants' *Daubert* motion.

[18] Under Rule 702, a witness may testify to scientific, technical, or other specialized knowledge if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In admitting such testimony, the trial court must perform a gatekeeping function and decide whether the proposed testimony, including the methodology employed by the witness in arriving at the proffered opinion, rests on a reliable foundation and is relevant to the facts of the case. *Cummings v. Standard Register Co.,* 265 F.3d 56, 65 (1st Cir. 2001)(holding that trial court properly allowed testimony by plaintiff's expert economist because the defendant's criticism of the expert's damages methodology for failing to consider certain data and excluding certain variables went to the weight, not the admissibility, of the expert's opinions). Whether a witness meets these criteria is a case-specific inquiry, and a question "that the law grants the trial judge broad latitude to determine." *Id.* (citing *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

correctly determined that Dr. Hartman's damages methodology rested on a reliable foundation and was not speculative. There were no substantive changes to Dr. Hartman's methodology at trial. Thus, there is no reason for the Court to reverse its prior decision. *See* 9/21/10 Tr. 31:4-34:23; 38:1-39:25 for Dr. Hartman's methodology.

Defendants' argument revolves around the fallacy that because 75% of claims were paid on a basis other than EAC (i.e. FUL, MULP, U&C), Defendants' WAC was irrelevant to the adjudication of those claims. That is simply incorrect. Regardless of the basis upon which a claim was paid, the EAC (and hence, in Massachusetts, the WAC) was contained in the algorithm by which every claim was adjudicated. Therefore, the WAC was relevant to every claim, not just those that were paid on the basis of EAC. 9/21/10 Tr. 26:6-30:24. It was not "inappropriate" for Dr. Hartman to attribute damages to Defendants for claims that were reimbursed on the basis of FUL or U&C. As Dr. Hartman explained, even if MassHealth reimbursed on the basis of a FUL or a U&C, the Commonwealth was still damaged as a result of Defendants' false WAC, because the Commonwealth would have paid even less than the FUL or U&C if Defendants had reported a true WAC. *Id.* at 44:19-45:3; 46:13-47:8; Trial Ex. 3.

Not knowing which pharmacy billed amounts were submitted in accordance with the Commonwealth's U&C regulation (i.e. which U&Cs were "true") does not render Dr. Hartman's damages calculation speculative or unreliable. In determining the amount of damages caused by Defendants' false, inflated WAC prices, Dr. Hartman included in his damages calculation only those claims where the allowed amount (AA), actually paid by the Commonwealth, was greater than what the Estimated Acquisition Cost (EAC) would have been had Defendants reported a "true" WAC price. *Id.* at 31:4-34:23; 38:1-39:25. The damages were the difference between what was actually paid and what would have been paid had Warrick reported a true WAC. *Id.* In Dr.

Hartman's damages calculation, if the amount the Commonwealth actually paid (AA) was less than what EAC would have been had Defendants reported a true WAC, there were no damages to the Commonwealth as a result of Defendants false WAC, and that claim was not included in the damages calculation.  *Id.* at 124:19-126:16.  If the Commonwealth paid less than it would have paid if it had reimbursed at EAC using a true WAC, the Commonwealth did not incur any damages as a result of Defendants' conduct and the claim was properly excluded.  There is nothing inconsistent about Dr. Hartman's calculation.

As Dr. Hartman testified, it does not matter under his damages model whether the U&C prices submitted by the pharmacies were "true" or not.  *Id.* at 59:19-60:20; 61:7-65:15.  He was calculating the damages which were caused by Defendants false WAC prices.  Had Defendants reported a true WAC price, the Commonwealth would have paid less.  *Id.*  If the pharmacy reported a false U&C price which was greater than the true EAC, then the pharmacy jointly caused a portion of the damage.  *Id.* at 61:7-63:14.  None of the damage, however, would have occurred if Defendants had reported a true WAC.  *Id.*  If the pharmacy reported a false U&C price, and the true U&C price was less than the true EAC, then Defendants and the pharmacy each caused the damages down to the level of the true EAC.  *Id.* at 63:15-65:15.  Had either Defendants or the pharmacy reported a true number, that portion of the damages, down to the level of the true EAC, would not have been incurred.  *Id.*  When the true U&C is less than the true EAC, there is additional damage to the Commonwealth, caused by the pharmacy alone, but Dr. Hartman did not include this additional damage in his damages calculation.  *Id.*  This was consistent with the Court's summary judgment opinion.  *See Mylan Labs.,* 608 F.Supp.2d at 147 ("The pharmacies would be liable for the spread between the true U&C and the true WAC.").

46

Defendants have not explained why Dr. Hartman's calculation is "unreliable" or "speculative" merely because he excluded claims paid at amounts less than the true EAC. If Defendants' argument was correct, no case based upon falsely inflated AWP or WAC prices could ever succeed. Defendants have admitted that determining which billed amounts were submitted in accordance with the U&C regulation would be nearly impossible. *See* Warrick's Corrected *Daubert* Motion (Dkt. No. 838) at ¶ 5. They now argue that a calculation of damages where "true" U&C prices are unknown is speculative and unreliable. *Id.* at ¶ 3. Under Defendants' theory, any calculation of damages (not just Dr. Hartman's) would be speculative because no economic expert could ever go back and determine which claims were billed in accordance with the U&C regulation and what the "true" U&C prices were.

## CONCLUSION

For the foregoing reasons, the Commonwealth respectfully requests that Defendants' Renewed Motion for Judgment as a Matter of Law or in the Alternative for a New Trial be denied.

<div style="margin-left: 40%;">

Respectfully submitted,
Martha Coakley
Attorney General

</div>

By:  /s/ Peter A. Mullin
Peter A. Mullin (BBO # 360620)
K. Nathaniel Yeager (BBO # 630992)
John Pina, III (BBO # 652247)
Robyn Pozza Dollar (BBO# 674480)
Steven T. Sharobem (BBO# 664583)
Assistant Attorneys General
One Ashburton Place
Boston, MA 02114
Dated: November 3, 2010                (617) 963-2622

## Certificate of Service

I, Peter Mullin, hereby certify that I caused a true and correct copy of the foregoing to be served upon all counsel of record in this case, by filing it electronically in the Court's CM/ECF system this 3rd day of November 2010.

/s/ Peter A. Mullin
Peter A. Mullin
Assistant Attorney General