**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS )<br><br>)<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MYLAN LABORATORIES, INC., *et al.* )<br>)<br>Defendants. )<br>) | Civil Action No. 03-CV-11865-PBS<br><br>LEAVE TO FILE GRANTED ON<br>NOVEMBER 23, 2010 |

**REPLY IN SUPPORT OF WARRICK'S POST-TRIAL BRIEF AND**
**RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**
**OR IN THE ALTERNATIVE FOR A NEW TRIAL**

# TABLE OF CONTENTS

**Page**

ARGUMENT ...........................................................................................................................1

I.   THE COMMONWEALTH SAYS NOTHING IN ITS OPPOSITION THAT SHOULD DISSUADE THE COURT FROM APPLYING *BORNSTEIN* AND ITS PROGENY AS WARRICK URGES...............................1

    A.   The relevant language of the federal FCA construed in *Bornstein* is identical to that found in the MFCA. ...........................................................2

    B.   The Commonwealth's reliance on the 1986 legislative history is misplaced because Congress did not amend the operative statutory language in 1986. .......................................................................................3

    C.   *Bornstein* remains good law.....................................................................4

II.  THE COURT SHOULD SET ASIDE THE JURY'S FINDING AS TO PRONG 1 OF THE MFCA BECAUSE, AS THE COMMONWEATH NOW CONCEDES, THIS CLAIM IS NOT SUPPORTED BY THE EVIDENCE…...............................................................................……………7

III. THE COMMONWEALTH IGNORES THE CRITICAL FACT THAT WARRICK HAD NO DUTY TO PROVIDE A "TRUE WAC" AND THAT, IN THE ABSENCE OF ITS LAUNCH PRICE, THERE WOULD HAVE BEEN *NO* WAC FOR MASSHEALTH TO USE IN ITS ALGORITHM........................................................................................................9

    A.   The Commonwealth's arguments regarding scienter, materiality, damages, and causation all rely on the mistaken premise that the alternative to Warrick's launch price was a continually updated WAC. .......................................................................................................10

    B.   *Backman* v. *Polaroid* did not impose a duty on Warrick to "update" its launch price with a "true WAC." ............................................13

CONCLUSION....................................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Allison Engine Co., Inc.* v. *United States ex rel. Sanders*,
    553 U.S. 662 (2008)......................................................................................7, 8

*Backman* v. *Polaroid Corp.*,
    910 F.2d 10 (1st Cir. 1990)........................................................................ passim

*BMY—Combat Systems Div. of Harso Corp.* v. *U.S.*, 44 Fed. Cl. 141 (Fed. Cl. 1999) ..................4

*Communications Workers of America* v. *Beck*,
    487 U.S. 735 (1988)......................................................................................7

*Falby* v. *New England Forestry Foundation*,
    823 N.E. 2d 823, 2005 WL 600332 (Mass. App. Ct. 2005) .............................................14, 16

*Hays* v. *Hoffman*,
    325 F.3d 982 (8th Cir. 2003) .........................................................................5

*In re Schimmels*,
    85 F.3d 416 (9th Cir. 1996) ..........................................................................4

*McEvoy Travel Bureau, Inc.* v. *Norton Co.*,
    563 N.E.2d 188 (Mass. 1990) ........................................................................16

*United States ex rel. DRC, Inc.* v. *Custer Battles, LLC*,
    2009 WL 3756343 (E.D. Va. Oct. 14, 2009)....................................................4, 5

*United States ex rel. Carpenter* v. *Abbott Labs., Inc.*,
    2010 WL 2802686 (D. Mass. July 16, 2010)....................................................8, 9

*United States ex rel. Duxbury* v. *Ortho Biotech Products, LP*,
    579 F.3d 13 (1st Cir. 2009)..........................................................................8

*United States ex rel. Gagne* v. *City of Worcester*,
    565 F.3d 40 (1st Cir. 2009)..........................................................................8

*United States ex rel. Grubbs* v. *Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) ........................................................................8

*United States ex rel. Hendow* v. *Univ. of Phoenix*,
    461 F.3d 1166 (9th Cir. 2006) ......................................................................16

*United States ex rel. Karvelas* v. *Melrose-Wakefield Hosp.*,
    360 F.3d 220 (1st Cir. 2004)........................................................................8

*United States* v. *Bornstein*,
   423 U.S. 303 (1976)................................................................................ passim

*United States* v. *Ehrlich*,
   643 F.2d 634 (9th Cir. 1981) ...............................................................4, 6

*United States* v. *Fliegler*,
   756 F. Supp. 688 (E.D.N.Y. 1990) .............................................................4

*United States* v. *Incorporated Village of Island Park*,
   888 F. Supp. 419 (E.D.N.Y. 1995) .............................................................6

*United States* v. *Killough*,
   848 F.2d 1523 (11th Cir. 1988) ................................................................4

*United States* v. *Krizek*,
   111 F.3d 934 (D.C. Cir. 1997) ..................................................................5

*United States* v. *McLeod*,
   721 F.2d 282 (9th Cir. 1983) ....................................................................4

## OTHER AUTHORITIES

G. L. c. 12, § 5B ....................................................................................2

Warrick submits this reply brief to correct certain misstatements – both legal and factual – in the Commonwealth's arguments against the application of *United States* v. *Bornstein*, 423 U.S. 303 (1976), and to urge the Court again to faithfully apply the Supreme Court's controlling precedent on the number of violations question.  This reply also offers further support for Warrick's argument as to the non-applicability of prong 1 of the MFCA to the facts of this case. Finally, this reply addresses the single most glaring omission in the Commonwealth's Opposition:  its failure to identify any source of duty requiring Warrick to continuously report a "true" WAC after launch.  As to other issues, notwithstanding the Commonwealth's extensive argumentation, Warrick is content to rest on its earlier briefing.

## ARGUMENT

### I.   THE COMMONWEALTH SAYS NOTHING IN ITS OPPOSITION THAT SHOULD DISSUADE THE COURT FROM APPLYING *BORNSTEIN* AND ITS PROGENY AS WARRICK URGES.

As this Court is surely aware, its decision concerning whether and how to apply the Supreme Court's precedent in *United States* v. *Bornstein* may have very significant practical and constitutional consequences.  The "cat and mouse game" that the Commonwealth plays in its Opposition cannot mask these realities.[1]  Indeed, it is for precisely these reasons as well as others that the Supreme Court in *Bornstein* instructed lower courts to focus on *a defendant's own conduct*, not on the conduct of others, when determining the number of violations for purposes of

---

[1] On the one hand, the Commonwealth recites the jury's prong 1 finding and asks the Court to "enter judgment . . . consistent with the jury's verdict," by which statements Warrick understands the Commonwealth to be requesting that the Court erroneously impose penalties on the basis of the 989,103 Medicaid claims that the jury found *pharmacists* submitted.  *See* Commonwealth's Opp. to Defs.' Renewed Mot. for Judgment as a Matter of Law or in the Alternative for a New Trial (Nov. 3, 2010) [Dkt. 940] (hereinafter "Opp."), at 1, 6.  On the other hand, the Commonwealth argues that "[i]t is premature to apply an Excess Fines Clause analysis before any penalties are requested or imposed" and declines to take any firm position on the amount of penalties it will later seek.  Indeed, the Commonwealth goes so far as to suggest that the constitutional implications of a grossly disproportionate request for penalties should be "completely irrelevant to the Court's resolution of this Motion."  *Id.* at 13.  Although the Commonwealth might prefer to have the penalties question decided in a vacuum – without any focus on the ridiculous and patently unfair outcome that imposing penalties based on the conduct of others would produce – the Court should not (and we trust will not) decide the legal question of how many penalties to impose without giving due consideration to the practical and constitutional implications of its decision.

imposing penalties under the FCA.  Nothing the Commonwealth says in its Opposition should distract the Court from that teaching.

> ### A.    The relevant language of the federal FCA construed in *Bornstein* is identical to that found in the MFCA.

The Commonwealth incorrectly insists that there is a meaningful difference between the language of the pre-1986 federal FCA construed by the Supreme Court in *Bornstein* and the currently applicable provision of the MFCA.  However, the applicable language is identical. Both the current version of the MFCA and the pre-1986 federal FCA construed by the Court in *Bornstein* impose liability on any party that "causes to be presented" a false claim for payment.[2] *See Bornstein*, 423 U.S. at 303 n.1; G. L. c. 12, § 5B.  It is this language, which is identical in both statutes, that this Court must construe in deciding the legal question that it has reserved for itself:  how many statutory violations did Warrick commit?

The Commonwealth attributes great significance to the fact that the MFCA expressly states that a violator shall be liable to the Commonwealth for a civil penalty of not less than $5,000 and not more than $10,000 "per violation."  Opp. at 7.  However, it ignores the fact that the penalties provision of the pre-1986 federal FCA contained similar language.  In relevant part, that provision required violators to "forfeit and pay to the United States the sum of two thousand dollars" for each "act" prohibited by the federal FCA.  423 U.S. at 305 n.1.  Those acts included, among others, "caus[ing] to be presented" a false claim for payment.  *Id.*  In any event, whether or not the statute contains the words "per violation" is irrelevant.  The relevant questions are: what constitutes a statutory violation, and how many of these violations did Warrick commit? The "per violation" language that the Commonwealth points to has no bearing whatever on the answers to these questions.

---

[2] The operative language of the federal FCA was *not* modified by the 1986 amendments and remains effective today.

Confirmation that this "per violation" language is not controlling can be found in the Commonwealth's own *ex post facto* argument.  In arguing that the Commonwealth should be entitled to recover penalties for acts committed prior to the current MFCA's enactment in July 2000, the Commonwealth points to what it calls an earlier version of the MFCA that does *not* contain this same "per violation" language.  Nonetheless, it argues that the Commonwealth is entitled to recover pre-July 2000 penalties because the addition of the "per violation" language in 2000 did not substantively change Warrick's rights.  Opp. at 14-17.  This inconsistency in the Commonwealth's position betrays the unimportance of the very "per violation" language on which the Commonwealth stakes its entire statutory construction argument.[3]

**B.      The Commonwealth's reliance on the 1986 legislative history is misplaced because Congress did not amend the operative statutory language in 1986.**

The Commonwealth's reliance on the 1986 legislative history is similarly misplaced. Again, the applicable language – that anyone who "causes to be presented" a false claim shall be liable – did not change as a part of the 1986 amendments to the federal FCA.  Surely Congress's objective in amending the FCA in 1986 was to strengthen the Act, but Congress did *not* amend the language defining what acts constituted a statutory violation, which is the relevant question here and was the question that the Supreme Court considered in *Bornstein*.  Moreover, nothing in the legislative history that the Commonwealth cites, nor in the legislative history more broadly, demonstrates that Congress intended to alter the *Bornstein* Court's answer to the question of how a court should determine what constitutes a statutory violation when a defendant did not submit

---

[3] The Commonwealth similarly contradicts itself when it contends, on the one hand, that "arguments regarding the constitutional implications of civil penalties in this case are premature" because the Commonwealth has not requested any penalties and no penalties have been imposed, *see* Opp. at 13, but then contends, on the other hand, that Warrick has waived its retroactivity argument by not raising it sooner.  *See* Opp. at 14.  To state the position clearly, Warrick's *ex post facto* argument is not an argument that the MFCA count fails to state a claim, but rather that the expanded damages and penalties cannot be applied retroactively.  Thus, the argument goes only to the amount of the damages and penalties, and could not have been raised earlier.  More fundamentally, the Commonwealth ignores entirely the case law cited in Warrick's opening briefing holding it would be error to apply retroactively the more stringent damages and penalties provision first adopted in the MFCA.

claims directly to the government but rather is alleged only to have "cause[d] to be presented" false claims.  In any event, because it did not amend the applicable language of the statute, Congress could not have legislatively overruled *Bornstein*.

## C.    *Bornstein* remains good law.

That *Bornstein* remains good law is confirmed – as Warrick points out in its opening brief – by the fact that many courts have continued to apply *Bornstein* exactly as Warrick urges the Court to do.  *See* Warrick's Post-Trial Brief and Mem. of Law (Oct. 13, 2010) [Dkt. 937] (hereinafter "Defs.' Mem."), at 4.  The Commonwealth's attempt to distinguish some of these cases – buried in a footnote – falls flat.  Similarly, as Warrick points out in its opening brief, *United States* v. *Ehrlich*, 643 F.2d 634 (9th Cir. 1981), if not wrongly decided, is clearly factually distinguishable from this case.  The remaining cases that the Commonwealth cites have nothing at all to do with a court's determining the number of statutory violations committed.[4]

In its opening brief, Warrick cites *United.States ex rel. DRC, Inc.* v. *Custer Battles, LLC*, 2009 WL 3756343 (E.D. Va. Oct. 14, 2009), as a recent example of a district court applying *Bornstein*'s holding.  The Commonwealth attempts to distinguish this case on the basis that the Court cited *Bornstein* "when deciding whether to assess a $5,500 or $10,000 penalty per violation" and on the ground that "the court in *Custer Battles* accepted the number of claims found by the jury as the number of 'violations.'"  Opp. at 8 n.3.  The Commonwealth misreads *Custer Battles*.  The court there actually applied *Bornstein* in exactly the manner Warrick urges and, focusing on each individual defendant's conduct, imposed penalties for fewer statutory

---

[4] *United States* v. *Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988) (defendants pled guilty to "twelve false claims"); *United States* v. *Fliegler*, 756 F. Supp. 688, 694 (E.D.N.Y. 1990) (defendants admitted by stipulation to 32 false claims); *United States* v. *McLeod*, 721 F.2d 282, 284 (9th Cir. 1983) (defendant was subject to three penalty fines because he "endorsed and deposited three government checks, which he knew were issued to him by mistake"); *In re Schimmels*, 85 F.3d 416, 419 n.1 (9th Cir. 1996) (affirming dismissal of bankruptcy appeal on procedural grounds); *BMY—Combat Systems Div. of Harso Corp.* v. *U.S.*, 44 Fed. Cl. 141, 151 (Fed. Cl. 1999) (denying summary judgment on number of penalties under the FCA where invoices for payment were delivered directly to government).

violations than would have followed from the jury's findings.  *Custer Battles, LLC*, 2009 WL 3756343, at *1.

The Commonwealth's treatment of *Hays* v. *Hoffman*, 325 F.3d 982, 993 (8th Cir. 2003), similarly tells only half the story.  In attempting to distinguish *Hays*, the Commonwealth asserts that the court in *Hays* did not reduce the number of violations on the basis of *Bornstein*, but rather "based upon a determination that the plaintiff's expert had guessed at the number of claims."  Opp. at 8 n.3.  While the Eighth Circuit reversed on the basis of the unreliability of the expert's opinion, it actually went on to apply *Bornstein* as Warrick urges, focusing on defendant's conduct, and found eight violations based on the defendant's falsification of the accounting records for eight different facilities, which records then gave rise to the submission of a much greater number of false Medicaid claims.  *Hays*, 325 F.3d at 982.  Notably, in *Hays* – a Medicaid case – the court recognized that a single violative act could give rise to "many thousands of claims for reimbursement."  *Id.* at 993.

The Commonwealth also tries to gloss over the District of Columbia Circuit's decision in *United States* v. *Krizek*, 111 F.3d 934 (D.C. Cir. 1997).  While the court remanded that case as the Commonwealth points out on the ground that "each demand for payment rather than each CPT code contained within the demands" should constitute a violation, Opp. at 8 n. 3, the court did so precisely in conformity with *Bornstein*.  As the court stated in reaching its conclusion: "The gravamen of [*Bornstein* and its progeny] is that the focus is on the conduct of the defendant.  The Court asks, 'With what act did the defendant submit his demand or request and how many such acts were there?'. . . The question turns, not on how the government chooses to process the claim, but on how many times the defendant made a 'request or demand.'"  *Krizek*, 111 F.3d at 939-40.  A similar analysis must apply where a defendant is found to have "cause[d]

to be presented" false claims for payment, which is precisely Warrick's point in asking this Court to follow *Bornstein* here.

The Commonwealth's argument is premised almost entirely on *United States* v. *Ehrlich*, 643 F.2d 634 (9th Cir. 1981). Warrick explains at length in its opening brief why, even if the Ninth Circuit panel's decision can be reconciled with *Bornstein*, this case is factually distinct from *Ehrlich*. Defs.' Mem. at 6-8 (noting that, in *Ehrlich*, the number of false claims submitted to the government by the bank bore a one-to-one correlation to the number of fraudulently reduced interest payments by the defendant to the bank). However, it bears repeating that Warrick did not know *in advance* how many claims pharmacists would submit nor did Warrick "knowingly cause a *specific number* of false claims to be filed" as the defendant did in *Ehrlich*. 643 F.2d at 638 (emphasis added). The Commonwealth has introduced no evidence to the contrary. The Medicaid rebate invoice that the Commonwealth mentions in its Opposition is not in evidence in this case, but even if it was, it is entirely retrospective in character and could not have told Warrick in advance how many claims pharmacists would submit in the next quarter.[5]

Indeed, this is a much more compelling case than *Ehrlich* was for the application of *Bornstein*'s holding. For the Commonwealth's apparent view (that penalties should be assessed for each claim that a pharmacist submitted) to prevail, this Court would not only have to impose penalties against Warrick based on the conduct of others – pharmacists whom Warrick did not control – but it would also have to impose penalties based on claims that clearly did not contain any false statements when the pharmacists submitted them. In *Ehrlich*, the claims the bank submitted to the government had at least been caused by the defendant to be false at the time they were submitted, even if the defendant did not submit them. Here, the Commonwealth

---

[5] As Warrick points out in its opening brief, *United States* v. *Incorporated Village of Island Park*, 888 F. Supp. 419, 441 (E.D.N.Y. 1995), is distinguishable for similar reasons.

apparently asks the Court to so far depart from *Bornstein's* focus on the defendant's own conduct as to impose separate penalties for claims that Warrick not only did not submit, but that were allegedly rendered "false" only by the intervention of other actors after they were submitted. Rather than impose penalties on this logically and legally flawed basis, this Court should apply the holding of *Bornstein* and its progeny to find that, if at all, Warrick committed 28 violations of the MFCA, one for each occasion on which FDB allegedly asked Warrick to update its WACs and Warrick failed to so, and should impose penalties, if at all, on that basis – on the basis of *Warrick's* supposedly wrongful conduct.[6]

## II.   THE COURT SHOULD SET ASIDE THE JURY'S FINDING AS TO PRONG 1 OF THE MFCA BECAUSE, AS THE COMMONWEATH NOW CONCEDES, THIS CLAIM IS NOT SUPPORTED BY THE EVIDENCE.

The Commonwealth makes a dispositive concession in its Opposition, admitting that "the pharmacy submissions did not themselves contain the false WACs."  Opp. at 20.  Because the claims themselves were not false at the time that they were presented to the government for payment, the Court must set aside the jury's finding against Warrick under prong 1.  Here, Warrick can be liable, if at all, only under prong 2 of the MFCA for making false statements that were used in obtaining payment from the government.

As Warrick argued in its opening brief, the Supreme Court in *Allison Engine Co., Inc.* v. *United States ex rel. Sanders*, 553 U.S. 662 (2008), clarified a critical distinction between the first and second prongs of the FCA:  a claim made under prong 1 of the FCA cannot proceed as a

---

[6] The Commonwealth's suggestion that the doctrine of constitutional avoidance is not an independent reason for the Court to interpret the MFCA as the Supreme Court interpreted the federal FCA in *Bornstein* is simply wrong.  *See, e.g., Communications Workers of America* v. *Beck*, 487 U.S. 735, 761 (1988) (construing the statute "to avoid . . . serious constitutional question[s] that would otherwise be raised" by alternative constructions); Norman J. Singer & J.D. Shambie Singer, 2A Sutherland Statutory Construction § 45:11 (7th ed. 2010) ("the fact that one among alternative constructions would involve serious constitutional difficulties is reason to reject that interpretation in favor of another").  Construing the MFCA consistently with the Supreme Court's holding in *Bornstein* is much more than a matter of mere "convenience" as the Commonwealth suggests, *see* Opp. at 12; it is a constitutional imperative.

matter of law absent evidence that the claim was false when presented to the government for payment, whereas prong 2 – meant to reach a broader group of defendants – does not have a similar presentment requirement.  *Id.* at 670-71.  In response, the Commonwealth asserts incorrectly that, "in the two years since *Allison Engine* was decided, no court has adopted Defendants' suspect interpretation of *Allison Engine*."  Opp. at 19.  *United States ex rel. Grubbs* v. *Kanneganti*, 565 F.3d 180 (5th Cir. 2009), is one such case.  In *Grubbs*, the Fifth circuit noted that the fraudulent presentment element of a prong 1 claim, highlighted by the Supreme Court in *Allison Engine*, "requires proof . . . of the claim's falsity," *id.* at 189, and went on to distinguish prongs 1 and 2, citing *Allison Engine*, as follows:

> As the Supreme Court recently settled:  "[T]he concept of presentment is not mentioned in § 3729(a)(2).  The inclusion of an express presentment requirement in subsection (a)(1), combined with the absence of anything similar in subsection (a)(2), suggested that Congress did not intend to include a presentment requirement in subsection (a)(2)."

*Id.* at 192-93.

Even before the Supreme Court clarified this distinction in *Allison Engine*, the First Circuit required plaintiffs to plead facts sufficient to demonstrate the falsity of the claim at the time of its presentment in order to state a prong 1 claim.  *See United States ex rel. Karvelas* v. *Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004) ("defendant's presentation of false or fraudulent claims to the government is a central element" of prong 1 FCA claims) *abrogated on other grounds by United States ex rel. Gagne* v. *City of Worcester*, 565 F.3d 40, 46 n.7 (1st Cir. 2009) (affirming the vitality of *Karvelas*'s presentment of a false claim pleading requirement with respect to prong 1 actions).  Neither *Ortho Biotech Products* nor *Abbott Laboratories,* cases on which the Commonwealth relies, alters this basic requirement.[7]  Thus the Commonwealth

---

[7] *United States ex rel. Duxbury* v. *Ortho Biotech Products, LP*, 579 F.3d 13, 30 (1ˢᵗ Cir. 2009), cites *Allison Engine* for the unremarkable proposition that a prong 2 claim requires a plaintiff to prove intent.  Similarly, the discussion

simply cannot make out a claim under prong 1 of the MFCA in light of its admission that the

claims at issue were not false at the time they were presented to the government for payment.

### III.  THE COMMONWEALTH IGNORES THE CRITICAL FACT THAT WARRICK HAD NO DUTY TO PROVIDE A "TRUE WAC" AND THAT, IN THE ABSENCE OF ITS LAUNCH PRICE, THERE WOULD HAVE BEEN *NO* WAC FOR MASSHEALTH TO USE IN ITS ALGORITHM.

Warrick's opening brief explained that Warrick had no obligation to publish a WAC.

Defs.' Mem. at 37.  Accordingly, even if Warrick could be held liable for the fact that FDB did

not fully withdraw Warrick's launch prices after the prices for Warrick's products dropped post-

launch (as other compendia did when Warrick asked), Warrick had no duty to "update" by

publishing ongoing transaction prices.  As a result, if Warrick had successfully stopped FDB

from publishing an outdated WAC based on its launch prices, there would have been *no price at

all* in the WAC field of FDB's database for Warrick's products.  In its Opposition, the

Commonwealth ignores this critical fact and instead makes argument after argument about the

significance of Warrick's failure to "report[] a true WAC."  Opp. at 35 (scienter), 36

(materiality), 45-46 (damages).

The Commonwealth's suggested rule that publishing a launch price subjects a company

to an ongoing duty to issue endless "updates" with actual transaction prices is entirely without

precedent and would work a dramatic extension in the law.  Massachusetts courts applying state

law and federal courts applying the federal FCA have repeatedly held that a statement of fact,

including a statement of intent with forward-looking connotations, is actionable only if the

statement was false or misleading when made and does not give rise to a duty to make further

disclosures if circumstances change.  But, even assuming that Warrick had some duty to take

further action after the price had fallen post-launch, at worst, Warrick's alleged fraud would have

---

of *Allison Engine* in *United States ex rel. Carpenter* v. *Abbott Labs., Inc.*, 2010 WL 2802686, at *5-6 (D. Mass. July 16, 2010), is limited to the intent requirement under prong 2.

been fully cured by having FDB delete its launch-prices from all fields.  Therefore, the

Commonwealth's arguments about what would have happened "if Defendants had reported a

true WAC" are simply beside the point.

> **A.      The Commonwealth's arguments regarding scienter, materiality, damages, and causation all rely on the mistaken premise that the alternative to Warrick's launch price was a continually updated WAC.**

Throughout the Commonwealth's Opposition, it repeatedly assumes that, in the absence

of Warrick's launch price, Warrick would have "reported a true WAC" to FDB.  Opp. at 35, 36,

45, 46.  This mistaken premise is the foundation for the Commonwealth's arguments with

respect to scienter, materiality, causation, and damages.  Because, contrary to the

Commonwealth's supposition, the alternative to Warrick's launch price would have been *no*

WAC for Warrick's products in the FDB database, the Commonwealth cannot establish any of

these critical elements of its causes of action.

The Commonwealth's discussion of its expert's damages calculations demonstrates the

extent to which its arguments depend on the false premise that Warrick's direct price at launch

would have been replaced by a "true WAC."  Over the course of three pages, the Commonwealth

refers *fifteen* times to either a "true WAC" or a "true EAC" based on a "true WAC."  Opp. at 45-

47.  For example, the Commonwealth contends that, even in cases where MassHealth reimbursed

on the basis of FUL or U&C, "the Commonwealth was still damaged as a result of Defendants'

false WAC, because the Commonwealth would have paid even less … *if Defendants had

reported a true WAC*."  *Id.* at 45 (emphasis added).  Similarly, in its effort to defend the

reliability of Dr. Hartman's damages model despite its failure to account for false U&C prices,

the Commonwealth contends that false U&Cs were irrelevant to damages because "[n]one of the

damage … would have occurred *if Defendants had reported a true WAC*."  *Id.* at 46 (emphasis

added); *see also id.* ("Had Defendants reported a true WAC price, the Commonwealth would

have paid less."). Indeed, Dr. Hartman's calculations assume that Warrick would have reported to FDB a "true WAC" based on actual transaction prices for albuterol prices every quarter. *See* Trial Tr. 32:14-16, Sept. 21, 2010.

The Commonwealth's arguments about materiality and scienter are equally dependent on the mistaken premise that the alternative to Warrick's outdated launch price would have been "a true WAC." In response to Warrick's argument that the true character of its published WAC could not have been material to the 75% of claims that MassHealth paid on the basis of U&C, MULP or FUL, Trial Tr. 28:12-18, 30:13-24, Sept. 21, 2010, the Commonwealth seeks to establish materiality by asserting that "*a true WAC* would have resulted in more claims being reimbursed on the basis of EAC." Opp. at 36 (emphasis added). Similarly, in an effort to show that Warrick had the requisite scienter, the Commonwealth contends that Warrick knew that if it had "*reported a true WAC price*, the percentage of claims paid at WAC would have increased." *Id.* at 35 (emphasis added).

Despite the critical role that a hypothetical "true WAC" plays throughout the Commonwealth's response, the Commonwealth fails to point to *any* basis in the trial record for the premise that, in the absence of its launch price, Warrick would have "reported a true WAC." At trial, the Commonwealth's witnesses repeatedly acknowledged the undisputed fact that nothing in the regulations in effect throughout the damages period required Warrick to report a WAC to FDB or other price reporting entities. *See*, *e.g.*, Trial Tr. 14:2-25, Sept. 13, 2010 (testimony of Dr. Rosenthal agreeing that Massachusetts Medicaid regulations had no "requirement that generic manufacturers report or publish a WAC" and that the Medicaid rebate agreement had no "specific requirement that WAC prices be published by manufacturers"); Trial Tr. 79:6-15, Sept. 20, 2010 (testimony of Dr. Jeffrey agreeing that in 2003 the Commonwealth

"didn't add any requirement … that manufacturers report any published prices at all to any of the pricing services" and that "many generic manufacturers do not report a wholesale acquisition price to FDB").  The Commonwealth makes no attempt to point to any evidence in the record to contradict this testimony by its own witnesses.

Nor does the Commonwealth point to any evidence that would have allowed the jury to conclude that Warrick would have reported a "true WAC" to FDB on a quarterly basis in the absence of any regulatory obligation to do so.  To the contrary, the evidence shows that Warrick specifically directed FDB to *delete* its direct price listings and did not intend for FDB to publish a WAC for its products at all after 1995.  Trial Ex. 16.[8]  The evidence further demonstrates that when another pricing database, Medispan, *did* comply with Warrick's direction to delete direct price information from both the electronic and paper copies of its pricing compendium, Warrick did *not* thereafter voluntarily supply Medispan with quarterly updates of true wholesale transaction prices.  *See* Trial Tr. 114:12-25, Sept. 27, 2010.

Had Warrick's launch price been withdrawn, in the absence of a voluntarily submitted "true WAC," the WAC field in FDB's database would have been empty, as it was in the Medispan database.  *See id.*  Because Massachusetts regulations defined EAC as "WAC plus 10%," Trial Ex. 1 (stipulation), without a WAC, EAC could not have been calculated consistent with the regulations.  Nor did the Commonwealth offer any evidence at trial that Massachusetts would have (or consistent with the regulations could have) calculated an EAC for Warrick's products using some proxy for WAC.  Thus, without a WAC for Warrick's products, Unisys/ACS would have ignored the EAC value when applying MassHealth's algorithm as it did

---

[8] The Commonwealth contends that, by directing FDB to "delete direct price listings from your publication *or* database," Warrick was impliedly directing FDB to delete direct price *only* from the Blue Book and *not* to delete direct price from the electronic database.  Opp. at 31 (quoting, with emphasis, Trial Ex. 16).  The Commonwealth points to nothing that would support so bizarre a construction of Warrick's action.

when there was no MULP.  *See* Trial Tr. 36:16-37:11, Sept. 16, 2010 (without one of the four

values, the algorithm would simply ignore that potential value).

Without any evidentiary support for its assertion that Warrick would have voluntarily or

otherwise "reported a true WAC" to replace its launch price, the Commonwealth's arguments

about damages, causation, materiality, and scienter all fail.  For the 75% of claims that

MassHealth reimbursed on the basis of FUL, MULP, or U&C, the fact that Warrick's launch

price remained in FDB's system could not have been material to MassHealth or caused the

Commonwealth any damage, because the withdrawal of the supposedly inflated WAC could not

have affected the Commonwealth's reimbursement decision.  For the 25% of claims for which

EAC was the lowest value and the basis of MassHealth's reimbursement, if Warrick's launch

price had been withdrawn, there would have been no WAC and thus no EAC upon which to

reimburse.  For those claims, Unisys/ACS would have instead reimbursed at a *higher* rate,

whichever was the lowest of the remaining three values MULP, FUL, and U&C.  *See* Trial Ex. 1

at 2-3.  Moreover, Warrick could not have thought that publication of its launch price would

harm the Commonwealth because Warrick must have known that its launch price would affect

reimbursement only when it was the *lowest* of the available rates and that removal of that value

would only cause the Commonwealth to pay *more*.  Thus, Warrick could not possibly have had

the scienter necessary to sustain liability.

**B.**    ***Backman* v. *Polaroid* did not impose a duty on Warrick to "update" its launch price with a "true WAC."**

The closest the Commonwealth comes to providing an argument in support of its premise

that Warrick had a duty to report a "true WAC" is its assertion that, under *Backman* v. *Polaroid*

*Corp.*, 910 F.2d 10 (1st Cir. 1990) (en banc), Warrick had a "duty to correct" the statement of the

"direct price" for its albuterol products at the time of their launch.  Opp. at 23-28.  The Commonwealth misreads *Backman*.

At trial, the Court correctly instructed the jury that, under *Backman*, "no duty to correct a statement exists if the statements were true and not misleading when made."  Trial Tr. 123:20-21, Sept. 28, 2010.  The Court then instructed the jury that there were two "exceptions" to this rule.  *Id.* at 124:3-13.  The first "exception" addressed only whether the statement was "knowingly" false when made.  *Id.*  Warrick did not object to that instruction.  However, the Court further instructed the jury that "a statement may be correct at the time it is made and may have a forward intent and connotation upon which parties may be expected to rely in the future. If a statement has a clear meaning and remains live, and there is a change, a further disclosure or correction may be called for."  *Id.*  In its opposition, the Commonwealth blatantly misstates the record by asserting that "Defendants did not object" to this instruction.  Opp. at 23.  To the contrary, Warrick did object to this instruction, both in the jury charge conference and in its objections submitted at the time the jury was instructed, explaining that "[a] statement of intent is only actionable if it is a false statement of the party's intent at the time of the statement." Warrick's Written Objections to Jury Instructions dated Sept. 28, 2010 at 27 (marked Sept. 28, 2010 as Trial Ex. 904) (citing *Falby* v. *New England Forestry Foundation*, 823 N.E. 2d 823, 2005 WL 600332 (Mass. App. Ct. 2005)); Trial Tr. 150:12-15, Sept. 28, 2010 (recognizing that Warrick had preserved objections by making them before jury retired).

As Warrick stated in its opening brief, the Court's instruction on this second point, at the Commonwealth's request, was incorrect.  *Backman* did not hold that a statement of intent that was not misleading when made could become actionable on the basis of subsequent events.  At most, *Backman* assumed *arguendo* that a statement of intent "*may*" become actionable "in

-14-

special circumstances." 910 F.3d at 17.  In *Backman*, the First Circuit did "not … face this question" because it was not presented on the facts of the case.  *Id.*  However, the en banc court of appeals noted that the panel had misstated the law when it opined that "even if [Polaroid's] optimistic Third Quarter Report was not misleading at the time of issuance" it "*became misleading in light of the subsequent information acquired by Polaroid indicating the seriousness of Polavision's problems*" and thus gave rise to a duty of further disclosure.  *Id.*

Similarly, here, Warrick's statement of price as of the date of launch was an accurate statement at the time of its issuance, *see*, *e.g.*, Gough Dep. Tr. 151:15-18, Feb. 6, 2003; Trial Tr. 103:24-104:1; 137:22-138:3, 141:5-10, Sept. 24, 2010 (testifying that it was the initial offer price before any sales had been made, and that there were some sales at Warrick's launch price), and "remained precisely correct thereafter" as a statement of price as of the date of launch.[9]  Even if there was a "forward-looking" suggestion that the launch price would remain the price for some unspecified time after launch, it certainly did not have a "clear meaning" (on which other parties could reasonably "be expected to rely") that the launch price would remain the actual transaction price for the next decade.  Trial Tr. 124:9-13, Sept. 28, 2010.  Indeed, as the Commonwealth's own witnesses testified, it was well known that prices of generic drugs drop precipitously after launch as other generics compete in a new market.  Trial Tr. 27:15-18, Sept. 13, 2010 (testimony of plaintiff's expert, Meredith Rosenthal); *id.* at 87:8-13, Sept. 21, 2010 (testimony of plaintiff's expert, Raymond Hartman).

---

[9] The Commonwealth goes to great lengths to argue that Warrick's launch price was misleading even at the time it was issued.  *See* Opp. at 23-26.  It is immaterial that the Commonwealth's evidence *might* have persuaded a jury that the statement was misleading when made.  The Court's instruction as to the second purported exception was erroneous and would have permitted a jury to find Warrick liable even if its statement of a launch price was *not* misleading when made.  Therefore, it is impossible to know whether the jury might have been persuaded that the statement was misleading when made and the verdict cannot be upheld on that basis.

This is not a case, therefore, in which "special circumstances" warrant imposing a further duty, even if *Backman* had formally recognized such an exception.  910 F.2d at 17.  Rather, this case is governed by the general rule under Massachusetts and federal law that "statements cannot serve as a basis for fraud unless it is shown that the disputed statements were false when made." *Falby* v. *New England Forestry Foundation*, 823 N.E. 2d 823, 2005 WL 600332, at *1 (Mass. App. Ct. 2005) (statement of intent not to develop land that was not false when made not actionable).  *See also McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 563 N.E.2d 188, 192 (Mass. 1990) ("statements of present intention as to future conduct may be the basis for a fraud action if … the statements misrepresent the actual intention of the speaker"); *United States ex rel. Hendow* v. *Univ. of Phoenix*, 461 F.3d 1166, 1171-72 (9th Cir. 2006) ("under the False Claims Act,  . . . false claims must in fact be 'false *when made*'") (emphasis added).

Finally, even assuming that Warrick's issuance of a direct price at launch did constitute a "special circumstance[]" in which "further disclosure[] may be called for," Warrick did not have a duty to continuously report a "true WAC" to FDB for the ensuing decade.  In fact, *Backman* specifically rejected such an endless duty of further disclosures.  In questioning whether there should be *any* requirement to make further disclosure in light of future developments, the en banc court recognized the validity of the amici's question "what is the limit":  "for how long would [the speaker be] under a duty of disclosure if the tide turned"?  910 F.2d at 17.  Later, the court returned to the issue and specifically rejected the panel's opinion, which the en banc court characterized as "requiring [an update] in terms of a new duty that had never been undertaken."  *Id.* at 18.  That is precisely what the Commonwealth attempts to do in its opposition brief.  It seeks to convert a duty – assuming it exists at all – to correct the original statement of a launch price into a further "duty that had never been undertaken" to provide a

"true WAC" for an apparently indefinite period.  Because the allegedly misleading nature of

Warrick's launch price could have been completely "corrected" by withdrawing the price,

*Backman* makes clear that Warrick cannot be held liable for failing to report a "true WAC" to

FDB when the relevant regulations did not require Warrick to report a WAC and Warrick never

undertook such a duty voluntarily.

## CONCLUSION

For all the foregoing reasons, and those set forth in its opening Memorandum, Defs.'

Mem., Warrick is entitled to judgment as a matter of law on all counts or, in the alternative, a

new trial.  At the very least, the Court should find that Warrick committed no more than 28

violations for purposes of imposing penalties under the MFCA.

Respectfully submitted,

/s/ John P. Bueker
John T. Montgomery (BBO #352220)
Douglas H. Hallward-Driemeier (BBO #627643)
John P. Bueker (BBO #636435)
Amanda L. Lydon (BBO #669235)
Ropes & Gray LLP
800 Boylston Street
Boston, MA 02199-3600
(617) 951-7000

*Attorneys for Warrick*

Dated:  November 23, 2010

## CERTIFICATE OF SERVICE

I, John P. Bueker, hereby certify that a true and correct copy of the foregoing document
was served upon all counsel of record via ECF electronic filing on November 23, 2010.

/s/ John P. Bueker
John P. Bueker