# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br>PLAINTIFF<br><br>vs.<br><br>SCHERING-PLOUGH CORPORATION,<br>SCHERING CORPORATION and WARRICK<br>PHARMACEUTICALS CORPORATION,<br><br>DEFENDANTS | )<br>)<br>)<br>)   C.A. No. 03-11865-PBS<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____

### COMMONWEALTH'S MEMORANDUM IN SUPPORT OF
### IT'S MOTION FOR ENTRY OF JUDGMENT

## INTRODUCTION

The Commonwealth moves, pursuant to Fed. R. Civ. P. 58(b) (2) (A) and (d), for entry of

judgment in its favor, based on the jury's verdict of $4.6 million in damages in this case (plus

prejudgment interest and costs), which must be trebled, and asks for an award of over $191

million in civil penalties.  While substantial, penalties in this amount are needed to punish the

Defendants for their misconduct in this case, which the jury found to be willful, and to deter

them and others from engaging in similar acts to defraud the Massachusetts Medicaid program

(MassHealth), a vital government program serving the Commonwealth's poorest and most

vulnerable citizens.  As set forth below, penalties in this amount, which are less than 4 percent of

the minimum penalties mandated by the Massachusetts False Claims Act (MFCA), do not violate

the Excessive Fines or Due Process clauses of the federal and state Constitutions.  The

Commonwealth also requests that the Court enter judgment in its favor for Defendants' breach of

the implied covenant of good faith and fair dealing in the Medicaid Rebate Agreement.[1]

## PROCEDURAL BACKGROUND

This case was filed on September 25, 2003 against Warrick Pharmaceuticals Corporation (Warrick) and twelve other drug companies.  After Defendants' motions to dismiss and for summary judgment were denied, the Commonwealth filed a Second Amended Complaint (SAC) on August 25, 2009, which added Schering-Plough Corporation (Schering-Plough) (n/k/a Merck & Co., Inc.) and Schering Corporation (Schering) as defendants.  The SAC alleges four counts: (1) violation of Sections 1 and 2 of the MFCA; (2) violation of the Massachusetts Medicaid False Claims Act (MMFCA); (3) common law fraud; and (4) breach of the implied covenant of good faith and fair dealing in the Medicaid Rebate Agreement.  SAC, Dkt. No. 604.

Trial against Schering-Plough, Schering and Warrick (Defendants) began on September 7, 2010 before a jury of ten.  The Commonwealth called 17 witnesses, including 13 witnesses by video deposition, and rested on September 21, 2010.  The Defendants called nine witnesses, including two by video deposition, and rested on September 27, 2010.  The parties argued the case, and the Court charged the jury, on September 28, 2010.  By agreement of the parties, the Commonwealth's count for breach of the implied covenant of good faith and fair dealing was reserved for the Court to rule on, and not submitted to the jury.  9/27/10 Tr. 217:18-219:22.[2]

On September 30, 2010 the jury returned a special verdict, finding all three Defendants had violated sections 1 and 2 of the MFCA, violated the MMFCA and engaged in common law

---

[1] The Commonwealth is entitled to prejudgment interest pursuant to M.G.L. c. 231, § 6B (tort) and § 6C (contract), from September 25, 2003, when the case was filed, until the date judgment is entered, and to attorney's fees and other costs. See, M. G.L. c. 12, § 5B and M.G.L. c. 118E, § 44. The Commonwealth expects to move to amend any judgment entered, after it is entered, to add the prejudgment interest and costs. Damages, including consequential damages, must be trebled.  *Id.; see also R.W. Granger & Sons, Inc. v. J&S Insulation, Inc.,* 435 Mass. 66, 84, 754 N.E.2d 668 (2001).

[2] Citation to the trial transcript will be in the form: (date) Tr. (page):(line)-(page):(line).

fraud; that Defendants' illegal conduct proximately caused $4,563,328 in damages to

MassHealth; that Defendants knowingly caused 989,103 false claims to be filed with MassHealth

and knowingly made 28 false statements to obtain payment or approval of a claim by the

Commonwealth.  After being polled, the jurors unanimously affirmed their verdict.[3]  9/30/10 Tr.

13:24-14:25.

## FACTS RELEVANT TO THE IMPOSITION OF PENALTIES

### A.        The Massachusetts Medicaid Program

The Massachusetts Medicaid program, MassHealth, was the victim of Defendants' willful

misconduct in this case.  MassHealth is a means-tested, government entitlement program, jointly

financed by the federal and state governments, that provides healthcare to the Commonwealth's

neediest, most vulnerable residents.  Mullin Decl., Tab A at p. 1.[4]  Children of low income

families and their parents account for 62% of MassHealth's members, with disabled adults, the

elderly and the long term unemployed accounting for the bulk of the remaining members.

Mullin Decl., Tab B at p. 15.  MassHealth's 1.2 million members account for approximately 20%

of the Commonwealth's entire population and include one-third of all children, two-thirds of

nursing home residents, one-half of all HIV/AIDS patients, and one-quarter of the non-elderly

disabled adults in the Commonwealth.  *See id.* at p. 7; *see also* Mullin Decl., Tab A at p. 2.

The Medicaid budget has been a substantial and growing portion of the Commonwealth's

total budget during the relevant time period.  Between Fiscal Year (FY) 1994 and FY 2003 the

Commonwealth's Medicaid budget grew from $3.3 billion to $5.6 billion, an increase of over

---

[3] At the close of the Commonwealth's case, the Defendants filed a Motion for Judgment as a Matter of Law [Dkt. No. 910].  The Court deferred ruling on the motion and Defendants filed a Renewed Motion for Judgment as a Matter of Law or in the Alternative for a New Trial [Dkt. No. 936] following the verdict.  The Renewed Motion is scheduled for oral argument on January 25, 2011.

[4] Simultaneous with the filing of this Memorandum the Commonwealth will file the Declaration of Peter A. Mullin (Mullin Decl.) which will attach various exhibits used to support factual assertions in this memorandum.

169%.  Mullin Decl., Tab C at p. 360.  The Commonwealth's Medicaid expenditures, prior to
federal reimbursement, account for approximately one quarter of the Commonwealth's total state
budget.  *See id.* at p. 5; *see also* Mullin Decl. Tab B at p. 13.  During the years in question in this
case, 1995 to 2003, MassHealth's annual pharmacy expenditures rose dramatically from $313
million to $924 million, an increase of 296%.  Mullin Decl., Tab D.  As of FY03 pharmacy
expenditures accounted for 20% of the overall Medicaid expenditures, up from only 8% in 1995.
Mullin Decl., Tab E.

> **B.**     **Schering-Plough Corporation**

At all relevant times, Defendant Schering-Plough was a publically-traded, worldwide
pharmaceutical holding company headquartered in New Jersey.  It had no employees, but owned
various subsidiary corporations, including Defendant Schering, its wholly-owned, principal
operating subsidiary, which engaged in the manufacture and sale of brand name pharmaceuticals.
Exh. 2, ¶ 2.[5]  In 1993 Schering-Plough caused Defendant Warrick to be incorporated, as a
wholly-owned subsidiary of Schering, to act as a generic pharmaceutical subsidiary.  Warrick
was designed to "[p]rotect and extend the life cycle of [Schering's] branded products as patents
expire" and "create leverage in our Managed Care business," through bundling brand and generic
products.  Exh. 12, p. WAR0005993.  One major benefit to Schering-Plough from creating
Warrick was to minimize Medicaid rebates on Schering's branded products.  *Id.* at App. 2, pp.
WAR 0006069-74.  On November 3, 2009 Schering-Plough merged with Merck & Co. Inc. to
form the world's second largest pharmaceutical company.  As part of the merger, Schering-
Plough changed its name to Merck & Co. Inc.[6]  Exh. 2, ¶ 1.

---

[5] Citation to Trial Exhibits shall be Exh. (number).

[6] Merck and Schering-Plough engaged in a "reverse merger," in which Merck became a subsidiary of Schering-
Plough, and Schering-Plough then changed its name to Merck, because Schering-Plough was party to a marketing

During the years at issue in this case, 1995 to 2003, Schering-Plough's annual net sales doubled from $5.1 to $10.1 billion and totaled $72.6 billion for the entire period. Mullin Decl., Tab G. Annual net income more than doubled, growing from $887 million to $1.97 billion and totaled $13.7 billion for the entire period.[7] *Id*. Total assets grew from $4.7 to $15.3 billion and total shareholder equity grew from $1.7 to $7.3 billion during this period. *Id*. Schering-Plough's merger with Merck has increased the corporation's net worth by more than fivefold. In 2009, Schering-Plough, n/k/a Merck & Co. Inc., reported annual net sales of $27.4 billion, annual net income of $13 billion, total assets of $112.1 billion and total shareholder equity of $61.5 billion. *Id.*

### C. Schering-Plough's Longstanding Awareness of Government Scrutiny of its Price Reporting Practices

Schering-Plough has long been aware that its price reporting practices relating to Warrick products were being investigated by law enforcement authorities, yet it never corrected the false prices it sent to First DataBank (FDB). In October 1997, Warrick was served with a United States Department of Health and Human Services Office of Inspector General (OIG) subpoena *duces tecum,* issued by the OIG's South Florida office, in connection with "an investigation of Medicaid and/or Medicare fraud." Mullin Decl., Tab H. The subpoena called for the production of numerous documents, including documents relating to Warrick's price reporting to FDB, Wholesale Acquisition Cost (WAC) and Massachusetts. *Id*. Schering-Plough subsequently learned that this subpoena was issued in connection with a Department of Justice review of a

---

agreement with Johnson & Johnson, relating to a lucrative arthritis drug, Remicade. The agreement had a provision that if Schering-Plough became a subsidiary of any other company, or its incumbent board of directors no longer constituted a majority of the board, the marketing agreement would be terminated and Johnson & Johnson would have the right to market Remicade worldwide. Mullin Decl., Tab F. In 2008 Schering-Plough's Remicade sales outside the U.S. were $2.1 billion, while Johnson & Johnson's sales in the U.S. were $2.8 billion. *Id*. This marketing agreement is presently the subject of an arbitration proceeding.

[7] Schering-Plough's annual net income increased each year from 1995 to 2002, growing from $887 million to $1.97 billion. In 2003 Schering-Plough reported a $92 million loss. Mullin Decl., Tab G.

federal False Claims Act (FCA) *qui tam* action filed in August 1997 by Ven-A-Care of the

Florida Keys, Inc. against Warrick.  Mullin Decl., Tab I.  On August 25, 2000, the Massachusetts

United States Attorney's Office issued a subpoena *duces tecum* to Warrick and Schering-Plough,

requiring the production of numerous documents relating to WAC, Medicaid reimbursement,

"spread" and price reporting to FDB.  Mullin Decl., Tab J.  Schering-Plough's Form 10-K, filed

with the Securities and Exchange Commission (SEC) for the year ended 12/31/00, disclosed that

Warrick had been sued by the State of Texas for supplying the state with "false reports of

wholesale prices, which caused the state to pay Medicaid claims … at a higher than justified

level."  Mullin Decl., Tab K.  Warrick settled the Texas suit in 2004, prior to trial, for $27

million.  Mullin Decl., Tab L.  Yet, notwithstanding all of this notice that its price reporting

practices were causing damage to the Medicaid program, Schering-Plough never corrected its

reported prices as to Warrick's products.

      **D.**        **Schering-Plough's and Merck's Pattern of Misconduct**

      In 2004 and again in 2006, Schering-Plough, through a subsidiary, pled guilty to felony

criminal misconduct, which defrauded the Medicaid program, and paid more than $780 million

in fines and damages to resolve the cases.  In 2004, Schering-Plough's sales and marketing

subsidiary, Schering Sales Corporation (Schering Sales), pled guilty to violating the federal Anti-

Kickback Act, for having paid an HMO $1.8 million in kickbacks to induce the HMO to keep

Claritin, Schering-Plough's highest grossing drug at the time, on its formulary.  Mullin Decl.,

Tab M.  Schering Sales paid a criminal fine of $52.5 million pursuant to a plea agreement.  *Id.*

At the same time, as part of a global settlement, Schering-Plough paid $293 million to settle

federal FCA charges that it had made secret, disguised payments to two HMOs, to keep Claritin

on the HMOs' formulary, while failing to include the secret payments in Schering-Plough's

calculation of Claritin's "best price" for purposes of the rebates owed to the state Medicaid programs. *Id.* The Department of Justice said at the time that by failing to include these payments in Claritin's "best price" calculation, "the Medicaid program [nationwide] … paid far more for Claritin from 1998-2002 than these two managed care customers." *Id.*

In 2006, Schering-Plough agreed to a $435 million global settlement with the Department of Justice to resolve criminal and civil charges relating to its drug marketing and sales practices. Schering Sales pled guilty to conspiring from early 1998 to August 2001 to knowingly and willfully making false and fraudulent statements (1) to the Medicaid program regarding its "best price" for Claritin Reditabs, to avoid paying Medicaid rebates and (2) to the FDA to avoid FDA scrutiny of its illegal promotional activities relating to Temodar, a drug used to treat brain tumors, and Intron A, a drug used to treat bladder cancer. Mullin Decl., Tab N. Schering Sales paid a criminal fine of $180 million. *Id.* At the same time, Schering-Plough paid $255 million to settle civil FCA charges, among other things, that it falsely reported its "best price" to the Medicaid program on Claritin Reditabs, a drug used to treat allergies, and K-Dur, a drug used to treat stomach conditions, in order to evade rebates owed to the state Medicaid programs. *Id.*

Merck & Co., Inc., Schering-Plough's merger partner in 2009, has an equally notorious record of Medicaid fraud. In 2008, it agreed with the Department of Justice to pay $650 million to resolve two federal FCA *qui tam* actions alleging it improperly excluded certain sales to hospitals from "best price" calculations, in order to evade Medicaid rebates owed to the states. Mullin Decl., Tab O. One of the resolved cases involved the marketing of Zocor, a cholesterol lowering drug, and Vioxx, a drug used to treat acute pain and arthritis. *Id.* The other case involved Pepcid products, used to reduce stomach acid and to treat heartburn and acid reflux disease. *Id.* State Medicaid programs recovered $290 million as part of these settlements. *Id.*

In its most recent SEC filing, Merck reported it has reserved  $950 million to pay for an anticipated resolution of a federal government investigation of its sales and marketing practices relating to Vioxx.  Mullin Decl., Tab P at pp. 21-22.  Merck has previously disclosed that the U.S. Attorney's Office in Boston has notified it that it is a target of a grand jury investigation relating to the company's research, marketing and sales activities relating to Vioxx, which Merck withdrew from the market in 2004 after it was linked to a higher risk of heart attacks and strokes. *Id.*

### E.    The Impact of Healthcare Fraud and the Need for Deterrence

Healthcare is a huge portion of the U.S. economy and has been riddled with fraud in recent years. In 2007 U.S. healthcare spending exceeded $2.2 trillion and represented 16% of the nation's Gross Domestic Product (GDP). Mullin Decl., Tab Q at p. 3.  The federal government financed more than one-third of the nation's healthcare expenses and the federal and state governments combined financed 46% of healthcare spending in 2007.  *Id*.  The FBI reports that estimates of fraudulent billing to healthcare programs range from three to ten percent of total healthcare expenditures. Mullin Decl., Tab R at p. 4.  The FBI also reports that healthcare expenditures in the United States are rising at twice the rate of inflation.  *Id*. at 5.

 In 2005 Medicaid was the nation's single largest drug purchaser, accounting for 18% of all drug purchases.  Mullin Decl., Tab S at p. 2.  Even after Medicare Part D became effective in January 2006, and virtually all Medicaid members in nursing homes were enrolled in a Medicare Part D prescription drug plan, Medicaid drug purchases remained substantial, accounting for 9% of total drug purchases in the United States.  *Id*.  The federal FCA is the federal government's principal weapon against fraud in government programs.  The Department of Justice (DOJ) reports that between 1986, when the FCA was substantially amended, and 2009, it recovered

$24.1 billion in FCA cases.  Mullin Decl., Tab T at p. 2.  Two-thirds of these recoveries, $15.9

billion, were recovered in healthcare fraud cases.  *Id.* at p. 4.  The predominance of healthcare

fraud cases was even more pronounced in FY 2010, which ended September 30, 2010.  The

federal government recovered $3.0 billion in FCA cases in FY10, of which 83%, or $2.5 billion,

was recovered in healthcare fraud cases.  Mullin Decl., Tab U.

In the last ten years, FCA cases involving the pharmaceutical industry have dominated

the federal government's FCA recoveries (*see* following Table):

| YEAR | DEFENDANT | TOTAL PAYMENT | ILLEGAL CONDUCT |
|------|-----------|---------------|-----------------|
| 2010 | Roxane | $280 million | Falsely inflated reported prices |
| 2010 | Abbott | $126 million | Falsely inflated reported prices |
| 2010 | GlaxoSmithKline | $600 million | Falsely manufacturing and distributing adulterated drugs |
| 2010 | Novartis | $420 million | Off label marketing and kickbacks |
| 2010 | Forrest | $313 million | Off label marketing |
| 2010 | AstraZeneca | $520 million | Off label marketing and kickbacks |
| 2009 | Mylan | $118 million | Evasion of Medicaid rebates |
| 2009 | Pfizer | $2.3 billion | Off label marketing and kickbacks |
| 2009 | Eli Lilly | $1.4 billion | Off label marketing |
| 2008 | Cephalon | $425 million | Off label marketing |
| 2008 | Merck | $650 million | Evasion of Medicaid rebates and paying kickbacks |
| 2007 | Purdue Pharma | $634 million | Falsely misbranded drug |
| 2007 | Bristol-Myers Squibb | $515 million | Off label marketing, kickbacks, false price reporting and evasion of Medicaid rebates |
| 2007 | Aventis | $190 million | Falsely inflated reported prices |
| 2006 | Schering-Plough | $435 million | Evasion of Medicaid rebates and false statements to FDA |
| 2005 | King Pharma | $124 million | Evasion of Medicaid rebates |
| 2005 | Serono | $704 million | Off label marketing and kickbacks |
| 2005 | GlaxoSmithKline | $150 million | Falsely inflated reported prices |
| 2004 | Schering-Plough | $345 million | Evasion of Medicaid rebates and kickbacks |
| 2004 | Warner-Lambert | $430 million | Off label marketing |
| 2003 | Bayer | $251 million | Evasion of Medicaid rebates |
| 2003 | SmithKline Beecham | $87 million | Evasion of Medicaid rebates |
| 2001 | TAP Pharma | $875 million | Falsely inflated reported prices and |

| | | | kickbacks | |
|---|---|---|---|---|
| **Total Amount of FCA Recoveries:** | **$11.9 billion[8]** | | | |

Mullin Decl., Tab V.

The need to deter potential violators is particularly important in pharmaceutical cases involving the Medicaid program. These cases are difficult to detect and prosecute. The cases are usually complex, involving regulations and business practices known only to industry insiders. The vast majority of the successful federal FCA cases listed above are *qui tam* actions, filed by a present or former employee of the defendant company, or other industry insider. Even with the help of a Relator, it usually takes years to investigate and prosecute a FCA case involving the Medicaid program. This case took seven years from date of filing to verdict. There is no way of knowing how many other fraudulent schemes are currently undetected and presently defrauding the Medicaid program. The lower the rate of a fraud's detection, the higher the civil penalties required to ensure that crime does not pay.[9] It is the specter of substantial penalties, if caught, which will deter potential violators from engaging in prohibited conduct.

## ARGUMENT

**I.     THE COURT SHOULD ENTER JUDGMENT FOR THE COMMONWEALTH ON ITS CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

The Court decided at trial, with the agreement of the parties, that Defendants' liability on the Commonwealth's claim for breach of the implied covenant of good faith and fair dealing was a question of law to be decided by the Court after the verdict, based, in part, on whether the jury found Defendants' conduct violated the MFCA, the MMFCA and/or constituted common law

---

[8] This figure includes FCA recoveries, criminal fines and recoveries pursuant to the Food, Drug and Cosmetic Act.

[9] *United States v. Rogan*, 517 F.3d 449, 454 (7th Cir. 2008), *citing* A. Mitchell Polinsky and Steven Shavell, *Punitive Damages: An Economic Analysis*, 111 Harv. L. Rev. 869 (1988).

fraud. 9/27/10 Tr. 217:18-219:22.  The jury found Defendants liable on all three counts.

Accordingly, the Court should enter judgment for the Commonwealth on its claim for breach of

the implied covenant of good faith and fair dealing.[10]

The covenant of good faith and fair dealing means that when parties enter into a contract,

neither party shall do anything to destroy or injure the other party's rights to receive the benefit

of the contract. *Massachusetts v. Mylan Labs.,* 608 F.Supp.2d 127, 158-59 (D.Mass. 2008).

Although the requirement of good-faith performance is "circumscribed by the obligations-the

'fruits'-actually contained in the agreement," *Accusoft Corp. v. Palo,* 237 F.3d 31, 45 (1st Cir.

2001), that does not mean that a party can avoid liability simply by honoring the letter of the

agreement.  A party may breach the covenant of good faith and fair dealing even if it does not

violate a specific clause in the contract.  *Mylan Labs.,* 608 F.Supp.2d at 158-59 ("A party may

breach the covenant of good faith and fair dealing implicit in every contract without breaching

any express term of that contract.  Otherwise, the implied covenant would be a mere

redundancy."); *see also Bergeron v. Ridgewood Securities Corp.,* 610 F.Supp.2d 113, 141

(D.Mass. 2009) ("The implied covenant of good faith and fair dealing is a judicial convention

designed to protect the spirit of an agreement when, *without violating an express term of the*

*agreement*, one side uses oppressive or underhanded tactics to deny the other side the fruits of

the parties' bargain.") (emphasis added); *Declude, Inc. v. Perry,* 593 F.Supp.2d 290, 295

(D.Mass. 2008) (covenant can be breached even in the absence of a breach of the express terms

of the contract); *Craig-Buff Ltd. Partnership v. U.S.,* 69 Fed.Cl. 382, 388 (Fed. Cl. 2006) ("claim

for a breach of implied covenant of good faith and fair dealing is not limited to specific contract

terms."); *Chase Manhattan Bank, N.A. v. Keystone Distributors, Inc.,* 873 F.Supp. 808, 815

---

[10] For further discussion of this topic, see the Commonwealth's Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law or in the Alternative for a New Trial (Dkt. No. 940) at pp. 3-6.

(S.D.N.Y. 1994) ("a party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations.")

A party may breach the implied covenant of good faith and fair dealing by engaging in an extra-contractual course of action that has the effect of destroying the value of the agreement or interfering with the reasonable expectations of the parties to the agreement.  *See Centex Corp. v. U.S.,* 395 F.3d 1283, 1306 (Fed. Cir. 2005) (prohibition on interfering with benefits contemplated by contract is "among the core functions served by the implied covenant of good faith and fair dealing"); *M/A-COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2nd Cir. 1990)("Where a party's acts subsequent to performance on the contract so directly destroy the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties, the implied covenant of good faith may be implicated."); *Speakman v. AllAmerica Financial Life Ins. Co.,* 367 F.Supp.2d 122, 125 (D.Mass. 2005) (holding that defendant's conduct "hindered plaintiffs from reaping substantial benefits of the contract.")

The Court has already concluded that the intended "fruits" of the rebate agreement included: "[giving] state Medicaid programs the benefit of the best price at which the manufacturer sells the drug to any public or private purchaser."  *Mylan Labs.,* 608 F. Supp.2d at 159.  The rebate agreement provides value to the Commonwealth only when reimbursement is grounded in reality.  Although Defendants may have accurately reported AMPs for purposes of the rebate agreement, they "sabotaged" the intended benefit of the agreement by simultaneously reporting, and failing to correct, falsely inflated published prices, thereby inflating reimbursement and diminishing the value of the rebates.  Defendants' extra-contractual conduct (violating the MFCA, the MMFCA and committing common law fraud) interfered with the reasonable expectations of the parties and destroyed the value of the agreement to the

Commonwealth.  Accordingly, the Court should rule as a matter of law that Defendants breached

the implied covenant of good faith and fair dealing implicit in the Medicaid Rebate Agreement.

## II.     EACH FALSE CLAIM DEFENDANTS CAUSED TO BE PRESENTED TO MASSHEALTH WAS A SEPARATE VIOLATION OF THE MFCA.

The jury found Defendants liable under both Section 1 and Section 2 of the MFCA.

Under Section 1, the jury found Defendants caused 989,103 false claims to be presented.[11]

Section 1 of the MFCA provides:

> Any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval…shall be liable to the commonwealth or political subdivision for a civil penalty of not less than $5,000 and not more than $10,000 per violation, plus three times the amount of damages, including consequential damages, that the commonwealth or political subdivision sustains because of the act of that person.

M.G.L. c. 12 § 5B.

The plain language of the statute indicates that (1) each false claim that a person "causes

to be presented" to the Commonwealth is a violation and (2) a civil penalty is to be assessed "per

violation."  By the plain terms of the statute, a person commits a violation (and is subject to a

civil penalty) each time he causes a false claim to be presented.  "The Supreme Court has

repeatedly emphasized the importance of the plain meaning rule, stating that if the language of a

statute or regulation has a plain and ordinary meaning, courts need look no further and should

apply the regulation as it is written."  *In re Pharmaceutical Indus. Average Wholesale Price

Litig.,* 582 F.3d 156 (1st Cir. 2009)(quoting *Textron, Inc. v. Comm'r,* 336 F.3d 26, 31 (1st Cir.

2003)).

---

[11] Under Section 2, the jury found Defendants made 28 false statements.  Section 2 of the MFCA provides that any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof" shall be liable for one civil penalty per violation, plus treble damages.  In their Renewed Motion for Judgment as a Matter of Law or in the Alternative for a New Trial, Defendants request that the Court set aside the jury's finding of liability under Section 1 and impose only 28 penalties under Section 2. (Dkt. No. 937) at Section I.  As set forth herein, the Court should not so limit the award of civil penalties.

In their Renewed Motion for Judgment as a Matter of Law (and previously in other filings) Defendants have argued that the Court may not assess one penalty per false claim.  In support of their argument, Defendants rely upon one case only: *United States v. Bornstein,* 423 U.S. 303 (1976), a 1976 case decided solely as a matter of statutory construction, prior to the 1986 amendments to the FCA, which changed the structure of the statute.  Not only is Defendants' theory contrary to the plain language of the MFCA and the clear intent of the Congress in adopting the 1986 amendments to the FCA, but *Bornstein* itself is distinguishable from this case.[12]

In *Bornstein,* the defendant subcontractor sent falsely labeled components to a prime contractor in three separately invoiced shipments.  The prime contractor shipped the final product to the government in 35 separately invoiced shipments.  The Supreme Court held that the subcontractor was responsible for three—not 35—forfeitures because the number of shipments by the prime contractor was unrelated to the subcontractor's conduct.  Specifically, the Court noted that the fact that the prime contractor "chose to submit 35 false claims instead of some other number was, so far as [the subcontractor] was concerned, wholly irrelevant, completely fortuitous and beyond [the subcontractor's] knowledge and control."  *Id.* at 312.

Unlike the subcontractor in *Bornstein,* Defendants cannot credibly argue that the number of claims pharmacies presented to the Commonwealth was, as far as Defendants were concerned, "beyond [Defendants'] knowledge and control."[13]  *See id.*  This case is much more like *U.S. v.*

---

[12] The *Bornstein* issue has been extensively briefed in conjunction with Defendants' Renewed Motion for Judgment as a Matter of Law or in the Alternative for a New Trial. Dkt. No. 936.  In the interest of judicial economy, rather than reiterate all of its arguments here, the Commonwealth incorporates, as if set forth in full, all arguments set forth in its Opposition [Dkt. No. 940] and Sur-Reply [to be filed on December 10, 2010].

[13] In *Bornstein,* there is no indication that the subcontractor had any information about the number of shipments/invoices the prime contractor was sending to the government.  In contrast, in this case, Defendants received quarterly reports advising them of the number prescriptions MassHealth had reimbursed for each of the Warrick drugs. *See* Mullin Decl. Tabs W at pp. F-15, *et seq.* and X. Accordingly, unlike the subcontractor in

*Ehrlich,* 643 F.2d 634 (9th Cir. 1981), in which the defendant, relying on *Bornstein,* argued he

"did but one act"—overstated construction costs—so he should only be liable for one penalty,

not the 76 penalties the district court assessed based on 76 false monthly vouchers that were

generated based on the falsely overstated construction costs. *Id.* at 637. The court distinguished

*Bornstein* and rejected Ehrlich's argument, holding that when a person knowingly causes a

number of false claims to be filed, he is liable for an equal number of forfeitures, stating:

> Ehrlich knew a false claim would be submitted each month. He could have
> prevented the filing of additional false claims. Instead, he did nothing and gained
> a continuing benefit from the inflated interest subsidies. Had he submitted the
> claims himself, he would be liable for 76 forfeitures. As in the case of
> conspirators, it would defeat the purposes of the Act, given Ehrlich's knowledge
> and control of the situation, to limit his liability to one forfeiture.

*Id.* at 638. Like *Ehrlich*, the Defendants in this case knew a claim would be submitted for each

prescription, they could have prevented more false claims from being presented by correcting

their false WAC prices, and they did nothing, in order to gain the continued benefit of their false

prices.

   This Court has recognized that *Bornstein* is distinguishable from the facts involved in this

case, in which a pharmaceutical manufacturer submits false prices with knowledge that they will

be used in the adjudication of multiple subsequent claims. In assessing the triggering date for the

statute of limitations in the AWP litigation, this Court noted, "an FCA claim accrues each time a

false claim is submitted." *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 498

F.Supp.2d 389, 400 (D.Mass. 2007), *citing United States v. Rivera,* 55 F.3d 703, 707 (1st

Cir.1995); *see also U.S. v. Incorporated Village of Island Park*, 888 F. Supp. 419, 441 (E.D.N.Y.

1995) (holding that a separate claim for liability existed for each monthly mortgage subsidy

---

*Bornstein,* Defendants knew that multiple claims were being presented to the Commonwealth and had information
about how many claims were presented each quarter.

submitted by the non-party where the defendant's initial fraudulent conduct and false statements caused the third party to submit a "readily ascertainable number of claims" for reimbursement); *U.S. v. Rogan,* 459 F.Supp.2d 692, 720 (N.D.Ill. 2006), *aff'd,* 517 F.3d 449 (7th Cir. 2008) (holding that the number of violations of the False Claims Act depends on the number of false or fraudulent claims that defendant caused to be submitted, and that a separate penalty is assessed per false claim); *U.S. v. Killough*, 848 F.2d 1523, 1533 (11th Cir. 1988) (holding that imposition of forfeitures under the Act is not discretionary, but is mandatory for each claim found to be false); *U.S. v. Fliegler,* 756 F.Supp. 688, 694 (E.D.N.Y. 1990) (holding that the amount of the penalty to be assessed per claim is left to the court's discretion); *United States v. McLeod,* 721 F.2d 282, 285 (9th Cir. 1983) ("A person who commits any of the acts prohibited by the False Claims Act is liable for a…civil penalty for each false claim presented…"); *In re Schimmels,* 85 F.3d 416, 419 n. 1 (9th Cir. 1996) ("[T]he FCA requires a court to award [penalties] for each false claim or statement submitted to the government, even if no damages were caused by the false submissions."); *BMY—Combat Sys. Div. of Harsco Corp. v. United States,* 44 Fed.Cl. 141, 150 (Fed.Cl. 1999)("Each false claim results in one penalty.")

## III.   THE COURT SHOULD IMPOSE $191 MILLION IN CIVIL PENALTIES UNDER THE MASSACHUSETTS FALSE CLAIMS ACT.

The jury found that Defendants caused 989,103 false claims to be presented to MassHealth for payment.  As set forth above, each false claim was a violation of the MFCA and is subject to a civil penalty of "not less than $5,000 and not more than $10,000."  M.G.L. c. 12, § 5B.  Thus, based on the jury's verdict, the Defendants are liable to the Commonwealth for between $4,945,515,000 and $9,891,030,000 in civil penalties.[14]

---

[14]  The jury also found the Defendants knowingly made 28 false statements to obtain payment of claims by MassHealth.  Each of these false statements was a violation of Section 2 of the MFCA and is subject to a civil

In order to avoid Eighth Amendment Excessive Fines Clause issues, the Commonwealth requests fewer civil penalties than are mandated by the MFCA and the jury's verdict.  *See U.S. v. Eghbal*, 475 F.Supp.2d 1008, 1017 (C.D. Cal. 2007) ("Civil penalty awards in which the amount of the award is less than the statutory maximum do not run afoul of the Excessive Fines Clause.")  The evidence in the case shows that the Warrick Albuterol "rescue" inhaler, NDC 59930-1560-01, was clearly the most important of the three drugs at issue in the case.  The rescue inhaler accounted for $3,072,319 of the $4,563,328 in total damages, and 781,635 of the 989,103 false claims found by the jury.  Exhs.5 and 6.  In general, the spreads between Warrick's reported and actual prices were greater on the rescue inhaler than the other drugs.  Exh.4.  The greatest spread, 690%, was on the rescue inhaler during the 3rd quarter of 2000.  *Id.*  There were 38,303 false claims for the rescue inhaler presented to the Commonwealth during this single quarter.  Mullin Decl.Y.  Applying the MFCA's minimum penalty, $5,000, to these 38,303 false claims results in civil penalties of $191,515,000.   Accordingly, the Commonwealth asks that the Court award it civil penalties in the amount of $191,515,000.[15]

The requested civil penalties for the 38,303 false claims constitute the most invidious false claims Defendants caused to be presented to the Commonwealth.  They relate to the "rescue" inhaler, a product that can be a matter of life and death for a Medicaid beneficiary.  9/18/06 Weintraub Depo. 79:25-80:6 ("It can be life and death product in certain situations.")  These are the claims with the greatest spread between actual and reported prices, with regard to the product which caused the greatest amount of economic damage.  By seeking penalties on only these 38,303 false claims the Commonwealth is seeking to recover penalties on only 3.87%

penalty.  Thus, the Defendants are liable to the Commonwealth for additional civil penalties between $140,000 and $280,000.

[15] The Commonwealth also requests that the Court award it $280,000 in civil penalties for the 28 false statements the Defendants made in violation of Section 2 of the MFCA.

of the false claims the Defendants caused to be presented[16] and it is seeking to recover less than 2% of the statutorily mandated maximum penalties and less than 4% of the statutorily mandated minimum penalties.[17]   Civil penalties of $191 million represent only 0.26% of Schering-Plough's net sales, and 1.4% of its net income, during the relevant period, 1995-2003, and only 1.25% of its net assets, and 2.6% of its total shareholder equity as of 12/31/03, the end of the relevant period.[18]   Civil penalties in this amount are an even smaller percentage of Schering-Plough's finances currently, after its merger with Merck: 0.7% of 2009 net sales, 1.4% of net income, 0.17% of total assets and 0.3% of total shareholder equity.[19]

Other courts have found no violation of the Excessive Fines Clause when the number of false claims upon which penalties are applied is fewer than the total number of false claims at issue in the case.  *See e.g. United States v. Mackby*, 339 F.3d  1013, 1015-16 (9th Cir. 2003)(no Excessive Fines Clause violation when applying statutory minimum penalty to 111 false claims out of the total 8,499 false claims)*; see also e.g. U.S. v. Bickel*, 2006 WL 1120439 (C.D.Ill.) at *3-*4 (holding that the government seeking treble damages and only one statutory maximum penalty, where defendant submitted 32,949 false claims, did not violate the Excessive Fines clause); *U.S. ex rel. Shutt v. Community Home and Health Care Svcs., Inc.*, 305 Fed.Appx. 358,

---

[16] The 38,303false claims for the 3Q 2002 (690% spread quarter) represents 3.87% of the 989,103 false claims found by the jury in this case (38,303 divided by 989,103 equals 3.87%).

[17]   The Commonwealth is effectively seeking a civil penalty of approximately 2 cents on the dollar.  Applying the $5,000 minimum civil penalty to only 38,303 false claims yields a penalty of $191,515,000 out of a maximum civil penalty of $9,891,030,000 ($10,000 x 989,103) or 1.94% of maximum allowable statutory penalty.  Even comparing the $191,515,000 requested penalty with the minimum civil penalty of $4,945,515,000 ($5,000 x 989,103) results in the Commonwealth seeking only 3.87% of the minimum allowable civil penalty or approximately 4 cents on the dollar.

[18] Each of these figures was calculated using data from Schering-Plough's filings with the SEC.  *See* Mullin Decl., Tab G.

[19] Each of these figures was calculated using data from Schering-Plough's filings with the SEC.  *See* Mullin Decl., Tab G.

360-61 (9th Cir. 2008)(holding that a single statutory minimum penalty and treble damages was not constitutionally excessive where the defendant had made "multiple fraudulent claims to obtain hundreds of thousands of tax dollars"); and *U.S. ex rel. Smith v. Gilbert-Realty Co., Inc.,* 840 F.Supp. 71, 74-75 (E.D.Mich. 1993)(evaluating whether $1,630 of actual damages caused by 58 false claims warranted $290,000 in civil penalties, and holding that it was not constitutionally excessive to impose penalties only on the seven most egregious false claims).

## IV.   THE REQUESTED CIVIL PENALTIES WILL NOT VIOLATE THE EIGHTH AMENDMENT'S EXCESSIVE FINES CLAUSE.

The Eighth Amendment to the U.S. Constitution provides, in relevant part, that "[e]xcessive bail shall not be required, nor excessive fines imposed . . . ." U.S. CONST. Amend. VIII.  The Excessive Fines Clause has been held to apply to any "payment to a sovereign as punishment for some offense."[20]  *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989).  Although typically associated with criminal cases, civil penalties can also fall within the purview of the Eighth Amendment.[21]  *Hudson v. United States,* 522 U.S. 93, 103 (1997).

In *United States v. Bajakajian*, 524 U.S. 321, 327-338 (1998), the Supreme Court set out, for the first time, the analysis for determining whether a sanction runs afoul of the Excessive Fines Clause.[22]  Generally, courts must determine whether "(1) the payment to the government

---

[20] It is not clear what portion of the treble damages and civil penalties mandated by the MFCA are punitive. The Supreme Court has said that the pre-1986 version of the FCA, which mandated a $2000 per false claim civil penalty and double damages, was wholly remedial. *See Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003). The Supreme Court has also noted that the treble damages portion of the 1986 amendments to the FCA, "has a compensatory side, serving remedial purposes in addition to punitive objectives." *Cook County, Ill.*, 538 U.S. at 130.

[21] The Seventh Circuit has expressed doubt as to whether the Excessive Fines clause applies to civil penalties under the FCA, *see Rogan*, 517 F.3d at 453, *citing Browning-Ferris Indus.*, 492 U.S. 257 (1989), for the proposition that punitive damages were not considered "fines" under the Eighth Amendment).

[22] Both the Supreme Judicial Court and the Massachusetts Appeals Court have cited favorably to *Bajakajian* in evaluating Excessive Fine Clause determinations under state civil statutes.  *See MacLean v. State Bd. of Retirement*,

constitutes punishment for an offense, and (2) whether the payment is grossly disproportionate to the gravity of the defendant's offense." *United States v. Mackby*, 261 F.3d 821, 829 (9th Cir. 2001), *citing Bajakajian*, 524 U.S. at 327-328, 334.  In conducting this analysis, courts must give substantial deference to legislative determinations of penalties.  *Bajakajian*, 524 U.S. at 336. *See United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F.Supp.2d 719, 744 (N.D. Ill. 2007). The party asserting that civil penalties violate the Eight Amendment bears the burden of establishing that the amount is excessive.  *See Bajakajian,* 524 U.S. at 348 (Kennedy, J. dissenting); *Amerigroup Ill., Inc.*, 488 F.Supp.2d at 747.

Once a court finds that a payment is punitive, it is required to determine whether such payment is "grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334*, see also Austin v. U.S.*, 509 U.S. 602, 622-623 (1993).  A proportionality assessment is "inherently imprecise."  *Bajakajian*, 524 U.S. at 336.  In applying *Bajakajian* courts have generally looked to a number of factors including, but not limited to, "the egregiousness of the [defendant's] conduct, the government's monetary damages, any other damages that the government might have incurred, the right of the government to be made completely whole, . . . general fairness [,] . . . the gravity of the offense, a defendant's acceptance of responsibility or lack of remorse, the need for deterrence, and possible recidivism."  *Amerigroup Ill., Inc.,* 488 F.Supp.2d at 741, *citing S.E.C. v. Lipson,* 129 F.Supp.2d 1148, 1159 (N.D. Ill. 2001).  The most critical (and most commonly evaluated) factors are the gravity of the offense and the egregiousness of the defendant's conduct.  *See e.g., Mackby,* 339 F.3d at 1017-1018; *Amerigroup Ill., Inc.,* 488 F.Supp.2d at 742.

The Commonwealth's request for $191 million in civil penalties in this case is not

_____

432 Mass. 339, 345 (2000) and *Maher v. Justices of the Quincy Div. of the Dist. Ct. Dep't*, 67 Mass.App.Ct. 612, 619 n.12 (2006).

"grossly disproportional to the gravity of [the] defendant's offense." *Bajakajian*, 524 U.S. at

334. In determining proportionality under the Excessive Fines clause, the first consideration is

the penalty provided for in the statute. *Id.* at 336 ("[J]udgments about the appropriate

punishment for an offense belong in the first instance to the legislature"); s*ee also Amerigroup*

*Ill., Inc.*, 488 F.Supp.2d at 744, *quoting*, *U.S. v. 817 N.E. 29th Drive, Wilton Manors, Fla.*, 175

F.3d 1304, 1310 (11th Cir.1999) (Congress' penalty determinations "represent the collective

opinion of the American people as to what is and what is not excessive"). Here the

Commonwealth is seeking less than 2% of the maximum penalties and less than 4% of the

minimum penalties mandated by the MFCA. Such small percentages are hardly excessive.

There can be no dispute that the Massachusetts legislature considered violations of the

MFCA to be serious offenses warranting significant penalties. In enacting the MFCA in 2000 the

Legislature increased the available penalties from $2000 to not less than $5000 and not more

than $10,000 per violation, as well as going from double to treble damages.[23] The Legislature

clearly believed in 2000 that substantially greater penalties were needed to deter violations. This

Court should give "substantial deference" to the Legislature's judgment regarding the penalties

needed to deter MFCA violations. *Bajakajian*, 524 U.S. at 336 (citing *Solem v. Helm,* 463 U. S.

277, 290 (1983) ("Reviewing courts … should grant substantial deference to the broad authority

that legislatures necessarily possess in determining the types and limits of penalties for crimes.").

In weighing the gravity of the Defendants' offenses, the Court should recognize that both

---

[23] Prior to July of 2000, Massachusetts had a statute that prohibited the same conduct and required proof of the same elements that the defendants were found at trial to have violated in Sections 1 and 2 of the MFCA. *See* Commonwealth's Opposition to Defendants' Renewed Motion for Judgment as Matter of Law or in the Alternative for a New Trial, [Dkt. No. 940], p. 15-17. Enacted in 1980 and previously found at M.G.L. c. 93, §9B, *see* St. 1980, c. 531, §1, this predecessor statute to the MFCA mandated double damages and a $2000 civil penalty for each false claim a violator "cause[d] to be presented" to the Commonwealth. *See* M.G.L. c. 93, §9B. The statute was repealed and replaced by the MFCA on the same day, July 28, 2000. *Compare* St. 2000, c. 159, §202 (repealing M. G. L. c. 93, §93B) and St. 2000, c. 159, §18 (enacting M. G. L. c. 12, §5K).

the Massachusetts Legislature and Congress have determined that knowingly causing a false claim to be filed for public funds is a serious offense requiring treble damages and mandatory civil penalties. *Mackby,* 339 F.3d at 1017-1018 (the fact that "Congress provided for treble damages and an automatic civil monetary penalty per false claim shows that Congress believed that making a false claim to the government is a serious offense."); *Amerigroup Ill., Inc.*, 488 F. Supp. 2d at 744 ("Congress determined that a FCA violation is a serious offense …..") The Senate report, regarding the 1986 amendments to the federal FCA, noted that in raising the civil penalty to $10,000 per claim, Congress was expressing an intent that "defrauding the Government is serious enough to warrant an automatic forfeiture." *See* S. Rep. 99-345 (1986) at 17, *reprinted in* 1986 U.S.C.C.A.N. 5266.

The egregiousness of Defendants' offenses in this case warrants the imposition of the requested civil penalties. Defendants knowingly caused false claims to be filed with the Medicaid program, a taxpayer funded healthcare plan for the elderly, the disabled, and low-income children and their families. The false claims related to a life and death product, a "rescue" inhaler. Defendants' illegal conduct extended over many years and involved hundreds of thousands of false claims. The Defendants were receiving quarterly statements from MassHealth telling them exactly how many prescriptions for Warrick drugs had been reimbursed. Mullin Decl., Tabs W and X. First DataBank was making an annual request to Defendants to update Warrick's false WAC prices. *See* 10/24/07 Chadwick Depo. 162:12-163:12; 164:2-12; 164:18; 167:10-14; 167:19; *see also e.g.* Exhs. 19 and 146. Defendants were also on notice, as early as 1997, that law enforcement authorities were investigating the lawfulness of their price reporting practices. Mullin Decl., Tab H. Yet the Defendants did nothing to correct the false prices for Warrick's products they had caused to be published,

because correcting them was contrary to Defendants' economic interests.[24]  The jury found this

conduct to be willful.[25]

    In examining the egregiousness of a defendant's conduct, it is proper to consider whether

a defendant accepts responsibility for its fraudulent behavior.  *See Amerigroup Ill., Inc.,* 488

F.Supp.2d at 741 (citing *Lipson,* 129 F.Supp.2d at 1159).  Here the Defendants not only blamed

the Commonwealth, FDB, Unisys and ACS, but they also insisted at trial that the illegal conduct

was merely a "typo" or "mistake" by others.[26]  These statements demonstrate that the Defendants

do not acknowledge the wrongfulness of their actions and that "strong medicine" will be needed

to deter future violations.

    The harm caused by Defendants' offenses is a factor to be considered in assessing

whether the requested penalties are "grossly disproportional to the gravity of [the] defendant's

offense."  *Bajakajian*, 524 U.S. at 334.  Here the jury found that the Defendants proximately

caused $4,563,328 in economic damages to the Commonwealth.  Dkt. No. 934.  This figure is

not, however, the true measure, for Excessive Fines Clause purposes, of the economic harm

caused by Defendants' offenses.  Because Medicaid is jointly funded by the state and federal

governments, and the Commonwealth received 50% federal participation in its Medicaid

---

[24]As Dr. Rosenthal, the Commonwealth's expert witness explained, generic pharmaceutical manufacturers compete on the basis of the "spread" on their products, which is the difference between the pharmacy's reimbursement for the drug and its acquisition cost. Since virtually all pharmacy reimbursement is based on reported prices, manufacturers have no incentive to reduce reported prices, because it will reduce pharmacy reimbursement and cause the manufacturer to lose market share.  *See generally*, 9/8/10 Tr. 67:7-69:12.

[25] The jury found the Defendants violated the MMFCA.  Verdict Form, Dkt. No. 934, Question 4.  The court instructed the jury they could so find only if they found the Defendants acted "willfully."  9/28/10 Tr. 133:3-134:13.

[26] The Defendants' position, throughout the trial, clearly reveals their inability to accept responsibility for the harm that they caused the Commonwealth. *See e.g.* Defendants' Opening, 9/8/2010 Tr. 19:10-20; 50:15-17 ("The use of the old direct price was plainly a mistake for which MassHealth and First DataBank were primarily responsible."); Defendants' expert witness, Dr. Fiona Scott Morton, 9/23/2010 Tr. 68:4-7 ("So there was only a WAC in the system because of a typo by First DataBank."); Defendants' closing, 9/28/2010 Tr. 24:5-25:19 ("If [MassHealth or ACS] detected an error, and clearly they didn't here, but had they done it, they could easily have repaired the problem.")

program, the true measure of the economic harm caused by the Defendants' offenses is twice that

amount or $9,126,656.  While the Court has ruled that the Commonwealth cannot recover the

"federal share" of the economic harm here, because the federal government approved a *qui tam*

relator's settlement with the Defendants in a related federal FCA case, that does not mean the

Court cannot consider the full measure of Defendants' economic harm in deciding whether the

requested penalties are "grossly disproportional" to the gravity of the Defendants' offenses.

*Sony BMG Music Entertainment v. Tenenbaum*, 2010 WL 2705499 *13 (D. Mass. 2010) ("a jury

may consider harm to nonparties in evaluating the reprehensibility of the defendant's conduct

toward the plaintiff") *relying on, Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007)

("Evidence of actual harm to nonparties can help to show that the conduct that harmed the

plaintiff … was particularly reprehensible.") *See also Mackby*, 339 F.3d at 1017 (in assessing

defendant's culpability it was proper to consider all 8499 false claims he submitted, even though

the government sought damages on only 1459 claims and penalties on only 111 claims.)

The harm flowing from Defendants' offenses is more than just economic harm.  The

Commonwealth has a strong interest in maintaining the integrity of its Medicaid program.  As

the Ninth Circuit said in *Mackby,* a FCA case involving Medicare:

> The government has a strong interest in preventing fraud, and the harm
> of such false claims extends beyond the money paid out of the treasury.
> (citation omitted.) Fraudulent claims make the administration
> of Medicare more difficult, and widespread fraud would undermine public
> confidence in the system.

339 F.3d at 1019.  Here the Defendants' fraud was widespread, spanning more than eight years

and causing the submission of almost one million false claims.  The Medicaid program is

essential to the Commonwealth's 2006, near-universal coverage, healthcare reform law.  Mullin

Decl, Tab Z.  It is critical to the success of that law to maintain public confidence in the fiscal

integrity of the Medicaid program.  It is not "grossly disproportional" for the Commonwealth to

seek substantial penalties at this time to protect the integrity of its Medicaid program.

## V.       THE REQUESTED CIVIL PENALTIES WILL NOT VIOLATE
THE CONSTITUTION'S DUE PROCESS CLAUSE

The Supreme Court has held that the Due Process Clause applies to *jury-determined*

punitive damage awards, particularly where a legislature has not mandated a statutory range or

cap on the amount awarded.  *See Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 15-17 (1991);

*TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 452-453 (1993); *BMW of N. Am., Inc. v.*

*Gore,* 517 U.S. 559, 565 (1996); and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408,

417 (2003).  In *State Farm*, the Court explained its concern:

> We have admonished that "punitive damages pose an acute danger of arbitrary
> deprivation of property.  Jury instructions typically leave the jury with wide discretion in
> choosing amounts, and the presentation of evidence of a defendant's net worth creates the
> potential that juries will use their verdicts to express biases against big businesses,
> particularly those without strong local presences."

538 U.S. at 417.  Massachusetts courts have similarly confined their Due Process analysis of

whether a punitive damages award is "grossly excessive" to punitive damages awarded by juries.

*See e.g. Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 826-827 (1997) (utilizing Due Process

Clause to analyze a jury-determined punitive damages award where there was an absence of a

legislative cap for handicap discrimination).  Courts have generally declined to utilize a Due

Process clause analysis when confronted with a *judicially determined* award premised on a

statutory penalty range.  *See e.g., Morse Diesel Int'l v. United States*, 79 Fed.Cl. 116, 126 (Fed.

Cl. 2007).  The rationale for this distinction is that a judicially determined award does not present

the same imprecision, subjectivity and arbitrariness concerns as a jury award.  *United States v.*

*Bourseau*, 2006 WL 39449169 at *2 (S.D. Cal. Dec. 1, 2006).  In *Romano v. U-Haul Int'l* the

First Circuit said that "a congressionally-mandated, statutory scheme identifying the prohibited

conduct as well as the potential range of financial penalties goes far in assuring that appellants' due process rights have not been violated."  233 F.3d 655, 672 (1st Cir. 2000).

Of particular note here, "[n]o False Claims Act case has rejected disproportionate damages based on the Due Process Clause . . . ."  Boese, John T., *Civil False Claims and Qui Tam Actions*, §3.06[C], p. 3-109 (3d ed. 2010).  Although the First Circuit has not addressed the question, other federal courts have consistently rejected the application of the Due Process Clause to a judgment under the FCA.  *See Morse Diesel Int'l*, 79 Fed.Cl. at 126  (holding Due Process Clause is inapplicable "to the [FCA], because potentially subjective punitive damages are not at issue.  Congress, not a jury, has prescribed a civil penalty range and mandated the imposition of treble damages"); *Bourseau*, 2006 WL 39449169 at *2 (holding Due Process Clause does not apply because "[t]he damages award here . . . is not the product of a jury verdict and does not have the potentially arbitrary quality of a classic punitive damages award"); *Amerigroup, Ill., Inc.*, 488 F.Supp.2d at 748 (rejecting applicability of Due Process Clause, in part, because the Supreme Court's review of a statutorily imposed civil forfeiture in *Bajakajian* "did not consider the previously established Due Process case law"); and *United States ex rel. Smith v. Gilbert Realty Co., Inc.*, 840 F.Supp. 71, 73 (E.D. Mich. 1993) (finding no support for the application of the Due Process clause).

While the Massachusetts courts have not directly considered this question under the MFCA, it is notable that in non-jury, statutorily-mandated civil forfeiture cases, an Excessive Fines clause analysis was the only one employed by the Commonwealth's courts.  *See e.g. MacLean,* 432 Mass. at 346; and *Maher v. Justices of the Quincy Div. of Dist. Ct. Dep't*, 67 Mass.App.Ct. at 617-621.  *Compare Labonte,* 424 Mass. at 826-827 (utilizing a Due Process Clause analysis for a jury award imposed under a statute devoid of a legislative cap on punitive

damages).

Since the MFCA gives clear notice of the penalties for its violation, and based on the case law set forth above, the Commonwealth believes the Court need not analyze the requested civil penalties under the Due Process clause, separate from the Excessive Fines clause. *See Rogan*, 517 F.3d at 454 ("[i]t's hard to see why the Court's approach to punitive damages under the Fifth Amendment would differ dramatically from an analysis under the Excessive Fines Clause.")  If the Court were to do a separate Due Process analysis, the Supreme Court has provided three guideposts for determining whether jury-determined punitive damages violate Due Process: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of the harm caused by the conduct to the damages awarded; and (3) the penalties authorized or imposed in comparable cases.[27]  *BMW,* 517 U. S. at 574; *State Farm*, 538 U. S. at 538.  It is only when a punitive damage award is "grossly excessive," in relation to the interests of the state in punishing and deterring misconduct, that it violates Due Process.  *BMW*, 517 U. S. at 568.

The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.  *BMW*, 517 U.S. at 575-76 (this principle reflects the accepted view that "some wrongs are more blameworthy than others.")  In considering reprehensibility the Court should consider the vulnerability of the victim, whether the defendants conduct involved repeated acts, and whether it involved intentional false statements or mere negligence.  *State Farm*, 538 U.S. at 419, *citing BMW*, 517 U.S. at 576-77.  Deliberate false statements, such as are present here, warrant stiffer penalties.  *BMW*, 517 U.S. at 580.  Similarly, repeated conduct, over many years, as is present here, warrant "strong medicine

---

[27] The purpose of this third guidepost is to determine "whether a particular defendant was given fair notice as to its potential liability for particular misconduct, not to determine an acceptable range into which an award might fall." *Zimmerman v. Direct Federal Credit Union*, 262 F.3d 70, 83 (1st Cir. 2001).  While fair notice may be a concern in jury-determined punitive damage awards, it is not a concern in our case, because the MFCA gives express notice of the penalties for its violation.

…to cure the defendant's disrespect for the law." *BMW*, 517 U.S. at 577.  The Massachusetts courts have suggested additional criteria a court can consider in determining whether, under the Due Process Clause, a punitive damages award is excessive, including: "removal of the profit of an illegal activity . . .; factoring in of the financial position of the defendant; [and] factoring in of the costs of litigation and encourage plaintiffs to bring wrongdoers to trial."  *Labonte*, 424 Mass. at 827, *citing BMW*, 517 U.S. at 589-592 (Breyer, J., concurring).

In a recent copyright infringement case, involving illegal undergraduate music file-sharing, Judge Gertner extensively analyzed the application of the Due Process clause to *jury-determined*, statutory damages for illegal downloading copyrighted songs.[28]  *Sony BMG Music Entertainment v. Tenenbaum,* 2010 WL 2705499 (D. Mass. Jul. 9, 2010).  While acknowledging that the Supreme Court's case law regarding Due Process and punitive damages is "not entirely clear or consistent," *id* at 2, Judge Gertner found the Court's recent jurisprudence has "both substantive and procedural components," *id* at 9, which requires not only fair notice of potential penalties but also protection against "damages awards that are grossly excessive in relation to the objectives that the awards are designed to achieve." *Id*. at 14.  The jury's award of $675,000 in statutory damages in *Sony BMG Music* had a 32,143 to 1 damages to harm ratio and a 450 to 1 damages to defendant's benefit ratio. *Id.* at 22 and 24.  Finding that the jury's damages award "bears no rational relationship to the government's interests in compensating copyright owners and deterring infringement," *id.* at 25, Judge Gertner reduced the jury's award to $67,500, which she said was "the maximum amount consistent with the dictates of the Due Process Clause." *Id.* at 26.  These reduced statutory damages had a damages to harm ratio of 3,214 to1 and a damages

---

[28] The copyright infringement statute, 17 U.S.C. §504, provides  a copyright owner with a choice to recover actual damages and the infringer's profits or statutory damages ranging from $750 to $30,000, per infringed work, or up to $150,000 if the infringement was willful.  17 U.S.C. § 504 (a) and (c)(1).  The jury determines the amount of the statutory damages based only on what it deems "just." *Id.*

to defendant's benefit ratio of 45 to 1.  *Id.*

Applying *Sony BMG Music* to the facts of our case shows that an award of $191 million in civil penalties will not violate the Due Process Clause.  The jury found that the Defendants caused $4,563,328 in economic damages to the Commonwealth.  This harm has a ratio of 42 to 1 to the requested civil penalties.[29]  As set forth above, however, the true measure of the harm caused by the Defendants' false reporting of Warrick's WAC prices was $9,126,656, the combined harm to the Commonwealth and the United States with regard to the Massachusetts Medicaid program.  The combined economic harm has a 21 to 1 ratio to the requested civil penalties.[30]  These ratios are well below the ratios found constitutionally acceptable in *Sony BMG Music.*

The Supreme Court has expressed a reluctance to identify a precise constitutional limit on the ratio of harm to punitive damages awards.  *State Farm*, 538 U.S. at 424.  *See also BMW*, 517 U.S. at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula").[31]  Numerous courts, including the Supreme Court, have upheld the award of punitive damages or civil penalties, when challenged on Due Process or Excessive Fines grounds, where the ratio of harm to punitive award was greater than the ratio for the requested civil penalties in this case.  For example, in *St. Louis, I. M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66 (1919), the Supreme Court upheld a civil penalty to harm ratio of 114 to 1.  There a railroad challenged on Due Process grounds a $75 civil penalty for overcharging two

---

[29] $191,515,000 divided by $4,563,328 equals 41.97.

[30] $191,515,000 divided by $9,126,656 equals 20.98.

[31] The Supreme Court has suggested that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  *State Farm*, 538 U.S. at 425.  This statement was made, however, in a case involving jury-determined punitive damages, without any statutory cap or legislative guidance for an amount, and where the concern was procedural Due Process and giving the defendant notice of potential penalties, concerns not present in our case.

sisters $.66 each in contravention of state law.  The Court noted:

> When the penalty is contrasted with the overcharge possible in any
> instance it of course seems large, but, as we have said, its validity is not
> to be tested in this way.  When it is considered with due regard for the
> interests of the public, the numberless opportunities for committing the
> offense, and the need for securing uniform adherence to established
> passenger rates, we think it properly cannot be said to be so severe and
> oppressive as to be wholly disproportioned to the offense or
> obviously unreasonable.

*Id.* at 67.  A 114 to 1 civil penalties to harm ratio in this case would support $520 million in civil

penalties, even if the harm was measured as only the Commonwealth's $4.6 million in economic

damages.

In *Missouri v. Spilton,*  315 S.W.3d 350 (2010), the Missouri Supreme Court, *en banc,*

upheld the award of $1,625,000 in civil penalties against a social worker for knowingly

falsifying billing to the state's Medicaid program, causing $45,385 in actual damages, a penalties

to harm ratio of 35.8 to 1.  In rejecting Due Process and Excessive Fines challenges to the

penalties, the Court said:

> A statutory punishment will not be considered an excessive fine
> in contravention of the Eighth Amendment unless it is so disproportionate
> as to "shock the moral sense of all reasonable [persons]."

*Id.* at 358 (citation omitted).  Notably, a 35 to 1 penalties to harm ratio for the Defendants in this

case, who are a group of multi-billion dollar corporations, not a single social worker, would call

for penalties of $160 million.

Federal courts in FCA cases have imposed civil penalties that resulted in penalty to harm

ratios comparable to the ratio of requested penalties to the combined state and federal harm in

this case.  *See. e.g., Gilbert-Realty, Co.*, 840 F.Supp. at 74-74 (imposing $35,000 in civil

penalties for seven false claims where actual damages were $1,630, a ratio of 21 to 1); *United*

*States v. Byrd*, 100 F.Supp.2d 342, 346 (E.D.N.C. 2000) (imposing $1,320,000 in civil penalties

under the FCA for 264 violations of illegally redeeming food stamps that resulted in $85,012 in actual damages, for a ratio of 15.5 to 1).  In *Romano v. U-Haul Inter'l*, the First Circuit rejected a Due Process "excessiveness" challenge to $285,000 in punitive damages, where the ratio of compensatory to punitive damages was 19 to 1.  233 F.3d at 672-73.  Like the *Romano* case, the civil penalties requested here are well within a legislatively-mandated, statutory scheme and the harm resulting from Defendants' offenses are more than "purely economic."  *Id*. at 673.  There is simply no unconstitutional "excessiveness" in imposing $191 million in civil penalties (a 21:1 ratio to the total economic harm) on a group of multi-billion dollar corporations for having caused 989,103 false claims to be presented to MassHealth over an eight year period.

## CONCLUSION

For the foregoing reasons the Court should grant the Commonwealth's motion and enter judgment for the Commonwealth in the amount of $4,563,328 (plus prejudgment interest and costs),  to be trebled, plus civil penalties in the amount of $191,515,000 and $280,000.

Respectfully submitted,

Martha Coakley
Attorney General

By:     /s/ Peter A. Mullin
        Peter A. Mullin (BBO # 360620)
        K. Nathaniel Yeager (BBO # 630992)
        John Pina, III (BBO # 652247)
        Robyn Pozza Dollar (BBO# 674480)
        Steven T. Sharobem (BBO# 664583)
        Assistant Attorneys General
        One Ashburton Place
        Boston, MA 02114
Dated: December 10, 2010          (617) 963-2622

**<u>Certificate of Service</u>**

I hereby certify that I caused a copy of the foregoing Commonwealth's Memorandum in Support of Its Motion for Entry of Judgment to be served on counsel for each other party in this case, by filing it electronically in the Court's CM/ECF system, this 10th day of December, 2010.

<u>/s/ Peter A. Mullin</u>
Peter A. Mullin
Assistant Attorney General