# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, PLAINTIFF | ) ) ) |
| | ) C.A. No. 03-11865-PBS |
| vs. | ) |
| | ) Leave to file granted on |
| MYLAN INC. et al., DEFENDANTS | ) December 16, 2010 ) ) |

_____

## COMMONWEALTH'S SUR-REPLY IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE FOR A NEW TRIAL

**TABLE OF CONTENTS**

I.     THE COURT SHOULD DENY DEFENDANTS' REQUEST TO SET ASIDE
       THE JURY'S FINDING OF LIABILITY UNDER SECTION 1 OF
       THE MFCA……………………………………………………………...………..…1

II.    *BORNSTEIN* IS NOT "CONTROLLING," AND IF THE COURT LOOKS
       TO THE FCA FOR GUIDANCE IN HOW TO ASSESS PENALTIES
       UNDER THE MFCA, IT CANNOT IGNORE THE CLEAR INSTRUCTIONS
       OF THE LEGISLATURE, WHICH POST-DATE *BORNSTEIN* BY
       TEN YEARS…………………………………………………………………………4

       A.     Defendants' Position is Contrary to the Plain Language of the MFCA…………..4

       B.     The Language of the Revised Statutes Construed in *Bornstein*
              Was Not Identical to the MFCA or to the FCA Codified at
              31 U.S.C. § 231 et seq. …………………………………………………………6

       C.     The 1986 Legislative History Cannot Be Ignored………………………………..6

       D.     Defendants Have No Response to the Fact that *Bornstein* is Distinguishable……8

III.   DEFENDANTS' ARGUMENT THAT THE ALTERNATIVE TO A
       FALSE WAC WOULD HAVE BEEN "NO WAC" IS FUNDAMENTALLY
       FLAWED, CONTRARY TO THE EVIDENCE, AND
       INCONSEQUENTIAL BECAUSE   DEFENDANTS INDISPUTABLY
       HAD A DUTY TO CORRECT THEIR MISLEADING REPORTED PRICES………..11

       A.     There Was Sufficient Evidence for the Jury to Conclude that
              Defendants' Published Prices Were Misleading When Issued,
              and Defendants Concede That In That Situation, There Is a Duty to Correct…...11

       B.     The Court's Instruction on the Second *Backman* Exception was Correct……….12

       C.     Defendants' Argument That the Alternative to a False WAC Would Have
              Been "No WAC" Is Inconsequential, Fundamentally Flawed, and Based
              Upon a Hypothetical Scenario That Is Contrary to the Evidence………………..14

       D.     Defendants' Claim that Scienter, Materiality, Causation and Damages
              Were Based on a "Mistaken Premise" Is Simply Wrong …………………………15

       CONCLUSION………………………………………………………………………...16

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages(s)**

*Allison Engine Co., Inc. v. U.S. ex rel. Sanders,*
    553 U.S. 662 (2008)……………………………………………............1, 2

*Backman v. Polaroid,*
    910 F.2d 10 (1st Cir. 1990)…………………………….…………11, 12, 13

*Capitol Records, Inc. v. Alaujan,*
    626 F.Supp.2d 152 (D.Mass. 2009)……………………………...……11

*Falby v. New England Forestry Foundation,*
    823 N.E.2d 823 (Mass.App.Ct. 2005)……………………………..………12

*General Motors Corp. v. Darling's,*
    444 F.3d 98 (1st Cir. 2009)……………………………………...………7

*Massachusetts v. Mylan Labs.,*
    608 F.Supp.2d 127 (D.Mass. 2008)……………………...……………2, 4, 15

*McEvoy Travel Bureau, Inc. v. Norton Co.,*
    563 N.E.2d 188 (Mass. 1990)……………………………………………12

*Neder v. United States,*
    527 U.S. 1 (1999)………………………………………...……………15

*Ross v. A.H. Robins Co.,*
    465 F.Supp. 904 (S.D.N.Y. 1979)……………………………...…………12, 13

*Scannell v. Attorney General,*
    70 Mass.App.Ct. 46, 872 N.E.2d 1136 (2007)……………………………………4

*United States ex rel. DRC, Inc. v. Custer Battles, LLC,*
    2009 WL 3756343 (E.D.Va. Oct. 14, 2009)……………………..……………10

*United States ex rel. Drake v. NSI, Inc.,*
    --F.Supp.2d--, 2010 WL 3417854 (D.Conn. 2010)……………………………5

*United States ex rel. Grubbs v. Kanneganti,*
    565 F.3d 180 (5th Cir. 2009)……………………………………………2

*United States ex rel. Hendow v. Univ. of Phoenix,*
    461 F.3d 1166 (9th Cir. 2006)……………………………………………12

*United States ex rel. Marcus v. Hess,*
    317 U.S. 537 (1943)……………………………………………………………………3

*United States v. Bornstein,*
    423 U.S. 303 (1976)…………………………………………………………………passim

*United States v. Ehrlich,*
    643 F.2d 634 (9th Cir. 1981)………………………………………………………………9

**Statutes**

M.G.L. c. 12 § 5B………………………………………………………………...…………4

Revised Statutes §§3490-94, 5438…………………………………………………..…………6

31 U.S.C. §§ 231 et seq………………………………………………………………………6

31 U.S.C. §§ 3729 et seq………………………………………………………..……4

**Other Authorities**

Senate Report No. 99-345, 99th Cong., 2d Sess. 1986, 1986 U.S.C.C.A.N. 5266…………...……7

The Commonwealth submits this Sur-reply in further Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law or in the Alternative for a New Trial, and to specifically address the three arguments in Defendants' Reply.

## I.   THE COURT SHOULD DENY DEFENDANTS' REQUEST TO SET ASIDE THE JURY'S FINDING OF LIABILITY UNDER SECTION 1 OF THE MFCA

In a futile attempt to buoy their dubious *Allison Engine* argument, Defendants resort to mischaracterizing the Commonwealth's arguments rather than tackling the Commonwealth's arguments head-on. Defendants falsely contend that the Commonwealth "concedes [that its MFCA Section 1] claim is not supported by the evidence," made a "dispositive concession," and "admi[tted] that the claims at issue were not false." Defendants' Reply (Dkt. No. 943) at 7 ("Reply"). Nothing could be further from the truth. Defendants' rely upon a single sentence fragment in the Commonwealth's Opposition that "the pharmacy submissions themselves did not contain the false WAC." Commonwealth's Opposition (Dkt. No. 940) at 20 ("Opp.") Not only have Defendants entirely removed this sentence fragment from its surrounding context, Defendants stretch the statement far beyond its limits and represent that through this statement alone, the Commonwealth "admits" that the claims weren't false when they were presented. The Commonwealth's *actual* Opposition argument was that a claim can be false or fraudulent (and actionable under MFCA Section 1) even if it does not specifically contain the false WAC.

In their Memorandum in Support of their Motion for Judgment as a Matter of Law, Defendants argued that the Court should set aside the jury's finding of liability under Section 1 of the MFCA because *Allison Engine* eliminated liability for "causing false claims to be presented" except in the situation in which a defendant's false statement is specifically included in the claim. Defendants' Memorandum at 17-18 ("Memo"). Defendants claimed that unless a WAC was explicitly listed in the claim submitted to the government, or the drug company

directly submitted the claims to the government, the drug company cannot be held liable under Section 1 of the MFCA for its false WAC. *Id.* As the Commonwealth pointed out, in the two years since *Allison Engine* was decided, no court has adopted this suspect interpretation of *Allison Engine.* Defendants claim that *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180 (5th Cir. 2009) is one such case, but *Grubbs,* like *Allison Engine,* merely mentions claims brought under Section 1 to distinguish Section 1 claims (which require a showing of presentment) from claims brought under Section 2 (which do not). Neither *Allison Engine* nor *Grubbs* says that a defendant's false statement has to be specifically included in the claim. Defendants offer no further support for this argument. Therefore, the Commonwealth's statement that "the pharmacy submissions did not themselves contain the false WACs" is of no consequence, because it simply is not a requirement for MFCA Section 1 liability.

Apparently recognizing that they cannot support their argument that *Allison Engine* eliminates Section 1 liability for "causing false claims to be presented" except where the defendant's false statement is specifically included in the claim, it appears Defendants are backing away from that argument and now just generally arguing that a claim must be false when it is presented for payment. First, contrary to Defendants' representation, *Allison Engine* does nothing to advance this argument, as it only speaks on the requirement of presentment, not on the issue of the falsity of the claim. *Allison Engine Co., Inc. v. U.S. ex rel. Sanders,* 553 U.S. 662, 670-671 (2008). Regardless, the Commonwealth does not dispute that a false or fraudulent claim is required for liability under MFCA Section 1. As set forth in detail in the Commonwealth's Opposition, regardless of whether the false WACs were specifically included in the claims, the claims *were* false or fraudulent because they were "predicated on an underlying fraudulent pricing scheme." *Massachusetts v. Mylan Labs.,* 608 F.Supp.2d 127, 145 (D.Mass. 2008). Each

2

time a pharmacy submitted a claim to MassHealth for payment, the claim travelled electronically through a network switch to the claim processor's server where a pricing file (which included an EAC based upon Defendants' false reported prices) was brought up and used to determine whether the claim was approved and if so, what amount would be paid. *See* Opp. at 20-21.

As set forth in the Commonwealth's Opposition, the facts proven at trial regarding Defendants' involvement in the claims submitted to the Commonwealth are consistent with the facts in *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 544 (1943). In *Hess,* the defendants engaged in a collusive big rigging scheme. The bids were submitted to local municipalities who then submitted claims to the federal government. The defendants themselves did not present claims to the federal government, much less present false certifications of competitive bidding to the government. *Id.* at 542-44. Moreover, there was no indication that the defendants submitted false certifications of non-collusive bidding to the local municipalities, or that the local municipalities submitted false certifications of non-collusive bidding to the government. *Id.* Yet, the Supreme Court found that the FCA reached the defendants because they "knowingly assisted in causing the government to pay claims which were grounded in fraud." *Id.* Just as in *Hess*, the claims in this case were "grounded in fraud" because Defendants' false WAC prices were used to populate the claim processor's pricing file, which was an integral part of adjudicating the claim. Defendants do not even mention *Hess* in their Reply, much less make any effort to distinguish it. As set forth in detail in the Commonwealth's Opposition, the Commonwealth presented sufficient evidence for the jury to find that Defendants were a substantial factor in causing pharmacies to submit false claims. Opp. at 19-22. Defendants' representation that the Commonwealth "conceded" that the claims weren't false is simply untrue.

II.     *BORNSTEIN* IS NOT "CONTROLLING," AND IF THE COURT LOOKS TO
        THE FCA FOR GUIDANCE IN HOW TO ASSESS PENALTIES UNDER THE
        MFCA, IT CANNOT IGNORE THE CLEAR INSTRUCTIONS OF THE
        LEGISLATURE, WHICH POST-DATE *BORNSTEIN* BY TEN YEARS

        First and foremost, to correct a key misrepresentation by Defendants, *United States v.*
*Bornstein,* 423 U.S. 303 (1976) is not "controlling."  Reply at 1.  This Court's task is to interpret
the Massachusetts False Claims Act (MFCA) and determine how to assess penalties under the
MFCA.  While the Court may turn to federal cases and treatises interpreting the federal FCA for
"guidance" in interpreting the MFCA, it certainly is not "controlled" by a factually
distinguishable, 34-year old case interpreting a prior version of the federal FCA.  *See Mylan*
*Labs.,* 608 F.Supp. at 140.[1]

        A.      **Defendants' Position is Contrary to the Plain Language of the MFCA**

        Given that there is no Massachusetts case law or legislative history explaining how
penalties are to be assessed under the MFCA, the first step in interpreting the MFCA is to look at
the plain language of the statute.  As set forth in the Commonwealth's Opposition, by the plain
terms of the MFCA, a person commits a violation each time he causes a false claim to be
presented, and a civil penalty is to be assessed "per violation."  M.G.L. c. 12 § 5B.  Defendants
encourage the Court to ignore the "per violation" language entirely, claiming it is irrelevant to
the construction of the statute.  Of course, Defendants provide no authority for this assertion.[2]

---

[1]  Massachusetts courts have said they will look to federal FCA cases in interpreting the MFCA because the MFCA
"was modeled on the similarly worded Federal False Claims Act, 31 U.S.C. §§ 3729 et seq."  *Scannell v. Attorney*
*General,* 70 Mass.App.Ct. 46, 49 n. 4, 872 N.E.2d 1136, 1138 (2007).  There is no reason for Massachusetts courts
to follow *Bornstein,* however, because it was solely a case of statutory interpretation at a time when the federal FCA
had very different language from the MFCA.

[2]  The only basis for Defendants' argument that the Court should ignore the "per violation" language is Defendants'
assertion that the Commonwealth's *ex post facto* argument proves that the "per violation" language is unimportant.
This is absurd.  Defendants again rely on a misstatement of  the Commonwealth's argument.  Defendants'
substantive rights were not affected because the there was a statute in existence prior to the MFCA that prohibited
the very same conduct and required proof of the very same elements of the MFCA. The only material difference
between the prior statute and the MFCA was in the remedy available to the Commonwealth.  As set forth in the
Commonwealth's Opposition, Massachusetts law is clear that changes to statutes relating to remedies alone do not

4

The Court must consider this language in construing the statute as a whole.  The jury concluded that Defendants "knowingly caused false claims to be presented."  The statute mandates that one penalty is to be assessed "per violation."  The question for the Court to determine is whether each false claim Defendants knowingly "caused to be presented" is a separate violation of Section 1 of the MFCA (as the Commonwealth contends) or whether (as Defendants contend) the Court must determine how many affirmative "acts" Defendants committed which caused the 989,103 false claims to be presented, and count the number of acts as the number of violations of the statute.

There are several problems with Defendants' interpretation of the statutory language. First, Defendants claim that the Court should find 28 violations of MFCA Section 1, based upon the jury's determination that under MFCA Section 2, Defendants made 28 false statements. If Defendants' interpretation was correct, and the number of Section 1 "violations" was based upon the number of false statements made by a defendant, there would be no meaningful difference between liability for causing false claims to be presented under Section 1 and liability for making false statements to obtain payment or approval of a claim under MFCA Section 2.  Additionally, Defendants do not dispute that if a defendant directly presents false claims under Section 1, the number of "violations" is determined by the number of false claims, even if multiple claims are submitted at one time.   Section 1 imposes liability for both presenting false claims and for causing false claims to be presented.  It does not indicate that the number of "violations" should

---

affect substantive rights and can be applied retroactively. Opp. at 14-28. The cases Defendants claim "the Commonwealth ignores" (Memo at 16) do not reflect Massachusetts law, do not "hold[] it would be error to apply retroactively the more stringent damages and penalties provision" in the MFCA, and are not without contrary authority. *See e.g. United States ex rel. Drake v. NSI, Inc.,* --F.Supp.2d--, 2010 WL 3417854 (D.Conn. 2010) at \*7-8.  Defendants' footnote accusing the Commonwealth of "contradicting itself" by arguing that Defendants have waived their *ex post facto* argument is similarly baseless. When the Commonwealth filed its Complaint, Defendants were put on notice that the Commonwealth was seeking penalties under the MFCA for conduct that occurred prior to July 2000. If it was Defendants' position that the Commonwealth could not seek penalties under the MFCA for conduct occurring prior to July 2000, they should have raised that argument long ago.  They chose not to, preferring to wait and raise it when the amount of civil penalties became an issue. Now it is too late.

be counted differently depending upon whether the party directly presented the false claims or caused the false claims to be presented.  It does not make sense that the legislature intended for each claim to be a "violation" of Section 1 when the defendant presented it directly, but not when the defendant caused it to be presented, but chose not to make that distinction clear in the statute. Accordingly, the Commonwealth submits that its interpretation of the plain language of the MFCA is correct—each claim that Defendants caused to be presented is a separate violation of the statute, and that a penalty is to be assessed "per violation."

> **B.     The Language of the Revised Statutes Construed in *Bornstein* Was Not Identical to the MFCA or to the FCA Codified at 31 U.S.C. § 231 et seq.**

The language of the FCA in 1976 when *Bornstein* was decided was not identical to the MFCA, so *Bornstein* is not instructive (much less "controlling") in this Court's interpretation of the plain language of the MFCA.  The fact that both statutes imposed liability for "causing false claims to be presented" has no bearing on how penalties are to be assessed under the plain language of the MFCA.  The former version of the FCA in the Revised Statutes (upon which *Bornstein* was based) attached liability "only for the commission of acts which cause false claims to be presented." *Bornstein,* 423 U.S. at 313; Rev.Stat. §§3490-94, 5438.  The "commit any of the acts" language upon which the Court in *Bornstein* specifically focused did not appear in the later version of the FCA codified in 31 U.S.C. § 231 et seq., which was enacted into positive law after *Bornstein* was decided, nor does it appear in the MFCA.

> **C.     The 1986 Legislative History Cannot Be Ignored**

To the extent the Court looks to federal authority interpreting the FCA for guidance in how to interpret the MFCA, it simply cannot ignore the unequivocal directive of the legislature that the imposition of a civil penalty is "automatic and mandatory for each false claim which is

found to be false." Senate Report No. 99-345, 99th Cong., 2d Sess. 1986, 1986 U.S.C.C.A.N. 5266, 5273.

Defendants' only response to this explicit legislative directive is that Congress did not change the "cause to be presented" language in the 1986 amendments. However, in 1986 the legislature was not amending the Revised Statutes upon which *Bornstein* was based; it was amending the language in Title 31 which "differs in some important respects from that contained in the revised Statutes" [*Bornstein,* 423 U.S. at 307, n.1]. There is no indication that the legislature would have felt the need to amend "the "cause to be presented" language in Title 31 to address the *Bornstein* decision, particularly given that, as set forth above, the Court in *Bornstein* focused on the "commit…acts" language which never appeared in Title 31.

Regardless of what specific changes Congress made to the language of the FCA in 1986, Congress made its intent abundantly clear in the legislative history. When a statute is ambiguous, courts turn to the legislative history to determine Congress' intent. *General Motors Corp. v. Darling's,* 444 F.3d 98, 108 (1st Cir. 2009)). The *Bornstein* Court itself noted that in 1976, when it was interpreting the Revised Statutes, "[t]he legislative history of the Act offer[ed] little guidance on how properly to determine the number of forfeitures." *Bornstein,* 423 U.S. at 309. Thus, the *Bornstein* Court was forced to interpret the statutory language in effect at the time based upon its own impression of Congress' purpose in enacting the law. *Id.* at 309-10. In contrast, today we have legislative history explaining how the statute is to be interpreted and how penalties are to be assessed—one per false claim. While it may be proper for a court to look to the statutory language to interpret the legislative intent when legislative history is lacking, when the legislature makes its intent clear, a statutory interpretation contrary to the stated intent of the legislature would be erroneous.

**D.      Defendants Have No Response to the Fact that *Bornstein* is Distinguishable**

Not only was *Bornstein* interpreting a prior, different version of the FCA, it is distinguishable on its facts.  As set forth in the Commonwealth's Opposition, Defendants cannot credibly argue that the number of false claims pharmacies were submitting to the Commonwealth was "wholly irrelevant, completely fortuitous and beyond [Defendants'] knowledge and control." *Id.* at 312.   Defendants knew that pharmacies were submitting claims for reimbursement to MassHealth whenever Defendants' drugs were dispensed to Medicaid patients.  Defendants received quarterly reports advising them of the total number of units and total number of prescriptions MassHealth had reimbursed for each of the Warrick subject drugs.[3] In contrast, in *Bornstein,* there was no indication that the subcontractor had any information about the number of shipments or invoices the prime contractor was sending to the government.

The Commonwealth has repeatedly pointed out that *Bornstein* is distinguishable on its facts, yet Defendants have made no further attempts to reconcile the facts of this case with the facts of *Bornstein.*  Defendants' only response to this distinguishing evidence is that although they received quarterly invoices advising them that thousands of claims were being submitted to MassHealth for reimbursement for the Warrick subject drugs, and they knowingly continued to reap the benefits of the submission of thousands of claims, they should only be subject to a handful of penalties because they did not know *in advance* the *specific number* of claims that would be filed.  Reply at 6.  Regardless of whether Defendants knew the exact number of claims in advance, it clearly was not "wholly irrelevant, completely fortuitous and beyond Defendants'

---

[3] In their Reply, Defendants state that the Medicaid Drug Rebate Program invoice [Dkt. No. 858-2] is "not in evidence in this case." Reply at 6.  It is irrelevant that the document was not a trial exhibit.  It is pertinent to the legal ruling to be made by the Court, not to any finding of fact made by the jury. Regardless, the Commonwealth also cited the trial testimony of defense witnesses Debra Kane and Dr. Sumanth Addanki, who confirmed that Defendants received quarterly invoices containing utilization data and advising them of the number of units MassHealth reimbursed for Defendants' drugs. *See* 9/27/10 Tr. 82:15-17; 9/27/10 Tr. 107:17-108:8.

knowledge and control" that thousands of claims were being submitted to MassHealth each quarter for Warrick subject drugs.

Defendants clutch to the statement in *United States v. Ehrlich,* 643 F.2d 634, 638 (9th Cir. 1981) that "if a person knowingly causes a specific number of false claims to be filed, he is liable for an equal number of forfeitures." Reply at 6 (quoting *Ehrlich,* 643 F.2d at 638).  However, the *Ehrlich* Court never stated that knowing the specific number of claims in advance was necessary to its holding. The point of the Court in *Ehrlich* was that "it would defeat the purposes of the Act to impose multiple forfeitures on a person submitting false claims, but limit the liability of coconspirators who caused the claims to be submitted."  The Court explained, "Ehrlich knew a false claim would be submitted each month. He could have prevented the filing of additional false claims. Instead, he did nothing and gained a continuing benefit from the inflated interest subsidies. Had he submitted the claims himself, he would be liable for 76 forfeitures. As in the case of conspirators, it would defeat the purposes of the Act, given Ehrlich's knowledge and control of the situation, to limit his liability to one forfeiture." Defendants knew in advance that thousands of claims for reimbursement for Warrick subject drugs would be presented to MassHealth each month.  The evidence presented at trial demonstrated that Defendants knew their published prices were false and misleading and knew that state Medicaid agencies, including MassHealth, relied on prices in the pricing compendia to calculate reimbursements. Opp. at 24-25, 27-33.  Defendants did nothing (in fact, the evidence showed they regularly received requests for pricing updates from First DataBank and allowed their false prices to be republished on a yearly basis).  Opp. at 27-28.  Defendants gained a continuing benefit from pharmacies submitting claims for reimbursement for Warrick subject drugs.  It would defeat the purpose of the act to limit Defendants' liability to a handful of forfeitures simply because, while

9

it knew hundreds of thousands of claims were being submitted based upon its false reported prices, it did not know in advance the exact number of claims that would be filed.

In its Opposition, the Commonwealth cited numerous other cases that support the Commonwealth's argument that the FCA requires that a penalty be assessed for each false claim Defendants caused to be presented.   Opp. at 11-12.  Defendants' assertion that the cases had "nothing at all to do with a court's determining the number of statutory violations committed" is totally false, and their attempts to distinguish the cases are based on a string of misleading parentheticals. Every single one of the cases cited by the Commonwealth pertained to the issue of how to assess statutory penalties, and specifically indicated that one penalty is to be assessed per false claim.

Defendants continue to insist that *Bornstein* is "good law," pointing to three cases that they insist apply *Bornstein* in the manner in which Defendants suggest.  As the Commonwealth pointed out in its Opposition, all three cases are distinguishable.  Defendants' further explanation of the cases in their Reply does not change that fact.  Defendants' further explanation of *United States ex rel. DRC, Inc. v. Custer Battles, LLC,* 2009 WL 3756343 (E.D.Va. Oct. 14, 2009) is blatantly misleading, and their representation that *Custer Battles* supports applying *Bornstein* in the manner in which Defendants' suggest is disingenuous.    Contrary to Defendants' misrepresentation, the Court in *Custer Battles did not* "impose[] penalties for fewer statutory violations than would have followed from the jury's findings." Reply at 4-5.  To the contrary, the jury in *Custer Battles* found 5 violations of FCA Section 1 and 31 violations of FCA Section 2. However, "the jury did not find all seven defendants responsible for all of the 36 separate false claims and false statements," so the Court, consistent with the jury's finding of liability, attributed specific violations to specific defendants: three of the seven defendants were assessed

35 violations and hence 35 penalties, one defendant: 34 violations/penalties, one defendant: 18, one defendant: 14, and one defendant: 3. *Id.* at *1.  The Court certainly did not (as Defendants represent) reduce the number of violations found by the jury based upon the Court's assessment of the defendants' conduct.  Moreover, the Court accepted that under Prong 1, the number of false claims constituted the number of "violations."[4]

**III.  DEFENDANTS' ARGUMENT THAT THE ALTERNATIVE TO A FALSE WAC WOULD HAVE BEEN "NO WAC" IS FUNDAMENTALLY FLAWED, CONTRARY TO THE EVIDENCE, AND INCONSEQUENTIAL BECAUSE DEFENDANTS INDISPUTABLY HAD A DUTY TO CORRECT THEIR MISLEADING REPORTED PRICES**

> **A.    There Was Sufficient Evidence for the Jury to Conclude that Defendants' Published Prices Were Misleading When Issued, and Defendants Concede That In That Situation, There Is a Duty to Correct**

It makes absolutely no difference that the regulations did not require Defendants to publish a WAC.  Defendants chose to do so.  Having made that choice, Defendants assumed a duty to correct their reported prices that were inaccurate, incomplete or misleading when made.

Defendants do not dispute that if a disclosure is inaccurate, incomplete or misleading when made, there is a duty to correct it. *Backman v. Polaroid,* 910 F.2d 10, 16-17 (1st Cir. 1990). The Commonwealth presented extensive evidence at trial that Defendants' direct prices at launch were misleading when made.  Opp. at 24-26.  Defendants acknowledge the extensive evidence presented by the Commonwealth and concede that based upon the evidence, the jury "might" have concluded that Defendants' launch prices were misleading even at the time they were issued. Reply at n. 9.   Rather than pursuing their sufficiency of the evidence argument,

---

[4] Defendants' insistence that applying *Bornstein* is a "constitutional imperative" is incorrect. Defendants continue to misunderstand the doctrine of Constitutional avoidance.  The canon of Constitutional avoidance is only implicated when one interpretation of a statute makes the statute unconstitutional, not when, as here, a constitutional statute applied in one specific case may result in a penalty award that the losing party claims is constitutionally excessive. *See Capitol Records, Inc. v. Alaujan,* 626 F.Supp.2d 152, 155 (D.Mass. 2009)(despite the fact that Copyright Act's penalty provisions might result in constitutionally excessive award against non-commercial defendant, doctrine of constitutional avoidance did not allow court to interpret Act to only apply to commercial infringers).

Defendants hang their hat on their argument that the Court's instruction regarding the second *Backman* exception was erroneous.  Defendants did not raise this issue in their opening brief.

### B.        The Court's Instruction on the Second *Backman* Exception was Correct

The Court properly instructed the jury regarding the second exception to *Backman*:

> "Second, a statement may be correct at the time that it is made and may have a forward intent and connotation upon which parties may be expected to rely in the future.  If the statement has a clear meaning and remains alive, and there is a change, a further disclosure or correction may be called for. It is up to you to decide if the price reported by Warrick when the albuterol product was launched was in fact misleading when made. If it was not misleading when made, you must determine whether it was a statement that was true when made and had a forward intent and connotation, a statement the defendants knew third parties would rely on, and that defendants knew had changed.  If so, you must determine whether defendants breached a duty to update the statement."

9/28/10 Tr. at 124:9-21.  The Court's instruction faithfully tracked the First Circuit's opinion in *Backman*, wherein the Court stated "in special circumstances, a statement, correct at the time, may have a forward intent and connotation upon which parties may be expected to rely. If this is a clear meaning, and there is a change, correction, more exactly, further disclosure, may be called for." *Backman,* 910 F.2d 17; *see also Ross v. A.H. Robins Co.,* 465 F.Supp. 904, 908 (S.D.N.Y. 1979)("This duty exists so long as the prior statement remains 'alive.')

Defendants continue to cite *Falby v. New England Forestry Foundation,* 823 N.E.2d 823 (Mass.App.Ct. 2005), *McEvoy Travel Bureau, Inc. v. Norton Co.,* 563 N.E.2d 188 (Mass. 1990) and *United States ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166 (9th Cir. 2006) in an attempt to undercut *Backman,* but ignore the fact, pointed out by the Commonwealth, that the cases are distinguishable because they all involve promises regarding future conduct rather than statements of fact that remained 'alive' into the future and upon which the party had reason to expect others would continue to rely. Reply at 16; Opp. at n. 15.

As set forth in the Commonwealth's Opposition, the jury had sufficient evidence to find that Defendants' reported prices had a forward-looking connotation, and Defendants knew or should have known that state Medicaid agencies would continue to rely on them in future reimbursement calculations. Opp. at 27-28. Defendants offer no response to this evidence. Defendants merely reiterate their prior reference to the Commonwealth's experts' testimony, but as set forth in the Commonwealth's Opposition (and entirely ignored by Defendants in their Reply) Defendants' representation that the Commonwealth's experts testified that it "was well known" that prices of generic drugs drop precipitously after launch is patently false. Reply at 15, Opp. at n. 12.

Defendants also once again resort to distorting the Commonwealth's argument.  The Commonwealth has never suggested that Defendants had "an ongoing duty to issue endless 'updates' with actual transaction prices." Reply at 9.   The duty to correct is tied to the speaker's expectation that parties are continuing to rely on the speaker's statement, and it only exists as long as the statement remains 'alive.' *See Backman,* 910 F.2d at 17.; *Ross,* 465 F.Supp. at 908. Defendants were well aware that state Medicaid agencies were relying on prices published in pricing compendia such as FDB.  Opp. at 27-28. Defendants were also aware that FDB was continuing to publish prices for Defendants' drugs.  FDB routinely sent Defendants update reports requesting verification of Defendants' reported prices. Trial Exh. 19, 20, 146; 10/24/07 Chadwick Video 162:15-21, 163:9-12, 165:8.  Yet Warrick's prices remained unchanged. Trial Exh. 20.  Given that Defendants knew that state Medicaid agencies were continuing to rely on Defendants' published prices, and those prices remained very much 'alive' in that they were regularly republished, Defendants maintained a duty to correct their false published prices throughout the time period at issue in this case.

13

C.     **Defendants' Argument That the Alternative to a False WAC Would Have Been "No WAC" Is Inconsequential, Fundamentally Flawed, and Based Upon a Hypothetical Scenario That Is Contrary to the Evidence**

Defendants repeatedly assert, with no factual support, that the alternative to Warrick's false WAC price at launch "would have been no WAC." Reply at 9-17.  Defendants' baseless assertion is inconsequential, because as set forth above, by choosing to publish prices, Defendants assumed a duty to correct them.

Defendants' argument is also fundamentally flawed because Defendants cannot randomly pick and choose after they have been found liable what the alternative to their offensive conduct "would have been."  If they could, a defendant who breached a contract could argue that the alternative to breaching the contract was never signing the contract in the first place, rather than performing his obligations under the contract.  Damages in a breach of contract claim are properly measured by comparing the result of the breach to what would have occurred had the defendant performed under the contract, not, as Defendants advocate, to what would have occurred had the parties had never entered into the contract in the first place.

Apparently acknowledging that their argument fails given that they assumed a duty to correct misleading prices by choosing to publish them in the first place, Defendants hypothesize about what would have occurred had they "successfully stopped FDB from publishing an outdated WAC based on its launch prices." Reply at 9.  Defendants base this imaginary scenario on their claim that they "directed FDB to delete its direct price listings" (Reply at 12). Defendants are referring exclusively to Trial Exhibit 16, an October 12, 1993 letter from Harvey Weintraub to two individuals at First Data Bank.  However, Defendants gloss over the fact that the letter only pertained to two Warrick NDCs (only one of which is at issue in this case), did not mention the other two Warrick NDCs at issue in this case, did not request that FDB delete direct

prices for <u>all</u> Warrick drugs, and did not request that FDB delete the direct prices for the two drugs mentioned in the letter from both FDB's hard copy *and* electronic publications. More importantly, Defendants fail to mention that after the October 12, 1993 letter, Defendants continued to send Direct Prices and WACs to FDB (Trial Exhs. 10, 17, 18) and continued to receive requests for updates from FDB by which they allowed republication of Warrick's published WAC prices on a yearly basis. Trial Exh. 19, 20, 146; 10/24/07 Chadwick Video 162:15-21, 163:9-12, 165:8. Accordingly, Defendants' assertion that the alternative to a false WAC was "no WAC" is based upon a hypothetical fact scenario that is contrary to the evidence.[5]

### D.   Defendants' Claim that Scienter, Materiality, Causation and Damages Were Based on a "Mistaken Premise" Is Simply Wrong

The foundation for all of Defendants' arguments regarding the elements of the Commonwealth's claims is Defendants' unsupported assertion that the alternative to a false WAC would have been "no WAC." As set forth above, this is a flawed argument and a hypothetical scenario that is inconsistent with the evidence presented at trial. Moreover, as set forth above, Defendants voluntarily published prices and thereby assumed a duty to correct prices that were misleading, so it was entirely proper for the Commonwealth and its damages expert to consider what would have occurred had Defendants met their duty and corrected their false and misleading prices.

Defendants misstate the Commonwealth's argument regarding materiality. A false statement is material if it has a "natural tendency to influence" or is capable of influencing agency action. *Mylan Labs,* 608 F.Supp.2d at 153 (citing *Neder v. United States,* 527 U.S. 1, 16

---

[5] Defendants also claim that they asked Medispan, another pricing database, to delete direct price information, but there is absolutely no evidence in the record to support that assertion. Defendants cite the trial testimony of Dr. Addanki (Reply at 12), but Dr. Addanki never testified that Defendants requested Medispan delete direct prices. He only testified that he reviewed Medispan and did not see any direct prices listed. *See* 9/27/20 Tr. at 114:12-25.

(1999)). As set forth in the Commonwealth's Opposition, regardless of the basis upon which a claim was actually paid, the EAC (and hence, in Massachusetts, the WAC) was contained in the algorithm by which every claim was adjudicated. Therefore, the WAC was "capable of influencing" every claim, not just those that were paid on the basis of EAC. Opp. at 36. In response to Defendants' argument that WACs were immaterial because EAC was not the basis for reimbursement for 75% of claims, the Commonwealth did point out that more claims would have been paid on the basis of EAC if Defendants' WACs were not inflated. That is indisputably true—if WACs were lower, EACs would have lower, and thus, EAC would have been the basis for reimbursement more often. However, the Commonwealth's materiality argument does not depend on that fact. As set forth above, WACs were material whether they were low, high, true or false.

Defendants' attempt to tie this argument to scienter is even more curious. Defendants claim, with no evidentiary support, "Warrick could not have thought that publication of its launch price would harm the Commonwealth because Warrick must have known that its launch price would affect reimbursement only when it was the *lowest* of the available rates and that removal of that value would only cause the Commonwealth to pay *more*. Thus Warrick could not possibly have had the scienter necessary to sustain liability." (Reply at 13). Again, this is pure conjecture, unsupported by any evidence. Defendants make no effort to support this statement or to explain how it could possibly negate the Commonwealth's extensive evidence regarding Defendants' scienter.

## **CONCLUSION**

For all of the foregoing reasons, and those set forth in its Opposition, the Commonwealth respectfully requests that Defendants' Renewed Motion for Judgment as a Matter of Law or in

the Alternative for a New Trial be denied.

Respectfully submitted,

Martha Coakley
Attorney General

By:     /s/ Robyn Pozza Dollar
        Peter A. Mullin (BBO # 360620)
        K. Nathaniel Yeager (BBO # 630992)
        John Pina, III (BBO # 652247)
        Robyn Pozza Dollar (BBO# 674480)
        Steven T. Sharobem (BBO# 664583)
        Assistant Attorneys General
        One Ashburton Place
        Boston, MA 02114
Dated: December 16, 2010          (617) 963-2622

## Certificate of Service

I hereby certify that I caused a copy of the foregoing to be served on counsel for each other party in this case, by filing it electronically in the Court's CM/ECF system this 16th day of December 2010.

/s/ Robyn Pozza Dollar
Robyn Pozza Dollar
Assistant Attorney General

17