**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS )<br><br>Plaintiff, )<br><br>v. )<br><br>MYLAN LABORATORIES, INC., *et al.* )<br><br>Defendants. ) | Civil Action No. 03-CV-11865-PBS |

**WARRICK'S RESPONSE TO THE**
**COMMONWEALTH'S MOTION FOR ENTRY OF JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................1

COUNTER-STATEMENT OF FACTS RELEVANT  TO THE IMPOSITION
OF PENALTIES .................................................................................................................3

ARGUMENT.......................................................................................................................8

I.   THE COMMONWEALTH'S REQUEST FOR PENALTIES OF $191 MILLION
     IS GROSSLY DISPROPORTIONATE TO WARRICK'S CONDUCT AT ISSUE
     AND WOULD VIOLATE CONSTITUTIONAL LIMITS ON PUNITIVE AWARDS........ 8

     A.   The Commonwealth's Requested Award of More Than $191 Million in
          Penalties Far Exceeds the Limits of the Due Process Clause. ........................................ 8

          1.   The Due Process Clause Bars the Grossly Excessive Penalties the
               Commonwealth Requests............................................................................................ 11

               (a) Reprehensibility:  Warrick's failure to fully withdraw its launch prices
                   is not the sort of reprehensible conduct the Supreme Court has required
                   to justify an extraordinary penalty. .....................................................................12

               (b) Ratio comparison:  The 40:1 ratio sought by the Commonwealth far
                   exceeds the constitutional limits of the Due Process Clause. .............................14

               (c) Comparison with other statutory penalties:  The Commonwealth cites
                   no statute that authorizes a punitive to compensatory damages ratio
                   that even approaches 40:1.................................................................................17

          2.   The Commonwealth Improperly Attempts to Sway the Court with a
               Discussion of Facts That Are Not Relevant to Any Constitutional Analysis. ......... 18

     B.   The Commonwealth's Requested Award of More Than $191 Million in
          Penalties Would Also Violate the Excessive Fines and Penalties Clause
          of the Eighth Amendment. ........................................................................................... 21

II.  UNDER A PROPER CONSTRUCTION OF THE MFCA, THE STATUTE
     DOES NOT GIVE RISE TO ANY OF THE CONSTITUTIONAL PROBLEMS
     PRESENTED BY THE COMMONWEALTH'S OUTSIZED REQUEST FOR
     MORE THAN $191 MILLION IN CIVIL PENALTIES. .................................................... 27

III. SHOULD THIS COURT DENY WARRICK'S RULE 50(B) MOTION, IT
     SHOULD ENTER FINAL JUDGMENT IN THE AMOUNT OF $14,643,893. ................. 33

CONCLUSION..................................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allison Engine Co., Inc.* v. *United States ex rel. Sanders*,
553 U.S. 662 (2008) ........................................................................................28, 29

*Allison Engine Co., Inc.* v. *United States ex rel. Sanders*,
667 F. Supp. 2d 747 (S.D. Ohio 2009) ...............................................................34

*Bach* v. *First Union Nat'l Bank*,
486 F.3d 150 (6th Cir. 2007) ...............................................................................9

*Backman* v. *Polaroid Corp.*,
910 F.2d 10 (1st Cir. 1990) (en banc) ..................................................................6

*BMW of North America, Inc.* v. *Gore*,
517 U.S. 559 (1996) .................................................................................. *passim*

*Bridgeport Music, Inc.* v. *Justin Combs Publ'g*,
507 F.3d 470 (6th Cir. 2007) ...............................................................................9

*Browning-Ferris Industries of Vermont, Inc.* v. *Kelco Disposal, Inc.*,
492 U.S. 257 (1989) ............................................................................................9

*City Coal of Springfield* v. *Noonan*,
434 Mass 709 (2001) .....................................................................................34, 35

*Cook County, Ill.* v. *United States ex rel. Chandler*,
538 U.S. 119 (2003) ..........................................................................................16

*Cooper Indus., Inc.* v. *Leatherman Tool Group, Inc.*,
532 U.S. 424 (2001) ...............................................................................9, 14, 22

*Glavin* v. *Eckman*,
No. 02-00061, 2007 WL 751264 (Mass. Super. Ct. Nov. 20, 2006) ......................35

*Hays* v. *Hoffman*,
325 F.3d 982 (8th Cir. 2003) .........................................................................32, 33

*Leavey* v. *Unum Provident Corp.*,
295 F. App'x 255 (9th Cir. 2008) .........................................................................9

*Maher* v. *Retirement Bd. of Quincy*,
452 Mass. 517 (2008) .......................................................................................22

*Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp.*,
   25 Mass. App. Ct. 302 (1988) .................................................................... 35

*McEvoy Travel Bureau, Inc.* v. *Norton Co.*,
   408 Mass. 704 (1990) ................................................................................. 35

*Mill Pond Assoc., Inc.* v. *E & B Giftware, Inc.*,
   751 F. Supp. 299 (D. Mass. 1990) ............................................................. 35

*Missouri* v. *Spilton*,
   31 S.W.3d 350 (Mo. 2010) ......................................................................... 16

*Méndez-Matos* v. *Municipality of Guayanbo*,
   557 F.3d 36 (1st Cir. 2009) .................................................................... 8, 14

*Ojeda-Rodriguez* v. *Zayas*,
   666 F. Supp. 2d 240 (D.P.R. 2009) .............................................................. 9

*Pacific Mut. Life Ins. Co.* v. *Haslip*,
   499 U.S. 1 (1991) ....................................................................................... 17

*Philip Morris USA* v. *Williams*,
   549 U.S. 346 (2007) ................................................................................... 20

*Reiter* v. *Sonotone Corp.*,
   442 U.S. 330 (1979) ................................................................................... 29

*Romano* v. *U-Haul Intern.*,
   233 F.3d 655 (1st Cir. 2000) ................................................... 10, 11, 15, 16

*Sony BMG Music Entertainment* v. *Tenenbaum*,
   721 F. Supp. 2d 85 (D. Mass. 2010) ...................................... 10,  15, 18

*St. Louis, I.M. & S. Ry. Co.* v. *Williams*,
   251 U.S. 63 (1919) ................................................... 10, 11, 15, 23

*State Farm Mut. Auto. Ins. Co.* v. *Campbell*,
   538 U.S. 408 (2003) ............................................................................ *passim*

*United States ex rel. DRC, Inc.* v. *Custer Battles, LLC*,
   No. 1:04CV199, 2009 WL 3756343 (E.D. Va. Oct. 14, 2009) ............... 33

*United States ex rel. Grubbs* v. *Kanneganti*,
   565 F.3d 180 (5th Cir. 2009) ..................................................................... 29

*United States ex rel. Marcus* v. *Hess*,
   317 U.S. 537 (1943) .............................................................................. 29, 30

*United States ex rel. Tyson* v. *Amerigroup Ill., Inc.,*
    488 F. Supp.2d 719 (N.D. Ill. 2007) .........................................................19,22 , 25

*United States* v. *817 N.E. 29th Drive,*
    175 F.3d 1304 (11th Cir. 1999) ...........................................................................19

*United States* v. *Bajakajian,*
    524 U.S. 321 (1998)............................................................................... *passim*

*United States* v. *Bornstein,*
    423 U.S. 303 (1976)............................................................................... *passim*

*United States* v. *Byrd,*
    100 F. Supp. 2d 342 (E.D.N.C. 2000)...................................................................16

*United States* v. *Ehrlich,*
    643 F.2d 634 (9th Cir. 1981) ...............................................................................32

*United States* v. *Krizek,*
    111 F.3d 934 (D.C. Cir. 1997) ........................................................................32, 33

*United States* v. *Mackby,*
    261 F.3d 821 (9th Cir. 2001) ..........................................................................21, 26

*United States* v. *Murphy,*
    937 F.2d 1032 (6th Cir. 1991) .............................................................................33

## OTHER AUTHORITIES

Mass. Const. part 1, art. XII....................................................................... *passim*

Mass. Const. part 1, art. XXIV .........................................................................24, 35

Mass. Const. part 1, art. XXVI ................................................................... *passim*

U.S. Const. amend. VIII............................................................................... *passim*

U.S. Const. amend. XIV, § 1 ...................................................................... *passim*

U.S. Const. art. 1, § 9 ......................................................................................24, 35

## PRELIMINARY STATEMENT

The Commonwealth's motion for entry of judgment vastly overreaches in many respects. First, the Commonwealth's astonishing request for more than $191 million in penalties on the basis of conduct that caused *at most* $4.6 million in damages, if allowed by this Court, would offend the basic constitutional protections afforded by the Due Process and Excessive Fines Clauses of the United States and Massachusetts Constitutions.

At the heart of the constitutional inquiry under either the Due Process Clause or the Excessive Fines Clause is the question whether the penalties imposed are disproportionate to the defendant's conduct. *See State Farm Mut. Auto. Ins. Co.* v. *Campbell*, 538 U.S. 408, 428 (2003) (due process limits "ensure both reasonableness and proportionality"); *United States* v. *Bajakajian*, 524 U.S. 321, 334 (1998) ("touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality").

Applying a proper analysis, there can be no doubt that a penalty of more than $191 million, representing a ratio (properly calculated) in excess of 40:1, is grossly disproportionate to the conduct that purportedly gives rise to liability under the Massachusetts False Claims Act (MFCA).  The Supreme Court has repeatedly made clear that, where a plaintiff has already been fully compensated by a substantial award of damages, the constitutional limit on any additional award of punitive damages or penalties generally cannot exceed a single digit ratio of penalties to injury.

Ignoring these established principles, the Commonwealth instead urges the Court to base its decision on a variety of improper considerations, such as (1) how much the Commonwealth spends on healthcare, (2) the defendants' revenues, (3) unrelated misconduct that defendants committed, or are alleged to have committed, years ago against other governmental entities, and (4) dissimilar misconduct that other pharmaceutical manufacturers committed, or are alleged to

1

have committed, at various times against other governmental entities.  As we explain below, none of these is an appropriate consideration in analyzing the constitutionality of the Commonwealth's requested penalties.

Moreover, Warrick's conduct in no way deserves to be labeled "egregious[]" as the Commonwealth so freely does.  Reduced to the essentials, Warrick is charged with failing to ensure that First DataBank (FDB) fully deleted from its electronic database the "direct prices" at launch for certain of Warrick's albuterol products, as Warrick requested FDB to do and as other pricing services did in compliance with Warrick's request.  FDB converted and continued to report those prices without change throughout the entire eight-year damages period, and MassHealth and its fiscal agent used the launch prices for Warrick's products as proxies for Wholesale Acquisition Cost (WAC) to generate one of four possible reimbursement values for Warrick's products.  The Commonwealth now concedes, however, that Warrick had no legal duty to continuously publish its direct price or a WAC.  What is more, if there had been no WACs, the Commonwealth's reimbursement rate would in most cases have stayed the same, and would in the remaining cases have actually *increased*.  Therefore, the launch prices published by FDB could not have caused the Commonwealth economic harm, since it never reimbursed any claim at a higher rate as a result of them.  While the jury apparently accepted the argument that the Commonwealth was injured because it paid more than the "true WAC," there is no reasonable basis to conclude that "correcting" the outdated launch prices would have meant anything other than FDB's deleting them, which would have increased the Commonwealth's total costs.

Second, while Warrick continues to maintain that the jury's verdict should be set aside entirely, none of the constitutional problems presented by the Commonwealth's outlandish

request for penalties would even arise but for the Commonwealth's misreading of the MFCA's statutory provisions.  By conflating prongs 1 and 2 of the Act, reading prong 1's presentment requirement out of the statute, and divorcing the imposition of statutory penalties from Warrick's own conduct, it is the Commonwealth that puts the MFCA on a collision course with the Due Process and Excessive Fines Clauses.  Under a proper construction of the Act, Warrick is only subject to liability (if at all) under prong 2 on the basis of the 28 instances in which (according to the jury) Warrick violated the MFCA through its own conduct by making a false statement.  Failing that, a straightforward application of the Supreme Court's controlling precedent in *United States* v. *Bornstein*, 423 U.S. 321 (1976), to penalties under prong 1 would obviate the need to address the constitutional problems that follow from the imposition of an otherwise grossly excessive civil penalty.

Third, Warrick at least agrees with the Commonwealth that the time for the entry of judgment has arrived.  Should the Court deny Warrick's Rule 50(b) motion for entry of a judgment of dismissal, the Court should enter a final judgment on damages promptly so as to avoid the continued accumulation of prejudgment interest at the exorbitant statutory rate of 12% per annum.  Warrick has explained below the appropriate calculation of damages, as well as the reasons that the Commonwealth's interest calculation, like so much of its presentation, overreaches by misstating or ignoring the applicable law.

## COUNTER-STATEMENT OF FACTS RELEVANT
## TO THE IMPOSITION OF PENALTIES

The only conduct by Warrick for which it is purportedly liable under the MFCA is the failure to ensure that FDB fully deleted the direct prices at launch for certain of Warrick's albuterol products, as Warrick requested.  It is undisputed that the "direct prices" at issue in this case were the prices issued by Warrick at the launch of its products, before any historical sales,

3

and that Warrick did make some sales at the launch prices. Trial Tr. 103:24-104:1; 137:22-138:3,

141:5-10, Sept. 24, 2010; Gough Dep. Tr. 151:15-18, Feb. 6, 2003 (confirming "that's the price

that customers paid" at launch). It is also undisputed that, in 1993, Warrick requested that FDB

delete the "direct prices" from its pricing compendium, and that FDB did in fact delete the

"direct prices" from its hard copy publications. Exs. 16, 341; Trial Tr. 111:6-15, Sept. 27, 2010.

It is further undisputed that other pricing services, unlike FDB, did delete the "direct prices"

from both the hard copy and electronic versions of their pricing compendia, *Id.* at 114:19-115:2

(if MassHealth had "used Medi-Span's electronic data as opposed to FDB's electronic data,"

they "would have found no WACs or direct prices in the Medi-Span data" after "1993"), and that

the Commonwealth did not make public the fact that it was relying on FDB's electronic database

in making its reimbursement decisions. Ex. 309 at 2 (reflecting the Commonwealth's

discontinuance of reliance on the Blue Book); Trial Tr. 45:18-24, Sept. 13, 2010 (testimony of

Dr. Rosenthal acknowledging that the Commonwealth had not announced its reliance on the

Blue Book during the damages period). Thus, the sole conduct upon which liability is predicated

is Warrick's failure, on 28 occasions, to correct FDB's failure to delete Warrick's "direct prices"

from the electronic version of FDB's pricing service upon which the Commonwealth happened

to rely.

It is also notable what the evidence in this case did *not* show about Warrick's conduct. In

attempting to lump this case in with, and draw comparisons to the settlements in, numerous other

cases against pharmaceutical companies, Commonwealth's Mem. in Supp. of Entry of J. [Dkt.

947] at 9-10 (Dec. 10, 2010) (hereinafter "Pl.'s Mem."), the Commonwealth ignores the limited

nature of the suit and of the wrongdoing alleged. Unlike many of the settlements cited by the

Commonwealth, this is not a suit seeking a nationwide recovery on behalf of multiple

governmental health programs besides Medicaid, but rather concerns claims of the Commonwealth alone, limited to the alleged injury to its state-share of the Medicaid program. The Commonwealth is not suing for off-label promotion or anti-kickback violations that may make a product or service wholly ineligible for reimbursement.

Rather, this case involves three allegedly inflated "direct prices" that the Commonwealth used as proxies for WAC, where 75% of the claims were paid on the basis of a lower reimbursement rate than Warrick's direct prices at launch (which the Commonwealth's agent FDB translated into WACs and reported without change throughout the eight-year damages period), and the remaining 25% of the claims would have been paid at a *higher* rate than Warrick's direct prices at launch if FDB had followed Warrick's instruction to delete its direct prices. *See* Trial Tr. 28:12-18; 30:13-24, Sept. 21, 2010. Significantly, there was *no evidence* that Warrick marketed the alleged "spread" between the WAC reported by FDB and transaction prices. Although the Commonwealth refers to testimony about "marketing the spread" by Drs. Rosenthal and Hartman, those expert witnesses did not offer any fact testimony about Warrick's conduct, but only testified about the phenomenon of marketing the spread more generally. Pl.'s Mem. at 23 n.24 (citing Trial Tr. 67:7-69:12, Sept. 8, 2010 (explaining the spread in the context of "manufacturers' reported prices" but not once mentioning Warrick or referring to specific marketing conduct)). Indeed, the direct evidence was to the contrary. Trial Tr. 115:15-22, Sept. 24, 2010 (Al Graf, National Director of Sales for Warrick, confirms he never "discuss[ed] or use[d] the term 'spread'" and no "customer ever br[ought] spread up" in connection with selling product to Warrick customers).

Finally, although the Commonwealth recites the jury's finding of approximately $4.6 million in economic damages, the Commonwealth omits entirely any discussion of the analytical

flaws underlying the alleged damages calculation presented to the jury.  As Warrick has

previously demonstrated, see Warrick's JMOL Reply [Dkt. 943] at 9-17 (Nov. 23, 2010), this

damages figure, which derives from testimony by the Commonwealth's expert, Dr. Hartman,

does not even calculate damages caused by Warrick's allegedly wrongful conduct – *i.e.*,

Warrick's failure to get FDB to delete the outdated "direct prices" in the electronic version of

FDB's pricing service.  Rather, Dr. Hartman's damages calculations reflect the amount that the

Commonwealth would have saved if Warrick had published a "true WAC."  Pl.'s JMOL Opp.

[Dkt. 940] at 45 (Nov. 3, 2010) ("The damages [calculated by Dr. Hartman] were the difference

between what was actually paid and what would have been paid had Warrick reported a true

WAC.").  Because Warrick had no duty to publish a "true WAC," the entire premise of Dr.

Hartman's damages calculation, which forms the sole basis for the Commonwealth's claim for

damages and the denominator in its penalties to damages ratio, is mistaken.

 In its Sur-Reply to Warrick's Rule 50(b) Motion, the Commonwealth acknowledges that

"the regulations did not require Defendants to publish a WAC" at all and now concedes that

"[t]he duty to correct" that purportedly arises from *Backman* v. *Polaroid Corp.*, 910 F.2d 10 (1st

Cir. 1990) (en banc), "only exists as long as the [inaccurate] statement remains 'alive.'"  *Id* at 11,

13.  The Commonwealth further concedes that Warrick had no "ongoing duty to issue endless

'updates' with" true WACs.  *Id.* at 13.  In other words, the Commonwealth now concedes that, if

FDB had complied with Warrick's request that it delete the outdated launch prices, the inflated

WACs would no longer have remained "alive," and Warrick would have had no duty to issue a

"true WAC."  Yet Dr. Hartman's damages calculation assumes the existence of just such a "true

WAC."  He did not testify that the Commonwealth suffered any damages as a consequence of

Warrick's failure to delete the launch prices.  Rather, Dr. Hartman's testimony was that "the

Commonwealth was . . . damaged as a result of Defendant's false WAC, *because the Commonwealth would have paid even less . . . if Defendants had reported a true WAC*." Pl.'s JMOL Opp. at 45 (emphasis added); *id.* (acknowledging that, in Dr. Hartman's calculation, "damages were the difference between what was actually paid and what would have been paid had Warrick reported a true WAC").

Thus, the conduct by Warrick that gives rise to liability under the MFCA did *not* cause the Commonwealth $4.6 million in damages.  The Commonwealth has offered no evidence that it would have saved money had Warrick's launch prices been withdrawn (but not been replaced by a "true WAC").  To the contrary, the evidence shows that, in the absence of Warrick's outdated launch prices, the Commonwealth would have paid *more*.  In the 25% of cases in which MassHealth reimbursed on the basis of WAC, if that WAC had been withdrawn, MassHealth would instead have reimbursed at the next *higher* of the four reimbursement values.  Trial Tr. 162:21-163:10, Sept. 27, 2010.  Warrick attaches as Exhibit A a graphic to numerically illustrate why the Commonwealth's use of Warrick's outdated launch prices caused it no damage.

That the Commonwealth did not truly sustain any damages only underscores the gross excessiveness of the Commonwealth's request for penalties.  Even accepting the jury's verdict of $4.6 million in damages, the Commonwealth's request for $191 million in penalties is grossly disproportionate to Warrick's conduct and thus unconstitutionally excessive by any relevant measure.

## ARGUMENT

I. **THE COMMONWEALTH'S REQUEST FOR PENALTIES OF $191 MILLION IS GROSSLY DISPROPORTIONATE TO WARRICK'S CONDUCT AT ISSUE AND WOULD VIOLATE CONSTITUTIONAL LIMITS ON PUNITIVE AWARDS.**

A. **The Commonwealth's Requested Award of More Than $191 Million in Penalties Far Exceeds the Limits of the Due Process Clause.**

The Due Process Clause of the United States Constitution "prohibits the imposition of grossly excessive or arbitrary punishments." *State Farm Mut. Auto. Ins. Co.* v. *Campbell*, 538 U.S. 408, 416 (2003). A grossly excessive penalty greater than what is necessary to punish the conduct and deter further violations offends due process because it "furthers no legitimate purpose" of the government and therefore "constitutes an arbitrary deprivation of property." *Id.* at 417.

In *State Farm*, the Supreme Court held that a punitive damages award of $145 million was "neither reasonable nor proportionate to the wrong committed" by the defendant, and, because the $1 million compensatory award was already "substantial," the maximum constitutionally permissible punitive award would likely be "at or near the amount of compensatory damages." *Id.* at 426, 429. Even punitive awards of considerably smaller amounts than those at issue in *State Farm* and this case have been held to violate due process when the defendant's underlying conduct is not particularly egregious. In *Méndez-Matos* v. *Municipality of Guayanbo*, 557 F.3d 36 (1st Cir. 2009), the First Circuit held that punitive damages of $350,000 – ten times the compensatory award of $35,000 – were grossly disproportionate and violated due process, and affirmed the district court's judgment reducing the award to an amount equal to the compensatory damages. *Id.* at 56. Because the defendant's conduct – which involved the wrongful imprisonment of a contractor's employees – was not particularly reprehensible and the plaintiffs had been fully compensated by the award of

compensatory damages, there was "no justification for a great disparity between the compensatory and punitive awards." *Id.*[1]  Here, likewise, the Commonwealth's requested award of more than $191 million is grossly excessive relative to Warrick's conduct, which consisted merely of "not updating, not responding to the [28] requests for updates from First DataBank, not correcting it," Trial. Tr. 96:2-3, Sept. 28, 2010 (Commonwealth's closing). The punitive award the Commonwealth seeks is particularly excessive in light of the fact that Warrick's conduct did not actually cause the Commonwealth any damages.  But even assuming the Commonwealth did sustain actual damages of $4.6 million, a penalties award "at or near the amount" of that "substantial" compensatory award would be the maximum the Due Process Clause would tolerate.

Although the Supreme Court has recognized that jury-imposed punitive damage awards pose a particular risk of offending the Due Process Clause due to the lack of fair notice and that therefore they warrant certain procedural safeguards, *e.g.*, *Cooper Indus., Inc.* v. *Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001) (*de novo* appellate review), both the Supreme Court and the First Circuit have made it clear that due process principles impose "substantive limits" on statutory penalties as well by prohibiting the federal and state governments from "imposing 'grossly excessive' punishments on tortfeasors." *Id.* at 433-34; *State Farm*, 538 U.S. at 416.  In *Browning-Ferris Industries of Vermont, Inc.* v. *Kelco Disposal, Inc.*, 492 U.S. 257 (1989), the Supreme Court considered but rejected a challenge under the Excessive Fines Clause on the

---

[1] These cases are the rule, not the exception.  *See also Leavey* v. *Unum Provident Corp.*, 295 F. App'x 255, 258-59 (9th Cir. 2008) (concluding that "[t]he district court did not err in reducing the jury's $15 million punitive damages award to $3 million" because a ratio of 7.5:1 was excessive); *Bridgeport Music, Inc.* v. *Justin Combs Publ'g*, 507 F.3d 470, 488 (6th Cir. 2007) (characterizing 9.1:1 ratio of punitive damages to compensatory damages as "large" and unconstitutional in light of the compensatory award, which at $366,939 was itself "very large"); *Bach* v. *First Union Nat'l Bank*, 486 F.3d 150, 154 (6th Cir. 2007) (holding that a 6.6:1 ratio of punitive damages to compensatory damages based on $400,000 compensatory award was "alarming"); *Ojeda-Rodriguez* v. *Zayas*, 666 F. Supp. 2d 240, 266 (D.P.R. 2009) ("this Court finds [ratio of punitive damages to compensatory damages based on compensatory award of $150,000] to be unreasonable because Ojeda was already amply (but not excessively) compensated by the compensatory damages awarded in this case").

ground that the government had neither prosecuted nor shared in the punitive damages award. *Id.* at 263-64. Although the defendant had not preserved a Due Process Clause challenge, the Court expressly noted prior precedent establishing that "the Due Process Clause places outer limits on the size of a civil damages award made pursuant to a statutory scheme." *Id.* at 276 (citing *St. Louis, I.M. & S. Ry. Co.* v. *Williams*, 251 U.S. 63 (1919)). *See also Williams*, 251 U.S. at 67 (rejecting railroad's due process challenge to an Arkansas statutory penalty for overcharging for railroad tickets because the award of $75 to each of two sisters was not "so severe and oppressive as to be wholly disproportionate to the offense and obviously unreasonable," but making clear that the Due Process Clause does prohibit "wholly disproportioned" statutory penalties). In *Romano* v. *U-Haul Intern.*, 233 F.3d 655 (1st Cir. 2000), the First Circuit scrutinized under the Due Process Clause a penalty awarded by the district court in "conform[ity] with [a] punitive damages cap" established by statute. *Id.* at 672. Although the First Circuit ultimately determined that the statutory award in that case was "constitutionally permissible," *id.* at 673, it did so only after subjecting the award to analysis under the due process framework established in *BMW of North Am., Inc.* v. *Gore*, 517 U.S. 559 (1996). *Romano*, 233 F.3d at 673-74.

Because a civil penalty can be "grossly excessive" to the government's legitimate purposes whether imposed by a jury, a judge, or the legislature, the substantive limitations of the Due Process Clause cannot be "confined," as the Commonwealth would have them be, to jury-determined awards. Pl.'s Mem. at 25. The Commonwealth's argument that its penalties request should not be subject to due process scrutiny is utterly without merit, as Judge Gertner recently recognized in *Sony BMG Music Entertainment* v. *Tenenbaum*, 721 F. Supp. 2d 85 (D. Mass. 2010). There, plaintiff sought imposition of a statutory penalty of $675,000, only a small

10

fraction of the $191 million sought by the Commonwealth in this case.  Like the Commonwealth here, the plaintiff argued that the penalty was not excessive because "the Supreme Court's recent punitive damages jurisprudence does not apply to statutory damages."  *Id.* at 101.   Judge Gertner disagreed.  According to her ruling, the Due Process Clause precludes awards that "lack[] any rational foundation and smack[] of arbitrariness" or "bear[] no rational relationship to the government's interests" in compensation and deterrence.  *Id.* at 116.  Based on the Supreme Court's jurisprudence, Judge Gertner concluded that a penalty of $67,500 was "the maximum that the Constitution will permit given the facts of this case."  *Id.* at 119.

As set forth below, a proper analysis of the relevant factors should lead to the same conclusion here:  that the Commonwealth's penalties request of $191 million is grossly excessive and offends due process.

      1.      <u>The Due Process Clause Bars the Grossly Excessive Penalties the Commonwealth Requests.</u>

In considering whether a statutory penalty comports with the substantive limits of the Due Process Clause, a court should apply the three guideposts identified by the Supreme Court in *BMW*: "(1) the degree of reprehensibility of a defendant's conduct; (2) the ratio between punitive and actual and potential damages; and (3) a comparison of the punitive damages figure and other civil and criminal penalties imposed for comparable conduct."  *Romano*, 233 F.3d at 672-73. The ultimate due process inquiry is whether the penalty is "wholly disproportioned to the offense."  *Williams*, 251 U.S. at 67.  Here, there can be no question – based on these factors – that the penalty sought by the Commonwealth, and even a penalty substantially lower, would violate due process principles.

     (a)    *Reprehensibility:  Warrick's failure to fully withdraw its launch prices is not the sort of reprehensible conduct the Supreme Court has required to justify an extraordinary penalty.*

Assuming that it violated the MFCA, Warrick's conduct was still not even remotely so reprehensible as to justify an "eye-popping" penalty in excess of $191 million.  In *State Farm*, the Supreme Court identified five indicia of reprehensibility that might, if present to a sufficient degree, justify imposing a penalty:  (1) "the harm caused was physical as opposed to economic"; (2) the "conduct  evinced an indifference to or a reckless disregard of the health or safety of others"; (3) the conduct targeted victims with "financial vulnerability"; (4) the conduct involved "repeated actions" rather than "an isolated incident"; and (5) the defendant engaged in "intentional malice, trickery, or deceit."  538 U.S. at 419.  The Court made clear that the presence of any one of these factors "may not be sufficient to sustain a punitive damages award," and stressed that "punitive damages should *only* be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of *further* sanctions to achieve punishment or deterrence."  *Id.* (emphasis added).

The Commonwealth's request for more than $191 million in penalties is far in excess of what would be reasonable to punish or deter Warrick's conduct here.  The harm that the Commonwealth claims to have suffered was purely economic.  There is no evidence that anyone was denied access to necessary medical care as a result of Warrick's conduct or that the Commonwealth will not be fully compensated for its purely economic loss by the jury's award of approximately $4.6 million in compensatory damages plus more than $4 million in prejudgment interest alone.  Indeed, the damages determined by the jury are already greatly in excess of any actual injury to the Commonwealth.  As discussed above, the Commonwealth's assertion that it sustained $4.6 million in damages to its Medicaid program is predicated on the false premise that the Commonwealth would have saved money if Warrick had withdrawn its outdated launch

prices because the Commonwealth would have "reimbursed at EAC using a true WAC." *See supra* pp. 5-7. There is, however, no basis in law or fact for the Commonwealth's assumption that Warrick would have "reported a true WAC" in place of its outdated launch prices.

Indeed, some of the most compelling evidence that Warrick's conduct did *not* pose a threat to health or safety or to vulnerable victims, or even injure the Commonwealth, is the fact that long after the Commonwealth was aware of the true nature of Warrick's published prices, the Commonwealth continued to include those outdated launch prices in the WAC field of the MassHealth reimbursement algorithm. Trial Tr. 92:19-21, Sept. 20, 2010 (Director of MassHealth asked whether, after MassHealth began receiving letters from Warrick reporting the high/low range of actual transaction costs starting in January 2002, "did your practices change at all?" A: "No, it did not."); Exs. 533-55. Moreover, even when the Commonwealth subsequently established a Massachusetts Upper Limit Price for defendants' albuterol products, the Commonwealth determined that it should pay more than *twice* the price that Dr. Hartman assumed should have been the reimbursement rate. Trial Tr. 123:13-22, Sept. 21, 2000 (Dr. Hartman confirms that "MassHealth in September of 2002 learns that the Warrick albuterol inhaler could be acquired on average in the marketplace at 17 cents, and sets a Massachusetts Upper Limit just six weeks later at more than double that price"); *id.* at 165:18-24, Sept. 27, 2010. To allow the Commonwealth to recover a penalty in excess of $191 million when it failed to take even the relatively modest step of deleting the outdated launch prices (or setting a lower reimbursement rate) when it learned the true nature of Warrick's published prices is manifestly unjust.

Although the Commonwealth stresses that Warrick's conduct was repeated over several years, Pl.'s Mem. at 27, it is noteworthy that the jury did *not* find that Warrick itself engaged in

989,103 wrongful acts, or even that Warrick engaged in 38,303 wrongful acts, the number of pharmacist claims that form the basis for the Commonwealth's request for penalties. To the contrary, the jury found only that Warrick made 28 false statements, presumably on the basis of the 28 annual FDB updates that Warrick did not correct.

It is this disconnect between Warrick's alleged misconduct and the penalties sought by the Commonwealth that renders the requested penalties unconstitutional. The Due Process Clause focuses on "the degree of the defendant's reprehensibility or culpability," *Cooper Industries*, 532 U.S. at 435, and the state's legitimate interest in punishing and deterring that conduct. By misreading the MFCA to call for the imposition of penalties for each false claim submitted by a third party, rather than for each action of the defendant that violates the statute, the Commonwealth would divorce the MFCA's penalties provision from the touchstone of the constitutional due process analysis. That statutory misconstruction puts the MFCA on a collision course with the Due Process Clause. If the MFCA would permit so excessive a penalty, the Due Process Clause, which focuses on the defendant's own conduct, forbids it.

     (b)     *Ratio comparison: The 40:1 ratio sought by the Commonwealth far exceeds the constitutional limits of the Due Process Clause.*

As set forth above, *State Farm* instructs that "few awards exceeding a single-digit ratio . . . will satisfy due process," and that the limit is even *lower* when the compensatory damages are already "substantial." *Id.* at 425. According to the Court, "[w]hen compensatory damages are substantial," "then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* In *State Farm* itself, which involved a $1 million award, the Court held that, "in light of the substantial compensatory damages awarded," proper application of due process principles "likely would justify a punitive damages award at or near the amount of compensatory damages." *Id.* at 429. *See also Mendez-Matos* v. *Guaynabo*,

14

557 F.3d 36, 55 (1st Cir. 2009) ("[W]here the compensatory award is substantial, a ratio of punitive-to-compensatory damages larger than one-to-one may be unreasonable.").

Undeterred by this precedent, the Commonwealth brazenly seeks a penalty-to-damages ratio of 40:1[2] – amounting to total penalties of $191 million, in addition to the further punitive award already provided in the statutory treble damages.  Even if the Court were to conclude that Warrick's conduct was particularly reprehensible – which we believe it clearly was not – this ratio alone requires the Court to deny the Commonwealth's request for penalties.

The Commonwealth treats the second *BMW* factor as merely an exercise in locating cases in which the compensatory damages were very low, so that even a relatively minor penalty represents a large "ratio" of penalties to damages – one that is greater than the ratio sought by the Commonwealth in this case.  The Supreme Court, however, has rejected precisely that mode of analysis.  The Supreme Court has explained that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards," *BMW*, 517 U.S. at 582, in which case a single-digit ratio, perhaps as low as 1:1, may be the constitutional limit, *State Farm*, 538 U.S. at 425.  The Commonwealth's attempt to justify its excessive penalties request based on cases that involve 66-cent and $21 damages awards only highlights the weakness of its position. In *Sony BMG Music*, for example, the plaintiff's injury was only $21, and the punitive award less than $75,000.  721 F. Supp. 2d at 112, 118.  In *Williams*, likewise, the harm was only 66 cents, so that even a minor penalty of $75 produced a mathematically large ratio of 114:1.  251 U.S. at 64.  The Commonwealth's additional authorities, all with compensatory damages less than $100,000, are similarly inapposite.  *See* Pl.'s Mem. at 30-31 (citing *Romano*, 233 F.3d at 661,

---

[2] Even worse, the Commonwealth engages in a misguided effort to make the ratios it calculates appear slightly more reasonable by including the federal share of the harm allegedly caused by Warrick's conduct.  Even if this were a proper interpretation – and it is not, *see infra* p. 23 – the ratio would still far exceed the bounds of due process.

673 (compensatory damages of $15,000, and ratio of 19:1)[3]; *Missouri* v. *Spilton*, 31 S.W.3d 350 (Mo. 2010) (actual damages of $45,385, and ratio of 36:1); *United States* v. *Byrd*, 100 F. Supp. 2d 342, 346 (E.D.N.C. 2000) (actual damages of $85,012, ratio of 16:1); *Gilbert-Realty Co.*, 840 F. Supp. at 74 (compensatory damages of $1,630 and ratio of 20:1).   Even the largest compensatory damages award among the Commonwealth's examples ($85,012) is less than 2 percent of the compensatory damages awarded in this case.   Yet *none* of these cases involving anything more than nominal damages yielded a ratio as high as the one the Commonwealth asks the Court to sanction here.   *See* Ex. B (attached hereto).

Finally, it is notable that even the Commonwealth's purported ratio of more than 40:1 understates the punitive nature of the award it seeks.   The MFCA already provided, pre-July 2000, for a doubling of actual damages, and now provides for a trebling of those damages. *Compare* G. L. c. 93 § 9B (repealed July 28, 2000 by St. 2000, c. 159, § 2), *with* G. L. c. 12, § 5B (enacted July 28, 2000 by St. 2000, c. 159, § 18).   In contrast to the federal FCA, in which the doubling of damages and arguably some penalties were held to be remedial, at least when recovery is shared with a *qui tam* relator, *see Cook County, Ill.* v. *United States ex rel. Chandler*, 538 U.S. 119, 130-31 (2003), the double and treble damages in this suit under the MFCA are entirely punitive.   That is so because, under the MFCA, unlike the FCA, the Commonwealth will be separately compensated for the costs and fees of litigation and its investigation, as well as for prejudgment interest at a 12% rate far in excess of the present cost of capital.   G. L. c. 12, § 5B; *id.* at c. 231, §§ 6B, 6C, 6H.   Nor will the Commonwealth have to share its double or treble recovery with a relator.   Thus, the MFCA's statutory double/treble damages provision already imposes on Warrick penalties for its conduct that approach the constitutional limits.   Moreover,

---

[3]  Notably, in *Romano*, the First Circuit specifically noted "the low actual damages" of $15,000 as a factor justifying the 19:1 ratio in that case.   233 F.3d at 673.

because the Commonwealth failed to establish that it sustained *any* injury as a consequence of the continued presence of the outdated launch-price (as opposed to the absence of a "true WAC," which Warrick had no duty to provide), the true ratio of penalties to harm is in fact infinite.

> (c)  *Comparison with other statutory penalties: The Commonwealth cites no statute that authorizes a punitive to compensatory damages ratio that even approaches 40:1.*

The third *BMW* factor requires the court to consider the penalty under review in light of other statutory penalties.  This too demonstrates the gross excessiveness of the $191 million in penalties sought by the Commonwealth.  As the Supreme Court has noted, early English statutes and present-day federal laws often allow or mandate imposition of multiples of damages.  *BMW*, 517 U.S. at 580 & n.33.  But these precedents "provide[] for double, treble, or quadruple damages," *id.*, not any multiple even approaching the 40:1 damages to penalties ratio that the Commonwealth seeks here.  As the Supreme Court has emphasized, this long historical practice of limiting statutory sanctions to at most a quadrupling of compensatory damages is "instructive" of the constitutional limits and "demonstrate what should be obvious:  Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution."  *State Farm*, 538 U.S. at 425.  *See id.* (citing *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U.S. 1, 23-24 (1991), for the proposition that a punitive damages award "of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety").

While the Commonwealth may point to other statutes that provide for per-violation penalties, the Supreme Court and First Circuit have made clear that the Due Process Clause *does* impose limits even on statutorily-imposed civil penalties.  As Judge Gertner recently observed, just because a penalty award falls "within the broad range of [punitive] damages that Congress set for *all* . . . cases does not mean that the members of Congress who approved the language . . .

17

intended to sanction the eye-popping award imposed *in this case*." *Sony BMG Music*, 721 F. Supp. 2d at 104 (emphasis in original).

In any event, reliance by the Commonwealth on other per-violation statutory penalties begs the question because statutory per-violation penalties are imposed on the basis of the *defendant*'s conduct. Thus, the legislature would expect that the final penalty would bear some rational relationship to the culpability of the defendants' acts that gave rise to liability. Here, however, the constitutional infirmity of the Commonwealth's proposed penalty derives precisely from the Commonwealth's proposed statutory construction, which eliminates any necessary connection between the number of "violations" and the number of wrongful acts by the defendant. Under a proper construction of the MFCA, which conforms to the Supreme Court's construction in *Bornstein*, the number of statutory violations, and therefore penalties, is necessarily tied to the defendant's own wrongful conduct, thus reducing, if not eliminating, the likelihood that application of the per-violation penalty would give rise to unconstitutional awards.

      2.    <u>The Commonwealth Improperly Attempts to Sway the Court with a Discussion of Facts That Are Not Relevant to Any Constitutional Analysis.</u>

Apparently recognizing the outlandishness of its request for more than $191 million in penalties, the Commonwealth resorts to discussing a host of facts that courts have held are not properly the subject of any constitutional analysis. The Commonwealth's brief opens with an extensive discussion of how much healthcare costs and of the defendants' ability to satisfy even a $191 million penalties award. The Commonwealth advances these points despite the Supreme Court's prescription against such arguments. *See*, *e.g.*, *BMW*, 517 U.S. at 585 ("The fact that [the defendant] is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice" or the protections of the Due Process Clause); *see also United States* v.

*817 N.E. 29th Drive*, 175 F.3d 1304, 1311 (11th Cir. 1999) ("The Supreme Court . . . has made

clear that whether a forfeiture is 'excessive' is determined by comparing the amount of the

forfeiture to the gravity the offense, *see Bajakajian*, 524 U.S. at __, 118 S.Ct. at 2036, and not by

comparing the amount of the forfeiture to the amount of the owner's assets.") (citation in

original); *United States ex rel. Tyson* v. *Amerigroup Ill., Inc.*, 488 F. Supp.2d 719, 747 (N.D. Ill.

2007) (citing *817 N.E. 29th Drive* and other cases and concluding, "This Court will not undertake

an economic analysis – it seems that the excessiveness of a penalty should turn on the nature of

the Defendants' conduct, not the state of his coffers.").

The Commonwealth's resort to argument about other settlements involving Schering and

Warrick is similarly improper.  As the Court in *State Farm* admonishes:  "A defendant's

dissimilar acts, independent from the acts upon which liability was premised may not serve as a

basis for punitive damages.  A defendant should be punished for the conduct that harmed the

plaintiff, not for being an unsavory individual or business."  538 U.S. at 422-23.  Regardless of

the Commonwealth's evident view of pharmaceutical manufacturers, punitive damages may not

be imposed to punish dissimilar acts.  The two prior Schering settlements that the

Commonwealth notes are just that:  "dissimilar acts."  Indeed, this Court has already so found in

denying the MDL plaintiffs' request for expansive discovery into the materials produced to the

government in connection with the 2006 settlement, *see* Hr'g Tr. 43:23-24, Sept. 20, 2006,

*United States* v. *Schering Sales Corp.*, No. 06-10250 PBS (D. Mass.) (Judge Saris remarking

"AWP is not part of this [referring to the substance of the events leading to 2006 settlement] . . .

It's just not here.")[4] (attached at Tab A to the Bueker Decl.), and in limiting the testimony of the

Philadelphia relators (testimony about the events that led to the 2004 settlement).  *See* MDL Trial

---

[4] All record materials except trial transcripts and exhibits are attached to the Declaration of John P. Bueker in Support of Warrick's Response to the Commonwealth's Motion for Entry of Judgment (hereinafter "Bueker Decl."), submitted herewith.

Tr. 200:2-201:4, Nov. 7, 2006 (informing plaintiffs "I don't want to hear about the Philadelphia settlement, but is there something about AWP?") (Tab B, Bueker Decl.); *see also* MDL Trial Tr. 128:9-10, Nov. 16, 2006 (asking toward the end of Mr. Pironti's testimony, "How does this involve AWP at all?") (Tab C, Bueker Decl.).

To the extent that settlements, representing compromise positions (and not adjudicated verdicts), are relevant comparators at all, the only relevant settlement involving Warrick's price reporting to the three national pricing compendia for use by Medicaid programs is its nationwide AWP settlement with the Department of Justice and others last December that this Court approved as "fair, adequate and reasonable."  Order of Dismissal with Prejudice, No. 01-12257-PBS, [Dkt. 6756] at 2 (Dec. 11, 2009) (Tab D, Bueker Decl.).  By comparison to the $44.5 million that Warrick agreed to pay to resolve all of the federal share of Medicaid claims nationwide, the Commonwealth's request for $191 million is clearly disproportional.  Massachusetts represents only about 3.9% of all Medicaid reimbursement for Schering and Warrick's drugs nationwide between 1991 and 2005; 3.9% of $44.5 million is $1,735,500.  *See* Bueker Decl. at ¶¶ 5-6 & Tab E.  The Commonwealth stands to be awarded far more than that here in multiple damages alone.

Finally, the Commonwealth's reference to settlements by other pharmaceutical manufacturers mostly for very different and unrelated conduct affecting parties and governmental entities far beyond those before this Court – presumably in an effort to color this Court's view of the industry as a whole or to improperly sway this Court's view about what amount the defendants can afford to pay – is even farther removed.  As the Supreme Court held in *Philip Morris USA* v. *Williams*, 549 U.S. 346, 353-55 (2007), while a court might appropriately consider the harm a defendant causes to others in deliberating about the

reprehensibility of a defendant's conduct, ultimately, "the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that is inflicted upon nonparties . . . , *i.e.*, those who are, essentially, strangers to the litigation."  Even if this conduct were committed by Warrick, which it was not, it would not be an appropriate consideration, as "[p]unishment on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other party obtains."  *State Farm*, 538 U.S. at 423 (citing *BMW*, 517 U.S. at 593).  These principles, taken together with the ones stated above, demonstrate the irrelevance of the other settlements cited by the Commonwealth involving different pharmaceutical manufacturers of dissimilar litigation to any constitutional analysis.  Moreover, as Exhibit C demonstrates, these other settlements are not even factually comparable, and thus offer no assistance for that reason as well.

> **B.    The Commonwealth's Requested Award of More Than $191 Million in Penalties Would Also Violate the Excessive Fines and Penalties Clause of the Eighth Amendment.**

There is no dispute among the parties that the United States and Massachusetts Constitution's prohibitions against the imposition of excessive fines and penalties applies to the imposition of multiple damages and per-violation penalties under the federal FCA; nor could there be.  *See* Pl.'s Mem. at 19 ("Although typically associated with criminal cases, civil penalties can also fall within the purview of the Eighth Amendment.") (*citing Hudson* v. *United States*, 522 U.S. 93, 103 (1997)).  Courts have for many years routinely scrutinized FCA penalty awards for compliance with the Excess Fines Clause of the United States Constitution.  *See*, *e.g.*, *United States* v. *Mackby*, 261 F.3d 821, 830 (9th Cir. 2001).  Moreover, the scrutiny applied is exacting:  in the words of one court, "[i]t is not enough for [a court] to rubber-stamp the number of false claims as determined by the jury, as these are facts with constitutional import (in light of

21

[d]efendants' Eighth Amendment excessiveness arguments)." *Amerigroup*, 488 F. Supp.2d at 740. "Although a court is bound by Congress' mandated FCA damages, 'in cases in which the Eighth Amendment is applicable, a court must still independently assess whether any fines levied comport with the Amendment's requirements.'" *Id.* at 742 (quoting *United States* v. *Williams*, No. 02-C-4990, 2003 WL 21384640 at *4 (N.D. Ill. June 12, 2003)).

As Warrick has previously explained, *see* Part I.A.1(b); Warrick's JMOL Mem. [Dkt. 937] at 11-12 (Oct. 13, 2010), the multiple damages and per-violation penalties imposed by the MFCA are, if anything, even more punitive than those imposed by its federal analog because the MFCA separately allows the Commonwealth to recover prejudgment interests, attorneys' fees, and investigative costs – all of which the Commonwealth has expressed an intention to do in this case. Pl.'s Mem. at 2 n.1. Undoubtedly then, the Eighth Amendment's limits, which have been incorporated as against the states,[5] apply to any award of multiple damages and penalties that this Court might make under the MFCA, which would by definition be punitive in nature.

The parties also agree that the United States Supreme Court articulated the standard for judging when fines and penalties are excessive in violation of the Eighth Amendment in *Bajakajian*: "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportionate to the gravity of a defendant's offense." 524 U.S. at 334. Again, as noted above, the focus of the inquiry is on the defendant's conduct. Focusing on the defendant's conduct, the Court in *Bajakajian* found that the nature of the defendant's offense, which was the failure to report the removal of currency from the United States, was "grossly disproportionate" to the penalty imposed – forfeiture of the entire $357,144 amount that the defendant failed to report. This was particularly so in light of the minimal harm caused – the loss of information

---

[5] *See Cooper Indus.*, 532 U.S. at 433-34; *Maher* v. *Retirement Bd. of Quincy*, 452 Mass. 517, 522 (2008).

that $357,144 had left the country that would have occurred if the crime had been successful. *Id.* at 337-39. The same reasoning applies in this case. The jury found Warrick to have failed on 28 occasions to ensure that FDB fully deleted its direct prices at launch from its electronic pricing service. Viewed in these terms, the penalty that the Commonwealth seeks – more than $191 million – seems "grossly disproportionate" to the gravity of Warrick's conduct – which at most caused $4.6 million in purely economic harm and, more likely, caused no economic harm at all to the Commonwealth.

Although the Supreme Court has counseled "against requiring strict proportionality between the amount of the punitive forfeiture and the gravity of [the] offense," *id.* at 336, the Commonwealth's outlandish request for penalties so far exceeds the bounds of reasonableness that this is not even a close case. Indeed, the Commonwealth does not cite a single example in which any court has tolerated a penalty to compensatory damages ratio even approaching 40:1 under the Excessive Fines and Penalties Clause of the United States Constitution, much less one with "substantial" damages.[6] Put differently, if the Court were to grant the Commonwealth's more than $191 million request for penalties (in addition to millions of dollars in multiple damages to which it is entitled) in a case in which Warrick caused at most $4.6 million in harm (a 41.5:1 penalties to harm ratio), its award would be – to Warrick's knowledge – unprecedented. Perhaps recognizing that fact, the Commonwealth attempts to inflate the denominator, thus reducing the ratio to 21:1, by adding the federal share of the harm allegedly caused by Warrick's conduct. Even if Warrick had not reached a settlement with the federal government that this Court approved as "fair, adequate, and reasonable" to fully compensate the federal government

---

[6] While the Supreme Court upheld a civil penalties to harm ratio of 114:1 in *St. Louis, I. M. & S. Ry. Co.* v. *Williams*, 251 U.S. 63, 66 (1919), despite a challenge under the Due Process Clause of the United States Constitution, the compensatory damages awarded in that case totaled 66 cents. As explained above, cases involving nominal harm have a special place in Due Process "ratios" jurisprudence. *See supra* Part I.A.1(b).

for any loss that it had sustained as a result of Warrick's price reporting conduct, Order of

Dismissal with Prejudice, No. 01-12257-PBS, [Dkt. 6756] at 2 (Dec. 11, 2009) (Tab D, Bueker

Decl.), and it were therefore proper to take the federal loss into account in calculating the ratio

(which it is not), the 21:1 ratio would still go well beyond the bounds of anything that has been

tolerated by any court in a case in which the jury has awarded more than tens of thousands of

dollars in damages. *See supra* Part I.A.1(b); Exhibit B.

In applying *Bajakajian*'s generalized standard, lower courts have developed a number of

factors to consider. The Commonwealth's brief seizes on some of those factors and ignores

others. In particular, citing *United States* v. *Eghbal*, 475 F. Supp.2d 1008, 1017 (C.D. Cal.

2007), the Commonwealth argues, "Civil penalties awards in which the amount of the award is

less than the statutory maximum do not run afoul of the Excessive Fines Clause." Pl.'s Mem. at

17. The Commonwealth cannot seriously contend that simply because a court awards less than

the maximum amount of penalties permitted by a statute the award is constitutionally proper. If

that were so, most of the Excessive Fines jurisprudence the Commonwealth cites and the ratio

analyses in which it engages would be wholly unnecessary. The Commonwealth's argument

also suffers from another equally fatal flaw. While the Commonwealth pats itself on the back for

"seeking to recover less than 2% of the statutorily mandated maximum penalties and less than

4% of the statutorily mandated minimum penalties," *id.* at 19, the accuracy of both claims

depends on the Commonwealth's flawed reading of the MFCA and the erroneous assumption

that each of the 989,103 claims the jury found pharmacists submitted constituted a violation of

the statute for purposes of imposing penalties. If the Court focuses on Warrick's conduct in

imposing penalties as it must, *Bajakajian*, 524 U.S. at 334; *Bornstein*, 423 U.S. at 312-13, even

setting aside for a moment *ex post facto* considerations, *see infra* Part III, the maximum penalty

that this Court could impose would be $280,000 (28 × $10,000 per violation).  Again, viewed

through a proper lens, the Commonwealth's request for penalties is simply outrageous.

The Commonwealth's brief also cherry-picks from a list of factors that the *Amerigroup*

court used in exercising its discretion as to where in the range between $5,000 and $10,000 to set

the per-violation penalty, not in evaluating the excessiveness of the penalties sought in that case

under the Eighth Amendment.  *See* Pl.'s Mem. at 20; *Compare Amerigroup*, 488 F. Supp.2d at

741 (listing factors for determining where within the statutory range to fix the civil penalty), *with*

*id.* at 744 (setting forth factors to be used in determining if the fine was "grossly

disproportionate").  Nonetheless, it is worth pausing on at least one of these "factors" – even if it

is not relevant to the excessiveness analysis for just a moment – because the Commonwealth so

widely misses the mark.  The Commonwealth's brief makes much of the fact that Warrick chose

to take this case to trial and to exercise its constitutional right to defend itself against the claims

made, even going so far as to suggest that by doing so Warrick had refused to "accept

responsibility" for its actions.  *See* Pl.'s Mem. at 23 & n. 26.  Notably, in deciding to set the

penalty at the minimum end of the range, the *Amerigroup* court took precisely the opposite

approach: "[t]his Court will not consider Defendants' discovery and litigation strategies; in these,

Defendants merely engaged in a meaningful defense against charges brought against them."  *Id.*

at 742.  In effect, the Commonwealth not only seeks to impose enormous penalties on Warrick

for conduct that does not justify such penalties, but it also seeks to punish Warrick for even

attempting to defend that conduct.

One other factor the *Amerigroup* court considered in exercising its discretion to impose

only the minimum penalty that the Commonwealth virtually ignores in its brief is "general

fairness."  *See* Pl.'s Mem. at 20.  Moreover, despite the Commonwealth's extensive citation to

*United States* v. *Mackby*, there is no mention in the Commonwealth's brief of *Mackby*'s holding

directing the district court on remand to consider both the amount of the multiple damages and

the penalties imposed together in conducting the excessive fines analysis. *Mackby*, 261 F.3d at

831. Here, the Commonwealth is seeking $5,000 for each of 38,303 pharmacy-submitted claims

– claims that it now concedes were not false when submitted, *see* Pl.s' JMOL Opp. at 20 –

notwithstanding that the jury found Warrick's conduct to have caused, on average, harm of only

about $4.65 per claim ($4.6 million ÷ 989,103) for each claim that a pharmacist submitted.

Moreover, as the Affidavit of Dr. Addanki demonstrates, because there was a FUL in effect for

all of Q3 2000, the quarter on which the Commonwealth chooses to base its request for penalties,

*none* of the claims that the Commonwealth says justify its outlandish penalties request were

reimbursed on the basis of the WAC that FDB reported for Warrick's inhaler. *See* Affidavit of

Sumanth Addanki, Ph. D., dated July 11, 2001, ¶ 5b (hereinafter "Addanki Aff.") (Tab F, Bueker

Decl.).

Although the jury found that Warrick failed to stop FDB from transmitting outdated

launch prices to the Commonwealth for use in connection with Medicaid payments, there is no

direct evidence that Warrick knew the Commonwealth was using its outdated direct prices or that

Warrick intended it to do so. In fact, Warrick continues to maintain that the only reasonable

inference to draw from the evidence is that, had anyone of authority at Warrick received FDB's

annual updates and understood their significance, Warrick would have done as it did in 1993 and

instructed FDB to delete its outdated pricing information. At worst, and notwithstanding the

jury's finding and the elements of a Massachusetts Medicaid False Claims Act claim, this is a

case of negligence – not intentional or willful misconduct aimed at deceiving the

Commonwealth's Medicaid program and the poor and needy citizens it serves. Furthermore, the

26

evidence does not show that there was any reason for Warrick to believe that the Commonwealth would be injured by FDB's continued publication of the outdated launch prices, given the reasonable expectation that one of the three other reimbursement values always would have been lower, and that the Commonwealth therefore would not have been reimbursing for the albuterol products on the basis of WAC.  Trial Tr. 68:8-25, Sept. 23, 2010.  In fact, in 75% of instances, Warrick's WAC was *not* the basis for reimbursement.  Trial Tr. 28:12-18, 30:13-24, Sept. 21, 2010.  In short, this is not the kind of egregious conduct that might justify the imposition of extraordinarily large penalties.

In all fairness, the substantial multiple damages and per-violation penalties that this Court will impose if it denies Warrick's Rule 50(b) motion and simply follows the law are sufficient to punish Warrick for the conduct the jury found Warrick to have committed.  Nothing more is warranted, and nothing more is constitutionally permissible.

## II.   UNDER A PROPER CONSTRUCTION OF THE MFCA, THE STATUTE DOES NOT GIVE RISE TO ANY OF THE CONSTITUTIONAL PROBLEMS PRESENTED BY THE COMMONWEALTH'S OUTSIZED REQUEST FOR MORE THAN $191 MILLION IN CIVIL PENALTIES.

Warrick's pending Rule 50(b) motion sets forth numerous reasons why the jury's verdict should be set aside entirely.  *See* Warrick's JMOL Mem.  Warrick will not repeat those arguments here.  However, two arguments warrant further exposition because they bear most directly on the Commonwealth's outsized request for penalties.

First, this Court need not reach any constitutional question because it should set aside the jury's finding of liability under prong 1 of the MFCA.  If it did so, the Commonwealth has acknowledged that the statutory penalties available under prong 2 of the MFCA – calculated on the basis of each of Warrick's 28 allegedly false statements – are, at most, $280,000, and therefore present no constitutional concern.  Pl.'s Mem. at 17 n.15.  In contrast, under prong 1,

27

the Commonwealth seeks a $5,000 penalty per *pharmacist claim*, which, even when limited to a single quarter of the eight-year damages period, produces the astronomical penalty of more than $191 million.  The unconstitutional excessiveness of the Commonwealth's penalty request is particularly evident in light of the fact that the pharmacist claims on which the Commonwealth would predicate its $5,000-per-claim penalty *were not false*.  Indeed, the Commonwealth has previously conceded that "the pharmacy submissions did not themselves contain the false WACs."  Pl.'s JMOL Opp. at 20.

Under a proper construction of prong 1, the jury's verdict must be set aside in light of the Commonwealth's concession, and this Court would then not have to confront the constitutional problems presented by the Commonwealth's motion for the entry of judgment.  Liability under prong 1 of the MFCA requires the defendant to "knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval."  G. L. c. 12, § 5B.  Thus, "presentment" of a "false or fraudulent claim" is essential to establish liability under prong 1.  *Allison Engine Co., Inc.* v. *United States ex rel. Sanders*, 553 U.S. 662, 671 (2008).  Indeed, in its Sur-Reply, the Commonwealth now concedes that "a false or fraudulent claim is required for liability under MFCA Section 1."  *See* Pl.'s JMOL Sur-Reply at 2.  Because the claims that pharmacists presented to the government for payment were not false at the time they were presented, but rather became false only as a result of subsequent events, Warrick can be liable, if at all, only under prong 2 of the MFCA.  Perhaps it is for this very reason that this Court has previously remarked that "this case lends itself more easily to [a] making a false statement to get a claim paid [claim under Prong 2] than [an] actually causing a claim" to be submitted claim under prong 1.  Trial Tr. 84:18-20, Sept. 23, 2010; *see also id.* at 85:23 (the Court inquiring "what is . . . the falsity in the claim?").  If the Court were to set aside the jury's finding as to prong 1, what would

28

remain is the jury's finding that Warrick made 28 false statements that were used by MassHealth to adjudicate the pharmacists' claims for payment.  While constituting error for other reasons, *see* Warrick's JMOL Mem., penalties imposed on this basis would not run afoul of constitutional prohibitions on excessive fines and penalties or violate the Constitution's Due Process Clause.

In its Sur-Reply, the Commonwealth seeks to salvage its prong 1 claim by citing *United States ex rel. Marcus* v. *Hess*, 317 U.S. 537 (1943).  The Commonwealth characterizes *Marcus* v. *Hess* as holding that *prong 1* of the FCA independently encompasses any claims "grounded in fraud."  Pl.'s Mem. at 3.  To the contrary, *Marcus* v. *Hess* holds that prongs 1 and 2 "taken together" with the prohibition on conspiracies to defraud "indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud."  317 U.S. at 544.  *Marcus* v. *Hess* does not suggest that the requirement of presentment of a false claim under prong 1 can be disregarded, and even if it did, such a suggestion would not have survived the Supreme Court's recent decision in *Allison Engine*, which expressly held that presentment of a false claim is the essential feature that distinguishes liability under prong 1 from prong 2.

The Commonwealth's attempt to rewrite prong 1 as a prohibition on all claims "grounded in fraud" would completely collapse any meaningful distinction between prongs 1 and 2 of the MFCA, and render one or the other of the provisions effectively superfluous – a result that this Court certainly cannot countenance.  *Reiter* v. *Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used."); *see also United States ex rel. Grubbs* v. *Kanneganti*, 565 F.3d 180 (5th Cir. 2009) (explaining that "[t]he inclusion of an express presentment requirement in subsection (a)(1), combined with the absence of anything similar in (a)(2), suggested that Congress did not intent to include a

presentment requirement in subsection (a)(2)"). Of course, permitting the Commonwealth to read the presentment requirement out of a prong 1 claim would have the practical effect of allowing the Commonwealth to bypass prong 2's heightened scienter requirement without having to show that a false claim was ever presented to the government for payment.

Whereas *Marcus* v. *Hess* upheld the defendants' liability under prong 1, the facts of that case are entirely distinguishable from those here. As the Court emphasized, inflated "monthly estimates for payment were submitted by the respondents to the local sponsors on [federal government] forms" and the presentment of these inflated estimates "was a prerequisite to respondents' payment." 317 U.S. at 543. The claims that respondents presented for payment were themselves fraudulent because, had the government known about the defendants' misrepresented collusion "[t]he government's money would never have been placed in the joint fund for payment to respondents." *Id.* Here, by contrast, the pharmacists' claims were entirely proper. By the Commonwealth's own admission, "the pharmacy submissions did not themselves contain the false WACs." Pl.'s JMOL Opp. at 20. And the pharmacists were entitled to payment. Moreover, in most instances, as demonstrated above, *supra* pp. 5-7, the pharmacists would have been reimbursed *the same amount* regardless of whether Warrick did (or did not) withdraw its outdated launch prices and, in the remaining instances, pharmacists would have been paid *more* if Warrick's launch prices had been fully withdrawn. In other words, the Commonwealth was not harmed by Warrick's conduct. In *Marcus* v. *Hess*, on the other hand, the government paid an inflated price as a result of each of the fraudulent claims.

The alleged falsity in this case does not reside in the pharmacists claims for payment, but in the pricing statements attributed to Warrick that the Commonwealth obtained from its third-party agent FDB and incorporated into its reimbursement algorithm. Where liability is premised

on a false statement, but where there is no false claim presented to the government for payment, liability under the MFCA must be premised, if at all, on prong 2.  Because the statutory penalties imposed under prong 2 are directly tied to the number of Warrick's own allegedly false statements, imposing per-violation penalties on that basis does not present the constitutional problems that would arise under the Commonwealth's misconstruction of prong 1.

Second, even if Warrick were liable under prong 1 of the MFCA, the problem of constitutionally excessive penalties does not arise under a proper construction of the statute's penalty provision.  That provision imposes penalties only on the basis of a defendant's own acts that violate the statute, and not on the basis of the number of acts taken by an independent third-party (pharmacists).  As the Court is by now well aware, the seminal Supreme Court decision on this point makes clear that the FCA "penalizes a person for his own acts, not for the acts of someone else."  *Bornstein*, 423 U.S. at 312-13.  As a point of supposed distinction, the Commonwealth repeatedly stresses that the FCA now provides for a statutory penalty "per violation," whereas the FCA construed by the Court in *Bornstein* imposed a penalty for "do[ing] or commit[ing] any of the acts prohibited" by the FCA.  *Id.* at 305 n.1.  But this supposed distinction merely begs the question what constitutes a "violation" on which the act premises liability.  In a prong 1 case such as this one where the defendant is not accused of submitting claims itself, the "violation" upon which liability and any penalty is based is that the defendant "causes to be presented" a false claim, the same act prohibited by the FCA in the version construed by the Court in *Bornstein*.  Significantly, the statute uses the active verb to describe the prohibited conduct.  It is only a *defendant's own act* of "caus[ing]" the false claim to be presented that violates the act.  In this case, Warrick is *not* accused of having enticed or directed pharmacists to submit false claims for payment.  Instead, what the jury found Warrick did was,

on 28 occasions, fail to fully correct false statements that were then used by the Commonwealth in its Medicaid claims processing.  The Commonwealth's theory that every pharmacist-submitted claim constitutes a violation by Warrick, however, has the effect of rewriting the statutory text to impose liability upon the presentment of any claim where the alleged falsity was "caused by" the defendant.  That is not, however, what the legislature prohibited in prong 1 of the MFCA.

The Commonwealth's continued reliance on its now tired refrain – that Warrick relies "upon one case only:  *United States* v. *Bornstein*, 423 U.S. 303 (1976), a 1976 case decided solely as a matter of statutory construction, prior to the 1986 amendments to the FCA, which changed the structure of the statute," *see* Pl's Mem. at 14 – is misplaced.  For its part, the Commonwealth's argument against a straightforward application of *Bornstein* is premised almost exclusively on a thirty-year-old decision of a divided panel of the Ninth Circuit, *United States* v. *Ehrlich*, 643 F.2d 634 (9th Cir. 1981), that was also decided prior to the 1986 amendments to the FCA, and that construed (albeit differently) the exact same pre-1986 statutory language as the United States Supreme Court did in *Bornstein*.  Clearly, then, this Court is bound by the Supreme Court's precedent and not a factually distinguishable decision of a divided panel of the Ninth Circuit.

Moreover, Warrick has cited to numerous post-1986 cases that have applied *Bornstein* in finding that the number of violations must be based on the defendant's own conduct.  *See, e.g.*, *Hays* v. *Hoffman*, 325 F.3d 982, 993-94 (8th Cir. 2003) (holding, on the basis of *Bornstein*, that the defendant could be found liable only for eight violations based on the defendant's own actions, rather than 336); *United States* v. *Krizek*, 111 F.3d 934, 939-40 (D.C. Cir. 1997) (relying on *Bornstein* for the proposition that the court must focus on "the specific conduct of the defendant," rejecting "the government's definition of claim [that] permitted it to seek an

astronomical $81 million worth of damages," and remanding for a recalculation of the civil

penalty); *United States* v. *Murphy*, 937 F.2d 1032, 1038-39 (6th Cir. 1991) (holding that, even

assuming the 1986 FCA amendments applied to pre-1986 conduct, the amendments did not

eliminate *Bornstein*'s focus on the defendant's own conduct); *see also, e.g.*, *United States ex rel.*

*DRC, Inc.* v. *Custer Battles, LLC*, No. 1:04CV199, 2009 WL 3756343 at *1 (E.D. Va. Oct. 14,

2009) (counting the number of "violations" subject to a penalty and noting that, under *Bornstein*,

the focus must be "upon the specific conduct of the person from whom the Government seeks to

collect the statutory forfeitures").  Notably, many of these courts have focused on the defendant's

conduct, as this Court should, as a means of avoiding serious constitutional questions.  *See Hays*,

325 F.3d at 993 (rejecting district court's method of counting claims because it bore "no rational

relationship to the false claim misconduct" and was "laced with Excessive Fines Clause

implications"); *Krizek*, 111 F.3d at 940 (avoiding excessive fines issue by rejecting the

"government's definition of claim [which] permitted it to seek an astronomical $81 million

worth of damages for alleged actual damages of $245,392").  Indeed, properly construing the

MFCA and faithfully applying *Bornstein* to the facts of this case will enable this Court to avoid

addressing any constitutional questions at all.  This is how – in Warrick's view – this Court

should decide the present motion, if it does not allow Warrick's pending Rule 50(b) motion.

## III.   SHOULD THIS COURT DENY WARRICK'S RULE 50(B) MOTION, IT SHOULD ENTER FINAL JUDGMENT IN THE AMOUNT OF $14,643,893.

If the Court denies Warrick's pending Rule 50(b) motion, which it should not, then

Warrick would urge the Court to enter final judgment in the amount of $14,643,893.  As the

calculation described below illustrates, this sum represents the full amount of compensatory and

punitive damages, per-violation civil penalties, and prejudgment interest to which the Commonwealth is entitled and the maximum that the Constitution permits.[7]

As an initial matter, there is no dispute that the jury found Warrick's conduct caused compensatory damages of $4,563,328.  *See* Verdict Form, at 3 [Dkt. 934].  To avoid running afoul of the *Ex Post Facto* Clauses of the Massachusetts and United States Constitutions, *see* Warrick's JMOL Mem. at 14-16; *United States ex rel. Sanders* v. *Allison Engine Co., Inc.*, 667 F. Supp. 2d 747, 759 ("[r]etroactive application violates the Ex Post Facto Clause because Congress intended for the FCA to be punitive and because FCA sanctions are punitive in purpose and effect"), this amount needs to be divided between the damages caused prior to July 28, 2000, when the current version of the MFCA was enacted, and the damages caused after that date.  As the Commonwealth points out in its Motion for Entry of Judgment, the "predecessor statute to the MFCA mandated double damages" while the current version of the statute mandates trebling. *See* Pl.'s Mem. at 21 n.23 (citing G. L. c. 93, § 93B).  To do so, Warrick asked Dr. Addanki to replicate Dr. Hartman's damages calculation (apparently accepted by the jury), which he did to within $53.[8]  *See* Addanki Aff., ¶ 5a. (Tab E, Bueker Decl.).  Dividing the damages pre- and post-July 28, 2008 yields $3,155,926 in damages for the pre-July 28, 2000 period and $1,407,455 in damages for post-July 28, 2000 period.  *Id.*  Doubling the first compensatory damages amount adds $3,155,926 to the total damages award, while trebling the second compensatory damages amount adds another $2,814,910, resulting in a total damages award of $10,534,164.

Massachusetts law is clear and well-settled that a plaintiff is entitled to prejudgment interest only on that portion of the damages award representing compensatory damages.  *City*

---

[7] Warrick has set out this calculation in Exhibit D.

[8] Dr. Addanki actually calculated $53 *more* dollars than Dr. Hartman applying Dr. Hartman's damages methodology.  To be conservative, Warrick has included this small amount of additional damages in the pre- and post-July 2008 amounts that it doubles and trebles.

*Coal of Springfield* v. *Noonan*, 434 Mass 709, 716 (2001) (plaintiff "not entitled to prejudgment

interest on multiple damages portion"); *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass.

704, 717 (1990).[9]  "Prejudgment interest, as is well understood, compensates the prevailing party

for loss of the use of money that party, as determined by the judgment, should have had in the

first place and not been obliged to chase.  No similar purpose would be served by imposing

interest on punitive damages which . . . have a purpose beyond restoring to a plaintiff what

should have been his."  *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp.*, 25 Mass. App. Ct.

302, 321 (1988); *see also Glavin* v. *Eckman*, No. 02-00061, 2007 WL 751264 at *2 (Mass.

Super. Ct. Nov. 20, 2006) ("Case law has established that prejudgment interest under c. 231 . . .

does not apply to punitive damages" because "single damages provide full compensation" and

"plaintiff is entitled to pre-judgment interest only on the single damages amount").  Prejudgment

interest on the $4,563,328 in compensatory damages that the jury awarded from September 25,

2003, the date on which the case was filed, until January 25, 2011, at the statutory rate of 12%

per annum, *see* G. L. c. 231, §§ 6B, 6C, totals $4,017,729.  Together with the total damages

award, the Commonwealth is entitled to receive $14,551,893.

　　　　Finally, faithfully applying the Supreme Court's precedent in *United States* v. *Bornstein*

and applicable constitutional principles forbidding the *ex post facto* application of a more

stringent penalty to the jury's finding that Warrick made 28 false statements results in the

addition of civil penalties in an amount of $92,000.  In finding that Warrick made 28 false

statements, the jury must have accepted the Commonwealth's argument in closing that Warrick

made a false statement each time it failed to respond to an annual First DataBank request seeking

an updated WAC.  Trial. Tr. 96:1-11, Sept. 28, 2010 (arguing for finding of liability for 28

---

[9] *See also Mill Pond Assoc., Inc.* v. *E & B Giftware, Inc.*, 751 F. Supp. 299 (D. Mass. 1990) (in triple damages case, prejudgment interest not awarded on the punitive portion of the damages and "tak[ing] judicial notice" of the uniform procedure of the Superior Court to calculate prejudgment interest only on the compensatory portion).

statements consisting of "not updating, not responding to the [28] requests for updates from First DataBank, not correcting it"). Assuming that is so, sixteen of those false statements must have been made prior to July 2000, and twelve after that date.[10] Again, as the Commonwealth points out, prior to July 2000, each violation of the MFCA was punishable by a civil penalty of $2,000; currently, violations of the statute carry with them the imposition of a civil penalty of between $5,000 and $10,000 per violation. *See* Pl.'s Mem. at 21 n.23. Simply doing the math (16 x $2,000 + 12 x $5,000) results in a civil penalties award of $92,000. Thus, if the Court accepts the jury's verdict without modification, which it should not, then the Court should enter a final judgment in an amount of $14,643,893, reflecting the full amount of compensatory and punitive damages, per violation civil penalties, and prejudgment interest to which the Commonwealth is entitled. For the reasons discussed above, any judgment in excess of that amount would be more than constitutional limits permit. *See State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 426, 429; *Bajakajian*, 524 U.S. at 334; Warrick's JMOL Mem. at 14-16.

## CONCLUSION

For the foregoing reasons, and all the reasons set forth in Warrick's Rule 50(b) motion, the Court should deny the Commonwealth's motion for the entry of judgment and, instead, enter judgment in Warrick's favor. Alternatively, if the Court denies Warrick's Rule 50(b) motion, the Court should enter final judgment in the amount of at most $14,643,893.

---

[10] Both albuterol solution products were launched in 1993, while Warrick's albuterol inhaler was not launched until 1995. Presumably the jury concluded that there were ten false statements related to each of the annual updates between 1994 and 2003 for the solution products and eight false statements for the annual updates for the inhaler between 1996 and 2003. Assuming that the 2000, 2001, 2002, and 2003 annual updates each occurred after July 28, 2000, there would have been twelve post-July 2000 false statements and sixteen pre-July 2000 false statements.

Respectfully submitted,

/s/ John P. Bueker
John T. Montgomery (BBO #352220)
Douglas H. Hallward-Driemeier (BBO #627643)
John P. Bueker (BBO #636435)
Amanda L. Lydon (BBO #669235)
Ropes & Gray LLP
800 Boylston Street
Boston, MA 02199-3600
(617) 951-7000

Dated:  January 12, 2011

*Attorneys for Warrick*

## CERTIFICATE OF SERVICE

I, John P. Bueker, hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via ECF electronic filing on January 12, 2011.

/s/ John P. Bueker
John P. Bueker