UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
THE COMMONWEALTH OF             )
MASSACHUSETTS,                  )
                                )
            Plaintiff,          )
                                )
        v.                      ) CIVIL ACTION NO. 03-11865-PBS
                                )
SCHERING-PLOUGH CORPORATION,    )
SCHERING CORPORATION, &         )
WARRICK PHARMACEUTICALS         )
CORPORATION,                    )
                                )
            Defendants.         )
_____ )

**MEMORANDUM AND ORDER**

April 27, 2011

Saris, U.S.D.J.

## I. INTRODUCTION

The Commonwealth of Massachusetts claims that Schering-
Plough Corporation, Schering Corporation, and Warrick
Pharmaceuticals Corporation caused the Massachusetts Medicaid
Program to overpay for the generic drug Albuterol by fraudulently
inflating the "Wholesale Acquisition Cost" ("WAC") of the drug.
The Commonwealth argues that the spreads between defendants'
reported prices and "true" WACs ranged from 100% to 700%.
Albuterol is a drug used to prevent and treat respiratory
problems caused by lung diseases such as asthma.

After a lengthy trial, the jury returned a verdict in favor
of the Commonwealth, finding that defendants committed fraud and

violated the Massachusetts False Claims Act ("MFCA") and the Massachusetts Medicaid False Claims Act ("MMFCA"), causing the Commonwealth damages in the amount of $4,563,328. (See Jury Verdict, Docket No. 934.) Both sides have filed post-trial motions. Defendants seek judgment as a matter of law in their favor or, alternatively, a new trial. (Docket No. 936.) The Commonwealth seeks entry of judgment in its favor, along with trebled damages and an award of civil penalties. (Docket No. 946.) In addition, the parties agreed during trial that the Commonwealth's claim of breach of the implied covenant of good faith and fair dealing could be resolved by the Court as a matter of law based upon the jury's findings on the other counts. Accordingly, the Court must rule on that outstanding claim.

After a hearing and a review of the record, the Court **ALLOWS** defendants' motion for judgment as a matter of law to the extent it pertains to Prong 1 of the Massachusetts False Claims Act and to the claim of breach of the implied covenant of good faith and fair dealing. The Court also finds that application of the Massachusetts False Claims Act to conduct that occurred prior to the MFCA's passage in July 2000 would be impermissibly retroactive. This Court **DENIES** the remainder of defendants' motion. The Court **ALLOWS** the Commonwealth's motion for entry of judgment in its favor on the jury's verdict (with the exception of the verdict on Prong 1 of the MFCA), but **DENIES** the motion as

it pertains to breach of the implied covenant of good faith and fair dealing.

## II.  FACTUAL BACKGROUND

The Court assumes familiarity with the drug pricing issues discussed in its previous decisions in this case and in the related multi-district litigation.  See Massachusetts v. Mylan Labs., Inc., 608 F. Supp. 2d 127 (D. Mass. 2008); Massachusetts v. Mylan Labs., Inc., 357 F. Supp. 2d 314 (D. Mass. 2005); see also In re Pharm. Indus. Average Wholesale Price Litig., 685 F. Supp. 2d 186 (D. Mass. 2010); In re Pharm. Indus. Average Wholesale Price Litig., 478 F. Supp. 2d 164 (D. Mass. 2007);  In re Pharm. Indus. Average Wholesale Price Litig., 460 F. Supp. 2d 277 (D. Mass. 2006).

The facts below are found in the trial record, and are recited in the light most favorable to the verdict.  See Grajales-Romero v. Am. Airlines, 194 F.3d 288, 292 (1st Cir. 1999).

## A.  **MassHealth**

The Massachusetts Medicaid Program, MassHealth, is a means-tested government entitlement program, jointly financed by the federal and state governments, that provides healthcare to low-income residents in Massachusetts.  MassHealth covers 1.2 million people in the Commonwealth.

MassHealth uses a pricing algorithm to reimburse pharmacies for prescription drugs dispensed to members.  The algorithm reimburses based on the lowest of four calculations: (1) the Federal Upper Limit ("FUL") set by the federal government; (2) the Massachusetts Upper Limit Price ("MULP") set by the Commonwealth; (3) the Estimated Acquisition Cost ("EAC"), defined as a price generally paid by providers to wholesalers and estimated using WAC + 10%[1]; and (4) the Usual and Customary price ("U&C"), which is determined by the "billed amount" reported by the pharmacy submitting the claim.  The algorithm identifies which of the four prices is the lowest and adds a dispensing fee to determine the "allowed amount" that MassHealth will reimburse the pharmacist for prescription drug sales to MassHealth beneficiaries.

## B.  **Schering-Plough Corporation**

At all relevant times, defendant Schering-Plough was a publically-traded pharmaceutical holding company headquartered in New Jersey.  It had no employees, but owned various subsidiary corporations, including defendant Schering.  Schering is wholly owned by Schering-Plough and is its principal operating subsidiary.  It engages in the manufacture and sale of brand-name pharmaceutical products.  (Trial Exhibit ("TX") 2.)  In 1993,

---

[1] During the majority of the time at issue in this case, from 1995 until August 3, 2002, EAC was defined as WAC + 10%. After August 3, 2002, EAC was defined as WAC + 6%.

defendant Warrick was incorporated as a wholly-owned subsidiary of Schering. Its function was to act a generic pharmaceutical manufacturer. Warrick was designed to "[p]rotect and extend the life cycle of [Schering's] branded products as patents expire" and "create leverage in our Managed Care business," through bundling brand and generic products. (TX 12.)

On November 3, 2009, Schering-Plough merged with Merck & Co, Inc. to form the world's second-largest pharmaceutical company. (TX 2.)

## C. **Warrick's Pricing Conduct**

During the mid-1990s, Schering's largest-selling drug was Proventil, a brand-name version of the drug albuterol that is used to treat asthma and other respiratory diseases. Patent protection for Proventil expired in late 1995. In order to prevent deterioration of albuterol sales after the launch of generic competition, Schering set up Warrick Pharmaceuticals to sell generic versions of Proventil. At issue in this case are three Warrick drugs: Albuterol Sulfate (.083%), Albuterol Sulfate (.5%), and an Albuterol inhaler (90 mcg).

In December 1995, prior to launching its albuterol inhaler as a generic product, Warrick sent letters to various customers, including MassHealth, announcing the product's launch and listing its launch price as $16.06 per unit of the inhaler. This price is described as the "direct wholesale" price. The letter written

to MassHealth explained that "[t]his information is being provided in the event it is required for reimbursement purposes." (TX 8.) The $16.06 direct wholesale price was also provided to First DataBank, a company that publishes pharmaceutical pricing information. First DataBank published this direct wholesale price in its WAC field.

Warrick expected that this initial launch price would drop and provided "price protection" for its wholesale and retail pharmacy customers, meaning that if they purchased albuterol at $16.06 per unit and the price later fell, they would receive a rebate. Within six months, the price for the albuterol inhaler had fallen to $12 for all major wholesalers, and by May 2000 the price fell to $5.00 or less. Warrick did not report these price changes to MassHealth or to First DataBank.

On October 12, 1993, shortly after the launch of Warrick's albuterol solution products, Warrick sent a letter to First DataBank notifying it of a change in AWP for one of the albuterol products. The last sentence of letter said, "Please delete direct price listings from your publication or database." (TX 16.) While First DataBank did delete the direct price field from its electronic database, it did not delete the WAC prices, which were still listed at $16.06 for the albuterol inhaler. Warrick knew that First DataBank continued to publish WAC prices for Warrick's albuterol products in its electronic database.

Throughout the time period at issue in this case, First

DataBank sent notices to Warrick, listing the prices that were currently published for the three albuterol products and asking Warrick to update its prices - particularly the WAC listings. These notices stated that WACs were increasingly being used by state Medicaid program for reimbursement purposes. (See, e.g., TX 19-20, 91.) Warrick did not update its prices.

Warrick did, however, provide WAC prices to Medicaid programs in other states, such as Arkansas and Texas. For example, in 1997 Warrick sent a letter to the Texas Medicaid program listing the inhaler's WAC at $10.71. (TX 88.)

D.  **Damages**

Throughout the relevant time period, 1995-2003, the WAC used by the Commonwealth, as listed by First DataBank, to reimburse for Warrick's albuterol drugs was significantly higher than the "true" WAC. For example, in the third quarter of 2002, the price paid by MassHealth for the albuterol inhaler was 690% of the true WAC. (TX 4.) The Commonwealth's expert, Dr. Raymond Hartman, found that the Commonwealth overpaid for Warrick's albuterol drugs as a result of the false WAC prices in the amount of $4,563,328 from 1995 through 2003. (TX 5.)

The jury found in favor of the Commonwealth on all counts, and awarded full damages as calculated by Dr. Hartman.

### III.  DISCUSSION

A.  **Warrick's Motion for Judgment as a Matter of Law**

Defendants move for judgment as a matter of law or, alternatively, for a new trial.  "A party seeking to overturn a jury verdict faces an uphill battle."  <u>Marcano Rivera v. Turabo Med. Ctr. P'ship</u>, 415 F.3d 162, 167 (1st Cir. 2005).  "Courts may only grant a judgment contravening a jury's determination when 'the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party.'"  <u>Rivera Castillo v. Autokirey, Inc.</u>, 379 F.3d 4, 9 (1st Cir. 2004) (quoting <u>Keisling v. SER-Jobs for Progress, Inc.</u>, 19 F.3d 755, 759-60 (1st Cir. 1994)).  In deciding such a motion, a court must consider all evidence in the record, drawing all reasonable inferences in favor of the nonmoving party, without making credibility determinations or weighing the evidence.  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000); <u>Rivera Castillo</u>, 379 F.3d at 9.

Where there are multiple causes of action, judgment as a matter of law may be granted on a subset of the causes of action if appropriate.

### 1. The Massachusetts False Claims Act

Defendants argue that the Commonwealth has failed to prove, as a matter of law, that Warrick violated Prong 1 of the MFCA. Prong 1 of the MFCA creates liability for any person who "knowingly . . . causes to be presented, a false or fraudulent claim for payment or approval."  Mass. Gen. Laws ch. 12, § 5B(1).

This provision is modeled after the similarly worded Section 3729(a)(1) of the federal False Claims Act ("FCA"). 31 U.S.C. § 3729(a)(1). As such, Massachusetts courts look for guidance in interpreting the MFCA to cases and treatises interpreting the FCA. Scannell v. Attorney Gen., 70 Mass. App. Ct. 46, 49 n.4, 872 N.E.2d 1136, 1138 n.4 (2007) (citing Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 611, 405 N.E.2d 106, 108 (1980)).

Defendants advance two related arguments in support of their contention that the Commonwealth has presented insufficient evidence to support a cause of action under Prong 1 of the MFCA. First, they argue that their conduct was entirely unrelated to the claims submitted to MassHealth by the pharmacists and that they in no way caused the pharmacists to submit claims. Second, they argue that the claims themselves were not even false, because the false WACs were not present anywhere in the "claims" submitted by the pharmacists.

The Commonwealth argues that the claims submitted to the MassHealth were false because they were "predicated on an underlying fraudulent pricing scheme." See Massachusetts v. Mylan Labs., 608 F. Supp. 2d at 145.

Some background facts are necessary to understand the dispute. As stated above, Massachusetts regulations require MassHealth to reimburse for prescription drugs based on an algorithm, which determines the lowest of four types of prices: a) the FUL plus a dispensing fee; b) the MULP plus a dispensing

fee; c) the EAC, defined as WAC + 10%, plus a dispensing fee; or
d) the U&C charge, defined as the lowest price accepted by a
pharmacist from any third party payor on the same date of
service.  See id. at 132-33.  In order to determine the EAC for
each drug, the Commonwealth's fiscal agent uses pricing
information received from First DataBank ("FDB"), a
pharmaceutical price compendium.  FDB typically gets the WACs
from the manufacturers.  The jury could have reasonably found
that defendants initially sent FDB the pricing information and
failed to correct it although they knew the prices published by
FDB were no longer accurate.

     The false WACs provided to MassHealth by Warrick through FDB
did not pass through pharmacists to be "presented" to MassHealth.
The process was much more complex.  When a MassHealth beneficiary
purchased a Warrick albuterol product from a pharmacist, the
pharmacist submitted claim forms electronically to MassHealth's
fiscal agent (Unisys or ACS) using the Pharmacy Online Processing
System.  Those claim forms included the U&C price for the drug
purchased, but they did not contain WACs or Average Wholesale
Prices ("AWPs").  (See Trial Tr. vol. 7, 22, 91, 95-96, Sept. 16,
2010.)  The claim traveled electronically, through a network
switch, to the agent's server, where it caused, among other
things, a pricing file to be brought up.  The pricing files in
the claims at issue here included the false WACs obtained from
FDB.  The computer then compared the billed amount (U&C) in the

pharmacy's submission with the other prices in the pricing file (FUL, MULP and EAC); and selected the lowest price for reimbursement.  A communication was sent back to the pharmacy, through the network switch, telling the pharmacy whether the claim was approved and what amount would be paid.  (Milnes Dep. Tr., 107-21, 143-44, 155 (played Sept. 15-16, 2010); see also Trial Tr. vol. 7, 20-24, 27, 35-37, 70.)  This process takes an average of three seconds.  (Trial Tr. vol. 7, 20-22.)  There was evidence that many of the Usual and Customary prices submitted by the pharmacies were also false.

The claims submitted by the pharmacy contained a National Drug Code ("NDC") assigned by Warrick, that determined which pricing file was activated for comparison purposes.  (Id. at 22, 24; TX 145.)

The centerpiece of defendants' argument here is that the Supreme Court's opinion in Allison Engine precludes the Commonwealth from making a claim under Prong 1.  Allison Engine Co., Inc. v. United States ex rel. Sanders, 553 U.S. 662 (2008).  Allison Engine does not address Prong 1 of the federal FCA head-on.  It focuses, rather, on the element of intent required by claims premised on Prong 2.  Prong 2 of the operative version of the FCA in 2008 created liability for any person who knowingly uses a "false . . . statement to get a false or fraudulent claim paid or approved by the government."  31 U.S.C. § 3729(a)(2)

(2006) (amended 2009).[2]  For the purpose of explaining the

difference between the two prongs, the Court stated that "§

3729(a)(1) [of the federal False Claims Act] requires a plaintiff

to prove that the defendant 'present[ed]' a false or fraudulent

claim to the Government."  <u>Allison Engine</u>, 553 U.S. at 671.  This

statement tracks the language of the statute.  The <u>Allison Engine</u>

opinion is not dispositive on the issue of Prong 1 liability in

this case.

This Court has previously addressed this issue.  In the

opinion denying cross-cutting summary judgment motions by all

eight defendants in this case, the Court wrote:

> Here, the defendants reported false prices to
> MassHealth via the publishing compendium knowing that
> pharmacies would present claims to MassHealth which
> will be reimbursed based on a formula that utilizes the
> inflated price to determine the appropriate
> reimbursement amount.  Thus, although the manufacturers
> do not themselves submit claims to the Commonwealth,
> and the claims do not themselves contain WACs or AWPs,
> the claims here were predicated on an underlying
> fraudulent pricing scheme.  The defendants are thus
> chargeable with causing false claims to be presented to
> the Commonwealth.

<u>Massachusetts v. Mylan Labs.</u>, 608 F. Supp. 2d 127, 145 (D. Mass.

2008) (internal citations omitted).  In the summary judgment

opinion, however, the Court did not differentiate between the two

prongs of the MFCA, which were both in play.

---

[2] Similarly, Prong 2 of the MFCA creates liability for any
person who "knowingly makes, uses, or causes to be made or used,
a false record or statement to obtain payment or approval of a
claim by the commonwealth or any political subdivision thereof."
Mass. Gen. Laws ch. 12 §, 5B(2).

Plaintiff argues vigorously that there is longstanding Supreme Court precedent to support liability under Prong 1 where the claim is predicated on a false scheme, but does not itself contain false information. In <u>United States ex rel. Marcus v. Hess</u>, 317 U.S. 537 (1943), the Court dealt with a case involving electrical contractors who submitted claims for payment to local government entities as opposed to submitting claims directly to the federal government. Those claims, however, were ultimately paid with funds originating from the federal government. The government argued that the contractors had defrauded the government by engaging in collusive bidding with other contractors. The Court found the contractors liable under Prong 1 of the FCA, and held that "[b]y their conduct, the [contractors] thus caused the government to pay claims of the local sponsors in order that they might in turn pay [the contractors] under contracts found to have been executed as the result of the fraudulent bidding." <u>Id.</u> at 543. The Court noted that the various prongs of the FCA, "considered together, indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." <u>Id.</u> at 544-45. Ultimately, the contractors were found to be liable under Prong 1. Although <u>Marcus v. Hess</u> dealt with an earlier version of the FCA, the "caused to be presented" language in Prong 1 was

identical to the language at issue in the MFCA.

The Commonwealth claims that <u>Hess</u> supports the contention that the false information does not necessarily need to be contained within the four corners of the claim when it is presented to the government. It argues that because the falsity involved in <u>Hess</u> was the collusive bidding underlying the selection process for contractors, there was no legal requirement that the explicitly false information be contained in the claim presented to the government.[3]

This argument is not persuasive in the circumstances here. Although the Commonwealth relies heavily on the "grounded in fraud" language used in <u>Marcus v. Hess</u>, that language has largely been abandoned in modern FCA cases. Indeed, the First Circuit has repeatedly held that "[e]vidence of an actual false claim is 'the sine qua non of a False Claims Act violation.'" <u>United States ex rel. Karvelas v. Melrose-Wakefield Hosp.</u>, 360 F.3d 220, 225 (1st Cir. 2004) (quoting <u>United States ex rel. Clausen v. Lab. Corp. of Am., Inc.</u>, 290 F.3d 1301, 1311 (11th Cir. 2002)). Defendants' argument, then, raises the question of whether or not

---

[3] Defendants note that the lower court in <u>Hess</u> wrote that "the defendant-contractors, in submitting their bids which were approved by the [federal] PWA Administrator, submitted signed statements" that "certifie[d] that this Proposal is genuine and not sham or collusive." <u>United States ex rel. Marcus v. Hess</u>, 41 F. Supp. 197, 206 (W.D. Pa. 1941). Accordingly, in their view the bids <u>presented</u> to the government included a false certification. However, these bids themselves were not a claim for payment.

the claims, submitted by the pharmacists to MassHealth, were false or fraudulent. The overwhelming evidence at trial was that the pharmacists' claims were factually false because the reported U&C prices were inaccurate. However, defendants had no role in causing that independent falsehood.

The Commonwealth argues that the "claim" submitted to MassHealth should not be viewed narrowly as simply the bill submitted by the pharmacist, but should encompass the electronic claim form and the pricing file, which included the WACs. As stated earlier, Warrick reported prices to First DataBank, which then forseeably provided price reporting services to MassHealth for use in its pricing algorithm. While a close question, the transmission of false data to the government for use in a statutory or regulatory algorithm, without any collusion between Warrick and the pharmacists in a fraudulent scheme, does not appear to be governed four-square by Hess.

There is no precedent supporting the Commonwealth's argument that the defendants' conduct falls within that contemplated in Prong 1 of the MFCA. It appears that the Commonwealth's theory collapses Prong 1 and Prong 2, vitiating the important differences between them. Such an interpretation of the MFCA would violate the well-established rule disfavoring statutory interpretations that render words or phrases "mere surplusage." See Carter v. United States, 530 U.S. 255, 262 (2000) (quoting Potter v. United States, 155 U.S. 438, 446 (1894)); see also

United States v. Menasche, 348 U.S. 528, 538-39 (1955) ("It is
our duty to give effect, if possible, to every clause and word of
a statute . . . .") (internal citations omitted); Continental
Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 555 F.3d 399, 410
n.32 (5th Cir. 2009) (citing "the requirement that our
interpretations not create redundancies").

Accordingly, the Court allows Warrick's motion for judgment
as a matter of a law as to the Commonwealth's claims under Prong
1 of the Massachusetts False Claims Act.

### 2.    Retroactivity of the MFCA

The Massachusetts False Claims Act was enacted on July 1,
2000.  The damages period in this case begins in 1995 and ends in
2003.  The Commonwealth asserts that the MFCA should be
retroactively applied to defendants' actions occurring before the
MFCA's effective date of July 1, 2000.  Defendants claim that
retroactive application is impermissible.[4]

The MFCA increases penalties and damages above and beyond
the previous state law that governed false claims.  Prior to the
enactment of the MFCA, defendants' actions would have been
governed by Mass. Gen. Laws ch. 93, § 9B, repealed by 2000 Mass.
Legis. Serv. Ch. 159 (H.B. 5300).  The old law provided for a

_____

[4] The Commonwealth contends that Warrick has waived its
retroactivity argument because it did not raise the issue in a
Rule 12 motion to dismiss prior to the end of trial.  See Fed. R.
Civ. P. 12(h)(2).  However, defendants' argument goes to the
amount of damages and penalties, and need not have been raised
earlier.

forfeiture of $2,000 for each violation, double damages, and the costs of the action. Id. The MFCA imposes penalties of $5,000 to $10,000 per claim on top of trebled compensatory damages and prejudgment interest. Mass. Gen. Laws ch. 12, § 5B; id. ch. 231, § 6H. In addition, the MFCA allows for consequential damages. Id. ch. 12, § 5B.

The MFCA is facially unambiguous in intending to permit retroactive application. Mass. Gen. Laws ch. 12, § 5K(1) ("A civil action . . . may be brought for acts or omissions that occurred prior to the effective date of this section . . . .").[5] However, this Court cannot retroactively apply the MFCA if such application would collide with the Ex Post Facto Clause applicable to the states. U.S. Const. art. I, § 10, cl. 1.

The constitutional prohibition on ex post facto laws usually applies to criminal statutes. Landgraf v. USI Film Prods., 511 U.S. 244, 266 n.19 (1994) (citations omitted). However, a civil statute may violate the Ex Post Facto Clause if it is "'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'" Kansas v. Hendricks, 521 U.S.

---

[5] Warrick argues that the statute does not evidence a clear intent to apply the MFCA retroactively, because the above-quoted clause does not explicitly say that the MFCA's penalties may apply to a civil action brought prior to the statute's effective date. This argument has no merit. Section 5K of the MFCA clearly states that a civil action "pursuant to section[] 5B" may be brought for acts or omissions that occurred prior to the effective date. Section 5B prescribes nondiscretionary fines and damages.

346, 361 (1997) (quoting United States v. Ward, 448 U.S. 242,
248-49 (1980)).  In other words, the Ex Post Facto Clause may "be
applied in civil cases where the civil disabilities disguise
criminal penalties."  Louis Vuitton S.A. v. Spencer Handbags
Corp., 765 F.2d 966, 972 (2d. Cir. 1985).  "In those limited
circumstances, we will consider the statute to have established
criminal proceedings for constitutional purposes."  Kansas, 521
U.S at 361.

     Not every civil sanction with punitive effects implicates
the Ex Post Facto Clause.  See Hudson v. United States, 522 U.S.
93, 102 (1997).  "[E]ven remedial statutes carry the 'sting of
punishment.'"  Dep't of Revenue of Mont. v. Kurth Ranch, 511 U.S.
767, 777 n.14 (1994) (citing Marcus v. Hess, 317 U.S. at 551).
"It is hard to imagine a sanction that has no punitive aspect
whatsoever."  United States v. Ursery, 518 U.S. 267, 284 n.2
(1996).  A civil sanction only violates the Ex Post Facto Clause
when the statute is so punitive (measured on its face and not
simply as applied) as to convert the civil sanction into a
criminal penalty.  Hudson, 522 U.S. at 100.  "'[O]nly the clearest
proof' will suffice to override legislative intent and transform
what has been denominated a civil remedy into a criminal
penalty.'"  Id. (citing Ward, 448 U.S. at 249).

     "Whether a particular punishment is criminal or civil is, at
least initially, a matter of statutory construction."  Id. at 99
(citing Helvering v. Mitchell, 303 U.S. 391, 399 (1938)).  The

-18-

Court must first ask whether the legislature, "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." Ward, 448 U.S. at 248. The Massachusetts legislature intended the MFCA to be a civil and not a criminal statute. See Mass. Gen. Laws ch. 12, § 5K (discussing MFCA as a "civil action" and contemplating a separate "criminal proceeding charging fraud"); id. § 5B (casting fines as "a civil penalty"). However, even in those cases where the legislature "has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect," Ward, 448 U.S. at 248-49, as to "transform[] what was clearly intended as a civil remedy into a criminal penalty." Rex Trailer Co. v. United States, 350 U.S. 148, 154 (1956). The Ex Post Facto Clause prohibits "impos[ing] additional punishment to that then prescribed." Cummings v. Missouri, 71 U.S. 277, 326 (1866).

The MFCA makes several significant changes to the damages and penalties provisions of the previous law. It increases the damages ceiling from double to treble damages, and increases the penalty amount per claim from $2,000 to a range of $5,000 to $10,000. It also provides for consequential damages, prejudgment interest, attorney's fees, and costs of the action. Mass. Gen. Laws ch. 12, § 5B; id. ch. 231, § 6H.

The question, then, is whether there is clear proof that the MFCA crosses the line to be "so punitive in purpose or effect as

to negate the State's intention to deem it civil." <u>Kansas</u>, 521 U.S at 361 (internal citations omitted); <u>see also</u> <u>Hudson</u>, 522 U.S. at 100-05 (holding that certain civil penalties are not "so punitive" in form and effect as to render them criminal).

Massachusetts courts look to federal False Claims Act cases when interpreting the MFCA because the MFCA "was modeled on the similarly worded Federal False Claims Act, 31 U.S.C. §§ 3729 et seq." <u>Scannell</u>, 70 Mass. App. Ct. at 49 n.4. While federal cases are instructive, they are not necessarily dispositive when interpreting the MFCA, as there are important differences between the liability provisions in the statutes. Most notably, the MFCA allows for consequential damages, whereas the FCA excludes consequential damages. <u>Compare</u> Mass. Gen. Laws ch. 12, § 5B, <u>with</u> 31 U.S.C. § 3729 (2000); <u>see also</u> <u>Cook County, Ill. v.</u> <u>United States ex rel. Chandler</u>, 538 U.S. 119, 131 n.9 (2003) ("The treble damages provision [of the FCA] was, in a way, adopted by Congress as a substitute for consequential damages."). In addition, Massachusetts law provides for prejudgment interest on damages awarded under the MFCA at the statutory rate of twelve percent, whereas the FCA has no separate provision for prejudgment interest. <u>Compare</u> Mass. Gen. Laws ch. 231, § 6H, <u>with</u> <u>Chandler</u>, 538 U.S. at 131.

There is some Supreme Court precedent on the question of whether the FCA is punitive. In <u>Vermont Agency of Natural</u> <u>Resources v. United States ex rel. Stevens</u>, 529 U.S. 765 (2000),

the Court considered the question in the context of an inquiry into the application of <u>qui tam</u> liability to the states. The Court wrote that "the current version of the FCA imposes damages that are essentially punitive in nature . . . ." <u>Id.</u> at 784. However, three years later the Court again considered whether or not the FCA was punitive, this time in the context of applicability to municipalities. <u>Chandler</u>, 538 U.S. at 131. There, the Court explained that "it is important to realize that treble damages have a compensatory side, serving remedial purposes in addition to punitive objectives." <u>Id.</u> at 130 (citing <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 635-36 (1985); <u>Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.</u>, 456 U.S. 556, 575 (1982)). "While the tipping point between payback and punishment defies general formulation, being dependent on the workings of a particular statute and the course of particular litigation, the facts about the FCA show that the damages multiplier has compensatory traits along with the punitive." <u>Id.</u> Neither <u>Chandler</u> nor <u>Vermont Agency</u> addresses punitive damages in the context of the Ex Post Facto Clause.[6]

---

[6] Although Congress amended the FCA in 1986 and many cases raised the question of retroactivity, the cases focused on whether Congress had expressed a clear intent that the amendments be applied retroactively. In 1997, the Supreme Court ruled that Congress had not expressed a clear intent, and that the presumption against retroactive application required prospective application. <u>See</u> <u>Hughes Aircraft Co. v. United States ex rel. Schumer</u>, 520 U.S. 939, 946 (1997). Accordingly, the Supreme Court has never directly addressed the question of whether

The D.C. Circuit has held that the Ex Post Facto Clause is not implicated by retroactive application of the 2009 amendments to the FCA because the FCA is not penal. <u>United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.</u>, 608 F.3d 871, 878 (D.C. Cir. 2010) (citing <u>Hudson</u>, 522 U.S. at 100-03). District courts have split on the question. <u>See</u> <u>United States ex rel. Drake v. NSI, Inc.</u>, No. 3:94-cv-963, 2010 WL 3417854, at *5-11 (D. Conn. Aug. 26, 2010) (holding after extensive discussion that the FCA does not violate the Ex Post Facto Clause); <u>United States ex rel. Sanders v. Allison Engine Co.</u>, 667 F. Supp. 2d 747, 753 (S.D. Ohio 2009) (holding that the FCA's monetary penalties have historically been regarded as punishment, and providing legislative history and case law to support the punitive nature of the FCA sanctions specifically and treble damages generally); <u>United States ex rel. Baker v. Community Health Sys., Inc.</u>, 709 F. Supp. 2d 1084, 1110 (D.N.M. 2010) (agreeing with and adopting the ex post facto analysis in the lower court opinion in <u>Allison Engine</u>).[7]  The First Circuit has not addressed the issue.

---

retroactive application of the FCA implicates the Ex Post Facto Clause.

[7] In addition, this Court has previously written on the competing purposes of the FCA. <u>See</u> <u>Fresenius Med. Care Holdings, Inc. v. United States</u>, No. 08-cv-12118-PBS, 2010 WL 2595541, at *4-5 (June 24, 2010) (recognizing that the facts about the FCA show that the damages multiplier has compensatory traits along with punitive, and concluding that courts must apply a multi-factor test to determine whether a civil penalty violates the Double Jeopardy Clause) (citing <u>Chandler</u>, 538 U.S. at 130; <u>Hudson</u>, 522 U.S. at 99-101).

The analysis adopted by the Supreme Court to determine if a sanction is punitive for the purposes of the Ex Post Facto Clause is the seven-factor test outlined in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963). The seven factors to determine whether a legislative act is "penal or regulatory in character" are (1) whether the sanction involves an affirmative disability or restraint; (2) whether the sanction has historically been regarded as a punishment; (3) whether the sanction comes into play only on a finding of scienter; (4) whether operation of the sanction will promote the traditional aims of punishment of retribution and deterrence; (5) whether the behavior to which the sanction applies is already a crime; (6) whether an alternative purpose to which the sanction may rationally be connected is assigned to the sanction; and (7) whether the sanction appears excessive in relation to the alternative purpose assigned. 372 U.S. at 168-69. The Supreme Court warns that these factors are "neither exhaustive nor dispositive" but are simply "useful guideposts." Smith v. Doe, 538 U.S. 84, 97 (2003) (internal citations omitted).

      i.   Affirmative Disability or Restraint

The first Kennedy factor looks at whether a punishment imposes an "affirmative disability or restraint," which occurs when the sanction approaches "the infamous punishment of imprisonment." Hudson, 522 U.S. at 104 (internal citations omitted). Because the sanctions under the MFCA do not approach

imprisonment, this factor weighs in favor of a finding that the MFCA sanctions are civil and regulatory in purpose or effect.

ii.   Historical Context of the Sanction

Second, Kennedy inquires whether the sanction has historically been considered to be a punishment.  In Hudson, the Supreme Court held that money penalties have not historically been viewed as punishment and that "the payment of fixed or variable sums of money is a sanction which has been recognized as enforcible by civil proceedings since the original revenue law of 1789."  522 U.S. at 104 (internal citations and quotation marks omitted); cf. Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 264-65 (1989) ("[T]he First Congress . . . did not discuss what was meant by the term 'fines,' or whether the prohibition had any application in the civil context. . . . Then, as now, fines were assessed in criminal, rather than in private civil, actions.").

As such, historically money penalties were imposed in both civil and criminal contexts.  This factor does not weigh strongly in favor of either camp.

iii. Scienter Requirement

Third, Kennedy asks whether the statute's sanctions come into play only upon a finding of scienter.  Courts have held that the Kennedy scienter requirement is satisfied by means of a statute that requires a person to act "knowingly."  See, e.g., Cutshall v. Sundquist, 193 F.3d 466, 475 (6th Cir. 1999) (citing

-24-

<u>Herbert v. Billy</u>, 160 F.3d 1131, 1137-38 (6th Cir. 1998));
<u>Noriega-Perez v. United States</u>, 179 F.3d 1166, 1173 (9th Cir.
1999); <u>LaCrosse v. Commodity Futures Trading Comm'n</u>, 137 F.3d
925, 931 (7th Cir. 1998).  The MFCA has a clear scienter
requirement.  Mass. Gen. Laws ch. 12, § 5B (requiring a finding
that a person acted "knowingly").  This factor weighs in favor of
a finding that the MFCA sanctions are punitive.

> iv.  <u>Retribution and Deterrence</u>

The fourth <u>Kennedy</u> factor asks whether operation of the
sanction will promote the traditional aims of punishment -
retribution and deterrence.  The MFCA provides for consequential
damages, high prejudgment interest, costs and attorney's fees on
top of the FCA penalties and trebling of damages.  It is
significantly more penal than the FCA.  These penalties primarily
promote the rationales of retribution and deterrence because
compensation is fully provided by the other provisions of the
statute.  <u>See</u> <u>Allison Engine</u>, 667 F. Supp. 2d at 757 (finding
that the FCA's monetary sanctions promote the traditional
punitive goal of deterrence).  This factor weighs in favor of a
finding that the MFCA sanctions are punitive.

> v.  <u>Criminal Behavior</u>

<u>Kennedy</u> suggests that if behavior is already criminalized,
then a sanction that addresses the same behavior in a civil
statute may in fact be punitive.  372 U.S. at 168 n.26 (citing
cases holding same).  <u>Kennedy</u> relies on other cases to explicate

this factor, such as <u>United States v. La Franca</u>, 282 U.S. 568,

572-73 (1931) (quoting <u>United States v. Chouteau</u>, 102 U.S. 603,

611 (1880) ("Admitting that the penalty may be recovered in a

civil action, as well as by a criminal prosecution, it is still

as a punishment for the infraction of the law.  The term

'penalty' involves the idea of punishment, and its character is

not changed by the mode in which it is inflicted, whether by a

civil action or a criminal prosecution.")).

Presentation of false claims can be prosecuted criminally by

the Commonwealth.  Mass. Gen. Laws ch. 266, § 67B.  Accordingly,

the fifth <u>Kennedy</u> factor weighs in favor of a finding that the

MFCA sanctions are punitive.

vi.  <u>Alternative Purpose</u>

Sixth, <u>Kennedy</u> considers whether there is an alternative

purpose to which the sanction may rationally be connected.  In

<u>Vermont Agency</u>, the Court held that the FCA is "essentially

punitive in nature," noting that "[a]lthough this Court suggested

that damages under an earlier version of the FCA were remedial

rather than punitive, that version of the statute imposed only

double damages and a civil penalty of $2,000 per claim; the

current version, by contrast, generally imposes treble damages

and a civil penalty of up to $10,000 per claim."  529 U.S. at

784-85 (internal citations omitted).  Later, in <u>Chandler</u>, the

Court asserted that "the facts about the FCA show that the

damages multiplier has compensatory traits along with the

punitive." 538 U.S. at 130. To reach that conclusion, <u>Chandler</u> points out that "[t]he FCA has no separate provision for prejudgment interest, which is usually thought essential to compensation, and might well be substantial given the FCA's long statute of limitations. Nor does the FCA expressly provide for the consequential damages that typically come with recovery for fraud." 538 U.S. at 131 (internal citations omitted). <u>Chandler</u> further notes that "[t]he treble damages provision [of the FCA] was, in a way, adopted by Congress as a substitute for consequential damages." <u>Id.</u> at 131 n.9.

Here, in contrast, the MFCA specifically allows for "three times the amount of damages, including consequential damages" along with attorney's fees and litigation costs. Mass. Gen. Laws ch. 12, § 5B. Moreover, Massachusetts law provides for civil penalties of $5,000 to $10,000, along with prejudgment interest on damages. Mass. Gen. Laws ch. 231, § 6H (2010). These provisions appear to go far beyond making the Commonwealth whole. Therefore, the civil penalties are primarily punitive in nature.

This factor, as applied to the MFCA, weighs in favor of a finding that the MFCA sanctions are punitive.

vii. <u>Excessiveness</u>

Finally, <u>Kennedy</u> asks whether the sanction appears excessive in relation to the alternative purpose assigned. Because the Court finds that there is no alternative compensatory purpose for the penalties because the interest and money damages satisfy any

compensatory purpose, consideration of this factor carries little or no weight in the context of the MFCA.

Four of the seven <u>Kennedy</u> factors, as applied to the MFCA, provide clear proof that the MFCA sanctions are "so punitive either in purpose or effect" as to transform the MFCA into a criminal penalty for ex post facto purposes. Accordingly, the defendants' liability is governed by Mass. Gen. Laws ch. 93, § 9B for actions up to and including July 27, 2000, and by the MFCA (as Mass. Gen. Laws ch. 12, §§ 5A-5O) on and after July 28, 2000.[8]

Nonetheless, the Commonwealth is still entitled to treble damages for the entire time period at issue in this case, albeit not under the MFCA. The Massachusetts Medicaid False Claims Act, Mass. Gen. Laws ch. 118E, § 44, was enacted in 1993 and provides for treble damages. Accordingly, the Court's retroactivity holding affects the amount of civil penalties to which the Commonwealth is entitled.

### 3. Implied Covenant of Good Faith and Fair Dealing

---

[8] The parties disagree as to whether the effective date of the MFCA should be July 1, 2000 or July 28, 2000. The legislative history shows that the repeal of Mass. Gen. Laws ch. 93, § 9B and the enactment of the MFCA (as Mass. Gen. Laws ch. 12, §§ 5A-5O) were both part of an omnibus appropriations bill signed on July 28, 2000. <u>See</u> 2000 Mass. Legis. Serv. Ch. 159 (H.B. 5300). This bill contained an emergency preamble making the bill immediate law, <u>id.</u>, and retroactive to July 1, 2000, <u>id.</u> § 498. Since this retroactivity provision also implicates the Ex Post Facto Clause, the Court picks the latter date.

Both parties have moved for entry of judgment as a matter of law as to the Commonwealth's claim that Warrick breached the implied covenant of good faith and fair dealing related to the Medicaid Rebate Agreement that Warrick entered into with the federal government. At trial, the Court decided, with the agreement of the parties, that defendants' liability on this claim was a question of law to be decided by the Court after the verdict based, in part, on whether the jury found that defendants' conduct violated the MFCA, the MMFCA and/or constituted common law fraud. (<u>See</u> Trial Tr. vol. 14, 217-19, Sept. 27, 2010.) The jury found defendants liable on all three counts.

A threshold issue is whether the Commonwealth can even make a claim of breach of the implied covenant of good faith and fair dealing in the context of the Medicaid Rebate Agreement. It is undisputed that the Commonwealth is not a signatory to the Medicaid Rebate Agreement. The agreement was entered into only by Warrick and the federal government, although the agreement states that the Secretary of HHS enters the agreement "on behalf of [HHS] and all States." Accordingly, the Commonwealth's claim of breach of the implied covenant of good faith and fair dealing is brought under a third-party beneficiary theory. Warrick argues that such a claim is barred by the Supreme Court's recent decision in <u>Astra USA, Inc. v. Santa Clara County</u>, 563 U.S. __ , 131 S. Ct. 1342 (2011). In <u>Astra</u>, the Supreme Court held that

340B entities, such as Santa Clara County, could not sue as third party beneficiaries to enforce the terms of pharmaceutical pricing agreements (PPAs) between manufacturers and the federal government.[9]  The Astra decision is relevant to this case because "[t]he 340B Program is tied to the earlier-enacted, much larger Medicaid Drug Rebate Program" and the Court indicates that the two agreements should be treated similarly.  Id. at 1345.

In its opinion, the Court noted that 340B entities "have no right of action under § 340B itself."  Id. at 1347.  Likewise, the Medicaid Rebate Act provides no private right of action.  The Supreme Court explained that "[t]he 340B Program, like the Medicaid Drug Rebate Program, employs a form contract as an opt-in mechanism" to the statutory programs for drug manufacturers. Id. at 1346.  As such, these agreements "simply incorporate statutory obligations and record the manufacturers' agreement to abide by them.  The form agreements, composed by HHS, contain no negotiable terms."  Id. at 1348.  "The statutory and contractual obligations, in short, are one and the same."  Id.  Because the PPAs, and the Medicaid Rebate Agreements, are not traditional contracts, a "third-party suit to enforce an HHS-drug manufacturer agreement . . . is in essence a suit to enforce the

_____

[9] "Section 340B of the Public Health Services Act . . . imposes ceilings on prices drug manufacturers may charge for medications sold to specified health care facilities.  Those facilities [known as 340B entities] . . . include public hospitals and community health centers, many of them providers of safety-net services to the poor."  Astra, 131 S. Ct. at 1345.

-30-

statute itself.  The absence of a private right to enforce the
statutory . . . obligations would be rendered meaningless if 340B
entities could overcome that obstacle by suing to enforce the
contract's . . . obligations instead." Id. (citing Grochowski v.
Phoenix Constr., 318 F.3d 80, 86 (2d Cir. 2003) (when a
government contract confirms a statutory obligation, "a third-
party private contract action [to enforce that obligation] would
be inconsistent with . . . the legislative scheme . . . to the
same extent as would a cause of action directly under the
statute")).

The holding in Astra does not address actions brought by
states to enforce Medicaid Rebate Agreements.  Indeed, in an
amicus curiae brief to the Supreme Court in support of the drug
manufacturer in Astra, the United States distinguished suits
brought by states: "Third-party beneficiary suits by covered
[340B] entities are thus quite different from suits by States to
enforce manufacturers' obligations under the Medicaid Rebate
Program. . . . [T]he Medicaid Rebate Program, like Medicaid
generally, is a cooperative federal-state program, in which
States make their own payments to manufacturers and therefore
have long played a role in identifying and prosecuting fraud."
Brief for United States as Amicus Curiae at 34 n.14, Astra USA,
Inc. v. Santa Clara County, 131 S. Ct. 1342 (No. 09-1273), 2010
WL 4717264 (internal citations omitted).  Congress envisioned the
states playing an important role in prosecuting and preventing

Medicaid fraud.  In 1977, Congress authorized the creation of

Medicaid Fraud Control Units (MFCUs) by individual states.  See

Medicare-Medicaid Fraud and Abuse Amendments of 1977, Pub. L. No.

95-142.  In 1993, Congress mandated that all states establish

MFCUs.  42 U.S.C. § 1396(a)(61).

The question of Astra's application to the instant case is

quite difficult, as the states do play a unique role in pursuing

Medicaid fraud, and the Medicaid Rebate Agreements impose certain

duties on manufacturers with respect to the States.  However,

this Court need not decide the issue[10], as the Court finds that,

as a matter of law, the Commonwealth cannot maintain an action

for breach of the implied covenant of good faith and fair dealing

based on the trial record in this case.

The covenant of good faith and fair dealing means "that

'neither party shall do anything that will have the effect of

destroying or injuring the rights of the other party to receive

the fruits of the contract.'"  Speakman v. Allmerica Financial

Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (quoting

---

[10] The Astra decision does not invalidate the jury's verdict
in the Commonwealth's favor as to the state common law and
statutory fraud claims.  See id. at 1349 n.5 ("The County notes
that in In re Pharmaceutical Industry Average Wholesale Price
Litigation, 263 F. Supp. 2d 172 (D. Mass. 2003), the United
States urged that the statute establishing the Medicaid Drug
Rebate Program, § 1396r-8, does not preempt States from
maintaining state-law fraud claims based on fraudulent reporting
of 'best prices' to HHS. . . .  See Brief for United States as
Amicus Curiae in No. 01-cv-12257 (D. Mass.), pp. 6-9 (observing
that States make their own payments to manufacturers and have
long played a role in identifying and prosecuting Medicaid
fraud).  We take no position on this issue.").

<u>Anthony's Pier Four, Inc. v. HBC Assocs.</u>, 411 Mass. 451, 471, 583

N.E.2d 806, 820 (1991)).  "A party may breach the covenant of

good faith and fair dealing implicit in every contract without

breaching any express term of that contract.  Otherwise, the

implied covenant would be a mere redundancy."  <u>Id.</u> (citing

<u>Fortune v. Nat'l Cash Register Co.</u>, 373 Mass. 96, 101, 364 N.E.2d

1251, 1255-56 (1977)); <u>see also</u> <u>Bergeron v. Ridgewood Secs.</u>

<u>Corp.</u>, 610 F. Supp. 2d 113, 141 (D. Mass. 2009) ("The implied

covenant of good faith and fair dealing is a judicial convention

designed to protect the spirit of an agreement when, without

violating an express term of the agreement, one side uses

oppressive or underhanded tactics to deny the other side the

fruits of the parties' bargain.") (internal citations omitted).

According to the Restatement (Second) of Contracts, "[g]ood faith

performance or enforcement of a contract emphasizes faithfulness

to an agreed common purpose and consistency with the justified

expectations of the other party."  <u>Id.</u> § 205, cmt. a.  "The

essential inquiry is whether the challenged conduct conformed to

the parties' reasonable understanding of performance obligations,

as reflected in the overall spirit of the bargain, not whether

the defendant abided by the letter of the contract in the course

of performance."  <u>Speakman</u>, 367 F. Supp. 2d at 132.  However, the

"requirement of good-faith performance ultimately is

circumscribed by the obligations - the contractual 'fruits' -

actually contained in the agreement."  <u>AccuSoft Corp. v. Palo</u>,

237 F.3d 31, 45 (1st Cir. 2001).  "Thus, the covenant may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship."  Speakman, 367 F. Supp. 2d at 132.

The Commonwealth claims that the intended "fruits" of the Medicaid rebate agreement were to give state Medicaid programs the benefit of the best price at which the manufacturer sells the drug to any public or private purchaser.  While defendants may have reported accurate AMPs for purposes of the rebate agreement, the argument goes, they sabotaged the intended benefit of the agreement by simultaneously reporting, and failing to correct, inflated published prices, thereby inflating reimbursement and negating the value of the rebates.  Accordingly, the Commonwealth contends that defendants destroyed the value of the agreement to the Commonwealth.

Warrick, on the other hand, claims that, in exchange for allowing drug manufacturers to have their drugs reimbursed by the Medicaid program, the Medicaid Rebate Agreement entitles states to receive rebate payments from the drug manufacturers in specified amounts calculated with reference to certain measures - AMP and Best Price - as defined in the rebate agreement.  The Center for Medicare and Medicaid Services uses the AMPs and Best Prices reported by manufacturers to calculate a Unit Rebate Amount (URA) for each drug, typically 11% of the AMP for generic drugs, and sends this data to the states, including the

Commonwealth. The Commonwealth then uses URAs to invoice manufacturers for rebates based on drug quantities.

While the Commonwealth was injured by Warrick's conduct in failing to update the WACs published by FDB because it reimbursed for albuterol at grossly and fraudulently inflated prices, there is no evidence that the injury was increased by the AMPs or Best Prices reported under the auspices of the Medicaid Rebate Agreement. In other words, the rebate amount would have been the same regardless of the accuracy of the WACs listed by FDB. Although the purpose of the Medicaid Rebate program is to reduce states' expenditures on Medicaid reimbursement, the mechanism by which the Rebate Agreements accomplish that goal has nothing to do with the initial reimbursement amount.

Accordingly, the Court concludes that the defendants did not breach the implied covenant of good faith and fair dealing, and will enter judgment on this claim for the defendants.

**B.    The Commonwealth's Motion for Entry of Judgment**

The Commonwealth moves for entry of judgment in its favor based on the jury's verdict. (Docket No. 934.) With the exception of the Commonwealth's claims under Prong 1 of the MFCA and breach of the implied covenant of good faith and fair dealing, the Court will allow the Commonwealth's motions as to all remaining claims, including Prong 2 of the MFCA, the Massachusetts Medicaid False Claims Act and common law fraud.

The jury found that the Commonwealth suffered damages in the amount of $4,563,328.  Under the MMFCA, that amount must be trebled.  Damages will be awarded in the amount of $13,689,984.

In addition, the Massachusetts False Claims Act provides for civil penalties.  Prong 2 of the MFCA creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof." Mass. Gen. Laws ch. 12 § 5B(2).  The jury found that Warrick made 28 false statements in violation of Prong 2 of the MFCA, and the Court will award civil penalties based on that number.  For statements made before July 28, 2000, state law provides for a $2,000 penalty per statement.  Sixteen of the false statements at issue in this case were made before July 28, 2000, resulting in civil penalties totaling $32,000.  (<u>See</u> Warrick's Response to the Commonwealth Mot. For Entry of Judgment, Ex. D.)  For the remaining twelve statements made after July 28, 2000, the MFCA provides for penalties between $5,000 and $10,000.  The Court will award $10,000 for each post-2000 false statement, totaling $120,000.  Therefore, total civil penalties awarded to the Commonwealth equal $152,000.

Under Massachusetts law, the Commonwealth is entitled to prejudgment interest on actual damages at a rate of 12% per annum.  <u>See</u> Mass. Gen. Laws ch. 231 §§ 6B, 6C, 6H.  The award of prejudgment interest is not trebled.  <u>See</u> <u>McEvoy Travel Bureau,</u>

Inc. v. Norton Co., 408 Mass. 704, 716-18, 563 N.E.2d 188, 196-97 (1990); Makino, U.S.A., Inc. v. Metlife Capital Credit Corp., 25 Mass. App. Ct. 302, 320-21, 518 N.E.2d 519, 529-30 (1988).  In addition, the Commonwealth is entitled to costs of this litigation, including attorney's fees.  Mass. Gen. Laws ch. 12, § 5B.

## IV.  ORDER

The Court **ALLOWS** defendants' Motion for Judgment as a Matter of Law (Docket No. 936) as to the Commonwealth's claims under Prong 1 of the Massachusetts False Claims Act and for breach of the implied covenant of good faith and fair dealing, and **DENIES** the motion as to all other claims.

The Court **ALLOWS** the Commonwealth's Motion for Entry of Judgment (Docket No. 946) and **ORDERS** the entry of judgment in favor of the Commonwealth as to Prong 2 of the Massachusetts False Claims Act, the Massachusetts Medicaid False Claims Act, and common law fraud.  Pursuant to the jury's verdict, the Court awards treble damages to the Commonwealth in the amount of $13,689,984 and civil penalties in the amount of $152,000, for a total of $13,841,984.  This amount does not include prejudgment interest, attorney's fees, or costs.  The Court anticipates that the parties will file calculations of prejudgment interest in conjunction with their proposed forms of judgment.

The parties shall submit proposed forms of judgment conforming to this order within fourteen days.


                                        /s/ PATTI B. SARIS
                                        PATTI B. SARIS
                                        United States District Judge